UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,                          :

                 Plaintiff,              :     90 Civ. 5722 (CSH)

     -against-                                       :
                                             MEMORANDUM OPINION
DISTRICT COUNCIL OF NEW YORK CITY AND        :     AND ORDER
VICINITY OF THE UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF AMERICA, et al.,   :

                Defendants.      :
------------------------------------------------------------------------X

Haight, Senior District Judge:

      In this civil RICO action against a labor organization, the government moves for an order

holding the organization and its president in contempt of a consent decree previously entered in the

case. The question presented is whether collective bargaining agreements entered into by the labor

organization with employers violated the consent decree.

## I. BACKGROUND

A.    **The Complaint**

      On July 16, 1991 the government filed a Supplemental Complaint ("the Complaint") against

the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and

Joiners of America ("the District Council" or "the Union"), four present officers of the District

Council, three former officers, and six individuals alleged to be active in organized crime. The

Complaint's Preliminary Statement asserted: "For at least twenty years, the District Council has been

infiltrated by corrupt individuals and organized crime figures who have exploited their control over

the District Council for personal gain." Complaint ¶ 1. The government invoked the RICO statute

"in order to put an end to this corrupt control of a labor organization." *Id.*

The Complaint then set forth detailed factual allegations in support of the government's preliminary assertions. With respect to collective bargaining agreements and hiring practices, the Complaint alleged that "[t]he District Council is the central governing body of the carpenters union in the New York City area, and has supervisory powers on all matters relating to its Local Unions. Collective bargaining agreements in the New York City area are entered into between employers on the one hand and the District Council on the other." *Id.* ¶ 18. The officers of the District Council "have converted the collective bargaining agreements into tools of extortion." *Id.* ¶ 19. "Union officers have abused the hiring hall system, rewarding their associates and punishing dissident union members." *Id.* ¶ 77(e). "The members have been deprived of the effective enforcement of the applicable bargaining agreements. The members have also been prejudiced by losing job opportunities and by the increased productivity burden arising from the no-show jobs given to associates of the defendants." *Id.* ¶ 86.

The Complaint prayed for a preliminary injunction and for the appointment of "one or more court liaison officers, *pendente lite,* whose responsibilities would *inter alia* include the following:

> " . . . (B) To review the proposed actions of the officers of the District Council insofar as they relate to expenditure of union funds, appointments to union positions, contracts or proposed contracts *other than collective bargaining agreements*, or changes in the union constitutions or by-laws, and to petition the Court for an order restraining any such proposed action or to obtain any other appropriate relief which is reasonably necessary to protect the rights of District council members, consistent with the relevant constitutions and by-laws.

Complaint, page 56, ¶ (a)(1)(3) (emphasis added).

The Complaint also prayed for a permanent injunction providing, *inter alia,* that the Court

would appoint a trustee(s) for the District Council who, until such time "as free and fair elections" of District Council officers can be held, would be empowered to "discharge any of the duties and responsibilities of the District Council (*other than negotiating and entering into collective bargaining agreements*) when the trustee deems it necessary to protect the rights of the members of the District Council . . . "  Complaint, page 58, ¶ (d) (emphasis added).

## B.    <u>The Trial</u>

A bench trial began on September 13, 1993.  The United States Attorney's office for this district represented the government.  Separate counsel appeared for the District Council, two present Council officers and one former one, and one other individual defendant.

Counsel were invited to make opening statements.  Assistant United States Attorney Thomas A. Zaccaro opened for the government by saying this:

> The evidence in this case will reveal a widespread and persuasive [thus in the trial transcript; probably should read "pervasive"] pattern of corruption and racketeering in the New York City District Council of Carpenters, one of the largest and most powerful construction unions in New York, if not the country.
>
> The government will prove that for the last two decades organized crime has exercised substantial influence over this union.  Members of La Cosa Nostra have used this union to extort payoffs from contractors, to obtain favorite [probably should read "favored"] treatment for mob controlled companies and to reward themselves and their associates.
>
> Union officers have not only tolerated organized crime influence in the union but they have welcomed it, appointing members of La Cosa Nostra to powerful union positions.
>
> The government will also prove that union officers have routinely accepted illegal payoffs from employers in disregard of their fiduciary duties and the interests of the members who they are elected to represent.

Finally, your Honor, the government will prove that the union members who have joined this union to protect their economic destiny have had their fundamental democratic rights to participate in the affairs of this union extorted by corrupt union officers and organized crime members.

In sum, your Honor, the evidence will demonstrate that the relief the government seeks in this case is not only warranted but necessary to remedy decades of entrenched corruption in this union.

Trial Transcript at 5-6.

After other counsel made opening statements, the government began to call witnesses and offer exhibits into evidence. The trial continued from day to day through October 18, 1993. By that time the government had called 21 witnesses from widely different walks of life (some in the Witness Protection Program). The trial was then terminated because counsel for the parties announced that they had agreed upon a consent decree which they presented to the Court for endorsement. I signed that document on March 4, 1994, and will refer to it hereafter as "the Consent Decree."

## C.     The Consent Decree

In discussing the provisions of the Consent Decree pertinent to the government's contempt motion, I will where appropriate use the present tense, because the Consent Decree is still in effect and, to the extent applicable to particular circumstances, controls the conduct, rights and obligations of the District Council, its officers, and the government. The Consent Decree also explicitly creates and implicitly limits the powers of this Court. Federal district courts are courts of limited jurisdiction. Their powers must be traced to an identifiable source. Usually that source is the Constitution or a federal statute. In the case at bar, the source is the Consent Decree.

