UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,                         :
                                                  :
                        Plaintiff,                :            90 Civ. 5722 (CSH)
                                                  :
        -against-                                 :      MEMORANDUM OPINION
                                                  :           AND ORDER
DISTRICT COUNCIL OF NEW YORK CITY AND             :
VICINITY OF THE UNITED BROTHERHOOD OF             :
CARPENTERS AND JOINERS OF AMERICA, et al.,        :
                                                  :
                        Defendants.               :
------------------------------------------------------------------------X

HAIGHT, Senior District Judge:

        This case is on remand from the Second Circuit.  *See* 2007 WL 1157143 (2d Cir. Apr. 18,

2007).  The question on remand is the appropriate remedy for the violation by defendant District

Council of the Consent Decree entered in the case.  In addition to submissions on the remedy issue,

the District Council has also moved to modify the Consent Decree.  The government has made a

motion for remedies which, if granted by the Court, would impact collective bargaining agreements

("CBAs") entered into in 2006 between the District Council, as bargaining agent for its constituent

local unions of carpenters, and associations of building contractors who employ carpenters.

Principally for that reason, the Court granted the motions of four contractors' associations to

intervene in the action (the "Intervenors" or "the Associations") so that they might be heard on the

question of remedy.

        Officers and representatives of the District Council and of the Intervenors have recently filed

sworn declarations and other submissions addressing these aspects of the case.  The government has

not filed its responsive papers because it takes the position that before doing so, it is entitled to

discovery.  The District Council and the Intervenors resist the government's request for discovery

and say that none should be allowed.  In the alternative, these parties contend that if the government is granted discovery, such discovery should be strictly limited and the Intervenors should be entitled to reciprocal discovery.  This opinion resolves that dispute.

## I. BACKGROUND

The government's request for discovery was first contained in a letter to the Court dated June 4, 2007.  The government stated in broad terms that it "seeks the authority to issue document subpoenas and take depositions of the witnesses whose declarations were included as part of the most recent submissions to the Court," discovery that "will enable the Government to explore the truth of these and other allegations and their relevance *vel non* to the proceedings now before the Court."  Govt.'s June 4, 2007 Letter at 1.  This request prompted a number of objections in letter form from counsel for the District Council and the Intervenors which I will consider *infra*.  But the scope of the government's intended discovery was narrowed somewhat in its reply letter dated June 15, 2007, which states in relevant part at 2:

> With respect to the District Council's letter, the Government does not anticipate taking any depositions of the individuals who provided declarations on the District Council's behalf in support of their motion to terminate the consent decree.  At this time, we anticipate seeking from the District Council[1] only notes and other documents evidencing the Associations' knowledge of the consent decree and the job referral rules.

Therefore it appears that the government's focus in discovery, for the present at least, is upon the assertions contained in declarations submitted by officers and representatives of the four Intervenor contractors' associations.  Thus the government says that it "is seeking discovery because the

---

[1]  The government's letter at this point says "District Court," an obvious typographical error for "District Council," which I have corrected in the quotation in text.

Associations have submitted declarations in support of their motions with respect to the contempt remedy, and because it is entitled to test the accuracy of those representations." *Id*. I will now summarize those declarations, some submitted in support of an Association's motion to intervene, others specifically addressing the government's proposed contempt remedies. Thereafter I will consider the letter briefs of counsel for the District Counsel and the Intervenors, which oppose the government's discovery requests, and the government's reply letter brief supporting them.

**Joseph Olivieri** is the executive director of The Association of Wall-Ceiling & Carpentry Industries of New York, Inc. ("WCCI"), whose president, **Michael Weber**, describes in his own affidavit as "an employer association of approximately one hundred forty contractors and sub-contractors engaged in any phase or phases of gypsum drywall construction, acoustical ceiling construction, and/or general carpentry construction doing business in the State of New York." Weber Aff. ¶ 2. Olivieri is also one of the "management trustees" for the District Council's benefit funds, which depend upon contributions mandated by the CBAs from employers. Olivieri's affidavit states that beginning in 1993, the funds' trustees have engaged in "a concerted effort to eradicate corruption," Olivieri Aff. ¶ 3, and goes on to describe the particulars of that effort, ¶¶ 4-8.

