```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
UNITED STATES OF AMERICA,                       :
                                                :
                    Plaintiff,                  :      90 Civ. 5722 (CSH)
                                                :
        -against-                                :
                                                :
DISTRICT COUNCIL OF NEW YORK CITY AND           :      MEMORANDUM
VICINITY OF THE UNITED BROTHERHOOD OF           :      OPINION AND ORDER
CARPENTERS AND JOINERS OF AMERICA, et al.,      :
                                                :
                    Defendants.                 :
------------------------------------------------------------------------X
```

HAIGHT, Senior District Judge:

The question presently before the Court is whether an independent investigator the Court appointed to assume certain responsibilities in the governance of a labor organization should be retained in office or replaced.

This Court exercises its authority in the case pursuant to a Consent Decree entered into in 1994 which resolved the government's 1990 civil RICO action against the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("the District Council"), certain of its officers, and individuals allegedly associated with the Genovese organized crime family. Since the entry of the Consent Decree, the case has generated numerous opinions in this Court and the Court of Appeals for the Second Circuit. Familiarity with all those opinions is assumed.

In 2002, following a complaint by a union member alleging violation of Job Referral Rules incorporated into the Consent Decree, the government and the District Council conducted further negotiations resulting in a stipulation and order appointing Walter Mack, Esq., a former Assistant United States Attorney now in private practice, as the Independent Investigator (sometimes referred

to hereinafter as "II"). The order authorized Mack as II to, *inter alia*, "investigate allegations of wrongdoing concerning the operation of the job referral system and/or corruption or violations of federal, state, or local law" by representatives of the District Council and its constituent local unions, operate the previously established anti-corruption telephone hotline, assess the competency of the District Council's anti-corruption program, and periodically issue written reports to the Court and the parties. The order also armed Mack with the subpoena power, enabling him to command the presence of individuals before him for interviews and depositions and compel the production of documents by individuals and entities such as local unions, contractors, and banks.

The order appointed Mack for a two-year term as II. He served in that capacity from 2003 to 2005. At the end of that time, the District Council exercised the option granted to it by the 2002 stipulation and terminated Mack's services as II. The government moved to continue Mack in office, but the Court enforced the plain language of the stipulation to which the government had agreed. Mack departed the scene. The District Council expressed its willingness, even desire, to continue the office of Independent Investigator. It issued a number of requests for proposals, and ultimately suggested to the Court three companies to succeed Mack as II. One of those companies was Unitel Intelligence Group, Inc. ("Unitel"), whose president is William P. Callahan, Esq. In its submission to the Court forwarding documents relevant to the three candidates, the District Council said any of them would be acceptable, but expressed its preference for Unitel.

The government conducted its own interviews of the three candidates, and contended that either of the other two companies would be a better choice than Unitel. The government urged the Court to conduct the search process *de novo* by interviewing the CEOs of all three companies.

In an opinion reported at 2005 WL 1713061 (S.D.N.Y. July 19, 2005), the Court found that

2

all three candidates were well qualified to act as the Independent Investigator, and accepted the District Council's stated preference for Unitel. On the latter point, I said:

> Given the fact, as I have found, that all three companies are qualified to serve as the II, I am prepared to defer to the District Council's preference for Unitel. The II's services will, after all, be paid for with the dues of the union carpenters, and their representative organization is in my view presumptively entitled to select the provider of those services. The District Council would not be free to prefer and select an unqualified II or one tainted by a conflict of interest.

2005 WL 1713061, at *5.

The Court appointed Unitel as the II in an Order dated August 18, 2005. The order provided in ¶ 5 that the II would serve "for no less than 24 months from the date of entry of this Order." Unlike the earlier order appointing Walter Mack as II, this order did not give the District Council (or the government) a veto power over Unitel's continuation in office after the two-year term. Instead, the Order provided in ¶ 5:

> Not later than thirty (30) days prior to the completion of the 24-month term provided for in this paragraph, the parties are directed to file and serve applications for a further Order (1) continuing the Independent Investigator in office for an additional stated term; or (2) terminating the services of Unitel as Independent Investigator and appointing a successor; or (3) abolishing the office of the Independent Investigator; or (4) such other Order as the parties may be advised to request.

