UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

UNITED STATES OF AMERICA,            :

             :

       Plaintiff,       :      90 Civ. 5722 (CSH)

             :

   -against-         :

             :

DISTRICT COUNCIL OF NEW YORK CITY AND   :    <u>MEMORANDUM</u>
VICINITY OF THE UNITED BROTHERHOOD OF  :  <u>OPINION AND ORDER</u>
CARPENTERS AND JOINERS OF AMERICA, et al.,  :

             :

      Defendants.     :

---------------------------------------------------------------------X

<u>HAIGHT, Senior District Judge:</u>

In 1994 the government and the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council") entered into a Consent Decree to settle the government's civil RICO action against the District Council, certain of its officers, and other individuals. Since then the District Council has operated subject to the rules and obligations imposed by that decree. The case has generated numerous opinions by this Court and the Second Circuit Court of Appeals. Familiarity with all those opinions is assumed. The District Council now moves to terminate the Consent Decree, contending that its objectives have been met. The government vigorously opposes the motion.

## I. PRELIMINARY

### A.    Legal Standard for Terminating a Consent Decree

The Second Circuit has held that, in cases involving "institutional" reform, courts should "apply a flexible standard in determining when modification or termination should be ordered in light of either changed circumstances or substantial attainment of the decree's objective." *Patterson*

*v. Newspaper & Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir. 1993).[1] This standard "entitles a court of equity to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." *Id.* at 39. In other words, when a "decree has served its purpose, . . . all of its provisions may be ended." *Id.* The *Patterson* district court stated: "Before exercising its power to modify or vacate a judicial decree, a court must be convinced by the party seeking relief that the purposes of the litigation as incorporated into the decree have been fully achieved." *Patterson v. Newspaper & Mail Deliverers' Union*, 797 F. Supp. 1174, 1179 (S.D.N.Y. 1992).

## B. The Consent Decree in This Case

*Patterson* holds that the legal standard for deciding whether a consent decree should be terminated requires the identification of the "objective" and "purpose" of the decree. The objectives and purposes of the Consent Decree in this case are considered in detail *infra*. At the outset it is useful to review the core provisions of the Decree.

The Consent Decree begins with a preamble of "Whereas" paragraphs, which include the following statements:

> WHEREAS, the District Council acknowledges that former officers and representatives of the District Council and certain of its constituent locals have been convicted of labor racketeering;

---

[1] The court noted that "[t]he 'institution' sought to be reformed need not be an instrumentality of the government," and that this flexible standard would apply "[i]f a decree seeks pervasive change in long-established practices affecting a large number of people, and the changes are sought to vindicate significant rights of a public nature." *Id.* In *Patterson* the Second Circuit applied this flexible standard to a consent decree that addressed systematic discrimination and widespread minority underrepresentation in a newspaper and publication deliverers' union. The same standard applies to this action involving the District Council of carpenters' unions.

WHEREAS, the parties agree that there should be no criminal element or La Cosa Nostra corruption of any part of the United Brotherhood of Carpenters and Joiners of America (the "UBCJA"), including the District Council and its constituent local unions, . . .;

WHEREAS, the parties agree that one of the purposes of this Consent Decree is to ensure that the District Council and its constituent local unions shall be maintained and run democratically, and without unlawful influence from outside its membership; . . .

Paragraph 2 of the Consent Decree, captioned "Permanent Injunction against Racketeering Activity," provides:

All current and future officers, employees, and members of the District Council and its constituent locals are permanently enjoined:

a. from committing any act of racketeering activity, as defined in 18 U.S.C. § 1961;

b. from knowingly associating with any member or associate of any La Cosa Nostra crime family or any other criminal group, or with any person prohibited from participating in union affairs (hereinafter collectively referred to as "barred person"); and

c. from obstructing or otherwise improperly interfering with the work of the officers described in this decree.

Paragraph 3 of the Consent Decree established the Investigations and Review Officer ("IRO") and an Independent Hearing Committee "to implement the terms of this Consent Decree."[2] Paragraph 4 of the Consent Decree set forth the powers, rights, and responsibilities of the IRO. These powers included authority to investigate the operation of the District Council and its constituent locals; to bring disciplinary charges against union officers and members; to review and veto certain expenditures, contracts, or proposed changes to the Constitution or By-Laws; to

---

[2] The parties agreed in the Consent Decree that Kenneth Conboy, a former judge of this Court then in private practice, would serve as the IRO, which he did with distinction.

3

recommend to the Court changes in certain areas of operations of the union (such as the procedures used by the union to investigate and discipline misconduct by union officers, employees, or members, and the procedures used by the union to fill vacancies in union positions); to supervise implementation of the job referral rules (further described *infra*) and to supervise certain union elections held in 1995. Paragraph 9 of the Consent Decree stated that the IRO's term of office was 30 months, unless extended. Following several extensions, the IRO's term expired on June 6, 1999.

