```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED  1/13/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA,                      :

                        Plaintiff,                      :              90 Civ. 5722 (CSH)

         -against-                                    :

                                     :              MEMORANDUM OPINION
DISTRICT COUNCIL OF NEW YORK CITY AND          :                 AND ORDER
VICINITY OF THE UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF AMERICA, et. al,     :

                    Defendants.                     :
-----------------------------------------------------------------------X

**HAIGHT, D.J.**

In *United States v. District Council of New York City & Vicinity of the United Brotherhood of Carpenters and Joiners of America*, 229 Fed.Appx 14 (2d Cir. 2007), the Court of Appeals, reversing this Court, held that the District Council (also referred to as "the Union") was in contempt of the Consent Decree entered in this civil RICO action commenced by the Government. The Court of Appeals remanded the case to this Court for the fashioning of a proper remedy. This opinion sets forth that remedy.

## I. BACKGROUND

### A. Procedural History

Familiarity is assumed with all prior decisions of this Court and the Court of Appeals, the Consent Decree, and the Job Referral Rules incorporated into the Consent Decree. This opinion recites the factual background only to the extent necessary to explicate the nature of the District Council's contempt and the remedy fashioned by the Court.

1

Rule 5(A) of the Job Referral Rules required union members on the out-of-work list ("OWL") to be "referred to jobs in the order in which they have registered their availability for referral." Rule 5(B) provided: "Requests by an employer for specific members employed by the employer within the previous six months shall be fulfilled, as required by applicable bargaining agreements." Other provisions of the Consent Decree incorporated the Job Referral Rules attached to the Consent Decree into the Union's By-Laws, and directed the constituent local unions to adopt the Rules and make all job referrals in compliance with them.

Paragraph 12 of the Consent Decree required the Union to give the Government prior written notice of any proposed changes to its By-Laws, and inform the Government "of any changes in any rules or procedures adopted or implemented" pursuant to certain paragraphs of the Consent Decree, from the date the Consent Decree was implemented to seven years "after the termination of the Investigations and Review Officer's term of office," which ended in June 1999.[1] The Job Referral Rules fell within Paragraph 12's notice requirement. If the Government objected to a change proposed by the Union, the Union could "apply to the Court for a determination as to whether the proposed change is consistent with the terms and objectives of the Consent Decree"; otherwise, the change would not occur.

When the Consent Decree was entered, almost all the Union's collective bargaining agreements ("CBAs") contained a "50/50 Rule" that authorized the Union to assign 50 percent of the carpenter work force at a particular job site, with the employer/contractor company[2] designating

---

[1] The Investigations and Review Officer ("IRO"), Kenneth Conboy, was appointed pursuant to the Consent Decree.

[2] This opinion uses the nouns "employer" and "contractor" interchangeably.

2

the other 50 percent.[3]  Although all carpenters at a job site had to be members of a District Council constituent local union, those carpenters assigned by the Union were commonly called "Union workers," while those selected by contractors were termed "company workers."  The interplay of the 50/50 Rule and Job Referral Rule 5(A) created a major source of job opportunities for union members on the OWL who had been seeking work for the longest time.  This effect was lessened somewhat by Job Referral Rule 5(B), which permitted employers to request workers who had worked for them in the previous six months.  Carpenters requested by an employer pursuant to Rule 5(B), also referred to as "the six-month rule," were designated "Union" workers for 50/50 Rule allocation purposes.

In CBAs negotiated in 2001, the District Council granted a concession to certain associations of contractors which eliminated the practical effect of the six-month rule, that is to say, the 2001 CBAs gave a contractor the right to request a particular carpenter for a job site and have that carpenter count against the Union's 50 percent allocation, regardless of whether that carpenter had worked for the requesting carpenter within the past six months.  The 2001 CBAs thereby gave a contractor an unfettered right to select all the carpenters on a job, by permitting the contractor to pick the 50 percent Union contingent of carpenters who, under the previous CBAs, the Union had assigned to contractors in chronological order from the OWL (except for the limited effect of Rule 5(B)), in addition to the contractor's own 50 percent.  The contractors and the Union refer to this

---

[3]  Of course, all carpenters at a job site, whether assigned by the Union or designated by a contractor, had to be members of a District Council constituent local union.

3

entitlement conferred by the 2001 CBAs as the "Request System." I will use the phrase in this opinion. The Request System was also included in the 2006 CBAs, which remain in effect until 2011.

The District Council made no attempt to notify the Government, either before or after it entered into the 2001 and 2006 CBAs, that these changes would occur. The Second Circuit held that this failure to give notice constituted contempt by the District Council of the Consent Decree: "[T]he Paragraph 12 requirement that 'the District Council shall give prior written notice to the Government . . . of any proposed changes to the By-Laws" was violated when the Union entered into CBAs that made it impossible to comply with the Job Referral Rules incorporated into both the Consent Decree and the Union By-Laws." 229 Fed.Appx. at 19.[4]  The Court of Appeals rejected "the Union's claim that Rule 5(B) permitted the job referral practices in the CBAs, and noted that the Union had offered no other argument that the terms of the CBAs were otherwise consistent with the Consent Decree's requirements,"and concluded: "We remand for the entry of the Order of contempt, and leave to the district court's discretion the proper remedy." *Id.* Proceedings then took place before this Court on what that remedy should be.

**B.     Proceedings on the Question of Remedy**

The Government and the District Council are original parties in the case. As noted, the District Council entered into the 2001 and 2006 CBAs with associations of contractors. The associations' membership is made up of contractor companies. The associations act as the collective

---

[4] This Court held that the Consent Decree did not apply to or restrict future CBAs, and denied the Government's motion to hold the District Council in contempt. 409 F.Supp.2d 439 (S.D.N.Y. 2006). The Court of Appeals reversed, holding that no provision in the Consent Decree "empowers the Union to circumvent the Consent Decree through a CBA." 229 Fed.Appx. at 18.

4

bargaining representatives for their member contractors. Because the contempt remedy question had obvious implications for the 2006 CBAs, still in effect, and the contractors' interests in them, the Court allowed four associations to intervene in the remedy proceedings: the Building Contractors Association ("BCA"); the Wall-Ceiling & Carpentry Industries of New York, Inc. ("Wall-Ceiling"); the Cement League, Inc; ("Cement League"); and the General Contractors Association of New York, Inc. ("GCA") (sometimes collectively "the Intervenors").

In addition, the Court granted the status of *amicus curiae* to Eugene Clarke, a union member and prior litigant against the District Council and its chief executive officer,[5] and allowed Clarke to make submissions on the remedy question.

The Government, the District Council, the Intervenors, and Clarke have filed affidavits and briefs on the question of remedy. The Court allowed the Government limited discovery into the Intervenors' assertions that abrogating the Request System would work great economic hardship upon contractors, and their assertions of ignorance concerning the Government's contempt motion challenging the validity of the Request System. Counsel for the Government, the District Council, three of the Intervenors (BCA, Wall-Ceiling, and Cement League), and Clarke presented oral arguments at a hearing on October 24, 2008. With the Court's permission, a number of individual carpenters made statements at the hearing, and certain of the Intervenors filed written submissions addressing those statements.

I will discuss in turn the several contentions with respect to the remedy that the Court should fashion.

---

[5] *See,* in particular, the opinion reported at 2007 WL 2697135 (S.D.N.Y. Sept. 17, 2007).

## II.    THE CONTENTIONS OF THE GOVERNMENT, THE DISTRICT COUNCIL, THE INTERVENORS, AND CLARKE

### A.    The Government

The Government initially proposed, as a remedy, a new assignment scheme where half the carpenters on any job would come directly from the OWL in strict chronological order.    The Government devised two mechanisms for accomplishing this outcome: either Job Referral Rule 5(B) be eliminated, or Rule 5(B) would be retained and the Job Referral Rules modified to provide that all an employer's requests (whether under Rule 5(B) or not) be counted against the employer's share of the 50/50 Rule calculation.  Either remedy would do away with the limited benefit bestowed upon employers by Rule 5(B), where carpenters selected by an employer in accordance with its six-month requirement  counted against the Union's 50 percent allocation.

However, as a second-best alternative, during the briefing and at the hearing the Government stated that it "would not oppose" the District Council's own second choice for a remedy, namely, a return to the *status quo ante* by abrogating the Request System and reinstating Job Referral Rule 5(B) as part of a reinvigorated 50/50 Rule.

Either way, under the Government's proposed remedy, the Court would also void the 2006 CBAs (which by their terms remain in effect until 2011), to the extent that the CBAs established the Request System; and extend and expand the Government's oversight over the District Council's compliance with the Consent Decree.

### B.    The District Council

The District Council initially proposed that any remedy for its contempt leave the Request System entirely intact.  That is a 180 degree change of course from its position at the beginning of the

6

negotiations for the 2001 CBAs, when Union negotiators sought to put an end to any contractors' requests whatsoever.[6] But by the end of the 2001 negotiations, the District Council appears to have concluded that the economic concessions it obtained from contractors in other areas justified granting the concession the contractors most desired, namely, doing away with Job Referral Rule 5(B)'s six-month rule and conferring upon contractors the Request System's unfettered right to select 100 percent of the carpenters at a particular job. The Request System was included in the 2001 CBAs and again in the 2006 CBAs. The Government vigorously opposed a "remedy" that would leave the Request System intact (which it viewed as no remedy at all). With equal vigor, the Intervenors argued for the retention of the Request System without any alteration.

However, during the briefing and hearing on the present remedy issue, the District Council expressed its willingness to abandon an insistence upon retaining the Request System, and to accept instead the remedy of a reinstatement of Job Referral Rule 5(B) and return to the operation of the 50/50 Rule. As noted *supra*, the Government is also prepared to accept that remedy.

## C. The Intervenors

It is the Intervenors who continue to press their strongly expressed view that whatever form the Court's remedy for the District Council's contempt may take, it must not alter or diminish the Request System, which the contractors bargained for and obtained during the negotiations for the 2001 and 2006 CBAs. As a corollary, the Intervenors contend that any change in the CBAs affecting the

---

[6] The reference in text is to a contractor's request for a carpenter who would be counted as a Union carpenter under the 50/50 Rule. The Union did not seek to disturb a contractor's right under the Rule to select 50 percent of the carpenter work force at a job site.

7

Request System must be the result of renewed negotiations between the employers and the Union, rather than imposed by the Court in the form of a remedy for the Union's contempt of the Consent Decree.

## D.     Clarke

Clarke proposes a number of injunctive and monetary remedies.

As for injunctive relief: Clarke argues for the remedy initially requested by the Government, namely, counting every carpenter requested by a contractor as part of the contractor's contingent under the 50/50 Rule, thereby eliminating the Request System and depriving contractors of even the limited freedom of selection conferred by Job Referral Rule 5(B). In addition, Clarke says that because the District Council and its President, Peter Thomassen, "deliberately sabotaged" the Job Referral Rules during the 2001 and 2006 CBA negotiations,[7] the Court should require Thomassen to post a bond with the Clerk in the amount of $224,610, his annual salary, in order to (1) "induce Thomassen to take measures to deter – rather than facilitate – violations of the Consent Decree," and (2) "cover future losses to the [Union Benefit] Funds caused by fraudulent cash contractors."[8] Lastly, perceiving in the brief of Intervenor Wall-Ceiling a threat to rescind its CBA with the District Council if the remedy fashioned by the Court is not to Wall-Ceiling's liking, Clarke asks that the Court enjoin that Intervenor from "taking any steps whatsoever to implement its threat to rescind its agreement."[9]

---

[7] Clarke Main Brief at 5.

[8] *Id.* at 10. Notwithstanding Thomassen's title as "President" of the District Council, the highest executive office is that of Executive Secretary/Treasurer, currently held by Michael Forde.

[9] *Id.* at 12.

As for monetary relief: Clarke proposed in his briefs that the Court appoint a special master, whose tasks would be to identify the carpenters on the OWL jumped over by the operation of the Request Rules, and calculate their resulting lost pension and welfare (principally medical) benefits, amounts which the District Council would have to pay to the carpenters in question. In addition, Clarke proposed that the District Council be held responsible for the cost of unpaid Fund contributions resulting from the wrongdoing of Tri-Built Company, a contractor whose avoidance of contributions was first exposed by Walter Mack. Lastly, Clarke proposed that Thomassen be directed to reimburse the District Council for half the fees and costs charged by the law firm which defended both the District Council and Thomassen against the Government's contempt motion.

Clarke is in a position to make these submissions because the Court, at his request, conferred upon him the status of *amicus curiae.* The broad array of remedies Clarke proposes, institutional and personal, and his choice of pejorative phrases in proposing them also qualify him for the status of *hostis coniunctio*, at least with respect to the present Union leadership.

## III. THE COURT'S AUTHORITY TO FASHION
## A PROPER REMEDY

"We remand for the entry of the Order of contempt," the Second Circuit wrote, "and leave to the district court's discretion the proper remedy." 229 Fed.Appx. at 19. One would naturally interpret these words as an expression of the Court of Appeals' expectation that this Court will exercise the broad discretion courts sitting in equity have to remedy acts of civil contempt. Where contempt sanctions have as their purpose the coercion of future compliance with a court's order, "the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy." *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979). "The measure of the court's power in civil

9

contempt proceedings is determined by the requirements of full remedial relief." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-34 (1949).

However, some Intervenors contend that in the case at bar, this Court's authority to fashion a remedy is severely limited. The Intervenors speak with one voice in arguing that whatever remedy the Court fashions, it should leave the Request System entirely unchanged. Taking the argument one step further, certain Intervenors say the Government lacks the authority to propose changing the Request System, and the Court lacks the authority to change it.

These Intervenors argue that the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, "embodies our private sector national labor policy," which is "to reduce or eliminate industrial strife that interferes with production and commerce through collective bargaining where employees have decided to organize collectively for such purpose." Brief for BCA at 23. The argument continues:

> Central to the federal scheme is absolute freedom of contract. . . . So inviolate is the bedrock principle of freedom of contract that, even when one of the parties might have unlawfully thwarted reaching agreement by purposely refusing to modify its position without any legitimate basis, the National Labor Relations Board is powerless to remedy such a violation of the duty to bargain in good faith by ordering either party to agree to anything they have not freely agreed to do themselves. . . . [I]f the National Labor Relations Board, which was established to administer the national labor policy, cannot force parties to agree to matters they are unwilling to freely contract to do, then another Government agency charged with unrelated responsibilities, like the Justice Department, cannot interfere with a freely negotiated collective bargaining agreement by modifying it in a collateral proceeding over the objection of a party to that agreement who has entered into that agreement in good faith. . . . Accordingly, any remedy for the District Council's violation of the Consent Decree should be narrowly tailored to punish only the District Council, not the BCA or the other Associations.

*Id.* at 23-24. It follows from these propositions, the argument concludes, that "if the Court feels it

must do something else . . . the only thing that the Court could do would be to order the parties to go back to the bargaining table. . . . [I]f the Court were to do anything other than leave our contract alone and find a remedy directed at the District Council, it's got to send us back to the bargaining table." Oral argument by counsel for the BCA, at Tr. 45, 47.[10]

This argument is not persuasive. No one doubts the centrality of the collective bargaining process in the nation's labor relations policy. No one asserts that the National Labor Relations Board can require an employer or a union to include provisions in their collective bargaining agreement with which one party or the other disagrees. But these general propositions do not take into account the Consent Decree, which lies at the center of the case and the Intervenors largely ignore. This Court's obligation on remand is to fashion a proper remedy for the District Council's violation of the Consent Decree. That remedy must take into account the circumstances of everyone affected by the Consent Decree's provisions, parties and non-parties alike. The Court's equitable powers are not as limited as the Intervenors suggest.

To support their contention that this Court cannot change the Request System contained in the 2006 CBAs, the Intervenors rely upon *W.R. Grace & Co. v. Local Union 179, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 771 (1983), where the Supreme Court noted "the federal policy that parties to a collective bargaining agreement must have reasonable assurance that their contract will be honored." But there is a critical difference between *W.R. Grace* and the case at bar. In *W.R. Grace*, the Court held that the EEOC and the company, through their

---

[10]   At oral argument counsel for the BCA reserved the right to contend on appeal that this Court lacked even the power to direct further collective bargaining: "I would say we don't want that, and I'm not agreeing that if the Court did that again that we would think it's within the Court's power to do that. We might challenge that." Tr. 47.

11

conciliation process, could not alter a *pre-existing* CBA without the union's consent. In this case,

however, the Union and the Government entered into the Consent Decree in 1994; and the Union

*subsequently* entered into conflicting CBAs in 2001 and 2006. Surely, "federal *judicial* policy" (to

paraphrase *W.R. Grace*) requires that parties to a Consent Decree have reasonable assurances that

their agreement and the Court's orders will be honored. There is nothing in national labor policy

requiring that the Union and contractor associations be permitted, through the collective bargaining

process, to abrogate the Government's rights under a pre-existing Consent Decree without the

Government's consent. After all, that is precisely the conduct which the Second Circuit branded as

contumacious in the case at bar.

I am not persuaded by the Intervenors' argument that this Court, as a matter of law, has no

power to disturb the CBAs' provisions creating the Request System. On the contrary, I conclude that

under the All Writs Act, 28 U.S.C. § 1651(a), this Court clearly has power to alter provisions in the

2006 CBAs so that the Consent Decree may be effectuated. The Act provides that federal courts

"may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to

the usages and principles of law." A court's "jurisdiction" in this context is construed broadly, and

the court's injunctive writ may affect the conduct of innocent third parties. The Supreme Court has

explained:

> The power conferred by the [All Writs] Act extends, under appropriate
> circumstances, to persons who, though not parties to the original
> action or engaged in wrongdoing, are in a position to frustrate the
> implementation of a court order or the proper administration of justice,
> and encompasses even those who have not taken any affirmative
> action to hinder justice.

*United States v. New York Tel. Co.*, 434 U.S. 159, 174 (1977). In *Sheet Metal Contractors*

12

*Association v. Sheet Metal Workers' International Association*, 157 F.3d 78 (2d Cir. 1998), the district court exercised its power under the All Writs Act to enjoin a reaffiliation agreement between a local union and an international union which "had some likelihood of frustrating the implementation" of the district court's remedial orders and judgments. The Second Circuit, holding that the All Writs Act was "the only proper basis for enjoining the reaffiliation," went on to say that the "necessary and appropriate" standard under the Act applies when the district court is focused "upon preventing persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, from doing so." *Id*. at 83-84 (citation and internal quotation marks omitted).[11]

In the case at bar, the Second Circuit has held that the notice provision in Paragraph 12 of the Consent Decree was violated when the Union (and, of course, the Intervenors) "entered into CBAs

---

[11] In *Sheet Metal*, the Second Circuit reversed the district court's issuance of a preliminary injunction because, "under the particular circumstances of this case, the district court's injunction was neither necessary nor appropriate," 157 F.3d at 79. While the circumstances of *Sheet Metal* bear no resemblance to those of the case at bar, the Second Circuit's opinion articulates the All Writs Act standard in this Circuit. *Sheet Metal* involved an equitable injunction directed at non-parties. The *Sheet Metal* court distinguished such a case from cases involving equitable injunctions under the Act directed at parties to the litigation who had not been the subject of liability findings. *EEOC v. Local 638*, 81 F.3d 1162, 1180 (2d Cir. 1996), an example of the latter category, holds that innocent parties can only be ordered to provide "minor and ancillary" remedial relief under the All Writs Act (citing and quoting *General Bldg. Contractors Assn. v. Pennsylvania*, 458 U.S. 375, 399-400 (1982)). However, the Second Circuit also noted in *Sheet Metal* that "[i]n contrast to *General Bldg. Contractors*, the defendants in the instant case were not parties to the EEOC litigation, *nor have they been asked to bear directly the cost of an equitable remedy*." 157 F.3d at 83 (emphasis added). Arguably, in the case at bar the Government does make such a request of the Intervenors, in the form of giving up the Request System. This raises the question whether the "necessary and appropriate" standard or the "minor and ancillary" standard applies to the Court's injunctive power under the All Writs Act. Given the history of this litigation, the public interests involved, and the overriding importance of fully implementing the Consent Decree, I apply the "necessary and appropriate" standard articulated by the All Writs Act in assessing this Court's powers under the Act.

13

that made it impossible to comply with the Job Referral Rules, incorporated into both the Consent Decree and the Union By-Laws." 229 Fed.Appx. at 19. The Intervenors, although not parties to the original action or engaged in wrongdoing, have by their procuring the Request System and insistence upon retaining it placed themselves in the position of frustrating the implementation of the Job Referral Rules and thus the Consent Decree. In such circumstances, the Court's power to fashion a broad equitable remedy is derived from the All Writs Act. That power justifies an alteration of the CBAs if necessary and appropriate to implement the Consent Decree, which was in effect at the time the CBAs were negotiated. It is "consistent with federal labor policy that where they differ, collective bargaining agreements yield to the Consent Decree." *United States v. Int'l Bhd. of Teamsters ("Star Market")*, 954 F.2d 801, 810 (2d Cir. 1992).

There is no substance to the contention of some Intervenors that any alteration of the existing CBAs *must* be the subject of renewed collective bargaining, which would inevitably open up a number of issues, and *cannot* be part of a Court-ordered remedy. The CBAs themselves contain a "Validity Provision," which states:

> If a Court of competent jurisdiction should decide that any clause or part of this Agreement is unconstitutional or illegal, or should any clause or part of this Agreement be found contrary to present or future laws, it shall not invalidate the other portions of this Agreement.

While constitutional questions do not arise, the Request System included in the 2006 CBAs is "illegal" because it violates the Consent Decree. In consequence, the Court's remedy can excise that part of the CBAs and deal with it separately, leaving the rest of the CBAs intact.

That is not to say that the Intervenors, in addressing the question of a proper remedy, cannot call the Court's attention to the adverse economic consequences to them of such an excision and

14

alteration. Indeed, that is just what the Intervenors' submissions do. The question of a proper remedy is considered in Part VII, *infra*. For the reasons stated in this Part, I reject the argument of some Intervenors that the Court has no power to fashion a remedy for the District Council's contempt that changes any provisions in the 2006 CBAs.

It follows from that conclusion that, if equity requires, the Court can proceed under the All Writs Act to fashion a remedy which alters relevant provisions of the 2006 CBAs, without requiring the contractors' associations and the District Council to return to the bargaining table and renegotiate the CBAs.

## V. THE NATURE AND CONSEQUENCES OF THE DISTRICT COUNCIL'S CONTEMPT

Fashioning the proper remedy requires consideration of the nature and consequences of the District Council's contempt; the interests of the entities and individuals the remedy will affect; and an equitable balancing of those interests.

The District Council acted contumaciously when it failed to give the Government notice of its intention to alter the Job Referral Rules by granting the contractors' associations the Request System in the 2001 CBAs. It repeated that failure in the 2006 CBAs. The Court of Appeals has held that those failures violated Paragraph 12 of the Consent Decree.

The Intervenors dismiss this act of contempt as merely "technical." They do so in an effort to minimize the remedy and leave the Request System in place. But it is not that simple.

To assess the consequences of the District Council's contempt, one must engage in the pop history game "What If"? (*e.g.,* "What if Lincoln had Lived?") Specifically: What if the District Council had obeyed Paragraph 12 and given the Government advance notice of the 2001 CBA

15

negotiations? There is no reason to suppose that the Government would not have made the same objection then that it made in this contempt proceeding: The Request System is inconsistent with the terms and objectives of the Consent Decree. Under the Paragraph 12 protocol, the Government's objection would have precluded the inclusion of the Request System in the 2001 CBAs, and the question would have been presented to this Court. What if this Court had reached the same conclusion then that it reached in this contempt proceeding: The District Council and the contractors can include the Request System in the CBAs without violating the Consent Decree? There is no reason to suppose that the Government would not have appealed that order and made the same argument to the Court of Appeals then that it made to that Court in this contempt proceeding. What if the Court of Appeals had considered the question in 2001 rather than in 2007? There is no reason to suppose that its conclusion would have been any different.

This analysis compels the conclusion that if in 2001 the District Council had complied with Paragraph 12 of the Consent Decree, the Request System would never have come into effect. Stated differently, for seven years (2001 to 2008) the contractors' associations had the benefit of the Request System, to which they were not entitled under the Consent Decree; and union members on the OWL were deprived of the full benefits of the Job Referral Rules, to which they were entitled under the Consent Decree.

Given the totality of these circumstances, the District Council's contumacious act cannot be shrugged off as a mere technicality, requiring only a minimal remedy. The question is more serious than that. A proper remedy must address those realities.

16

## VI. THE ENTITIES AND INDIVIDUALS THE REMEDY WILL AFFECT

The remedy the Court fashions will, of course, directly affect the interests of the parties to the case: the District Council and the Government.

The Court of Appeals has in effect instructed the District Council that the Request System it agreed to in the 2001 and 2006 CBAs is invalid under the Consent Decree. The 2006 CBAs remain in force until 2001. The District Council, as bargaining representative for all union carpenters, is directly interested in and affected by any remedy that might alter any term or condition of those CBAs.

The Government, which initiated this civil RICO action and obtained the Consent Decree, represents the public interest and is directly concerned with a proper implementation of the Decree and the Job Referral Rules.

The Intervenors, in the 2001 and 2006 CBA negotiations, obtained the benefit of the Request System, which is now at hazard and the Intervenors strongly wish to retain unaltered. The Court recognized that direct interest by allowing these contractors' associations to intervene in the remedy proceeding.

Individual union members, while represented by the District Council in collective bargaining negotiations, may have views on the proper remedy which differ from those of the District Council. They have a direct interest in the form the remedy takes. The Court recognized that interest by granting *amicus curiae* status to Clarke, and receiving the oral statements of a number of union members at the hearing.

An equitable remedy must take into consideration these diverse and differing interests. No remedy could satisfy all the entities and individuals it will affect. One is reminded of Lincoln's

17

second inaugural address: "The prayers of both could not be answered; that of neither has been answered fully."

## VII. DISCUSSION

The Government's initially proposed remedies would prevent any carpenter requested by an employer from counting against the Union's allocation under the 50/50 Rule. The Government is wise not to press those remedies. They would deprive employers, who were not responsible for the District Council's contempt, of the benefits conferred upon them by Rule 5(B) of the Job Referral Rules. Such an alteration of the Job Referral Rules, to the prejudice of employers, would be inequitable. The Court, sitting in equity, rejects it, both as initially proposed by the Government and presently proposed by Clarke. The Government now assents to the District Council's second-choice remedy: reinstating and enforcing Rule 5(B) as a modification of the 50/50 Rule.

The District Council initially proposed leaving the Request System intact and limiting the remedy for its contempt to a fine, presumably to be paid by the District Council to the Government. That is the sole remedy advocated by the Intervenors. It is unavailable as a matter of law. This is a case of *civil*, not *criminal* contempt. In a proceeding for criminal contempt, the district court may subject the contemnor to a punitive fine, "usually payable to the United States." *Parker v. United States*, 153 F.2d 66 (1st Cir. 1946). However, in a civil contempt proceeding, "a punitive fine cannot be imposed upon [the contemnor]. Where a fine is imposed in such a proceeding, it must not exceed the actual loss to the complainant caused by respondent's violation of the decree in the main cause plus complainant's reasonable expenses in the proceedings necessitated in presenting the contempt

18

for the judgment of the court." *Id.* at 70-71.[12]  What the District Council initially proposed and the Intervenors still propose is a punitive fine.  It cannot be imposed in this civil contempt proceeding.

The District Council's alternative remedy is an abrogation of the Request System and a return to the interrelated operations of Rule 5(B) and the 50/50 Rule.  As noted, the Government does not oppose that remedy.

The Intervenors seek to retain the Request System for economic reasons.  As noted, the Request System gives a contractor the power to select the entire carpenter force for a particular job. The Intervenors contend that this entitlement is essential to make contractors using union labor ("union contractors") competitive with non-union contractors, whose lower labor costs enable them to submit lower bids on building projects. The Intervenors say that a union contractor's ability to select and retain a team of skilled and reliable carpenters is essential to productivity, a crucial consideration in matching or bettering the bids of non-union contractors. It follows from these factors, the Intervenors argue, that depriving their contractors of the Request System would lead to great economic loss for them and a loss of employment for union carpenters. These concerns are particularly acute, it is said, during the present economic turmoil and the slowing of the recent construction boom in New York City.

The Government responded that the Intervenors' professed economic concerns were non-existent or exaggerated. I granted the Government limited discovery into the question. The evidence elicited thereby demonstrates that the Intervenors' concerns are substantially justified.   The Government contends that the Intervenors' economic propositions are not supported by statistics or

---

[12]  The Second Circuit has referred to the First Circuit's decision in *Parker* as "the leading case" on the imposition of a compensatory fine as a remedy for civil contempt. *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979).

other objective evidence. But those propositions are not susceptible of statistical proof. For example, a core question is: How many jobs would union contractors lose to non-union contractors if the union contractors were deprived of the Request System? Obviously, that question cannot be answered by statistics or other extrinsic evidence. To assess the risk, the Court must depend upon the testimony of witnesses well versed in the industry, such as Paul O'Brien and John O'Hara of BCA. Their descriptions, in affidavits and depositions, of the value of the Request System to union contractors and the risks inherent in losing the System persuade me that the value is substantial and the risk real.

In contending for a judicial remedy that would leave the Request System in place and unaltered, the Intervenors stress that the union contractors are "innocent" third parties. "Innocence," in this context, means that the union contractors were not complicit in the District Council's contumacious conduct. Of course, that is true: the contempt consisted of a failure by the District Council to give the Government a notification that only the District Council could give. Nonetheless, the Government challenged the contractors' professions of innocence, arguing in its first submission on the remedy issue that during the negotiations of the 2006 CBAs the contractors knew or should have known that the Government and the District Council were litigating the contempt issue and the validity of the Request System.[13] On that assumed knowledge, actual or constructive, the Government suggested that the contractors' effort to retain the Request System is subject to obstacles akin to estoppel or unclean hands. The Court allowed the Government discovery into whether the contractors' representatives were aware of the contempt proceedings and what they entailed during the negotiations of the 2006 CBAs. No proof was elicited to support the Government's theory. It

---

[13] The Government filed its motion to hold the District Council in contempt in 2005. This Court's opinion denying the motion is dated January 12, 2006. The Government filed a notice of appeal. The Second Circuit reversed this Court in 2007.

appears from the record that the District Council negotiators, who knew all about the contempt litigation, kept quiet about it during the 2006 CBA negotiations. That silence was arguably ill-advised, although it must also be said that at the time of those negotiations, the District Council had the benefit (albeit temporary) of this Court's ruling that the Consent Decree did not inhibit the Union's ability to enter into such an agreement. In any event, to the extent that the District Council's reticence is problematic, its shortcomings cannot be ascribed to the contractors' negotiators.

So I accept the Intervenors' claims of innocence. But they are not the only innocent participants in the case. Union carpenters who, for whatever reason, have not been requested by a contractor, and are consequently condemned by the Request System to languish unemployed on the Out-of-Work list, are equally innocent of contempt of the Consent Decree. Moreover, the District Council's failure to notify the Government of the effect the 2001 and 2006 CBAs and the Request System would have upon Job Referral Rule 5(A) was contumacious precisely because the Request System undermined the benefits the Consent Decree was intended to confer upon unemployed carpenters who signed up on the OWL.

While there is force to the Intervenors' economic arguments and claim of innocence, I conclude that they do not require this Court, on remand from the Court of Appeals, to fashion a "remedy" for the District Council's contempt that is no remedy at all: the retention of the Request System without alteration. This Court, sitting in equity, will not fashion a remedy that is wholly in favor of contractors, while denying any relief to union carpenters for whose benefit the Job Referral Rules were drafted and included in the Consent Decree.

I conclude that a fair and proper remedy, having in mind the several interests affected by it, will include these elements:

21

(1) Abolish the Request System in its present form. This will require that the relevant provisions in the 2006 CBAs be declared void.

(2) Allow a contractor to select particular carpenters for a job up to but not in excess of 67 percent of the total carpenter work force. That percentage is made up of the contractor's 50 percent under the 50/50 Rule, and an additional 17 percent, representing one-third of, and to count against, the Union's 50 percent. The remaining 33 percent of the carpenter work force will be assigned by the Union from the OWL.

(3) Restore the six-month provision contained in Job Referral Rule 5(B), so that a contractor cannot request a carpenter and have that carpenter count against the Union's 50 percent unless that carpenter has been employed by that contractor during the previous six months.[14] But under no circumstances may carpenters chosen under Rule 5(B) count against the 33 percent assigned by the Union directly from the OWL.

This resolution is fair and equitable because it recognizes contractors' economic and competitive concerns by allowing them to select most of the carpenter work force on any particular project, while restoring the Out-of-Work List as a meaningful source of employment for carpenters seeking work.

---

[14] In an order prior to the hearing, the Court directed counsel to consider the "capping" concept contained in subparagraph (2) of the resolution summarized in text. At the hearing, the Government responded through AUSA Torrance: "[T]his is a remedy that we could accept, the idea of restoring the six-month exception, but capping the percentage of carpenters, as we suggested, as the Court pointed out in our reply brief. We do prefer the true 50-50, but we can accept this one. . . . I would say that we would prefer it to be no more than one-third of the Union's 50 percent. And we think anything more than that would be too much. Of course, it's all just a balancing act and it's in the Court's discretion, but one-third of the 50 percent would be effectively two-thirds on the employer's side and one-third on the Union side." Tr. 17. I agree with the Government's assessment, which is reflected in the resolution summarized in text.

A question arises as to when a remedial order containing this resolution should become

effective. It is raised by an argument made at the hearing by counsel for an Intervenor, the GCA.

Counsel voiced concern with the contention by another Intervenor that the Court would have to send

the parties back to the negotiating table. Counsel for GCA said:

> Our members, 110 of them, perform what's called heavy construction
> and highway work in New York; that is, they build the tunnels,
> bridges, highways, transit projects, water treatment plants. . . . Those
> who work on public jobs, it's competitively bid. Contracts are
> awarded to the lowest responsible bidder. They are locked into these
> prices.
>   So if you're going to reopen negotiations and raise all kinds of issues
> on ongoing projects where contractors are committed to prices, there's
> really no mechanism to go back and say to the Port Authority or to
> Metropolitan Transit Authority and say, Hey, look, I got to get more
> money because we had a renegotiation of a labor agreement. So that's
> a thorny issue for our association.

Tr. 68-71.

This is a legitimate concern. It arises with respect to all presently existing construction

projects, where contractors based their winning bids upon cost and profit calculations which assumed

the continuing existence of the Request System. It would be unfair to alter a contractor's right to

select carpenters until that project has been completed. Accordingly, the remedial order containing

the resolution described *supra* will not apply to any existing construction contracts. The order will

govern any construction contract entered into after the order is filed with the Clerk of the Court.

I turn now to the remedies proposed by Clarke.

First, Clarke contends that a return to the six-month rule of Job Referral Rule 5(B) should be

accompanied by a "hiatus of about six months going forward so that everybody is back on the same

playing field." Tr. 85. By that, counsel means that for six months from the date of the Court's

23

remedial order, contractors cannot select a contractor and have him count against the Union's 50 percent, even if the contractor had employed that carpenter within the previous six months. Clarke reasons that the contractors' utilization of the improper Request System for seven years allowed them to build up a semi-permanent team of carpenters and renders the six-month rule illusory. Counsel put it this way: "The problem now is that a lot of people have worked for different companies over the last seven years who might not have qualified under the rule but would have the six months now because of the violation. . . . [I]f you're going to reinstate the six-month rule, then nobody can get credit for the past seven years if they want to invoke the rule." Tr. 85.

There is logic to this position, but it does not take into consideration the contractors' economic and competitive concerns, which I have found to be substantial. In that context, Clarke's proposal is too disruptive, and I decline to accept it. Furthermore, the ultimate goal of this proposal – that of limiting the way in which Rule 5(B) can be abused – is achieved by "capping" a contractor's requests, in the manner described *supra*.

Next, Clarke contends that since the District Council has been held in civil contempt of the Consent Decree, an award of compensatory damages is mandatory. Clarke cites two Second Circuit cases in support of that contention: *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126 (2d Cir. 1979), and *Milburn v. Coughlin*, 83 Fed.Appx. 378 (2d Cir. 2003).

It is quite true that in *Vuitton* the Second Circuit said: "The district court is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established." 592 F.2d at 130 (citations omitted). *Milburn* cited *Vuitton* for the proposition that "once actual injuries are shown, compensatory damages must be awarded," and added that "the fact that compensatory damages may be difficult to ascertain does not relieve the district court of its duty

24

to award compensatory damages if actual injuries are suffered." 83 Fed.Appx. at 380 (citations omitted).

Notwithstanding the breadth of these pronouncements, when they are considered in the factual contexts of the cases in which they appear, I conclude that those cases do not deprive this Court of discretion to reject the particular monetary proposals Clarke suggests in the entirely different circumstances of the case at bar.

In *Vuitton*, plaintiff, a seller of handbags, brought an action for trademark infringement and unfair competition against defendant, a seller of imitation and counterfeit handbags. Plaintiff obtained an injunction against the sale of the offending handbags, later taking the form of a consent decree. The counterfeit handbags continued to be sold. Plaintiff moved to hold the corporate defendant and certain individuals in civil contempt. The Second Circuit remanded the case to the district court for a determination of whether any of those individuals "had actual notice of the injunction, acted in concert with Carousel, and is in contempt because of a violation of the decree," 592 F.2d at 131. If such a showing was made, the Second Circuit said that "Vuitton should be afforded an opportunity to prove its damages," and held that in such circumstances, the district court would not be "free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established." *Id*. at 130.

In *Milburn*, state inmates had brought a class action alleging inadequate medical treatment. The district court had entered an order and judgment in their favor. Plaintiff, an inmate named James West, moved to hold prison officials in contempt for violating that order. The district court entered a contempt order, but refused to award compensatory damages. The Second Circuit reversed:

> In this case, the district court committed clear error when it refused
> to award West any compensatory damages. . . .
>
> The record indicates that West suffered considerable injury as a
> result of Defendant's violation of the *Milburn* Judgment. The district
> court found that West was denied physical therapy for his lower
> extremities for over five years. As a result of this, West may have
> suffered two significant injuries: (1) he was confined to a wheel chair
> for several years; and (2) as a result of being wheelchair bound, he
> developed bilateral ankle contractures.
>
> There is competing evidence in the record below regarding to what
> extent Defendant's failure to provide West with physical therapy
> caused him to become wheelchair bound. Nonetheless, it is clear from
> the record that West suffered some actual injury as a result of
> Defendant's breach. Accordingly, we hereby VACATE the district
> court order denying West's request for compensatory damages and
> REMAND this case to the district court so that it can determine an
> appropriate compensatory damages award.

83 Fed.Appx. at 380. It is in these unremarkable circumstances that the Second Circuit stated that

"the fact that compensatory damages may be difficult to ascertain does not relieve the district court

of its duty to award compensatory damages if actual injuries are suffered." *Id.* One wonders what

difficulties the Court of Appeals had in mind; this would appear to be a garden-variety question of

causation resolvable by medical proof.

　　　*Vuitton* and *Milburn* have two characteristics that the case at bar does not. First, the identity

of the party to be compensated is immediately apparent: the handbag seller in *Vuitton*, the inmate in

*Milburn*. Second, the burden of paying compensatory damages falls solely upon the wrongdoer. In

the case at bar, Clarke's proposal requires, first, the identification of carpenters on the OWL who

during a seven-year period were jumped over by the operation of the Request System; and, second,

a calculation of the resulting individual lost pension and welfare benefits (including medical benefits

that should have been paid to health care providers but were not). Those amounts, and the cost of the

inevitably protracted proceedings, conducted by a special master, would be paid out of Union funds.

The practical difficulties inherent in Clarke's proposal are summarized in the District

Council's main brief at 13-14:

> [T]he pecuniary implications to the Union of this remedy, assuming it
> is the party to bear its cost, would be staggering, while the actual
> identification of "injured persons" and the extent of their lost earnings
> would be nearly impossible to determine. Identifying which carpenters
> to compensate would in itself be an endless, bankrupting chore. There
> are approximately 18,000 active carpenters, each of whom have unique
> work histories and issues related to their availability and willingness
> to work (to say nothing of the numerous carpenters who have retired
> or left the industry since 2001). In 2004 alone there were over 11,000
> requests submitted by 226 different contractors, and this remedy would
> require the analysis of the effects of every request since July 2001.
> Even if it could be determined which carpenters were on the OWL at
> the time someone else was requested, there is no way of knowing
> whether any of those carpenters had the skill set that motivated the
> request for the particular carpenter, as skills are not submitted when a
> person is requested by name. Additionally, it could not be determined
> whether the bypassed carpenter would have been retained by the hiring
> contractor for any period of time, as no contract violation is presented
> by the discharge of a carpenter for poor work performance. Different
> contractors have different expectations or demands of their employees,
> so a carpenter considered acceptable by one contractor may be
> unacceptable to another. Nor is there any recognized measure of how
> many hours or days a carpenter should be expected to work in any
> given period. Any evaluation of each affected carpenter's work history
> would have to be conducted to, presumably, assess how many hours
> or days he or she would have worked. But by what measure?
> Moreover, a carpenter bypassed by a request one day could have been
> dispatched to, or shaped to a huge job the next. The permutations are
> endless, uncertain and incapable of calculation as a practical matter.
> To be sure, the only people who will benefit from such an exercise are
> those who will be hired and paid with members' money.

Clarke does not contest the District Council's factual premises, but argues through counsel

that "the difficulties have been exaggerated." Tr. 82. Counsel said at the hearing that "I don't think

27

in this case we need a special master" to resolve all the factual issues; "I would leave it to the magistrate," since the case is "essentially close to a damages inquest, and that's the way it would work." Tr. 82. That perception, both optimistic and simplistic, is quite at odds with the view Clarke expressed in his main brief at 14-15:

> Clarke requests that the Court appoint a special master under F.R.Civ.P 53 to identify the carpenters who were illegally jumped over and award them lost pension and welfare (medical) benefits, with the District Council held responsible for the cost of the damages awarded and the cost of the special master.
> To effectuate this remedy, the special master will have to determine the hours of work lost by each carpenter who was bypassed for a referral because he or she was jumped over unlawfully due to an illegal request. Once that determination is made, the special master can ascertain each bypassed carpenter's eligibility for medical coverage and pension benefits. The District Council will be responsible for covering the cost of the contributions for the hours of work determined to have been lost.

(citations and footnotes omitted). Counsel acknowledged at the hearing that a bypassed carpenter, whose medical expenses during the seven-year period should have been covered by union benefits but were not because the Request System prevented him from working enough hours to qualify for the coverage, would have to participate in "an individual claim procedure," because "[t]hey're going to have to make a showing that was the case. . . . [T]he individual is going to have to come in and make a claim or something like that. And someone's going to have to assist them in doing it." Tr. 83. Since on Clarke's theory the District Council would have to pay such claims, it would have standing and a due process right to contest each carpenter's claim during the procedure.

If the tasks Clarke proposes were manageable at all, it would be inappropriate for this Court to add them to the busy docket of a Magistrate Judge. Clarke was right the first time, when he recognized the need for a special master. But the basic point is that Clarke grossly oversimplifies the

28

tasks themselves. He does not persuasively rebut the difficulties described by the District Council's brief. To sum up on this factor: In the case at bar, the difficulties inherent in identifying the victims, and calculating their losses with reasonable certainty, differentiate the case in material respects from *Vuitton* and *Milburn*.

As for the second factor, the open-ended costs of Clarke's proposed remedy would be paid out of Union funds, which would otherwise be available to benefit union members. It is no answer for Clarke to point out that the District Council has "net assets of about $45,000,000." Tr. 84. That is not a *per se* justification for diverting significant Union funds to cover the cost of protracted proceedings. Again, this case is different from *Vuitton* and *Milburn*, where the compensatory damages came out of the pockets of the wrongdoers. Here the union carpenters, for whose well-being and advancement the District Council funds are held, did no wrong.

In short, I disagree with Clarke's contention that this Court, sitting in equity, has no discretion to decide that compensatory damages of the sort he suggests are inappropriate in the circumstances of this case. *Vuitton* and *Milburn* do not compel that conclusion. A district court's discretion in such circumstances may be analogized to that conferred by the statutory provisions for restitution in criminal sentencing. 8 U.S.C. § 3663A(a)(1) provides that an order of restitution is mandatory in convictions for "an offense against property," §3663A(c)(1)(A)(ii), but restitution  need not be ordered if "the number of identifiable victims is so large as to make restitution impracticable," §3663A(c)(3)(A), or "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." §3663A(c)(3)(B). The analogy is not perfect, but the principles are instructive.

29

In the exercise of that discretion I conclude I possess, I decline to include in the remedial order a direction for the compensation procedures Clarke proposes.

Clarke asks for a remedial order requiring Union president Thomassen to post a bond in the amount of his annual salary, for the stated purposes of inducing Thomassen to deter Consent Decree violations instead of facilitating them, and to cover "future losses" of the benefit funds caused by "fraudulent cash contractors." Assuming without deciding that this bonding requirement is not punitive in nature (and thus unavailable in a civil contempt proceeding), I reject the proposal because it would be inequitable. Thomassen's participation in the negotiations for the 2001 and 2006 CBAs cannot be fairly characterized as inducing a violation of the Consent Decree, because it was not known that the CBAs violated the Decree until the Second Circuit said so in 2007. There is no justification for holding Thomassen's salary hostage to future (and hypothetical) benefit fund losses that might be caused by others, *viz.*, "fraudulent cash contractors." It is those contractors who would be the villains of the piece.[15]

Clarke asks that the Court enjoin Wall-Ceiling from rescinding its contract with the Union. I decline to do so because there is no apparent and present need for such a prophylactic order.

Clarke asks the Court to direct the District Council to reimburse the benefit funds for contributions which the Tri-Built Company did not make because of its job site fraud; and to direct Thomassen to reimburse the District Council for half the legal costs incurred in jointly defending the District Council and Thomassen against the Government's contempt motion. Whatever may be the

---

[15]  A number of contractors who apparently are engaging in the fraudulent practice of paying carpenters in cash and off the books, with consequent losses to the Union benefit funds, are currently receiving the unwelcome attention of Fund auditors and the Court's Independent Investigator, armed with the subpoena power. There is nothing in the record to suggest that Thomassen is impeding those remedial steps.

merit of such demands, they do not represent damages directly caused by the District Council's contempt of the Consent Decree. Accordingly they are not recoverable as compensatory damages in this civil contempt proceeding, and I decline to make those orders.

The Government asks the Court to reinstate the District Council's lapsed obligation under Paragraph 12 of the Consent Decree to notify the Government of any proposed changes in the Union by-laws. While there is no apparent present need for such an order – the disregard of Paragraph 12 condemned by the Second Circuit will be remedied by this Court's remedial order and presumably the Union is suitably chastened – such an order will not overburden the District Council and it may serve the public good. The Court's order will include that provision.

The order will also provide for the enhanced and continued supervision the Government requests in its Main Brief at 31-32. The Union resists those measures, but the burden they will impose is not great, and the resulting increased transparency may serve the public interest.

I reject the Government's request that the Court enjoin any aspect of the collective bargaining negotiations that will take place in 2011, when the present CBAs expire. It would be premature to do so, and contrary to the disinclination of courts to intrude in labor-management relations and the collective bargaining process – except, of course, in a case such as this one, where the CBAs violated a previously existing Consent Decree.

## VIII. CONCLUSION

Having summoned up the powers of a Chancellor in Equity, and considered each contention and request made by all those concerned in these proceedings, the Court concludes that the foregoing Opinion describes a fair and proper remedy for the District Council's contempt of the Consent Decree and the Job Referral Rules incorporated therein.

31

Counsel for the Government are directed to settle on ten (10) calendar days' notice a Final

Order and Judgment of Contempt and Remedy, consistent with this Opinion.

It is SO ORDERED.

Dated: New York, New York
        January 13, 2009

Charles S. Haight Jr.

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE