UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,          :

       Plaintiff,                    :

       v.                            :

DISTRICT COUNCIL OF NEW YORK CITY :
AND VICINITY OF THE UNITED        :
BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, et al.,       :

       Defendants.                   :
-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

90 Civ. 5722 (CSH)

**MEMORANDUM**

HAIGHT, Senior District Judge:

     In this case, commenced by the Government in 1990 as a civil RICO action and having over the past 20 years passed through a number of permutations, including the entry of a Consent Decree in 1994 pursuant to which this Court continues to exercise jurisdiction, the parties and other interested entities now propose to the Court a Stipulation and Order Regarding Appointment of a Review Officer ("the RO Stipulation"). The RO Stipulation, if approved by the Court, would bring about fundamental changes in the future governance of the case. The Court held a hearing on May 20, 2010 to consider the matter. For the reasons that follow, I conclude that the RO Stipulation advances the legitimate interests of all concerned and have endorsed it, thereby making its provisions an Order of the Court.

     Familiarity with all prior opinions of this Court and the Court of Appeals is assumed. For present purposes, it is sufficient to say that the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("the District Council") is one of

1

several regional councils of constituent local unions established by the parent United Brotherhood of Carpenters and Joiners of America ("the UBC"). Douglas J. McCarron is the General President of the UBC. In 1990 the Government, represented by the office of the United States Attorney for this district, filed a civil RICO action for injunctive relief against the District Council, several of its officers, and other individuals. The gravamen of the Government's complaint was that the District Council and some of its constituent local unions had been taken over and corrupted by the Genovese organized crime family. The defendants denied those charges. A bench trial began in 1994. The case was settled during trial by the entry of a Consent Decree. The Consent Decree provided principally for the removal from office of the defendant District Council officers, the establishment and incorporation of Job Referral Rules intended to make the assignment of union carpenters to job sites honest and free of corrupt influence, a permanent injunction against all current and future officers, employees and members of the District Council and its constituent locals from engaging in racketeering activity, and the appointment of an Investigations and Review Officer ("IRO") whose duties included conducting union elections, enforcing the Job Referral Rules, and investigating corrupt and illegal practices. The parties agreed upon the appointment of Kenneth Conboy, a former judge of this Court then in private practice, as the IRO.

A time came when IRO Conboy's term in office expired. The District Council and its constituent locals (sometimes collectively, "the Union") continued operation, ostensibly in compliance with the Consent Decree and the Job Referral Rules. However, in 2002 it became apparent that corrupt practices continued, particularly with respect to certain contractors paying union carpenters in cash, "off the books," and the related problem of assigning shop stewards to job sites who were complicit in that corruption. Discussions between the Government and counsel for

2

the District Council resulted in a stipulation and order in December 2002 which, *inter alia*, created the position of Independent Investigator ("II"). The II was granted subpoena power, subject to Court approval, and charged with investigating allegations of wrongdoing concerning the operation of the job referral system and/or corruption or violations of federal, state or local law by District Council representatives concerning the operation of that system. In the 2002 stipulation and order, the parties agreed upon Walter Mack as the II. At about that time, the UBC placed the District Council under trusteeship pursuant to the UBC constitution and by-laws, replacing the District Council officers with appointees the UBC selected. In August 2005, by Court order, Mack was succeeded as II by Unitel, Inc., of which William Callahan is president. The UBC trusteeship was lifted.

In August 2009, the Government unsealed an indictment returned by a grand jury in this District charging various acts of racketeering against several defendants, including Michael Forde, the Executive Secretary-Treasurer of the District Council and a trustee of the Unions' Benefit Funds, several local union officers and employees, a contractors' association representative, and a contractor. *United States v. Forde, et al.*, S3 08 Cr. 828 (S.D.N.Y.). Trial of that indictment is pending before Judge Marrero. At least one guilty plea has been entered, by the accused contractor.

The factual allegations in the indictment, as well as the allocution on the contractor's guilty plea, strongly suggest that while the influence of organized crime upon the District Council and the local unions, the original impetus for this action, has been eliminated or at least largely dissipated, serious corrupt practices continue to exist involving certain contractors and Union officers and representatives. A principal corrupt practice involves contractors paying union carpenters at a job site in cash, "off the books," at rates lower than those specified in the existing collective bargaining agreements ("CBAs") negotiated between the District Council and various contractors' associations,

-3-

and then failing to report wages paid and make contributions to the Union Benefit Funds, also in violation of the CBAs.  To engage in that corrupt practice, dishonest contractors require the cooperation of equally dishonest local union shop stewards and business representatives and District Council officers, whose responsibilities include monitoring activities at job sites and ensuring compliance with CBAs. Dishonorable contractors gain by reducing labor costs and getting an unfair advantage in bidding for projects.  Depriving the Benefit Funds of contributions contractors should be paying victimizes all union members.[1]  The Benefit Funds are governed by boards of trustees, some appointed by the Union and some by the employer-contractors' associations.  Two defendants in the criminal case before Judge Marrero are Union trustees of the Benefit Funds.  Another is an Employer trustee.  Following the unsealing of the indictment, the UBC again placed the District Council under trusteeship.  Frank Spencer, a UBC officer, is the Trustee.

The unsealing of the indictment in August 2009 and the facts alleged therein, as the result of a lengthy investigation by federal law enforcement agents, brought about a consensus among counsel for the Government, the UBC, the Union Benefit Funds trustees, and the Employer trustees that future governance of the District Council and its constituent locals under the Consent Decree would have to be implemented by a new stipulation and the appointment by the Court of a new officer: the Review Officer ("RO").  The last "WHEREAS" paragraph in the RO Stipulation's preamble states that "the presence and activity of an independent court-appointed officer granted

---

[1]  Carpenters who agreed to accept cash from contractors acted culpably.  They had to know that the contractors were violating the CBAs.  However, dishonorable contractors had leverage over carpenters: a refusal to hire unless wages were accepted in cash.  Carpenters had families to support and bills to pay.  The real villains in the piece are the contractors who cheated those carpenters and the Benefit Funds by paying wages in cash, and the Union shop stewards, business agents, and officers who betrayed the membership by letting those contractors get away with it.

powers beyond those provided to the Independent Investigator in the December 2002 Stipulation and Order and the August 2005 Order, as set forth below, are essential to the eradication of corruption and racketeering as they affect union carpenters and union employers." The Stipulation confers broad powers and responsibilities upon the RO, a breadth that may be gleaned from the description of his "General Authority" in paragraph 5.a.:

> The Review Officer is granted authority to ensure compliance with the injunctions set forth in the Consent Decree; to investigate the operations of the District Council and the operations of the Benefit Funds, including but not limited to investigating allegations of corruption and wrongdoing by officers, representatives, agents, employees, members, and trustees; to bring disciplinary charges against any District Council officers, representatives, agents, employees, or members; and to exercise the authorities, rights and powers described below.[2]

Those "authorities, rights and powers" are then set forth in a single-spaced, 21-page document. They are varied and extensive. I need not recite them in detail. Their scope may be sensed from the captions of some of the Stipulation paragraphs creating them: Review and Oversight Authority, paragraph 5.b.; Investigative Powers, paragraph 5.d.; Referral of Matters to the Review Officer, paragraph 5.e.; Disciplinary Authority, paragraph 5.f.; Litigation Authority, paragraph 5.g.; Job Referral Rules, paragraph 5.j.; and Supervision and Conduct of Elections, paragraph 5.k. It is fair to say that in his powers and responsibilities, the RO created by this Stipulation more closely resembles the IRO created by the 1994 Consent Decree than the II created by the 2002 and 2005 orders.

---

[2] This paragraph of the Stipulation concludes with the sentence: "The reference herein to trustees of the Benefit Funds is to be construed as referring to the trustees solely in their capacity as trustees of the Benefit Funds."

-5-

The parties stipulate, and ask the Court to order, that Dennis M. Walsh, an attorney in private practice, be appointed the RO. The RO's term in office extends for 30 months from the entry of the Stipulation and Order, and may be extended "for any period" on the consent of the District Council, the Benefit Funds, the Government, and the Review Officer. Paragraph 8.c.

The proponents of the RO Stipulation submitted a joint brief in support of the Court's jurisdiction and authority to approve the Stipulation and appoint Mr. Walsh as RO, and the reasons why I should do so. At the hearing on May 20, I heard submissions from counsel for all signatories to the Stipulation. Mr. Walsh was present and I put some questions to him. A number of carpenters attended the hearing. I invited them to speak. Four did so.

Having considered the present record on this application, and the history of the case over 20 years, I reach the following conclusions.

1. The Court has the authority to enter this Stipulation and Order. That authority derives from the inherent power conferred by the Consent Decree to enforce, ensure compliance with, and modify its terms; Rule 60(b) of the Federal Rules of Civil Procedure; the Court's contempt powers; and 18 U.S.C. § 1964.

2. Whether to approve the RO Stipulation lies within the sound discretion of the Court.

3. In the exercise of that discretion, I will approve the Stipulation, endorse it as an Order of the Court, and appoint Mr. Walsh as the Review Officer.

I reach those conclusions for the following reasons:

1. It is entirely clear that increased efforts must be made to cleanse the District Council and its constituent locals of corruption and dishonest practices. The appointment of a Court officer with increased powers is vital to that purpose.

2. Mr. Walsh is well qualified for the task. He was the first assistant and front-lines litigator for IRO Conboy during the IRO's energetic and productive tenure, and consequently is well versed in District Council and local union practices, personnel, and culture. Mr. Walsh has additional valuable experience as a private investigator, a prosecutor, and in law enforcement. While the fact that all interests concerned have chosen Mr. Walsh with visible and audible enthusiasm suggests they will work with him effectively in the common cause against union and employer corruption, his experience also assures the Court that he will hold those interests to account if they do not.

3. There are two additional reasons for hope that the RO Stipulation will bear fruit. First, the Government and the District Council, to a degree not previously seen in this frequently contentious litigation, are acting as committed allies against the sort of corruption and dishonesty that victimize honest union carpenters. That the District Council and its constituent locals still confront these problems 20 years after this action was filed must surely be a source of disappointment, even embarrassment, to the UBC and General President McCarron. The spirit of the UBC's resolve, as revealed in the letter of the RO Stipulation, is encouraging. Second, the Benefit Funds are for the first time directly involved in a Court-supervised effort to combat union and employer dishonesty. To be sure, the Government and the Benefit Funds agree to disagree about whether the Consent Decree binds the Funds, and the Stipulation preserves their positions on that issue; but that disagreement makes the cooperation of the Government and the Benefit Funds on the present effort more impressive, not less.

4. The operative provisions of the Stipulation are well crafted and should prove beneficial. Counsel for the several interests have clearly worked hard on the document. It seeks to confer upon the RO the broad powers he needs, while attempting to provide for any contingency that might arise.

-7-

Of course, we know that in the course of human events that latter objective is difficult to achieve, but this is a highly professional document. The Court commends counsel for their negotiating and drafting skills, and their clients for breathing life into counsel's efforts by authorizing the Stipulation.

5. I give considerable weight to the remarks of the four carpenters who spoke at the May 20 hearing. They all spoke in favor of the Stipulation and Mr. Walsh's appointment as RO. These skillful and honorable artisans are tired of and frustrated by decades of dishonesty in their Union. They all expressed, in different ways, that this may be the best, perhaps the last, chance of turning things around. I take their words to heart.

For these reasons, the Court is concurrently endorsing the Stipulation and Order Regarding Appointment of a Review Officer.

A concluding word. The RO's greatly expanded powers and responsibilities will inevitably generate increased litigation, disputes, applications, and occasions for supervision or intervention by the Court. That reality is presaged by paragraph 12.f. of the Stipulation, which provides:

> This Court retains exclusive jurisdiction to supervise implementation of this Stipulation and Order and retains exclusive jurisdiction to decide any and all issues arising under this Stipulation and Order, and any and all disputes growing out of the issuance, interpretation, or application of this Stipulation and Order. The Review Officer or any party to this Stipulation and Order may apply to the Court for any orders necessary and appropriate to implement the Consent Decree and this Stipulation and Order, including orders preventing non-parties from interfering with the implementation of the Consent Decree or this Stipulation and Order. The Review Officer will have the right to intervene in any matter or proceeding concerning this Stipulation and Order.

I have supervised this case since its inception in 1990. In October 2008, I relocated to the District of Connecticut on permanent reassignment from the Southern District of New York, and now

maintain my courtroom and chambers in New Haven. At first, it was feasible to manage the case

from New Haven, by telephone conferences, faxes, e-mails, and an occasional court hearing in New

York. But that world changes entirely with the entry of this Stipulation and Order and the

assumption by the Review Officer of his broader duties. It is necessary that all those presently

concerned with the events of that new world, or who may become ensnared in those events as they

unfold, have ready access to a judicial officer. In that circumstance, I have asked the Chief Judge

and the Assignment Committee of this Court to reassign the case to another judge, whose chambers

and courtroom are located at 500 Pearl Street.

Dated:  New York, New York
        June   2   , 2010


CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE