15GFDISC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4
                Plaintiff,
5
           v.                        90 CV 5722 (RMB)
6
   DISTRICT COUNCIL, et al,
7
                Defendants.
8  ------------------------------x

9                                    New York, N.Y.
                                     May 16, 2011
10                                   2:30 p.m.

11 Before:

12

13              HON. RICHARD M. BERMAN,

14                                   District Judge

15                   APPEARANCES

16
   PREET BHARARA
17      UNITED STATES ATTORNEY for Plaintiff
   BENJAMIN TORRANCE
18      Assistant United States Attorney

19 SCOTT WEISS
      Attorney for Michael Bilello
20
   DENNIS WALSH
21 BRIDGET ROHDE
      Attorneys for Review Officer
22

23

24

25

15GFDISC

APPEARANCES (Cont'd)

LATHAM & WATKINS
    Attorneys for UBC
KENNETH CONBOY
WILLIAM RECHLER
NATE KALE

DeCARLO, CONNOR & SHANLEY, PC
    Attorneys for District council
BRIAN F. QUINN

MARK ROSEN
    Attorney for General Contractors Association

CARY KANE, LLP
    Attorneys for Carpenters Committee
LARRY CARY

15GFDISC

1          (Case called)

2          (In open court)

3          THE COURT:  I did get a letter from one of the union

4     members asking that we adjourn today's meeting.  I thought

5     better of that because so many people are involved and had

6     already planned to come and also the meeting that that

7     individual, Mr. Franco, was concerned about, was to occur at

8     5:00 today, and unless there's something very unusual I don't

9     know about we'll be done long before 5:00 and certainly in time

10    for anybody to get to that meeting.

11         So we set today's meeting the last time we were

12    together on April 6 and we started that meeting with

13    Mr. Conboy.  I'm happy to start with him today to bring things

14    up to where we stand today, bylaws, etc.

15         MR. CONBOY:  Good afternoon, your Honor.  I'm Kenneth

16    Conboy of Latham & Watkins representing the UBC.  Judge, I do

17    want to say first with respect to the bylaws that they were

18    handed a week before last to Dennis Walsh, the review officer

19    and I do note because of Mr. Walsh's cover letter your Honor is

20    aware of the fact that they are now under review by the rank

21    and file as your Honor directed.  So our understanding is that

22    the review period will continue, I believe until June 9, and my

23    own view of the matter is that the bylaws are constructive and

24    that they broadly address the objectives and the concerns of

25    all of the parties to the consent decree.

1    I also would like to say, your Honor, that with

2    respect to the funds, I am going to ask my colleague, Raymond

3    McGuire, to bring your Honor up to date with a matter that

4    actually has emerged only in the last several days, and is of a

5    nature that we believe should be shared by you and by all here

6    in the courtroom, obviously very concerned about the integrity

7    of these funds, as those funds relate to the retirement and the

8    health and indeed the fundamental expectations of the rank and

9    file vis-a-vis these benefit funds.

10    Finally, I would like to tell your Honor that at your

11    suggestion Mr. Weiss was very accommodating to us, when I say

12    us, I mean Mr. Torrance, the United States Attorney, Mr. Walsh

13    and myself and he did arrange for a teleconference to be had

14    last week with respect to issues that he raised in his letter

15    to you.  Your Honor will recall that you applied a memorandum

16    endorsement to his letter inviting the parties to have a

17    constructive discussion with respect to the status of the

18    various aspects that are either explicitly or implicitly before

19    the Court because of Mr. Bilello's motion.

20    We did have a conference of I think about an hour's

21    duration and also counsel, Mr. Kane and Mr. Cary were able to

22    participate and I certainly feel that because Mr. Weiss was

23    good enough to take the initiative there, that I defer to

24    Mr. Weiss to give your Honor a report with respect to those

25    matters.  But if your Honor please, I would like to now ask

1    Mr. McGuire to bring the Court and counsel and the parties up

2    to date on the status of the benefit funds and more

3    particularly more recent developments in terms of the

4    prospective viability of those funds.

5         THE COURT:  If we could in one minute turn to that.

6    I'm obviously aware of the status of the bylaws.  I would like

7    to hear a little bit more about that.  There were a couple of

8    drafts, according to the correspondence exchanged, comments

9    given by Mr. Walsh back and forth, so is this draft the draft

10   that absorbs or incorporates as many of those comments as you

11   thought were helpful and is now out for public distribution on

12   the theory that this is the draft recommended by yourself?

13        MR. CONBOY:  Yes.  Judge, if I could just make a very

14   brief statement about that and then I do want to defer to

15   Dennis Walsh, who obviously has at this stage under Judge

16   Haight's order the primary responsibility to do two things,

17   number one, to satisfy himself that these bylaws adequately

18   address the concerns of your Honor and Mr. Torrance and

19   secondly to keep an open mind with respect to the text of the

20   bylaws so that when the commentary period is over he has

21   sufficient flexibility to make a final recommendation, I would

22   assume initially to us and ultimately to your Honor.

23        We have had a very constructive dialogue with

24   Mr. Walsh.  We had met numerous times.  We have had discussions

25   not only among the lawyers but with respect to the offices of

15GFDISC

1    the UBC and I do believe that the bylaws in their present form

2    meet in large degree the concerns that Mr. Walsh has repeated

3    to us in the course of these deliberations.  And he, as we,

4    await the comments of the rank and file in terms of their

5    careful scrutiny of these bylaws.  Indeed, Mr. Walsh did advise

6    me, although I was not aware of this, that they have been

7    posted on the website of the District Council and I assume they

8    are on other websites as well, and I think probably, Judge, it

9    would be appropriate for me to ask Mr. Walsh to comment further

10   before we turn to the funds.

11             THE COURT:  Sure.

12             MR. WALSH:  Thank you, Mr. Conboy.  Your Honor, I can

13   endorse all of the background in terms of the meetings that I

14   did have with Mr. Conboy's office and counsel from the UBC out

15   of Washington.  At the end of the discussion, I agreed to keep

16   an open mind, obviously, about the bylaws that would be

17   submitted, but I also think it is vital that part of this

18   process be consideration of the comments from the rank and file

19   and I think I did mention in the letter that I wrote last week

20   that I was expecting a third draft which would be posted.  I

21   obviously received it, it was posted immediately on the

22   District Council website and I have received about a dozen

23   comments to date.  I sent also a message to the union for

24   posting on the website indicating that for people to

25   participate, that they needed to identify themselves and it

15GFDISC

1    would be helpful if they could specifically identify any

2    section that they wished to endorse or criticize and I really

3    implore all the members of the union to take the time to go to

4    the District Council website and read these bylaws and send me

5    an e-mail or a note indicating what they think about them.

6         I do intend to present the comments to the Court as

7    part of the record.  I also, though, intend to go back to the

8    UBC on or about June 10 after the close of the comment period

9    and if there's a consensus on certain comments before that, I

10   think I can actually go back and say this is what I'm

11   receiving, let's talk about this.  But certainly no later than

12   the close of the period I would take the comments back to the

13   UBC and continue the dialogue and see if there's anything that

14   needs to be adjusted which I perhaps might say I strongly

15   believe needs to be adjusted, and I'm sure we'll have a

16   meaningful discussion at that point.

17        So I think my message is to all the members and to the

18   extent that today's events are reported over the internet and

19   by word of mouth, the message is please read these draft bylaws

20   and let me know what you think about them.

21        THE COURT:  You asked for language suggestions or

22   thematic suggestions or ideas or any of it?

23        MR. WALSH:  Any of it, and the responses that I've

24   gotten have encompassed all of those bits and pieces.  I've

25   gotten some very exhaustive, very detailed comments about the

1    entirety of the proposal, as well as specific suggestions, and

2    I've also gotten simple comments from people about individual

3    sections or why they think in theory something is good or bad.

4    And I'm grateful for that and make sure that everyone

5    understands how important it is, and that they're certainly not

6    limited, if they have additional thoughts, I would like to know

7    what they are.  So if they submitted, it's not just one bite.

8              THE COURT:  Okay.  So they know that they have until

9    June 10.

10             MR. WALSH:  June 9 would be the actual close and then

11   as soon as our schedules allowed, I would go back to the UBC

12   and share not only the comments, but my thoughts on the

13   comments and any points which I've agreed to keep an open mind

14   about which don't necessarily reflect a meeting of the minds

15   with respect to the draft that was actually submitted to me.

16             THE COURT:  Okay.  Great.  So should we hear from

17   Mr. McGuire next about the funds?

18             MR. McGUIRE:  Thank you, your Honor.

19             THE COURT:  Do I take it from Mr. Conboy's remarks

20   that this is in the nature of a problem that you have?

21             MR. McGUIRE:  It's not as bad a problem as we thought

22   up to about two hours ago.  The review officer and I have just

23   come from a meeting of the fund's trustees and actuaries,

24   Siegel & Company.  We had met with Siegel last week and we did

25   get some disturbing news last week.

1    The funds in fiscal year 2010-2011, which will end on

2  June 30th of this year, are projected to have an income of

3  $199 million, that is based on the $11.25 contribution for each

4  hour worked made by employers to the welfare fund, and expenses

5  of $244 million.  So we will be running in 2010-2011 a deficit

6  of approximately $45 million.  What disturbed us was that

7  Siegel told us last week that if we did nothing to address this

8  problem the reserves which are always measured in months when

9  you speak of welfare plans, will go from eight months this year

10  down to five months in the next fiscal year, and down to about

11  a month and a half in the third fiscal year.

12    We were not aware that the situation was as precarious

13  as Seigal told us last week, although today it somehow found

14  $32 million in income.  It just hadn't accounted for investment

15  gains in its analysis last week, so the situation is not as

16  dramatically precarious, but it remains precarious.

17    The District Council has always projected --

18    THE COURT:  What does it mean?  Is it 50 minus 34,

19  roughly?

20    MR. McGUIRE:  I would say if we did nothing, maybe we

21  have four or five years before the reserves run out.  But if we

22  do nothing the reserves run out, no question about it.  And by

23  nothing, I mean if we do not raise and raise by perhaps

24  50 percent the employer hourly contribution or somehow adjust

25  and restructure the benefit plans and the benefits available

1    under the plans, we will be facing a serious problem.

2            The trustees are as we speak grappling with these

3    problems.  Siegel has come up with an analysis of the plan and

4    all of its component parts, including the costs for covering

5    early retirees, the cost for covering Medicare retirees, the

6    cost for covering dental, vision, etc., etc. so the trustees

7    were slogging their way through a lot of technical details, but

8    they I think are in reach of a consensus as to a number of

9    changes that will have to take place in order to do two things;

10   to make sure we have a viable welfare plan for not just our

11   retirees, but for the present generation of apprentices and

12   journeymen, and secondly, we can't do that in a way that makes

13   the industry, and I mean the unionized industry less

14   competitive than it is today.

15           We have an $86 and change package.  I think we all are

16   appreciating now that it has resulted in a considerable loss of

17   market share over the last few years, so in order to raise the

18   hours we know we have to contain costs and that's what's being

19   done both in the trustee's tenth floor meeting room as well as

20   at the collective bargaining table.  And I'm fairly confident

21   listening to the details and the tenor of the conversation the

22   trustees were having today that a solution will be reached to

23   make sure the fund remains viable into the indefinite future.

24           THE COURT:  So just to fix on fiscal year 2010-2011,

25   you said that there was $199 million in income and $244 million

1  in expenses, so that gives rise to a deficit of $45 million,

2  but that did not include return on investment as --

3         MR. McGUIRE:  That's right, your Honor.

4         THE COURT:  So that's 35 million, right?

5         MR. McGUIRE:  It reduced the deficit to about

6  $20 million when we accounted for the returns.

7         THE COURT:  I got 10 million.

8         MR. McGUIRE:  Well, there were a number of different

9  figures thrown around, but what I have in my notes here from

10 John Urbank at Siegel was that the deficit was reduced from 44

11 to $20 million or is projected to be reduced by the end of the

12 fiscal year when he accounted for investment gains.

13        THE COURT:  I see.  And how did that, if you know,

14 compare with last year's results, fiscal year 2009-2010?

15        MR. McGUIRE:  I don't have those figures, your Honor.

16 I know also, again, if nothing changed in the contribution

17 rate, etc., for 2011-2012, Siegel is projecting expenses of

18 $260 million and income of $190 million for a $56 million

19 deficit and the reserves would be down to approximately 5 and a

20 half months.

21        THE COURT:  So the deficit for next fiscal year was

22 what?

23        MR. McGUIRE:  $56 million.  Again, he does not --

24        THE COURT:  I understand.

25        MR. McGUIRE:  Because of the volatility of the

1    markets, he doesn't want to project investment gains at this

2    point.  So that could be lower.

3           THE COURT:  Got you.  Okay.  Anybody want to comment

4    on that?  Okay.

5           And so what if anything -- you're not proposing

6    anything at this time other than to call to our attention these

7    results?

8           MR. McGUIRE:  That's true, your Honor.  They're

9    meeting for the balance of the afternoon and I'm sure we'll be

10   having another meeting early next week.

11          VOICE:  Your Honor.

12          THE COURT:  Somebody --

13          THE DEPUTY CLERK:  I don't know who that was.

14          THE COURT:  If you could just let me finish the

15   agenda, and then we'll hear from anybody else who wants to

16   speak.

17          Did that conclude your report?

18          MR. McGUIRE:  Yes, your Honor, thank you.

19          THE COURT:  So was there a -- is this the first time

20   anybody's hearing about these results or are there quarterly

21   statements that are put out in writing that say how the fund is

22   doing for the fiscal year or is this the first time that

23   anybody's making any kind of public pronouncement about where

24   the fund is going to end up in fiscal year 2010-2011?

25          MR. McGUIRE:  This is the first time this has been

1   discussed publicly, and the funds normally do not publicize

2   these results until the funds submit a 5500 end of the year and

3   fiscal year report to the Department of Labor, until they have

4   all the numbers from the accountants and the actuaries.

5          THE COURT:  That's a little unusual to me.  I don't

6   know about union fund reporting, but in every other field

7   quarterly would be late, monthly would be for your Merrill

8   Lynch account, so to speak, you would get a monthly statement.

9   Some accounts, some statements you get quarterly.  This is a

10  little bit surprising and maybe not, but a little bit

11  surprising that one doesn't find out how something that is as

12  important as a fund is doing until almost on the eve of the end

13  of the fiscal year.

14         MR. McGUIRE:  Well, the trustees which represent both

15  the UBC, the District Council and the important employer

16  associations, they know on a quarterly basis.

17         THE COURT:  Well sure, I'm sure.  But --

18         MR. McGUIRE:  And to the extent the union chooses to

19  share what it knows with the membership, it's free to do so.

20         THE COURT:  All right.  Okay.  So if we could turn --

21  did Mr. Weiss want to be heard?

22         MR. WEISS:  Yes, your Honor.  Scott Weiss on behalf of

23  Michael Bilello.  Mr. Conboy is correct.  On May 10 we had a

24  telephone conference which lasted 45 minutes.  There were four

25  category discussed, not the least of which your Honor may

1  recall that the UBC was to provide a restructuring plan --

2          THE COURT:  Is this the letter dated April 5, 2011?

3          MR. WEISS:  Correct, your Honor.  The April 22 letter

4  asked there be a written plan that would include a timetable

5  that would include restructuring by no later than June 30,

6  2011.  We talked about four categories or rather included in

7  the conferees, as he did point out Mr. Torrance, Mr. Cary,

8  myself, Mr. Bilello was included and Mr. Walsh and Mr. Conboy,

9  obviously, and my take-away from that conversation was that we

10  expected to see a written plan, as one is required, which will

11  ultimately be for review under 5(b) and well in advance of

12  June 30, 2011, and I would expect that that plan would have

13  some kind of timetable so we understand what exactly the UBC

14  intends to do with the locals and the restructuring.

15          THE COURT:  So are you satisfied that based on those

16  calls that you had that what you were seeking is in the works

17  or maybe forthcoming or what?

18          MR. WEISS:  At this time, I'm generally satisfied.

19  However, I would like to see a more definitive date.  Indeed,

20  the UBC has done this before.  I suspect that someone has white

21  boarded the restructuring plan.  What they plan to do, and I

22  think that the membership in view of the fact that it is their

23  organization, they're entitled to know.

24          THE COURT:  Okay.

25          MR. WEISS:  Thank you, Judge.

1    THE COURT:  Anybody want to comment on that?  Yes.

2    MR. CARY:  Larry Cary, your Honor, for the carpenter's

3  committee.

4    THE COURT:  Before we get to that, while this is on my

5  mind, if you don't mind, Mr. McGuire, could you just look into

6  this issue of disclosure, of a written disclosure and let me

7  know your thoughts about that or what is doable, what is

8  possible.  In other words, like I said before, and I don't know

9  if there are particular constraints here.  Clearly this is not

10  my Merrill Lynch account, but it is an account which people

11  have, a lot of people have a very important and vested

12  interest, so it seems a little bit disconcerting, as I say, to

13  hear that there's a problem with the fiscal year results on the

14  eve of the end of the fiscal year and not have received any

15  kind of written warning or notification until, boom, there is

16  that problem.  It sort of puts -- well, anyway.  You get it.

17    MR. McGUIRE:  Certainly, your Honor.

18    THE COURT:  If you could inquire and see if there's

19  any possibility to enhance that mechanism for reporting.

20    MR. McGUIRE:  I'll report within 48 hours, your Honor.

21    THE COURT:  Thank you.  Okay, yes.

22    MR. CARY:  Thank you, your Honor.  There is a

23  relationship between the restructure of the locals and the

24  draft set of bylaws which makes it difficult to fully assess

25  the draft set of bylaws.  Obviously, what the UBC does with the

1  locals has an impact on the structure as it relates to the

2  District Council.  So we're being told we'll have a comment

3  period up until June 9, but it's possible that we won't get the

4  restructuring plan until as late as June 30 and there's a bit

5  of a disconnect between the two.  Now I understand that efforts

6  were made to get the restructuring plan well in advance of

7  June 30, but having practiced law for a number of years, I know

8  that deadlines matter and oftentimes the deadline is the

9  deadline as opposed to intent to do something earlier.  So I'm

10  just bringing this to the Court's attention because we have

11  some concern about that.

12  THE COURT:  So you're saying it would be difficult,

13  perhaps, thoroughly to evaluate the bylaws unless you know what

14  the restructuring plan was going to look like.

15  MR. CARY:  Correct.

16  MR. WEISS:  Your Honor, if I may be heard on that

17  point?

18  THE COURT:  Yes.

19  MR. WEISS:  Yes, your Honor, I actually had raised

20  that point with Mr. Walsh, Mr. Conboy beforehand to see if

21  there would be any objection to create a comment period.

22  Indeed we're not looking to delay this process any more.  We

23  want to bring the organization back to the membership.  In 1996

24  there was, in 1996 when there was a trusteeship and the

25  aftermath of the trusteeship there was a plan that I believe

1  was published as part of the interim reports, I don't recall, I

2  apologize.  There may have been a time period in which there

3  were some comments out to the membership and indeed there were

4  some various lawsuits, sticks in my mind had the name Lebow in

5  it that dealt with the restructuring plan.  I agree with Mr.

6  Cary, that the two are interrelated because they're affiliated

7  locals, and the affiliated locals are as I mentioned in my

8  April 22nd letter, the affiliated locals are going to be voting

9  for those delegates so it's all kind of connected together.

10             THE COURT:  Got you.

11             MR. WALSH:  Judge, I think it's fair to tell everyone

12  to the extent that I have any advance information, that the, I

13  would be the first to protest to the UBC if I thought that the

14  schedule that everyone to date has agreed upon would in any way

15  be jeopardized by the lack of production of a plan, and I will

16  hold them to that.  But I have no reason to believe that this

17  schedule will not be met, that we will not have a written plan

18  even before the end of the comment period, and I think that one

19  of the connections to the draft bylaws which concerns many

20  people is the alteration of the ratio of representation from

21  one delegate to 500 members down to 1 delegate to 200 members

22  and I have received comments on that particular change.

23             As I understand what's being contemplated, and I have

24  been told that this is obviously not set in stone, that the

25  general president McCarron has yet to inform counsel and his

1   top people exactly what this is going to look like, but I

2   believe that it will leave in the New York City area five

3   locals that reached the cap of 20 delegates each with one

4   additional local that will probably have about ten delegates is

5   what's being contemplated now.  Again, this has not been

6   submitted to me, about 110 delegates in the new delegate body

7   that's contemplated by these draft bylaws, and these

8   reorganized locals and some will not be affected, will in

9   September and October elect delegates and that is a necessary

10  prelude to installation of a fully autonomous District Council,

11  so that it is something that needs to be set in stone for the

12  December election and January installation that we had

13  contemplated to actually be realized.

14          So just to be clear, if at any time I think that we

15  are getting close to hindering any of that progress I'm going

16  to press the UBC, and I'm sure that we will have a plan in hand

17  which will allow us to conform to the schedule.

18          THE COURT:  Is that the heart of the matter, the

19  number of delegates, this change in ratio?  Is that a key

20  change?

21          MR. WALSH:  I can say that based on the comments that

22  I received, it is a matter of great concern to some of the

23  commenters.  There are other matters which I've received

24  comment on which will form part of the discussion, so that's

25  not the only area, but it is certainly an area that people have

15GFDISC

1    expressed themselves in detail.

2            THE COURT:  And in moving the ratio from what it is

3    now to what you think it might be, is that in keeping with what

4    people are asking you to do?

5            MR. WALSH:  Well, comments that I have received, and I

6    don't want to influence anybody one way or the other --

7            THE COURT:  Sure.

8            MR. WALSH:  Are questioning why the ratio is being

9    changed.

10           THE COURT:  I see.  Got you.  Okay.  Anybody else?

11           So some people in the audience indicated they wanted

12   to be heard.  Does anybody wish to be heard on any of these

13   topics?  Sure.  If you could state your name.

14            MR. CLARKE:  Gene Clark, 52 year member, brotherhood,

15   and I'd like to say that the trustees that are now negotiating

16   for us are very suspicious.  They will not sign a letter that

17   Mr. Walsh has asked everybody to sign.  As a result of that

18   letter, many people stopped working and left the brotherhood

19   because of their dirty background.  I would like these people

20   before they negotiate one more step, I want them to sign this

21   letter for the brotherhood and for the brothers and sisters

22   that were robbed here meticulously for the last ten years.  We

23   cannot afford this tragedy to repeat itself.  It's therefore

24   I'm asking you as a good man to look into this problem and ask

25   them why they're not signing the letter, and also, Joel

15GFDISC

1    Olivieri when he used to take our illustrious leaders of deceit

2    down to Mexico, they used to swim out to him to talk to him and

3    he would give them the orders.  And the reason for the swimming

4    is, you can't carry a wire in your bathing suit if it's wet.

5    Okay?  So we have problems and we're nowhere near the solution

6    to these problems until we find the total answer of why certain

7    things took place when Mr. Ford was indicted years back, the

8    international let him stay in office.  Then the judge, he threw

9    out the jurors' decision and two days later retired.  We're

10   talking about Judge Atlas.  We have been a victim of these

11   people for years.  We can no longer tolerate being their

12   victim.

13           THE COURT:  I got it.

14           MR. CLARKE:  We have to find justice and justice is

15   going to be found in this Court and I know that.  Thank you.

16           THE COURT:  I didn't quite understand Mr. Walsh signed

17   the letter, that issue.

18           MR. WALSH:  What Mr. Clark is referring to I think is

19   commonly misunderstood by many members but I'll explain.  As

20   part of my scope, I've embarked on what I call the organized

21   crime initiative and at its core it involves interviewing

22   employees of the District Council, officers of the District

23   Council and certain employees of the funds leading up to the

24   trustees to inquire about their knowledge of organized crime.

25   And then using the authority that I have to require that they

15GFDISC

confirm their representations by sworn statement.  We have

talked to a number of people, some of whom have decided that

they would rather not sign and who have either retired or left

the employ of the District Council or the benefit funds.  I

have explained to Mr. McGuire as counsel to the funds that I

think it is fair that this inquiry go from the bottom of the

pyramid to the top and that I want to ultimately get assurances

from all the trustees that I know what they know about

organized crime, if anything, and I certainly make no

assumptions that anyone is up to anything nefarious, and I have

distilled the procedure down to I think seven threshold

questions which I would like the trustees to answer, and then

confirm their answers under oath in a sworn statement.

I have gotten a sworn statement from one of the

employer trustees last week, and an indication from another

that he intends to give me that confirmation very shortly, and

we will be taking the deposition of a third trustee I believe

in the next two weeks, which would then leave two employer

trustees and the three remaining union trustees and I have not

heard one way or the other as to whether they intend to

cooperate or not.

I have certainly not been told that they do not intend

to cooperate.

THE COURT:  I get you.  Thank you.

MR. FRANCO:  Good afternoon, your Honor.  Dan Franco,

1  Local 157 member.  I just want to express that I have grave

2  concern about this restructuring plan.  They're saying there

3  isn't one just yet as far as I understand, but tactics that the

4  UBC has used in the past is they say they don't have a plan and

5  all of a sudden they swoop in and dissolve locals.  They did

6  that in New York State and New Jersey, 33 locals, dissolved

7  them, restructured them into ten new locals, all appointed E

8  boards.  They did that in the northwest, I think it was 22

9  locals, dissolved, appointed new E boards.  I think we need to

10  have this restructuring plan if there's going to be one well

11  before June 9.  We need to be notified as soon as possible in

12  my opinion.

13       The other part I want to talk about is the bylaws.  I

14  was one of the ones that raised concern about the delegates,

15  why was the ratio change, could we get more representation,

16  great, but I'm very disturbed at the cap, because it's just

17  another reason why McCarron would come in dissolve all the

18  locals, consolidate us into one mega local and cap our

19  delegates to 20, take our representation down from 100 whatever

20  down to 20.  I don't want that to happen.  Thank you.

21       THE COURT:  Thank you.

22       MR. LEBO:  Good afternoon, your Honor my name is

23  William Lebo.  Gene Clark touched on something that was kind

24  of, I was going to say myself.  We have the trustees now

25  negotiating our contracts and I would like to see them sign

1    this letter.  I mean, if the rest of the council has to do it,

2    I think that it's crucial that we know that they're honest

3    enough to sign this letter.

4         The other issue is with our contracts the UBC is now

5    negotiating them for us without a voice in the membership at

6    all.  They don't seem to care whether or not what our feelings

7    are about them.  I can't understand why these contracts can't

8    be put on hold until the time that we have elected officials in

9    office that we can have our elected officials that we elected

10   from the New York City District Council deal with our

11   contracts.  There are numerous agencies and unions across the

12   country that have put contracts off for months, if not years at

13   a time.  There's no reason we can't do it now.  There's no

14   reason they should be negotiating our contracts for us.  We

15   have to live under them.

16        The other issue too that I'd like to speak about is

17   they do need to let us know what the locals are going to be.

18   Right now the locals are going through an election process.

19   157 tonight is holding their elections for their officers,

20   Local 45 is going to be doing the same.  We have an election

21   process going on now, nominations and so forth.  It would be

22   prudent for us not to waste the money if some of our locals are

23   not going to exist.  Why should we waste the money on election

24   booths and so forth and so on when those locals are not going

25   to be there or are going to be there.  We don't know.  So for

1    them to let us know before this happens would be prudent.

2         The other issue, and my last one is in my motion, in

3    my submission in support of the Bilello motion, I asked you to

4    declare the New York City District Council a local union and I

5    gave you my reasons why.  I don't know if I have to put that in

6    a form of a motion to you or if you can do that, but I did ask

7    that of you and I would like to eventually get an answer from

8    you.

9              THE COURT:  I hear you.

10             MR. LEBO:  Thank you.

11             THE COURT:  Mr. Walsh, when were you suggesting that

12   it's likely that the restructuring plan would be out there?  I

13   won't hold you to it, because I --

14             MR. WALSH:  I think that my perspective, my principal

15   perspective is that it be in place in enough time in order to

16   make sure that the District Council electoral process continues

17   and we meet the schedule that everyone has said is fine, so

18   that I would have to promulgate the election rules by

19   August 15th.

20             THE COURT:  Right.

21             MR. WALSH:  So it doesn't leave a lot of time.  But

22   there obviously is a connection between the restructuring and

23   the draft bylaws and I think that it is a point well taken, so

24   as I said, if we don't have the submission really I think

25   before the end of the comment period, there may only be a

15GFDISC

1    slight window to enlarge the comment period if people want to

2    weigh in on a restructuring plan and the impact that it will

3    have on the draft bylaws, and indeed allow myself enough time

4    to consider the terms of the proposed restructuring plan

5    vis-a-vis the bylaws and their implementation.

6         MR. McGUIRE:  Your Honor, unfortunately, I have to

7    leave the hearing at 3:30.  I convened a meeting and a large

8    number of people attending it, so perhaps if there are comments

9    about my report that would provoke your questions, if we could

10   have those now.

11        MR. BRENNER:  Your Honor, if I may, I have a comment

12   for Mr. McGuire.

13        THE COURT:  Okay, come on up.

14        MR. CRANE:  I have to address him, too.  My name is

15   Patrick Crane, your Honor.  I was unable to sign up before the

16   opportunity to speak.

17        First I'd like to address the issue of delegates where

18   we're going to have a high delegate ratio.  They're going to

19   take away our right to vote, that's why.  That's my opinion.

20   There's three locals, local 46, the steamfitters, the latchers

21   and electricians.  They're the most powerful locals because

22   their membership has a voice and the representatives have to be

23   accountable to the membership.  That's what we lack.

24        To address the issue, $86 is the reason why the

25   welfare fund is in trouble?  Let me tell you why the welfare

1    fund is in trouble.  This is supported by Mr. Walsh's report

2    and something we've been going through for generations.  We

3    have been represented by narrow-minded officials content with

4    their own private agendas, unable or unwilling to organize the

5    unorganized and incapable of resisting corporate powers.  Union

6    officials build corrupt machines by starving our critics and

7    intimidation and selling out to the bosses.  They took payoffs

8    and committed forces to go nonunion.

9            We can go back to Mr. Mack.  He has mentioned many

10   people in their reports.  They were fired from positions here,

11   giving jobs to the international.  Our right to vote must be

12   reestablished at all levels.  That's it your Honor, thank you.

13           THE COURT:  Got you.  Was anybody going to speak

14   directly to Mr. McGuire?

15           MR. BRENNER:  Yes.  Thank you, your Honor.  Patrick

16   Brenner.  My question to Mr. McGuire is being that the funds

17   are in such dire straits and being that we wait to end the

18   fiscal year I mean is it at all possible to get a quarterly

19   report?  I mean, that being the condition that they're in, it's

20   fair enough.

21           THE COURT:  He said he would look into those

22   possibilities and let us know.

23           MR. BRENNER:  Okay, as far as the bylaws, I mean there

24   are some issues that have been brought up.  As far as in the

25   past, I know that we had our ratio of delegates and I know the

1   restructuring they're going to come up with 110.  Previously we

2   had about 88, so we're pretty much where we were in the past

3   with the delegate body but the problem we had was the fact of

4   the rubber stamp and the employees of delegates, and I know

5   it's not easy for them and I commend Mr. Walsh on his efforts,

6   but it is a grave issue to have employees and a delegate.  I

7   don't know what the answer to that is, I don't know whether a

8   delegate, they should be compensated if they're going to be

9   taking on these immense responsibilities and it's not an easy

10  task by no means.

11          What the solution is, I don't know.  I mean they

12  should be compensated undoubtedly, but as far as being a paid

13  employee of the District Council, it creates back that rubber

14  stamp pattern that we want to not go backwards.  Let's try to

15  move forward.  As far as the contracts and unfortunately I

16  don't believe the membership has faith in the trustees at this

17  point, and it would be of grave importance to have some

18  membership, the members to be involved with it somehow and

19  input with the contracts, you know, if that's something we're

20  really concerned about.  Thank you very much.

21          THE COURT:  What contracts, principal contracts do you

22  think people are referencing that be put on hold until there's

23  a new leadership?

24          MR. McGUIRE:  Your Honor, there are, the carpenters

25  probably have seven or eight.  They certainly have the Drywall

1  Association, that's the largest, second largest would be the

2  Cement League, then they negotiate with two general contractor

3  associations, the Building Contractors Association and the

4  Contractors Association of Greater New York.  I don't know if

5  the heavy agreement is up this year, I'm not sure with the dock

6  builders, but what happens generally in our industry is that

7  one of these associations will be the lead in the negotiations

8  and whatever contract is negotiated with that association, in

9  this case it's probably wall and ceiling will be the template

10  for all the other associations.

11          THE COURT:  All right.  Yes, sir?

12          MR. CARY:  Your Honor, may I make a comment?  Larry

13  Cary, carpenters committee.  One of the conundrums here is that

14  the UBC does not submit proposed collective bargaining

15  agreements to the membership for ratification.  Here we have a

16  situation --

17          (Applause)

18          MR. CARY:  I apologize to the Court for the exuberance

19  of whoever did that.

20          Here we have a situation where the trusteeship has

21  gone beyond the 18-month presumption.  Nobody is arguing for an

22  early end to the trusteeship given the history of what has

23  taken place and the difficulties of going forward.  But it

24  would be I think a middle ground, if nothing else, to simply

25  say that the Court would require that the agreements be

15GFDISC

1   ratified by the membership.  They would have a voice at that

2   point in time as to whether they agree with this collective

3   bargaining or not.

4           THE COURT:  And where else is that done?

5           MR. CARY:  To answer your question, your Honor, many

6   unions submit collective bargaining agreements to their

7   membership for ratification.  Many unions require it in their

8   Constitution.  Not all unions do.  In my 30 years of experience

9   apart from the UBC, every union I've ever been involved with

10  has submitted its collective bargaining agreement to membership

11  for ratification.

12          (Applause)

13          MR. WEISS:  Your Honor, if I may --

14          THE COURT:  Well, let's hear and then we'll come back

15  to you.

16          MR. ARANA:  Thank you, your Honor.  Thanks for having

17  us, and Dennis Walsh thanks for having us.  The union has a

18  sense that with Dennis Walsh that we have a say in the matter.

19  I want to commend that.  Thank you very much.  I want to speak

20  very quickly on the delegates which is a hot topic for them.

21          THE COURT:  Your name, please?

22          MR. ARANA:  Donald Arana.  As far as the delegates,

23  that's a very hot topic, the delegates with more power, and

24  just recently in November or December we had an election in

25  608, and for some E board spots and then a week after the

1    election, the local was dissolved, I'm pretty sure you're aware

2    of that.  There was roughly seven or 8,000 members and we were

3    consolidated into local 157 which has 3, 4,000 members so with

4    this plan that they have for the delegates, after you have, I

5    think it's 200 members you have one delegate so after you have

6    4,000 members you no longer have a chance to have delegates

7    that represent the other part of the body, so currently under

8    that resolution that took place, 608 went into 157, giving us

9    roughly 10, 11,000 members, so you have 6,000 members under

10   this dissolving and consolidate pattern that has been the

11   history of the UBC.  We lose representation.  And everybody in

12   this courtroom knows that the UBC has plans to continue

13   dissolving locals and have one big mega local, and I think

14   that's not fair and I think this whole thing is about

15   democracy, the consent decree, and this totally goes against

16   the members being represented.

17          And another thing that's attached to that, the last

18   court date I spoke to you and I spoke, and I mentioned were the

19   paid employees being delegates to the District Council and my

20   thinking was it was a conflict of interest and they were

21   proposing that they would put certain safeguards in that, that

22   delegates can't be influenced, because they're paid employees.

23   I think the only safeguard against that is that we don't have

24   paid employees as delegates.  And I think in the new bylaws

25   they propose that there's a negotiation that it's only

1   50 percent of them would be paid employees as well as delegates

2   to the District Council.  My argument is, if it's agreed that

3   being a paid employee and a representative of the membership

4   which is a delegate to the District Council becomes a conflict

5   of interest, that no percentage should be allowed to be paid

6   employees and delegates at the same time.  If it's not a

7   conflict of interest, and then let 100 percent be paid

8   employees.  That's my argument that, 50 percent is not the

9   answer to that.

10          Just a quick question I have is that on the

11  negotiations coming up for our union contracts they mention

12  that there's three trustees.  Does anybody know the name of

13  those three trustees?

14          THE COURT:  Mr. Walsh probably does.

15          MR. WALSH:  I'm afraid I don't understand the

16  question.

17          THE COURT:  I think you mean the three that signed the

18  letters.  Is that what you mean?

19          MR. ARANA:  They said there's trustees negotiating our

20  contracts?

21          THE COURT:  Oh, then I missed it.

22          MR. ARANA:  Right now we're under negotiations because

23  our contract is over June 31 and they said there's three

24  trustees negotiating our contracts with the contractors, so and

25  who were those three people?

15GFDISC

1          THE COURT:  Not sure that's what was said, but

2    Mr. Walsh, do you know?

3          MR. WALSH:  Obviously the UBC is still under

4    supervision.  Frank Spencer is the supervisor.  He is one of

5    the negotiators and he is as I've been told been joined by

6    assistant supervisor John Ballantine and general president

7    Douglas McCarron.

8          MR. ARANA:  That's what I thought it was, I just

9    wanted to confirm it.  We didn't elect these people to

10   negotiate our contract, but for temporary supervision so I

11   think it would be appropriate in this situation since the

12   contracts have to be negotiated and they're currently doing it

13   and will continue to do so, since they weren't elected by us

14   that when they negotiate the contract before they sign it that

15   the membership in this particular situation should be able to

16   review it and ratify it and vote on the contract if we want to

17   accept it.  I think that's more reasonable.

18         (Applause)

19          MR. CLARKE:  Thank you, your Honor.

20         THE COURT:  Yes.  Who is next?

21         MR. WELLINGTON:  Hello.  Good afternoon, Judge.  I

22   believe you received my letter because I got a reply from your

23   assistant.

24         THE COURT:  What is your name?

25         MR. WELLINGTON:  Alex Wellington.

1          THE COURT:  You spoke the last time, too, right?

2          MR. WELLINGTON:  Yes.  That is one of the reasons that

3   Mr. McGuire has to run away because of situations that the two

4   want.  He's given his figures and can't make the calculation

5   accurately.  As you said, you corrected him at one point which

6   is 199 and 44 million and the deductions and the balance.

7   These are the reasons why we face such dire issues in this

8   union.  We do not have our rank and file in these areas or in

9   these hot seats to negotiate and to make accurate assessment of

10  our union for the future.  In going forward we would like

11  contracts to be hold, because we have employers looking at the

12  maximums to give us 20 percent reduction in wage and benefits.

13  Are we rats?  No.  So in this case we cannot have the same rank

14  and file, I mean the same professional officers and delegates

15  and trustees negotiate our contracts.  In other words, I would

16  love us to be one of the forefront, the rank and file, to

17  negotiate our contracts.  And lastly, I want to make sure that

18  on behalf of the bylaws, I can see that the bylaws is giving

19  too much power, too much power to the executive secretary, the

20  delegates, they got too much power.  The bylaws itself is very

21  crooked.

22          THE COURT:  Very what?

23          MR. WELLINGTON:  Very crooked, it's giving too much

24  power to the rank and file officers.  The officers, the

25  executive secretary has too much powers and delegates they got

1  too much powers, so we need to ratify this information, bring

2  it down to the bottom of the table, negotiate it to the best

3  facts and best virtue of our knowledge and bring it forward to

4  all members in order to grow in the future.  Thank you.

5          THE COURT:  Mm-hmm.

6          MR. SAUL:  Norman Saul, Local Union 926.  The

7  percentage of delegates to the union members is not really

8  what's significant.  By creating mega locals, mega regions,

9  mega councils, we make it impossible for the rank and file to

10  make an informed choice on who they choose for their delegates.

11  How do we expect people to work 35 or 40 hours and then commute

12  hundreds of miles to get together to meet?  Now, well, in the

13  past when I started with this union we had many, many locals,

14  small groups of people could get together, argue perhaps but

15  still make an informed decision.  How is someone up from Albany

16  going to meet with someone in West Virginia or southern New

17  Jersey to be able to decide on a delegate, whether it's 2, 20

18  or 200?  Unions are using this technique.  We're not the only

19  union going to these mega areas.  All it does is dilute our

20  ability to communicate and cause only those people chosen by

21  the powers that be to select delegates, load our elections and

22  take more power from the rank and file.  It's not a matter of

23  numbers, it's a matter of area.

24          THE COURT:  Of what?

25          MR. SAUL:  Of area.

15GFDISC

1          THE COURT:  Geography?

2          MR. SAUL:  Geography.  We have trouble now getting

3     people to local union meetings.  What are we going to do when

4     we have to travel several states?  Thank you.

5          THE COURT:  You bet.  Yes, sir.

6          MR. NOONAN:  Hello, your Honor.  My name is James

7     Noonan.  I'm a junior carpenter 24 years.

8          THE COURT:  How do you spell your last name?

9          MR. NOONAN:  N-o-o-n-a-n.  I apologize for not being

10    so court savvy or whatever.  However, I do feel a lot better --

11         THE COURT:  A lot of people say that and then they --

12    including the lawyers, and then they --

13         (Laughter)

14         MR. NOONAN:  You know, if I did this for a living, I

15    would have been prepared and I would have known my numbers.

16    That was disgusting watching.  I'm sorry he left.

17         I want to thank you for your honest appraisal of the

18    situation.  I didn't expect that.  But thank you.  It was

19    spoken that we made $86 an hour like that's a big deal.  But I

20    don't know if I'm going to live to collect the pension.  You

21    know, my body hurts.  I just carried around my leg for three

22    months straight, you know, and I'm 49.  I got another six years

23    at minimum before I collect a pension and the pension isn't

24    that great.  I'm going to have to get another little job, you

25    know, driving a bus or something.

1          You know, we don't work full time, you know.  We make

2     a fair rate, a fair rate, and when he said that, I was waiting

3     for him to say that we were going to cut our pay.  You know?

4     That's beside the point.

5          The gentleman who spoke before me is, I think was the

6     most important conversation today.  We've lost our union

7     because our union used to be a lot more than our out of work

8     list or benefit department or trying to call somebody about

9     your pension or your vacation pay.  It was about meeting with

10     other carpenters and discussing life and that's all gone now,

11     and I'll tell you, if you read those bylaws, which shouldn't

12     take you that long, I mean, without even going in depth, you'll

13     realize that democracy is gone from our union, and as far as I

14     know, Mr. Walsh is all about democracy.

15          I would never do this unless I felt as strong about

16     what's going on.  I got to be careful what I say or else I can

17     get thrown out of the union.  Imagine that, for being honest.

18     But I do know like they said, what we want to know about the

19     restructuring is that because they had an election and a week

20     later they dissolved 608.  We asked one of the supervisors

21     about a month ago if he was going to make a mega local and he

22     said what, are you kidding me, and a week later he did.  Okay?

23     So how can we trust the international?  You know what's

24     hysterical?  That we have somebody in the court today that

25     we're paying for to represent us and he's not representing us.

1  Okay?

2          Why I'm saying this is that because I believe that

3  you'll do the right thing.  I tell you, I can get in a lot of

4  trouble, but I just thank you.  Thank you.

5          THE COURT:  You're welcome.  Okay, two more.

6          MR. CURCIO:  My name is Jared Curcio, local 1456 dock

7  builders.  Just on the topic of restructuring.  The dock

8  builders work is a specialty trade.  It has nothing to do with

9  like Mr. McGuire said about the lead contractors, the sheet

10  rockers.  We have nothing to do with that and we should be

11  represented in our own field.  They plan on putting us all

12  together with the carpenters.  The carpenters do different work

13  than we do, so that should be considered and also with the pay

14  scale, we're on the same similar scale with all the other

15  trades in the industry, the electricians, actually we probably

16  make a little less, so when they talk about the money it should

17  be we're on the level of everybody else, so we don't stand out

18  as the highest paid or anything, you know?  That's about it.

19          THE COURT:  Thank you.

20          MR. HOLNESS:  How you doing, your Honor?  My name is

21  Gauntlett Holness local 137.  I hear comments at least about

22  the delegate body being kept at a certain number.  Would the

23  Judge be able to comment on exactly why it is being proposed to

24  have that done?

25          THE COURT:  You know, it's still in the draft form.

15GFDISC

1  Seems to me that Mr. Walsh had the right idea.  If you think

2  that what you're seeing or hearing is not the right way to go,

3  the better way to do it would be for you to send in a comment

4  to Mr. Walsh.

5           MR. HOLNESS:  I understand that, your Honor, but I'm

6  saying though if someone is supposed to be working on your

7  behalf so to speak why would they be making a certain proposal

8  if it's supposed to be at a disadvantage to the membership

9  itself.

10           THE COURT:  How so?

11           MR. HOLNESS:  If you're going to be capping something

12  where you have a delegate body representing the local and it's

13  going to be capped at a certain amount of numbers it's like

14  saying a certain amount of numbers whatever comes after that is

15  not saying anything.

16           THE COURT:  You're saying you're opposed to a cap?

17           MR. HOLNESS:  Of course I am.  Which I believe all the

18  members are opposed.  That's why I'm asking what is the reason

19  why he's proposing it.

20           THE COURT:  That's fair.  Mr. Walsh, Mr. Conboy, just

21  generally, not specifically here, because we're still in flux

22  about the idea of a draft, but what's the idea of a cap as far

23  as you know?

24           MR. WALSH:  As I understand it, it was an attempt to

25  realize at some point the delegate body becomes unwieldy, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    there is an ample ability to discern what the consensus

2    opinions are, but there are people who feel that there are

3    enough opinions that it is improper to have their voices

4    capped, so to speak.  But I think that that was the main reason

5    why and I think it also reflected that the UBC is contemplating

6    having a smaller number of local unions and a piece of that

7    will involve a small number of large local unions.

8            THE COURT:  Mr. Conboy, did you want to -- I take it

9    the point is that in any representative body somebody has to

10   figure out who are the representatives and who is the rank and

11   file.

12           MR. HOLNESS:  We do understand that.

13           THE COURT:  So I guess the real question is what would

14   be the right number.

15           MR. HOLNESS:  But I don't think there should be a

16   number, period.  If there's numbers in a local they should be

17   represented.  That's the bottom line.

18           THE COURT:  Okay.

19           MR. HOLNESS:  So I'm asking why can't he make a

20   comment on why is it being proposed.

21           THE COURT:  I think we've got the concept down.  I

22   don't think we're going to resolve here today why there is a

23   cap and what the number should be.

24           MR. HOLNESS:  Whether or not could you still make a

25   comment on that, please?

1          MR. CONBOY:  Well, Judge, I have to say, frankly, this

2     gentleman has insulted me.  He is suggesting that I do not

3     have --

4          THE COURT:  Well --

5          MR. CONBOY:  No, Judge.  I've sat here for two court

6     sessions and there has been a repeated attack, completely

7     unrestrained on the UBC president, the trusteeship and me, and

8     under the circumstances there has been a great deal of effort

9     in consultation with Mr. Walsh who, of course, is the designee

10    of Mr. McCarron and I think they have respect for Dennis Walsh.

11    My own view of it is is that there is a complex question as to

12    how many delegates can properly and tolerably meet in a room.

13    How do you contain debate.  There are limitations on

14    congressmen in individual states, there are limitations on

15    members of the house of commons in any deliberative body --

16         THE COURT:  Hold on a second.  One person speaks at a

17    time here.  And now Mr. Conboy, Judge Conboy is speaking.

18         MR. CONBOY:  In any deliberative body there has to be

19    a balance between efficiency and access and that's what's taken

20    a great deal of time with respect to these bylaws.  There is a

21    very strong inclination on the part of those who are concerned

22    about union democracy to significantly curtail the power of the

23    executive secretary-treasurer and other officers.  However,

24    federal law makes it clear that you cannot ask the rank and

25    file to elect officers who have no power, so we are walking a

15GFDISC

1    line between the requirements of federal law and a reasonably

2    constructive model which in the end will be determined by these

3    gentlemen and by your Honor, and my own view is that it is

4    premature to take piecemeal elements of this plan and

5    essentially attack them with the kind of lack of balance that

6    we're hearing from a number of these commentators.

7            THE COURT:  These are somewhat unusual perhaps a

8    little bit hybrid court proceedings.  They have somewhat the

9    nature of a town hall meeting which is unusual for a court

10   proceeding, but I don't think anybody should take offense from

11   what is said.  People are just having an opportunity to talk

12   and I wouldn't take any of it personally.  We're at an early

13   stage, we're at a draft stage and comments from people are

14   entitled to be heard.  We got it.

15           MR. HOLNESS:  What I'm going to say if it does take it

16   that he's being insulted, I apologize.  But the bottom line is

17   the membership does not want it, period.  That's the bottom

18   line.

19           THE COURT:  Got it.

20           MR. HOLNESS:  Another thing I want to make a comment

21   on, is there a reason why Mr. Spencer, Ballantine and McCarron

22   has to be the ones that negotiate our contract, why it cannot

23   be put on hold?

24           MR. CONBOY:  Judge, I understand that Mr. McCarron and

25   Mr. Spencer are here pursuant to federal statute and they are

1    here under the overall supervision of the consent decree

2    officers, including this Court, including Mr. Walsh and

3    including Mr. Torrance, and under the circumstances there is a

4    clearly to me on the basis of the efforts made by the general

5    president and by his colleagues, there has been very

6    significant progress made here.

7            The biggest problem confronting this union is the lack

8    of hours recorded and the lack of funds committed to those

9    pension and welfare systems, and an effort is underway to deal

10   with it.

11           Mr. McGuire is a first class member of our Bar and of

12   the federal Bar and he has just come into this relatively

13   recently.  He is doing his best and yet he is the subject of

14   mockery by a number of these speakers.  So under the

15   circumstances I think that if we are all together joined in an

16   effort to make this union better, we ought to inform ourselves

17   as to the very significant and structural problems that are

18   being addressed here.  And my own view is that when the

19   commentary is finally had on these bylaws, there will be some

20   degree of compromise.  There will be members in this gallery

21   who will be unhappy with it and there will be others who will

22   denounce it.  That's the nature of democracy, and under the

23   circumstances let's soldier on.  Let's go through the schedule

24   that we've all agreed on and let's show some patience.  I said

25   that last time.  I said there has to be some patience here and

1    there was a great deal of heckling from the audience with

2    respect to that.  And my own view is we have too much labor

3    here ahead of us to be dragged down by this kind of completely

4    pointless commentary.

5              THE COURT:  Okay.

6              (Chorus of boo's)

7              THE COURT:  If you want to be heard, there's a way to

8    do it.  If you don't want to be heard, we'll just adjourn the

9    proceeding.

10             MR. PASSERO:  My name is Joseph Passero. I'm from

11   local union 1456.  The primary goal of the consent decree or

12   one of the primary goals is to eradicate corruption, is it not?

13             THE COURT:  Yes.

14             MR. PASSERO:  So if this goes -- maybe Mr. Conboy

15   could answer this.  I know how Dennis Walsh feels about it.

16             THE COURT:  You know, this is really not a debate.

17             MR. PASSERO:  Why --

18             THE COURT:  Because there's nothing really on the

19   table yet.  You're privy to, as I am, the progress report

20   that's being made and there's really nothing to determine to

21   vote on, etc.  We're happy to, I'm happy to hear your comments.

22   I think it's useful to inform the process, but this is not

23   really the time for debate back and forth.  It's really more to

24   hear where you stand and where things stand generally.

25             MR. PASSERO:  I would like to see in the bylaws a

1  section where the delegate meetings are recorded by

2  stenographic record and available to the membership, and those

3  stenographic records and preferably an audio and video

4  recording of the delegate meetings available on line at the

5  secured section of the District Council website.  There's also

6  no reason why the delegates if there's going to be 110 of

7  them --

8          THE COURT:  How often are the meetings?

9          VOICE:  Once a month.

10          MR. PASSERO:  That they can't have an electronic

11  voting and recording system in which the issues are presented,

12  the delegates get to vote and you get to know how they voted by

13  yes, no or abstention.  All this could be accomplished by

14  standard off the shelf software and hardware.  Nothing is

15  specialized.

16          THE COURT:  As opposed to what is done now?

17          MR. PASSERO:  Everybody say yay, everybody say nay,

18  with 110 people.

19          THE COURT:  Got you.

20          MR. PASSERO:  I know that there was comment about

21  putting that in the bylaws, but that never showed up.

22          THE COURT:  About what, putting it in the bylaws?

23          MR. PASSERO:  About having recording, stenographic

24  record of the meeting, audio and video and also an electronic

25  voting record which I think most of the of the members will

1    agree will give us transparency to see what goes on in the

2    meetings.

3               THE COURT:  Okay.

4               MR. PASSERO:  I thank you for your time.

5               THE COURT:  You bet.  You already spoke?

6               VOICE:  I just have one issue.

7               THE COURT:  Hold on.  Anybody who hasn't spoken yet?

8               MR. BILELLO:  Your Honor, may I?

9               THE COURT:  Yes, let's hear from him.

10              MR. T. McGUIRE:  I'm Tom McGuire for Local 287.  230

11   years ago we fought a war against the British concerning

12   taxation without representation.  What they're proposing in our

13   bylaws now is just that.  The per capitas that we pay each

14   member of the local pays to the District Council and the

15   international is around $25 a month.  If you continue to tax

16   the members, you have to give them a voice.  You can't take

17   money, tax the members and not give them a voice.

18              As Mr. Conboy has just proven he's in favor of taking

19   our constitutional rights because he doesn't want the members

20   to get up and speak their minds.  Some of the members are quite

21   angry and I hope he understands this.  Don't take our

22   constitutional rights.  The UBC contract does not trump the

23   U.S. Constitution.  Thank you, your Honor.

24              THE COURT:  Thank you.

25              MR. BILELLO:  Michael Bilello, your Honor.  A couple

1    of comments.

2                  THE COURT:  Right.

3                  MR. BILELLO:  Ray McGuire, I think he was right in his

4    assessment that the Wall Ceiling Association will be the lead

5    contractor organization in negotiations, and there's a real

6    concern on the part of the membership because the head of the

7    Wall Ceiling Association, Joe Olivero was complicit in all of

8    this that took place over the last few years.  He was indicted

9    for perjury and he was found guilty last year, so there's a

10   real concern on behalf of the membership about these

11   negotiations, and that's why they want a rank and file

12   representative at the table.  Not someone under supervision but

13   someone from the rank and file.

14                 And as far as the cap of 20 delegates, I think the

15   real concern comes into play as one member mentioned before, if

16   you have the UBC restructured and bring us down to one or two

17   locals, which they have the power to do and there's no

18   constraints under the consent decree for them to do that, then

19   they limit our voice down, to it could be as low as 20 people

20   and it's a lot easier for 20 people to be persuaded than it is

21   for 110.  And as far as the restructuring, the local election

22   process begins tonight for several locals.  It's going to carry

23   on and conclude in the third and fourth week of June and if

24   they are going to restructure and eliminate some of these

25   locals then they're allowing us to go forward in bad faith.

1    Thank you.

2              THE COURT:  I think that's it.  Anybody else?  Yes.

3              MR. WEISS:  Yes, your Honor.  I wanted to follow up on

4    that and one thing.  The reason the liaison is so important, I

5    didn't raise it earlier to the Court in the telephone

6    conference on May 10, it was raised in that May 10 telephone

7    conference that the primary discussion dealt with the

8    restructuring plan at that time the UBC took a position that it

9    was an important yet secondary consideration but in the 30

10   years I've been practicing labor relations, this is a unique

11   organization where District Council delegates are ratifying

12   collective bargaining agreements.  Typically it's a secret

13   ballot election that ratifies collective bargaining agreements

14   in most cases.  But here they need someone at the table who can

15   speak to the issues, represent the membership's interest and

16   then go back to the union meeting and be able to report on that

17   negotiation so that the ratification is appropriately

18   supported.  Otherwise it's being done by, if you will, in

19   deference to Mr. Conboy, strangers to the entity.

20             THE COURT:  So how would you implement that?

21             MR. WEISS:  Well, I would suggest that, I have another

22   client who has a liaison committee, and they have one person

23   from each department who comes in and sits in on the collective

24   bargaining negotiation and reports and goes back to the meeting

25   and says this is the agenda, this is what we talked about, and

1  by having this kind of transparency then the membership are

2  informed and can have an informed vote in their secret ballot

3  election on the ratification of that contract and that is their

4  right under federal labor law.

5          THE COURT:  How do you implement that structurally?

6          MR. WEISS:  Well, the membership or any local could

7  appoint, if you will, or someone could be appointed from each

8  local who attends the collective bargaining negotiations, has

9  become aware of the agenda then can appear at the negotiations

10  to be, if you will, the eyes and the ears of the membership.

11          THE COURT:  Are those people observers?  What are

12  they?

13          MR. WEISS:  Well, the negotiations, the union

14  membership negotiates through memberships, representatives of

15  their choosing, who they elect.  They haven't essentially

16  elected the UBC.  In the past what has happened is that

17  business agents who were elected or the executive committees

18  would be part of the negotiating committees and they would

19  negotiate on behalf of the membership.  They would be

20  observers, I suspect, because at this point the brotherhood has

21  the entity under trusteeship, but this would give them a voice

22  at the table on very important pocketbook issues.

23          THE COURT:  What do you think about that, Mr. Walsh?

24          MR. WALSH:  Judge, I try to be as orderly as possible

25  in my professional affairs, and my recommendation to all

1 concerned members, to the parties, to the Bilello motion and to

2 the Court would be that they be meticulous in making sure that

3 what they are talking about is properly before the Court.  I am

4 unaware of anyone filing a lawsuit to end the supervision, and

5 I'm also unaware of anyone seeking any kind of injunctive

6 relief or anything further from the district court to interdict

7 the lawful supervisor from doing his fiduciary duty on behalf

8 of 23,000 members.  So I don't suggest to anyone that they not

9 avail themselves of such rights, but that there's a time and

10 place for everything.

11 　　　　　THE COURT:  Got it.  Anybody else?

12 　　　　　So when would it be useful to get together again?

13 　　　　　MR. WALSH:  Judge, I think clearly we need to give

14 ourselves just the right amount of time to have the comments

15 and for me to be able to go back to the UBC and also for the

16 UBC to promulgate the restructuring plan.  So I would think

17 that the middle part of June would be the earliest that it

18 would be prudent to come back and inform the Court of the

19 progress that we've made.

20 　　　　　THE COURT:  How is June 28?  That would work for me if

21 that works for all of you.  Is this a good hour?  2:30?

22 　　　　　MR. WALSH:  Very good, Judge.

23 　　　　　THE COURT:  Okay.  Thank you very much.  We're

24 adjourned.

25 　　　　　(Adjourned)