## Office of The Independent Investigator

NYC District Council of Carpenters & Joiners
17 Battery Place, Suite 1226
New York, NY 10004
212-889-3000 / Fax 212-889-3242

William P. Callahan, Esq
Independent Investigator

October 5, 2006

Hon. Charles S. Haight, Jr.
U.S. District Court, SDNY
500 Pearl Street, Room 1940
New York, NY 10007

Re:        Assessment Report – NYC District Council
           90 Civ. 5722 (CSH)

Dear Judge Haight:

    Enclosed is my Report on the assessment of the District Council's anti-corruption program pursuant to paragraph 2(f) of the Court's 8-22-06 Order of Appointment.  My apologies for being a little bit late on this.  In line with Par. 2(f), page 9, copies are being provided to the District Council, the government and Mr. Rothman's office as well.  I chose not to submit advance copies to the parties for comment due to the exigencies of time; however, I welcome any comment letters that the parties or the Court may wish to submit in this regard.

    The Report sets forth our observations and conclusions after a busy year working closely with the D.C. and its anti-corruption efforts as well as close liaison with the various involved government agencies.  I'm pleased to report that the executive management of the D.C. and the various employees and members has been fully cooperative and in my view dedicated to eradicating all forms of corruption within and without the union.

    The members (rank and file) some 25,000 or so, may not universally agree with this observation, but the great majority of these highly skilled carpenters, have shown a dedication of purpose and zeal that is amazing.  The year has ushered in a dramatic increase in new construction throughout the City -- the City is undergoing a sustained renaissance in new and re-hab construction projects.  This renaissance translates to a bountiful future for the carpenter members and the new apprentices just coming into the union.  Union records show that in the quarter ending June, 2006, $153.2 million dollars were paid into the benefit funds.  This robust local economy is creating such demand for skilled workers that certain locals of the union, such as the Dockbuilders, are straining to find good carpenters.

All of this is good news indeed, but the union and my office recognize that wrongdoing, corruption and outside criminal activity tend to flourish in these heady times.  This means that vigilance and renewed effort by the ACC Committee and my Office as we enter the second year will require immense time and dedication to further reduce wrongdoing throughout the union.  The Organizing Department of the Union now faces unprecedented levels of new non-union construction in different Boros of the City.  We're observing this phenomenon as it continues to encroach -- the great dangers are that many non-union contractors fueled by enormous flows of available funding, are not under any constraints as to using skilled and trained workers, pay the required taxes, maintain worker's compensation insurance, and will pay the workers the least amount possible to complete a job.  Unions are more than just labor organizations generating good pay for their members, they are the true incubators of seeing that workers receive the best training possible in skills and above all, safety training.  The Carpenter's Union excels at the training process.

Respectfully submitted,

William P. Callahan
Independent Investigator

cc:   NYC District Council
       Edward Scarvalone, AUSA, SDNY
       Gary Rothman, Esq

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,                    90 Civ. 5722 (CSH)

                        Plaintiff,

            -against-

DISTRICT COUNCIL OF NEW YORK CITY
AND VICINITY OF THE UNITED BROTHERHOOD
OF CARPENTERS AND JOINERS OF AMERICA,
ET AL.,

                        Defendants.

-----------------------------------------------------------------x

## REPORT OF THE INDEPENDENT INVESTIGATOR ASSESSING THE ANTI-CORRUPTION PROGRAM OF THE DISTRICT COUNCIL

October 4, 2006

Submitted by William P. Callahan, Esq.
Independent Investigator
NYC District Council Carpenters
17 Battery Place, Suite 1226
New York, NY 10004
(212) 889-3000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA,                          90 Civ. 5722 (CSH)

                             Plaintiff,

            -against-

DISTRICT COUNCIL OF NEW YORK CITY
AND VICINITY OF THE UNITED BROTHERHOOD
OF CARPENTERS AND JOINERS OF AMERICA,
ET AL.,

                      Defendants.

----------------------------------------------------------------x

## REPORT OF THE INDEPENDENT INVESTIGATOR ASSESSING THE ANTI-CORRUPTION PROGRAM OF THE DISTRICT COUNCIL

### I. Preliminary Statement

        This report is submitted pursuant to paragraph 2(f) of the Court's Order of August 22, 2005, entered in the above-captioned action ("the Order"), requiring the Independent Investigator (sometimes referred to as the "I.I") to report to the District Council on his assessment of the District Council's Anti-Corruption Program.  Consistent with the Order, this report specifically addresses the operation and effectiveness of (1) the District Council's Anti-Corruption Committee, (2) the toll-free hot-line, (3) the District Council's efforts to investigate allegations of wrongdoing or corruption by District Council representatives, union members or other persons (i.e. outside contractors), (4) the District Council's efforts to detect and address violations of the job referral system, (5) the District Council's efforts to discipline acts of wrongdoing or corruption by District Council representatives or union members, and (6) any other area or factor relevant for the Independent Investigator to fully assess the District Council's ongoing efforts at deterring, detecting, and addressing wrongdoing and corruption by District Council representatives and union members.  The I.I.'s assessment will also evaluate whether members

1

feel free to report allegations of corruption, or fear reprisal for such reports. The Order further states that the I.I.'s report shall set forth "the findings of his assessment and his recommendations."

As the Court and the parties are well aware from the numerous reports previously submitted in this matter, including by the former Investigations and Review Officer and the former Independent Investigator, the District Council is faced with a formidable challenge in endeavoring to deter, detect and address wrongdoing and corruption within and affecting the Union. The corruption comprises more than individual acts committed by persons within the Union and construction industry who would cheat the Union and its members for self-enrichment as such opportunities arise. In fact, the Union must confront the systemic exploitation of its system by organized and single-minded racketeers and their confederates. In this regard, implementation of an effective program which serves to deter corrupt conduct should be the Union's paramount goal, followed by a continuing refinement of its efforts to detect and address corruption. Indeed, prevention is the best cure when it comes to corrupt practices which can deprive the Union of millions of dollars in lost salary and fringe benefits. (The Court and parties are being provided with a confidential appendix which amplifies some of the matters in this report.)

### A. The Industry is Flourishing

According to figures I have received from the District Council, the Union is prospering. In the quarter ending June 2006, the Union had 1,297 signatory employers, who employed carpenters for 6,314,656 hours; $153.2 million in fringe benefit contributions were paid in the quarter. In the preceding quarter (January 2006 through March 2006), 1,298 employers paid $135 million in fringe benefit contributions based on 5,535,447 hours of work. These figures may be contrasted with the weakest quarter since the middle of 2004, that of January 2005 through March 2005, where 1,283 employers contributed $116.4 million based on 5,044,736 hours of work. Against the background of an improving local economy, the Union attributes some of this improvement to the increased diligence of its business agents and the effectiveness

2

of its anti-corruption program.  The Union feels that the anti-corruption program "has played a significant role in reducing fraud and wrongdoing" and points out that over 1 billion dollars has been paid to the fringe benefit funds from July 2004 through June 2006.

The Union expects the positive trend to continue as major construction projects are beginning or will begin in the near future, including new stadiums for the Mets and Yankees, the new Goldman Sachs headquarters, the Javits Center expansion, the Number 7 Line extension and the Second Avenue Line for the MTA, $7 billion in new city school projects, the Freedom Tower and other projects at the World Trade Center site, the Atlas Terminal in Queens, the water filtration plant in the Bronx, the $7 billion New York City public housing initiative, the Bank of America Tower, the New York Times Tower, and the development of malls and dozens of private projects in all of the City's boroughs.

One must applaud the Union on its recent success in the increase of work hours and benefit contributions.  To the extent that this success is attributable to the vigilance of business agents and other members of the Union, and other initiatives taken by the Union, such as its skills certification program to insure the qualifications (and thus productivity) of union-referred carpenters, these efforts must be continued, and indeed fortified.  As recognized by District Council President Peter Thomassen in a recent message to the District Council membership, "we live and work here and know that the non-union threat has never been higher." *The Carpenter*, Spring 2006/First Quarter, Page 4.

Of course, an increase in the amount of construction projects, requires an increase in the vigilance that must be applied to thwart those tempted to engage in fraud and rob the Union of its rightful opportunities.  The Union recognizes that it must ultimately rely on its own efforts, not those of the I.I., or law enforcement, to prevent corruption, and help insure the welfare of its members.  As stated by President Thomassen "our feeling is that pensions are an integral part of retirement.  Our members count on that monthly check for the rest of their life.  We are going to do everything in our power to make sure our pension plan gets fully funded and secured for your

3

future." *The Carpenter*, Spring 2006/First Quarter, Page 4.

### B. Investigative Practices of the I.I.

My assessment of the District Council's anti-corruption efforts is of course based in part on the quantity and type of matters I have been called upon to investigate since my appointment. Having given due consideration soon after my appointment to the types of investigative practices that are best suited to fulfilling the obligations of the office, I decided that my investigative methods would differ from those employed by my predecessor. I instituted a policy of unannounced job site visits where I would personally visit job sites to respond to and investigate hot-line complaints of improper conduct. I believe that this practice has been very effective and has yielded confirmation of suspicions of improper activity as well as direct proof of improper conduct in multiple cases, including matters that have been referred to federal authorities for criminal investigation and prosecution. Though I have conducted some depositions, I have limited their use to situations where I believed that there was a good likelihood that necessary evidence would be gained. I have not hesitated to subpoena documents from contractors, banks and other third parties (with the Court's approval based on a showing of relevance and articulating a suspicion of improper conduct). My staff and I have reviewed and analyzed many thousands of documents, including contractor payroll records, other business records, and bank records. Where appropriate, we have notified law enforcement of the discovery of evidence relevant to their various criminal investigations.

I believe that it is important to be "in the field" and observe job sites and allegedly improper situations first hand. I also find that the direct involvement of the I.I. in response to the receipt of carpenter hot-line calls sends the message to the rank and file that their calls are important and will result in immediate attention by a person in a position to do something about the situation. Members of the ACC have participated in many of these visits, and participated in these investigations, and have provided valuable support.

4

## II. The Anti-Corruption Committee

### *A. Form and Function*

The Anti-Corruption Committee (ACC) is the hub of all of the Union's anti-corruption efforts. It was formed during the tenure of the former Independent Investigator, Walter Mack. The Committee is composed of members from the District Council (Maurice Leary, the District Council's Director of Operations, counsel Gary Rothman of O'Dwyer and Bernstien, Scott Danielson, the Out-of-Work-List Supervisor, and Mike Murphy, a union member who serves as an investigator). My office has attended and participated in each committee meeting since my appointment. Besides myself, the meetings are attended by my chief investigator, Richard Roth (a former FBI agent), and by my senior investigator, William O'Flaherty (a former first grade detective in the NYPD).

The ACC meets weekly for approximately three hours. The substance of the meeting normally involves discussing the "hot-line" corruption calls that are received during the week, except for calls that the I.I. deems confidential. Informal memos may be exchanged by Committee members prior to or after meetings. In the normal course, the Committee discusses each new complaint that is logged in. No formal meeting minutes are taken. Due to the volume of complaints presented to the Committee, in the absence of a consensus among its members that there is sufficient corroboration or other indicia that a complaint is founded or further investigation warranted, no further action may be taken. Sometimes, a follow-up step is called for, often involving a site visit by Michael Murphy, who will report back on his findings to the Committee. When there is a collective determination that a complaint or suspicion of corruption is serious and requires additional action, an Investigative Plan, or "IP," is drafted by the District Council. The I.I.'s office has received approximately 15 IPs to date.

Pursuant to an IP, business agents and/or the business manager of the affected local union are given the responsibility to treat the job in question with heightened

5

scrutiny, which requires visits by the business agents to the job[1]. Union records, such as shop steward reports, are analyzed and a detailed IP is forwarded to the I.I. for investigation and liaison with law enforcement authorities.

Specific members of the ACC are assigned to complete various aspects of the proposed investigation during a specific time period. Primarily under the direction of Scott Danielson, the ACC usually conducts investigative hearings each week. As an investigation progresses, when warranted, a form of summons is sent to rank and file members who may have knowledge of the conduct under suspicion compelling them to come to the District Council to answer questions. Stewards and foremen, even business agents, may also be summoned to the Council for questioning.

The process is begun by Mr. Danielson sending formal requests to Union members to appear at the District Council to answer questions related to the corruption complained of in a "hot-line" call or other tip. The members are informed at the beginning of the interview that they are free to leave at anytime but that their failure to answer questions may result in charges lodged against them by the District Council. Mr. Danielson also informs the members that the District Council will consider amnesty for them or a reduction in penalties if the member tells the truth at the interview, and materially assists the investigation. Mr. Danielson and the I.I. usually question the member and the member is then required to provide a signed, sworn statement listing the information that he or she has provided.

Mr. Murphy conducts visits to job sites to determine who is working on the job site and whether or not the carpenters are listed on the shop steward report. Mr. Murphy does not announce his visits. Mr. Murphy may be accompanied by an investigator from my office, in my discretion.

---

[1] The business agents/ managers *must* improve their efforts in this regard. (See *infra* VII. B)

6

### B. Limitations on Information Gathering

Scott Danielson has often been able to obtain helpful information when interviewing Union members suspected of working for lower wages than required by the collective bargaining agreement, and who have received no benefits. Such carpenters often admit such circumstances and provide signed statements to document this information. However, interviews of shop stewards, business agents and business managers are usually not successful. Typically, these Union members completely deny any allegations made against them or which may involve them, even when confronted with documentary evidence and witness statements. In a few cases, they have refused to make statements where such statements would have been incriminating.

"Stock" answers to questions have been prevalent in several separate investigations, which indicates that the corrupt schemes under investigation have been in existence for some time and participants want to cover the truth. Further, when the ACC investigator and/or the I.I. have conducted job site "raids" and found workers who are not or have not been reported on shop steward reports, they have often said, in substance, "I just started this job today." In lock step, we have found that stewards on such jobs usually claim that "the worker just started this morning, I didn't get a chance to put him on the sheet." Stewards invariably deny knowing that the workers are on the job site, and make statements in this regard such as "it's a large building with many floors. If the worker doesn't report to me that he is here, I can't find him."[2]

### C. Policy Forum

The ACC is also a forum for discussion of possible changes in policy and procedures within the District Council to deter and detect corruption, but decisions

---

[2] It should also be noted that both this office and the ACC (at my request) have refrained from pursuing certain aspects of investigative plans when requested to do so by law enforcement agencies investigating significant union-related matters of which the Court is aware.

regarding implementation of major policy changes are beyond the jurisdiction of the ACC.

### D. Assessment

The ACC system requires input from carpenters or affected parties. However, sophisticated fraudulent schemes may not be obvious to those working at or familiar with a job, and thus remain undetected by the Committee.

The ACC does not have a handbook of investigative procedures or written guidelines. The actual investigative work devolves on Mr. Murphy and Mr. Danielson, neither of whom have any formal investigative training or experience. They are carpenters by trade. Though Mr. Danielson is particularly effective, and he and Mr. Murphy exhibit seriousness of purpose in their undertakings, the committee is hampered by its limited resources and a lack of training. This directly restricts the range and effectiveness of its investigative plans. It cannot on its own do much more than inquire into allegations of improper conduct.

Though the committee has had a laudable record of success in certain cases (e.g., the matter involving an office furniture installer now under criminal investigation), ideally, its resources should be increased, its members provided with formal training, and it should be used in conjunction with other assets of the District Council and Benefit Funds as part of a greater campaign to *prevent* fraud rather than *react* to it. If the effectiveness of the committee were to be assessed solely in the light of major and ongoing fraudulent conduct committed by contractors such as On Par and Tri-Built, one could not conclude that it has been effective. Further, it has increasingly relied on this office to establish and take investigative initiatives.

After corruption is detected, the District Council is limited in the range of methods at its disposal to develop evidence which could be used against conspirators in a Union-proceeding or in a legal forum to recoup losses in wages and/or benefits. These

8

methods include review of steward reports and contractor remittance statements, interviews, job site visits, audits of contractor books authorized by collective bargaining agreements, and subpoenas to contractors and third parties after litigation is initiated. My office (as well as counsel for the District Council), have recommended to the ACC that audits of several contractors be conducted and the District Council has concurred and assigned auditors to do so.

Obviously, the Union now reaps a benefit in my office having the authority to issue subpoenas, with the consent of the Court, to gain evidence of corruption. However, the subpoena power of the I.I. is not a tool that the Union can rely upon indefinitely, as it necessarily must strive for self-sufficiency in seeking to deter, detect and address corruption.

**III. The Toll-Free Hot-Line**

Since assuming my duties effective September 1, 2005, the I.I.'s office has fielded 474 hot-line calls. Working with the ACC, this office has been able to effectively close 332 (70%) of the calls. See Exhibit A attached hereto (chart of hot-line calls)

The number of calls to the toll-free hot-line has decreased in the last few months. As I have no reason to assume that there is any more or less corruption now than there was a year ago, or five years ago, this is likely a direct result of the unprecedented demand for carpenters in New York City and the plethora of jobs available to carpenters.

Though the number of calls has fallen (and thus the number of false alarms, malicious, unfounded calls, and insubstantial gripe calls) the quality of certain calls has remained high. I believe that a small minority of District Council members are using the I.I.'s office to make false and malicious accusations against their fellow members. I am disturbed that I have had to use limited resources to investigate these matters. Malicious

9

calls have also created a burden that falls on the ACC and the Court in considering such claims. Such calls may also damage the reputations of District Council members.

I have launched significant investigations based on tips received through the hot-line. I believe that the hot-line remains an effective tool, and I have no reason to believe that carpenters are unwilling to call the hot-line.

## IV. The District Council's Efforts to Investigate Allegations of Wrongdoing or Corruption By District Council Representatives, Union Members or Other Persons

This category is really part of the first category above (II). The Union's anti-corruption efforts are directed through the ACC. To the extent that this category involves an assessment of the Union's willingness to assist my office through document requests or the providing of information I require, to date, I have detected no unwillingness on the part of the District Council to assist my office. A trend which I think needs reversing is that of the Union relying too much on this office to take the lead in all investigations based on a perception that the I.I. is more appropriately qualified to handle that area of the District Council's operations. Though I do not fault the Union for this perception, as I elaborate, infra, the Union should be striving for reliable self-sufficiency in the future.

## V. The District Council's Efforts to Detect and Address Violations of the Job Referral System

I believe that the general structure and operation of the centralized, computer-aided job referral system is sound, and has for years represented the best alternative to the shape hall or local union-run referral systems (often favoring allies and friends of business agents/managers). As the Court and parties are obviously aware, the system is subject to manipulation, often through the addition of a certain skill by a job seeker on the out-of-work list ("OWL") who has communicated with a contractor (or a business agent

10

to the contractor) who desires to add the carpenter as a union-referred carpenter for purposes of the "50/50" ratio of Union-to-company carpenters on a job. The DC detected this anomaly and in August 2006, the DC implemented that any new skill additions are subject to a 30-day delay.

As long as the "50/50" rule forms part of the District Council's collective bargaining agreement, this phenomenon will be encountered. Naturally, contractors want to assume as much control as they can over whom they employ. The construction industry is highly competitive, and when an opportunity to hire a productive, efficient carpenter arises, and only one carpenter is needed, the contractor will make an arrangement to hire the specific carpenter as a Union-referred carpenter. If the carpenter were hired as a "company man," the Union would be entitled to match the carpenter with a superfluous carpenter, an unwarranted and significant expense.

The Union recognizes this reality, but I have not found the Union at all reluctant to investigate alleged violations of the job referral system during my tenure. I note that the OWL administrator, Mr. Danielson, has installed a program on the District Council's computers designed to detect the phenomenon known as "riding the list." In addition, I'm told that the District Council is establishing additional computer-based methods to detect Job Referral Violations. However, I think the more important question presented in this regard cannot yet be answered: What effort will the Union apply to preventing, detecting and addressing violations of the job referral system in the absence of independent oversight?

The Union has been "monitored" in this regard for over a dozen years but even with such oversight, violations routinely occur. If self-regulation is to be achieved, the Union needs to strive for more transparency in its operation of the job referral system based on easy access by its members to all job referral data. In the future, in the absence of oversight, the rank and file will need a reliable and efficient means of checking the

11

accuracy and fairness of the job referral system, such as can be implemented with a job referral system website which can be accessed by members with a password.[3]

## VI. The District Council's Efforts to Discipline Acts of Wrongdoing or Corruption By District Council Representatives or Union Members

Though there has been a lull in proceedings before the District Council Trial Committee, in a significant step, approximately 80 carpenters have recently been charged by the Union on charges relating to the On Par investigation. These members were all charged with improperly accepting cash pay from a contractor. Further, this office expects shortly to recommend charges against stewards and foremen for violations detected in the same investigation. Thus, I must reserve judgment on the District Council's efforts to discipline acts of wrongdoing. With the recent establishment of disciplinary and sentencing guidelines for violations of the carpenter's Obligation to the Union, and other Union rules, the District Council is certainly well-positioned to effectively discipline corrupt members of the Union.

On August 1, 2006, the District Council executive and trial committees instituted strengthened disciplinary guidelines for various infractions and violations of the by-laws and constitution. See Exhibit B attached hereto: Disciplinary Guidelines, *The Carpenter*, summer 2006.

## VII. Other Factors Relevant to the Assessment of the Independent Investigator and Member Willingness to Report Suspected Corruption.

### A. Stewards

The investigations conducted by my predecessor and by this office demonstrate that shop steward accountability must be improved, and that oversight of stewards must

---

[3] Although job referral information is available to members, it requires them to visit a Union office. The District Councils website does not provide job referral information.

12

be significantly strengthened. In a perfect world, stewards zealously protect the interests
of the Union and its members. When a steward agrees to participate in the all too typical
scheme to leave Union members' names off of a shop steward report in exchange for cash
payments (reportedly $100 per name, per week; see also Exhibit B: Disciplinary
Guidelines, Accepting Cash by a Steward) he inflicts a grievous wound on the Union. In
exchange for each of those hundred dollar payments, he facilitates a criminal diversion of
salary and benefits that can exceed $1,000 per carpenter each week.

        The investigations have revealed that stewards involved in corrupt conspiracies
are often not present on the job site and when they are, they do not work. Yet, in the
absence of complaints by the rank and file or direct supervision by a business agent, such
conduct does not abate. As demonstrated by the revelations in the On Par investigation,
where the government alleged that $15 million was criminally diverted, and the owner of
the company indicted (United States v. James Murray, 06 Crim. 443, SDNY) for schemes
that required the complicity or gross negligence of stewards, the Union cannot afford to
suffer the effects of a lack of oversight of its stewards.[4]

## B. Business Agents

        Similarly, the accountability and effectiveness of business agents must be
strengthened. Business agents are largely left to their own discretion in determining how
to supervise job sites in their jurisdiction. In jurisdictions with a multitude of jobs, some
of which are difficult to detect, some union contractors seek an advantage by not
reporting their jobs to the District Council. Seeking to insure that jobs are run in
conformance with the collective bargaining agreement, even if they are reported or
discovered in the first place, can be a great drain on the time of a dedicated business
agent. Checking back to see if a steward is meeting his obligations can often be the last

_____

4 . Note: the District Council audit findings indicate an amount substantially less than $15 million

13

thing that the business agent seeks to accomplish on any given day. The business agents, and thus the Union, could benefit from the implementation of a system coordinating the supply of information between local unions, the District Council (including the Benefit Funds), and the ACC, about problem contractors-- for instance, those in arrears on benefit payments, who have run cash payrolls, or who repeatedly fail to notify the Union of pending jobs. To those agents not consumed by the any of the foregoing, expenditure of their time is left to their discretion. Perhaps most troubling, recent investigations have revealed that no visits were made by any business agent to certain job sites where corruption flourished.

### C. Shut-Down Conferences

The District Council has over the last few years adapted its stance regarding toleration of union contractors who are discovered operating in violation of their collective bargaining agreements. The Union recognizes the economic incentive driving contractors to increase their margins by choosing to pay only some of their carpenters the wages and benefits required by the collective bargaining agreement. "Shut down conferences" involving the Union and the contractor are held when a contractor engaged in such practices is discovered by the Union. However, "instead of shutting down the job," the Union often decides, in substance, that it is better to have some union work from a large contractor than none at all, and permits the contractor to continue working with Union carpenters. A payment schedule designed to compensate the fringe benefit funds for provable past violations of the collective bargaining agreement is often agreed upon by the Union and the contractor.

The union is confronted with a conundrum in this regard—"damned if they do, damned if they don't." My impression of this phenomenon is that the Union is invariably left with an unhappy outcome because any acceptance of deficient performance by

14

contractors institutionalizes cheating by repeat offenders and raises their expectations of concessions from the Union as their market share grows.

### D. Corrupt Schemes Employed to Avoid Paying Benefits

The court has expressed concern to me as to how contractors can avoid paying significant amounts of benefits. In the traditional scenario, members of organized crime or contractors pay bribes to union representatives and in exchange, contractors are allowed to violate the CBA. My office notes the following basic schemes which can be facilitated by the payment of bribes:

1) District Council members work for an hourly rate below that of the rate in the collective bargaining agreement (CBA). We suspect that the identities of these employees are actually available to contractors or that a "word of mouth" communication system exists, as demonstrated by statements taken in the On Par investigation.

2) Shop stewards fail to record members on shop steward reports, thus failing to provide the Benefits Funds with the proper documentation to quantify and collect all benefits. Shop stewards are willing to receive a cash payment from the contractor or are allowed to leave work early or not show up at all but still receive a full day's pay.

3) District Council members, with the assistance of the shop Stewards, are willing to "hide" when a business manager or business agent comes to the job site to check the accuracy of the shop steward report.

4) Contractors do not call in to report the commencement of a job and do not request a shop steward in violation of the CBA.

5) Contractors habitually do not pay proper wages and benefits, but continue to employ unquestioning Union carpenters until formally "shut down" by the business manager or District Council.

6) Contractors influence the appointment of shop stewards or attempt to lay off shop stewards who attempt to enforce the CBA.

7) Shop stewards are subject to threats and intimidation by organized Racketeers

15

8) After hours or weekend work is preformed by union members or non-union
workers at a rate of pay and benefits less than the rate per the CBA.

Any one of these schemes or any combination of these schemes, or others not listed
above, can result in a contractor failing to pay a significant amount of benefits.

### D. District Council Response to Corrupt Schemes

I have discussed that business managers and business agents are sometimes
required by the ACC to make special visits to job sites pursuant to an investigative plan.
This procedure needs to be strengthened.

When significant deficiencies in fringe benefit payments are suspected, the Union
arranges for forensic audits by Greg Polvere or Steven Levy who are retired Internal
Revenue Service Special Agents.

### E. Union Culture

I believe that the elimination of corruption in the District Council is hampered by
certain aspects of the union culture. This is not a critique or unique situation with respect
to the NYC District Council, but is common to many labor unions where most members
"mind their own business." The District Council is a political organization and many
workers owe their employment to the elected officials who have appointed them.
Conversely, officials owe their allegiance to District Council members or groups who will
vote for them. Some officials, upon hearing an allegation, hope that the allegation is
unfounded, and may hesitate to credit the veracity of a complainant. In some situations,
officials assigned to the anti-corruption effort may be friends of subjects of union
investigations. In some instances, members who inform on other members are treated
with scorn, and history has shown that they may be subject to economic or physical
coercion, or both.

16

## VIII. Findings and Recommendations

There is a convention that criminal prosecution represents the ultimate weapon in the fight against corruption. Indeed, it is the ultimate weapon in punishing the corrupt once their conduct is discovered. However, though the threat of prosecution deters many from embarking on the path to corruption, the investigations involving On-Par and Tri-Built, among others, demonstrate that the threat of prosecution has not deterred certain people from treading that path.

Further, the referral of an investigation to a law enforcement agency can sometimes result in the Union having to temporarily hold back its investigation and pursuit of remedies so as not to impede law enforcement while grand jury proceedings are in progress. However, such law enforcement investigations can be extremely time consuming and cannot urgently address alleged corruption in the Union.

In light of all of the foregoing (and the information provided in the Appendix attached hereto), I conclude that (1), the *prevention of corruption, whether initiated by union members or by organized racketeers,* is of paramount importance to the long-term health of the Union and (2), the District Council can and must fortify its ability to prevent fraud and corruption. There are systemic, procedural and technological improvements that the District Council and the Benefits Funds should consider implementing which I strongly believe would improve the operation and administration of the Union and increase its overall ability to prevent and uncover corruption. Recommendations in this regard follow:

1.    Issuance of Photo Union Identification Cards: This is self-recommending. Photo identification union cards would be an invaluable tool in the daily battle against non-union labor, violations of the job referral rules, and the fraudulent possession of Union cards obtained from other members. If combined with work-site swipe card technology, data could be sent directly to the Union (via wireless technology) indicating a member's

17

(including a steward's) presence at a job site and the hours spent at the job site; shop steward reports could be checked against this data for accuracy; if properly implemented with available technology, handwritten steward reports would be rendered obsolete.

2.  Implementation of time logs for business agents: Many business executives, professionals and government employees are responsible for the keeping of detailed time logs detailing their activities, in some cases, in increments of every tenth of an hour. Business agents of the Union should be required to keep such time logs as a means of demonstrating their daily activities, productivity, interaction with contractors and Union members. Making them available for inspection by the ACC would be a valuable time saver in assessing the veracity of many initial complaints involving business agents. After a reasonable period of confidentiality, they could be made available to the rank and file. Time logs could be generated directly into Union computers on a daily or weekly basis.

3.  GPS data should be gained from each district council and local union vehicle: global positioning data is commonly used in many cars these days, most often for in-car maps and directions; it is also used in the trucking and train transport industries to monitor the locations of trucks and freight trains; the location data of each car could be gathered and stored for each Union-owned vehicle to monitor the whereabouts of employees who use Union vehicles.

4.  Contractors should be required to post realistic bonds for each new job or a larger bond for multiple job sites: a contractor should not be allowed to start or continue a job without posting a bond in an amount equal to at least the first two weeks of fringe benefits expected for the job; the scope of a job should be verified by the Union by on-site inspection of the job and review of the specifications in order to determine the appropriateness of a bond.

5.  Contractors should not be authorized to proceed with jobs after the initial discovery of unpaid fringe benefits and/or cash payroll: contractors should not be allowed to proceed with new jobs until arrears in payment of fringe benefits and/or cash payroll transgressions have been rectified; reports of fringe benefit/cash payroll problems should be shared among Benefit Funds personnel and ACC personnel so that a unified approach to the problem can be formulated.

6.  Written guidelines should be implemented for the benefit of all personnel involved in policing and enforcing collective bargaining agreements and/or investigating malfeasance and corruption: a standardized,

18

documented approach would indicate which audit/investigative tasks need to be achieved and who would be responsible for the completion and reporting on each such task; such guidelines would not only instruct an assigned employee how to conduct his audit- or investigation-related task but would make clear reporting requirements, the completion times for tasks and the identity of personnel responsible for receiving reports and acting on the information.

7.    The ACC should be composed of full time persons responsible for ACC investigations and not other job descriptions within the Union: One possible method being adopted by some unions (Laborer's Int'l Union) is the creation of an internal Office of Inspector General with a dedicated staff who are all either trained or experienced in investigative techniques, state and federal labor law standards, the techniques used by labor racketeers, and the substance of collective bargaining agreements; they should have adequate financial resources to effectively investigate matters. Congress in 1978 established the IG Act of '78.

8.    The particulars of each new shop steward appointment should be available to members through a link on the District Council website: rank and file members with passwords for website access should be able to see who receives shop steward appointments, in nearly real time, without having to travel to Hudson Street headquarters.

9.    If available, records of cell phone usage for each mobile phone issued to a business agent/manager should be forwarded on a monthly basis to the ACC: such a measure would obviate the red flag associated with this type of documentary request by the ACC and discourage the use of union cell phones for improper purposes.

10.   Steward Whereabouts: stewards should face disciplinary charges for their failure to remain on a job site until quitting time and for any failure to notify the District Council of the necessity of leaving a job site (without reasonable justification).

11.   The Union should strive to adopt modern business practices which place a premium on *technology, productivity* and *accountability*: by way of analogy, the rank and file members are similar to shareholders of a corporation in their expectation of performance on the part of their executives *and* an expectation of dividends; the product of the Union is its hugely-skilled membership which, in essence, must be sold in a competitive environment where the competition comprises non-union

19

labor, non-union contractors, and cheating union contractors. Tragically, some union members are either inclined to aid the competition for self-gain or unable to fight the competition due to lack of skills, negligence or ineptitude. The Union should have written guidelines establishing the responsibilities of its employees, the details of how they are expected to do their jobs, and objective criteria by which their performance as employees serving the interests of the members will be regularly reviewed. Employees who do not meet the requirements of these guidelines, as in any modern business, should be dismissed. Further, all of the business of the Union should be done in the most cost-effective way possible, implementing technology (See Recommendations 1 and 2 above) to increase productivity and the reliability of Union records.

**Conclusion**

The District Council has arrived at a key junction in its history. The Union must decide how best to prevent corruption, preserve, protect and improve the assets of its fringe benefit funds, preserve and increase the level of its membership and represent the interests of its members while facing unprecedented competition from non-union workers and opportunistic employers. To the extent that "old ways" do not advance any of these goals, they should be refined or even abandoned. New ways that advance any of the goals should be adopted without delay, but in many respects, those intended to deter corruption are the *sine qua non*. Without the construction of a systemic bulwark designed to keep fraud out of the Union's affairs, all other goals are at risk. Without a system that allots shared responsibility to prevent corruption to many employees, officers and members, and uses technology to aid in this fight, racketeers who have mastered the same old schemes will continue to exploit the Union. Without the implementation of a system that allows the Union to be self-sufficient in this fight, the future will bring more revelations of fraud that will need to be addressed by independent investigators, the government, and the Court, at an aggregate cost far greater than the investment that can be made now.

Dated: New York New York
      October 4, 2006

Respectfully submitted,

_____ __ ____

William P. Callahan
Independent Investigator
17 Battery Place, Suite 1226
New York, New York 10004
212-889-3000

To:
AUSA Edward Scarvalone
United States Attorney's Office
Southern District of New York
New York, New York

Gary Rothman, Esq.
O'Dwyer and Bernstien
New York, New York
Counsel for the District Council

21

# NUMBER OF CASES BY CATEGORY
## 08/26/2005 — 10/04/2006



22 - REFER TO ELECTION COMMITTEE  0

21 - REFERRAL TO LAW ENFORCMENT  2

20 - ALLEGATIONS AGAINST DC

19 - IMPROPER DISCHARGE OF SS

18 - MISCELLANEOUS

17 - MEMBER MISCONDUCT

16 - JOBSITE SAFETY  2

15 - DISCRIMINATION  4

14 - WORK RULE VIOLATION

13 - COALITION ACTIVITY  0

12 - SS NOT DOING WORK  4

11 - OWL COMPLAINTS/PERSON

10 - OWL COMPLAINTS/GROUP

09 - OTHER UNIONS DOING WORK  2

23 - MARKET RECOVERY JOB  1

01 - PAYOFFS

02 - FAILURE TO PAY SALARY

03 - VIOLATING OWL RULES

04 - NO SHOP STEWARD

05 - ORGANIZED CRIME

06 - NON-UNION JOB SITE

07 - 50/50 RULE VIOLATION

08 - NON-UNION EMPLOYEES

EX. A

KEY
NUMBER OF CASES
45
CATEGORY
18 - MISCELLANEOUS

TOTAL CASES - 474

NYCDC CARPENTERS -  INDEPENDENT INVESTIGATOR



NUMBER OF CASES BY MONTH
08/26/2005 — 10/01/2006

Ex. A

TOTAL CASES - 474

NYCDC CARPENTERS - INDEPENDENT INVESTIGATOR

# Executive Committee and Trial Committee Formulate
# Disciplinary Guidelines



After numerous meetings, and detailed and extensive discussions, the District Council Delegate body recently received and acknowledged the following disciplinary guidelines from the Executive Committee and Trial Committee for various infractions and violations of the By-laws and the United Brotherhood of Carpenters Constitution. Faced with situations detrimental to individual members and to the entire union, these guidelines were set to prevent further offenses. These guidelines as listed below will be implemented commencing August 1, 2006.

The intent of these guidelines is primarily to deter wrongdoing and to maintain the integrity of the Out of Work List; not to punish members. All members should realize that any "defrauding" of our Union and Benefit Funds by working for cash denies proper funding to all our medical, vision, hospitalization, prescription, pension, vacation and annuity funds. When these benefit hours are not paid to the appropriate funds, ALL active and retired members and their families are damaged. When there are increases in co-pays, reduction of services or decreases in coverage, it is in part a result of the larceny performed by our own members who agree to cash deals as well, and even those who are aware of these actions but do not report it.

**Members who ride the Out of Work List while working damage their fellow brothers and sisters by "cutting the line"**, so to speak, and denying the rightful member his or her legitimate referral for a work opportunity.

When a member places or keeps his or her name on the list and receives an illegitimate referral, not only is the rightful member victimized of his or her weekly pay but the member is also denied the all-important medical hours, pension, annuity and vacation money. **There is also the damage that this behavior causes the victimized brother or sister by virtue of the extended unemployment and resulting distress to the rightful member and the member's family.**

Unfortunately, sometimes members find themselves brought up on charges for riding the List, not due to intentional actions, but because, while in the process of being requested by their employer, the member, who properly registered his or her name on the Out of Work List, finds him- or herself at a new job site, where the employer fails to fax in the required request all together, or faxes it in **after** the member has been registered on the Job Steward sheets and begins working at the new job site.

## THE INTENT OF THESE GUIDELINES IS TO PRIMARILY DETER WRONGDOING, NOT TO PUNISH MEMBERS.

To avoid this conflict and possible fine, you should ask that your employer fax in the request before your arrival at the new site. Call the Out of Work List yourself to report your presence at this new site and record the time, date, and name of the Out of Work List representative with whom you spoke. Doing this could prevent confusion that may lead to a job referral charge against you.

**Unreported jobs are usually indicative of other improper activity:** sometimes cash, sometimes non-union workers, many times the imbalance of the 50/50 manning ratio, etc. Unreported jobs deny members awaiting their proper turn on the Out of Work List their rightful dispatch and many times deny our Benefit Funds proper funding due to the fact that there is no shop steward dispatched to record hours and help enforce the 50/50 manning ratio.

For our Union to function properly, for our members to have faith in the system, and to help root out corruption, wrongdoing and

improper conduct, the Union must be able to gather proper, truthful, and timely information from those who may have knowledge of certain facts. **Many times a member doesn't even realize that he or she has important information that the Union or Anti-Corruption Committee could utilize.**

All members, no matter what the circumstances, are required and expected to respond when summoned for an interview. This cannot be overemphasized. Failure to respond after being duly notified via certified mail not once, but twice, leads to the member being charged. **Failure to respond to these notices is then grounds for expulsion from the Union.** If you are ever summoned for an interview, make sure you respond.

Please take time to read and review the disciplinary guidelines listed below and inform others on your job site of these guidelines. These actions and decisions are all created to protect you, your family and your Union. These have not been decided upon lightly. Significant thought and discussion resulted in the creation of these guidelines.

Again, the District Council takes no pride or pleasure in bringing members up on charges and hopes not to collect such serious fines or enact such heavy punishments; but they need to protect you, your family, and the integrity of our Union. To discipline or clean out the individuals who carry our membership cards while desecrating our great Brotherhood is of paramount importance to the Executive Officers, Executive Committee members, Trial Committee members, and your Local Union Delegates.

Let's all move forward in providing a more honest, fair and genuine Brotherhood for all of our members and our families that depend on us for their livelihood.

## Amnesty Program

✔ **The District Council is offering, for a limited time, AMNESTY, to encourage members to come forward and report any occasion when he or she accepted cash or worked for less than the contractual wage or benefit rate or any other activity that may be deemed to be improper. If you report this activity, you will be assured that the District Council will not seek your expulsion from Membership in the UBC.**

✔ **If you would like to be a part of this program call the telephone number designated for the AMNESTY program at 212.366.7818. Leave sufficient information, such as a telephone number where you can be reached and your UBC number. At this time, you do not have to leave your name. A District Council representative will contact you to schedule an appointment. Meetings can be scheduled before or after work.**

EX. B

# PENALTY GUIDELINES – DETERMINED BY EXECUTIVE COMMITTEE AND TRIAL COMMITTEE TO ADDRESS:

- Members Working On Unreported Jobs
- Members Not Honoring Interview Requests
- Working for Cash (Defrauding/ Lumping)
- Various "Obligation" Violations
- Out of Work List Violations

## ACCEPTING CASH – BY A STEWARD
▲ Conspiring to keep men off sheets   ▲ Performing work for cash him/her self

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲$10,000 fine<br>▲Lifetime Steward Certification suspension<br>▲Must provide full, complete, truthful cooperation with | District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition<br>▲Not eligible to be elected or appointed to office | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **Go To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>Expulsion or<br>▲ $15,000 fine<br>▲ Lifetime Steward Certification Suspension<br>▲ Must cooperate with AC/DC | ▲Not eligible to be elected or appointed to office<br>▲ Additional fine amount determined by multiplying number of estimated hours by hourly benefit rate (i.e. 100 hrs x $27= $2,700 additional fine)<br>▲ Must waive vacation portion of any recovered funds | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | | |

## ACCEPTING CASH – BY A JOURNEYMAN WORKER

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲$3,500 fine<br>▲Not eligible to be elected or appointed to office<br>▲Lifetime UBC Steward Ineligibility | ▲Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>Expulsion or<br>▲ $5,000 fine<br>▲Not eligible to be elected or appointed to office<br>▲ Additional fine amount determined by multiplying number of estimated hours | worked by hourly benefit rate<br>▲ Lifetime UBC Steward Ineligibility<br>▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition<br>▲ Must waive vacation portion of any recovered funds | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | | |

## MISCELLANEOUS STEWARD VIOLATIONS
▲ Not turning in sheets, Non-cooperation with Agent/District Council
▲ Habitual lateness   ▲ Unreported absences, No-show to job site

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲$0 – $5,000 fine<br>▲3 Month–Lifetime Steward Certification Suspension | ▲ Additional Mandatory Union Participation<br>▲ Letter of reprimand<br>▲ Possible removal from job site | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>Expulsion or<br>▲Minimum one year–Lifetime Steward Certification suspension<br>▲$0–$5,000 fine | ▲ Additional Mandatory Union Participation<br>▲ Not eligible to be elected or appointed to office<br>▲ Letter of reprimand<br>▲ Possible removal from job site | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | | |

## SECTION 15 NYC BY-LAWS (Working while on the out of Work List) & Section 51A(13) (Violating obligation)

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>▲ Signs waiver ▲ Letter of reprimand<br>▲ Receives copy of Out of Work List rules | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | |
| 3. Shows for Trial and pleads "Guilty" | ▲ $100 fine ▲ Letter of reprimand<br>▲ Receives copy of Job rules | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>▲ $250 fine ▲ Letter of reprimand ▲ Receive copy of Job Rules | |
| 5. Fails to show for Trial | **Guilty Verdict:**<br>▲ $350 Fine for Stewards<br>▲ $350 Fine for all other members | ▲ Letter of reprimand<br>▲ Receives copy of Job Rules |

*UBC Stewards receive 6 month suspension *Members may not take a Steward class for 6 months Second offense – Fines doubled; Third offense – Fines tripled

## ACCEPTING CASH – BY A FOREMAN (DEFRAUDING)
▲ Conspiring to keep men off sheets
▲ Performing work for cash him/her self, i.e. Acting as an "Orchestrator"

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲ $10,000 fine<br>▲ Not eligible to be elected or appointed to office | ▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>Expulsion or<br>▲ $15,000 fine<br>▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements | and/or deposition<br>▲ Not eligible to be elected or appointed to office<br>▲ Additional fine amount determined by multiplying number of estimated hours by hourly benefit rate<br>▲ Must waive vacation portion of any recovered funds | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | | |

## ACCEPTING CASH – BY AN APPRENTICE

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲ $500 fine – first year<br>▲ $1,000 fine – second year<br>▲ $1,500 fine – third year | ▲ $2,000 fine –fourth year<br>▲ Five additional days of Mandatory Union Participation<br>▲ Full cooperation with AC/DC | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **Go To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>Expulsion or<br>▲$1,000 fine – first year<br>▲ $2,000 fine – second year<br>▲$3,000 fine – third year<br>▲$4,000 fine –fourth year<br>▲ Additional fine amount of hours estimated worked | times benefit hourly contribution<br>▲ Must waive vacation portion of recovered funds<br>▲ 10 additional days of Mandatory Union Participation<br>▲ Third and Fourth year Apprentices not eligible to be a UBC Steward for 10 years after completion of Apprenticeship | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | | |

## MEMBER/FOREMAN FOUND ON UNREPORTED JOB SITES

| | | | |
|---|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>▲$300 fine for Foreman<br>▲$150 fine for Workers<br>▲ Letter of reprimand | ▲ Cooperation with District Council (i.e. Grievance) | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>▲$500 Fine for Foreman<br>▲ $300 Fine for Workers | ▲ Letter of reprimand<br>▲ Cooperation with District Council (i.e. Grievance) | |
| 5. Fails to show for Trial | **Guilty Verdict:**<br>▲ $1,000 Fine for Foreman<br>▲ $600 Fine for Workers | ▲ Letter of reprimand<br>▲ Cooperation with District Council (i.e. Grievance) | |

## FAILURE TO SHOW FOR INTERVIEW
▲ SECTION 2-NYC BY-LAWS (protect Member's Interests) ▲ Section 12A-NYC By-laws (Executive Secretary Treasurer Powers) ▲ Section 51A (13) UBC Constitution (Obligation) (Failure to respond to Executive Secretary Treasurer Investigative hearing Notice)

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty"<br>Expulsion or<br>▲ $350 Fine ▲ Cooperation and interview<br>*If accused is a UBC Steward then 1 year suspension is also activated | Pleads "Not Guilty"<br>To Trial |
| 2. Fails to show for 1st Reading | **To Trial** | |
| 3. Shows for Trial and pleads "Guilty" | **Same as above** | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty"<br>▲ $350-$1,500 Fine then can be reduced depending on level of cooperation reported back to Executive Committee from ensuing interview<br>*If member is UBC Steward a 1-5 year suspension of Steward Skill is activated. The length is determined by level of cooperation. | |
| 5. Fails to show for Trial | **Guilty Verdict: Expulsion** | |

Ex. B

## *CONFIDENTIAL APPENDIX (FOR THE PARTIES AND THE COURT)*

### *A. Background*

My office has reviewed the following documents in preparation for this report:

Walter Mack's transition reports regarding:

1) On-Par Cash Payments;
2) Shop Steward Issues;
3)
4)
5)
6) Javits Center/ Trade Shows;
7) Tri-Built.

Kenneth Conboy's Interim Reports to the Court, 1994 to 1999.

Walter Mack letter dated July 15, 2005.

Walter Mack letter dated January 23, 2006.

### *B. Walter Mack Letters Dated July 15, 2005 and January 23, 2005*

Mr. Mack stated in these letters that he had uncovered substantial evidence that the following contractors had defrauded the District Council's benefit funds: On-Par Construction, Tri-Built Construction,                      Perimeter Interiors, Pyramid Associates, Pitcohn Construction, Aurash Construction,

Each of the above companies have been assigned to Forensic Auditor Greg Polvere for a forensic audit. Mr. Polvere has provided this office with the following information:

| Date of Report | Company | Results (Deficiency Amount) |
|---|---|---|
| 8/7/06 | Pitcohn Construction | 2002 - $353,939<br>2003 - 608,858<br>2004 - 787,789<br>2005 - 160,052 |
| 8/7/06 | Pyramid Associates | 2002 - $459,669<br>2003 - 397,633 |

1

|         |                     | 2004 - 48,454   |
|         |                     | 2005 466,990    |
| 8/7/06  | Perimeter Interiors | 2002 - $63,694  |
|         |                     | 2003 - 395,523  |
|         |                     | 2004 - 512,687  |
|         |                     | 2005 - 304,102  |
| 8/15/06 |                     | 2004 - 48,091   |
|         |                     | 2005 - 114,145  |

## C. Recommendations Made by the I.I. to the ACC

I have made the following recommendations to the ACC:

### 1. Investigative Plans

Paychecks to rank and file carpenters should be inspected to ensure the salary portion is correct.

### 2. Upgrade of Audits

Due to the mixed success of job site "raids," and the limitations of other conventional investigative techniques, several deficiency allegations have been referred to forensic auditors retained by the Union (former IRS Special Agents Greg Polvere and Steven Levy). The Unions' right of audit pursuant to the CBA is a practice that should be used whenever feasible (based on a cost/benefit analysis).

### 3. Shop Steward layoffs

All contested shop steward layoffs should be reviewed by the District Council. A written letter from the contractor stating the reason for the layoff should be requested. The business manager of the affected local should write a formal memorandum documenting any decision not to file a grievance on behalf of the shop steward.

### 4. Shop Steward "sign out" notification

Any shop steward, who leaves a job site during the workday, must report his leaving to the District Council. The District Council has agreed to this proposition and a communication system is being implemented. Failure to notify the District

Council in this regard should constitute an offense which will result in charges being filed against a steward.

### D. Shut-Down List

The DC sends a form letter to approximately 100 to 150 companies each week informing the company that the company is delinquent in benefits and advising the company that no DC workers will be allowed to work until the benefits are paid. Most companies pay the benefits upon receipt of the letter. However, some companies do not and a meeting is held with the DC to discuss the delinquency. Some companies are allowed to continue in operation with DC members upon agreement to a "payment plan." The "payment plan" consists of making a payment each week. Pete Thomassen, the DC President, has advised the I.I. that he believes that it is most important to keep the members working rather than shut the company down.

### E. Forensic Audits

Audits conducted by Greg Polvere and Steve Levy have resulted in the identification of more than $3 million in Benefit Fund's payments owed by certain contractors, including On Par Construction.

### F. Immunity from DC Charges

Immunity in this context refers to the practice of providing immunity from charges to a carpenter who provides complete and truthful information of improper conduct by another DC member.

The U.S. Attorney's office has concurred with my opinion that this could be a useful step. Maurice Leary has informed me that the DC would consider any such recommendation from the I.I.

### G. Shop Steward Dispatch Manipulation

The Anti-Corruption Committee became concerned about the use of immediate dispatches, members quitting jobs before the job is complete, members putting freezes and holds on their position on the OWL and then suddenly releasing the freezes and holds, as a means to obtain jobs that otherwise might be referred to another DC member. This summer, the ACC eliminated all immediate dispatches and added a 30-day skill freeze, to address these possible dispatch manipulations.

### H. Code of Ethics

3

### *I. Effectiveness of "IP" Plans*

       Walter Mack stated in his reports that it was his opinion that the Investigative Plans (IP) he reviewed were "ineffective." This office can report that the Investigative Plans have had some limited success, but are hampered as no member of the ACC or the District Council has been made responsible for the review of the weekly reports submitted by the business managers pursuant to IPs.

       Information reported by business managers which could have led to corruption being detected, was not acted on in some cases. The I.I. is now responsible for the weekly reviews. Further, business managers, business agents and stewards have not been inspecting members' paychecks (received from contractors who are the subjects of IPs). They should be directed to do so by the DC without exception.

4