# **UNITEL REPORT**

William P. Callahan, Esq
Independent Investigator
New York City District Council of Carpenters
17 Battery Place, Suite 1226
New York, NY 10004
(212) 889-3000 – Fax (212) 889-3242
E-mail: unitel.group@gmail.com

DATE:      January 29, 2007

TO:          Michael J. Forde, Executive Secretary-Treasurer

FR:          William P. Callahan

RE           Stuyvesant Town - 20-011-082306   (hotline # 437)

### Synopsis

The Independent Investigator's Office, after completing a detailed investigation into Hotline call # 437, is recommending to the District Council that appropriate action be taken consistent with the I.I.'s findings herein involving _____, Business Manager of Local 157. This investigation revealed that _____ abused his position as a Business Manager by referring _____ for a carpenter position with Tri-Line Contracting Corp., a union signatory contractor. In doing so, he violated the UBC By-laws and the Job Referral Rules which arise from the previous Consent Decree. _____, a union carpenter working for Tri-Line was laid-off as a direct result of _____ deliberate and knowing actions in speaking with the Tri-Line job foreman to place another carpenter (_____) on the payroll at the on-going maintenance work at Stuyvesant Town. Although it is not believed that _____ was aware that a carpenter would be fired to make way for his referral, his position and long tenure with the union, including being previously reprimanded by the previous I.I. in a sworn interview for the same type conduct, should have educated him to the cause and effect such an action can have. The details of the I.I. investigation are as follows.

1

**Field Investigation**

1.1     On 8/23/06, the I.I. office was contacted via a Hotline call by Union member ▓▓▓. ▓▓▓ was interviewed by the I.I. staff at the I.I.'s office and stated that he had been fired from his position as a journey-man carpenter with Tri-Line Contracting Corp. at the Stuyvesant Town/Peter Cooper Village jobsite.[1]  The reason for his dismissal he stated was explained to him by the Foreman, ▓▓▓ of Tri-Line Contracting Corp ▓▓▓ that it was "for political reasons -- ▓▓▓ the BA for Local 157 needed to get one of his friends a job at the jobsite."

1.2     On 8/28/06, ▓▓▓ was again interviewed by members the of I.I.'s office and District Council at the District Council. ▓▓▓ gave a sworn statement concerning his complaint and details of his dismissal. ▓▓▓ explained how ▓▓▓ had told him during his dismissal that it was because "he needed to do a favor for ▓▓▓ pressured him into hiring his guy ▓▓▓" ▓▓▓ further stated that other carpenters in the shanty told him you weren't fired by Tri-Line, it was because "▓▓▓ needed a favor done."

1.3     On 9/8 /06, Tri-Line foreman ▓▓▓ was interviewed by members of the I.I.'s office and the D.C. at the D.C. ▓▓▓ agreed to cooperate with this investigation. In this interview ▓▓▓ initially stated that he met ▓▓▓ on the street. He knew ▓▓▓ from working together years ago. ▓▓▓ asked him for a job. ▓▓▓ hired him. After being confronted with information already known in this investigation, ▓▓▓ admitted that he was not telling the truth. ▓▓▓ stated that a few weeks ago S/S ▓▓▓ told him that ▓▓▓ wanted him to call ▓▓▓. He never called ▓▓▓. ▓▓▓ then left a voice mail on his cell phone to call him. ▓▓▓ called him back. ▓▓▓ told him to do him a favor. He needed a man to work on his job. As a result of this conversation, a few days later, a carpenter named ▓▓▓ came to the work site. ▓▓▓ told the super ▓▓▓ to go ahead and request ▓▓▓, but did not reveal to the Super the real reasons for the request. ▓▓▓ in this interview told the investigators he fired ▓▓▓ because he felt his work was not up to par, but he said he told the carpenter it was for political

---

[1] ▓▓▓, an Afro-American was asked if there were any discrimination aspects to the dismissal and he stated No. A grievance has been filed on his behalf with the Employer, Tri-Line Contracting Corp.

2

reasons, so his feelings weren't hurt. ▓▓▓▓ gave a sworn statement. But see Par. 1.7 *infra*, wherein he admitted he lied to the investigators at this time that the primary reason for the firing was the call from ▓▓▓▓.

1.4     On 9/18 /06, S/S ▓▓▓▓ was interviewed by members of the II office and the D.C. at the D.C. S/S ▓▓▓▓ agreed to cooperate with this investigation. S/S ▓▓▓▓ stated that in June, 2006, ▓▓▓▓ questioned him about his crew size and asked him to have the Foreman call him. ▓▓▓▓ gave ▓▓▓▓ the message. This may have happened a second time when ▓▓▓▓ asked him to tell ▓▓▓▓ to call him. The foreman had never complained to ▓▓▓▓ about ▓▓▓▓ work quality. S/S ▓▓▓▓ gave a sworn statement.

1.5     On 10/09/06, ▓▓▓▓, president of Tri-Line Construction Corp. and ▓▓▓▓ Foreman ▓▓▓▓ was interviewed by the I.I. staff. He agreed to cooperate with this investigation and provide cellular telephone records for ▓▓▓▓ cell phone. ▓▓▓▓ stated that ▓▓▓▓ makes the daily personnel decisions at the Stuyvesant Town jobsite. The next day, the cell phone records were delivered to the I.I.'s office. A review of the cell phone records shows contact between the parties involved in this investigation. On July 24, 2006, ▓▓▓▓ called Local 157 office. On August 10, 2006, ▓▓▓▓ called Local 157 office. On August 11, 2006, ▓▓▓▓ called Local 157 office and ▓▓▓▓ cellular telephone.

1.6     On 10/17/06, members of the I.I. office traveled to Tri-Line Contracting Corp. located at 321 W 44th St. NYC. The II met with ▓▓▓▓, superintendent for Tri-Line at the Stuyvesant Town jobsite. ▓▓▓▓ is not a member of the Carpenters Union. ▓▓▓▓ agreed to cooperate with this investigation. ▓▓▓▓ stated that on 8/17 or 8/18/06 a male came to the Tri-Line office at the jobsite. He can't identify the male. The male said he was from the Carpenter's Union and asked to speak to ▓▓▓▓. He called ▓▓▓▓ and sent the male to the carpenter's shanty located at another location. Later that day or the next, ▓▓▓▓ told him to put in a request for ▓▓▓▓. ▓▓▓▓ didn't give him a reason. It was a busy time of year; he assumed they were adding men. ▓▓▓▓ called a friend of his named ▓▓▓▓ and hired him, also.

3

1.7     On 10/18/06, ▓▓▓ was re-interviewed, for a second time, by members of the I.I. office and the D.C. at the D.C. ▓▓▓ admitted that he was not truthful during his previous interview on 9/8/06. He stated that S/S ▓▓▓ had approached him first in June to call ▓▓▓. He didn't call him because he had an idea about what he wanted. In July, he was told by S/S ▓▓▓ that ▓▓▓ wanted to talk to him. He finally contacted ▓▓▓. ▓▓▓ asked him for a favor to hire someone. ▓▓▓ admitted to the investigators he lied to ▓▓▓ during the call when he told him work was slow and he couldn't do it. In August S/S ▓▓▓ told him ▓▓▓ wanted to speak to him again. ▓▓▓ called him. ▓▓▓ asked him again for a favor. ▓▓▓ agreed to do it. ▓▓▓ told him he had a good guy, a good worker. ▓▓▓ showed up at ▓▓▓ office. ▓▓▓ called ▓▓▓, he met with ▓▓▓ told him that he was from Local 157 and he could start on the following Monday. ▓▓▓ told ▓▓▓ to request ▓▓▓ on Friday to start on the Monday, but didn't tell ▓▓▓ the reason behind the request. ▓▓▓ said that he was intimidated by ▓▓▓, because of his position. ▓▓▓ was the B.M. and he believed there would be union trouble at the work site if this favor was not done. ▓▓▓ admitted that ▓▓▓ would not have been fired, had ▓▓▓ not asked for a favor.

1.8     On 11/8/06, ▓▓▓ was interviewed by members of the II office and the D.C. at the D.C. ▓▓▓ agreed to cooperate with this investigation. ▓▓▓ confirmed to the investigators his cellular telephone number. ▓▓▓ initially stated that he shaped the job himself with no one's assistance. After being confronted with some of the details already known in this investigation, ▓▓▓ changed his story. ▓▓▓ stated that he had been laid off by L & D, on 8/11/06. He first told ▓▓▓ he had been laid off, during a golf game on Sunday, August 13, 2006. ▓▓▓ told him to come to the Hall this week; he had a few jobs he could shape. On Tuesday, August 15, 2006, ▓▓▓ went to the Local 157 Hall and met with ▓▓▓. ▓▓▓ told him to check out a job at the Peter Cooper Village. He went to the site and met ▓▓▓. He asked ▓▓▓ if he was hiring. He gave ▓▓▓ his information. ▓▓▓ told him he would get back to him. He did not visit or contact any other jobsites for work. The next day he put himself on the OWL. On August 18, 2006 he was contacted by the D.C. OWL and told he had been requested by Tri-Line to start on August 21, 2006. He stated he had no contact with ▓▓▓ or any of the other Business Agents, in Local 157, until he played golf with ▓▓▓ on Sunday, August 20, 2006. ▓▓▓ gave a sworn statement.

4

1.9     A review of cellular telephone records requested by the I.I. office from the District Council for ▬▬▬ and ▬▬▬ phones was done. Found were 11 incidents between 8/11/06 and 8/17/06 where contact was made between ▬▬▬ and ▬▬▬. During the same time period, there were 8 incidents of contact between ▬▬▬ and ▬▬▬.

**Deposition of** ▬▬▬

2.0     On 11/9/06, Local 157 Business Manager ▬▬▬ was interviewed by I.I. W.P. Callahan and Investigator W.J. O'Flaherty at the I.I's office. ▬▬▬ was represented by ▬▬▬ The interview was transcribed by Shorthand Reporter Jeffery Shapiro of Tankoos Reporting. ▬▬▬ agreed to cooperate with this investigation. During this Q&A interview, ▬▬▬ acknowledged that he was aware of the job referral rules. He was read parts of a deposition he had given to the previous I.I. Walter Mack, on May 18, 2005. In that deposition ▬▬▬ was advised that a B.M. is not permitted to make job referrals. In explaining his initial involvement, ▬▬▬ stated that he had noticed on the Tri-Line shop steward reports that Tri-Line had hired someone (▬▬▬) recently, and that was a favor to someone. He, also, recognized the Tri-Line foreman's name (▬▬▬) as someone he knew from the past. He reached out for the Foreman at the site. His intention was to get someone hired at the site. He and ▬▬▬ made contact after a few missed calls. ▬▬▬ asked ▬▬▬ when he (▬▬▬) was going to get someone down there. He had no one in particular in mind. ▬▬▬ told him that they were laying people off. ▬▬▬ said he may be able to use someone when they start the second phase, in early August. ▬▬▬ calls him back, after a few weeks. ▬▬▬ tells him that they are starting another phase, if ▬▬▬ want's to send a guy down... This happens on Friday or Saturday (August 11 or 12, 2006). That Saturday or Sunday, ▬▬▬ tells him he has been laid off. He tells ▬▬▬ that a couple of things are happening. He told ▬▬▬ to go down and see ▬▬▬, he may put you on. When told about ▬▬▬ statement that he had gone to the Hall and met with ▬▬▬, before being told about the Tri-Line job, ▬▬▬ then recalled the meeting but doesn't recall much detail. He didn't know what day ▬▬▬ went down to the Tri-Line jobsite or when he was hired. He didn't recall seeing or speaking with ▬▬▬ until the week after ▬▬▬ had been hired by Tri-Line. ▬▬▬ was shown telephone records from his DC cell phone. The calls indicate that 11 times there was contact between his cell phone and

[            ] cell phone over the period of August 11 thru August 17, 2006. [     ] couldn't recall if any of these calls were to discuss [     ]'s L & D layoff or work referral. He only offered that they could have been about golf. During this interview [     ] admitted to referring other members on occasion to other jobsites. He said that he uses the phrase "do me a favor" when talking about man power with construction company representatives.

2.1     Throughout the interview of [       ], he was vague with his answers and didn't appear to recall much detail of what transpired during the time period in question. It is believed that [     ] is intentionally answering in this fashion, so as not to be pinned down to any specific facts. What supports this theme is his previous interview with II Walter Mack on 5/18/05. [     ] appears to deploy the same tactic to avoid answering direct questions about another referral. Also there appears to be a conscious effort to limit the information about contact between [     ] and [     ], during the time period of the referral. Both, [     ] and [     ], only admitted to additional amount of times when they met and had telephonic contact, only after being confronted with records or statements by other members.

2.2     To explain the reason why [     ] requested a favor from Tri-Line foreman [     ], it initially appears to have been out of jealousy. Jealousy of the former Local 157 board member, [            ], being requested and working at the Tri-Line jobsite. Later, after [     ] is laid off by L & D, it appears [     ] intention has changed to placing his out of work, long time friend, and present Local 157 board member into a good job.

2.3     Deciding what action to take is the sole responsibility of the E.S.T., the I.I. is not attempting to tell the E.S.T. what penalty to affix to this wrong doing, only that we make the observation that [     ] holds an important position with the D.C. and with Local 157. These positions carry great responsibility and members holding them should be held to a high standard. Yet, [     ] has shown a total disregard for the job referral system. He admits to breaking the referral rules numerous times. He acknowledges being caught referring carpenters in the past and continues to do so after being warned and instructed to stop. One of the most frequent complaints from membership to the I.I.'s office is about the placement of family and friends of high ranking members to the best jobsite.

6

Membership needs to be shown that union rules are not just for rank and file members, but are to be adhered to by all.

A copy of the 11/9/06 ▮ deposition transcript annexed hereto as **Ex. A**

Selected potions of the ▮ deposition by Mr. Mack on 5/18/05 annexed hereto as **Ex. B**

## Conclusion

We wish to note that throughout the investigation herein, the I.I.'s Office recognizes the contribution of the District Council staff and particularly the assistance of the ACC Committee. This unfettered assistance demonstrates to our Office that the Union's cooperation is not just because of the efforts or presence of the I.I. as a body, but indicates to us that the D.C. wants to truly effect cultural changes throughout the Union.

The Independent Investigator has concluded its investigation of ▮ and refers this matter to the Executive Secretary-Treasurer for appropriate action consistent with the findings herein.

*William P. Callahan*

William P. Callahan
Independent Investigator

cc: Hon. Charles S. Haight, Jr.
    Edward Scarvalone, AUSA
    Gary Rothman, Esq.
    Gary Silverman, Esq.