**Office of The Independent Investigator**

NYC District Council of Carpenters & Joiners
17 Battery Place, Suite 1226
New York, NY 10004
212-889-3000 / Fax 212-889-3242

William P. Callahan, Esq
Independent Investigator

February 5, 2007

Hon. Charles S. Haight, Jr.
Senior United States District Judge
Southern District of New York
500 Pearl Street, Room 1940
New York, NY 10007

Re: United States v. District Council of Carpenters
    90 Civ. 5722 (CSH)

---

## I.I. INVESTIGATION REPORT

### Re

**Walter Mack Transition Report – 10-25-06**

**"(Cipriani Banquet Hall / ▭ ")**

**Introduction**

On 10-25-06, Mr. Mack submitted to the undersigned I.I. with copy to the Court, his Transition Memorandum (3-pages – copy annexed hereto) entitled Cipriani Banquet Hall – 200 Fifth Avenue, N.Y. This Office conducted a thorough review of the allegations in the Report including the five (5) questions posed for "consideration or resolution" and our findings are set forth below.

1

**Synopsis**

The CIPRIANI investigation uncovered several corrupt tactics utilized by entities in an anti-union culture to gain every possible marketplace advantage. The District Council of Carpenters were not the only union cheated by CIPRIANI's tactics. As this investigation shows, CIPRIANI cut all possible labor costs to the bone. CIPRIANI lay off his core catering workers at the renovated Rainbow Room two days before Christmas; paid La Cosa Nostra members for labor peace; signed a sham labor agreement with a competing labor union; and completed this highly visible construction project under a cloud of deceitful practices. The II broadened the scope of this investigation to include _____ CONTRACTORS, a signatory company employed at the 200 Fifth Avenue job site. The Carpenters were able to recover from _____ CONTRACTORS, through its grievance procedures 1290 hours of benefits. The II has several recommendations including the early implementation of an Investigative Plans, and vigorous site visitations for the duration of any CIPRIANI project. The II recommends using moral persuasion with any signatory company that chooses to hire indicted or otherwise ill suited workers and implement Investigative Plans for any company that continues to request workers like JOSEPH DELIA and JOHN MINGIONE.

**I.I. Investigation**

1.   The CIPRIANI BANQUET HALL matter was of high concern to the antecedent II, but was "superseded" by other investigations. On 10-25-05, this matter was referred to II Callahan for follow-up during the transition.

2.   At the time of these events, CIPRIANI BANQUET HALLS were a notorious non-union employer, who fired 250 Rainbow Room waiters two days before Christmas and had been vilified in the press   All of the banquet waiters are considered "private contractors." CIPRIANI tacked on a 20% service charge invoiced to bills, but did not distribute the implied gratuity to the wait staff and HERE Local 6 picketed several of their sites. NYT reported in a May 16, 1999 article that General Motors, George Magazine and HBO have

2

cancelled lucrative events at CIPRIANI properties rather than cross picket lines. (Above articles annexed hereto as Exhibit A).

3.   This matter has been assigned by the II to Chief Investigator Bernard Kane for review.

4.   During the course of these events, CIPRIANI CATERING signed a labor agreement with Local 810, International Brotherhood of Teamsters, while in a labor dispute with Hotel Employee Restaurant Employee Local 6 (Restaurant and Hotel workers). Local 810 does have a diversified membership. However, International Brotherhood of Teamsters General President James P. Hoffa, threatened to Trustee Local 810 if they acted as bargaining agent for the CIPRIANI workers. (New York Times articles July 30-31, 1999 attached hereto as Exhibit B)

5.   A November 18, 2004 column authored by GERRY CAPECI and eventually supported by events indicates that GIUSEPPE CIPRIANI, paid a bribe to settle a labor dispute at the Rainbow Room and that MICHAEL (Mickey Scars) DiLEONARDO, would testify to the events. In fairness to CIPRIANI, the article states that ANDREW GENNETT, the Chief Financial Officer for CIPRIANI disputes the pay off and any relationship with the middle-man on the deal, a contractor, FRANCIS (Buddy) LEAHY, who formerly owned MARINE CONTRACTING. (CAPECI, November 18, 2004 column- Attached hereto as Exhibit C)

6.   New York Magazine reported that GIUSEPPE CIPRIANI was to be deposed by the New York Department of Investigation (DOI), the Federal Bureau of Investigation (FBI) and New York Police regarding $120,000.00 given by him to a GAMBINO LCN cooperator in 1999 to settle the above described labor problems at the Rainbow Room. CIPRIANI was to be a 20% stakeholder in the development of old Pier 57 off West 15th Street, as the *Leonardo*, a $300 million Italian theme park with catering hall, rooftop pool, shops and a museum dedicated to DaVinci, but refused to submit forms or be interviewed concerning an ethical practice inquiry from the DOI., and eventually backed off the project. (Exhibit D)

3

7.	CIPRIANI is represented by STANLEY ARKIN, Esq.

8.	The Mack Transition report indicates that JOHN MINGIONE, a former UBC member who was convicted of a labor related conspiracy that cost the UBC Funds approximately $1 million worked the site. (EXHIBIT C- AG Spitzer press release).

9.	The DCC filed a grievance against ▭ CONTRACTING INC. a UBC signatory company and settled for 1290 hours. (Hearing Feb. 9, 2006).

10	▭ refused to provide names of workers to DCC counsel.

11.	Other issues raised by Mack transition report on CIPRIANI indicated that the DCC had no sense of urgency in responding to this high-priority investigation. Mack indicated that the Mason Tenders Union gave it more attention. The first visits to the site by the DCC are either September 17 or 20, 2004. Local 608 Business Agent (BA) ▭ ▭ found the site had been unsupervised, and that union contractors and carpenters were working without a steward. ▭ believed that this occurred for over a month.

12.	This period is underscored by the Mack deposition of ▭ ▭, a Mason Tenders shop steward, who testified that a "layout guy" worked the site for a period of time, but left the site, never to return after ▭ visited the site. ▭ indicated 6 or 7 carpenters started working the site in the middle of August, 2004. (▭ Deposition Page 20, Line 24).

13.	A review of this transcript and the 1290 hour settlement with ▭ indicates that the DCC acted in the best interests of its members when the Business Agent first became aware of the job. The DCC placed a steward on the site and negotiated a settlement with a contractor, who enjoyed the benefits of union tradesmen at the site but continually lied about their work (Mack report).

4

14. The II has implemented Investigative Plans (IP) which require reported site visitation by BAs, which are supervised by the II in conjunction with the Anti-Corruption Committee (ACC). These visitations of "troubled" companies focus the BAs efforts on those signatory companies which are of concern to the ACC.

15. Mack raised several issues including "special treatment" of CIPRIANI; how a highly visible job starts and continues below the DCC radar; was cash paid; was ▓▓▓▓'s testimony perjured to the II; and the previously raised observation of MINGIONE's presence on the site at the request of ▓▓▓▓.

16. The II believes that "special treatment" of contractors and projects can be alleviated in part by visible enforcement of both the Investigative Plans (IP) and site visitation by both the II staff and BAs. It is obvious CIPRIANI expected and would welcome any "special treatment" and his tactics with the unions representing his core workers clearly demonstrates the extent he would go to chart his own course. CIPRIANI is neither an UBC signatory; nor employs craftsmen that would fall under the jurisdiction of the UBC. CIPRIANI's employees are rightfully the responsibility of UNITE-HERE in terms of jurisdiction as Teamster President HOFFA so forcefully pronounced when he promised to Trustee Local 810 for this out and out raid on a striking local.

17. The timing of the discovery of ▓▓▓▓'s trampling of the Carpenters Collective Bargaining Agreement (CBA) at the CIPRIANI site and the arrival Local 608 Business Agent ▓▓▓▓ at the site, has to be tempered by the strain placed on Local 608 due in part to the real life demands of staffing, and policing the August 30, 2003- September 2, 2003 REPUBLICAN NATIONAL CONVENTION. Certainly ▓▓▓▓ received no "special treatment" after ▓▓▓▓'s arrival on the scene. Paragraph 21 which follows is a discussion of the actions taken by Construction Manager ▓▓▓▓ after the ▓▓▓▓ visits and the union enforcement actions that followed.

18.     To answer the question was cash paid, and to whom? The settlement with ▓▓▓▓ underscores the point that any cash payment to individual carpenters on the job is as detrimental to the good of the union as a payoff to a BA. or steward. The recovery of 1290 hours for the Funds is a significant settlement. Counsel for the Funds, Gary Rothman, Esq. indicated that ▓▓▓▓ is on a payment schedule and is paying as agreed.

19.     The presence of apparently ill suited workers at the job site is a problem that goes directly to the bargaining table and as long as the hiring practices are fractionalized between companies and the Out of Work List (OWL) and negotiated in the Collective Bargaining Agreement, the good office of the II remains in the realm of moral persuasion. It is inimical to the II that a known felon is requested by any UBC signatory company at any time. It is not outside the realm of possibilities, however, that a member under criminal charges would be dispatched from the OWL. It is noted that MINGIONE and JOSEPH DELIA were requested company workers, and not dispatched from the OWL List. MINGIONE was requested by ▓▓▓▓ and DELIA from ▓▓▓▓ ▓▓▓▓.

20.     With this stated, the remaining issue is the probable perjured testimony of ▓▓▓▓ ▓▓▓▓. ▓▓▓▓ is a member of the Electrician's Union and not under the jurisdiction of the II or the UBC; hence no local union charges under the UBC constitution can form a remedy. The ▓▓▓▓ testimony was particularly vague and troubling to Mack and the present II; however, the probative value of the Q&A falls short of supporting a recommendation by this Office to the United States Attorney to charge ▓▓▓▓ in the only alternative venue available, a criminal indictment. In the best light, ▓▓▓▓'s memory and testimony supports the March 7, 2005 Deposition of ▓▓▓▓ who acted as Construction Manager; as contrasted to the credible testimony of Mason Tender steward ▓▓▓▓, whose testimony clearly supports the above assertions that carpenters worked the site for about a month before a carpenter's steward was sent to the site.

21.     ▓▓▓▓ gives a clearer picture of how ▓▓▓▓ was chosen (lowest bidder); He identified many of the other subcontractors on the site. He also gives insight into how

6

this job was driven by a foreign design team operating under schedule for taskmaster, CIPRIANI. The Hong Kong and Milan design teams drove the concept, and in turn the work schedule. ▮ credits himself with removing ▮ from the job-site after being threatened with the "union rat." ▮ has a collective bargaining agreement with the Mason Tender's Union; but not with the Carpenters union. ▮ does not employ carpenters.

## Conclusions and Recommendations

The public record indicates that GUISEPPE CIPRIANI will use whatever tactics he can employ to gain an unfair workforce advantage.
- The II recommends that any construction project involving CIPRIANI have a particularly intense Investigative Plan with robust site visitations and audits.
- Carpenter stewards assigned to a CIPRIANI project should receive particular instruction and support from the II and the DCC to identify potentially corrupt tactics used at the work site.
- Local Business Agents should be aware of any CIPRIANI construction project in their particular jurisdiction.
- Executive Secretary Treasurer MICHAEL FORDE should open channels of communication with PETER WARD, the Principle Officer of UNITE HERE Local 6, and offer support and solidarity of purpose.

The II notes that two companies during this project requested carpenters under Indictment.
- The II is available to offer moral persuasion and reputational advice to companies who elect to hire indicted or otherwise ill suited carpenters over the reputable skilled craftsmen on the Out of Work List.
- The II and the ACC will look for the root cause behind any signatory companies request to hire a carpenter under indictment.
- The II will implement Investigative Plans for those companies that fail to comply.

The Chief Investigator recommends to the II that this matter be closed and that the II author and deliver a letter to the Mason Tenders District Council thanking their brother, ▓▓▓▓▓▓ for his cooperation with the II investigation.

 

William P. Callahan
Independent Investigator


cc: Edward Scarvalone, AUSA
    Gary Silverman, Esq
    Gary Rothman, Esq