**Office of The Independent Investigator**

NYC District Council of Carpenters & Joiners
17 Battery Place, Suite 1226
New York, NY 10004
212-889-3000 / Fax 212-889-3242

William P. Callahan, Esq
Independent Investigator

June 4, 2007

Hon. Charles S. Haight, Jr.
Senior United States District Judge
Southern District of New York
500 Pearl Street, Room 1940
New York, NY 10007

Re: United States v. District Council of Carpenters
    90 Civ. 5722 (CSH)

---

## I.I. INVESTIGATION REPORT
### June 4, 2007

### Re

### Walter Mack Transition Report – 10-25-05
### "(Cipriani Banquet Hall / ▅▅▅▅ )"

**Introduction**

On 10-25-05, Mr. Mack submitted to the undersigned Independent Investigator (II) with copy to the Court, his Transition Memorandum (3-pages – copy annexed hereto) entitled <u>Cipriani Banquet Hall</u> – 200 Fifth Avenue, N.Y. This Office conducted a thorough review of the allegations in the Report including the five (5) questions posed for "consideration or resolution" and our findings are set forth below.

1

## Synopsis

The Cipriani investigation uncovered several incidents of the use of non-Union labor by both Union and non-Union contractors in the "buildout" of its reception facility at 200 Fifth Avenue in Manhattan, commonly known as the "Toy Building." The complaint to the former II and his initial investigation focused on ▇ Contractors. ▇ was a Carpenter's signatory contractor, suspected of performing work at the Toy Building without Union labor, in violation of its contract.

While initially unable to uncover the truth of ▇'s work at this job site, after the disclosure of general contractor's records previously subpoenaed by the former II to the District Council and its attorneys, the District Council was able to recover from ▇ 1290 hours of wages and benefits fund contribution (totaling $90,000.00) as a result of this company's use of non-Union labor at this site.

The II notes that the Executive Officers of the District Council of Carpenters have taken preemptive and proactive measures in implementing changes to policies and procedures which should help insure that developers that utilize union contractors at their sites cannot skirt their contractual responsibilities to the Union. The II has several recommendations with respect to this developer including the early implementation of an Investigative Plan and vigorous site visitations for the duration of any future Cipriani project that involves Union carpenters.

## I.I. Investigation

1. The Cipriani Banquet Hall matter was of high concern to the antecedent II, but was "superseded" by other investigations. On 10-25-05, this matter was referred to II Callahan for follow-up during the transition. (Mack Letter)

2. This matter has been assigned by the II to Chief Investigator Bernard Kane for review.

3. At the time of these events, Guiseppe Cipriani, the real estate developer, preferred to utilize non-union contractors at his sites. His signature enterprises, Cipriani Banquet Halls

were a notorious anti-union employer, who fired 250 Rainbow Room waiters two days before Christmas and had been vilified in the press for their anti-union culture. New York Times reported in a May 16, 1999 article that General Motors, George Magazine and HBO cancelled lucrative events at Cipriani properties rather than cross picket lines as a result of their anti-Union conduct which has been extensively reported in other newspaper and magazine articles over the years. (Above articles annexed hereto as Exhibit A).

4. The Mack Transition report indicates that John Mingione, an expelled UBC member, who was convicted of a labor related crime, worked at the Toy Building site. Mingione had not been a UBC member for some time and his presence at the site was due to a non-Union painting company favored by Cipriani that employed Mingione. (Exhibit E- AG Spitzer press release). It is noted that most of the tradesmen and contractors utilized by Cipriani at the site were non-Union. From a review of Mack's depositions we can conclude that only the Mason Tenders had a steward on the site, we cannot conclude that Mingione did any carpentry work at the site.

5. The District Council of Carpenters filed a grievance against          Contracting Inc., a District Council signatory company that was reported to be working on the site with non-Union workers and no shop steward. Initially, in a telephone call from the District Council's Director of Operations Maurice Leary (Mr. Leary also serves on the District Council's Anti-Corruption Committee) concerning the complaint,          denied performing work at the site. When informed his company's equipment (such as ladders, and "bakers", portable work platforms) was observed at the site,          's principal,          , insisted it was not his and that perhaps some of his equipment had been stolen.

6. The ACC encouraged the former II to subpoena the records of the general contractor on the job,          , to discover the best evidence of what companies performed carpentry on this job. Mr. Mack issued a subpoena, and during the transition turned these records over to this II. The DC and its counsel informs me, those records were never disclosed to them. The ACC, in the presence of investigators from the former II's staff, interviewed many regular          employees, all of whom denied ever working at the Toy Building. Without the

records from the general contractor, the DC had difficulty proving the existence and extent of [redacted]'s work for Cipriani.

7.  Early in this II's tenure, former investigator Richard V. Roth and the II met with DC representative Scott Danielson and counsel Gary Rothman to discuss this investigation. When the II revealed the existence of the subpoenaed documents from [redacted], both of them were understandably surprised to learn of its existence. A review of those records established [redacted]'s carpentry work at the Toy Building and the billing of 1290 hours of such work. With this information in hand, the DC renewed its grievance, confronted Mr. [redacted] with the evidence and acquired from [redacted] an agreement for full restitution (payment of $90,000.00 in wages and benefits to eligible carpenters from the Out of Work List. I am informed that [redacted] has met its obligation and has discontinued operations.

8.  The records from [redacted] also revealed that another signatory contractor, dba, [redacted] also performed carpentry work at the Toy Building without reporting such work to the District Council. The Anti-Corruption Committee engaged former IRS Criminal Investigations fraud auditor, Stephen Levy, to audit [redacted] and [redacted] to determine if any other work and related funds were unreported to the Union and its benefit funds.[1]

9.  Other issues raised by the Mack transition report on Cipriani indicated that the DC had no sense of urgency in responding to this high-priority investigation. Mack indicated that the Mason Tenders Union gave it more attention. The initial complaint to the ACC hotline was August 24, 2004. The first visits to the site by the DC are either September 17 or 20, 2004. Local 608 Business Agent (BA) [redacted] found the site had been unsupervised, and that union contractors and carpenters were working without a steward. [redacted] believed that the site was unsupervised for over a month.

---

[1] The ACC, the DC and its related benefit funds utilize the services of two former IRS-CID fraud auditors on selected anti-corruption investigations. Mr. Levy and Gregory J. Polvere and Associates. I have found both of these individuals cooperative and effective in our work.

4

10. Director of Operations Maurice Leary began a family vacation out of state before the complaint was faxed to his office by the former II.[2] He expected reports to his office to be handled by other office or ACC personnel. On the Monday after Labor Day 2004, Gary Rothman, legal counsel to the DC and a participating member of the ACC at the time, read the fax from Mr. Mack concerning 200 Fifth Avenue in Mr. Leary's office. Mr. Leary was still on vacation. Later in the day, Mr. Rothman met two business representatives from Local 608 (Mr. Rothman remembers one being _____, but does not remember the other) at a charity golf function and asked them about the site. It appears this was the impetus that caused business representative _____ to visit the site.

11. It is unfortunate that nearly four weeks elapsed between the receipt of the complaint and the first reported job visit by a business representative. While I do not conclude there was anything nefarious responsible for the delay, important investigative opportunities that may have nipped this matter in the bud may have been lost in that time. I have reviewed this concern with the ACC and it fully appreciates the seriousness of this issue as it relates to investigative protocols. Fortunately, there are now in place procedures that generally preclude such a delay from occurring. In particular, the II is now prepared to dispatch my own investigators to job sites and the II makes many more personal job visits than our predecessor. In addition, our protocols with the DC permit us to directly contact business representatives as needed, so that the delay in response time that occurred in this case will not likely occur again.

12. The carpenter activity at the construction project is best described in the Mack deposition of _____, a Mason Tenders shop steward, who testified that a "layout guy" worked the site for a period of time, but left the site, never to return after _____ visited the site. _____ indicated 6 or 7 carpenters started working the site in the middle of August, 2004 several weeks before _____'s site visitation. (_____ Deposition Page 20, Line 2). A review of this transcript and the 1290 hour settlement with _____ indicates that the DC acted in the best interests of its members when the Business

---

[2] It was Mr. Mack's practice, as it is ours, to fax reports of most hot-line complaints to Mr. Leary to inform him of such in his capacity as the DC's ACC representative.

5

Agent first became aware of the job. The DC dispatched a steward to the site and pressed through with the arbitration process. This II notes that the contractor enjoyed the benefits of union tradesmen at the site but continually lied about their very presence at the work site throughout the process.

13. In conjunction with the Anti-Corruption Committee, the II has implemented and supervises Investigative Plans (IP) which require reported site visitation by Union business representatives and agents. These visitations of "troubled" companies focus the BAs efforts on those signatory companies which are of concern to the ACC. ____ was one of the first companies placed on IP plans. As a result of these efforts, ____ was found to be on an unsupervised job in January, 2006 and a steward was dispatched and a grievance filed. ACC Investigator Mike Murphy followed up with site visitations at other ____ sites and with the II ran down leads of possible *alter ego* companies utilized by ____. This vigorous enforcement resulted in ____ being shut-down at One Park Avenue in February 2006.

14. Mack raised several issues including "special treatment" of Cipriani; How does a highly visible job start and continue below the DCC radar? Was cash paid? Did ____ lie during his sworn deposition to the II? Along with his previously raised observation of Mingione's presence on the site.

15. The II finds that this was primarily a non-Union work site and sees no "special treatment" of either Cipriani or ____ by the DC. The II believes that "special treatment" of contractors and projects can be alleviated in part by visible enforcement of Investigative Plans (IP), shop steward education, and site visitation by both the II staff and BAs. It is obvious Cipriani expected and would welcome any sort of favorable treatment and his tactics with the unions representing his core workers clearly demonstrates the extent he would go to chart his own course. Cipriani is neither an UBC signatory; nor employs craftsmen that would fall under the jurisdiction of the UBC. Cipriani's core business employees are rightfully the responsibility of UNITE-HERE in terms of jurisdiction as Teamster President Hoffa found when he promised to trustee Local 810 for this out and out raid on a striking local as was reported in the news articles referred above.

16. The timing of the discovery of evidence that ▓ was not living up to their agreement with the DC through the requirements of the Carpenters Collective Bargaining Agreement (CBA) at the Cipriani site can be set with the arrival DC Business Agent ▓ at the site. Certainly ▓ received no "special treatment" after ▓'s arrival on the scene. (In Paragraph 20 there is a discussion of the actions taken by Construction Manager ▓ after the ▓ visits and the union enforcement actions that followed.)

17. To answer the question, Was cash paid, and to whom? The subpoenaed documents and subsequent discussions with ▓ of ▓ support the conclusion that cash was paid to unidentified non-Union workers. The documents seem to corroborate the extent of work performed reported by the cement mason steward. Armed with this evidence, DC counsel was able to achieve virtually a full recovery for the Union and the benefit funds. The recovery of 1290 hours for the Funds is a significant award and depended on Counsel for the Funds trying to negotiate with a company that denied it was ever present at the site.

18. It is inimical to the II that a known felon would be requested by any UBC signatory company at any time. Neither, Mingione, nor Mr. James Delio could have been requested from the District Council as since they were not members. In this instance, the entire Cipriani job was non-Union except for a few ▓ workers and some mason tenders. Both Mingione and another convicted felon James Delio were working for non-union companies, and neither was a UBC member. More troubling is the fact that Mingione was later detected by the New York City Department of Investigation at another project as a full time employee for Cipriani.

19. With this stated, the remaining issue is the probable perjured testimony of ▓. ▓ is a member of the Electrician's Union and not under the jurisdiction of the II or the UBC; hence no local union charges under the UBC constitution can form a remedy. The ▓ testimony was particularly vague and troubling to Mack and the present II; however, the probative value of the Q&A falls short of supporting a recommendation by this

7

Office to the United States Attorney to charge ▓▓▓ in the only alternative venue available, a criminal indictment. In the best light, ▓▓▓'s memory and testimony supports the March 7, 2005 Deposition of ▓▓▓, ▓▓▓ Construction, who acted as Construction Manager; as contrasted to the credible testimony of Mason Tender steward ▓▓▓, whose testimony clearly supports the above assertions that carpenters worked the site for about a month before a carpenter's steward was sent to the site.

20. ▓▓▓ gives a clearer picture of how ▓▓▓ was chosen (lowest bidder); He identified many of the other non-union subcontractors on the site. He also gives insight into how this job was driven by a foreign design team operating under a delivery schedule for Cipriani. The Hong Kong and Milan design teams drove the concept, and in turn the work schedule. ▓▓▓ credits himself with removing ▓▓▓ from the job-site after being threatened with the "union rat." ▓▓▓, through his affiliation with ▓▓▓, operates under a collective bargaining agreement with the Mason Tender's Union; but not with the Carpenters union. ▓▓▓ does not employ carpenters.

**Conclusions and Recommendations**

It is also noted that several procedures instituted by the Executive Officers of the District Council of Carpenters have begun to change the landscape in which the referred matter was rooted. The ACC has placed a number of companies under its oversight with the implementation of Investigative Plans which require union representatives to make a number of job site visitations scaled by a gradient developed by the ACC and the II. This initiative was fully supported by the Executive Officers of the District Council of Carpenters. The II has taken a hands-on approach to contacting Local union officials directly with requests to investigate a job site with good results. The II staff and the DCC Investigator visit job sites to insure they are supervised, and have referred to DCC organizers several non-union sites. At the request of the Executive Officers of the DCC, the II participates in the instruction of all union stewards during their certification course.

The public record indicates that Guiseppe Cipriani, the real estate developer, may help New York put its good face forward with beautiful renovations and high end development projects, but he has no interest in cooperating with those who question his ethical practices.

Based on my investigation and review of this matter:

- The II recommends that any future union construction project involving Cipriani have a particularly intense Investigative Plan with robust site visitations and audits.
- Carpenter stewards assigned to a Cipriani project should receive particular instruction and support from the II and the DCC to identify potentially corrupt tactics used at the work site.
- Local Business Agents should be aware of any Cipriani construction project in their particular jurisdiction.

The Chief Investigator recommends to the II that this matter be closed and that the II author and deliver a letter to the LIUNA Inspector General Doug Gow in appreciation for the cooperation of ▓▓▓▓▓▓▓▓▓▓ during the II investigation.

_____
Bernard J. Kane
Chief Investigator


Respectfully submitted,

_____
William P. Callahan
Independent Investigator


cc: Edward Scarvalone, AUSA
    Gary Silverman, Esq
    Gary Rothman, Esq

9



 

INTELLIGENCER

# Cracking Cipriani's Da Vinci Code

**Did restaurateur drop out of Leonardo pier project to dodge G-men's mob questions?**

By **Geoffrey Gray**



Two years ago, **Giuseppe Cipriani**, boss and heir to the global banquet empire, headed up a proposal to redevelop the old Pier 57 off West 15th Street as the Leonardo—a $300 million offshore Italian mini-theme-park with a catering hall, rooftop pool, shops, crafts, and a museum dedicated to Da Vinci. He and his partners beat out another, sportier bid by Chelsea Piers, and everything looked *molto bene*. Then early last month, he mysteriously dropped out and wouldn't explain why. A spokesman for the Leonardo deal, **James Capalino**, has maintained that Cipriani was worn down by all the bureaucracy. "Giuseppe has just got better uses for his capital right now," he says, and called his decision to pull out of a 20 percent stake in the deal "a rational business decision." But that isn't the entire story: Potential partners in public deals with the city must submit a thorough application detailing past business practices, which is then reviewed by officials from the city's Department of Investigation. Earlier this year, after submitting the forms, Cipriani received notice that before his application could be approved, city investigators wanted to take a sworn deposition about $120,000 he allegedly gave to a Gambino turncoat in 1999 to settle a labor dispute at Rockefeller Center's Rainbow Room, which he operates. Cipriani has denied making the mob payment. In addition, the city informed him that DOI investigators would be joined by an agent from the FBI and NYPD detectives, also seeking to ask him about alleged payments made to the crime family, among other matters. Cipriani decided to bail. His lawyer, **Stanley Arkin**, says it would have been foolish for Cipriani to show up for what he thought could be a legal ambush. "I wouldn't advise anyone to sit there in front of a handful of federal agents and submit to that kind of firing squad," Arkin says. "Not even the Pope." Cipriani's departure has left the majority partner on the Leonardo deal, developer **Steve Witkoff**, scrambling to find other tenants to occupy the space, which until recently was used as a bus depot.

**news**

### Nat Hentoff
# Look Who Crossed a Picket Line
#### Why Paul Newman Nixed PEN's Gala

by Nat Hentoff
June 2 - 8, 1999

EMAIL ALERT
WRITE TO US
EMAIL STORY
PRINTER FRIENDLY
NEWS
MY YAHOO!
DEL.ICIO.US
FURL IT

news
blogs
music
film
people
nycguide
nyclife
arts
screens
tags

*All 250 employees at the Rainbow Room lost their jobs two days before Christmas. . . . Many of us worked there 10 years or more. . . . It is our legal right to get our message out to the public. That's why we are here tonight. . . .*


**Local 6 picketing in front of a Henry Street Settlement gala at Cipriani's 42nd Street catering hall**
Hiroyuki Ito

*Did you know that the Ciprianis don't let women work in their dining rooms? . . . Did you know that the service charge that appears on the check for this evening's event will not be distributed to the [nonunion] workers who are serving the event?*

*The Ciprianis call their banquet waiters "independent contractors." This allows the Ciprianis to avoid paying their share of their employees' Social Security taxes and other obligations such as disability, [health benefits], and workers' compensation insurance.*

— from a leaflet handed out on a picket line by the Local 6 Hotel, Restaurant, and Club Employees Union, AFL-CIO, outside PEN American Center's awards gala at Cipriani's 42nd Street catering hall, May 12

PEN American Center, a writers' organization, does extraordinarily valuable work. It helps free imprisoned writers in repressive countries all over the world and is a vital force in battling censorship in this country. And PEN sends writers into prisons and conducts literacy programs.

I know some of its crucial achievements firsthand because, for a long time, I was on its Freedom-to-Write Committee.

PEN's annual black-tie awards gala dinner provides an important part of its annual budget and therefore attracts free-speech celebrities in and out of the literary world along with a good many of its major donors.

Nonetheless, because of Local 6's picket line on May 12 at a Cipriani catering hall across the street from Grand Central Station, a number of people who support PEN's work refused to attend that gala.

Each year, Paul Newman bankrolls a large PEN money award to a free-speech paladin who has risked a lot, even a job, to oppose censorship. But he declined, on principle, to attend the gala. Among others honoring the picket line were Gay Talese, Victor Gotbaum, Spalding Gray, Thomas Cahill— and George Stephanopoulos, who went inside briefly to tell his book publisher what he was protesting, and then came back out again.

Katrina vanden Heuvel, editor of *The Nation*, had a table in her name but did not attend; Victor Navasky, publisher of *The Nation*, also declined to cross the line.

Afterward, as reported in the *New York Post* (May 18), Paul Newman and his associate, A. E. Hotchner, insisted that the Newman's Own/*George*

Award— which gives $250,000 to the most philanthropic company in America— not take place at another Cipriani venue.

However, a good many guests, some of them surprising to me, walked right past the picketers and into the banquet hall owned by these employers, who operate in the imperious tradition of the preunion bosses of the 19th century and much of this century.

For a comprehensive news account of the fiercely antiunion Ciprianis, I recommend "A Restaurant Empire Under Siege" by Charles V. Bagli (*New York Times*, May 16) and "Now Invading Manhattan, Father and Son Cipriani Start Rainbow Room War" (by Frank DiGiacomo and Devin Leonard, *New York Observer*, January 25).

Keep that *New York Observer* publication date in mind when you consider PEN's disingenuous official statement— in this column next week— to "explain" why *it* did not honor Local 6's picket line.

Among those who went past the picketers to enjoy the gala was actor Ron Silver, who is also president of Actor's Equity and a cofounder of the Creative Coalition. That night, Silver scored a hat trick. He not only crossed Local 6's picket line, but he did so as the president of another union and as a member of the Screen Actors Guild. There must be some kind of an award for that in the name of Henry Ford, a nonpareil union-basher.

Also ignoring the Local 6 members fired by the Ciprianis were— as reported in the May 14 *Daily News*— Steve Kroft, Dan Rather, Bill Buford, Oliver Stone, David Remnick (editor of *The New Yorker*), Ken Auletta, E. L. Doctorow, Ben Bradlee, Alan King, Arthur Miller, and Judy Blume.

I did not expect to see the last two names. Judy Blume is one of the most forthright opponents of censorship in libraries and classrooms, and Arthur Miller has long been a free-speech activist on many fronts.

In that *Daily News* piece, Arthur Miller said: "It was more important for me to help PEN than worry about crossing a line. PEN helps writers over five continents. They have one fund-raising event each year, and this is it."

But why didn't PEN go somewhere else? As *The New York Times* reported (May 16), "General Motors, *George* magazine, HBO, and others" have canceled "lucrative events at the Rainbow Room and Cipriani 42nd Street" rather than cross the line.

But, says PEN, it was given "less than 48 hours' notice" that those inconvenient picketers would be standing in front of Cipriani 42nd Street on the night of the PEN gala.

This is a Clintonian spin, as I'll show next week.

On Local 6 picket lines, Bismark Mingle, who worked at the Rainbow Room for 10 years, holds up a sign that says: "It is supposed to be against the law to fire someone for being a union member. And that's exactly why Cipriani fired me. Shame on him."

PEN forgot, or did not know, that New York is still a union town.

**send a letter to the editor**

More Nat Hentoff

## METRO NEWS BRIEFS: NEW YORK; Teamsters Local Drops Pact With Restaurateur

Teamsters local in New York withdraws from agreement to represent workers at three Cipriani family restaurants; Giuseppe Cipriani had hoped contract would force Hotel Employees to end picketing, but Teamsters head James P Hoffa orders local to stay out of dispute

July 31, 1999 NEW YORK AND REGION NEWS
MORE ON INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND: LABOR, RESTAURANTS, CONTRACTS, CIPRIANI, GIUSEPPE, HOFFA, JAMES P, HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS UNION

## Sidestepping One Union, Cipriani Signs Deal With Teamsters
By CHARLES V. BAGLI

Cipriani family, locked in long-running battle with restaurant workers union that has cost it tens of thousands of dollars, signs contract with teamsters union Local 810, hoping deal will bring labor conflict to an end; James P Hoffa, international president of teamsters, scores deal and threatens to put Local 810 in trusteeship if it continues to deal with Ciprianis

July 30, 1999 NEW YORK AND REGION NEWS
MORE ON INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND: LABOR, LABOR UNIONS, RESTAURANTS, HOFFA, JAMES P, CIPRIANI HOLDING GROUP, HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES INTERNATIONAL UNION

  

# *This Week in* GANG LAND
## The Online Column

**November 18, 2004**

By Jerry Capeci

# Mob Buddy Plays The Rainbow Room

 Mafia boss Peter Gotti and several Gambino family associates allegedly split a $100,000 payoff from the owners of the Rainbow Room to squash a dispute it had with a mob-linked contractor who renovated the world famous nightspot, Gang Land has learned.



Once renowned for its revolving dance-floor where Fred Astaire danced with Ginger Rogers, the Rainbow Room today is primarily a ritzy catering hall, with 83 per cent of its business emanating from fundraisers, weddings, and other private parties. In 1999, the space atop Rockefeller Center was leased and renovated by the Cipriani family, who added it to their world-wide chain of fashionable restaurants and catering establishments.

Giuseppe Cipriani, the leader of the family business paid the bribe to settle a labor dispute at the restaurant, according to mob turncoat Michael (Mikey Scars) DiLeonardo, who is slated to be a key witness at Gotti's ongoing trial in Manhattan Federal Court.



Asked about the payoff allegations, Andrew Genett, the chief financial officer for Cipriani's U.S. holdings, said he has gone over all the records pertaining to the renovation and Cipriani had no dealings with the contractor, Francis (Buddy) Leahy, (left) or the Gambino family.

Sources say DiLeonardo told the FBI that Cipriani wrote a check for $100,000 to a firm run by Leahy, "to resolve a dispute involving the use of non-union workers" to



refurbish the legendary nightspot in 1999. Such pass-through payments to mob-tied firms are often used to enable businesses to count the payoff as a business expense.



Leahy is a longtime mob associate whose talents and money making prowess were memorialized by John Gotti 10 years earlier.

"This Buddy Leahy – the nicest guy in the world," Gotti proclaimed on Dec. 12, 1989, adding, "Nobody can do the work Marine does," referring to Leahy's company at the time, Marine Contracting.



Through Bosko Radondich, (left) the leader of the Westies, an Irish American gang of hoodlums based on the West Side of Manhattan, Gotti said Leahy was funneling $9000 to Gotti's liaison "every two weeks. He takes a third, and I get two thirds. I get $2000 a week. Who gives you $2000 a week."

Gotti's math was a little off, but he knew he had a good thing going. He stressed that he didn't want any of his wiseguys, particularly then-underboss Salvatore (Sammy Bull) Gravano, messing with Leahy. "This guy's MY partner," he said.

These days, according to DiLeonardo, Leahy, 65, of Atlantic Highlands, NJ, is still feeding the Gambino family coffers.

Of the $100,000, Leahy kept $15,000, according to DiLeonardo. Peter Gotti



received $40,000, mob associate Louis (Louie Black) Mariani got a token $5000, with Mikey Scars and soldier Edward Garafola (right) each receiving $20,000, DiLeonardo has told the feds.



Gotti, on trial for plotting to kill onetime turncoat Gravano and for construction industry extortion schemes, is not charged in the alleged Cipriani shakedown but testimony about it is likely to arise when DiLeonardo takes the stand.

In court papers, prosecutors Victor Hou, Joon Kim and Michael McGovern state that the Gambino family received extortion payoffs from construction projects at the United Nations, the Lexington Avenue subway line, Macy's at 34th Street, the MTA building at 2 Broadway "and various other residential and office buildings in New York City."



Garafola, who served on the Gambino family's "construction panel" with DiLeonardo, pleaded guilty to extortion and conspiring to kill Gravano, his brother-in-law, and faces 25 years.

Codefendant Thomas (Huck) Carbonaro, is charged with extortion, the Gravano plot, and the murders of two mob associates suspected of being informers. If convicted, Carbonaro, 56, faces life. Gotti, 65, (left) who has six years remaining for a racketeering conviction in Brooklyn last year, faces 20 years if convicted.



# Setting The Record Straight On Chips

Colombo associate Armand (Chips) DiCostanzo is not a happy man. His son-in-law, Frank Smith, cooperated and was most responsible for the murder and racketeering conviction two months ago of the family's consigliere, Joel (Joe Waverly) Cacace.

To make matters worse, DiCostanzo, 67, (right) was wrongly identified as an informant in "Cover Up," a



**News from
Attorney General
Eliot Spitzer**

Department of Law
120 Broadway
New York, NY 10271

Department of Law
The State Capitol
Albany, NY 12224

Contact: Brad Malone
(212) 416-8060

For Immediate Release:
March 1, 2002

## CARPENTERS UNION OFFICIALS INDICTED FOR RECEIVING BRIBES AND GRAND LARCENY

Union Official Permitted Non-Union Workers at Two Manhattan Job Sites

Attorney General Eliot Spitzer and U. S. Department of Labor Regional Inspector General John McGlynn today announced the indictment of three men accused of taking bribes from a contractor so that the contractor could use non-union workers to perform work at two Manhattan job sites. The indictment also alleges the defendants' conduct deprived the union's benefit funds of more than $1 million, which was to be paid by the contractor.

Charged today in an 11-count indictment was Stephen Goworek, 34, of 2331 Bruner Avenue in the Bronx. Among the charges are Grand Larceny in the First and Second Degrees, four counts of Bribe Receiving by a Labor Official and five counts of Violating a Fiduciary Duty to the union. Up until his arrest, Goworek was the manager of the Stamps Enforcement Unit of the Benefit Funds of the District Council of New York and Vicinity, United Brotherhood of Carpenters and Joiners of America, AFL-CIO. As the Stamps Enforcement Manager, Goworek was responsible for ensuring that contractors remitted to the Benefits Funds the payments required by the Collective Bargaining Agreement on behalf of union members employed by contractors.

Also charged was John Mingione, 32, of 2 Radcliffe Road, Staten Island, and a third defendant, Thomas Riccardo, 41, of 166 Oakdale Street, of Staten Island. Mingione was a shop steward for the Carpenters Union, while Riccardo was actually on the payroll at one of the construction sites. Both men are alleged to have acted in concert with Goworek in the bribery and grand larceny scheme. All three defendants were arraigned in Manhattan Supreme Court. Each faces up to 25 years in prison if convicted of the top count of Grand Larceny in the First Degree.

"My office will continue to work with the Inspector General to ensure that the labor laws are enforced, that workers receive the wages and benefits which they are entitled to, and that the integrity of the collective bargaining process is protected," Spitzer said.

The indictment comes as a result of a nine-month investigation conducted by the Attorney General's Statewide Organized Crime Task Force (OCTF) and the USDOL-IG that began in 1999. The investigation targeted remodeling projects at two

Stephen Goworek, Thomas Riccardo, and John Miniglione indicted
Case 1:90-cv-05722-RMB -THK Document 1101-13   Filed 10/14/11   Page 18 of 18
Page 2 of 2

Manhattan hotels–the Warwick Hotel and the Carlton Hotel. A contractor working on those projects cooperated in the investigation, which included audio and video taping the defendant's demands for bribes, as well as the actual bribe payments. Some bribes were actually delivered to the defendants by an undercover police officer from OCTF.

The charges in the indictment are accusations and the defendants are presumed innocent until proven guilty.

The investigation was led by Assistant Deputy Attorney General Dennis Walsh of OCTF. The case is being handled for trial by Assistant Deputy Attorney General John C. Prather of the Criminal Division. Attorney General Spitzer recognized the contributions of William Casey, Chief Investigator for the Attorney General's Office, Mitch Lampert, Chief Investigator at OCTF and Investigators John Mitchell of OCTF and Marcus Rivera of the USDOL-IG.