**Office of The Independent Investigator**

NYC District Council of Carpenters & Joiners
17 Battery Place, Suite 1226
New York, NY 10004
212-889-3000 / Fax 212-889-3242

William P. Callahan, Esq
Independent Investigator

August 24, 2007

Hon. Charles S. Haight, Jr.
Senior United States District Judge
Southern District of New York
500 Pearl Street, Room 1940
New York, NY 10007

Re: United States v. District Council of Carpenters
    90 Civ. 5722 (CSH)

---

# I.I. INVESTIGATION REPORT

Re

**Walter Mack Transition Report – 10-25-05**

## Introduction

On 10-26-05, Mr. Mack submitted to the undersigned I.I. with copy to the Court, his Transition memorandum entitled _____. This office conducted a thorough review of the allegations in the memorandum and our findings are set forth below.

1

**Synopsis**

⬚⬚⬚ is a small, member owned carpentry company with one large client, ⬚⬚⬚ that specializes in maintenance carpentry work. Two audits were conducted by the Funds, one in response to Mr. Mack's inquiry, both found small technical deficiencies. A subpoena, dated July 19, 2004 was served on ⬚⬚⬚ and the former II obtained the contracting agreement between ⬚ and ⬚⬚⬚, work invoices, and supporting documents. ⬚ services all the maintenance carpentry work for ⬚⬚⬚ New York properties. ⬚ has employed Local 608 carpenters exclusively with no regard for staffing their jobs through the Out of Work List, or adherence to the "50-50" rule. A review of the payment records, invoices and interviews form the foundation for the finding that ⬚ is in compliance with all matters concerning pay and benefits, but its owner, ⬚⬚⬚ a long time Local 608 carpenter, did not utilize the Out of Work List for staffing his job site, but does hire Local 608 carpenters, who in turn are paid the proper pay and benefits. Local 608 supervised the sites and had not enforced the job referral rules for ⬚ After a meeting with Business Manager John Greaney during which the conclusions of the investigation were discussed, and a remedy formulated, ⬚ requested two workers from the OWL on August 18, 2007.

**I. I. Investigation**

1. In August 2003 the Independent Investigator Walter Mack, "received a Hotline complaint from a credible source who advised that ⬚⬚⬚ who possessed the building maintenance contract with ⬚⬚⬚ for its buildings at and about ⬚⬚⬚ in Manhattan was defrauding the District Council and its benefit funds by paying carpenters cash without benefits." (from Transition Memorandum)

2. In response to a request from Mr. Mack, Maurice Leary, District Council of Carpenter Director of Operations requested from Stuart GraBois, the NYCDCC Benefit Funds Administrator an audit of ⬚⬚⬚ (September 9, 2003 memorandum to GraBois).

2

3. However, the Funds had just completed an audit on August 13, 2003 which reviewed the cash disbursement journal, the general ledger, compared gross wages reported in Employer's payroll records with federal and state payroll tax filings, wage rates were analyzed, total payroll hours were compared to total stamp purchases, the cash disbursement journal was reviewed for transfers to related companies, payroll records were compared to shop steward reports and stamp summary reports were compared to audited hours to determine if adjustments to reported hours were necessary. The audit covered the period 3/30/2001 through 6/30/2003.

4. The findings were a deficiency totaling $639.57 which included a 12% interest and a 20% penalty. ▓ paid the NYDCC Benefit Funds $539.93 on 9/2/2003.

5. Additionally, ▓ shop steward for ▓ was summoned by the District Council for an interview on October 14, 2003. Attorney Gary Rothman obtained a sworn, signed statement from ▓. ▓ stated: "I was employed as a carpenter for ▓ for 23 yrs. From about 1985 to about 2001. I was the shop steward for them at ▓. In 2001 one of their foreman broke away taking the house carpentry account with him. I went along with him & stayed on as shop steward on the account. The name of the company ▓ The local was aware of the change & that I would stay on as steward on the account ▓"

6. Although there is no written report, nor record of an OWL dispatch, it was determined that ▓ was entitled under the practices in effect at the time to remain as steward for the new company operating at the same site and doing the same type of work.

7. The gist of the original call to Mr. Mack's office was found in the work product turned over to the present I. I. during the transition. "Caller advised that in addition to performing maintenance for ▓, ▓ also performs small build-outs in the building which ▓ does not account for in its weekly shop steward reports. Caller advised that the workers who perform these build outs are paid cash for their work. Caller suggested that an audit of ▓ billings to ▓ would

3

reveal maintenance work as well as the build-out work, the latter of which is billed to ▭ as time and material and is not reported to the union. There is then hand written notations, "II Evaluation to DC for Action Corruption Committee Agenda."

8. In the Transition memorandum, Mr. Mack reported to the present I.I.: "For reasons unexplained, and despite my continued inquiries concerning the matter, the District Council did not respond to this complaint for more than a year when it was reported to me that an audit of ▭ reported no discrepancies between Shop Steward reports and Benefit remittances. Inasmuch, as "cash" carpenters are not normally reported on Shop Steward reports nor disclosed in the payroll records provided to the auditor, I decided to subpoena ▭ for all its invoices from ▭ in order to compare the man hours billed by ▭ against the benefit remittances made by ▭."

9. Mack continued, "▭ produced a sampling of ▭ invoices, many of which reflected flat fee rather than itemized billings of the actual hours worked. This type of billing appeared inconsistent with the Collective Bargaining Agreement between ▭ and ▭. I needed to isolate the particular job, compare Shop Steward reports and then obtain testimony from participants if the discrepancies were not apparent on their face."

10. Mack concludes, "Unfortunately other matters interfered with my progress on this subject matter, but my intention was always to obtain any further records I needed from ▭ and pursue the seeming discrepancies between the Collective Bargaining Agreement and the itemized billings. Is there some special exception here or is there some political or other reason for differentiated treatment that needs exposure or explanations were the questions that I felt deserved to be explored."

11. The referenced subpoena dated July 19, 2004 was served on ▭ and communications between the I.I. and ▭ legal counsel ensued.

12. On August 4, 2005 ▆▆▆▆▆ delivered the Contracting Agreement, effective April 1, 2004 between ▆▆ and ▆▆▆▆▆

13. The I. I. has reviewed the applicable Collective Bargaining Agreement that govern ▆▆▆ workforce and there is no reference as to how a signatory company would bill its clients. Collective Bargaining Agreements are between signatory companies and unions; the Contracting Agreement is the governing document between this vendor and its client. It is that document which governs billing procedures, scope of work, confidentiality, conflicts of interest, insurance and other items of importance to the parties. The union is not a signatory party to the Contracting Agreement.

14. The Contracting Agreement indicates that ▆▆▆▆ would assign ▆▆ work at ▆▆▆▆ and other ▆▆▆▆ properties. The rates of payment under the Agreement for carpentry work were $74.50 for New York City properties and $68.00 for Westchester. Premium rates would be $110.00 for NYC and $107.00 for Westchester and for Carpentry Sunday and holidays the rates were $135.69 and $138.00. Rates for foreman were slightly higher. A provision was included for pricing in conjunction with union increases.

15. These rates reflected the prevailing wages for carpentry work at that time, and would be enough to cover any union carpenter for wages and benefits.

16. A review of benefits purchased by ▆▆ during the time in question show purchases in excess of the steady 2-3 man workforce and includes union carpenters, who worked for premium pay after normal hours and a substantial amount of weekend work.

17. ▆▆ agreed to be bound by the terms and conditions of the Building Contractors Association Agreement with the NYCDCC and also by another agreement specifically negotiated by ▆▆ and the District Council for the period July 1, 2001 – June 30, 2006. This Specialty Maintenance Agreement for ▆▆▆▆ Locations allows for a $4.00 reduction in wages from the negotiated wage of the BCA Agreement. Fringe benefits would remain the same. This agreement has a

5

termination and renewal clause which allows for one (1) year renewals by mutual consent. This specialty agreement allows ▇ to pass this discounted rate to its workers who perform "carpentry work classified as maintenance work." ▇ recognizes the DCC as the exclusive bargaining agent for all of its employees covered under the Agreements. The governing Agreement in all other aspects is the Building Contractors Agreement (BCA). There is a Membership and Referral clause, which allows ▇ : "To the extent permitted by law. In order to maintain members of the United Brotherhood of Carpenters employed in performing work classified as maintenance at the referenced locations may request his full crew."

18. It is this clause which causes this II concern. The II finds an abundance of evidence that the steward reports reflect an accurate portrayal of the carpentry workforce. Rarely, was a carpenter found working for premium pay that was not a member of Local 608. ▇ hired carpenters that worked one job and then came to the off-hour job with ▇. Rarely was it found that a Union carpenter hired by ▇ was out of work. Those carpenters that ▇ hired most often came from other jobs during the week for the extra pay, thus they would not be available if ▇ chose the paper dance regarding the request clause. If ▇ properly complied with the request provision of its contracts, ▇ would have been able to hire Union carpenters from Local 608, who were out of work. If ▇ wants to hire Local 608 carpenters they are in abundance on the OWL, and could be requested, all ▇ would have to do would be write out a single page of names on letterhead and forward it to the OWL.

19. In January 2007 Chief Investigator Bernard J. Kane was assigned this matter to investigate and provide a report to the Court. The United States Attorney Office through Assistant United States Attorney Edward Scarvalone indicated several times to the I.I. that these transition cases should be given a high priority.

20. On April 27, 2007 ▇ owner of ▇ and a member of the Local 608 was interviewed by Chief Investigator Kane and Scott Danielson, OWL Supervisor acting as Anti-Corruption Committee investigator. O'Donnell stated that he began

6

      ▓▓▓ after serving as the foreman for the previous carpentry company, ▓▓▓ which was employed by ▓▓▓ as its maintenance carpentry force at its office buildings. ▓▓▓ stated that he knows of no animosity between him and the previous owners, one partner of ▓▓▓ wished him well and ▓▓▓ is still often contracted by ▓▓▓ for other types of carpentry work for its buildings. ▓▓▓ stated that he employs 2-3 carpenters full time. One, ▓▓▓, serves as the shop steward and ▓▓▓ is his foreman. Either ▓▓▓ signs the shop steward reports. Concerning the Specialty Maintenance Agreement, ▓▓▓ stated ▓▓▓ wanted a lower rate for the maintenance carpentry work; however, ▓▓▓ always pays the higher rate to ▓▓▓ employees.

21.   ▓▓▓ stated that ▓▓▓ does not do furniture installation work; ▓▓▓ employs another company to do that work. Occasionally ▓▓▓ will take down a work station, but does not install any type of furniture. ▓▓▓ does carpentry work. ▓▓▓ stated ▓▓▓ installs walls and ceilings and gives access to other trades such as the electricians to ceiling and floor areas. Rarely does ▓▓▓ install drywall, since only the executive floor is extensively sheetrocked. Other jobs that ▓▓▓ captures for its union carpenters is the removal of floor tiles for access to electrical wiring, HVAC, and pipes for other trades, the installation of locks and doors, and all other carpentry tasks. ▓▓▓ defined the term "build-out" as a typical 3-4 office floor to ceiling construction that ▓▓▓ does for ▓▓▓ often.

22.   ▓▓▓ stated that ▓▓▓ works about three (3) weekends a month and several evenings a week. Most large jobs are done over the weekend with support from several other trades and contractors. ▓▓▓ stated that he pays any premium rate and benefits according to the BCA contract. ▓▓▓ stated that he offers all overtime to his steward and foreman, but when he needs to increase his workforce for a weekend or a large night time job, he calls union carpenters that he knows and trusts to be on time and complete the job as scheduled. These carpenters are chiefly Local 608 members. ▓▓▓ stated he called the OWL maybe 4 times for dispatch of a carpenter.

7

23. ▮▮▮▮ reviewed some subpoenaed documents and he inquired how the I.I. obtained them. He was informed that a subpoena was served on his client by the previous I.I. and they complied. He stated that he had every record in our possession and would have complied if requested, and thought it was an unnecessary intrusion in the relationship between his company and his client.

24. ▮▮▮▮ reviewed several documents for weekend and longer term projects all of which he remembered, he indicated his handwriting was on the supporting documents. He concurred that many of these projects were well planned in advance in support of many construction trades such as electricians, HVAC and even other carpentry companies. Again, ▮▮▮▮ maintained that even for Saturday and Sunday jobs he needed to hand pick his work force.

25. ▮▮▮▮ provided a signed, sworn statement.

26. This matter was discussed at the Anti-Corruption Committee meeting, Thursday May 3, 2007 and the II informed the committee that an initial remedy of enforcing the "50-50" and utilization of the OWL should begin. Maurice Leary, Director of Operations, stated that he would speak with ▮▮▮▮ and inform him of the remedy to bring his company into compliance.

27. On May 15, 2007 ▮▮▮▮, a Local 608 carpenter and presently Foreman for ▮▮▮▮, was interviewed by Kane, Danielson and Senior Investigator William O'Flaherty. ▮▮▮▮ indicated that he joined ▮▮▮▮ after working for ▮▮▮▮ and knew ▮▮▮▮ personally and professionally. ▮▮▮▮ stated that he does not do the hiring for ▮▮▮▮. All hiring is done by ▮▮▮▮. He does not know of anytime a carpenter was hired off the Out of Work List. He services all the New York area ▮▮▮▮ buildings. He frequently works nights and most weekends with an enhanced crew of carpenters. He is always paid the proper rate of pay and benefits. ▮▮▮▮ was not aware of any second contract or the terms of the Specialty Maintenance Agreement between the District Council and ▮▮▮▮.

8

28. During the May 16, 2007, Anti-Corruption Committee meeting Director of Operations Maurice Leary reported that he spoke with ▚▚▚ and they are going to work on a resolution that will bring ▚▚▚ into compliance with the Consent Decree.

29. On June 13, 2007 Business Agents ▚▚▚ and Brain Hayes were interviewed concerning their past work as carpenters for ▚▚▚, both indicated they only worked a few jobs and were paid their union wages and benefits. Both thought that they were referred to those jobs directly by the owner, ▚▚▚. It should be noted that both men thought that ▚▚▚ was one of the finest employers they knew from their experience as carpenters and business agents. Both spoke of him in the highest personal and professional regard. They gave the opinion that ▚▚▚ maintenance crew of union carpenters is becoming rarer in an industry that now employs non-union handymen and those affiliated with SEIU Local 32B. Both types of workers are winning jobs from the New York City District Council of Carpenters in commercial buildings. Both opined that ▚▚▚ needed the latitude to hire workers with carpentry skills enhanced by good character and the deportment to work in an occupied building.

30. Business Agent Brian Hayes stated that he has responsibility for the ▚▚▚ work sites. Hayes stated that ▚▚▚ is one of the finest men he knows and Hayes notes that he gives him great leeway in hiring because ▚▚▚ requires trustworthy, skilled and dependable workers with the proper deportment. ▚▚▚ hires union carpenters and pays the proper wages and benefits. Hayes believes maintenance companies need flexibility in staffing to compete. For these reasons he has not enforced the job referral rules. He noted that ▚▚▚ has a normal full time staff of 3 union carpenters and for that small a company to continue to compete it needs leeway in staffing to retain its client and core workforce of union carpenters.

**Findings**

- ▓ supplemented its core work force with no regard for the NYCDCC job referral system or tried to comply with the referral provision in its Specialty Agreement.
- Local 608 did not enforce the job referral rules or the "50-50" rule for ▓
- The I.I. does not question the referral of the Shop Steward from ▓ to ▓ under the rules in place at that time and finds no reason to request the removal of the steward. In fact the steward reports were of significant help to the I.I. throughout this investigation and his sworn testimony was credible.
- There is no reason to conclude that the billing of carpentry work by ▓ to ▓ was in any way a violation of the Collective Bargaining Agreement. In fact the Collective Bargaining Agreement does not address how a vendor and its clients should be invoiced.

**Recommendations and Remedy**

On August 1, 2007 the Anti-Corruption Committee met with Local 608 Business Manager John Greaney concerning the findings in this investigation. Greaney stated that he will work with ▓ to bring them into compliance and raised valid issues concerning emergent staffing needs and manning properly skilled workers from the OWL. Greaney stated that the need to keep carpenters employed in building maintenance work may require a contractual agreement that specifically fits those needs rather that the BCA which ▓ is a signatory.

On August 18, 2007 the OWL dispatched two carpenters to ▓ from available out of work carpenters. We look forward to working with Local 608 in the supervision of this site, and we wish ▓ continued success with

10

his employment of properly dispatched Union carpenters. Should it be necessary the Independent Investigator believes that the New York City District Council and ▮ can enter into an agreement that maintains the spirit of the job referral rules and the unique staffing requirements that a maintenance contractor may require as opposed to the standard BCA agreement. The I.I. is not blind to the competitive issues in the marketplace and notes that SEIU janitorial apprentices are being trained in many maintenance carpentry tasks and Operating Engineers have taken a strong position in several commercial buildings as facility maintenance managers, evolving from their stationary engineer, boiler room tasks to the upper floors. Nevertheless, the I.I maintains that the job referral system does work and will work for ▮

In January 2008 the I.I. will report to the court the result of the compliance initiatives undertaken by the NYCDCC in the ▮ matter.

August 24, 2007

*/s/ Bernard J. Kane*
Bernard J. Kane
Chief Investigator

Respectfully submitted,

*/s/ William P. Callahan*
William P. Callahan
Independent Investigator

cc: Benjamin Torrance, AUSA
    Kristin L. Vassalo, AUSA
    Gary Silverman, Esq
    Gary Rothman, Esq

11