William P. Callahan, Esq
Independent Investigator
New York City District Council of Carpenters
17 Battery Place, Suite 1226
New York, NY 10004
(212) 889-3000 – Fax (212) 889-3242
E-mail: unitel.group@gmail.com

DATE:   October 30, 2007

TO:   Hon. Charles S. Haight, Jr.

FR:   William P. Callahan, Esq.

RE:   **Transition Report on the Trade Show Out of Work List**

### INVESTIGATIVE REPORT

## Introduction

Upon his termination, Walter Mack filed a transition report concerning the referral system used at the Javits Center and by the District Council's Trade Show Out of Work List (**Ex. A**). In this report, Mr. Mack explains his inability to conduct an investigation into these areas during his 30 month tenure, but recommends that the present I.I. take on this task. Mr. Mack lists four allegations concerning carpenters attempting to circumvent hiring practices at the Javits Center.

## Synopsis

The Independent Investigator's Office has conducted an inquiry, not limited to Mr. Mack's four allegations, but a broad review of the referral system at the Javits Center and the operation of the District Council Trade Show Out of Work List. This inquiry, because of the different systems used to assign carpenters, was conducted in two separate parts. The inquiry into employment of journeyman carpenters at the Javits Convention Center has uncovered no significant problems with the way carpenters are hired and assigned to trade show work at the

1

Center. This operation continues in accordance with rules established previously by IRO Judge Conboy. The rules established give the District Council very limited input into the hiring practices that goes on at this venue.

The second part of the investigation is a review of the operation of the Trade Show Out of Work List maintained by the District Council. This review, although still ongoing, has resulted in the I.I. making recommendations to the D.C. for significant changes to the operation of Trade Show OWL. The I.I. has been advised by the D.C. that to make the recommended changes would require the District Council to make changes to its bylaws. These bylaw changes will require the approval of the District Council delegate body. A proposal for the delegate body to consider is being undertaken.

The I.I. took an additional step during its inquiry of the Trade Show Industry to address the issue of Organized Crime's influence at the Javits Center and other Trade Show venues. The I.I. reviewed the work and union status of a list of union members compiled by former IRO Judge Conboy. This list of members was said to be "of interest" to Law Enforcement at the time. These members had worked at the Javits Center during the time period prior to New York State taking control. The I.I. found only a fraction of the members were still employed in the Trade Show Industry and members of the union. The I.I. asked the U.S. Attorney's office for assistance in determining if any additional information or evidence was available concerning these members that would disqualify them from membership in the union or deny them work privileges. AUSA Edward Scarvalone assisted in this matter. To date the U.S. Attorney's office has not provided any additional information to the I.I. concerning these individuals.

The following is a summary of the I.I. investigation.

## I.I. Investigation

1.1   To address concerns raised by Mr. Mack's report about employment issues at the Javits Convention Center, the I.I. contacted and met with Mr. Gerald T. McQueen, President and

CEO of the Jacob K. Javits Convention Center. Mr. McQueen explained the history behind the Javits Center taking over the hiring of carpenters working at that venue. These practices were reviewed and approved by former IRO Judge Conboy. This agreement allows the Javits Center to maintain a list of union carpenters, approximately 868 members, who work on a regular basis at the center doing trade show work. These carpenters went through a screening process conducted by Javits Center management prior to being hired. The Javits Center assigns these carpenters as needed to trade show positions at the center. The Javits Center replenishes this list by hiring new workers as they see fit. These new workers are not necessarily union members, although they must join the union after being hired. The Javits Center sponsors these workers entry into the union at the apprentice level. The Javits Center sends these apprentices to the District Council's Labor Technical College for apprentice instruction. In response to Mr. Mack's allegation that journeymen carpenters could misrepresent themselves to gain employment as an apprentice at the Javits Center is something it is aware of. Javits Center management contacts the District Council and verifies the applicant's union status before hiring them. The Javits center will not hire a journeyman carpenter as an apprentice.

1.2   Mr. McQueen explained the Javits Center maintains a secondary list of carpenters, approximately 160 workers, which is utilized during busier times at the center. This has inaccurately been referred to as the "temporary list". The Javits Center advertised on the internet and asked current employees for referrals for applicants to this list. Applicants were subject to a screening process and then approved by the Javits Center management. This list of carpenters is used as part time workers when the need arises. Assignment of these carpenters is at the discretion of the Javits Center. District Council rules allow these carpenters to have full time employment at other jobsites, while being employed part-time at the Javits Center. Mr. Mack's allegation that journeymen carpenters have been able to circumvent the employment system at the Javits Center through the temporary badge list or gaining entry through Exhibitor Contractors is not true, claims Mr. McQueen. Exhibitor Contractor's employees are also subject to a screening process and approval by the Javits Center management. The Javits Center has a history of having barred individual carpenters from working at the venue because of failing the screening process. Being allowed entry to

3

the Javits Center to work for an Exhibitor Contractor during particular show does not qualify the carpenter for assignment by the Javits Center for additional employment at that location. They are only allowed return to the Javits Center as an employee of the Exhibitor Contractor when that company has work at the center.

1.3     Mr. McQueen stated there are occasions during the calendar year when the Javits Center deviates from their normal practice of hiring carpenters for work there. Presently this only occurs during the annual Auto Show. The Auto Show is the biggest show of the year, and requires the Javits Center to seek additional carpenters, after exhausting both of the lists, to fill the employment demands of the show. During these times, the Javits Center requests the District Council to dispatch journeyman carpenters without requiring the members to have the Trade Show Skill Certification or to pass a screening process to be assigned. The District Council uses the Trade Show Out of Work List and their main Out of Work List to dispatch the required number of carpenters the Javits Center requests. Upon completion of the Auto Show, the Javits Center returns to their practice of controlling the hiring of carpenters. As to Mr. Mack's allegation that "Since 2000, when Javits began limited its hiring (i.e., issuance of badges) to Apprentices rather than Journeymen, several Jourymen Carpenters have conspired with Exhibitor Contractors to secure employment at Javits", the I.I. believes this allegation is too vague to be properly investigated and answered. The I.I. is satisfied with Mr. McQueen's description of the measures enacted and rules followed by the Javits Center in hiring carpenters.

1.4     The second part of this inquiry involves the operation of the District Council's Trade Show Out of Work List. This dispatch system was established during the tenure of IRO Judge Conboy. A copy of these Referral Rules are submitted as "**Ex. B**". The Trade Show OWL was structured similarly to the District Council's Main Out of Work List, but takes into account the special terms of the Exhibit Show Collective Bargaining Agreements staffing provisions. Business Representative Richard Tucillo was vetted and approved by IRO Judge Conboy to operate the Trade Show OWL. The Trade Show OWL dispatches carpenters to non- Javits Center Trade Show work sites.

4

1.5     Members of the I.I. office met with Tucillo to get an understanding of the workings of the Trade Show Industry and the operation of the Trade Show Out of Work List. Tucillo explained that the Trade Show Collective Bargaining Agreement going back to the 1990's allows a Trade Show company to assign the first carpenter to the jobsite. The D.C. assigns the second carpenter through the Trade Show OWL. The second carpenter is assigned to be the shop steward/time keeper. The third, fourth and fifth carpenters are the choice of the company to assign. Afterwards carpenters are assigned, 50/50, between union and company carpenters. However, the company can request a named carpenter off the union's Trade Show OWL to cover the union's part of the 50/50 assignment of workers. The Trade Show OWL handles the dispatching of all union assigned carpenters to these worksites. Carpenters wishing to have their names placed on the Trade Show OWL must complete a 50 hour Trade Show Skill Certification course given by the D.C Labor Technical College. Upon completion of the course, the member then requests his or her name be placed on the Trade Show OWL. There are approximately 600 members currently certified in the Trade Show skill. The Trade Show OWL fluctuates between 40 to 60 members on the list.

1.6     The D.C. Trade Show Out of Work List is essentially a one man operation, that man being Richard Tucillo. He has the assistance of a clerical employee on a part time basis, approximately one hour a day. Tucillo handles all the requests made by Trade Show companies and all the dispatching of members to jobsites. The requests are made via fax or by a telephone call directly to Tucillo. The Trade Show OWL is maintained on a computer at the D.C. The computer used does not maintain a history of members on the OWL, or a history of dispatches made of these members. The I.I. requested Tucillo provide the I.I. office with access to the paper records of requests and dispatches done in the last 2 years. Tucillo was unable to locate records covering the year 2005. The I.I. office conducted a review of the records Tucillo was able to provide. These records consisted of company requests for manpower, dispatch records of carpenters and shop steward reports for trade show jobsites. A review by the I.I. office found these records to be incomplete. There was only a limited amount of jobs that appeared to have all the associated paperwork. An accurate assessment of the Trade Show OWL could not be reached.

1.7     The I.I. requested Tucillo to provide a copy of the Trade Show Out Of Work List and a list of all trade show certified members. The Trade Show OWL consisted of 46 members. Tucillo informs the I.I. the list generally has 40-60 members on it. The list of certified members consisted of approximately 600 members. The small percentage of members utilizing the Trade Show OWL is curious, especially since members attended 50 hours of training on personal time to qualify for certification.

1.8     The I.I. office interviewed Trade Show OWL office assistant _____. She has worked part-time for the Trade Show OWL for the last 7 years. Her duties consist of answering the telephone and doing clerical work. When members call to be placed on the Trade Show OWL, she verifies that they're Trade Show certified. She does not handle any requests for manpower or the dispatching of members. She receives lists of dispatched members from Tucillo. Using the computer, she prints out a dispatch report for the members dispatched, attaches it to Tucillo's list and files it. She manually changes the list numbers of all the following members on the OWL. She prints out a copy of the Trade Show OWL and gives it to Tucillo, each night before leaving for the day. She is responsible for boxing up the office records, upon completion of each calendar year.

1.9     The I.I. applied for and was granted federal court subpoenas for six of the most active trade show companies. The subpoenas required the companies to produce a list of jobs performed in the D.C. area and employment records for 2005 & 2006. Analysis of these records will assist the I.I. to address Mr. Mack's final allegation concerning cash payments to journeymen by Exhibitor Contractors at non-Javits Center venues. Additional time and investigative measures will be needed to sufficiently answer this allegation.

1.10    After the initial review of the operation of the Trade Show OWL, the I.I. identified problems he felt needed attention by the D.C. The I.I. voiced his concerns to the Anti-Corruption Committee and legal representatives of the D.C. The I.I. recommended that the Trade Show OWL be moved, from its current one man operation with outdated computer system, to the Ultra Computer system used by the UBC and the D.C. to dispatch journeyman carpenters to jobsites. The D.C. Executive Officers were receptive to these recommendations

and entered into discussions with the I.I. and ACC as to how best to implement this change. The I.I. was last informed that a referendum will soon be presented to the delegate body, to make the proper bylaw changes required in job referral matters.

1.11    The I.I. has continued his review of the Trade Show OWL. The I.I. decided that a clear record of the operations of the Trade Show OWL and the responsibilities of its director and business representative Richard Tucillo was needed. A deposition of Tucillo was held on 5/29/07 at the I.I. Office at 17 Battery Place New York, N.Y. 10004. Tucillo appeared represented by Gerald Mc Cabe Esq. Also in appearance were AUSA's Edward Scarvalone and Benjamin H. Torrance and D.C. legal representative Gary Rothman Esq. Tucillo was questioned by members of the I.I. office and was cooperative in answering the questions posed to him.

1.12    Richard Tucillo's deposition brought to light the limited duties and responsibilities he had as D.C. Business Representative of the Trade Show Industry. There is no defined job description or reporting responsibilities with his position. For ten years, Tucillo operated the Trade Show OWL as his own shop, with little instruction or assistance in its operation. The failure to keep current with technological updates and maintain proper record keeping left it without documentation that members were being dispatched properly. Limited jobsite visits and lack of diligence in the collection of shop steward reports left the membership susceptible to possible Benefits Fund fraud and CBA contract violations. All of these issues need to be addressed and rectified to assure members are represented properly in this industry.

## Conclusion

2.1    The I.I. acknowledges that the hiring practices currently applied by the Javits Center, were set up with the approval of IRO Judge Conboy, enacted to combat organized crime influence in the assignment of carpenters at that venue. The I.I. agrees with the continuation of these practices in the future.

2.2     As for the Trade Show Out of Work List, the I.I. appreciates the D.C. willingness to work with the I.I. Office to reform the dispatch system it now uses. The I.I. realizes the procedures the D.C. must go through in making changes to their bylaws, but the methodical response to this issue has taken longer then originally expected. The I.I. will continue to encourage the D.C. to act with dispatch in achieving the change.

2.3     The Trade Show industry is an opportunity for members seeking primary and part time employment. The lack of participation of D.C. membership in the Trade Show OWL is a possible reflection of a lack confidence they have in this system. Nothing has been done over the years the Trade Show OWL has been in operation to change this perception. The Trade Show OWL is run the same way as it was setup without any upgrade or improvement. The quicker changes can be enacted, the quicker they will help to re-establish the Trade Show OWL as a viable opportunity for union members who seek employment in this area. The I.I. will keep the court advised on the D.C.'s progress in this regard.

2.4     Freeing the Business Representative of his Trade Show OWL responsibilities should also allow for more time for policing of the Trade Shows to ensure better contract compliance. The Business Representative position is responsible for making sure that trade show companies are conducting themselves as they have agreed to in the CBA. Any violations of the CBA should be met with the required action in filing of grievances, arbitrations and or union charges against members. Having the Business Representative more visible at job sites will afford trade show carpenters an opportunity (other then by telephone) to voice concerns and grievances they may have in their area of employment. In this regard, the same record keeping and job contact efforts required of all District Council. Business Representative should be required of the Trade Show Representative. A daily record of job site visits should be maintained by the Business Representative. Collection of shop steward reports from all job sites must be a priority of the Business Representative, to assure the D.C. Benefit Funds can verify remittances paid by a company on behalf of the membership. Shop Stewards must be instructed in how and where to turn in completed S/S reports from jobs they are assigned. The Business Representative must have an immediate supervisor, to whom he reports to and is answerable for his actions. A regular schedule of reporting to the D.C.

Executive Officers should be established to pass on information concerning activities, job figures, man power hours and problems concerning the Trade Show Industry.

2.5     The I.I. has reviewed these concerns with the D.C. Executive Officers. While they have pointed out that they have not received complaints from members concerning Mr. Tucillo they have accepted the I.I.'s suggestions and will assign the same set of written Business Representatives' Duties and Responsibilities distributed to the other field B/S's to him. They will monitor Mr. Tucillo's performance of his new performance instructions in the coming months and provide whatever guidance or assistance he may require in adapting his routine to these expectations.

2.6     The I.I. will continue its investigation into Mr. Mack's final allegation of whether members working in the Trade Show Industry were paid the proper wage and benefits. The I.I. will report it's finding in a future report, along with it's assessment of B/R Tucillo's performance under his new job performance requirements.

<u>End of Report</u>

October 30, 2007

_____
William P. Callahan, Esq
Independent Investigator


cc:     Michael J. Forde, D.C. Executive Secretary Treasurer
        Peter Thomassen, D.C. President
        Denis Sheil, D.C. Vice President
        Benjamin H. Torrance, AUSA
        Kristin L. Vassallo, AUSA
        Gary Silverman, Esq
        Gary Rothman, Esq

**New York & Vicinity Trade Show Industry Job Referral Rules
For Hotels and Job Sites Other than Javits Convention Center**

### Section I - Purpose

The New York District Council of Carpenters, U.B.C.J.A., AFL-CIO ("District Council") publishes these Rules to implement the hiring provisions contained in the Collective Bargaining Agreement between the New York Trade Show Contractors Association, Inc., and the District Council and to regulate referrals to job sites at hotels and locales other than the Javits Convention Center ("JCC"). It is the intent of these Rules to provide equal opportunity in job referrals and registration to all qualified members. These Rules do not prohibit any qualified members from securing employment directly with Trade Show Industry Employers ("Employers").

### Section II - Industry Representative and Industry Out of Work List

The District Council and the Employer have agreed to the appointment of the Industry Representative ("IR") who administers job referrals. The IR maintains an Industry Out of Work List of qualified Carpenters. Applicants seeking employment in the Trade Show Industry **must be certified** by completing a 50 hour "Trade Show Industry Training course" given by the New York District Council of Carpenters Labor Technical College.

### SECTION III - How Referrals Are Made

The General Foreman and Foreman shall be the agents of the Employer with respect to the hiring, discharge and layoff of employees. The Employer shall have the right to name the Foreman on each site. The Union shall appoint a working shop steward and or timekeeper. The first Trade Show Carpenter on the job site shall be referred by the Employer. The Second Trade Show Carpenter shall be the Union's selection. The third, fourth and fifth may be the employers selection. Each selection shall presumptively be qualified as set forth in Section II, (Industry Representative and Industry Out of work List) or possesses the skills of a presumptively qualified carpenter. The balance shall be selected in the same manner: 50% from the Union and 50% from the Employer, as long as each of those Trade Show Carpenters selected by both the Employer and the Union are presumptively qualified as set forth in Section II (Industry Representative and Industry Out of Work List) or possess the skills of a presumptively qualified carpenter.

The IR refers qualified members from the Industry List in the order in which each members name appears. The IR accepts Employers' Labor Requests daily and fills Requests on a first-come-first-serve basis from the Industry List in the list-order priority since the Employers' labor needs are immediate, two (2) attempts will be made to contact a member. After two (2) attempts are made the member's name will be removed from the Industry List. If the next registered member on the Industry List is unavailable or has completed a job assignment, the IR must be notified. The IR will provide members a number representing the next open position. Eligible members, who do not want to receive referrals, should notify the IR, to remove his/her name from out of work list.

### Section IV - Attaining Position on Industry List

Members can register at the School or complete a Registration Form. This Form can be obtained from the School or from the IR, and must be accurately completed. No referrals will be made based upon an incomplete Form. The information provided may be verified. The IR relies upon the information to make referrals so completing the Form truthfully ensures fair distribution of jobs. Members who falsify this Form are subject to charges in accordance with District Council By-Laws. The completed Form should be returned in at the School or to the IR. After the IR receive completed forms, a Photo ID Card certifying status will be provided to the member.

To obtain a position on the **Industry** Out of Work List call (212)366-7394 state your name, social security number, and phone number. A representative will notify you of your position on the list.

### Section V - Timekeepers

The IR may refer available members as Timekeepers in accordance with Industry practice and custom and in the order in which their names appear on the Industry List.

Exhibit B

## Section VI - Rejecting Referral

Members can reject a referral without losing list position due to a death in their immediate family, or a disability injury provided that a doctor's report indicating unavailability, including time period is submitted.

## Section VII - Removal From List

When a member is referred or has been requested by the employer to a job site at any trade show Industry venue (including JCC) that member's name shall be removed from the Industry List.

Members can not work within the Industry and retain a position on the out of work list. Member may only register on the out of work list when unemployed.

## Section VIII - Failing to Notify IR of Unavailability for Work or to Appear at a Job Site

If a member fails to notify the IR of his unavailability for work before he/she is dispatched, or fails to appear at an Employer's job after accepting a referral for a second time, that member will be notified that failure to notify the IR or appear again, will result in removal from the Industry List and forfeiture of the privilege of obtaining referrals for 1 year.

## SECTION IX - Violation of Rules

Any member who violates these Rules may be subject to the filing of charges in accordance with District Council By-Laws.

## SECTION X - Obtaining a Copy of Rules and Registration Form

A copy of these Rules and Registration Form may be obtained by calling:

212 366-7500, or by writing to the District Council at 395 Hudson Street, New York, New York 10014 and enclosing a self-addressed stamped envelope.

**Effective As Of January 1, 1998**

District Council for New York City & Vicinity
United Brotherhood of Carpenters & Joiners of America
395 Hudson Street
New York, New York 10014