**Office of The Independent Investigator**

NYC District Council of Carpenters & Joiners
17 Battery Place, Suite 1226
New York, NY 10004
212-889-3000 / Fax 212-889-3242

William P. Callahan
Independent Investigator

December 3, 2007

Hon. Charles S. Haight, Jr.
Senior United States District Judge
Southern District of New York
500 Pearl Street, Room 1940
New York, NY 10007

Re: United States v. District Council of Carpenters
    90 Civ. 5722 (CSH)

    **On Par Report**

Dear Judge Haight:

Enclosed please find our final report on the On-Par Investigation. If you have any questions, please feel free to contact the undersigned. This Report may be made public.

Respectfully submitted,

William P. Callahan

cc: Benjamin Torrance, AUSA
    Kriston S. Vassallo, AUSA
    Gary Rothman, Esq.
    Gary Silverman, Esq.

# **UNITEL REPORT**

William P. Callahan, Esq
Independent Investigator
New York City District Council of Carpenters
17 Battery Place, Suite 1226
New York, NY 10004
(212) 889-3000 – Fax (212) 889-3242
E-mail: unitel.group@gmail.com

DATE:   12/3/07

TO:     Honorable Charles S. Haight, Jr.

FR:     William P. Callahan, Independent Investigator

RE      On Par Report

## Introduction

1.1   The Independent Investigator was asked by Judge Haight to attempt to identify the reason(s) that On Par, under the ownership and control of James Murray, was able to commit such a large fraud of the District Council Benefits Fund (estimated as $9.1 million - after penalties and interest the amount grows to $16.4 million) over such an extended period of time (estimated to be 1997-2006).

1.2   To understand how such a fraud could have been committed on the District Council Benefits Fund the I.I. looked at not just what James Murray did, but also at what measures the D.C had in place prior to the detection of the fraud and changes made afterwards. The I.I. then examined the investigation into detecting and identifying those involved in the fraud. In making this inquiry, the I.I Office reviewed investigative reports and records, read depositions, reviewed and participated in interviews. The I.I spoke with a number of individuals who participated in the investigation into the On Par fraud. The I.I. found the following facts:

1

## History

2.1     In 1996, James Murray[1] signed up On Par Construction Corp. as a signatory company with the District Council. It appears that sometime after beginning work as a signatory company, Murray decided to increase his business' profit by reducing his manpower costs. He did this by reducing the hourly rate he paid and by eliminating the benefits payments for a number of his workers. To do this, Murray exploited illegal aliens, non-union carpenters and District Council members willing to accept the lower than union wage, along with no benefits payment. For this plan to go forward, Murray needed the cooperation of a number of Shop Stewards. These Shop Stewards had to be willing to falsify their S/S reports by misrepresenting manpower numbers for On Par worksite. At worksites where shop stewards would not cooperate, Murray had workers perform work after regular work hours and on weekends. He furthered this conspiracy by assisting the cooperative Shop Stewards in manipulating the District Council's Out of Work List. He worked together with the cooperative S/S to get them assigned to additional On Par job sites. This was accomplished by Murray timing the request for a dispatch of a S/S to meet the positioning of a cooperating S/S on the OWL. They also conspired by changing the skills needed by a S/S assigned to a On Par jobsite to match the skills of a cooperative S/S on the OWL.

2.2     When Murray first signed with the District Council as a signatory company, the District Council had hired Barry Security Inc. to handle investigations of corruption and job referral violations. B.S.I. operated a Hotline designated for the membership to report corruption committed by or against the membership of the District Council. B.S.I.'s Hotline received a number of calls complaining of wrong doing going on at On Par worksites. These calls alleged that On Par was paying carpenters less than the union wage scale with no benefits. B.S.I. initiated an investigation into the allegations made against On Par.[2]

---

[1] Murray is a citizen of Ireland.
[2] BSI's services were pursuant to a contract with the District Council.

2.3     In May 2001, the District Council received a subpoena from the Manhattan District Attorney's Office, ADA Jane Tully, requesting documents related to a number of companies, including On Par, for a New York State Grand Jury investigation. The D.C. complied with the subpoena. B.S.I. slowed its investigation into On Par assuming that a full criminal investigation was under way by the Manhattan DA office. The Manhattan DA office never indicted or arrested anyone connected to On Par as a result of this Grand Jury investigation.

2.4     In December, 2001, the Benefit Funds, during a routine audit, found irregularities in the On Par payroll and disbursement accounts. Auditors found large sums of money being removed from the disbursement account on a regular basis without any substantiation. Therefore, the conclusion was, workers were being paid off the books with this money. Despite any hard evidence of such off the books payments, On Par paid the sum of $350,000.00 to settle a grievance that was filed. Subsequent audits by the Benefit Funds showed this practice was no longer used by On Par. Later forensic audits found On Par changed its methods to avoid detection by routine audits[3].

2.5     Calls on On Par continued to be received by B.S.I.'s hotline. B.S.I.'s investigation of these allegations included interviewing members, conducting surveillance and doing jobsite visits. Over time, B.S.I. was able to develop a cooperating witness. Using the cooperating witness, B.S.I. identified a business location used by On Par workers to cash their non-union wage checks. B.S.I.'s investigation showed signs of possible criminal activity being committed. B.S.I. turned over this evidence to the New York State Organized Crime Task Force, White Plains, NY (OCTF). Again B.S.I. slowed its investigation on the assumption that the OCTF would conduct a thorough investigation into criminal activity committed by James Murray and employees of On Par. Contrary to B.S.I.'s beliefs, the OCTF only did an initial inquiry into the activities of On Par. The OCTF felt the results were not to the level or type of criminal activity normally

---

[3] See paragraph 2.12 *supra*

investigated by this unit. B.S.I. was never notified of the OCTF decision to drop the investigation[4].

2.6     Thereafter, the District Council formulated a plan to initiate jobsite visits to all On Par jobsites, in the hopes of detecting non-union or unreported workers on site. This operation was named the "Investigative Plan." It required B/M & B/A's to visit On Par work sites to conduct an inspection and verify the manpower working was union and accounted for.

2.7     In 2003, Walter Mack was appointed by the court as the I.I. for the District Council, and continued the operation of the Anti-Corruption hotline. During the transition period, Mr. Barry informed I.I. Mack about the referral of the On Par investigation to OCTF. During Mack's tenure, he reports to have received 61 additional calls to his Corruption Hotline concerning On Par. I.I. Mack initiated an investigation into On Par. I.I. Mack allowed the members of the ACC Committee to participate in only certain parts of this investigation. I.I. Mack kept the rest of his investigation confidential. I.I. Mack issued a number of subpoenas during his investigation to locate bank accounts used by On Par to pay undocumented workers.

2.8     The District Council continued the I.P. plan during I.I. Mack's tenure. Over the next 30 months, numerous jobsite visits were conducted by D.C members and members of I.I. Mack's office, without identifying any wrong doing at any of the On Par worksites.

2.9     The District Council began calling all On Par Shop Stewards in for mandatory meetings with Director of Operations Maurice Leary. At these meetings the S/S were reminded of their obligation to the union to report corruption and wrong doing at the jobsites. They were told to pay extra attention to manpower at the work site and report any after hour work being done. This proved to be fruitless, because a number of the Shop Stewards, who attended these meetings, were involved in the conspiracy with On Par.

---

[4] This was verified through law enforcement sources.

4

2.10   Business agents were told to pay extra attention to any On Par work sites in their Local's area. Jobsite visits were to be done during work hours, after work hours and weekends. Although no evidence has shown Business Agents to be involved in the On Par fraud, reports of routinely scheduled jobsite visits and less than thorough inspections of jobsites were not helpful in deterring the illegal activity from continuing.

2.11   In April, 2005 I.I. Mack subpoenaed James Murray in for a deposition concerning complaints received on On Par. James Murray invoked his 5th amendment rights during the deposition and refused to answer any questions asked by I.I. Mack. I.I. Mack requested the District Council remove all union members from On Par jobsites, because of this action. The D.C. said that they were unable to do so because such action is strictly regulated by the Collective Bargaining Agreement. The only time such action is authorized is when a debit is established in the company's Benefits Funds payments or when the company fails to comply with an arbitration decision. No proof of a deficiency of the Benefits Fund had been proved at that point in time; no identifiable worker had asserted such a claim and no audit subsequent to 2001 had established such a deficiency.

2.12   A short time after, the District Council Benefits Fund attempted a new tact with dealing with suspected fraudulent companies. They notified James Murray that they had hired a forensic audit team to conduct a thorough audit of On Par's wages and benefit obligation. Murray agreed to cooperate with this audit and negotiated a pre-audit payment plan with Counsel from the Funds. He agreed to pay the Benefits Fund the sum of $750,000 in a series of payments on account of whatever the ultimate audit findings would be. Murray made all his payments, while the forensic audit was on going. The forensic auditor's reports determined that On Par used a series of previously undisclosed bank accounts to facilitate the payment of wages to undeclared workers prior to placing monies into the normal ADP benefit payment system employed by the DC Benefits Funds.

2.13   I.I. Mack conducted additional depositions of workers and shop stewards. II Mack referred charges to the D.C. against only members who refused to answer questions during depositions.

2.14   In August 2005, I.I. Callahan was appointed effective 9/1/05. During the transition period, additional depositions were taken by I.I. Mack and I.I. Callahan. In the fall of 2005, at the end of II Mack's tenure, he felt that a criminal investigation of On Par was warranted. He then referred his investigation to the Criminal Division of the U.S Attorney's Office of the Southern District of New York. The AUSA Office requested the FBI (S/A Roy Pollitt) assist in this investigation.

2.15   I.I. Callahan's office continued the investigation into On Par. I.I. Callahan, along with members of the D.C. and agents of the Department of Labor conducted a raid of an On Par jobsite at 69th St and 1st Ave (Sloan Kettering Hospital). This raid resulted in the detection of unreported manpower at the site. The S/S was brought up on charges by the DC. This was the first time an On Par job visit proved to be successful in detecting fraud. I.I. Callahan issued subpoenas for bank records and continued cooperating with law enforcement. I.I. Callahan believed that the investigation being led by the FBI and USAO would eventually bring criminal charges against James Murray, the upper level employees of On Par, along with a number of shop stewards. I.I. Callahan and the members of the District Council ACC Committee began interviewing journeyman union members who had been employed by On Par. The purposes of these interviews were to refer union charges against members who cooperated in the conspiracy.

2.16   On May 24, 2006, James Murray, alone, was indicted by the SDNY on the charges of Structuring, Employee Benefit Plan Embezzlement and Mail Fraud. $30 million in assets were reportedly seized as a result of this indictment. Murray fled to Ireland prior to being arrested.[5]

---

[5] The Justice Department's Forfeiture Division in the Southern District commenced forfeiture proceedings presently pending before Judge Kimba M. Wood, File No. 06 CR 00443.

6

2.17    After seeing the narrow scope of law enforcement's investigation, I.I. Callahan and the D.C. have since broadened their investigation to include upper level employees, Foremen, S/S and Journeymen carpenters. Interviews of members employed by On Par continues. I.I Callahan subpoenaed additional On Par bank records, along with records from general contractors of On Par work sites. The analysis of these records has resulted in providing information and evidence against over 100 union members for participating in the conspiracy or failing to cooperate with the investigation of the On Par fraud. The D.C. has filed internal union charges against all of the individuals subject to its jurisdiction.

2.18    Recently, charges were filed against an additional 6 Shop Stewards and 4 Foremen for their participation in the On Par fraud. This included a shop steward, who previously denied participation in the fraud during a deposition conducted by Mr. Mack. He has since, provided a signed sworn statement detailing his involvement in this fraud during a joint interview with the I.I.'s and D.C. investigators. The I.I. Office has maintained contact with the FBI and the Criminal Division of the USAO. New interest has been shown to share information uncovered for possible future criminal charges being filed against union representatives and employees of On Par. The I.I. Office will continue to cooperate in this investigation.

**Factors Leading to the Fraud**

3.1    The I.I.'s inquiry identified a number of factors, which not only assisted the fraud, but kept it going for an extended time period of time. The executive offices of the District Council must lead the fight against the culture of corruption they inherited from prior administrations. The mindset that a union carpenter, willing to accept cash payments for work, without any fear of being identified and punished for his action must be ended. The union was originally established to ensure members were paid a fair wage for a fair days work. These actions by a few union members tears at the foundation of the brotherhood

and can not be tolerated. The District Council must continue to take measures to prevent recurrence of this type of crime.

3.2    A second factor identified was the membership's indifference to other's actions, because of economic pressure. Most of the On Par jobs meant employment for a long duration. It is believed that carpenters were more concerned about losing a long term steady pay check, than reporting observations of others and/or offers to them of less than proper union wages and benefits. A member must be made to feel that their union obligation is their utmost duty. Any infraction made against the Union or Benefits Fund should be taken as an infraction against their future pension and benefits. A member reporting such infractions should be made to feel they are part of the solution, not a trouble maker or "Rat".

3.3    The third reason is the reluctance of Business Managers and Business Agents in seeing themselves as active members of the District Council Anti-Corruption effort. While no B/M or B/A were found to have participated in the conspiracy to defraud the Benefits Fund, their positions in dealing closely with Shop Stewards and doing jobsite visits, place them in close proximity to where and with whom the conspiracy was carried out. They must be held more accountable for their ineffectiveness at identifying the signs of corruption at the work site and being ready to report it to the I.I. Office. This is not to say that the B/M and B/A's who cooperated with the I.I. or conducted I.P. job site visits were not committed to their tasks, but lack of success in discovering wrong doing must, in some cases, be the result of inadequate training or investigative methods. Without the commitment of all District Council members an effective anti-corruption program can never be accomplished and future attempts to defraud the Benefits Fund will be successful. Any B/M or B/A found to be less then diligent in their duties to route out corruption should be removed from their position.

8

**Combined Actions Taken**

4.1   To prevent a recurrence of the On Par Fraud, the D.C., the Government and the I.I. Office have identified and changed a number of areas that the D.C. OWL was exploited by the membership and the On Par Company, to get cooperative S/S's assigned to their worksites. The changes include:

- Elimination of all immediate dispatches of S/S to jobsites.

- Implementing a 30 day freeze on skill changes before a member can be qualified for a dispatch based on the skill change made to his/her skills listing.

- The certification of S/S skills by a B/A at the local for S/S newly assigned to their area.

- Any S/S dispatched with a skill that requires the proof of a certificate or license must produce said certificate/license for inspected by the B/A at the jobsite.

- Any suspicious skill requests or certifications are referred to the I.I. Office for further investigation.

- A S/S has to wait 48 hours before his/her name is eligible to be dispatched to a jobsite, after placing a self imposed freeze on their being dispatched by the OWL.

4.2   The ACC Committee is aware of many of the factors, as described below, that contributed to the lack of communication between ACC members, the Benefits Funds, and Law Enforcement, which in turn played in the furtherance of the On Par Fraud.

9

- When information is passed on to Law Enforcement for investigation, members of the ACC must maintain communication with that agency.

- The I.I Office must verify that the investigation is being pursued and keep contact with the Law Enforcement agency.

- The I.I and ACC must have a clear understanding what their role will be in the investigation. This must continue until Law Enforcement officially ends their inquiry.

- Also, although some members of the ACC are counsel to the Benefits Funds, it must make sure that the Benefit Funds are notified as to any level of fraud being committed against them. This notification should be made with consideration that the I.I. investigation cannot be compromised, but still allow the Benefits Funds to be able to take whatever action it feels necessary to protect itself against companies or individuals attempting to defraud the funds.

## New Changes by the District Council and the Benefits Fund

5.1     The D.C. and Benefits Funds in coordination with the I.I. Office have made a number of important changes and improvements to the way they do business and the way they react to attempts to defraud the Benefits Funds.

- The D.C has contracted with Standard Data Corporation to design and implement scannable Shop Steward reports to compare that data with Benefit Funds remittances on a real time basis. The D.C. is currently retraining its over 2,500 shop stewards in using these new forms.

- The second change was begun by the Benefits Funds during the On Par investigation. They started the practice of hiring forensic auditors to conduct higher level audits on suspected fraudulent companies. This program has been

10

successful in a number of investigations, in identifying Benefit Funds deficiencies and the recovery of monies owed.

- A third change made by the Benefit Funds was utilizing its legal representation to bring ERISA suits against principals of companies found to be fraudulent in their reported Benefit Funds payments. An ERISA suit brought against On Par and James Murray are presently being litigated in Federal Court in the Southern District of New York[6]. If these suits are successful against On Par, they could lead to the recovery of the full amount of debt owed to the Benefits Funds (estimated at $16.4 million). As reported in paragraph 2.16 supra, the Government has already recovered substantial liquid assets in forfeiture proceedings.

- A fourth change made was to significantly increase the penalties imposed by the D.C. against members found guilty of charges for violating their obligations as UBC members[7]. This new change has already had success as disciplined members facing increased fines, have offered to cooperate with certain investigations.

**New Direction by the District Council and the I.I.'s Office**

6.1     Moreover, the District Council is presently making its most aggressive attempt to rid the membership of its culture of corruption. The D.C. has proposed to its executive board members that any member found guilty of having worked for less than union wages and benefits or assisted in any way in defrauding the benefits fund will lose their retirement medical benefits for life.

---

[6] File No. 06 CV 5643
[7] Disciplinary Guidelines enacted on 8/1/06. See attached Exhibit A.

11

6.2    The I.I. Office has taken a number of significant initiatives to help prevent any reoccurrence of an On Par type fraud:

- The I.I. currently participates in all shop steward classes given at the D.C.'s Labor Technical School. This includes the instruction of all new S/S and the recertification of present S/S. The I.I. takes this opportunity to advise them of their obligation to the union, responsibilities in their position and liabilities for taking part in any wrong doing.

- The I.I. has also made it a priority to work closely with the forensic auditors assigned by the Benefits Funds. The I.I. has assisted the auditors by utilizing subpoena powers to have suspect companies cooperate with the auditor's inquiries.

- The third change the I.I. made was to modify the Investigative Plan. Realizing its failure during the On Par investigation, the I.I. has given specific instructions to all B/M and B/A's on how jobsite visits are to be done. They were instructed on how often and when they are to be carried out. Written reporting requirements have been made mandatory for each job visit. The B/M reports are then compared by members of the I.I. office to Benefit Funds payments made by the companies to find any discrepancies.

- The I.I. has also met with the B/M and B/A from all of the locals to educate them on their responsibilities in the anti-corruption program. The B/M and B/A need to be aware of their important place in this program, they are the ones dealing with the S/S, Foremen and company owners. The first signs of corruption and fraud are usually evident in the paperwork or activities of these individuals. In the future, the I.I will meet on a regular basis with the B/M and B/A's to make sure their vigilance in the anti-corruption program is maintained.

- The I.I. since its inception in September '05, has initiated an unannounced job site visit policy which has shown to be very effective. By appearing unannounced at various sites and times, immediate problems have been corrected and the presence of the I.I. staff has signaled a strong message to the rank and file that the I.I. is concerned about member rights, and shows dedication to fight corruption.

- Since being appointed the I.I. has followed a policy of close liaison with the court, law enforcement agencies and concerned counsel for the District Council while maintaining our independent role. This liaison policy has in our view, been most beneficial for all concerned parties and has helped us to fulfill our mandate more effectively

- Last, the I.I. made a recommendation to the Executive Committee of the D.C. to start a cooperation program for members willing to admit wrong doing. This program allows the member to cooperate with an ACC investigation for possible leniency consideration at their Carpenter Court sentencing. This program was approved by the D.C. delegate body and is presently being utilized by the I.I. and ACC.

## Conclusions

7.1     The Benefits Funds, as the victim of the On Par fraud, expects to recover from the government's forfeiture proceedings against On Par, based on realty assets seized in the New York area, a substantial recovery in the future as the forfeiture proceedings progress. This appears to be a positive step brought about by the Government's vigilant efforts which will inure to the membership as a whole

7.2     Nevertheless, the lessons learned as a result of the overall inquiries into essentially the fraudulent acts of one individual over a long period of time, have been

both a painful experience and an educational one for the Union. The District Council and the Funds Management on behalf of the membership as a whole have clearly shown a fiduciary commitment and dedication to ensure these fraudulent acts do not occur in the future.

7.3     Likewise, the I.I recognizes the necessity of continued vigilance to combat fraud wherever and whenever it appears no matter how nascent it may be.

_____
William P. Callahan
Independent Investigation


cc:  Hon. Charles S. Haight, Jr.
     Michael J. Forde, Executive Secretary Treasurer
     Peter Thomassen, D.C. President
     Denis Sheil, D.C. Vice President
     Benjamin Torrance, AUSA
     Kristin S. Vassallo, AUSA
     Gary Rothman, Esq
     Gary Silverman, Esq

# Executive Committee and Trial Committee Formulate
# Disciplinary Guidelines



After numerous meetings, and detailed and extensive discussions, the District Council Delegate body recently received and acknowledged the following disciplinary guidelines from the Executive Committee and Trial Committee for various infractions and violations of the By-laws and the United Brotherhood of Carpenters Constitution. Faced with situations detrimental to individual members and to the entire union, these guidelines were set to prevent further offenses. These guidelines as listed below will be implemented commencing August 1, 2006.

The intent of these guidelines is primarily to deter wrongdoing and to maintain the integrity of the Out of Work List; not to punish members. All members should realize that any "defrauding" of our Union and Benefit Funds by working for cash denies proper funding to all our medical, vision, hospitalization, prescription, pension, vacation and annuity funds. When these benefit hours are not paid to the appropriate funds, ALL active and retired members and their families are damaged. When there are increases in co-pays, reduction of services or decreases in coverage, it is in part a result of the larceny performed by our own members who agree to cash deals as well, and even those who are aware of these actions but do not report it.

Members who ride the Out of Work List while working damage their fellow brothers and sisters by "cutting the line", so to speak, and denying the rightful member his or her legitimate referral for a work opportunity.

When a member places or keeps his or her name on the list and receives an illegitimate referral, not only is the rightful member victimized of his or her weekly pay but the member is also denied the all-important medical hours, pension, annuity and vacation money. There is also the damage that this behavior causes the victimized brother or sister by virtue of the extended unemployment and resulting distress to the rightful member and the member's family.

Unfortunately, sometimes members find themselves brought up on charges for riding the List, not due to intentional actions, but because, while in the process of being requested by their employer, the member, who properly registered his or her name on the Out of Work List, finds him- or herself at a new job site, where the employer fails to fax in the required request all together, or faxes it in after the member has been registered on the Job Steward sheets and begins working at the new job site.

**THE INTENT OF THESE GUIDELINES IS TO PRIMARILY DETER WRONGDOING, NOT TO PUNISH MEMBERS.**

To avoid this conflict and possible fine, you should ask that your employer fax in the request before your arrival at the new site. Call the Out of Work List yourself to report your presence at this new site and record the time, date, and name of the Out of Work List representative with whom you spoke. Doing this could prevent confusion that may lead to a job referral charge against you.

Unreported jobs are usually indicative of other improper activity: sometimes cash, sometimes non-union workers, many times the imbalance of the 50/50 manning ratio, etc. Unreported jobs deny members awaiting their proper turn on the Out of Work List their rightful dispatch and many times deny our Benefit Funds proper funding due to the fact that there is no shop steward dispatched to record hours and help enforce the 50/50 manning ratio.

For our Union to function properly, for our members to have faith in the system, and to help root out corruption, wrongdoing and improper conduct, the Union must be able to gather proper, truthful, and timely information from those who may have knowledge of certain facts. Many times a member doesn't even realize that he or she has important information that the Union or Anti-Corruption Committee could utilize.

All members, no matter what the circumstances, are required and expected to respond when summoned for an interview. This cannot be overemphasized. Failure to respond after being duly notified via certified mail not once, but twice, leads to the member being charged. Failure to respond to these notices is then grounds for expulsion from the Union. If you are ever summoned for an interview, make sure you respond.

Please take time to read and review the disciplinary guidelines listed below and inform others on your job site of these guidelines. These actions and decisions are all created to protect you, your family and your Union. These have not been decided upon lightly. Significant thought and discussion resulted in the creation of these guidelines.

Again, the District Council takes no pride or pleasure in bringing members up on charges and hopes not to collect such serious fines or enact such heavy punishments; but they need to protect you, your family, and the integrity of our Union. To discipline or clean out the individuals who carry our membership cards while desecrating our great Brotherhood is of paramount importance to the Executive Officers, Executive Committee members, Trial Committee members, and your Local Union Delegates.

Let's all move forward in providing a more honest, fair and genuine Brotherhood for all of our members and our families that depend on us for their livelihood.

### Amnesty Program

✔ The District Council is offering, for a limited time, AMNESTY, to encourage members to come forward and report any occasion when he or she accepted cash or worked for less than the contractual wage or benefit rate or any other activity that may be deemed to be improper. If you report this activity, you will be assured that the District Council will not seek your expulsion from Membership in the UBC.

✔ If you would like to be a part of this program call the telephone number designated for the AMNESTY program at 212.366.7818. Leave sufficient information, such as a telephone number where you can be reached and your UBC number. At this time, you do not have to leave your name. A District Council representative will contact you to schedule an appointment. Meetings can be scheduled before or after work.

# PENALTY GUIDELINES – DETERMINED BY EXECUTIVE COMMITTEE AND TRIAL COMMITTEE TO ADDRESS:

- Members Working On Unreported Jobs
- Members Not Honoring Interview Notices
- Working for Cash (Defrauding/ Lumping)
- Various "Obligation" Violations
- Out of Work List Violations

## ACCEPTING CASH – BY A STEWARD
▲ Conspiring to keep men off sheets  ▲ Performing work for cash him/her self

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $10,000 fine ▲ Lifetime Steward Certification suspension ▲ Must provide full, complete, truthful cooperation with | District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition ▲ Not eligible to be elected or appointed to office | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | Go To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" Expulsion or ▲ $15,000 fine ▲ Lifetime Steward Certification Suspension ▲ Must cooperate with AC/DC | ▲ Not eligible to be elected or appointed to office ▲ Additional fine amount determined by multiplying number of estimated hours by hourly benefit rate (i.e. 100 hrs x $27= $2,700 additional fine) ▲ Must waive vacation portion of any recovered funds |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |

## ACCEPTING CASH – BY A JOURNEYMAN WORKER

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $3,500 fine ▲ Not eligible to be elected or appointed to office ▲ Lifetime UBC Steward Ineligibility | ▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" Expulsion or ▲ $5,000 fine ▲ Not eligible to be elected or appointed to office ▲ Additional fine amount determined by multiplying number of estimated hours | worked by hourly benefit rate ▲ Lifetime UBC Steward Ineligibility ▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition ▲ Must waive vacation portion of any recovered funds |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |

## MISCELLANEOUS STEWARD VIOLATIONS
▲ Not turning in sheets, Non-cooperation with Agent/District Council
▲ Habitual lateness  ▲ Unreported absences, No-show to job site

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $0 – $5,000 fine ▲ 3 Month–Lifetime Steward Certification Suspension | ▲ Additional Mandatory Union Participation ▲ Letter of reprimand ▲ Possible removal from job site | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" Expulsion or ▲ Minimum one year-Lifetime Steward Certfication suspension ▲ $0–$5,000 fine | ▲ Additional Mandatory Union Participation ▲ Not eligible to be elected or appointed to office ▲ Letter of reprimand ▲ Possible removal from job site |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |

## SECTION 15 NYC BY-LAWS (Working while on the out of Work List) & Section 51A(13) (Violating obligation)

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" ▲ Signs waiver ▲ Letter of reprimand ▲ Receives copy of Out of Work List rules | | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | ▲ $100 fine ▲ Letter of reprimand ▲ Receives copy of Job rules | |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" ▲ $250 fine ▲ Letter of reprimand ▲ Receive copy of Job Rules | |
| 5. Fails to show for Trial | Guilty Verdict: ▲ $500 Fine for Stewards ▲ $350 Fine for all other members | ▲ Letter of reprimand ▲ Receives copy of Job Rules |

*UBC Stewards receive 6 month suspension *Members may not take a Steward class for 6 months Second offense – Fines doubled; Third offense – Fines tripled

## ACCEPTING CASH – BY A FOREMAN (DEFRAUDING)
▲ Conspiring to keep men off sheets  ▲ Performing work for cash him/her self, i.e. Acting as an "Orchestrator"

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $10,00 fine ▲ Not eligible to be elected or appointed to office | ▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements and/or deposition | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" Expulsion or ▲ $15,000 fine ▲ Must provide full, complete, truthful cooperation with District Council and/or Anti-Corruption Committee including possible court testimony, written statements | and/or deposition ▲ Not eligible to be elected or appointed to office ▲ Additional fine amount determined by multiplying number of estimated hours by hourly benefit rate ▲ Must waive vacation portion of any recovered funds |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |

## ACCEPTING CASH – BY AN APPRENTICE

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $500 fine – first year ▲ $1,000 fine – second year ▲ $1,500 fine – third year | ▲ $2,000 fine – fourth year ▲ Five additional days of Mandatory Union Participation ▲ Full cooperation with AC/DC | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | Go To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" Expulsion or ▲ $1,000 fine – first year ▲ $2,500 fine – second year ▲ $3,000 fine – third year ▲ $4,000 fine –fourth year ▲ Additional fine amount of hours estimated worked | times benefit hourly contribution ▲ Must waive vacation portion of recovered funds ▲ 10 additional days of Mandatory Union Participation ▲ Third and Fourth year Apprentices not eligible to be a UBC Steward for 10 years after completion of Apprenticeship |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |

## MEMBER/FOREMAN FOUND ON UNREPORTED JOB SITES

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" ▲ $300 fine for Foreman ▲ $150 fine for Workers ▲ Letter of reprimand | ▲ Cooperation with District Council (i.e. Grievance) | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" ▲ $500 Fine for Foreman ▲ $300 Fine for Workers | ▲ Letter of reprimand ▲ Cooperation with District Council (i.e. Grievance) |
| 5. Fails to show for Trial | Guilty Verdict ▲ $1,000 Fine for Foreman ▲ $600 Fine for Workers | ▲ Letter of reprimand ▲ Cooperation with District Council (i.e. Grievance) |

## FAILURE TO SHOW FOR INTERVIEW
▲ SECTION 2-NYC BY-LAWS (protect Member's Interests) ▲ Section 12A-NYC By-laws (Executive Secretary Treasurer Powers) ▲ Section 51A (13) UBC Constitution (Obligation) (Failure to respond to Executive Secretary Treasurer Investigative hearing Notice)

| | | |
|---|---|---|
| 1. Member shows for 1st reading | Pleads "Guilty" Expulsion or ▲ $350 Fine ▲ Cooperation and interview *If accused is a UBC Steward then 1 year suspension is also activated | | Pleads "Not Guilty" To Trial |
| 2. Fails to show for 1st Reading | | To Trial |
| 3. Shows for Trial and pleads "Guilty" | | Same as above |
| 4. Shows for Trial | Pleads "Not Guilty" but Found "Guilty" ▲ $350-$1,500 Fine that can be reduced depending on level of cooperation reported back to Executive Committee from ensuing interview *If member is UBC Steward a 1-5 year suspension of Steward Skill is activated. The length is determined by level of cooperation. | |
| 5. Fails to show for Trial | | Guilty Verdict: Expulsion |