## CONFIDENTIAL

### Simultaneous Submission to Chambers

### <u>MEMORANDUM</u>

| | |
|---|---|
| TO: | William Callahan, Independent Investigator |
| FROM: | Walter Mack, Former Independent Investigator<br>Donald Sobocienski, Chief Investigator for Former Independent Investigator |
| DATE: | October 26, 2005 |
| RE: | Transition Memorandum Regarding Cash Payments by On Par Contracting and Other Contractors |

The purpose of this memorandum is to provide an outline of: (1) the steps we have taken in these investigations and (2) the information we have obtained. I am disappointed that I was unable to complete these investigations during my tenure and I hope that you will pursue them and write a final report for the Court, setting forth your findings.

We began to look into On Par after it seemed to us that the District Council's work pursuant to its Investigative Plan for this company, widely-reputed to be a "cash" company, had not yielded any significant results. It appeared to us that the Investigative Plan was ineffectual in its conception, its execution, or both.[1]

---

[1] We were informed that the Investigative Plan called for all Local Unions to be instructed that all On Par jobs were to be visited by business agents at least twice during the week and once on weekends. Information we obtained from on-site journeymen was that typically the shop stewards seemed to know in advance when a business agent was expected. It seems that business

We received sixty-one Hot Line complaints that: On Par was paying cash to Carpenters being kept off the shop steward reports, that Carpenters were performing unreported weekend and other overtime work, and that On Par had sites at which Carpenters were working without a shop steward. Yet the District Council was unable to make any inroads into exposing On Par's practices. As with the shop steward and other issues about which I have reported, there was nothing that we did as outsiders that could not have been done by the District Council.

We adopted the same investigative format as that used in the Boom and Tri-Built investigations: we looked for and then followed the money.

## I. Our Methodology

Because "cash" Carpenters working for Boom and Tri-Built typically cashed their paychecks in local bars, we identified bars in which Carpenters working for On Par might be doing the same. For the bars so identified, we obtained a court-ordered subpoena for

---

agents tended to perform all of their site visits on the same day and to take the same route each time, so that, even assuming that the shop stewards had no advance warning of visits from the business agents themselves, the predictability of the business agents' visiting pattern gave them the information they needed to hide "cash" Carpenters. Additionally, at least on occasion, business agents were heard telling the foreman on an On Par site what site he was planning to visit next.

Lack of followup was demonstrated when, in April of 2004, Don Sobocienski accompanied Michael Murphy and          to a large job site at New York University which appeared near completion. Two Carpenters whom they interviewed, both of whom subsequently were identified as cash Carpenters, claimed to be working under the International Agreement, which would permit this activity without a shop steward. As of the time our II term was concluded nearly a year and-a-half later, the District Council still had not ascertained whether the International Agreement had, in fact, been invoked. Although the District Council did make written inquiry of the general contractor, they received no response and did not follow up.

the bar's bank statements and items deposited. We then obtained the checks for sample time periods. This enabled us to identify as payors several contractors, whose bank accounts we then subpoenaed; again, via court subpoena.

Initially the banks produced the statements, alone. They have not yet produced all of the checks. Approximately 24,535 of these checks, totaling $19,485,446, were written by On Par on four bank accounts.[2] We obtained approximately 14,000 checks for 762 payees. Of those 762 payees, 218 have so far been identified as Carpenters (by comparing the names to On Par's payroll records). (Forty-eight of the payees were members of a Tapers Union local.) Because of the amounts in which these checks are written (rounded to the dollar or half-dollar and commensurate with weekly payments we would expect "cash" Carpenters to be paid), we assume that most if not all of the checks written on these four accounts were non-payroll checks, primarily to "cash" Carpenters.[3]

By this method we also found several thousand checks written by six other

---

[2] Roughly 11,595 checks, totaling $9,267,678, were identified to an account at Fleet Bank, account number ⬛⬛⬛⬛⬛; roughly 1,540 checks, totaling approximately $1,354,921 were identified to Bank of America, account number ⬛⬛⬛⬛⬛; roughly 4,400 checks totaling approximately $3,138,021 were produced by Wachovia Bank, account number ⬛⬛⬛⬛⬛; and roughly 7,000 checks, totaling $5,724,826, were produced by First Union Bank, account number ⬛⬛⬛⬛⬛

[3] We had testimony from several On Par workers that On Par routinely hired Irish immigrants, many of whom were undocumented. There was testimony that many of these workers used union cards belonging to others. We also obtained testimony showing that cash workers were sometimes given "cash" paychecks in names similar but not identical to their own. The fact that only 218 of the 762 payees have thus far been identified as union Carpenters does not suggest that the remaining payees were not being paid for carpentry work. Approximately half of these 762 payees received five or fewer checks, indicating that they may have left On Par's employment prior to joining the union.

3

contractors, which we discuss in Section V of this memorandum.[4]  But we targeted On

Par first because: (1) we received many more complaints about On Par and (2) On Par

was, by far, the payor of more checks than the other contractors.

(*see* below at V. B.) also generated a significant number

(seven) of Hot Line complaints and close to $14 million in apparent "cash checks" (the

bank production is still not complete).  We provided to the District Council what we had

by way of bank account statements and checks and asked that they follow up on our

preliminary investigative efforts.  We are concerned about whether the District Council

has vigorously pursued this information since my II tenure ended in late August.  They

have refused to communicate with me about the investigation and I do not know if they

have questioned journeymen and shop stewards implicated in this activity.[5]

We then began deposing some of the On Par payees identified as cash Carpenters.

We deposed six journeymen.  We also deposed seven shop stewards who had been

assigned to the job sites at which the journeymen had worked.[6]  Nearly every journeyman

testified that he had worked for On Par for some time prior to becoming a union member.

---

[4]  Those contractors are:

; Pyramid Associates Construction, Inc. of
Maspeth, New York ("Pyramid"); Aurash Construction Corp. of Brooklyn, New York; Pitcohn
Construction Enterprises Inc. of New York City; and Perimeter Interiors, Inc. of Yonkers, New
York.

[5]  Clearly, keeping me current on the investigation would have enabled me to report more
fully to you and the Court.

[6]  We are submitting herewith all of the deposition transcripts.  The deponents' names are
listed in Appendix A hereto.

4

Union membership usually was precipitated by the Carpenter being assigned to one of On Par's bigger jobs, which appear to attract business agent scrutiny more frequently than do the smaller jobs. In many of these cases, the shop steward would insist that the non-union cash workers join the union. However, even after joining the union, these workers usually were still paid cash and would be instructed by the shop stewards to hide when the business agent arrived.

## II. On Par Shop Stewards Michael Mitchell and Michael Brennan

In the cases of shop stewards Michael Mitchell ("Mitchell") and Michael Brennan ("Brennan"), who repeatedly served as On Par shop stewards (as a result, we believe, of manipulation of the OWL in concert with On Par representatives [*see* Transition Report to Independent Investigator William Callahan Regarding Shop Steward Issues ("Shop Steward Report"), Section II]), the shop steward often personally escorted the journeyman to the Local Union to make sure that he joined. Nevertheless, even after joining the union, these workers usually were omitted from the sheets and paid cash, in amounts between $12 and $35 per hour.

Carpenter journeyman whom we deposed identified Mitchell as the shop steward on three of fourteen job sites they identified as On Par job sites at which cash was paid. Brennan was identified as the shop steward on two of these cash sites.[7]

---

[7] District Council records show that since 1998 Mr. Mitchell has served a total of six times as an On Par shop steward and Brennan a total of three times.

5

## A. <u>Mitchell's On Par Job Sites</u>

We have little information about what appear to have been Mitchell's first two

shop steward assignments for On Par.  The District Council has only one shop steward

report for **620 Avenue of the Americas,** (January - September 1998; foreman:

) Mitchell's assignment to **626 Fifth Avenue** (January - July, 1999; foreman

) is confusing because despite the fact that OWL records show him as

"bypassed" (either could not be reached or refused the job) on January 26, 1999, and there

is no dispatch record for him, Mitchell submitted shop steward reports for this job site

starting that same day.[8]

Although Mitchell was dispatched to **3 World Financial Center** on December 15,

2000, the District Council has no shop steward reports for this job and we do not know

when it ended.  Mitchell put his name back on the OWL on January 2, 2001; he was

credited with benefits corresponding to 87 hours of work. (Foreman: unknown.)

Mitchell appears to have obtained the On Par job at **270 Broadway** (May, 2001 -

April, 2002; foreman:                 ) through skills manipulation of the OWL.  (The skills

of asbestos, hazardous materials and protection were among those requested.  On Par

called in the manning request on May 2, for a shop steward on May 3.  Mitchell added the

skill of protection to his skillset on May 2, 2001 and was assigned.  Mitchell held this job

_____

[8] We were unaware of this job at the time we deposed Mitchell, so he was not questioned
about it.

6

for nearly a year. Although Mitchell testified that, to the best of his knowledge, his shop steward reports for this job site were accurate and that On Par never asked him to keep workers off the sheets or otherwise to violate his shop steward obligations, we interviewed two journeymen and deposed another who worked at this site. All of them had been paid cash, two of them at hourly rates as low as $16.

The journeyman we deposed told us that Mitchell insisted that he join the union and escorted him personally to Local 608 to accomplish this. As this witness suspected, even after joining the union he was omitted from Mitchell's shop steward reports and paid $16 an hour. One of the Carpenters we interviewed told us that Carpenters routinely worked from 7:00 a.m. until 5:30 p.m., and that Mitchell was not present either first thing in the morning or at the end of the work day. This Carpenter told us that Mitchell rarely walked the site. This Carpenter also told us that he does not recall ever having seen a business agent on the site.

Before very long Mitchell had another shop steward assignment to an On Par site: **1745 Broadway (at 55th Street)** (June - December, 2002; foreman:          ). Again, the paperwork suggests that this assignment, too, was rigged. There were six skills requested on the manning request, including: finish woodwork, drywall ceiling and drywall. Mitchell, who entered a "hold calls" directive on June 5, released that directive on June 25 and was assigned to this job site on June 26 on an immediate dispatch basis.

Again, Mitchell testified that his shop steward reports for this site were accurate to

7

the best of his knowledge and that On Par had not asked him to omit names from his reports or otherwise to violate his union obligations as shop steward. However, three Carpenters testified that although Mitchell carded them, he omitted them from the shop steward reports and they were paid cash in amounts between $16 and $26 per hour. One Carpenter, who worked on the site for fourteen or fifteen months, testified that he was paid properly on this site only one time; that was when business agents checked the site one Saturday.[9]

Mitchell was again dispatched as a shop steward for an On Par site in May of 2003 when he was sent, again on an immediate dispatch basis, to **602 Washington Street (Morton Square).** This job lasted approximately one and a-half years (May, 2003-November of 2004; foreman          ). Not only was this an immediate dispatch, but the number of skills requested (six), including the unusual one of "firestop," again suggesting that Mitchell and On Par had colluded to obtain this result. Additionally, the immediate dispatch was called in the day after another shop steward,          had been dispatched to the job but immediately terminated, ostensibly because On Par had been unhappy with his performance at a previous job site.          whom we interviewed, claimed that he was laid off from the previous On Par job site because he complained to the foreman about being asked to do work which should have been

_____

[9] Two of these three Carpenters testified that the shop steward assigned to this site before Mitchell, identified by one Carpenter as          also kept them off the sheets although he carded at least one of them.

performed by apprentices.)[10]

Again, Mitchell testified that he believed his shop steward reports to be accurate and that On Par had not asked him to omit names from the sheets or to otherwise violate his shop steward obligations. Yet two Carpenters testified that they worked on this job and were left off the sheets and paid "cash checks" despite the fact that Mitchell carded them.

### B. Michael Brennan

In contrast to Mitchell, Brennan invoked his Fifth Amendment privilege against self-incrimination when asked whether he had kept Carpenters off the sheets or whether anyone asked him to violate his union obligations while he served as shop steward at the following three On Par sites.

There is nothing to suggest that Brennan's first assignment to On Par, **18 Leonard Street** (April - July, 2000; foreman:               ), was engineered. Yet, based on Brennan's invocation of the Fifth Amendment in response to questions about the site, it appears that On Par found in Brennan a shop steward who would cooperate with them.

Brennan's next shop steward dispatch to an On Par job site, **130 West 34th Street (Loew's Cinema** at the bottom of an apartment building) followed shortly; again, the

---

[10]            told us that initially business agent              told him to remain on the site. However, once            arrived at the site, he told            that there was nothing he could do to affect the situation and that grieving it would be fruitless because a new shop steward was already in place.            abided by this advice and simply put his name back on the OWL.

foreman was        The job lasted nearly a year. (September, 2000- August, 2001.) OWL manipulation is suggested by the fact that several skills were listed on the dispatch request, thereby narrowing the pool of eligible shop stewards, and the unusual skills of CPR and welding were included. As discussed in our Shop Steward report, no welding was required on this job.

We deposed one of the Carpenters at this site and he told us that he and two other Irish immigrants working at this site lacked union cards and that Brennan took them, plus a worker from another site, to Local 608 so that they could join the union. (The foreman provided the funds for this purpose.) However, even once he was a union member, this Carpenter continued to be omitted from Brennan's shop steward reports and was paid an hourly rate of between $14 and $16.

Within two or three months Brennan obtained his next shop steward dispatch to an On Par site: **1 Times Square and 7 Times Square (Times Square Tower)**. This job lasted nearly three years (October, 2001- July, 2004; foremen:        and Declan Daly). Again, numerous skills were listed, including hollow metal store fronts and welding. Not only was Brennan dispatched on an immediate basis, but the initial manning request, on October 18, was withdrawn after Brennan somehow missed the call from the OWL, resulting in another shop steward, George Kadafer, being dispatched. However, Mr. Kadafer was contacted as he was en route to the job site and told that the dispatch had been cancelled. A new manning request was telefaxed to the

OWL on October 22 and this time Brennan received the phone call and was dispatched.

Six Carpenters who worked on this job were either deposed or interviewed. Five told us that they were paid by "cash check," at rates of between $18 and $32 per hour.[11] The sixth told us that he was aware, from talking to co-workers, that others were being kept off the shop steward reports. One deponent testified to having heard Brennan say that foreman            needed to authorize more men to be listed on the sheets because too few Carpenters were being reported for a job of this size. This Carpenter also testified that Brennan would walk the job site in advance of visits from business agent

            to make sure that everyone had a proper union card. Another Carpenter testified that he worked on this site for three or four weeks and the only time he was paid a union wage was for one Saturday, when a business agent visited the site and carded him. He also testified that Brennan spent most of his time in the shanty.

### III. Other On Par Shop Stewards and Job Sites

**Pershing Venzen** is a shop steward whom we deposed in the context of our Tri-Built investigation. He also was the shop steward at two On Par sites: **2006-2016 Madison Avenue** (June, 2003 - ?; foreman:            ), where, as he admitted, he omitted from his shop steward reports the names of two or three Carpenters for approximately six weeks in exchange for $200 per week, per man; and **711 Third**

---

[11] One of these Carpenters, Declan Daly, who also served as a foreman during part of his sixteen or seventeen month tenure on this job site, testified that he was paid properly except for Saturday and other overtime work, when he was paid by "cash" checks at the hourly rate of $32.

**Avenue** (May, 1999; foreman:           ), where he performed the same corrupt service for approximately three weeks at the rate of $100 per man, per week.

We deposed                          who was the shop steward for On Par at **51ˢᵗ Street and First Avenue** (November, 2000 - January, 2002; foreman:           ), who denied that he had kept Carpenters off the sheets (contrary to the testimony from a journeyman who worked under him at this job site) except with respect to Carpenters who unloaded delivery trucks, a practice which he claimed is common among shop stewards. He also admitted that he left work early on Fridays and that he did not work on Saturdays and did not report the fact that work was performed on Saturdays. He also admitted having taken a week's paid vacation without advising a business agent that he would be absent.

We deposed           . the shop steward at **350 Madison Avenue** (November, 1999 - October, 2000; foreman:           ), who denied having kept journeymen off the shop steward reports.           testified that the interior work at this job site was being performed by On Par for another general contractor and that he therefore was not responsible for certain of the Carpenters working at this site. This testimony, however, is undercut by the testimony of a Carpenter who had been paid cash for the six months he worked at the site. This Carpenter told us not only that he had been carded by a shop steward named       whom we believe to be       (the Carpenter told us that       was from       where we know that       lives) and that       had instructed him to

12

hide when a business agent made a site visit.  Additionally,          admitted that On Par

paid him for a significant amount of overtime work even though he had not been present

when overtime work was performed.

Shop Steward **Michael Vivenzio** was assigned to the On Par site at **205 West 45th**

**Street** (August, 2002 - August, 2003; foremen:

          ).  Mr. Vivenzio testified that work on this site was well underway when he

arrived but that he never ascertained how or why this was the case.  He denied having

deliberately left Carpenters off his shop steward reports and said that if his reports were

incomplete, it was because some Carpenters worked on the site after he had left for the

day or because he had been unaware of their presence.  This testimony is put into question

by the testimony of a Carpenter who testified that he had worked on the site for one or

two months for cash, that Carpenters at this site worked ten-hour days, that the shop

steward was not regularly on the site, and that he believed that the steward's name was

"Mikey," and possibly "Mikey V."

Although we did not depose other On Par shop stewards, we obtained information

about the following.

We obtained testimony from          the foreman at the job at **63 Wall**

**Street** for which **Brian Carson** was shop steward.  (October, 2003 - December, 2004).

          , who testified in a manner we found evasive, admitted that the shop steward

reports at this job site had been incomplete.  While he was non-committal in answers

13

about whether Mr. Carson was always present on the job site, he conceded that Mr.

Carson's production decreased as the job progressed.  We also either deposed or

interviewed five Carpenter journeymen who told us that they had been omitted from the

shop steward reports and paid in cash for work at this site in amounts between $15 and

$24 per hour.  These Carpenters testified that they had interacted with the shop steward.

One of them said that he never saw a business agent on the site in the six months he

worked there.  Another, who worked at the site for eight or nine months, testified that he

saw a business agent on the site only once, when he was working on a Saturday.

            was the second shop steward at On Par's **90 Washington**

**Street** job site (July, 2003 - December, 2003; foreman:          ).  Two

Carpenters told us that they had been paid cash for their work on this job.  At least one of

them was carded by the shop steward.  Further investigation would be required to verify

that          was the shop steward during the times that the two Carpenters

worked at this site.[12]

            was the shop steward at **35 West 33rd Street** (January - October,

2003; foreman          ).  Three journeymen whom we deposed or interviewed told

us that they were paid cash on this job.  They all testified that shop steward

left them off his shop steward reports either all or part of the time, so that they often were

---

[12] The identity of these Carpenters, and all the others whose testimony and statements are characterized in this report, are apparent on reading the deposition transcripts and interview memoranda, which are all being provided to you under separate cover.

given "cash checks." Two of them testified to having been carded by          One of

the deponents testified that he never saw          wearing his tools or performing any

work. He also testified that          was not present in the shanty every morning .

One Carpenter whom we interviewed told us that he worked at this site for seven

or eight weeks just as the job was beginning, when only one other Carpenter, and no shop

steward was assigned to the job. He was paid in cash until the shop steward for another

company on the job site told him to demand proper union wages and benefits from On

Par. He followed this directive and was then paid properly on an intermittent basis.

When "cash check" payments resumed, this Carpenter telephoned the On Par office to

complain and was told by the woman who answered the telephone that he could "either

take it or leave it."

                    was the shop steward at **43 West 64ᵗʰ Street** (January - October,

2003; foreman:          ).  A Carpenter whom we deposed testified that he

worked at this job site for six months, beginning when the job did in January of 2003.

This Carpenter identified          as the shop steward, whom he saw on a daily

basis and was carded by quarterly. He was paid "cash checks" in amounts reflecting an

hourly pay rate of $16 to $18.

                    was the shop steward at **150 East 50ᵗʰ Street** (San Carlos Hotel)

(March, 2002 - January, 2003; foreman:          ).  We deposed one Carpenter who

worked at this site and interviewed another. The deponent testified that he worked at this

15

site for three to six months and that he had numerous conversations with          the

shop steward. He was paid in "cash checks" reflecting an hourly rate of between $12 and

$14 per hour. The Carpenter we interviewed told us that          was so incompetent as a

Carpenter that he posed a physical danger to workers on the site. This Carpenter told us

that on the occasion of a business agent's visit to the site, he told the business agent that it

was only his first day on the job. For a couple of weeks following this, the Carpenter was

paid proper union wages and benefits for at least some of the hours that he worked.

**John Stamberger** was the shop steward at On Par's **NYU jobsite at 89 West 4th**

**Street** (November, 2002 - July, 2003; foreman: Sean Flynn). A Carpenter testified that

he worked at this site for approximately six weeks. He was carded by the shop steward,

named John, and paid properly for the first three weeks. After that, he was paid cash. He

believes that when he was laid off in the middle of the day, this occurred because a

business agent visit was expected.

          was the shop steward at **Interfaith Hospital, Brooklyn** (August, 1999

- September 2002; foremen:                                        ). A Carpenter whom

we deposed testified that he had worked at this site for approximately three months at the

end of 2000, along with fifteen to twenty other Carpenters. He was paid cash and did not

recall whether there was a shop steward on the site.

**IV.**

is a signatory contractor about whom the District
Council had  substantial allegations of CBA violations prior to my appointment as
Independent Investigator.  During my tenure, I received a number of Hot Line complaints
about                              , the most significant of which came from an anonymous
caller who reported to Don Sobocienski, my Chief Investigator, that he and other
Carpenters were receiving non-payroll checks from                              for
overtime work.  After some encouragement, the caller agreed to provide  the name of the
bank and the account number on which these checks were drawn.

Pursuant to court-ordered subpoena, HSBC produced bank records for an account
that                         opened in January, 2005.  An analysis of the cancelled
checks reflected nearly regular weekly checks in amounts rounded to the dollar, made
payable to union Carpenters who had a long history of employment with
            .  Mr. Sobocienski provided these findings, together with suggestions for further
investigation, in a memorandum to the District Council Director of Operations, Maurice
Leary.

The District Council conducted interviews of several union members who had
received checks.  Each of the                         employees whom the District
Council interviewed gave one of the following reasons for having received these checks:
reimbursement for the purchase of materials needed on a job site; reimbursement for

17

travel expenses; personal loans to the payee; payment for construction work performed at the company's offices; payment for estimating work performed; or bonuses.   None had any records to support these purported explanations.

Pursuant to a court-ordered subpoena,                    owner,

, appeared before me and produced records which included the HSBC statements and approximately 200 cancelled checks totaling over $310,000 for the period January through June, 2005.   However, on the advice of counsel, apart from identifying the bank documents,            invoked his Fifth Amendment privilege as to all my questions. And he produced no records to substantiate the explanations offered by

"company" Carpenters whom the District Council interviewed for the "cash checks" they had received.

In an effort to identify                    "cash" accounts pre-dating the HSBC account (which was not opened until January of this year), Mr. Sobocienski reviewed the cancelled HSBC checks for endorsements and identifying bank account information.   He then compared that to            payroll checks issues since 2001 and found that the following three employees deposited both legitimate payroll checks and "cash checks" in the same bank accounts:            (Independence Community Bank, account numbers            );            (Independence Community Bank, account number            ) and            (JP Morgan/Chase account number            ).

18

A review of these accounts and their deposit items should enable you to identify "cash" accounts used by ████████████████ prior to 2005.  Therefore, it is my strong recommendation that you apply to the Court for so-ordered subpoenas for these accounts so that you can obtain the deposit items.  Since those deposit items should identify additional cash accounts used by ████████████████ you will then be able to subpoena those accounts and identify additional Carpenter payees.  Then the same methodology we used for Boom, Tri-Built and On Par can be employed.  I believe that this methodology will give you results similar to those we obtained.

## V.  Other Companies For Which We Found Cash Accounts

A. ████████████████ **Yonkers, NY** - The owners of this company, ████████ ████████████████ , are, respectively, a former project manager and foreman for On Par.  When we sought to depose them with respect to On Par, they asserted their Fifth Amendment privilege against self-incrimination.  With respect to ████████████ again asserted the Fifth Amendment; ████████ did not appear.

We obtained approximately 643 checks, totaling $469,836 from an ████████████ checking account that appears to have been dedicated exclusively to cash payroll.  The account, number ████████ , is with Astoria Federal Savings.  The checks cover the six-month period from October, 2004 to April, 2005.

B. ████████████████ **New York, NY** - ████████████████ owner, declined to produce documents pertaining to either of the two accounts we found for this

company, citing his Fifth Amendment privilege.  We have approximately 1520 checks, totaling $13,579, 214, from Citibank account number ▮▮▮▮▮ spanning the one-year period January, 2002 to January 2003.   We have an incomplete production from North Fork Bank, covering the period September, 2004 to May, 2005.

      C. **Pyramid Associates Construction, Inc., Maspeth, NY** - We located three bank accounts for this company: Bank of New York account number ▮▮▮▮▮ for the period February, 2002 to August, 2003 (approximately 1767 checks totaling $2,113,705); Commerce Bank account ▮▮▮▮▮ for the period December, 2004 to May, 2005 (approximately 661 checks totaling $1,010,617).  We received no production from Green Point Bank with respect to ▮▮▮ account number ▮▮▮▮▮

      D. **Aurash Construction Corp., Brooklyn, NY** - We identified two bank accounts: HSBC account number ▮▮▮▮▮ covering January, 2002 to January, 2003 (approximately 1375 checks totaling $957,870); and North Fork Savings Bank, account number ▮▮▮▮▮ as to which we have received no production.

      E. **Pitcohn Construction Enterprises, Inc. New York, NY** - We identified four bank accounts: Commerce Bank account number ▮▮▮▮▮ (December, 2003 to January, 2005; approximately 1306 checks totaling $3,246,482); M & T Bank account number ▮▮▮▮▮ (December, 2001 to March, 2004; approximately 1148 checks totaling $2,179,321); HSBC account number ▮▮▮▮▮ (December, 2001 to March, 2003; approximately 905 checks totaling 1,138,352); North Fork Savings Bank account

number ▭ (December, 2004 to January, 2005; approximately 319 checks totaling $1,118,583).

   F. **Perimeter Interiors, Inc., Yonkers, NY** - We identified Country Bank account number ▭ (November, 2003 to August 2004; approximately 6556 checks totaling $1,296,994).

   We found an account for what appears to be a related company, ▭ ▭. The account is in the name of ▭ and is at Country Bank with the account number ▭ the period covered is September, 2003 to June, 2004. There are approximately 7,000 checks totaling $5,724,826. ▭ is not a District Council signatory but may well be the "double-breasted" counterpart to Perimeter. ▭ ▭ President of Perimeter Interiors and ▭, President of ▭ ▭ live at the same address (according to their drivers' licences), which is also the address for ▭. Additionally, in or about October of 2004, Perimeter stopped using its Country Bank cash account except to write checks to ▭ and ▭. The checks written to ▭ were deposited into that company's cash account at Country Bank. And at least two of the Perimeter checks made payable to ▭ were signed by ▭ rather than ▭ Furthermore, a large number of the Perimeter payees were also payees of ▭ ▭ cash account.

*      *      *

21

I am sorry that I was unable to complete these investigations and I hope that you will undertake them so as to provide the Court with an accurate description of the widespread wrongdoing demonstrated by the evidence obtained thus far. If I may be of assistance to you or the Court, please do not hesitate to call upon me.

# APPENDIX:
# LIST OF DEPOSITIONS AND INTERVIEWS

| Exhibit No. | Description |
|---|---|
| 1. | Transcript of       deposition |
| 2. | Transcript of Michael Brennan deposition |
| 3. | Memorandum of       Interview |
| 4. | Transcript of       deposition |
| 5. | Transcript of Brian Carson deposition |
| 6. | Transcripts of       depositions<br>A.    September 27, 2005<br>B.    October 6, 2005 |
| 7. | Transcript of       deposition |
| 8. | Transcript of       deposition |
| 9. | Transcript of       deposition |
| 10. | Transcript of       deposition |
| 11. | Memorandum of       Interview |
| 12. | Transcripts of       depositions<br>A.    August 2, 2004<br>B.    September 14, 2005 |
| 13. | Transcript of Jim Murray deposition |
| 14. | Memorandum of       Interview |
| 15. | Transcript of       deposition |
| 16. | Transcript of       deposition |
| 17. | Transcript of       deposition |

i

18.                Transcript of             deposition

19.                Transcript of             deposition

20.                Transcript of Michael Vivenzio deposition

21.                Memorandum of             Interview

22.                Letter from             , Esq. to Walter Mack dated
October 4, 2005

23.                Transcript of             , owner of       , deposition

24.                Transcripts of             , owner of             , depositions
                                A.         June 28, 2005
                                B.         August 2, 2005

25.                Transcript of             , co-owner of       , deposition