USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: __________
DATE FILED: 5/8/13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X

UNITED STATES OF AMERICA, :

Plaintiff, :

-against- :

DISTRICT COUNCIL OF NEW YORK CITY and VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS and JOINERS OF AMERICA, et al., :

Defendants. :

---------------------------------------------------------X

90 Civ. 5722 (RMB)

**DECISION & ORDER**

Having reviewed the record herein, including, without limitation, **(i)** the Consent Decree, entered into by the Government and the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council" or the "Union"), and approved by United States District Judge Charles S. Haight Jr. on March 4, 1994, (Consent Decree §§ 2(a), (b), 5); **(ii)** the May 26, 2009 Order in which Judge Haight determined that "[t]he percentage of the total carpenter workforce on a job site selected by a contractor shall not exceed 67%" with "[t]he remaining 33% of the total carpenter workforce on a jobsite . . . assigned by the District Council from the Out of Work List," (Final Order and Judgment of Contempt and Remedy, filed May 27, 2009 ("2009 Order"), at 3(b)(iv), (v)); **(iii)** the Fourth Interim Report of Review Officer Dennis M. Walsh, Esq. ("Review Officer," "RO," or "Walsh"), dated June 4, 2012, stating, among other things, that "[t]he employers and the District Council members need [collective bargaining] agreements to be settled as soon as possible" and that "[s]tability in the industry and comity in the relations between the Union and the employers must be restored to best serve the urgent need to increase Union market share and man hours, bringing much needed income to the Benefit Funds," (Fourth Interim Report, dated June 4, 2012 ("Fourth Interim

Report"), at 10); **(iv)** the (undated) agreement between the New York City District Council of Carpenters and the Association of Wall-Ceiling and Carpentry Industries of New York, Inc. ("WC&C" or "Employers") and the Addendum with Respect to Compliance Issues (hereinafter "MOU") which was approved by the District Council's Executive Committee and its Delegate Body on August 22, 2012 and which eliminated hiring ratios to achieve what is referred to as "Full Mobility." "The remainder of the carpenters shall be selected by the Employer." (MOU at 2, MOU Addendum at 1); **(v)** the September 12, 2012 Opinion & Order of the Court dismissing the April 28, 2012 application of Veronica Sessions for, among other things, "'intervention' as to . . . a proposed 'full mobility' amendment to the collective bargaining agreement entered into on July 1, 2006 between the District Council and the [WC&C]." Sessions "made no showing that she has standing to litigate under the Consent Decree." (Opinion & Order, dated September 12, 2012 (September 12, 2012 Opinion) at 3); **(vi)** the Fifth Interim Report of the Review Officer ("Fifth Interim Report"), dated December 3, 2012, stating, among other things, that "in exchange for significant wage increases, the employers and the District Council must develop an appropriate compliance program and obtain an order from the Court to alter the current hiring ratio ('67-33') to allow employers to select [all of] the District Council members who will work for them" and that in accordance with the terms of the MOU "[t]he District Council has retained a vendor . . . to develop an electronic time entry program" which will represent "a great leap forward in the fight against fraud and will render the flawed paper steward report system obsolete," (Fifth Interim Report, dated December 3, 2012, at 8, 9); **(vii)** the hearing held on December 19, 2012 at which the RO stated, among other things, that "[t]he benchmark agreement [referring to the MOU] between the district council and the wall-ceiling association is, I believe, very close to implementation," (Hr'g Tr., dated December 19, 2012 ("12/19/12 Tr."),

at 2:12–15); **(viii)** the District Council's February 13, 2013 letter to the Court stating that "[t]he District Council is seeking the Court's approval of [a] new arrangement . . . referred to by the District Council and the WC&C as 'full mobility'[which] will allow WC&C contractors to employ all of their carpenters . . . by hiring them directly without having to use the District Council's job referral rules through the out of work list (the 'OWL')," and set forth "four quite different yet complimentary methods that will be utilized to insure compliance with the [collective bargaining agreement ('CBA')]" and "prevent corruption," (Letter from James M. Murphy, Esq. to Hon. Richard M. Berman, dated Feb. 13, 2013 ("DC Feb. 13 Let."), at 1, 2); **(ix)** the District Council's February 26, 2013 letter enclosing "a copy of the [draft] collective bargaining agreement ('CBA') between the District Council and the [WC&C] with a term of July 1, 2011 through June 30, 2016," including "full mobility in hiring and . . . compliance . . . and anti-corruption provisions," (Letter from James M. Murphy, Esq. to Hon. Richard M. Berman, filed Feb. 27, 2013 ("DC Feb. 26 Let."), at 1, 2); **(x)** the hearing held on February 27, 2013 at which the Court reviewed full mobility issues and the technological implementation of the anti-corruption procedures in the MOU. "It strikes me that with respect to the implementation of this new collective bargaining agreement, what you all are proposing is a companion technology that goes towards implementation. And I think that's pretty much up to you." (Hr'g Tr., dated Feb. 27, 2013 ("2/2/13 Tr."), at 3:6–9);[1] **(xi)** the March 12, 2013 CBA (which incorporated and superseded the MOU, which had been ratified by the Delegate Body on August 22, 2012), between the District Council and the WC&C, with a term of July 1, 2011 through June 30, 2016, which replaced the collective bargaining agreement which had expired by its terms on June 30,

---

[1] The Court heard from the District Council, the RO, and rank and file members of the Union and invited further written comment on the draft CBA provisions for "full mobility" and corruption prevention. Id. at 106:23

2011, (See Letter from Murphy to Hon. Richard M. Berman, dated Mar. 13, 2013, at 1); **(xii)** the March 19, 2013 letter of the Review Officer noting "important advantages" of the CBA, including an "increase in the wage and benefit package," and stating that full mobility does not conflict with the objectives of a "democratically run and corruption free" union. The RO anticipated that "the electronic time entry technology, including its member oversight component, [will] significantly enhance anti-corruption efforts," (Letter from Walsh to Hon. Richard M. Berman, dated March 19, 2013 ("RO Mar. Let."), at 1, 4; 12/19/12 Tr. at 2:11–16 (MR. WALSH: "The benchmark agreement between the district council and the wall-ceiling association is, I believe, very close to implementation. And that, of course, is with the court's consent.")); **(xiii)** the Court's April 11, 2013 Order directing the District Council "as a matter of 'best practices,' to seek ratification of the complete Collective Bargaining Agreement, dated March 12, 2013," including full mobility and technological anti-corruption mechanisms; **(xiv)** the District Council's April 26, 2013 letter stating "last night at a regularly scheduled meeting, the District Council's Delegate Body voted to ratify the [March 12, 2013] fully executed collective bargaining agreement ('CBA') between the District Council and the [WC&C]," (Letter from Murphy to Hon. Richard M. Berman, dated April 25, 2013 ("April DC Letter"), at 1); **(xv)** many other helpful and informative letters and applications submitted by rank and file members, the District Council, and the RO commenting on full mobility (both "pro" and "con") and the CBA; and applicable legal authorities, **the Court hereby grants the District Council's application and approves the CBA and its provisions regarding full mobility and anti-corruption mechanisms for the reasons that follow:**

    1)      As noted above, in addition to the submissions of the District Council and the RO, several individual union members have submitted petitions and/or letters, regarding full mobility

and corruption prevention, among other issues.  (See, e.g., Letter from Demian Schroeder to Hon. Richard M. Berman, dated Apr. 11, 2013, at 5 ("We respectfully request that Your Honor refuse to sign the WC&C CBA until a complete and final draft has been presented to the Membership or at the very least the Delegate Body for vote."); Letter from Daniel J. Franco to Hon. Richard M. Berman, dated Mar. 19, 2013, at 7–8 ("I petition you . . . to deny the acceptance and implementation of 'Full Mobility' in any agreement with the NYCDCC and/or affiliated organizations until at least June 30, 2016."); Letter from Jarrett Weinrich to Hon. Richard M. Berman, filed Mar. 5, 2013, at 1 ("I believe the Wall and Ceiling [contract] that is before you should be approved.").)  The Court has reviewed all submissions in the context of the District Council's application, dated February 13, 2013.  Individual rank and file members, whose opinions are often valuable but who are not parties to the CBA, do not appear to have "standing" to litigate this proceeding regarding the CBA.  (See, e.g., Notice of Motion of Demian Schroeder for Intervention of Limited Standing, dated Mar. 11, 2013; see also infra p. 11; see also Opinion & Order, dated September 12 2012, at 2 ("Preliminarily, Ms. Session's application is dismissed . . . because she has made no showing that she has standing to litigate under the Consent Decree."); United States v. Dist. Council of New York City, No. 90 Civ. 5722, 2012 WL 3822963, at *1 (S.D.N.Y. Aug. 27, 2012) ("[Movant] is not a party to this case and appears to have no standing under the Consent Decree."); FW/PBS v. City of Dallas, 493 U.S. 215, 231, 110 S. Ct. 596, 608 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.") (citations omitted).)

  2) The CBA, including its full mobility and the anti-corruption compliance provisions, was duly approved and ratified by the District Council on April 25, 2013.  (See DC Apr. Let. at

5

1.) It was initially approved as the MOU by the Delegate Body on August 22, 2012. (RO Mar. Let. at 1 ("On August 22, 2012 the delegate body of the District Council, by a vote of 60-26, approved [the MOU containing] terms amending in significant respects the [existing] collective bargaining agreement with the WC&C.") (citation omitted).)[2]

The District Council and the RO have argued persuasively that the (new) CBA is advantageous for both the carpenters in the Union and the contractors in the WC&C. First, they point out that the District Council members will, as a result of negotiation, receive a wage/benefit increase and the WC&C will achieve full mobility. (DC Feb. 13 Let. at 2.) And, at the December 19, 2012 hearing, the RO stated that "the contractors want the benefit of [full] mobility" and the carpenters want the raise. (12/19/12 Tr. at 5:14–16.) "[B]y the end of year five [of the CBA] the hourly package paid to the district council carpenter will exceed $99 per hour." Id. at 6:22–23. Second, the CBA includes four "anti-corruption compliance features," (DC Mar. Let. at 4.), including an "electronic time entry program" which the RO has referred to as "a great leap forward in the fight against fraud [which] will render the flawed paper steward report system obsolete." (Fifth Interim Report at 9). Third, the Union has been without a collective bargaining agreement with the WC&C since the former collective bargaining agreement between the District Council and the WC&C expired on June 30, 2011. The RO contends that "[s]tability in the industry and comity in the relations between the Union and the employers must be restored to best serve the urgent need to increase Union market share and man hours, bringing much needed income to the Benefit Funds." (Fourth Interim Report at 10.) Fourth, the electronic time entry program will give members greater and more rapid access to

---

[2] The RO notes that "there is no provision in the Consent Decree, District Council Bylaws, or otherwise, that requires a collective bargaining to be put to a direct vote by the rank and file." (RO Mar. Let. at 2.)

documentation of the hours worked by them (and every carpenter) on their jobs. (2/27/13 Tr. at 11:10–15 (MR. MURPHY: "[R]ank and file members would be able to go on and check any job that they been on, which . . . will allow them not only to see themselves and their own hours, but [to also] see the other carpenters working on [the] job and their hours.").)

Rather than approve the draft CBA filed on February 27, 2013, the Court, on April 11, 2013, directed the District Council "as a matter of 'best practices,' to seek ratification of the completed Collective Bargaining Agreement, dated March 12, 2013." (April 11, 2003 Order at 1.) The District Council Delegates, as noted, approved the complete CBA on April 25, 2013 by a "roll call vote of 48 in favor and 34 against." (Apr. DC Let. at 1.) "Union ratification is generally considered to be 'the last act necessary . . . to create a meeting of the minds and an enforceable agreement.'" Mack Trucks, Inc. v. Int'l Union, UAW, 856 F.2d 579, 592 (3d Cir. 1988) (quoting NLRB v. Deauville Hotel, 751 F.2d 1562, 1569 n.10 (11th Cir. 1985)); see also American Federation of Television and Radio Artists, AFL-CIO, New York v. Inner City Broadcasting Corp., 748 F.2d 884, 887 (2d Cir. 1984) ("When the parties have agreed on the substantive terms of a contract . . . they can . . . be held to its terms.").

3) The CBA, including its full mobility and anti-corruption provisions, has also been approved by Assistant United States Attorney Benjamin H. Torrance, Esq. ("Torrance") and the Review Officer. (See September 12, 2012 Opinion & Order at 3 ("The RO has advised that [full mobility] cannot be implemented without approval of the Review Officer, the United State's Attorney's Office and, ultimately, the Court.") (citation omitted).) The RO, having been "satisfied that the corruption risk is being addressed," stated that "I recommend to the Court that an order be entered that will allow implementation of full mobility and compliance programs

. . . ." (RO Mar. Let. at 4.) The RO also stated that "[t]he Consent Decree is not violated by full mobility, as the decree does not require hiring ratios." (RO Mar. Let. at 4.)

The Government, through Mr. Torrance, has been involved in all discussions regarding the new CBA—including assisting the parties in clarifying ambiguities in the language of the draft CBA—and has "reviewed and approved" full mobility and the compliance (technology) procedures in the CBA to protect against corruption. (DC Feb. 13 Let. at 1; 12/19/12 Tr. at 3:18–19 (MR.WALSH: "We received a very detailed presentation [on the electronic entry of hours]—and when I say 'we' I mean the union and the government, Mr. Torrance was at the union on the day the presentation was given—from the vendor that's being used to develop the software.") Torrance explained that in the past the hiring ratio was a "corruption issue" because it involved "workers . . . working off the books for cash" and "kickback[s]" paid to "corrupt union leadership." (2/27/13 Tr. at 19:6–20.) He has agreed that the anti-corruption provisions in the CBA effectively counter corruption. (2/27/13 Tr. at 19, 51:15–23 ("MR WALSH: I believe the sooner we get the compliance program in place, the better. . . . It will I think lead to the elimination of corruption as we know it . . . . THE COURT: You're of the same view, Mr. Torrance? MR. TORRANCE: Yes.").)

4) The RO persuasively contends that "[i]t is entirely appropriate that the elected representatives in the delegate body, which is vested with plenary authority by the District Council Bylaws, vote on collective bargaining agreements." (RO Mar. Let. at 2.) The Bylaws state that "[f]ollowing recommendation by the Executive Committee, the Council Delegate Body shall have the exclusive power and authority to ratify and execute Collective Bargaining Agreements for and on behalf of its affiliated Local Unions except to the extent the International Union exercises its jurisdiction or authority." (Fourth Interim Report of the Review Officer, Ex.

11, Bylaws §§ 20, 5(B)(8) ("[T]he Council Delegate Body must [r]eview and approve or reject, in advance, all Collective Bargaining Agreements following a recommendation from the Executive Committee in writing.").)  As noted, Delegate Body approval occurred on April 25, 2013.  (See pp. 5–7, supra.)

     5) The February 27, 2013 hearing was almost entirely devoted to the draft CBA.  (See 2/27/13 Tr.)  All parties to the CBA and the Consent Decree—and rank and file members of the District Council—were given the opportunity to be heard.  Id.  The District Council explained that the central change in the new CBA was the elimination of the 67/33% hiring ratio contained in Judge Haight's 2009 Order and the addition of full mobility.  Id. at 9:24–10:2 ("THE COURT: So obviously the big change relates to the substantive issue of full mobility, right?  MR. MURPHY: Right.  THE COURT: So this is a contract that will change[] existing procedure, practice, and in fact orders of the court with regard to that.  Correct?  MR. MURPHY: Correct."); 15:2–19 ("MR. MURPHY: [U]nder the Court's 2009 order . . . at least 33 percent of the hires for a job had to come from the district council's out-of-work list . . . . Now with ["full mobility"] no one will have to come from the out-of-work list except for the certified shop steward.").  The District Council also explained some of the compliance (technological) features in the CBA aimed at preventing corruption:

> MR MURPHY: So there was a really concerted and almost overwhelming effort to put into place a multifaceted compliance procedure of which the daily reporting by the shop steward, and then reporting those hours to the employer on a daily basis so the employer can check it daily . . . . Also the rank and file members would be able to go and check any job that they have been working on, which . . . will allow them [to see] the other carpenters working on the job and their hours . . . . Plus there are initiatives be the inspector general's office to hire retired carpenters to go out and do spot checks . . . to make sure they're in compliance under the [CBA].

Id. at 11:4–23. The Union also noted that the new electronic time entry had been tested and, so far, deemed a success. Id. at 12:8–10 ("MR. MURPHY: There's been a trial that's gone on for several months now involving six contractors. All reports are that the system does work.").

The Court also heard presentations from the rank and file and invited post-hearing written submissions from interested persons. Id. at 69:13–14, 106:22–25 ("THE COURT: [S]o why don't I invite any written comment on the submissions that I [have] receive[d] today by March 12, 2013, and then I will be in a much better position on that date to decide on the order.").

6) Integral to the CBA is full mobility and a computerized compliance program designed to protect against abuse and corruption in the workplace. (See DC Feb. 13 Let. at 2–3.) As to full mobility, the ability of the contractors to select the carpenters they employ appears to have been freely bargained for with the Union, resulting in, among other things, a higher wage component. (12/19/12 Tr. at 5:14–16; see also pp. 5–8, supra.) As to the anti corruption compliance provisions, these seem genuinely calculated to prevent fraud and abuse in the workplace.

> [T]here will be four quite different yet complementary methods that will be utilized to insure compliance with the CBA. The four methods are (1) Shop Stewards electronically reporting personnel and hours, (2)carpenters being able to check through the electronic reporting system any and all jobs on which they were employed to insure the accuracy of the number of reported carpenters and hours, (3) the hiring of additional on-site inspectors employed by the Inspector General of the District Council for visiting job sites on a 24 hours a day and 7 days per week basis and concentrating on one and two-person jobs where the CBA will not require a Shop Steward, and (4) CBA sanction and arbitration provisions by which contractors found to have willfully and with bad intent violated staffing, wage, and benefit requirements would be subject to loss of the right to full mobility and instead would be required to use the OWL for at least fifty percent (50%) of their staffing requirements while otherwise being bound by all of the other provisions of the CBA. Id.

It is intended that "the District Council [will] report to the Review Officer, the Government, and the Court on a regular basis on the progress of the compliance program. . . .

[T]his formal reporting [will] be done by the District Council initially every thirty days after entry of the . . . order and, when the Court deems it appropriate, eventually requiring such formal reporting every ninety days." Id. at 2. The RO has stated his belief that "if the program is correctly implemented, it will represent a great leap forward in the fight against fraud and will render the flawed paper steward report system obsolete." (RO Mar. Let. at 2 (citation omitted).)

**Conclusion & Order**

Most importantly, the CBA is a bargained over agreement and was approved by the Executive Committee of the District Council and by the Delegate Body of the District Council, lawfully designated representatives with the authority to approve collective bargaining agreements. **Accordingly, it is ordered that the Court's May 26, 2009 Order (Haight, J.) is hereby modified and superseded to permit the parties forthwith to implement the full mobility job hiring and compliance procedures specified in the CBA between the District Council and the WC&C approved on April 25, 2013.**

The District Council will file with the Court every thirty (30) days after entry of this Decision & Order and every thirty days thereafter until further order of the Court a report describing (i) the progress and effect of the electronic jobs reporting procedures and the compliance and enforcement procedures under the CBA; (ii) the anti-corruption enforcement efforts of the District Council; and (iii) additional information regarding the CBA pertaining to enforcement of the Consent Decree.

The application of Demian Schroeder [Doc. 1246] is denied for the reasons stated above. (See pp. 4–5 supra.)

Dated: New York, New York
May 8, 2013

_____
**RICHARD M. BERMAN, U.S.D.J.**