The Consent Decree begins with "Whereas" paragraphs which may be fairly analogized to

4

a statement of legislative purpose in the preamble to a statute. They include paragraphs which read as follows:

> WHEREAS, the District Council acknowledges that former officers and representatives of the District Council and certain of its constituent locals have been convicted of labor racketeering;

> WHEREAS, the parties agree that there should be no criminal element or La Cosa Nostra corruption of any part of the United Brotherhood of Carpenters and Joiners of America (the "UBCJA"), including the District Council and its constituent local unions, . . .

> WHEREAS, the parties agree that one of the purposes of this Consent Decree is to ensure that the District Council and its constituent local unions shall be maintained and run democratically, and without unlawful influence from outside its membership; . . .

Paragraph 2 of the Consent Decree, captioned "Permanent Injunction against Racketeering Activity," provides:

> All current and future officers, employees and members of the District Council and its constituent locals are permanently enjoined:
>
>   a. from committing any act of racketeering activity, as defined in 18 U.S.C. § 1961;
>
>   b. from knowingly associating with any member or associate of La Cosa Nostra crime family or any other criminal group, or with any person prohibited from participating in union affairs (hereinafter collectively referred to as "barred persons"); and
>
>   c. from obstructing or otherwise improperly interfering with the work of the officers described in this decree.

Paragraph 3 of the Consent Decree established the office of an Investigations and Review Officer ("IRO") and an Independent Hearing Committee in order "to implement the terms of this Consent Decree." The individuals filling these positions were agreed upon by the parties and named in ¶ 3 of the Consent Decree. Kenneth Conboy, a former judge of this Court and now in the private

5

practice of law, was appointed as the IRO.

Paragraph 4 of the Consent Decree set forth the powers, rights and responsibilities of the IRO. I need not recount them all. Two provisions are pertinent to the government's present motion. Paragraph 4.f., captioned "Review Authority," provides in part that the IRO shall have the authority to review " all contracts or proposed contracts on behalf of the District Council and its constituent locals, *except for collective bargaining agreements*" (emphasis added). Paragraph 4.h., captioned "Job Referral Procedures," provides in part that the IRO "shall supervise the adoption, implementation and operation of the job referral rules adopted pursuant to paragraph 5."

Paragraph 5 of the Consent Decree provides as follows:

> Job Referral Rules. Within thirty (30) days after the entry of this Consent Decree, each of the constituent locals shall adopt the job referral rules and procedures attached hereto as Exhibit A and incorporated herein (the "job referral rules"). The constituent locals shall make all job referrals in accordance with the job referral rules and shall comply with the job referral rules in all respects.

Thus the Job Referral Rules, physically attached to the Consent Decree and incorporated therein by reference, become a part of the Consent Decree, so that a violation of the Job Referral Rules is *ipso facto* a violation of the Consent Decree. Because the Job Referral Rules lie at the heart of the present motion, I consider them separately.

## D.      The Job Referral Rules

The Job Referral Rules recite in their introductory paragraph that they were promulgated "to maintain and administer a processing system for referral of members to employment in a fair and equitable manner, and to establish records and procedures which will be adequate to disclose fully the basis on which each referral is made." Again, it is not necessary to recite in full the detailed

provisions of the Rules. For present purposes it is sufficient to note that Rule 4 provides for union members to register their availability for referral to a job with their local union, and that "[t]he Local Union will compile an out-of-work list consisting of the members who have registered their availability for referral." Rule 5, captioned "Referral Procedure," provides in pertinent part:

> A. Members on the out-of-work list shall be referred to jobs in the order in which they have registered their availability for referral, with the first registered member referred first, provided that the member has indicated that he or she has the qualifications requested by the employer.
>
> B. Requests by an employer for specific members employed by the employer within the previous six months shall be fulfilled, *as required by applicable collective bargaining agreements*.

(emphasis added). The inference to be drawn from this language is that the requirement that a requested carpenter have been employed by the requesting contractor within the previous six months had its genesis in collective bargaining agreements predating the Consent Decree, thereafter echoed by Rule 5(B) of the Job Referral Rules.

It is necessary at this point to revert to the Consent Decree, which provides in ¶ 12 as follows:

> Future Practices. The parties intend the provisions set forth herein to govern the District Council's practices in the areas affected by this Consent Decree, now and in the future. The District Council shall give prior written notice to the Government and to the Investigations and Review Officer of any proposed changes to the By-Laws. In addition, the District Council shall inform the Government and the Investigations and Review Officer of any changes in any rules or procedures adopted or implemented pursuant to paragraphs 4(g), 4 (h), 4(i)(3), 5, 9(c), and 10 of this Consent Decree. For a period of seven (7) years after the termination of the Investigations and Review Officer's term of office, the District Council shall continue to give prior written notice of any such proposed change to the Government. If the Investigations and Review Officer or the Government objects to the proposed change as inconsistent with the terms or objectives of this Consent Decree, the change shall then not occur, provided that,

upon such objection, the District Council may apply to the Court for a determination as to whether the proposed change is consistent with the terms and objectives of this Consent Decree.

As discussed *infra*, the government bases its contempt motion principally upon the provisions of this paragraph in the Consent Decree.

**E.** **The Collective Bargaining Agreements Existing at the Time of Entry of the Consent Decree and the "50/50 Rule"**

The government says without contradiction by the District Council that "[u]nderlying the job referral rules was the '50/50 rule,' found in all of the District Council's collective bargaining agreements at the time of the [1994] Consent Decree, authorizing the union to assign fifty percent of the carpenter workforce at a job site (with the company designating the other fifty percent)." Main Brief at 6.

The consequence of the interaction between the Job Referral Rules and the 50/50 Rule contained in the collective bargaining agreements ("CBAs") of that vintage is readily apparent. Since the Job Referral Rules required carpenters to be assigned to jobs from the out-of-work list ("OWL"), and the CBAs allowed the union to assign fifty percent of the carpenters to any job site, the combined effect was to create a major source of job opportunities for members who had been seeking work for the longest period of time. That effect was lessened by the provisions of Rule 5(B) of the Job Referral Rules, which as noted provides that, "as required by applicable collective bargaining agreements," requests "by an employer for specific members employed by the employer within the previous six months shall be fulfilled," without regard to how long that carpenter has been on the OWL. Since carpenters requested off the OWL by an employer for a particular job are designated as "union" for purposes of the 50/50 Rule and therefore included in the union's fifty

8

percent share under the CBA, "requested" carpenters diminished the extent to which the interaction of the Job Referral Rules and the 50/50 Rule ensured employment for carpenters who had been waiting the longest on the OWL.

## F.    The Collective Bargaining Agreements Entered Into in 2001

The CBAs between the District Council and associations of contractors or individual contractors came up for negotiated renewals in 2001. At that time, the District Council granted a concession to the associations of contractors that eliminated the requirement that a contractor could not request the services of a particular contractor on a job unless that carpenter had worked for the requesting contractor within the past six months. It will be recalled that this requirement was apparently included in the prior CBAs and was echoed in Rule 5(B) of the Job Referral Rules. At the same time, during the 2001 negotiations the District Council eliminated from CBAs with "independent" contractors (that is, contractors who were not members of an association) the ability to request any carpenter for a particular job. A practical result of the 2001 CBAs was to confer upon contractors who were members of an association an unfettered right to select all the carpenters on a job, since under the 50/50 Rule a contractor could select its half of the carpenter work force and, freed from the six-month previous employment requirement, can now request that the Union furnish particular carpenters who would make up the other half of the work force that the Union had a nominal right to select under the 50/50 Rule. A second practical result was that independent contractors, deprived by the 2001 CBAs of any right to request particular carpenters, now obtain their carpenter work forces through strict adherence to the 50/50 Rule.

The facts just recited are derived from the testimony of Peter Thomassen, the President of the District Council, at a hearing before this Court on April 12, 2005, and Thomassen's declaration

dated October 4, 2005, submitted in opposition to the government's present motion.

The hearing on April 12, 2005 was called to consider an issue not directly related to those presented by the government's instant contempt motion. In July 2001 a carpenter named Eugene Clarke filed a complaint with the District Council Executive Committee alleging persistent violations of the Job Referral Rules, particularly with respect to the selection of shop stewards. The District Council rejected Clarke's complaint and Clarke filed a separate lawsuit which is presently pending. However, Clarke's allegations came to the attention of the government and led to renewed discussions between the government and the District Council, within the context of the captioned action, about further remedial steps to be taken with respect to the job referral system. Those discussions culminated in a stipulation and order entered on December 18, 2002, which modified the Job Referral Rules in certain respects and appointed Walter Mack, Esq., for a two-year term as Independent Investigator.

As Mr. Mack's two-year term was nearing its end, the District Council gave him a notification of termination. The government, which had been closely following Mr. Mack's investigations and reports, took the position that his service as Independent Investigator should be extended, at the District Council's continued expense, even though the District Council wished to terminate him. The government moved for that relief and the Court held a hearing on April 12, 2005, at which Thomassen testified.[1]

During his testimony, Thomassen described the manner in which the 50/50 Rule originally

---

[1] In an opinion reported at 2005 WL 1137877 (S.D.N.Y. May 1, 2005), the Court held that the District Council was entitled by the unambiguous terms of the stipulation and order to terminate Mr. Mack as the Independent Investigator. That ruling and its rationale are not pertinent to the government's present motion.

functioned. "New York City is still today the most unionized city in the country," Thomassen said, "and we're very diligent in trying to keep it that way." Because the unions were strong, they were able in negotiating CBAs to keep in place work rules that "were restrictive to the contractor." One of these was the 50/50 Rule, which in Thomassen's paraphrasing "states that half of the members on a particular job site, if the contractor wants to hire 10 carpenters, according to that rule, he can hire five of any carpenters he would like, as long as they're union carpenters, of course, and the other 5, which is the other 50 percent, would come from the union hall." Tr. at 281-82.[2]

The 50/50 Rule "was good for us," Thomassen testified, " because as our carpenters got older, maybe they weren't as much in demand as they got older. There is nothing wrong with their brain. They just didn't work fast. That was our way of letting those members make a living also." *Id.* at 282. But it was a rule "that the contractors have fought us over in every collective bargaining agreement going back as long as I can remember." *Id.* at 283. Thomassen explained why in answering a question I put to him:

> THE COURT: What are the contractors fighting for?
>
> THE WITNESS: The contractors, your Honor, say that they agree to be a union contractor. I am going to pay all the wages and benefits I am supposed to pay. All I ask you is to let me hire who I know can do the job.

*Id.* And pressure on the District Council to yield to union contractors[3] on this point has been generated by the recent emergence of nonunion contractors in New York City. Thomassen testified:

---

[2] I have edited the transcript in minor and non-substantive respects.

[3] "Union contractors" in this context means a contractor who is willing to hire only union labor. They may be contrasted with "nonunion contractors," a phrase that Thomassen also used in his testimony. Nothing in federal or state labor law requires a contractor to hire only union members.

> In the 50-50 [Rule], in just looking at it, it looks fair, it looks democratic, but the reality of it is – and I will put it right on the table – the reality of it is, if New York City is going to stay a union town, we have to do everything we can to help our union contractors stay in business. If we don't help those union contractors stay in business, we can negotiate the best contracts in the world, but if there is no one around to employ them, we'll be out of work and the union is going to go down the tubes in New York City . . . . I mean, walk down the block anywhere in New York City and you'll find a three or four or 15 story building being built nonunion, which never, ever happened before . . . . So we have a tiger on our hands, which is the nonunion entity that is making a move in New York City, and we realize that if we don't let our companies hire the carpenters who can produce the work that they bid – they bid a job based on an amount of progress they're going to make every day on that job. If they don't make that, at the end of the job and they lose money, they can go out of business. Part of the *request system* allows our contractors the latitude to hire carpenters who they think can perform the job.

*Id.* at 285-286 (emphasis added). I emphasize the phrase "Request System" (which I also capitalize in order to place it on a graphic footing with the 50/50 Rule) because its operation and effect lie at the heart of the present motion.

Thomassen also testified that "the international came up with the requesting system, and that was a way of getting the contractors a little more latitude in picking who they would have working for them." *Id.* at 284. "International" is a reference to the United Brotherhood of Carpenters and Joiners of America (UBC), the parent union of which the District Council of New York City and Vicinity is one of several regional entities. In a declaration dated October 31, 2005, Douglas J. McCarron, the General President of the UBC, opposes the government's contempt motion and states in part:

> I submit this declaration to advise the Court of the UBC's position with respect to the "request system," pursuant to which signatory contractors have the right to hire, employ and retain Union carpenters of their own choice even while certain other carpenters wait for work

assignments from the District Council's out of work list . . . . The number one objective of the UBC under my leadership has been the effort to organize unorganized carpenters and to stem the rising tide of non-Union carpenters in all areas under our jurisdiction. To accomplish these objectives, as an institution we have had to recognize that many of the old ways and practices of the construction trades had to change. We have to enable our signatory contractors to successfully compete with their non-Union competition . . . . In this regard, the UBC recognizes a contractor's right to employ carpenters of his/her choice and to determine which carpenters will make their company most competitive in the marketplace. This concept has been referred to as "full mobility". The UBC is fully aware of past practices or contract provisions requiring a certain number or percentage of carpenters to come from among the ranks of the Union's out of work lists, but our position is better suited to advance our organizing strategy and goals and thus, our membership's interests in the long run. We cannot seek to organize a company today that may already be a successful, busy carpentry firm, by telling them that if they sign a Union contract they will have to trade half of their workforce for unknown workers on their next job . . . . I am also aware that such requests [made under the Request System] do, by definition, dilute and may replace the traditional 50/50 systems of job assignments and will result in some carpenters waiting on the job referral list longer than others. The UBC is keenly aware of this and the implications of our policy on this topic, but our experience and belief is that our approach will best serve the long term interests of the vast majority of our membership . . . . In short, for many years now the UBC has endorsed the free mobility of Union carpenters to work steadily for signatory contractors desiring to employ them, free from any restrictions by any Local Union or District Council. The request system existing in New York City is consistent with this policy . . .

McCarron Declaration ¶¶ 2, 4, 5, 8, 10, 12.

The Request System was included in CBAs the District Council negotiated with certain contractors in 2001. Thomassen described the process, prompted in part by a question by me:

> We enhanced the request system for the contractors for the association. In return, we have the best contract we have ever negotiated, at least in my mind, for the New York City Council of Carpenters.

THE COURT: I take it that you intend to convey by your last answer that in the most recent negotiation with the association of contractors with whom you negotiate a collective bargaining agreement, you relaxed or gave something up on the – you tell me what you meant by that.

Did you give something up on the 50-50 rule? Did you grant them greater liberty than they otherwise had had in the past with respect to their ability to request individual carpenters? Is that what was going on?

THE WITNESS: Yes, your Honor, we actually did both.

With the associations, it used to be that if an employee was going to be requested, he had to show that he worked for the contractor in the past six months. We took that away and said you could request a carpenter. He didn't have to work for you in the last six months.

At the same time, what we did also say is that all the independent contractors that work in New York City would not be allowed to request carpenters any more, where they were allowed before. We took the requesting procedure away from the independent contractors, and they have strict 50-50 rules right now, today, as we speak. The only ones who are allowed to request are the associations.

Tr. at 287-88. While the record does not reveal the statistical breakdown between contractors who belong to an association and those "independent" contractors who do not, I infer from the evidence and the written submissions that there are more of the former than the latter.[4]

In his October 4, 2005 declaration, Thomassen expands upon the negotiations in June 2001 that resulted in the inclusion of the Request System in the 2001 CBAs between the Union and the contractors' associations. John Greany, the business manager of Local 608, one of the District

---

[4] That inference is supported by a statement such as that appearing in Thomassen's October 4, 2005 declaration at ¶ 6: "The contracts, with the major employer associations representing our signatory contractors and our independent signatory contractors engaged in general outside carpentry work, were scheduled to expire on June 30, 2001." Walter Mack, the Court-appointed Independent Investigator, submitted a report dated November 5, 2004 on the 50/50 Rule and the Request System which says at page 2: "The vast preponderance of jobs are performed by contractors who are members of associations having CBAs with the district council."

Council's constituent locals, made known to the District Council CBA negotiating committee (which included Thomassen) the desire of Local 608's members "to eliminate requests." Declaration ¶ 7. Accordingly the Union included in its opening demands a provision that "[t]he 50/50 rule will be enforced and no special requests can be made to the union. The contractor can hire whom he wants on his 50% ratios." *Id.* ¶ 8. Thomassen recalls that "the contractors' opposition to this proposal was loud and definite":

> The contractors resisted any effort to limit their right to request particular workers from the OWL beyond the six (6) month limitation contained in the existing agreements. In addition, the contractors repeated their often made complaint that they were not receiving qualified, productive carpenters from the OWL and needed to be able to hire whom they wanted in order to remain competitive with a growing non-Union segment of our industry.

*Id.* ¶ 9. The parties were also negotiating "economic terms concerning wage increases, certain classification pay increases and other matters." *Id.* ¶ 11. "A final agreement with the major associations was reached on June 28, 2001." *Id.* ¶ 12. The Request System was included and the six month limitation eliminated.

The government says that the District Council did not give it prior notice of its intention to enter into the 2001 CBAs containing the Request System, and that this failure constitutes a violation of the Consent Decree. The District Council acknowledges that it did not give the government such notice, but says that it was not obligated to do so by the Consent Decree, the Job Referral Rules, or anything else. These contentions are further considered *infra*. But first it is necessary to consider the effect of the 2001 CBAs between the District Council and the contractors' associations upon the 50/50 Rule.

**G.    The Effect of the 2001 Collective Bargaining Agreements Upon the 50/50 Rule**

On November 5, 2004, Mr. Mack presented to the Court his "Independent Investigator's Report on the '50/50 Rule' and 'Request System.'"    The report was based principally upon the depositions of a number of carpenters conducted by Mr. Mack pursuant to the powers conferred upon him by the Court in the stipulation and order of December 18, 2002.  The 2001 CBAs had been in effect for several years, so that the carpenters Mack deposed were in a position to describe the effect of the Request System in those agreements upon the 50/50 Rule, a subject Mack addressed in a section of his report beginning at page 2 and captioned "The Interplay of the 50/50 Rule and the Request System."

Mack began his report with disarming self-deprecation: "I had naively believed that the 50/50 rule, incorporated in most Carpenter collective bargaining agreements, was designed to work with the OWL system so that for half of the Carpenters on any job site, the members who have been out of work the longest are the first to be dispatched.  I was wrong."  Report at 1.  That was so, Mack deduced from the depositions of carpenters he conducted, because "[t]he 50/50 rule as described in most of the CBAs is diluted by the implementation or re-introduction, in the past few years, of the practice of permitting the contractor to satisfy the requirement of hiring 50% of the Carpenters from the OWL by requesting particular Carpenters from the list – regardless of those Carpenters' time on the list."  *Id.* at 3-4.  In point of fact, that practice was "implemented" by the inclusion of the Request System in the 2001 CBAs, a development of which Mack's knowledge was understandably incomplete; he expressed his "understanding," based upon the carpenters' depositions, that "the request rule was dormant for some time and was re-introduced with the CBAs that were entered into starting three or four years ago."  *Id.* at 3 n.4.  These were, of course, the 2001 CBAs.  Mack  quite

properly decided "not to undertake an investigation into how and when the request rule was integrated with the 50/50 rule." *Id.* No such investigation is now necessary; the relevant facts are revealed in the testimony and declarations described in Part I.F., *supra*. Considering the impact of the Request System upon the 50/50 Rule as it was originally designed to operate, Mack concluded that "it is not surprising that many of the witnesses I deposed expressed the view that the 50/50 rule as it currently operates is meaningless." Report at 10.

The District Council in its submissions on the present motion does not go so far; Thomassen clings to the assertion that the Union's CBAs with independent contractors eliminate any employer requests for particular carpenters and strictly enforce the 50/50 Rule. But those contracts account for a distinct minority of the jobs available to union members in the City, *see* note 4, *supra*, and the District Council does not really deny that the Request System contained in the 2001 CBAs with contractors' associations conferred upon contractors the unfettered right to choose the entire carpentry work force at a job site without regard to the OWL, a right which does indeed render the 50/50 Rule meaningless. Nor could the District Council deny the truth of that proposition, since the evidence adduced from Thomassen and McCarron makes it plain that this is a right the contractors' associations demanded in the 2001 CBA negotiations and the District Council agreed to give them, in exchange for unrelated union benefits which, in Thomassen's perhaps less than wholly objective view, resulted in "the best contract we have ever negotiated."

## H. The Contentions of the Parties on the Government's Contempt Motion

Against this factual background, the contentions of the government and the District Council may now be summarized.

The government contends principally that the District Council violated ¶ 12 of the Consent

Decree by failing to give the government prior notice of its intent to enter into the 2001 CBAs which included the Request System, thereby eliminating the six-month prior employment limitation contained in Rule 5(B) of the Job Referral Rules.

The remedies the government seeks are (1) a declaratory judgment that the Request System, as implemented by the 2001 CBAs, violates the Consent Decree; (2) an order voiding the 2001 CBAs insofar as they contain the Request System; and (3) an order striking Rule 5(B) of the Job Referral Rules and eliminating requesting entirely, so that the 50 percent of the workforce assigned by the union to a job site is assigned from the OWL solely on the basis of length of unemployment. As an alternative to the third of these requests, the government suggests that the Job Referral Rules be modified to make contractor requests count against the contractor's fifty percent of the 50/50 Rule, again ensuring that fifty percent of the carpentry work force is assigned solely on the basis of length of unemployment.

The District Council contends principally that ¶ 12 of the Consent Decree requires prior notice to the government only in respect of changes to its By-Laws; and that, in any event, the Consent Decree does not empower the government to interfere with or veto actions that are properly left to the collective bargaining process.

## II. DISCUSSION

### A.  <u>Standard of Review</u>

In this circuit, a contempt order is warranted "only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict. More specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the contemnor

has not diligently attempted to comply in a reasonable manner. A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (citations and internal quotation marks omitted).

**B.      The Consent Decree and the District Council's Conduct**

**1.      The Scope of ¶ 12 of the Consent Decree**

The District Council  accepts – indeed, Thomassen's testimony and declaration proclaim – that the Request System contained in the 2001 CBAs changed the operation of Rule 5(B) of the Job Referral Rules.  The District Council also accepts the fact that the Job Referral Rules were incorporated in the Consent Decree and thus became part of the Decree; it could not reasonably contend otherwise.  The District Council's first contention is that ¶ 12 of the Consent Decree requires prior written notice to the government only of intended changes in the District Council's By-Laws, so that it did not need to give notice of a change in the Job Referral Rules.

If the District Council were interpreting ¶ 12 of the Consent Decree correctly, or even if its notice requirements were ambiguous on the point at issue, that would be a sufficient basis for denying the government's contempt motion, which depends upon a broader reading of ¶ 12. However, I reject the District Council's narrow reading of ¶ 12, which limits the notice requirement to By-Laws changes.

The paragraph begins with the recitation that "[t]he parties intend the provisions set forth herein to govern the District Council's practices *in the areas affected by this Consent Decree*, now and in the future." (emphasis added).  This broad and all-inclusive language clearly embraces job referral, the "area" specifically "affected" by ¶ 5 of the Consent Decree.  While the second sentence

of ¶ 12 is limited to requiring prior written notice to the government and the Investigations and Review Officer "of any proposed changes to the By-Laws," the very next sentence begins with the phrase "In addition," and goes on to require that the District Council "inform the Government and the Investigations and Review Officer of any changes in any rules or procedures adopted or implemented pursuant to" a number of specified paragraphs in the Consent Decree, including ¶ 5, which directs each constituent local union to adopt and follow the Job Referral Rules. Paragraph 12 then provides that for a period of seven years after the IRO leaves office, "the District Council shall continue to give prior written notice of *any such proposed change* to the Government" (emphasis added).

Given the structure of ¶ 12, the phrase "any such proposed change" can only be reasonably read to include all the "changes" referred to in the preceding sentences, including the Job Referral Rules mandated by ¶ 5, and consequently prior notice of them (the meaning of the adjective "proposed"). That conclusion is reinforced by ¶ 12's closing provisions, which allow the government to object to "the proposed change as inconsistent with the terms or objectives of this Consent Decree," in which event the change "shall then not occur," and the District Council "may apply to the Court for a determination as to whether the proposed change is consistent with the terms and objectives of this Consent Decree."

In view of the importance laid by the Consent Decree upon the problem of job referrals and the solution intended by the Job Referral Rules, it is entirely unreasonable to suppose that the parties intended ¶ 12's prior notice requirements to apply only to changes the District Council might propose in its By-Laws, and leave the District Council free to change the Job Referral Rules in any manner it might choose, without prior notice to the government and the IRO or, after the IRO's departure,

to the government alone. _____

However, that construction of ¶ 12 of the Consent Decree in the government's favor does not entitle the government to an order holding the District Council in contempt of the Decree. The manner in which the District Council chose to change the Job Referral Rules was through the process of collective bargaining with the contractors' associations, which gives rise to the second question: does the Consent Decree have anything to do with collective bargaining agreements?

**2.      The Effect *Vel Non* of the Consent Decree upon the District Council's Ability to Negotiate and Enter into Collective Bargaining Agreements**

It must be remembered that one of the remedies the government seeks on this motion is an order from this Court voiding the provisions for the Request System contained in collective bargaining agreements entered into by the District Council and contractors' associations in 2001. Moreover, while the government does not say so explicitly, it is implicit in the relief it seeks that the Court's order would bar the District Council (and indirectly the contractors' associations) from including any comparable provision in the CBAs to be negotiated in the spring of 2006 (the duration of the 2001 CBAs being five years).

It is startling to visualize a federal district judge voiding collective bargaining agreements previously entered into by a union and employers, particularly since the Supreme Court recognizes "the federal labor policy that parties to a collective-bargaining agreement must have reasonable assurance that their contract will be honored." *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 771 (1983) (conciliation process agreed to by employer and EEOC to address employer's job discrimination cannot alter non-consenting union's collective bargaining agreement right to arbitrate resulting

layoffs).

The government asserts that the Court should "void the terms of the 2001 collective bargaining agreements that broadened contractors' requesting power in derogation of the limited requesting authority agreed upon in Rule 5(B) of the Consent Decree's job referral rules" because "where the terms of a collective bargaining agreement are at variance with the terms of a consent decree governing a labor union, the former must bow to the latter." Main Brief at 23. The only case cited for this proposition is *United States v. International Brotherhood of Teamsters*, 954 F.2d 801, 810 (2d Cir. 1992), which the government's brief quotes as follows: "[W]here they differ, collective bargaining agreements yield to the Consent Decree . . . " *Id*.

Given the sole reliance the government puts on this case, it is necessary to place its holding in context. I begin by placing the quoted words in their immediate context (the government having properly indicated by parentheses and ellipses that the quotation was edited). The quoted words appear as a part of this discussion:

> However, collective bargaining agreements and the Consent Decree address different problems and serve different purposes. The former governs the daily relations between particular employers and their employees, while the latter is an attempt to rebuild the infrastructure of an entire national labor organization. Considering these different objectives, we think it consistent with federal labor policy that where they differ, collective bargaining agreements yield to the Consent Decree, and that the Consent Decree officers and the district court remain free to complete their task unencumbered by collateral arbitration results.

954 F.2d at 810.

The Second Circuit made those observations in these particular circumstances. The government filed a civil RICO action against the International Brotherhood of Teamsters ("IBT")

"in an effort to rid the IBT of its domination by organized crime." *Id.* at 804. The parties entered into a Consent Decree as "a critical part of the settlement" of the case, the "central purpose" of the decree being "to insure the fair and open conduct of the 1991 IBT election, as a means of freeing IBT's General Executive Board from the grip of La Cosa Nostra." *Id.* (citation and internal quotation marks omitted). Toward that end, the decree "authorized the appointment of three court officers to oversee certain aspects of the IBT's affairs: an Election Officer (EO), an Investigations Officer, and an Independent Administrator (IA)." *Id.* These officers were "charged with implementing the free and fair election of the IBT's governing officials," as well as "Election Rules, promulgated under the Consent Decree." *Id.* at 804-05.

A time came when one Henderson, a union steward, was terminated from his employment by a company which was a party to a collective bargaining agreement with an IBT local. Henderson, claiming that he had been fired in retaliation for union election activities, filed a grievance pursuant to the CBA and also filed a protest with the EO alleging that the dismissal violated the Election Rules. The CBA provided for arbitration. The arbitrator found Henderson's discharge to be justified. "Although Henderson argued that he was a victim of retaliation, the arbitrator did not address the issue." *Id.* at 805. The EO then completed his own investigation, concluded that the company "had retaliated against Henderson for engaging in Union Election campaign activity, which is protected by the Election Rules," and ordered Henderson's reinstatement with back pay. *Id.* at 806. The IA affirmed the EO's decision. The district court affirmed the IA, directed the company to comply, and imposed a coercive sanction if it did not.

The company appealed, and the Second Circuit posed the issue as follows:

> Here, the grievance arbitration conducted pursuant to the CBA, and

the parallel Election Rule proceedings held by the EO and IA, reached conflicting results with respect to Henderson's reinstatement. Under these circumstances the question arises as to which determination is controlling.

*Id.* at 808. The court of appeals, affirming the district court, concluded that the consent decree court officers' determination took precedence over that of the CBA arbitrator:

> [W]e hold that (1) where a consent decree provides individual union members with a source of independent rights as a means of effectuating the consent decree's intended goal, and (2) where the purpose of the consent decree transcends the localized function of particular collective bargaining agreements and, instead, impacts upon the structure and processes of a national parent union, federal policy favoring independent arbitration of labor disputes does not preempt the procedures created to insure the implementation of the consent decree . . . . Therefore, we conclude that to the extent an arbitration award is inconsistent with an order implementing the Consent Decree, the Consent Decree order must govern.

*Id.*

Analysis of the Second Circuit's opinion in *Teamsters* reveals significant differences between that case and the case at bar. The "central purpose" of the consent decree in *Teamsters* was to insure a fair and open 1991 IBT election. The court-appointed officers drafted election rules to achieve that purpose. The CBA arbitration award and the Election Officer's decision focused solely upon the discharge of the same individual. The award and the decision were in clear, unmistakable and irreconcilable conflict. The question was which one the district court would enforce and which one it would disregard. The court enforced the decision of the court officer appointed under the consent decree. The Second Circuit affirmed for the reasons quoted *supra*.

The case at bar does not present so narrow and clear a conflict between the results achieved under a collective bargaining agreement and pursuant to a consent decree. In this case, the

government contends that "[t]he District Counsel violated the Consent Decree's command that it provide the Government prior written notice of proposed amendments to the job referral rules." Main Brief at 20. However, the "amendment" to Rule 5(B) of the Job Referral Rules resulted from the 2001 CBAs; and so the government is left to argue that the phrase "such proposed change" in the penultimate sentence in ¶ 12 of the Consent Decree should be read to include changes effected in the Job Referral Rules by collective bargaining agreements entered into by the District Council subsequent to entry of the Consent Decree. However, the government's RICO Complaint, the Consent Decree, and the Job Referral Rules all contain allegations or provisions that argue against such an interpretation.

Thus the Complaint prayed for the appointment *pendente lite* of court officers authorized to review the Union's existing or proposed contracts "other than collective bargaining agreements." The prayer for a permanent injunction explicitly excluded from an interim District Council trustee's duties and responsibilities that of "negotiating and entering into collective bargaining agreements." The Complaint's principled exclusion of collective bargaining agreements from the reviewing and negotiating powers of prospective court officers was implemented in practice by the provision in ¶ 4.f. of the Consent Decree, which authorized IRO to review the Union's contracts or proposed contracts "except for collective bargaining agreements." The clear import of the quoted phrase is that the IRO had no business reviewing or editing CBAs (or, to state the proposition with greater *politesse*, no authority to do so). Job Referral Rule 5(B), the very rule impacted by the Request System included in the 2001 CBAs, provides that employer requests for specific carpenters shall be fulfilled "as required by applicable collective bargaining agreements." That phrase suggests the primacy of CBAs in the area of employer requests, and is consistent with the Consent Decree's

withholding from the IRO of any authority to review present or proposed collective bargaining agreements.

Given these exclusions from and limitations of power, it is difficult to accept the government's reading of ¶ 12 of the Consent Decree as requiring the District Council to give the IRO prior notice of a proposed change to a collective bargaining agreement that the IRO had no authority to review in the first place.

It would have been easy enough for the drafters of the Consent Decree to include language authorizing the IRO (and the government) to review and approve future CBAs that might impact the Job Referral Rules. But the explicit denial of authority to the IRO to review collective bargaining agreements, alone among all possible contracts, strongly supports the inference that the parties did not intend the Consent Decree to bring future collective bargaining agreements within its purview. That is not surprising, given the Consent Decree's manifest central purpose of preventing the control of the carpenters' unions by organized crime (an objective not related, at least directly, to the negotiation of collective bargaining agreements), and the centrality of collective bargaining agreements in federal labor law.

I stress, in that regard, that the District Council's asserted reason in granting the Request System concession to the contractors' associations in the 2001 CBAs is entirely understandable. Thomassen's hearing testimony and the Thomassen and McCarron declarations describing the genesis of the 2001 CBAs are credible, and I accept their evidence that the Union agreed to the Request System in order to improve the ability of union contractors to compete with the growing number of non-union contractors, with the attendant loss of union jobs. The District Council's purpose in negotiating the 2001 CBAs in this fashion is entirely unrelated to the government's

concern about the CBAs negotiated by the former District Council officers, who the government alleged in ¶ 19 of its pleading "have converted the collective bargaining agreements into tools of extortion."  There is no suggestion in the record on this motion that the 2001 CBAs were tainted by extortion or any other impropriety, or were influenced in any way by organized crime, the target of the government's civil RICO action as spelled out in the Complaint and in the opening statement of government counsel at the beginning of the trial.  On the contrary, the District Council negotiators agreed to include the Request System in the CBAs because they thought it would benefit more union carpenters over the long run.[5]

While certain carpenters are undoubtedly spending  more time on the out-of-work list than they would have if the District Council had not agreed to the Request System, the District Council has a fiduciary duty to bargain for the benefit of all union members, and Thomassen's and

---

[5]  Two arguments made by the parties should be briefly noted.  First, the government contends that the Request System included in the 2001 CBAs "increases the potential for corruption," since a contractor who recruits the entire carpentry work force at a job site is in a better position to pay that work force "in cash, off the books, in order to disguise the fact that the wages they were paying were significantly below the rate mandated by the collective bargaining agreement and to avoid paying fringe benefits."  Main Brief at 15-16.  Such deplorable conduct by certain contractors is demonstrated by Mr. Mack's investigations, but the corruption principally targeted by the Consent Decree is that inherent in organized crime's control of the District Council, its constituent locals, and union members.  The Decree cannot reasonably be read to reach all conceivable corrupt practices of employers.  It does not follow, of course, that the corrupt practices on the part of contractors will go unpunished because the Consent Decree in this case does not extend to those practices.  Certain of the contractors identified by the Mack investigations are now facing federal and state criminal investigations, and the District Council's benefit funds are pursuing remedies in arbitration against them.

Second, the parties' briefs debate whether IRO Conboy's actions with respect to the conduct in 1994 of former District Council officers in negotiating job referral procedures at the Javits Convention Center support the government's present request that this Court set aside the 2001 CBAs.  The circumstances surrounding the Javits Convention Center were quite different, and, with all due respect to IRO Conboy (a distinguished former judge of this Court), his resolution of that earlier matter has and can have no bearing upon the Court's resolution of the present motion.

McCarron's explanations of how the Request System benefits the larger carpenter population make sense. But whether or not that is so, the Consent Decree does not entitle the government to an order by this Court voiding CBAs arrived at by the negotiating process that lies at the heart of federal labor-management relations. Stated differently, in the view I take of the case it would be inappropriate for this Court to dictate the terms of collective bargaining agreements entered into by the Union and union contractors. If a sufficient number of union carpenters believe that the District Council negotiating team which agreed to the 2001 CBAs should not have conceded the Request System to contractors' associations at that time, or should not renew that concession in the next CBAs, their remedy lies in the democratic process, including use of the ballot box during the election of union officers.[6]

It follows that I agree with the District Council that the Consent Decree does not apply to the District Council's negotiation of the 2001 CBAs with the contractors' associations. While in Part II.B.1. I rejected the District Council's reading of ¶ 12 of the Consent Decree as requiring prior notice only of proposed changes in its By-Laws, my conclusion in this sub-Part is that the additional

---

[6] The Court is aware that in a document dated January 9, 2006, the Election Monitor certified the results of the election for the executive committee and delegate body of the District Council, held on December 9-10, 2005. Peter Thomassen ran unopposed for President and was re-elected. Michael Forde was re-elected Executive Secretary-Treasurer by a large margin over two opponents. (Notwithstanding these titles, under the District Council's governance structure the Executive Secretary-Treasurer is the chief executive officer.) These newly re-elected officers will have a great deal to do with the District Council negotiating committee for the next collective bargaining agreements. As counsel for the District Council properly observed during the oral arguments on this motion, the District Council and its negotiating committee owe a fiduciary duty to all union members. If there is a groundswell of opinion among the membership that the Request System in the 2001 CBAs is unfair and carpenters should instead be assigned to jobs off the out-of-work list in accordance with a strict application of the 50/50 Rule, the Court assumes that such a view will be made known to the negotiating committee and that committee will pay attention to it.

changes requiring notice do not include those that may be occasioned by future collective bargaining agreements. Accordingly, there is no basis in law for an order holding the District Council or Thomassen in contempt of the Decree, and the government's motion fails.

If one accepts that construction of the Consent Decree, and I believe it to be the correct one, then the District Council is right in arguing that the government, in the guise of claiming a violation of the existing Decree, is really trying to amend and enlarge it to cover conduct, namely the Union's negotiation of collective bargaining agreements, which the Consent Decree and the Complaint explicitly excluded from coverage. But the amending of a previously entered consent decree, while conceptually possible, requires a showing the government does not attempt on this contempt motion, which asserts a violation of the existing decree. *See Handschu v. Special Services Division*, 273 F. Supp. 2d 327, 336-37 (S.D.N.Y. 2003) (citing *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992)).

While a different construction of the Consent Decree is possible, so as to extend its reach to future CBAs, the very most that can be said for the government is that the language of the Decree is ambiguous in that regard. But that is equally fatal to the government's contempt motion, since the order an alleged contemnor is charged with disobeying must be clear and unambiguous in its prohibition of the contemnor's conduct.

For the foregoing reasons, the government's motion to hold the District Council and its president, Peter Thomassen, in contempt of the Consent Decree is denied.

It is SO ORDERED.

Dated: New York, New York
January 12, 2006

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

30