The affidavit of Michael Weber, WCCI's president, describes the manner in which the changes the 2001 and 2006 CBAs made in the job referral system came about and the importance of those changes to contractors. Weber's analysis is echoed by the declarations of officers of other Associations. Stated succinctly, the Associations' position is that prior to the 2001 CBAs, when the 50/50 Rule governed job referrals and employer requests for carpenters on the out-of-work list were often not heeded, the District Council's referrals, *i.e.*, carpenters selected by the District Council and sent to a jobsite, were often "unqualified to do the work at issue, were unreliable, were unfamiliar

3

with local standards and had never worked on the particular job before" and had to be replaced, which resulted in delaying the project and increasing the contractor's costs, consequences "especially troubling because the Association's members were  increasingly competing against nonunion construction management firms." Weber Aff. ¶¶ 5-7.  Weber states: "The completion of construction jobs that have workforces made up of 50% of the District Council's selection, which does not include the employer's requests, will take longer; this delay in carpentry work will affect every aspect of a construction job, such as electrical work, plumbing, etc.  Entire jobs, many of which consist of some of the largest construction projects in New York City, will be held up and delayed." *Id*. ¶ 15.  Moreover, contractors are presently performing or have bid out work for future jobs in reliance upon the Request System contained in the 2001 and 2006 CBAs.  Weber asserts that "[i]f the employers are denied their right to choose the most efficient, skilled, reliable and productive carpenters, their costs skyrocket, their timelines change and their already submitted bids become inaccurate and a liability."  *Id*. ¶ 17.

These problems recurred despite provisions in the previous CBAs that "the District Council would consider employer requests for specific workmen"; in practice, "the District Council often was not heeding such requests." Weber Aff. ¶ 5.  Weber was a member of WCCI's bargaining committee for the 2001 CBA re-negotiation.  The parties began the negotiations taking extreme positions.  The District Council wished to revise the CBAs by eliminating all employer requests for particular carpenters as part of the Union's 50 percent jobsite share and requiring a strict 50/50 allocation system.  The Associations wished to revise the CBAs so that all employer requests for specific

4

carpenters would be honored.[2]  The 2001 CBAs that emerged represented a compromise.  The employers gained the right to select all carpenters for a job: the "Request System."[3]  But the employers were required to limit their requests to New York City District Council carpenters (previously they could hire carpenters from other union jurisdictions), and the carpenters gained a 25.75% wage increase, a shorter workweek with increased breaks, and modifications in the union apprentice system.  Weber says that his Association only agreed to these concessions "as part of the give-and-take of the collective bargaining process because it was receiving the benefit of having all specific requests for District Council carpenters on the out-of-work list honored.  The Association would not have agreed to these terms if the Request System was not included in the CBA." *Id.* ¶ 11.  Weber makes the point that if a Court-imposed remedy does away with the Request System, the employers will lose the benefit of their bargain while remaining liable for the increased Union wages and benefits.

Weber also states explicitly that "[a]t no time during the collective bargaining negotiations did the District Council discuss the requirements of the Consent Decree that a requested carpenter need to have worked with the employer in the previous six-month period."  Weber Aff. ¶ 12.  Weber adds that the Association "was not aware of the contempt proceedings brought by the Government as a result of the Request System in the CBA"; that "when the Association and the District Council

---

[2] Rule 5(B) of the Job Referral Rules forming a part of the Consent Decree limited an employers' right of request for specific carpenters to those who had been employed by the requesting employer within the previous six months.

[3] The 50/50 Rule permits employers to select any Union carpenters as part of their 50 percent, and for the Union to designate the other 50 percent.  Under the Request System, employers can select all carpenters for a job because all employer requests for carpenters from the out-of-work list are honored, and these workers count as part of the Union's 50 percent under the 50/50 Rule.

entered into the collective bargaining for the 2006-2011 CBA, the Association did not know that the Request System was potentially prohibited by the Consent Decree"; and that the Association "was made aware of this case and its potential effect on the associations' collective bargaining agreements only after the Court of Appeals issued its summary order on February 20, 2007." *Id.* ¶ 13.

**Raymond G. McGuire** is a lawyer and the managing director of the Contractors Association of Greater New York ("CAGNY"), formed in 1984 "as a multi-employer bargaining association of the leading construction managers and general contractors operating in the metropolitan New York area," McGuire Aff. ¶ 2.  McGuire submitted his affidavit to support WCCI's motion to intervene and in support of WCCI's position on an appropriate remedy for the District Council's contempt of the Consent Decree.  He makes essentially the same factual assertions as Weber's about the genesis of the Request System in the 2001 and 2006 CBAs and the deleterious effect of a remedy that would eliminate the Request System in its present form.

**Joseph S. Kaming** is a lawyer whose firm represents another Intervenor, The Cement League, Incorporated ("Cement League"), a multi-employer association whose members "are engaged in the construction of building structures," particularly in "the placement of reinforced concrete." Kaming Aff. ¶¶ 2, 3.  Kaming's affidavit, filed in support of the Cement League's motion to intervene, makes the same substantive points as did Weber.  Thus Kaming asserts that "a modification of the present hiring practices under the 50/50 rule, which permits the employer to request specific skilled workers as a portion of the Union's 50% share, would have a most harmful effect on Cement League contractors, reduce union employment, threaten safety and cause New York City economic loss." *Id.* ¶ 6.  Kaming also makes the point that "[t]he Second Circuit acknowledged this Court's finding 'that there was no suggestion that the CBA formation processes were tainted by

6

extortion or influenced by organized crime.'" *Id.* ¶ 8.

**Christopher O. Ward** is the managing director of the General Contractors Association of New York, Inc. ("GCA"). He submitted a declaration in support of GCA's motion to intervene and to outline GCA's position on an appropriate contempt remedy. The GCA represents 110 contractor members active in the heavy construction industry in New York City, and is a party to 14 different CBAs with the heavy construction trade unions, including four separate CBAs with the District Council. Ward Decl. ¶ 2. Ward makes the same substantive point as Weber. He adds that contractors in the heavy construction industry in the City perform "the vast majority" of their work for public or governmental property owners, which award contracts "on the basis of open competitive bidding, in which the lowest price bid is generally awarded the contract." *Id.* ¶ 3. In Ward's view, "[t]he key element i[n] determining a contractor's bid price for any construction contract is the expectation of labor productivity under the circumstances of the job. . . . If the labor productivity is overestimated, there will be little, if any profit. . . . It is critical to the member contractors for the GCA to be able to rely on the fairly negotiated terms of the collective bargaining agreements now in place." *Id.* ¶ 5. Ward is referring, of course, to the Request System included in the 2001 and 2006 CBAs.

**Paul O'Brien** is the managing director of the Building Contractors Association ("BCA"). The BCA is a membership association consisting of about 165 general contractors, construction managers, and subcontractors who manage new construction and construction renovation on existing buildings, and do extensive restoration, alteration, and tenant change work. The BCA has had a long-term collective bargaining relationship with the District Council, and negotiated CBAs with the District Council in 2001 and 2006. O'Brien submitted an affidavit "to inform the Court of the

7

BCA's concerns about and opposition to any infringement upon its collective bargaining agreement with the District Council." O'Brien Aff. ¶ 2. O'Brien asserts that the old 50/50 rule was a "restrictive and costly work practice" that made its members less competitive, and that BCA members had been trying to change this provision for many years before successfully doing so in 2001. *Id.* ¶ 7. O'Brien states: "As a member and coordinator of the BCA's negotiating committee in its negotiations with the District Council, I was unaware of anything that would have prevented the BCA from seeking the changes it needed in the 50/50 rule on behalf of its members in 2001. I am also certain that no other members of the negotiating committee had any idea that anything we were negotiating to improve the ability of our members to hire the most qualified workforce possible would be forbidden." *Id.* ¶ 8. Furthermore, O'Brien states: "I do not recall having seen the Consent Decree or having become aware of the restrictions it placed upon the District Council that are at issue in this matter until I was notified by the District Council of the decision by the Second Circuit, remanding this matter to this Court for further proceedings." *Id.* ¶ 10. O'Brien asserts that the new Request System "was part of a negotiated compromise with many moving parts, not the least of which was a significant wage and benefit package the BCA agreed to in consideration of the productivity improvements it was receiving by virtue of the modification of the 50/50 rule." *Id.* ¶ 12. O'Brien goes on to state that, if the employer cannot select its own workforce, carpenters referred by the District Council may not have the proper skills, which "causes significant disruptions to the work on the site, and, therefore, hurts productivity and, ultimately, the employer's competitiveness." *Id.* ¶ 13. O'Brien also suggests that carpenters referred by the District Council may be unreliable in attendance or punctuality, or may have poor safety records. *Id.* Finally, O'Brien contends that the BCA as an institution will be harmed if members cannot rely on BCA's

ability to negotiate CBAs free from government disruption and interference. *Id.* ¶ 15.

Counsel for the District Council and the Intervenors have submitted letter briefs which, read together with these declarations, form the background for the government's discovery requests and the grounds on which those requests are opposed.

## II. DISCUSSION

**A.      Standard of Review**

The parties' submissions on the discovery issue reflect their implicit acknowledgment that the Federal Rules of Civil Procedure furnish the governing law.  The Court accepts that approach.  The discovery rules, principally Fed. R. Civ. P. 26, usually come into play in pre-trial proceedings in civil cases.  However, although Rule 26(b) is typically applied in pre-trial discovery, Rule 26(b)(1) and (2) are not explicitly limited to pre-trial discovery; and the last sentence in Rule 26(b)(1) refers to "[a]ll discovery."  Thus, Rule 26(b) is directly applicable to the scope of permissible discovery here.

Rule 26(b)(1) provides:

> For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.   All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

Rule 26(b)(2)(C) provides:

> The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in

the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

## B.   The Issues Presented on Remand

Rule 26 makes it plain that identification of the issues presented by the litigation is essential in determining the relevance of the discovery sought and its importance to the resolution of those issues.  In the case at bar, I begin that process by quoting at some length what the Second Circuit said in its summary order remanding the case for further proceedings in this Court:

> Rule 5(A) of the Union's Job Referral Rules required members on the out-of-work list ("OWL") to be "referred to jobs in the order in which they have registered their availability for referral."  Rule 5(B) provided, in full, that "[r]equests by an employer for specific members employed by the employer within the previous six months shall be fulfilled, as required by applicable collective bargaining agreements."

> . . . . When the Consent Decree was entered, all of the Union's CBAs contained a "50/50 rule" that authorized the union to assign fifty percent of the carpenter workforce at a job site (with the company designating the other fifty percent).  As the district court correctly noted, the interplay of the 50/50 Rule and Job Referral Rule 5(A) created a major source of job opportunities for members who had been seeking work for the longest period of time.  This effect was lessened somewhat by Rule 5(B), which permitted employers to hire workers who had worked for them in the previous six months, because workers hired under Rule 5(B) would be designated as "Union" workers for 50/50 Rule purposes.

> In the 2001 CBAs, the Union granted a concession to the associations of contractors that eliminated the requirement that a contractor could not request the services of a particular carpenter on a job unless that carpenter had worked for the requesting contractor within the past six months.  The 2001 CBAs gave these contractors an unfettered right to select all the carpenters on the job by permitting

10

them to pick the 50 percent contingent of carpenters that, under previous CBAs, had been assigned to them in chronological order from the OWL.  The parties refer to this as the "Request System."

In its contempt motion, the government alleged that the Union violated Paragraph 12 of the Consent Decree by failing to give the government prior notice of its intent to enter into the 2001 CBAs which included the Request System, thereby eliminating the six-month prior employment limitation contained in Rule 5(B) of the Job Referral Rules.

2007 WL 1157143, at *1-2 (internal quotation marks omitted).  The Court of Appeals accepted the government's theory of contempt.  It reasoned that "the portions of the Consent Decree that address the Union's prior notice and review obligations do not exclude CBAs from government oversight," *id*., at *3; "Rule 5(B) does not permit the Union to make unlimited changes to the Job Referral Rules in a CBA," *id*., at *4; and consequently Paragraph 12's requirement of prior notice to the government "was violated when the Union entered into CBAs that made it impossible to comply with the Job Referral Rules incorporated into both the Consent Decree and the Union By-Laws."  *Id*.  The Second Circuit concluded: "We remand for the entry of the Order of contempt, and leave to the district court's discretion the proper remedy."  *Id*.

As the result of the Second Circuit's order, the fashioning of an appropriate remedy constitutes the present "subject matter involved in the action," as that phrase is used in Rule 26(b)(1), and "the issue[] at stake in the litigation," as that phrase is used in Rule 26(b)(2)(C)(iii).  In addition, the District Council moves to modify the consent decree.  The question presented by this motion is whether the government is entitled to the discovery it seeks with respect to that subject matter and those issues.  To reiterate: the government seeks discovery with respect to certain factual assertions

11

contained in declarations submitted by officers of the intervening Associations.[4]

**C.     Whether Discovery by the Government Is Appropriate**

From the declarations of the Intervenors' officers and the letter briefs of counsel, one may distill the following factual assertions and legal arguments intended to show that the government is not entitled to any discovery at this stage of the proceedings:

1.  The Associations and the management trustees of the District Council benefit funds have cooperated in efforts to eradicate corruption.

2. Because this Court has stated that "there is no suggestion in the record on this motion that the 2001 CBAs were tainted by extortion or any other impropriety, or were influenced by organized crime," any issue "concerning the awareness of the employer parties to the 2001 collective bargaining agreements about the terms and conditions of the Consent Decree has been mooted, if not already decided, and any discovery concerning same would be pointless."  BCA Letter Brief at 2 (quoting this Court's decision, 409 F. Supp. 2d at 454-55).

3.  The government's request for discovery from the Associations is untimely because it should have been made during the evidentiary hearing on the government's contempt motion, where the president of the District Council testified and officers of the International Union and an employers' association gave affidavits about the adverse economic consequences of eliminating the Request System.  *See* District Council Letter Brief at 1 ("The Government should not now find it

---

[4]  It is perhaps unnecessary to observe that the Court allowed the Associations to intervene because, as its earlier submissions show, the government's suggested remedy would make it impossible for the Union and the Associations to comply with the 2006 CBAs (which reenacted the Request System contained in the 2001 CBAs), just as the 2001 CBAs made it impossible for those parties to comply with the Job Referral Rules.  The fashioning of an appropriate remedy falls upon the District Court sitting in equity.  It is well established that equity requires consideration by the Court of the interests of third parties that would be affected by its order.

necessary to seek discovery of the District Council and certain contractor associations that have made recent submissions to the Court, when it did not deem it necessary to 'test' the accuracy of similar facts and positions previously submitted."); WCCI Letter Brief at 3 ("The Government seeks to take discovery that is duplicative of evidence already in the record.  Additionally, the Government had ample opportunity to engage in discovery during the contempt proceedings, when the merits of the Government's allegation of contempt against the District Council were at issue.").

4.  Discovery should not be allowed with respect to "the relevant fact which is uncontested: modifying the effective current Carpenters-Cement League collective bargaining agreement would disastrously harm Cement League contractors and the public."  Cement League Letter Brief at 1.  A variation on that theme appears in the Letter Brief for WCCI at 2 (denigrating the government's desire to "expend a great deal of all the parties' and intervenors' time and money 'to test' the accuracy of *sworn affidavits*") (emphasis in original).

5.  In the alternative, if the government is held entitled to any discovery, then (a) that discovery should be limited to a line-by-line parsing of the recently submitted declarations; and (b) the government must submit to reciprocal discovery.

I deal with these assertions and arguments in the order in which they are summarized.

1.  No present case can be made for allowing the government open-ended discovery into the nature and effect of the efforts of the Associations and management benefit fund trustees to combat union corruption.  At least in the absence of any independent showing by the government that these entities may be trying to encourage rather than eradicate corruption, this discovery would resolve itself into a fishing expedition that is not justified on the present record.

2.  It is quite true that in my decision on the government's contempt motion, I noted that

"there was no suggestion that the CBA formation processes were 'tainted' by extortion or influenced by organized crime." (quoting Second Circuit's paraphrase, 2007 WL 1157143, at*2). But the Associations' argument that this "moots" the issue of their awareness of the Consent Decree when the CBAs were negotiated is a *non sequitur*. Weber, a WCCI negotiator, says in his affidavit that the District Council never discussed the Consent Decree during the CBA negotiations, and that the employer negotiators were entirely unaware of the "potential effect" upon the CBAs of the Consent Decree and the government's contempt motion until the Second Circuit issued its order in February 2007. O'Brien, a BCA negotiator, makes similar assertions in his affidavit. Given the centrality of the Consent Decree and its integrated Job Referral Rules to the Request System, the principal benefit the Association negotiators were trying to achieve, the asserted silence of the Union negotiators on the subject and the Associations' consequent professed ignorance are surprising. Certainly it is a legitimate subject for discovery by the government. If, for example, the Associations were aware that a court decision (by this Court or the Court of Appeals) might invalidate the Request System and took a chance anyway, this is a circumstance that might impact upon the Associations' equitable right to request a particular remedy. The issue turns upon equitable principles; phrases such as "equitable estoppel" and "clean hands" come to mind. In this opinion I do no more than suggest these factors; no eventual holding is intimated; but the government is entitled to discovery on the point.

3. The government is not precluded from seeking discovery from the Associations because it did not do so during the contempt hearing, when the Associations were not parties. The contempt hearing turned principally upon whether, on a proper reading of the Consent Decree and the Job Referral Rules, the collective bargaining agreements triggered the prior notice requirement of

14

paragraph 12 of the Consent Decree. This Court held "No." The Court of Appeals held "Yes" and remanded for a determination of the remedy. To analogize the case to an ordinary civil action, the case has passed from the liability phase to the damages phase; and the Associations, in aid of their motions to intervene in that second phase, submit declarations making assertions of fact, some for the first time, which they ask the Court to consider. The allegedly disastrous economic effect of eliminating the Request System did not furnish the rationale for this Court's refusal to hold the District Council in contempt; that decision turned, as I have just noted, upon a construction of the Decree and the Rules. But that alleged effect is now squarely before the Court; the Associations proclaim it from the rooftops; and the government is entitled to discovery on the issue.

4. For comparable reasons, there is no substance to the Associations' suggestion that the government is not entitled to discovery because their officers submitted "sworn" statements. The contention appears to be that because the declarants swore to the truth of what they said, what they said is uncontested (and uncontestable). But the discovery rules do not recognize litigation by *ipse dixit*.

5.(a). I reject the Associations' notion that the government's conducting of legitimate discovery should be placed in the strait-jacket of parsing declarations line by line. Discovery, where legitimate (as it is in this case), need not be so confined. If the discovery seems to be wandering too far afield, and away from the identified issues, remedies may be sought at that time.

(b). As for the alternative request that the government submit to reciprocal discovery, any such request will be deferred until the Magistrate Judge certifies to this Court that the government's discovery, to the extent allowed, has been completed. This will avoid any disputes about the preferential order of taking of cross-noticed depositions or other discovery demands. In addition,

completion of the government's discovery may serve to narrow or clarify the areas in which the other parties have legitimate discovery needs within the parameters of Rule 26(b).

An Order of Reference is being made to a Magistrate Judge to supervise discovery consistent with this Opinion. The Magistrate Judge is respectfully requested to certify to this Court when that discovery has been completed.

It is SO ORDERED.

Dated:  New York, New York
        August 13, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

16