On the present motion, the government invokes ¶ 5(2) of the Order and asks that Unitel be terminated as the II and replaced by a successor. The government does not suggest a successor or what procedures should be followed to select one.

In a separate motion, the District Council (sometimes referred to hereinafter as "the Union") asked the Court to terminate the Consent Decree. That motion, if granted, would put an end to the

3

Court's supervision of the Union's affairs and, of necessity, eliminate the office of Independent Investigator, thereby mooting the present motion. In a separate Opinion filed concurrently herewith, the Court denies the District Court's termination motion and extends the Consent Decree and the office of the Independent Investigator for at least an additional year from the date of these Opinions, subject to further Order of the Court. The question therefore becomes: Should Unitel be continued as II?

It is noteworthy that on the present motion, the District Council does not invoke ¶ 5(3) of the August 2005 Order and ask that the office of Independent Investigator be abolished even if the Consent Decree stays in effect; on the contrary, the District Council expresses its desire to continue the II. The dispute between the government and the District Council is that the government wishes Unitel to be replaced and the District Council wishes Unitel to be retained.

The District Council approaches that dispute by arguing the Court should defer to its wishes, as it did when Unitel was chosen among the three companies bidding for the position. I do not agree. The present context is entirely different. The Court appropriately gave some weight to the Union's subjective preference for Unitel at the time of *appointment*, particularly since the Union would be paying the II's substantial fees. But the present issue is whether, since its appointment, Unitel's *performance* has been adequate. That is a question to be answered by an objective assessment. While the Court has considered the parties' conflicting evaluations of Unitel's performance, it owes no deference to either party, and indulges in none.[1]

---

[1] The government says in its Reply Brief at 15 that since "it negotiated the 2002 stipulation that created the post of Independent Investigator, " it is "entitled to comment and upon and even criticize the performance of whoever holds that position." Well, of course it is. No one contends otherwise. Such criticism is expressly contemplated by ¶ 5 of the August 2005 appointment order, quoted in text. But I do not agree with the next step in the government's

The briefs of counsel and the voluminous exhibits recount in detail the relevant events during Unitel's tenure. Those events include hotline calls, cases opened and closed by the II, investigations, criminal references, resulting prosecutions, the disciplining of union members, and Unitel's reports upon and efforts to improve the District Council's anti-corruption efforts. They are viewed by the government and the District Council in diametrically different ways.

The government's "central contention" is that "[Unitel's] performance has not lived up to expectations." Rely Brief at 1. It would certainly seem that Unitel has not lived up to the *government's* expectations. However, at the threshold it is useful to ask: What are the *Court's* expectations of its officer, the Independent Investigator?

The Court had and has two fundamental expectations: (1) that the Independent Investigator conduct energetic and effective *external* investigations and inquiries into conduct violative of the Consent Decree and applicable laws; and (2) that the Independent Investigator pursue *internal* efforts with the District Council to develop practices and procedures which prevent, deter, and punish corruption within the union, including corruption on the job site which results in losses to union members and the Benefit Funds.

What does the adjective *independent* mean to the Court? With respect to external investigations, "independent" means that the II would exercise initiative, and would not refuse to commence or continue an investigation into wrongdoing because a Union officer asked him to do so. With respect to internal work efforts, "independent" means that the II would play an proactive

argument that because it "acts in the public interest in bringing RICO cases," its "assessment of the Independent Investigator's performance therefore deserves extra weight from the Court." In this vigorously contested litigation between the government and a labor union, the Court is the more significant protector of the public interest, and weighs the arguments of both parties on a balanced set of scales.

role in the affairs of the District Council and local unions, including the District Council's Anti-Corruption Committee, advocating aggressively for reforms and improved procedures, whether the Union welcomed them or not.

The government is critical of Unitel's performance in these areas. At the heart of that criticism, strongly expressed, is the government's view that Mack was a much more effective II than Unitel has been. The government's briefs heap praise upon Mack—well deserved, let it be said—and denigrate Unitel's efforts. The briefs for Unitel and the District Council praise Unitel's performance. These different perspectives lead the parties to view the same event in quite different lights. The exposure of corrupt representatives and placing of Local 157 under the supervision of the International Union Brotherhood of Carpenters and Joiners (the "UBC") in November 2007 furnishes an example. Unitel's brief says at 13-14 that "Unitel's investigations of activity within Local 157 recently led the UBC to grant Frank Spencer, District Vice President, full supervisory authority of the affairs of the local. The chain of events leading up to this event is instructive, and reveals how Unitel's largely behind-the-scenes investigations achieve concrete results and benefit rank-and-file members." The government's Reply Brief at 1-2 regards these events as equally instructive but teaching a different lesson: "Unitel cites its investigation of Local 157 and the actions taken by the international union to remove wrongdoers from that local's leadership. Those actions occurred in November 2007, well after the government had filed its papers seeking Unitel's replacement in September.[2] . . . . In any event, although Unitel did accomplish the removal of Local 157's leadership, the malfeasance of that leadership was well known and well documented by Mack;

---

[2] That observation by the government calls to the Court's mind that pop theology commandment: "If the Second Coming is at hand, look busy."

the suggestion that Unitel 'discovered' that Local 157 business agents were not monitoring job sites . . . is difficult to understand." This is a typical exchange. In discussing several incidents during Unitel's tenure resulting in Union discipline or criminal indictment, Unitel's papers ascribe those salutary results to its effective investigatory techniques, while the government credits Mack with unearthing the facts and faults Unitel for not following them up effectively. The briefs of counsel recount these incidents in extensive, sometimes tedious, detail. The government also contends that Unitel has not pursued with requisite energy a number of corrupt practices discovered by Mack and described by him in a series of transition memoranda as he exited the stage.

Another contrast in the parties' perspectives has to do with statistics: specifically, the number of calls made by union members to the "hotline" maintained by the II, first Mack and then Unitel, and the number of cases "opened" and "closed" by the two IIs during their tenures. To some extent, the parties' differing statistical calculations reflect different procedures in logging and characterizing the calls and the cases. In any event, the meaning of statistics, like beauty, is often found in the eyes of the beholder.[3]

While I do not think that statistics are determinative in this case, one aspect of the hotline-generated statistics catches the eye. Unitel states in its brief at 4 that a comparison of "all calls" (as opposed to "logged calls") received by Mack and Unitel would result in a similar level of calls, but later, when criticizing the percentage of cases closed by Mack, Unitel's brief at 7 states that Mack opened 1,757 cases as a result of hotline calls during his tenure, while Unitel opened 895 cases (through January 17, 2008): a nearly 50% reduction.

---

[3] I do not go so far as to say, with Mark Twain, that "figures don't lie but liars figure." Twain also ascribed a variation on that theme to Disraeli: "There are three kinds of lies: lies, damned lies, and statistics."

That is a dramatic decrease in the number of II-opened cases during comparable periods of time, but it furnishes an uncertain yardstick for measuring Unitel's performance because the decrease may be attributable to a number of possible causes, none provable by extrinsic evidence, at least on this record. The government says these numbers reflect the rank-and-file carpenters' loss of confidence in Unitel's effectiveness and independence from the District Council, when contrasted with carpenters' high regard for Mack.[4] In one of its reports, Unitel suggested that hotline complaints were down due to the construction boom, the logical inference being that when carpenters are more fully employed they complain less. While greater employment would reduce hotline calls from disgruntled, unemployed workers, it would not necessarily reduce calls by employed workers who observe misconduct on the job site; in fact, the construction boom could even *increase* opportunities for the latter type of misconduct. Another explanation is that as the result of the reforms enacted by the District Council, in cooperation with and prodded by Unitel, the

---

[4] In that regard, the government submits a sworn declaration by Donald T. Sobocienski, Mack's investigator, that two unnamed carpenters told Sobocienski that when they called the hotline maintained by Unitel, Callahan refused the carpenters' request to remain anonymous, insisted that they give their names, and subsequently they were confronted by business agents who seemed to have precise knowledge of their allegations of wrongdoing and communications with Callahan. Callahan's answering declaration says at ¶ 7: "Since assuming control of the telephone hotline, our practice has been to allow each caller the option of remaining anonymous. We understand that protecting callers' anonymity is critically important to maintaining the vibrancy and effectiveness of the hotline. It is categorically untrue that Unitel ever conditions the launch of an investigation on the caller's agreement to provide a name. In fact, over half of the calls that Unitel receives on the hotline are anonymous." In denigrating the Sobocienski declaration, Unitel's brief argues at 6 that "the Court should be particularly cautious when inadmissible—and untestable—evidence serves as 'support' for the Government's position." The out-of-court declarations of the unidentified carpenters paraphrased by Sobocienski are offered for their truth and at a trial would be inadmissible hearsay. While it is understandable that carpenters who fear retaliation may wish to remain anonymous, Unitel's counsel are correct in saying that such hearsay evidence carries little weight in the determination of the present motion.

underlying job site misconduct has been reduced and with it the volume of hotline calls; but this theory would not entirely explain the statistical disparity unless underlying misconduct went down *by half,* theoretically possible but seemingly unlikely, and in any event unprovable.

In sum, the statistics upon which the government relies to denigrate Unitel's performance give rise to some concerns about reduced confidence in the hotline by carpenters, but there is too much uncertainty in the proper interpretation of those statistics to give them decisive weight.

Nor do I intend, in this Opinion, to accept the invitation in the briefs of counsel to examine each and every investigation during the Mack and Unitel tenures under a microscope. That is because I am satisfied that Unitel has met the Court's expectations, previously summarized, of what the II should do.

As for *external* investigations, Unitel has submitted numerous subpoenas *duces tecum* to the Court for signature, requiring the production of documents from contractors and their banks, in aid of payments to union carpenters off the books and other manifestations of job site corruption. A number of these investigations are ongoing. In addition to the written reports by Unitel to the Court, which reflect satisfactory levels of investigative sophistication and energy, Mr. Callahan and his two experienced investigators[5] have on a number of occasions participated in informal status reports and

---

[5] These are Bernard J. Kane, who joined Unitel after serving for 22 years as an FBI agent concentrating on organized crime and labor racketeering issues similar to those presented by the case at bar; and William O'Flaherty, who served 20 years in the NYPD, attained the rank of detective, and received commendations for investigations from, *inter alia*, the Office of the United States Attorney for this District. *See* Kane Affidavit, verified February 5, 2008; O'Flaherty Affidavit, dated February 5, 2008. Callahan himself has prior experience as a Court-appointed Independent Investigator monitor of a labor union, Local 1814, ILA, in a case that was brought in the Eastern District of New York. *See United States v. District Council*, 2005 WL 1713061, at *2 (S.D.N.Y. July 19, 2005).

discussions with the Court in chambers.[6]

Unitel's external investigations have achieved some positive results. Most significantly, Unitel's investigation of L & D Installers helped expose a large-scale fraud, in which L & D failed to pay over $2 million in required benefits contributions on behalf of union carpenters. Unitel's investigative efforts helped the government indict two former shop stewards, Frank Proscia and Michael Annucci, on embezzlement charges.[7] As part of its follow-up to the On Par fraud uncovered by Mack, Unitel reviewed bank and contractor records, and interviewed shop stewards, foremen, business agents, and journeymen. These actions led to union charges against at least 60 members, as well as six shop stewards and four foremen. Unitel's follow-up to Mack's investigation of the Cipriani Banquet Hall resulted in recovery through the union grievance process of $90,000 in unpaid benefits from Picasso Contractors. Finally, Unitel discovered evidence of misconduct by the business manager and business agents of Local 157, which resulted in an overhaul of the leadership of Local 157 and supervision by the International Brotherhood of Carpenters.

The government's briefs grudgingly acknowledge these achievements, but tend to ascribe them principally to Mack's initial investigations, and criticize Unitel for not following through more

---

[6] These were informal discussions between the Court and its appointed officer, unattended by counsel for the parties. While my evaluation of Unitel's performance as the Independent Investigator depends more upon its formal reports and the objective evidence of its achievements, these informal discussions between the Court, its appointed officer, and his investigators furnish an additional basis for that evaluation, and my impression was favorable.

[7] The government emphasizes that Unitel initially closed the investigation after minimal action, but this does not completely undermine the significant investigative findings that eventually were made by Unitel after it reopened the case.

quickly. While this list of achievements is less extensive than what Mack's investigations revealed,[8] I conclude that Unitel's performance in this regard has been adequate.[9]

As for Unitel's *internal* efforts to bring about Union reform, there have been quite striking, albeit recent, accomplishments in that area, and it appears that Unitel played a lead role, sometimes having to overcome District Council resistance. These reforms include a 48-hour waiting period for the dispatch of shop stewards from the Out-of-Work List ("OWL") to a job site (in addition to a 30-day waiting period on requested changes to a shop steward's skills listed on the OWL);[10] the standardizing and strengthening of disciplinary guidelines;[11] ongoing education by the II of local shop stewards, business agents, and business managers with respect to their obligations and

---

[8] Mack issued comprehensive reports on manipulations of the job referral system by John Corrigan, corruption and fraud by Boom Construction Enterprises, Tri-Built Construction, Inc., and Silo Construction; and prepared transition memoranda addressing fraud and corruption by A.J. Pegno and Newtown Creek, Port Incorporated, On Par Contracting, and at the site of the Cipriani Banquet Hall.

[9] It is of course entirely possible (although again unprovable) that Unitel may have uncovered less corruption than Mack because the combined efforts of Mack, Unitel, the District Council, and the government over the most recent years have reduced the underlying amount of corruption to uncover.

[10] The prior fraudulent practice of permitting a shop steward to list an additional unique or sometimes bogus skill in order to qualify immediately for a reference to a job site is described in the opinion dealing with Eugene Clarke's claims against Michael Forde. *See United States v. District Council*, 2007 WL 2697135, at *6-10 (S.D.N.Y. Sept. 17, 2007).

[11] Under the revised guidelines, effective August 1, 2006, a shop steward found guilty by the District Council of accepting cash on a job must pay a $10,000 fine or face expulsion from the union. If the fine is paid, the individual's steward certification is suspended for life, and he is barred from holding union office. The punishment for other violations of the Job Referral Rules and OWL procedures were also augmented. It would appear that Unitel played a leading role in achieving this significant reform. Callahan says in ¶ 37 of his declaration, without contradiction in the record: "In 2006, *after considerable lobbying on our part*, the DC instituted disciplinary guidelines designed to deter, to the greatest extent possible, wrongdoing by members." (emphasis added).

responsibilities; revision of the Investigative Plans used by business managers and agents to monitor the job sites of contractors that are suspected of corrupt and improper labor practices; and the referral of jobs for the Javits Center from the regular OWL, rather than a separate Trade Show Out-of-Work List.

These are all worthwhile reforms, and allow one to hope that they will operate to reduce misconduct and corruption in areas covered by the Consent Decree and the Job Referral Rules. But the most pertinent point on this motion is that Unitel has made a useful contribution to these efforts at reform because Unitel, acting principally through Callahan, and the Union have come to cooperate with each other. Unitel does not conceal that cooperation, it proclaims it, describing itself as having earned the Union's "trust and support" and "working closely with the District Council." Unitel Brief at 3, 19. Peter Thomassen, the president of the District Council, says in his affidavit at ¶ 10:

> A relationship has developed between the District Council and Mr. Callahan and his staff that has gone beyond their role as mere investigators. They have become sounding boards and partners with the District Council in our continuing efforts to educate our membership, train our shop stewards and improve our job referral system to assure that it provides fair and equitable opportunities for all our members wishing to use it. Our anti-corruption committee staff members work collaboratively with Mr. Callahan's staff investigators on most matters, while all parties respect the independent integrity of the others.

The government views these expressions not with satisfaction, but with alarm, suspicion, and discontent:

> The government sees the role of the Independent Investigator quite differently: while cooperation and coordination are important when appropriate, the Independent Investigator's job includes investigation of the District Council itself. It is necessary for the Independent Investigator to act at arm's length to the union and expose its shortcomings in policing and preventing corruption and violations of

12

> the collective bargaining agreements. . . . [I]t is plain that the
> Independent Investigator was still empowered to, and expected to,
> investigate the union itself. There is abundant evidence that the union
> could benefit from such oversight. That task becomes impossible if
> the Independent Investigator focuses instead on earning the union's
> trust and preserving a close relationship.

Reply Brief at 12-13.

While the government asserts that "it is plain that the union could benefit from such oversight," there is reason in the present record to believe that Unitel's oversight efforts over the past two years have borne some fruit. Callahan says in his affidavit at ¶ 3:

> With Unitel's help, over 400 members have been brought up on union
> charges, while numerous other members have faced charges at the
> hands of public authorities. On our watch, over $4.4 million has been
> identified for recovery on behalf of the union's Benefit Funds, most
> of which has already been recovered. Finally, by fostering an
> atmosphere of cooperation and intolerance for corruption, Unitel has
> helped to bring about important systemic changes at the DC level.

The government does not challenge the factual accuracy of the assertions contained in the first two sentences of this paragraph; nor does it point to any specific instance in which Unitel failed improperly to exercise its independent powers at the behest of the District Council. While Independent Investigator Mack forcefully described and the government properly viewed with concern the Union world as it existed in 2004 and 2005, recent reforms have been enacted during the tenure of Unitel as the II. Those reforms are intended to change the Union world for the better. Because it is too early to evaluate the effects of these reforms, continuing oversight by an Independent Investigator is necessary. The role played and initiative exercised by Unitel in achieving these reforms argue in favor of Unitel's retention as the Independent Investigator.

The record and briefs of counsel demonstrate a fundamental difference between the *modus*

*operandi* employed by Mack as II and that of Unitel. Vis-a-vis the Union, Mack's method was one of confrontation; Unitel's is one of cooperation. Neither method is all right or all wrong for an Independent Investigator, although both have their dangers if carried to extremes. Inflexible confrontation may waste opportunities for elimination and reform of corruption that a more cooperative spirit might further; too pliant cooperation may undermine the integrity of the II's office. I do not think either extreme is demonstrated in this case. Mack and Unitel are both effective Independent Investigators; their methods differ. There is nothing new in this. In human affairs, the same goals are frequently pursued by different methods. Certainly that is true in the legal profession. All trial judges seek to maintain control over their courtrooms; their methods of doing so differ. All trial lawyers seek to persuade juries by their arguments; some speak in calm quiet tones and others raise their voices dramatically. Or, to enlarge the focus, episcopal and evangelical priests may preach in markedly different ways, although their message is the same.

Having considered all the arguments of counsel, whether referred to in this opinion or not, I conclude that I am satisfied with Unitel's performance as Independent Investigator, and have confidence in its ability to live up to the Court's expectations as previously defined. Accordingly, the government's motion to terminate Unitel as the II is denied. Unitel will continue to function as the Court's Independent Investigator, with the same responsibilities and powers specified in the August 22, 2005 order of appointment. Unitel shall serve an additional term of 24 months from the date of entry of this Order; subject, however, to a shorter term length if the Consent Decree is terminated—and the Court's Independent Investigator eliminated—within the next 24 months.[12]

---

[12] I note that the consequence of the opinion filed concurrently herewith is that the Consent Decree's continued existence is guaranteed for no more than one year. It would not be productive to go through a selection process for a replacement Independent Investigator and

It is SO ORDERED.

Dated: New York, New York
August 8, 2008

                                         /s/ Charles S. Haight, Jr.
                                         CHARLES S. HAIGHT, JR.
                                         SENIOR UNITED STATES DISTRICT JUDGE

---

bring that new Il up to speed for what may prove to be so limited a time. That practical reality would not be determinative if I concluded that Unitel's performance to date was unacceptable. However, for the reasons stated in text, I reach the opposite conclusion, and in that circumstance the question of timing should be considered