Paragraph 5 of the Consent Decree required the constituent locals to "adopt the job referral rules and procedures" attached as an exhibit to the Consent Decree, to "make all job referrals in accordance with the job referral rules" and to "comply with the job referral rules in all respects." The Job Referral Rules were promulgated for the union "to maintain and administer a processing system for referral of members to employment in a fair and equitable manner, and to establish records and procedures which will be adequate to disclose fully the basis on which each referral is made." Under the basic structure of the Job Referral Rules, the union "will compile an out-of-work list consisting of the members who have registered their availability for referral," Rule 4, and "[m]embers on the out-of work list shall be referred to jobs in the order in which they have registered their availability for referral, with the first registered member referred first, provided that the member has indicated that he or she has the qualifications requested by the employer," Rule 5(A). However, Rule 5(B) provides an exception to the first-listed, first-hired procedure by permitting employers to request "specific members employed by the employer within the previous six months" from the out-of-work list.[3]

---

[3] At the time the Consent Decree was entered into, the collective bargaining agreements ("CBAs") between the District Council on behalf of its constituent local unions and employer companies contained a "50/50 rule" that allows a union to assign fifty percent of the carpenter

Paragraph 10 of the Consent Decree prohibits multiple officeholding. It states that "no District Council officer shall simultaneously hold any elected, appointed or salaried position in any local union."

Paragraph 11 of the Consent Decree amends the By-Laws of the District Council to conform with the terms of the Consent Decree, and to incorporate certain provisions of the Consent Decree into the By-Laws. It further states: "To the extent that this Consent Decree conflicts with any current or future rights, privileges or rules applicable to the District Council or its membership, the District Council, as the representative of its membership, hereby waives compliance with any such right, privilege or rule and agrees that it and its membership will act in accordance with this Consent Decree."

Paragraph 12 states that "[t]he parties intend the provisions set forth herein to govern the District Council's practices in the areas affected by this Consent Decree, now and in the future." It also required the District Council, for a certain period of time, to give prior written notice to the government and the IRO of proposed changes to the By-Laws and to certain rules and procedures relating to the Consent Decree.[4] The District Council's obligation to give notice of such changes to

_____

workforce at a particular job site (based on the Job Referral Rules and the out-of-work list), with the company designating the other fifty percent. The CBAs were renegotiated in 2001 and again in 2006. The 50/50 rule remains in those renegotiated CBAs, but in them the District Council granted to many employers an unfettered right to request particular carpenters which in effect entitled employers to designate all carpenters at the job site, thereby eviscerating the 50/50 rule. The District Council failed to give the government advance notice of its intent to enter into such CBAs, a failure which the Second Circuit has held placed the District Council in contempt of the Consent Decree. *See United States v. District Council*, 229 Fed. App'x 14 (2d Cir. 2007). On remand, this Court is considering the appropriate remedy for that contempt.

[4] It is this provision which forms the basis of the Second Circuit's decision, cited in footnote 3, *supra*, holding the District Council in contempt of the Consent Decree.

the government expired on June 6, 2006, seven years after the term of the IRO ended.

In July 2001, a union member named Eugene Clarke complained to the District Council that the Job Referral Rules were being systematically violated, with particular reference to the assignment of shop stewards to job sites. The District Council issued a report concluding that there had been no transgressions of the Rules. However, the ongoing controversy eventually involved the government, represented by the office of the United States Attorney for this District. Negotiations between the government and the District Council resulted in a Stipulation and Order dated December 18, 2002 that the proper implementation of the Job Referral Rules and related issues required certain reforms, including the appointment by the Court of an Independent Investigator ("II") with subpoena power to pursue inquiries appropriate to the furtherance of the Consent Decree's objectives (including the Job Referral Rules). The parties agreed that Walter Mack, a former Assistant United States Attorney now in private practice, would act as the II. The Stipulation and Order provided that the District Council would pay Mr. Mack's fees and expenses, and that it had the right to terminate Mack's services after two years. When that time arrived the District Council exercised that right and gave a notice of Mack's termination, while agreeing that the office of the II should be continued. The government objected and sought an order retaining Mack as the II, but the Court enforced the right conferred upon the District Council by the Stipulation and Order and terminated Mack as the II. *See* 2005 WL 975857 (S.D.N.Y. Apr. 26, 2005); 2005 WL 1137877 (S.D.N.Y. May 11, 2005). The parties then disputed who Mack's successor as II should be. The District Council wished to retain United Intelligence Group, Inc. ("Unitel"), whose president is William P. Callahan. The government objected to that selection, but the Court overruled the objection and appointed Unitel as the Court's II for a two-year period, again with subpoena power. *See* 2005 WL 1713061

6

(S.D.N.Y. July 19, 2005) and Order dated August 22, 2005. Unitel is currently serving as the II.[5]

To recapitulate: at present, the principal *active* effects of the Consent Decree are: (1) the permanent injunction against racketeering and association with organized crime figures in Paragraph 2 of the Decree; (2) the Job Referral Rules; and (3) the related investigations of corruption in job referrals and on job sites conducted by the Independent Investigator.

## II. THE PARTIES' CONTENTIONS

The District Council argues that the main purposes of the Consent Decree were to eliminate the "criminal element or La Cosa Nostra corruption" from District Council operations and to ensure that the "constituent local unions are maintained and run democratically and without unlawful influence from outside its membership." Def.'s Br. at 14. It contends that "[t]hese objectives have been achieved in the years since 1994 by the change in leadership and implementation of structural changes in operations and administration of the District Council."[6] *Id.* In addition, the District Council asserts that its "commitment to and cooperation with . . . efforts [to combat union

---

[5] Unlike the earlier Stipulation and Order appointing Walter Mack as the II, the Order appointing Unitel does not give the District Council (or the government, for that matter) the right to terminate Unitel at the conclusion of two years' service. Rather, ¶ 5 of the August 22, 2005 Order directs the parties at that time to apply to the Court for a determination of whether the II should be retained, replaced or abolished. The government has filed a motion for an order terminating Unitel. The District Council and Unitel oppose that motion. This Opinion does not address the merits of that motion.

[6] These various organizational and procedural changes include: removal of the named defendants in the 1990 civil RICO lawsuit from the District Council; implementation of the job referral system, overseen by the IRO; supervision of the union by the UBC from 1996 to 2000; restructuring of the District Council and its governing structure to ensure democratic governance; automated systems to prevent riding on the out-of-work list and improper benefit remittances by employers; the union's anti-corruption program, which employs the services of the Independent Investigator; and a rigorous code of disciplinary guidelines directed at all union members to deter wrongdoing. *Id.* at 15-18.

corruption] represents a sea change from the approach to critical review and investigation from that of the District Council leadership in place prior to the restructuring and since the return of self-governance to the District Council by the UBC in 2000," *id.* at 19, and highlights recent developments that demonstrate its "commitment to stamping out corruption in its industry and . . . its willingness to investigate wrongdoing at the highest ranks of its organization," Def.'s Suppl. Br. at 4.[7]

The government acknowledges that "a major goal of the Consent Decree is to prevent organized crime figures from exerting influence over the District Council," Pl.'s Opp'n Br. at 2, but contends that the Consent Decree more broadly "aims to eradicate all forms of corruption [and labor racketeering], not merely the influence of organized crime," *id.* at 4.[8] To support this interpretation,

---

[7] The supplemental brief describes the District Council and the anti-corruption committee's role in investigations of: (1) the Tri-Built Construction scheme to defraud the District Council benefit funds of millions of dollars, which was facilitated by bribed shop steward David Veltri; (2) the L&D Installations, Inc. conspiracy to defraud the Union benefit funds and to pay members less than their contractual wages, which involved District Council Executive Delegate Michael Annucci and Local 157 District Council Delegate Frank Proscia; and (3) the supervision of Local 157, where the Independent Investigator discovered that the business manager and several business representatives of Local 157 misrepresented attendance records to receive their salaries when they were not at work—leading to an overhaul of the Local 157 leadership and the placement of Local 157 under UBC supervision. Def.'s Suppl. Br. at 4-7.

[8] The government defines labor racketeering as "the use of union office or power for personal profit." *Id.* at 2-3 (citing PHILIP TAFT, CORRUPTION AND RACKETEERING IN THE LABOR MOVEMENT 1 (2d ed. 1979). Section 1961 of Title 18 defines "racketeering activity" as, *inter alia*, "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, of dealing in a controlled substance or listed chemical . . . chargeable under State law and punishable by imprisonment for more than one year"; and any act that is indictable under federal criminal laws prohibiting bribery, counterfeiting, embezzlement from pension and welfare funds, mail fraud, wire fraud, bank fraud, immigration fraud, obstruction of justice, witness tampering, passport fraud, robbery, money laundering, sexual exploitation of children, interstate transportation of stolen motor vehicles, trafficking in counterfeit recording/motion picture labels, and criminal copyright infringement. 18 U.S.C. § 1961.

the government notes that the Consent Decree enjoins the union from "committing any act of racketeering activity," that the IRO was granted broad powers extending to areas well beyond La Cosa Nostra corruption, and that the Job Referral Rules imposed structural reforms broadly designed to keep corruption at bay. *Id.* at 3-4. The government also reasons that "[t]he Consent Decree targets racketeering activity generally because this conduct is a well-trod pathway to organized crime infiltration of labor unions, particularly in the construction trades." *Id.* at 4.

The government argues that the present circumstances cannot justify termination of the decree. First, the government emphasizes widespread evidence of job site corruption. For example, "contractors such as On Par, Boom Construction, and Tri-Built were able—as a matter of consistent business practice—to pay their carpenter workforce in cash, off the books, abetted by corrupt District Council shop stewards who accepted bribes in exchange for omitting carpenters' names from shop steward reports." Pl.'s Opp'n Br. at 5. The government notes that such frauds are not limited to crooked contractors, as "[i]n recent years, five District Council shop stewards . . . have been indicted by the United States Attorney's Office for labor racketeering." *Id.* at 6.[9] Second, the government

_____

[9] The government's brief observes that in September 2000, a New York State grand jury indicted Michael Forde, the District Council Executive Secretary and Treasurer (the highest Union office) on labor racketeering charges. *Id.* at 7. I give no consideration to this circumstance in deciding this motion. It would be entirely unfair to do so, given the resolution of the state's charges against Forde. Following a jury trial, Forde was convicted of accepting a bribe from associates of the Luchese crime family in return for allowing off-the-books non-union workers at a job site. *See People v. Forde*, 8 Misc. 3d 1005 (N.Y. Sup. Ct. 2005). The court concluded the evidence was sufficient to support the jury verdict, but also noted: "[T]his was not a strong circumstantial case. Indeed, at best the evidence was only marginally sufficient to meet the standards that must be followed in a case based on circumstantial evidence." *Id.* at 6. However, the court set aside the verdict based on juror misconduct, including "the expression of totally unfounded negative opinions about the defendants' conduct during trial, the pre-mature determination of guilt shared freely with other jurors, the association of this case with newspaper articles and a television show where all the union members are portrayed as criminals and the apparent desire of some jurors to see the prosecution prevail in this case," which "created a

states that, contrary to the District Council's assertions, prosecutors *have* recently charged union officials with being involved in organized crime corruption. The government points to an indictment in *United States v. Moscatiello*, No. 04 Cr. 343 (KMW) (S.D.N.Y.), which charges that the Genovese Organized Crime Family, from the 1970s through January 2004, had the "ability to manipulate and control the District Council . . ., the New York City Locals [of the District Council], . . . and was able to leverage this control to benefit favored contractors and to extort and intimidate other contractors." *Id.* at 8. The indictment also charges three union officials—a shop steward, a Local 20 official, and a former District Council Benefit Funds employee—as associates of the Genovese Organized Crime Family. Third, the government alleges that the union's long-standing "culture of corruption" has allowed corruption to continue. The government cites Mack reports that sharply criticized the union itself for failing to detect massive cash jobs, as well as more recent Unitel reports that describe business agents and union members' reluctance to combat corruption.[10] *Id.* at 9-13. In response to the District Council's arguments, the government notes that many of the structural changes identified by the District Council were required by the Consent Decree or imposed by outside authorities, that cooperation with the Independent Investigator is required by the Consent Decree, and that the

_____

substantial risk of prejudice to the rights of the defendants by coloring the views of the deliberating jurors and improperly influencing them." *Id.* at 22. The state tried Forde again on these charges. The jury acquitted him.

[10] For example, Unitel's October 4, 2006 Report Assessing the Anti-Corruption Program noted that violations of the job referral system "routinely occur," and stated that anti-corruption efforts were hindered by a culture in which "members who inform on other members are treated with scorn" and "may be subject to economic or physical coercion, or both." *Id.* at 11, 16. In its December 3, 2007 On Par Report, Unitel concluded that the massive fraud was able to continue for many years due to the union's "culture of corruption . . . inherited from prior [District Council] administrations," "membership's indifference" to corruption, and the "reluctance of Business Managers and Business Agents in seeing themselves as active members of the District Council anti-corruption effort." *Id.* at 7-8.

union's cooperation with law enforcement in certain instances "simply do[] not establish that the objectives of the Consent Decree have been achieved." *Id.* at 15. The government concludes: "Before the Court can find that the goals of the Consent Decree have been fully reached, it must believe that the Union—including its shop stewards, business managers, and executive staff—can and will fully police itself, without court or Government supervision, and without the rules and protections of the Consent Decree. The record simply does not support such a finding." *Id.* at 15-16.[11]

The District Council makes several points in reply. First, it argues that the basic purpose of the Consent Decree is to eliminate organized crime's control over the District Council, rather than to "combat[] every form of collective bargaining agreement violation, job site wrongdoing and every aspect of employee (primarily business agent) job performance." Def.'s Reply Br. at 2. Thus, it contends that "the government's observations of job site corruption by these companies [On Par, Boom Construction, and Tri-Built] have no bearing on whether the principal goals and objectives of the Consent Decree have been met." *Id.* at 6. In support, the District Council cites this Court's earlier observation:

> [T]he government contends that the Request System included in the 2001
> CBAs "increases the potential for corruption," since a contractor who recruits
> the entire carpentry work force at a job site is in a better position to pay that
> work force "in cash, off the books, in order to disguise the fact that the wages
> they were paying were significantly below the rate mandated by the collective

---

[11] The government also notes that the Union and its highest officers have been held in contempt of the Consent Decree in the past year and a half. However, the union's failure to provide notice to the government of CBAs altering the job referral rules—which resulting in a finding of contempt by the Second Circuit—was based on a misreading of the Consent Decree shared by this Court. And this Court's finding of Forde's contempt in September 2007 reflected job referral misconduct that took place many years earlier, in 1999. *See United States v. District Council*, 2007 WL 2697135 (Sept. 17, 2007).

bargaining agreement and to avoid paying fringe benefits." Such deplorable conduct by certain contractors is demonstrated by Mr. Mack's investigations, but the corruption principally targeted by the Consent Decree is that inherent in organized crime's control of the District Council, its constituent locals, and union members. The Decree cannot reasonably be read to reach all conceivable corrupt practices of employers. It does not follow, of course, that the corrupt practices on the part of contractors will go unpunished because the Consent Decree in this case does not extend to those practices. Certain of the contractors identified by the Mack investigations are now facing federal and state criminal investigations, and the District Council's benefit funds are pursuing remedies in arbitration against them.

*United States v. District Council*, 409 F. Supp. 2d 439, 455 n.5 (S.D.N.Y. 2006).[12] Second, the District Council argues that it has made significant structural changes over the past 14 years, and that it deserves credit for its "proactive and interactive" cooperation with the Independent Investigators and other law enforcement agencies. *Id.* at 5. Third, the District Council states that the government's attempts to link the District Council with organized crime are "thin and unconvincing," and largely based on old examples. It further states: "Significantly, no District Council business agent has been charged by the United States Attorney's office with violating the Consent Decree's ban on associating with organized crime and neither Mr. Mack nor Unitel has accused any District Council business representative or other employee of such connections." *Id.* at 7. The District Council also criticizes the government's reliance on the jury verdict against Forde, in light of the unfair trial he received. Fourth, the District Council argues that the government's emphasis on the contempt findings is misplaced because Forde's contempt was based on a job referral in 1999, before many of the changes at the union, and because the contempt for failure to notify the government of provisions in the 2001 CBAs reflected a good faith misinterpretation of the

---

[12] However, I note that job site corruption does not merely involve misconduct by contractors *external* to the union; such schemes can be facilitated by union shop stewards (in exchange for bribes) and undetected by union business agents. *See, e.g.,* Unitel's On Par Report.

Consent Decree rather than an attempt to affirmatively conceal matters from the government.

## III. THE DOMINANT PURPOSES AND
## OBJECTIVES OF THE CONSENT DECREE

As noted *supra*, in *Patterson* the Second Circuit held that the applicable standard for modification or termination of a decree "entitles a court of equity to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." 13 F.3d at 39. Judge Conner, the district judge in *Patterson* whose decision to terminate a consent decree was affirmed by the Second Circuit, cautioned that: "Before exercising its power to modify or vacate a judicial decree, a court must be convinced by the party seeking relief that the purposes of the litigation as incorporated into the decree have been fully achieved." 797 F. Supp. 1174, 1179 (S.D.N.Y. 1992). In the case at bar, the District Council is the party seeking relief, namely, the termination of the Consent Decree.

Given the legal standards, this Court's first task is to identify the dominant objectives of the Decree and the purposes of the litigation incorporated into it. Not surprisingly, the District Council and the government disagree on this issue.

The District Council argues that the main purpose of the Consent Decree is to eliminate organized crime's control over the union. In its Reply Brief at 12-14, the District Council contends:

> [T]he basic purpose of the Consent Decree is clearly to eradicate the influence of organized crime over the District Council. This has been achieved, and nothing the Government has put forth suggests otherwise. . . . [I]n determining whether the basic purpose of the Consent Decree has been achieved, the Court must distinguish between situations in which the District Council and its members are victimized by corruption from those resulting from the types of criminal influences over the District Council that existed 17 years ago when the Government commenced this action. . . . The job referral rules and prior notification requirements are not the basic or dominant

> purpose of the Consent Decree. . . . Perfect compliance with the prior notification requirements or the job referral rules is simply not required for achieving the basic purpose of the Consent Decree.

The government argues that the main objectives of the Consent Decree were both to eliminate organized crime's control over the union *and* to combat corruption and labor racketeering within the union more broadly. The distinction is critical because under the District Council's reading of the decree, job site corruption unconnected to organized crime is irrelevant to the Consent Decree's main purpose; while on the government's reading, such corruption is highly relevant.

I begin my analysis of this question with the observation that the identification of the Consent Decree's dominant purpose is not necessarily dispositive on the issue of termination. In *Patterson*, the Second Circuit held that a district court *may* terminate the entire decree when its dominant objective has been achieved, but not that the court was *required* to do so. *See Patterson*, 13 F.3d at 39 ("Though other portions of the decree provide the plaintiff class with enforcement mechanisms for redressing any ongoing discrimination that may be more expeditious than the initiation of new litigation, we agree with Judge Conner that the decree has served its purpose, and that all of its provisions may be ended. Again, we do not decide that the District Court was required to vacate these additional provisions, only that it was entitled to do so."). These pronouncements by the Second Circuit in *Patterson* are instructive in the case at bar because they strongly suggest that even if this Court accepts the District Council's contentions that ridding the Union of organized crime influence was the dominant objective of the Consent Decree and that this objective has been achieved, the Court *may* terminate the entire Decree, but would also have discretion to maintain and enforce other provisions of the Decree—such as the Job Referral Rules—if they were still needed to address other identifiable objectives articulated by the Decree.

14

However, I need not pursue this subject further, because I conclude that the District Council, in its sole fixation upon the discernibly diminished presence of organized crime on the scene, paints the objectives of the Consent Decree with far too narrow a brush. Conceptually, a decree can have more than one basic objective; and I cannot accept the District Council's contention that corruption and racketeering within the union are unrelated to the dominant purposes of this Consent Decree so long as organized crime is not involved.

That contention is belied, first, by the fact that the Consent Decree permanently enjoins any union members "from committing any act of racketeering activity," regardless of whether such acts are performed in conjunction with organized crime figures. Second, the Job Referral Rules—a central and crucial component of the Consent Decree—were intended to eliminate corrupt job referral practices, whether or not connected to organized crime. This broad purpose is clearly demonstrated by the job referral violations which gave rise to the 2002 Stipulation and Order appointing an Independent Investigator. The improper referrals uncovered by Eugene Clarke in 2001 were allegedly made to reward Michael Forde's political supporters, *see United States v. District Council*, 2002 WL 31873460, at *3-5 (S.D.N.Y. Dec. 24, 2002), and had nothing to do with organized crime. If corruption unconnected to organized crime had little to do with the basic purposes of the Consent Decree, it is difficult to understand why Clarke's allegations would have triggered the creation of the Independent Investigator. Furthermore, the scope and nature of the Independent Investigator's investigatory authority, as agreed to by the District Council, demonstrate that the main purposes of the Consent Decree were not limited to combating the influence of organized crime. The Independent Investigator, initially Walter Mack and now Unitel, was charged with monitoring compliance with the Job Referral Rules and conducting inquiries into a broad range

of problematic areas related to the governance of the District Council and its constituent locals.

The Court's August 22, 2005 Order appointing Unitel as the successor II to Mack, which charged Unitel with "all the responsibilities previously wielded by Mr. Mack,"[13] provides in ¶ 2(a) that the Independent Investigator shall have the authority *inter alia*:

> to investigate allegations of wrongdoing concerning the operation of the job referral system, and/or violations of federal, state or local law by District Council representatives, including without limitation officers, employees, delegates, business managers, business representatives and shop stewards . . . or District Council signatory contractors; . . . to make referrals to the District Council and/or law enforcement agencies for further investigation when appropriate; and to report to the Court and/or the Government as appropriate. "Wrongdoing" as used in the foregoing sentence shall include, without limitation, (i) manipulation of the job referral rules for political or personal gain; (ii) falsified reports, including without limitation shop steward reports; (iii) kickbacks and bribes; and (iv) permitting contractors to pay workers in cash or violate the "50/50 rule." The Independent Investigator shall operate the toll-free "hotline" telephone service (formerly operated by Walter Mack, Esq.) in order to solicit and receive allegations of wrongdoing or corruption in connection with the operations of the District Council, whether or not such allegations relate to the job referral system. The Independent Investigator shall conduct an assessment of the District Council's anti-corruption efforts as set forth in paragraph 2(f) *infra*.

In both orders appointing Independent Investigators, the District Council agreed to this delineation of the II's responsibilities and authority, which covers various forms of union "wrongdoing" and corruption that can exist with or without the influence of organized crime. The II is appointed by this Court, whose supervisory powers are derived solely from the Consent Decree. Given its agreement to the language of the orders of appointment, the District Council cannot now be heard to say that the Consent Decree should be construed so narrowly as to make the eradication

---

[13] August 22, 2005 Order, p. 1, ¶ 3.

of organized crime's influence the *sole* objective of the Consent Decree.

The government identifies the eradication of labor racketeering and "job site corruption" as an important objective of the Consent Decree, whether or not organized crime figures play a part in it. At oral argument on the motion, AUSA Vassallo, in response to the Court's question, defined "job site corruption" as "corruption that takes place on the job site through unlawful activities of outside contractors," often acting in conjunction with "corrupt shop stewards who accept bribes to underreport the number of union members who are working on the sites; union members who accept cash, who fail to report it; other union officials who either fail to detect the fraud or to turn it in." Tr. 26. Moreover, in the government's view, the eradication of job site corruption "is itself, regardless of whether there's mob families behind it, that itself is a principal objective of this consent decree. And the job referral rules are the primary mechanism for making sure that doesn't happen." Tr. 27. The Court agrees with these perceptions of the Consent Decree's objectives.

In support of its narrow construction of the Consent Decree, the District Council relies upon a comment I made in a footnote in the opinion reported at 409 F. Supp. 2d 439 (S.D.N.Y. 2006), which denied the government's motion to hold the District Council in contempt of the Consent Decree.[14] That footnote, after reciting the government's contention that the Request System included in the 2001 CBAs increased the potential for corruption by placing contractors in a better position to pay carpenters in cash and off the books, went on to say: "Such deplorable conduct by certain contractors is demonstrated by Mr. Mack's investigations, but the corruption principally targeted by the Consent Decree is that inherent in organized crime's control of the District Council,

_____

[14] The Second Circuit reversed that opinion, 229 Fed. App'x 14 (2d Cir. Apr. 18, 2007), found the District Council in contempt, and remanded the case to this Court for the fashioning of an appropriate remedy, an issue that has been extensively briefed and is now *sub judice*.

its constituent locals, and union members.  The Consent Decree cannot reasonably be read to reach all corrupt practices of employers." *Id.* at 455 n.5.  It is entirely understandable that the District Council should fasten upon that language in support of its present motion.  But the footnote's ruminations were not essential to the decision arrived at in the text of the opinion, and can fairly be regarded as *dicta*.  To the extent that my words in the footnote are inconsistent with the Consent Decree's broader objectives as described in this opinion, they were improvidently uttered and I decline to give them the preclusive effect for which the District Council contends.[15]

For the above reasons, I reject the District Council's contention that the sole objective of the Consent Decree was eradicating the influence of organized crime.  I conclude that the basic objectives of the Consent Decree include the elimination of corruption and labor racketeering from the union (regardless of whether organized crime is involved).

### IV.  DISCUSSION

In support of its contention that the Consent Decree should be terminated because its objective has been achieved, the District Council includes two assertions which are correct, as far as they go.

First, it is true that the outer and visible signs of organized crime influence have been significantly reduced.  The members and associates of the Genovese crime family and the District Council officers named as defendants in the government's 1990 RICO action have departed the scene.  There is no evidence that comparably close connections between organized crime and District Council and its constituent locals have been reestablished.

---

[15]  A trial judge can find fault with his own words if the justice of the cause requires it; that is not a sole prerogative of the court of appeals.

Second, with respect to improper job referrals and job site corruption, the District Council has recently put in place hiring changes and reforms which are intended to prevent and deter fraud. These include a 48-hour waiting period for the dispatch of shop stewards from the Out-of-Work List ("OWL") to a job site (in addition to a 30-day waiting period on requested changes to a shop steward's skills listed on the OWL);[16] the standardizing and strengthening of disciplinary guidelines;[17] ongoing education by the II of local shop stewards, business agents, and business managers with respect to their obligations and responsibilities; and revision of the Investigative Plans used by business managers and agents to monitor the job sites of contractors that are suspected of corrupt and improper labor practices.

The government denigrates these reforms; and there is a hint of hyperventilation in its references during oral argument to "the widespread job site corruption that persists" and "the culture of corruption that continues to impede efforts to fight that corruption," Tr. 25. A more temperate assessment appears in the concluding paragraphs in II Callahan's report to the Court dated April 4, 2006 assessing the anti-corruption program of the District Council:

> I believe that the elimination of corruption in the District Council is hampered by certain aspects of the union culture. This is not a critique or unique situation with respect to the NYC District Council, but is common to many labor unions where most members "mind their own

---

[16] The prior fraudulent practice of permitting a shop steward to list an additional unique or sometimes bogus skill in order to qualify immediately for a reference to a job site is described in the opinion dealing with Eugene Clarke's claims against Michael Forde. *See United States v. District Council*, 2007 WL 2697135, at *6-10 (S.D.N.Y. Sept. 17, 2007).

[17] Under the revised guidelines, effective August 1, 2006, a shop steward found guilty by the District Council of accepting cash on a job must pay a $10,000 fine or face expulsion from the union. If the fine is paid, the individual's steward certification is suspended for life, and he is barred from holding union office. The punishment for other violations of the Job Referral Rules and OWL procedures were also augmented.

business." The District Council is a political organization and many workers owe their employment to the elected officials who have appointed them. Conversely, officials owe their allegiance to District Council members or groups who will vote for them. Some officials, upon hearing an allegation, hope that the allegation is unfounded, and may hesitate to credit the veracity of a complainant. In some situations, officials assigned to the anti-corruption effort may be friends of subjects of union investigations. In some instances, members who inform on other members are treated with scorn, and history has shown that they may be subject to economic or physical coercion, or both.

. . . . The District Council has arrived at a key junction in its history. The Union must decide how best to prevent corruption, preserve, protect and improve the assets of its fringe benefit funds, preserve and increase the level of its membership and represent the interests of its members while facing unprecedented competition from non-union workers and opportunistic employers. To the extent that "old ways" do not advance any of these goals, they should be refined or even abandoned. New ways that advance any of the goals should be adopted without delay, but in many respects, those intended to deter corruption are the *sine qua non*. Without the construction of a systemic bulwark designed to keep fraud out of the Union's affairs, all other goals are at risk. Without a system that allots shared responsibility to prevent corruption to many employees, officers and members, and uses technology to aid in this fight, racketeers who have mastered the same old schemes will continue to exploit the Union. Without the implementation of a system that allows the Union to be self-sufficient in this fight, the future will bring more revelations of fraud that will need to be addressed by independent investigators, the government, and the Court, at an aggregate cost far greater than the investment that can be made now.

*Id*. at 16, 20. I regard these comments by the present II as insightful, accurate, and helpful.

II Callahan submitted a subsequent report to the Court, dated December 3, 2007, dealing with the investigation into and steps taken as the result of massive job site fraud and corruption involving On Par Construction Corporation, a CBA signatory with the District Council. This report summarizes a number of reforms and procedures put in place by District Council, with the guidance and assistance

of the Independent Investigator's office, or planned for future implementation. Callahan's concluding paragraphs in this December 2007 report are more sanguine than those previously expressed in the 2006 anti-corruption report, in which he states: "The District Council and the Funds Management on behalf of the membership as a whole have clearly shown a fiduciary commitment and dedication to ensure that these fraudulent acts do not occur in the future." Unitel's On Par Report, at 14.

One can discern in II Callahan's December 2007 report grounds for optimism that the District Council is attempting to rid itself of any previously existing "culture of corruption" and has very recently fashioned or plans to fashion reforms and procedures to achieve that laudable goal. However, I agree with the government's submission at the oral argument that

> the question isn't whether the landscape has changed, it's whether the principal objectives of the Consent Decree have been fully achieved. . . . . [I]n order for you to terminate this Consent Decree, to use your actual powers to stop Court and government supervision, I think you have to be assured that the Union will be able to police itself without Court and government supervision and without the Consent Decree's protections.

Tr. 30. I think the government has it exactly right. The Court should not terminate the Consent Decree until the District Council and its constituent locals achieve that state of grace; and, under *Patterson*, the District Council bears the burden of convincing the Court that they have done so. I am unable to reach that conclusion at the present time, for a number of reasons.

First, the record makes it clear that massive job site corruption was taking place from the 1990s through 2006. James Murray, the president of On Par, was indicted in 2006 for fraudulent conduct extending up to that time. Another employer, Tri-Built Construction, committed job site fraud on a comparable scale from 1993 through 2004. Numerous other cases of that nature were exposed by the Court's Independent Investigators, first Walter Mack and then William Callahan of

Unitel. Moreover, both IIs' investigations made it clear that union officers and representatives, particularly shop stewards and business agents, played vital roles in facilitating, enabling, or abetting the employers' frauds. They did so by failing to: supervise the job sites, report on the presence (or absence) of carpenters, or keep track of hours worked to ensure that the employers made the payments to the Benefit Funds mandated by the CBAs. More recently, Unitel's investigation of the L&D Installers Company resulted in the indictment of two former shop stewards on embezzlement charges. There are also indicia of organized crime's presence and influence during these years. In *United States v. Moscatiello*, 04 Cr. 343 (KMW) (S.D.N.Y.), the government obtained an indictment charging that the Genovese organized crime family had the ability to manipulate and control the District Council, local unions, and certain contractors through January, 2004.

These circumstances are significant to the present motion because most of the reforms and procedures the District Council has put in place are so recent that it is too early to tell if they will achieve their purpose: to restore, to repeat the phrase, the District Council and its constituent local unions to that state of grace where the presence of an Independent Investigator with subpoena powers and the supervision by this Court under its Consent Decree are no longer necessary to protect sufficiently the legitimate interests of the union members from union corruption and labor racketeering.

That concern is made all the more compelling by the fact that II Callahan continues to apply to and obtain from this Court (in accordance with the provisions of Unitel's order of appointment) subpoenas to obtain the records of contractors, banks and other entities, on a showing of probable cause to believe that other contractors, necessarily aided and abetted by union shop stewards and business agents, are continuing to engage in the sort of job site corruption and fraud typified by the

22

earlier cases. As did Walter Mack, Unitel has discovered situations where contractors are paying union carpenters in cash, and subpoenaed documents to establish the facts.

It is clear enough that honest union members and their benefit funds continue to be victimized by the sort of conduct that constitutes violations of the Consent Decree. Having considered the totality of the circumstances, I conclude that the District Council has not borne its burden of showing that the Decree's objectives have been sufficiently achieved to justify termination. On the contrary: protection of the union membership and their interests requires the continuance, for a time, of the Consent Decree, and of the office of Independent Investigator, with its subpoena power, and the supervisory powers of this Court.[18]

The Court is of course aware that this sort of conduct is the result of human avarice, fear, and inability to resist temptation, vices which are inherent in the human condition. It follows that the complete and absolute eradication of corruption from the Union can never be fully achieved, at least in this world; and if such "perfection" were demanded of the Union, the Consent Decree would remain in effect forever. But that is not what the law requires, nor what the government seeks.

_____

[18] Mr. Rothman, the District Council's attorney, acknowledged during the oral argument that termination of the Consent Decree would deprive both the Court and its appointed Independent Investigator of their powers:

> THE COURT: But I would no longer spend my time in chambers receiving Mr. Callahan or his chief investigator and signing subpoenas for him so he can go out and look at bank records.
>
> MR. ROTHMAN: Only if he wanted to give you some light reading, Judge
>
> THE COURT: Yes, but I couldn't do any light writing.
>
> MR. ROTHMAN: No, you couldn't.

Tr. 50

Instead, the government

> envision[s] a world in which a random errant shop steward accepts a bribe and puts some of the journeymen off the books, in a union that has no culture of corruption, someone's going to speak up and the union's going to find this out and they're going to take action and it's not going to go on for eight years and a hundred million dollars. We have not reached that point.

Tr. 37.[19]  Given the very recent implementation of the District Council's reforms and revised procedures, the government argues that

> we need more time and more information to convince us and the Court that the Union can uncover fraud by itself, that it doesn't need outside monitors and Court supervision and government oversight to do that, and I think we need some sort of period of time where we see real improvements in the crack-down on members who are accepting bribes and who are accepting cash jobs, and less expressions of fear of reprisal by callers on the hotline.

Tr. 39.  These arguments are persuasive.

The Court will not treat every instance of corruption uncovered by the Union's anti-corruption committee as definitive proof that the Consent Decree's objectives have not been met: to do so would be unfair and counterproductive. Nonetheless, the District Council must demonstrate that the Union's efforts to combat corruption have reduced the frequency and scope of corrupt practices to the extent that this Court is convinced that the Union and its constituent locals can adequately police themselves, without further government involvement and Court supervision. At the present time the District Council has not made that showing.

---

[19]  "A hundred million dollars" is something of an exaggeration, or perhaps the exercise of poetic license. The record shows that On Par wrongfully deprived the Benefit Funds of about $10 million and Tri-Built deprived the Funds of about $6.5 million. *See* Pl.'s Opp'n Br. at 5-6. But these are unacceptable amounts, whatever the exact total.

## V. CONCLUSION

For the foregoing reasons, the District Council's motion to terminate the Consent Decree is denied. The Consent Decree will remain in full force and effect. The office of the Independent Investigator will be continued, with all the powers and responsibilities set forth in the April 18, 2005 order of appointment.[20]

An additional year of Court supervision of the District Council pursuant to the Consent Decree, coupled with the continuance in office during that period of the Court's appointed Independent Investigator, should give the parties and the Court an opportunity to determine whether or not the seeds of reform recently planted by the District Council have brought forth sufficient fruit to justify termination of the Decree.[21] In principle, the Court sympathizes with, indeed applauds, the Union's desire to rejoin the ranks of those labor organizations who conduct their affairs free of judicial supervision. In practice, however, I am not persuaded that at the present time the District Council has shown its entitlement to that freedom. If, one year from now, the District Council moves for termination of the Consent Decree and shows by empirical, statistical, or other probative evidence that the objectives of the Consent Decree have been substantially achieved, with no significant risk of a relapse, this Court will go out of business in this case and be glad to do so.

---

[20] Whether the Court discharges Unitel as the II and appoints a different one (as the government urges), or retains Unitel in that position (as Unitel urges and the District Council prays for in the alternative), is the subject of a separate opinion.

[21] The Court will not entertain a renewed termination motion by the District Council prior to the passage of one year from the date of this Opinion. Enough time must go by to allow a proper evaluation of the effects of the Union's new reforms and procedures, and the level of corrupt practices whose elimination or reduction constitute the objectives of the Consent Decree.

It is SO ORDERED.

Dated: New York, New York
August 8, 2008

Charles S. Haight Jr.

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE