UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

              Plaintiff,

       -against-

DISTRICT COUNCIL OF NEW YORK CITY
AND VICINITY OF THE UNITED
BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, et al.,

              Defendants.

---

90 Civ. 5722 (RMB)

# FIRST INTERIM REPORT OF THE INDEPENDENT MONITOR

GLEN G. McGORTY
JOANNE R. OLEKSYK
Crowell & Moring, LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
joleksyk@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United
Brotherhood of Carpenters and
Joiners of America

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. THE DISTRICT COUNCIL ............................................................................... 4

    A.  Developments at the District Council .................................................... 4

        1.  Man Hours and Member Statistics.................................................. 5

        2.  Market Recovery Efforts: The Provisional Journeymen ................ 6

        3.  Contract Negotiations ..................................................................... 8

        4.  Preparations for the General Convention........................................ 8

        5.  The Bylaws ..................................................................................... 9

        6.  The OWL ....................................................................................... 10

        7.  Information Technology Upgrade.................................................... 14

        8.  Ongoing Implementation ................................................................ 16

        9.  Compliance ..................................................................................... 18

        10. Failure to Pay Working Dues .......................................................... 19

    B.  Financial Health ...................................................................................... 22

    C.  District Council Departments and Committees ...................................... 24

        1.  IG Office and the Trial System ....................................................... 24

        2.  Audit Committee............................................................................. 26

        3.  Grievance Department .................................................................... 27

        4.  OWL Department............................................................................ 28

        5.  Information Technology Services Department ................................ 29

        6.  Human Resources ........................................................................... 30

    D.  Local Union Issues.................................................................................. 31

        1.  Vacancies in Local Union 157 ....................................................... 31

        2.  Local 1556 Elections...................................................................... 36

    E.  Ongoing Litigation .................................................................................. 37

III. THE BENEFIT FUNDS .................................................................................... 40

    A.  Overall Condition of the Funds............................................................... 41

    B.  Search for a New Executive Director ...................................................... 41

    C.  Information Technology ........................................................................... 43

NYACTIVE-14724170.1

# TABLE OF CONTENTS
(continued)

**Page**

| | | | |
|---|---|---|---|
| | D. | Employee Training and Compliance | 43 |
| | E. | Benefit Funds Collections | 44 |
| | F. | Ongoing Litigation | 45 |
| | G. | Trustees' Relationship | 46 |
| | H. | Hollow Metal Fund | 47 |
| | I. | Labor Technical College | 47 |
| IV. | | OFFICE OF THE INDEPENDENT MONITOR | 48 |
| | A. | Investigations | 48 |
| | B. | Hotline and Email Reporting | 48 |
| | C. | Removal of Local Union 157's Executive Committee Delegate | 49 |
| V. | | CONCLUSION | 51 |

NYACTIVE-14724170.1

## I.    <u>INTRODUCTION</u>

Pursuant to Section 5.l.iii of the Stipulation and Order filed in this matter on November 14, 2014, I respectfully submit this First Interim Report as the Independent Monitor of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council") and its affiliated Benefit Funds.  Herein, I endeavor to provide my assessment of the progress towards achieving the objectives of the 2014 Stipulation and Order and of the Consent Decree, approved by the Court on May 4, 1994; my view on the sustainability of reforms previously implemented; and my recommendations going forward.

On January 1, 2015, I assumed the responsibilities as the Court-appointed Independent Monitor, taking over for my predecessor, Dennis M. Walsh, the Court-appointed Review Officer, who served in that capacity for over four years.  As Mr. Walsh best described in his Final Report filed last December, the Union from which he was departing was starkly different than the Union he began monitoring in June 2010.  Mr. Walsh's interim reports, which I studied closely prior to beginning my own tenure, set forth the significant and culture-shifting reforms overseen by Mr. Walsh and his staff, pressed forward by the men and women who form the membership of the Union, and most especially effectuated by the leadership and employees of the District Council and the Benefit Funds.  As an outside observer who only recently came to learn of the history of the Union, I am awestruck by what was accomplished in such a short period of time, and it is with humility and respect that I have taken over the role as the Union's Independent Monitor.

1

The nature of this monitorship was destined to be quite different than Mr. Walsh's because of the institutional reforms and compliance-oriented mechanisms already implemented through his efforts.  Indeed, I face a far different task than my predecessor.  While Mr. Walsh was charged with revamping the Union that was plagued by corruption, my responsibilities are less about eradicating such an element, though we must be ever vigilant to prevent its return.  Instead, my mandate is to maintain the compliance structures implemented throughout the District Council and Benefit Funds; to assess what changes or new methodologies should be implemented to foster continued improvement within a culture of compliance; and above all, to make sure the Union does not slide one step backwards after it has come so far.  In this regard, as I have said on numerous occasions, my understanding is that my monitorship of the Union may well be its last, so my top priority is simple:  to make sure that the District Council and the Benefit Funds are ready and able to prosper within a compliance-first environment without the daily scrutiny of a Court-appointed monitor.  To meet those goals, I have worked to combine continued oversight and often rigid adherence to proven policy and procedure, with the willingness to try new things and let the District Council and Benefit Funds find their own compliant footing, as they must do in the future.  While I am only six months into my tenure as Independent Monitor, I believe the District Council and the Benefit Funds can and will continue on the right path.

As the Court is well-aware, my responsibilities as Independent Monitor include review, investigative, and oversight functions relating to both the District Council and the Benefit Funds.  As described further herein, I have also spent a significant amount of time during my first six months examining issues related to various Local Unions within the District

2

Council's organization structure.  I have been assisted in my task most closely and ably by

Joanne R. Oleksyk, an associate at Crowell & Moring LLP, who has spent countless hours at the

Union over the past six months and, most recently, collected much of the information needed for

this interim report.  Also at Crowell, my partner Jeffrey W. Pagano, a veteran labor and

employment lawyer and labor organization specialist, has provided regular counsel and

assistance on often complicated issues of labor law.  Finally, my investigative team has been

staffed by the investigative firm of Lemire LLC:  Katherine Lemire, a former Assistant United

States Attorney in the Southern District of New York, a former Assistant District Attorney in

Manhattan, and former Counsel to the NYPD Police Commissioner; David Burroughs, a former

Special Agent with the Federal Bureau of Investigation and supervisor in the FBI's Special

Operations Division; and Jack Mitchell, former Chief Investigator to the Review Officer from

2010 through 2014, former investigator with the Investigation and Review Officer from 1994

through 1999, and a former Special Investigator with the New York State Organized Crime Task

Force.  This team has extensive law enforcement experience and, most importantly, blends a

fresh perspective on the Union with the key ties and historical knowledge of the past.  I am

grateful to each of them for all their hard work and support.

        It is a daunting task to follow Mr. Walsh, whose decades-long affiliation with the

Union and boundless devotion to the mission is unsurpassed.  I thank Mr. Walsh and his staff for

being instrumental to my transition.  So, too, were the attorneys, leaders, trustees, and employees

of the District Council and the Benefit Funds, too numerous to mention here, but whose

cooperation and perspective have been crucial in my first six months as the Independent

Monitor.  Finally, I would be remiss in not singling out the District Council's Executive

3

Secretary-Treasurer ("EST") Joseph Geiger, who has generously welcomed us to the Union and worked closely with us over the last six months.  While we do not agree on everything all the time – meaning that we both are zealously doing our jobs – I believe that, under Mr. Geiger's leadership, the future of the Union is bright and will continue on the same positive trajectory as when I took over.

## II.     THE DISTRICT COUNCIL

### A.     Developments at the District Council

The District Council has arguably served as the centerpiece for the reforms installed by my predecessor:  the drafting of the Bylaws, the Out-of-Work List ("OWL") rules, and related policies and procedures; the creation of the Office of the Inspector General ("IG Office"), the position of Chief Compliance Officer, and a Human Resources Department; and a substantial information technology ("IT") overhaul, to name only a few.  Clearly, systems of compliance were created and implemented within the District Council, and I am pleased to see that the accompanying mindset among the leadership and employees of the Council has survived my predecessor's departure.

That being said, as one would expect with any "regime" change, I was greeted early on with the well-articulated concern that, while compliance remains paramount, certain rules have detrimental impacts on business development or create fundamentally unfair situations for the members, so should be closely reviewed and potential revisions considered.  These suggestions, particularly with respect to the Bylaws and the OWL, initially led me to believe that I was witnessing a cultural reversal, or sliding backwards, and that my openness to allowing the District Council to explore new methods would be detrimental to what had been

4

accomplished already.  Drilling down upon those requests, however, I soon learned that the leadership of the District Council was not seeking to overturn all the good which had been accomplished, but rather they were seeking an opportunity to self-govern — which by definition means making choices and trying new approaches, all in an effort to increase efficiencies and fairness to serve the best interests of the membership.  They understood that no radical or sudden changes would be acceptable to me, thus they decided to proceed in what I believe was a forward-thinking manner:  they formed committees with designated leadership to undertake a review of existing rules and procedures which they believed should be reconsidered.  I was pleased to see this process in effect with respect to both the Bylaws and the OWL rules, and while they are a work in progress, I believe these working groups have the best intention: improvements without weakening the compliance mechanisms in place.  As set forth in the Review Officer's Final Report, such changes are only being "considered, constructed, and adopted with great care and precision" and ultimately, only if they withstand the strict scrutiny of my office and the Government.  In short, the District Council is working towards taking the reins of its own future, and it seems to be doing so in a thoughtful and cautious way, imbued with compliance — the only acceptable path forward.

Below I set forth current developments at the District Council, including some of the efforts to analyze and improve the District Council's policies and procedures.

### 1.  Man Hours and Member Statistics

According to the data received from the Benefit Funds, as of May 2015, the projected number of hours for the Welfare Fund for the fiscal year ending June 30, 2015, is 19.1

million.  This will be a healthy increase over the approximately 17.4 million hours reported for the fiscal year ending June 30, 2014.

According to the data received from the OWL, there are 12,362 journeymen members in good standing and 1,664 journeymen members in arrears as of May 31, 2015, an improvement upon the 11,371 and 1,780, respectively, detailed in my predecessor's Final Report.

### 2.     Market Recovery Efforts: The Provisional Journeymen

As reported to Your Honor by EST Joseph Geiger at the November 2014 status conference, increasing man hours is a priority of the District Council leadership.  Since coming into power, the leadership has actively strategized ways to increase man hours and market share.  One product of these efforts has been the creation of the Provisional Journeymen Concrete Carpenter classification.  The District Council has been losing market share in residential and hotel concrete construction for some time, thus the District Council developed this classification as a way to regain market share by lowering union employers' overall labor cost for these types of projects.

The Provisional Journeymen Concrete Carpenter classification is part of a "market recovery addendum," approved by the delegate body on December 10, 2014, and executed by the District Council and The Cement League on April 2, 2015 (attached as Exhibit A), to the District Council's CBA with The Cement League.  The market recovery addendum allows the members of The Cement League to employ a 50:50 ratio of Journeymen Carpenters to Provisional Journeymen Concrete Carpenters on residential and hotel construction projects.

Provisional Journeymen Concrete Carpenters are paid a lower rate of wages and benefits, so staffing at the 50:50 ratio results in a twenty percent reduction in the average hourly rate.

The District Council intends to create a pool of Provisional Journeymen Concrete Carpenters by "stripping" carpenters skilled in vertical concrete from the non-union sector. The lower-rate package provided for in the market recovery addendum is substantially more than most non-union carpenters make, so there should not be any difficulty in finding non-union carpenters willing to work under the terms of the market recovery addendum. The recruits will join a local union affiliated with the District Council and they will be issued a regular District Council membership card showing them to be "Provisional Concrete" qualified. A new OWL list for the provisional concrete classification will be set up in order to dispatch Provisional Journeymen Concrete Carpenters where needed. Provisional Journeymen Concrete Carpenters are eligible for classification as regular journeyman carpenters upon working 7,700 hours or passing the written and practical test to obtain the recently established Journeyperson Concrete Skill Certification. Finally, and most importantly, the 50:50 staffing ratio needs to be carefully monitored by the District Council, and I will assist in those efforts as the program expands.

The establishment of the Provisional Journeymen Concrete Carpenter classification is a creative solution to the dual problems of Union carpenters being priced out of the market and competition from increasingly skilled non-union carpenters. The lower average hourly rate made possible by the market addendum should keep more residential and hotel concrete jobs within the purview of the Union. Not only will this provide work to members of the District Council, but it will also reinforce union-labor's skill advantage in this type of work. Furthermore, the new classification will draw skilled carpenters into the District Council. The

market recovery addendum lasts only until the end of the year, but I hope to see many more creative solutions like this to recover market share that has been captured by the non-union sector.

### 3. Contract Negotiations

As the Court is aware, some of the District Council's collective bargaining agreements ("CBAs") with employer associations expire on June 30, 2015. Thus, over the past few months, the leadership of the District Council has been negotiating successor CBAs. To this end, following a proper request-for-proposal ("RFP") process, the District Council retained the law firm of Archer, Byington, Glennon & Levine, LLP, to consult and advise on the negotiations. This law firm is providing guidance with respect to compliance with statutes applicable to labor organizations and CBAs, arising under the National Labor Relations Act ("NLRA") and otherwise applicable regulator regimes.

At the June 25th delegate meeting, the delegate body approved an agreement reached by District Council and the Building Contractors Association ("BCA"). No agreement was reached before the expiration of The Cement League CBA, and as of July 1, 2015, the District Council membership is striking.

### 4. Preparations for the General Convention

This August marks the forty-first General Convention of the United Brotherhood of Carpenters and Joiners of America ("UBC"). As would be expected, there is much excitement at the District Council and throughout the membership with regard to the opportunity to represent the carpenters of New York City at this high-profile event. The preparations for this event have allowed the District Council to showcase its fiscal accountability, among other things.

The District Council followed the appropriate RFP procedures to source union paraphernalia for the convention, and sought advance approval of the expenses from the delegate body.

One issue which arose during preparations for the General Convention was the discovery that the election materials for the EST's election in January 2014 inadvertently failed to specify that the EST, by virtue of his office, would be designated the District Council's single delegate to the General Convention. This notice is required by the UBC Constitution. Upon learning of this deficiency, the District Council acted swiftly to remedy this issue in accordance with the UBC Constitution. After receiving dispensation from the UBC General President from the Convention Call deadline, the District Council held an open election by the delegates. On June 15, 2015, Mr. Geiger was nominated and, absent any other eligible nominees, summarily elected to be the District Council's delegate to the General Convention.

### 5.     The Bylaws

As referenced above, the District Council has assembled a working group to review its Bylaws and propose updates and modifications. The newly designated Bylaw Working Group comprises the Vice President, an Executive Committee Delegate, the Chief Compliance Officer and General Counsel. The Bylaws Working Group, according to its mandate, will scrutinize the Bylaws and, if appropriate, propose changes. These changes may be procedural or technical in nature, as suggested in my predecessor's Final Report, or more substantive. The latter will be subjected to strict and careful review by myself and my staff. The Bylaws Working Group conducts regular meetings and has been seeking input from District Council department managers and the leadership of the Local Unions. When the Bylaws Working Group is ready to make formal recommendations, it will seek feedback from the

Independent Monitor.  In reviewing any proposals, I will apply the standards set forth succinctly in the Review Office's Final Report, ensuring that any proposed change:

> (i) comports with the strictures and goals of applicable law, the Consent Decree, and Stipulation and Order; (ii) materially improves the business operations and governance of the District Council; (iii) clearly benefits the organization and its members; (iv) is clearly written and unambiguous; (v) is the product of the process contemplated by the [UBC] Constitution and the Stipulation and Order; and (vi) is approved in writing by the Independent Monitor and the United States Attorney's Office.

I have already communicated to the Bylaws Working Group some areas that I believe should be clarified or modified based upon my own review.  The District Council is carefully following the procedure for Bylaw amendments provided in the Bylaws and the UBC Constitution, and will seek approval of the United States Attorney's Office after any changes are approved by the delegate body.

### 6.    The OWL

The leadership of the District Council has taken steps to improve the OWL, and in this regard, several new skills have been added so that employers have an enhanced ability to specify the skills they need, and carpenters can better describe and differentiate their skill sets. These new skills and classifications include the Millwork Installer Skill Certification, Concrete Boot Camp (for apprentices), Journeyperson Concrete Skill Certification and Provisional Journeymen Concrete Classification (referenced *supra* Section II.A.2).  These additions have been added upon the review and consent of both the Independent Monitor and the Government.

As with the Bylaws, the District Council has formed an OWL Rules Working Group to consider and eventually propose potential changes to the OWL rules.  It is clear, based upon preliminary discussions, that the OWL Rules Working Group prioritizes developing an

10

alternative to the three-dispatch rule instituted by my predecessor.  As the Court is aware, the District Council installed a three-dispatch rule several years ago in place of the temporal limitation of the prior system – the so-called "25-day rule."  Under the 25-day rule, carpenters on the OWL received dispatches to jobs until they reached the threshold of 25 days of work, after which they were dropped from the list.  Under the current three-dispatch rule, carpenters receive dispatches to three jobs, and, regardless of the length of those jobs, are dropped from the list after the third dispatch.

      The temporal component of the prior system was eliminated to end the skill-puffing and day-counting which plagued the 25-day rule system.  When 25 days of work were guaranteed, there was little disincentive to lie about one's skills in an effort to gain work, and there was an incentive to quit just shy reaching the 25th day of a job near completion in hopes of being dispatched to a longer job.  The three-dispatch system was designed to remove these improper incentives: a dispatch to a job where a member is shortly fired for not having the requisite skills still expends a dispatch, and quitting early does not result in an additional dispatch.  In this way, the three-dispatch rule helps ensure that carpenters sent to a job have the requisite skills and that fewer carpenters abandon jobs, and, at least theoretically, the rule prompts a more accelerated rotation of the OWL.

      In his Final Report, Mr. Walsh warned against changing the three-dispatch rule and highlighted the dangers of returning to the 25-day rule system.  To be clear, I recognize the benefits of the three-dispatch rule and have determined that a return to the prior system of the 25-day rule is not an option.  But I also realize that no system is perfect.  It was made known to me from the beginning that there is dissatisfaction with the current system because it allows

11

carpenters who have had the good fortune of being sent to a job that lasted years to return to the top of the OWL when that job finally ends, while other less fortunate members move quickly through their three dispatches, securing few hours of work.  I do believe that many of the members who are only able to secure limited job hours in three dispatches have such an experience because of the short-term nature of the jobs requiring their individualized skills (trade shop jobs, furniture installation jobs, etc.), or for other reasons, none of which suggest a problem with the OWL rules.

Nonetheless, aware that I would entertain any reasonable and purposeful modification to the existing system, the OWL Rules Working Group made a series of initial proposals, ranging from minor to more substantial changes.  For example, the OWL Rules Working Group suggested placing an upper threshold of hours worked, above which the member would be automatically dropped from the OWL even if all three dispatches had not been used, and a lower threshold, which, if not reached after three dispatches, would result in an additional dispatch.  The measurement of the thresholds in hours of work would be a change from any previous system and was intended to lessen the ambiguity that occurred under the 25-day rule when carpenters worked partial days.  Under this proposed system, the finite number of dispatches would continue to guard against skill puffing.  However, the hazard of premature quitting in advance of hitting the upper threshold, the key problem with the 25-day rule, would be re-introduced.  Moreover, an hours-based limit has the potential to create new problems in OWL administration because of the lag-time in reported hours, and ambiguity over the treatment of contested time and hours from jobs that are shaped while a member's position on the list is frozen.

Accordingly, the OWL Rules Working Group will continue to establish and evaluate the details of any proposed changes.  I have made it clear that I would only be amenable to modifications to the three-dispatch rule if I am provided with empirical evidence of the problems it creates.  How often is it that someone receives three year-long dispatches or three dispatches lasting only a few days?  As way of background, the choice of three as the number of dispatches was a measure intended to curb the very unfairness that is still being discussed; three dispatches would tend to level out the unavoidable variation in hours from any one dispatch.  In the absence of any empirical data beyond anecdotal reports to support the magnitude of these concerns, I have yet to be convinced that there is a better system than a simple finite number of dispatches.  The District Council is skeptical that it can provide the data I seek because members' experiences on the OWL are so different depending on their skill-set and the season.  I appreciate these variables, but the difficulty, or even impossibility, of collecting statistical evidence does not render anecdotal evidence sufficient to support a major change in policy.

I am hopeful we can compile data sufficient to illuminate the need for change and, if that need exists, that the OWL Rules Working Group can suggest a better though equally compliant system.  In this regard, I have encouraged the leadership to consider hiring a management consultant with the appropriate expertise to bring a new perspective to a review of the OWL system.  I have also explained that my approval of any change to the current dispatch system is contingent upon assurance that skill puffing and other manipulation of the OWL rules is vigilantly guarded against, most likely by triggering harsher penalties than being dropped from or to the bottom of the list.  In short, I believe that *any* manipulation of or attempt to circumvent the OWL rules should be met with the most significant penalties the system can allow.

13

Though any modification to the three-dispatch rule is premature at this point, I recognize that the OWL rules document itself (attached as Exhibit B), which has been abridged and amended over the years, would benefit from an overhaul in the interest of creating a streamlined document (or documents) which sets forth the rules in a clear manner to the intended audience, and reflects the present environment of modern technology and full mobility. I have requested that this project be undertaken whether or not any agreement on substantive modifications to the dispatch rule can be reached.

**7.      Information Technology Upgrade**

As Mr. Walsh's Final Report referenced, the District Council has undertaken an IT systems upgrade for its operations. Following proper RFP procedure, the District Council selected Data Research Group ("DRG") as the service provider, and in concert they developed an implementation schedule for the upgrades. The information technology ("IT") upgrade started with the Assessments Department, which the District Council determined was the top priority for new computer systems. The next priority is the Electronic Reporting System used by Shop Stewards, Council Representatives and the OWL, and lastly Grievances and the IG Office. Concurrent with these projects, DRG is also upgrading the Communication Department's system, where it is assisting with the transfer of data to a new website that will integrate user-access to much of the information in the new systems.

After great anticipation and a couple months delay from the initial timeline, the new IT system was rolled out for the Assessments Department on June 12, 2015. Concurrently with the Assessments work, another vendor, AKA Enterprise Solutions, implemented new financial software systems in Accounting and Payroll, which will be rolled out on July 1, 2015,

14

and January 1, 2016, respectively.  These new systems will allow the Accounting and Assessment Departments to use a single interface to access all of the information needed to perform their tasks.  Moreover, the data will now be controlled by the District Council, as opposed to its prior service provider, so the manner in which the information is presented and analyzed can be changed based on the District Council's evolving needs.  Once the new Assessments and Accounting systems have been used for a full billing cycle, and any issues that arise are resolved, DRG will begin to implement a user interface so that members and remitting employers can see all of the information that the Assessments Department has in their file, for example, payment history or assessments owed.  The user interface is scheduled to be implemented by the end of this summer.  Chief Accountant Judy Montreuil and Technology Manager Ralph Rivera have worked tirelessly with DRG through all steps of the upgrade.  As of late June, the new Assessments system appears to be working without any significant problems.

The delay in the deployment of the Assessments Department upgrade was largely due to the numerous and varied ways that the District Council receives payments.  Though this aspect of the department was known at the time the schedule was made, integrating all of these payment options into a new system simply took longer to resolve than expected.  Additionally, as the Chief Accountant and the Assessments staff became more familiar with the new system and its capabilities, they frequently refined the deliverables.  Although this reportedly exceptional level of involvement prior to the conversion date added to the delay, it has ensured that the new system is keenly tailored to the District Council's needs.  DRG does not expect a delay to be repeated in other departments because Assessments was the only department that required data conversion.

15

DRG has already begun to turn its attention to the Electronic Reporting System. The upgrades to this system include designing a much more user-friendly interface that is compatible with the Shop Stewards' devices and gives Shop Stewards and Council Representatives access to more complete information on the jobsite.  As of the time of this writing, the system has just begun beta testing, and DRG expects a conversion date in late summer.  DRG believes that it is similarly on-schedule with achieving a conversion date in early fall for the IG Office and Grievance Department.  Additional improvements to the District Council's technology infrastructure by the District Council's own IT department can be found *infra* Section II.B.5.

### 8.     Ongoing Implementation

#### a.     Working Dues Check-Off System

At the time of the Review Officer's Eighth Interim Report, approximately 5,600 cards authorizing the automatic deduction of working dues from wages had voluntarily been submitted by members.  As of June 25, 2015, that number had nearly doubled to 10,580.  This increase in authorization cards greatly reduces the manpower required of the District Council to obtain the working dues, and is a clear achievement for the District Council.  If universally utilized by both members and employers, the working dues authorization card would guarantee timely remittance of working dues and eliminate the risk of members falling out of good standing, as referenced *infra* Section II.A.10.  As it stands, however, even if a member has filled out the card, working dues are only deducted from the member's paycheck if the employer or the employer's association has pledged to do so in its agreement with the District Council.  Thus, the

16

goal of universal membership participation in the automatic working dues check-off system should be matched by a corresponding goal of universal employer participation.

Relatedly, delegates have raised the issue that there is confusion among the membership over what exactly the authorization card means.  Apparently, some members mistakenly believed that the working dues authorization card meant that working dues would always be deducted from the paychecks, regardless of the employer.  After the delegate meeting where the issue of confusion was raised, the Chief Compliance Officer, Joshua Leicht, assured me that he and Director of Operations Matthew Walker would take action to ensure that District Council employees explain the working dues authorization cards accurately.  Accordingly, General Counsel to the District Council has drafted an explanatory notice that will be provided to members when they fill out the working dues authorization card.  I will continue to track the progress on these issues.

b.    Employer Reporting of Time

Per the association CBAs, participant employers are tasked with reporting members' time to the District Council on one- and two-person jobs.  It has been a constant struggle to have employers report time in a timely manner.  Although the District Council has a high calculated compliance level (estimated at 97.48 percent in the Twenty-First Thirty-Day Report, ECF 1622), this compliance level is only possible with the constant effort of the Electronic Reporting Compliance Team to obtain time reports by calling employers.  The Electronic Reporting Compliance Team also dutifully files grievances when the employer fails to report time as required by the applicable CBA.  However, the absent time that is the subject of many of the grievances is generally reported eventually, oftentimes before the grievance is even

17

entered into the system.  Thus, grievances for failure to report time are an understandably low priority on the Grievance Committee's overwhelming docket (more on grievances *infra* Section II.C.3).

The timely reporting of hours is crucial to the District Council's operation, and especially for the success of Operation Watchdog, the District Council's program where members can self-police by viewing the hours the District Council has on file as the hours they and their co-workers have worked.  At the same time, the Electronic Reporting Compliance Team's heroic (and costly) efforts to induce employers to comply with their obligations under the applicable CBAs do not appear to be improving.  The burden on the Electronic Reporting Compliance Team has not lessened as employers gained familiarity with the reporting requirements as hoped, so the District Council is exploring solutions for employer time reporting that are more practical and sustainable than the status quo – a process I will monitor closely going forward.

## 9. Compliance

### a. Policies

The District Council, with the Chief Compliance Officer in a leading role, is in the process of revising many of its policies.  Far beyond merely removing outdated references to the Review Officer, the changes are intended to reflect the actual functioning of the District Council and align policies and procedures with best practices, all while adhering to a compliance methodology.  In this way, the revised documents can be used by the Chief Compliance Officer, the Inspector General and the Audit Committee to perform their oversight functions.  The

District Council recently completed a revised Code of Ethics (attached as Exhibit C), and policy revisions near completion include the Accounting Manual and Personnel Policy.

A new compliance project of significance is the creation of standard operating procedures for Council Representatives.  Counsel to the District Council and the Chief Compliance Officer have worked with the Council Representative Managers to complete the first step:  documenting the current practices of the Council Representatives.  Next, the District Council will seek to determine best practices for the Council Representatives and memorialize them in a standard operating procedure document.

b.  <u>Training</u>

During the fourth quarter of 2014, the Chief Compliance Officer developed and delivered to all District Council officers and employees comprehensive "barred persons" training.  This training explains the requirements and purpose of the prohibition, and what one should do in the event that he or she had contact or suspected contact with a barred person.  The presentation developed for the training was also provided to every member of the delegate body, and the Human Resources Director provides new employees with the barred persons training as part of the orientation process.  During the past several months, the Inspector General, the District Council leadership and my staff have received prompt reports from members who came in contact with barred persons.

**10.  Failure to Pay Working Dues**

In March, a number of delegates were relieved of their positions for failure to pay the working dues as required by the District Council Bylaws and the UBC Constitution.  Counsel for Local Union 157, which had the largest number of delegates removed, as well as its

19

President, contested the District Council's method of calculating the deadline at which unpaid working dues cause a member to no longer be in good standing.  The positions on this issue of Local Union 157 and the District Council are attached as Exhibits D and E.

At the request of Local Union 157, I have looked into this issue.  One complaint is that the "late" notice sent by the District Council is insufficient because it notifies members of the working dues already collected for the current billing period, but not the specific amount still owing for the current billing period.  Another complaint is that the notice is sent after which time the District Council already considers the working dues to be "late."  While I have not issued a formal determination at this time, as I am awaiting some materials from Local Union 157, I have thus far not been persuaded that the District Council's uniform practice in this regard violates the Bylaws or UBC Constitution.  The system does not seem unfair to members or otherwise inappropriate insofar as the District Council currently allows members two months from the last day in the billing period to remit working dues before any adverse status-change.  I also believe the notice provided setting forth the dates upon which a member will fall into "arrears" or be suspended is sufficiently clear to alert members of these threshold dates.  As to the complaint that the notice does not indicate the amount outstanding, members have always possessed knowledge of the hours they work, which form the basis of the working dues, and, in any event, this information will be readily available to the members once the IT upgrade provides user-access to the members' assessments accounts.

Regardless of how the underlying issue is resolved, I do concur that the District Council should endeavor to make the payment of dues as straightforward and convenient for the members as possible, even though it is ultimately the members' obligation to pay working dues.

For example, the District Council could standardize and refine the language in the Bylaws and the Working Dues Assessment Notice.  I will work with the District Council with respect to whatever improvements can be made.

I feel obliged to comment on another aspect of this matter which I find troubling. In connection with the removal of the officers and delegates in March 2015, I learned that no small number of members perceived that the removals were politically motivated, insofar as some of the affected individuals' failure to pay dues had occurred months prior to their removal. In response, I investigated this concern and found no bad faith basis for the manner in which the officers and delegates were removed.  I found, in sum, that the arrears issue was raised when a member (from a different Local Union) and the president of that Local Union inquired to the District Council as to the member's eligibility to run for election.  This prompted a subsequent review of all currently sitting officers and delegates, and this review, in turn, yielded the revelation that many of these individuals had not been in good standing at all times during the prior twelve months as required.

In sum, I find baseless the accusation that the District Council's leadership was long aware of this issue and only demanded compliance when politically useful.  Despite my clear communication on this front, I believe that some members continue to believe the removals were politically motivated.  Unfortunately, I believe this is symptomatic of a larger problem: some members are wont to believe the legitimate actions and routine decisions of the District Council are based on illicit motives and refuse to consider evidence to the contrary.  While this dynamic may be the inevitable by-product of any organization with a similar history, it is counter-productive to the health and well-being of the Union.

To dampen future suspicions, as well as promote compliance with the requirements of the UBC Constitution, I have recommended that the good standing of officers and delegates be assessed regularly.  As a result, the District Council has decided that the Chief Compliance Officer will conduct a quarterly review of currently sitting officers and delegates and, if removal is warranted, the Inspector General will notify the corresponding local union.

**B.**     **Financial Health**

The District Council has approximately $36 million in accounts under management, which include the Organizing Fund and the Communications Fund.  The asset manager reported on the performance of the funds for the first quarter of 2015 at a recent Executive Committee meeting.  Currently, the assets of the District Council are wholly invested in bonds because the District Council has pursued a conservative low-risk/asset-preservation strategy with the aim to guarantee the availability of the funds.  As a result, performance was relatively weak because interest rates have been low.  However, at a previous meeting, the Executive Committee voted to allow investment in equities as part of the investment mix.  The asset manager will begin to transfer some assets from bonds to equities this year.  The District Council will still pursue a low-risk strategy, but the addition of equities will diversify the investment portfolio and hopefully result in a higher return on investment.

Despite the healthy reserve of assets, the District Council has attempted to limit its operating budget to its expected income for the year.  In the upcoming fiscal year ending June 30, 2016, however, the District Council as a whole anticipates a $4.5 million operating deficit.  Part of this shortfall is due to this year's transition from cash-based accounting to accrual-based accounting; anticipated income from assessments that have been billed but not

22

paid as of the fiscal year ending on June 30, 2015, cannot be recognized in either the previous or the upcoming fiscal year.

Although a budget deficit is not a positive development, the District Council remains in a transition period.  Many of the present spending increases will yield long-term returns.  For example, the significant investment in upgrading the IT system should render every department more cost-effective.  As more working assessments are now automatically deducted from paychecks (*see supra* Section II.A.8.a), collections are expected to increase.  Likewise, while spending in connection with compliance initiatives has increased at present, these expenditures should decrease over time and yield savings as corruption is averted.  In addition, as my staff conducts reviews of the trial process, IG Office, and other departments (discussed *infra* Section II.C.1), they will be mindful of cost considerations when developing recommendations.

The District Council recognizes that it needs to balance its budget and is now considering the potentially huge cost-saving measure of moving out of its current location at 395 Hudson Street in Manhattan.  The District Council also is reviewing how surpluses in the Organizing and Communications accounts might be utilized to meet the District Council's needs.  Overall, there needs to be better planning with respect to earmarking funds for different accounts.  Earmarking needs to be reassessed frequently, and decisions must be based on need, not legacy.  This goes for monies allocated to the Benefit Funds as well.  It is my hope that next year, before the annual wage and benefits package increase under the CBAs is apportioned to the various funds, the Executive Director of the Benefit Funds will be invited to present to the Executive Committee on the status of the Benefit Funds so that the Executive Committee (in

23

particular the Executive Committee Delegates who are not trustees of the Benefit Funds) can make educated decisions on this issue of utmost importance.

### C.   District Council Departments and Committees

#### 1.   IG Office and the Trial System

Since becoming Independent Monitor, I have worked very closely with the Inspector General Scott Danielson and his office.  Mr. Danielson has spent a significant amount of time bringing me up to speed these past six months, and he has a wealth of knowledge on the history and culture of the District Council and the labor organization as a whole.  I have referred a number of calls from the Hotline to his department (*see infra* Section IV.B), and he has been both responsive and conscientious in furtherance of his office's mission.  In addition to working closely with me and my staff, Mr. Danielson has a close working relationship with the Chief Compliance Officer, and their combined focus on compliance is of great benefit to the District Council.

##### a.   Activities

The IG Office continues to be very active, having worked approximately 1,600 cases and having made approximately 500 jobsite visits since January 1, 2015.  Inspectors have also made thousands of Full Mobility Jobsite Inspections in 2015 and detected 43 possible Full Mobility Agreement violations.  In the same period, the IG Office has filed hundreds of grievances against non-compliant employers, and brought over 200 charges against members.  Of particular note, the Inspector General filed charges against Union member Anthony Calabro on June 30, 2015, based on his violation of the Consent Decree due to racketeering activities to which he previously pleaded guilty in the Eastern District of New York.  *See United States v.*

*Russo et al.*, 11 Cr. 30 (KAM) (EDNY, judgment filed May 16, 2012).  A more fulsome

description of the activities of the IG Office can be found in "Office of the Inspector General

Case Activity Report January 1, 2015-May 31, 2015," attached as Exhibit F.

> b.    Review of the IG Office

As pleased as I have been to find a cooperative and productive partner in the

Inspector General, I have nonetheless kept in mind my predecessor's call for the IG Office to

improve its compliance with the Investigative Guidelines, its delegation of work, and its use of

technology and organization.  Delayed only by the press of other business, my staff will soon

conduct a thorough review of the operations of the IG Office with the goals of creating a plan for

the effective, accountable and efficient operation of the IG Office, and assist the Inspector

General with the implementation of that plan.  I am hopeful that our suggestions will aid the

Inspector General in moving his crucial office forward.

> c.    Trial System

The current trial procedure has been in place since late August 2013.  As a system

of vital importance to the members, it is incumbent that the trial system serves the members and

promotes justice.  Upon receipt of complaints about its functioning, I had my staff observe the

different stages of the trial system.  While certainly an improvement over systems of the past,

there do appear to be deficiencies, most clearly with respect to the timeliness of hearings.  As a

result, my staff is working to evaluate each stage of the procedure and make recommendations to

improve the trial system's ability to fulfill its purpose of timely adjudication and resolution of

conflicts.  I look forward to the implementation of these recommendations, and expect to address

them in my next report.

### 2.      Audit Committee

The Audit Committee continues to meet monthly, and for the first time, funding for its activities has been included in the District Council's budget. This funding will allow the Audit Committee to hire auditors to look into issues as they arise, providing the Audit Committee with the "teeth" my predecessor justifiably feared to be lacking.

Even without funding, over the past six months the Audit Committee has reviewed accounting matters and provided advice. Mr. Bill Vorhees, the CPA advisor to the Audit Committee, has suggested that accounting at the District Council could be further strengthened by having a head of the Assessment Department separate from and in addition to the Chief Accountant. The Chief Accountant, Judy Montreuil, concurred and had already made this request to the District Council leadership. Funding for this new position was included in the budget for the fiscal year ending June 30, 2016. Despite the District Council's current financial position (discussed *supra* Section II.B), I am pleased by the leadership's prudent thinking on this matter; this position will increase the focus on collecting assessments and strengthen the District Council's overall control over its finances.

Earlier this year, the Benefit Funds sent a cost allocation, *i.e.*, a request for reimbursement, to the District Council for resources spent assisting the District Council's operations. The Audit Committee has adopted a measured and critical approach to this request and requested greater detail on and clarification of the expenses the Benefit Funds attributed to the District Council. Ms. Montreuil and Mr. Vorhees have been working to verify individual charges and intend to reach a resolution by year-end.

### 3.      Grievance Department

Paul Tyzner, the head of the Grievance Department, reports that year-to-date recoveries on grievances filed against employers exceed $730,000.  Although the related Grievance Committee is on track to hear more grievances than in 2014, grievances are being filed at an even faster rate, with over 1,300 filed since the beginning of the year.  Despite the best efforts of Mr. Tyzner and his staff of three, the current backlog is approximately 5,500 grievances.  In general, grievances fall into four categories:  (1) failure to remit benefits in a timely manner (approximately 1,600 unresolved grievances); (2) failure to report time from one- and two- person jobs (approximately 700 unresolved grievances); (3) manning ratio violations under prior CBAs (approximately 700 unresolved grievances); and (4) other miscellaneous alleged CBA violations.  Realizing that this backlog frustrates meaningful enforcement of the CBAs, the District Council is exploring options to streamline the Grievance Committee's operations, and empower the largest filers of grievances (business agents, inspectors, and the Electronic Reporting Compliance Department (discussed *supra* Section II.A.8.b)) to resolve violations outside of the grievance process.

This potential approach is not without concerns, as any decentralized method of resolving violations raises significant risks of lack of compliance and uniformity.  At the same time, I understand that the current rate at which grievances are filed is unsustainable.  In addition to sheer volume, there are grievances stretching back in time to an unacceptable degree.  As grievances accumulate, memories decay and witnesses become unavailable, rending violations more difficult to substantiate.

Accordingly, I will be monitoring any proposed shift in policy that discourages filing grievances very closely.  In addition to the issues raised above, grievances provide a paper trail of violations, and the centralized manner in which they are retained and addressed promotes consistent resolutions.  If the District Council seeks to resolve violations by other means, there must be a set of standardized operating procedures in place to ensure that employers are treated uniformly, and violations and resolutions are documented.  Furthermore, there must be guidelines for appropriate resolutions and a system of monitoring and auditing resolutions.  The District Council has begun the first step in creating standardized procedures for Council Representatives by documenting their current practices (*see supra* Section II.A.8.a).

### 4.    OWL Department

Under the leadership of Aaron Gholston, the OWL Department has labored tirelessly on the unenviable task of administering the OWL.  I have worked closely with Mr. Gholston and will continue to do so, especially with respect to the consideration of any possible changes to the OWL rules.  His insights and experience with regard to the current system will be pivotal in evaluating future modifications.  Below is a summary of OWL activity since January 1, 2015:

*Dispatches:*

|  | May 2015 | April 2015 | March 2015 | February 2015 | January 2015 | October 2014 |
|---|---|---|---|---|---|---|
| **Regular Dispatches** | 1,087 | 1,157 | 1,178 | 757 | 653 | |
| **Immediate Dispatches** | 40 | 43 | 61 | 22 | 30 | |
| **Off-Hour Dispatches** | 198 | 108 | 147 | 129 | 89 | |
| **Total Dispatches** | **1,325** | **1,308** | **1,386** | **908** | **772** | **1,145** |

28

*Refused Dispatches or Unanswered Calls Not Resulting in Loss of Dispatch Under Current OWL Rules:*

|  | May 2015 | April 2015 | March 2015 | February 2015 | January 2015 |
|---|---|---|---|---|---|
| **Total** | **11,363** | **8,727** | **12,329** | **4,605** | **2,989** |

### 5.    Information Technology Services Department

In addition to overseeing the DRG IT system upgrade, the Information Technology Services Department ("ITS") has made numerous improvements to the District Council's IT infrastructure over the past six months.  According to the ITS Manager, Ralph Rivera, ITS has replaced the failing legacy network switches and overhauled the network to separate traffic from different devices, dramatically increasing data transfer speeds.  ITS has also replaced the wireless LAN controller and firewall, greatly increasing the security of the District Council's IT system.  Another improvement of note is a new data back-up solution that is expected to result in $13,500 in annual cost savings.

ITS has multiple projects on the horizon for completion over the next six to eight months, including the virtualization of physical servers, upgrading the "Domain Active Directory Database," and developing an intranet site for District Council employees.  Additionally, in conjunction with other departments, ITS will develop comprehensive standard operating procedures for the handling of IT requests, as well as IT procedures governing new hires and terminations.  A more complete description of ITS' recent accomplishments and upcoming projects can be found in the "Executive ITS Annual Summary – June 2014 to June 2015," attached as Exhibit G.

29

**6.** **Human Resources**

The Human Resources Department, headed by Dana Brownstein, is one of the newer departments established within the District Council by my predecessor. The Human Resources Department was created as a compliance-strengthening initiative. Thus far, Ms. Brownstein has been very helpful in educating my staff on the policies and procedures of the Department.

a. <u>Hiring</u>

In early 2015, the District Council was in the process of hiring a number of Council Representatives. My staff reviewed the hiring process, and the scored applications and exams, for adherence to the Conditional Process for Hiring Council Representatives. My staff determined that those protocols had been followed, but observed that the process itself could be better crafted to serve its goal of identifying qualified candidates for Council Representatives. My staff intends to share its observations and recommendations with the District Council prior to the next round of Council Representative hiring. Generally, those recommendations include a revision of the grading process, as well as the regular updating and changing of test content to the extent allowed within the strictures of UBC requirements.

Communication of an objective hiring process is as important as the process itself. Members have expressed frustration with a perceived lack of transparency with respect to the Council Representative hiring process. Accordingly, I recommend that the process for hiring Council Representatives should be specifically referenced in the Bylaws and made available to the membership online. The District Council should consider additional measures to increase transparency in this process.

30

b.    <u>Training</u>

The Human Resources Director has transferred training for District Council administrative employees to an online platform.  This makes available a wide variety of courses and eliminates scheduling problems.  All District Council administrative employees are required to spend a specified amount of time on training, and the courses they can take range from technical to inter-personal skills.

Council Representatives receive their training from the UBC, as will the trustees. The trustees, in addition to the Inspector General, the Chief Compliance Officer, the Director of Operations, and the Chief Accountant, also received training from the United States Department of Labor upon starting their positions.

I believe that all of the elected leaders at the District Council should pursue training opportunities targeted towards development in their roles, whether administered through the UBC or by a private educational service provider.  As is the nature with democracy, a candidate with little applicable experience or skills could conceivably be elected to hold a significant leadership role in the District Council.  While some elected members thrive in their new roles despite gaps in experience, all could benefit greatly from a training apparatus for the elected leadership.  As properly lauded by my predecessor with respect to the Benefit Funds, such training opportunities would be no less valuable at the District Council.

D.    **Local Union Issues**

1.    **Vacancies in Local Union 157**

As a result of the removals discussed *supra* Section II.A.10, there were multiple vacancies among Local Union 157's elected positions this spring.  These circumstances brought

31

to the forefront the Union's policy towards vacancies in elected offices and *pro tem*

appointments, described in the Review Officer's Final Report.

      The UBC Constitution sets forth some guidance for filling vacancies in delegate

positions:

> When vacancies occur in any elective office of a Local Union or in
> the position of delegate to a Council from a Local Union, the
> president of the Local Union may appoint a qualified member to
> the vacancy pro tem, until such time as an election is held to fill
> the vacancy.

Section 32(B) of the UBC Constitution.  Notwithstanding this provision, the history and

circumstances of the District Council justified prioritizing election of delegates over the

President's power to make *pro tem* appointments of unspecified duration.  In October 2014, my

predecessor recommended defining a limitation to that power, as described in his Final Report:

> As we have discussed, I have viewed Paragraph 4.B of the District
> Council Bylaws as one of the special provisions of the Bylaws
> which supersedes related provisions of the Constitution of the
> UBC.  The unique circumstances of governance in New York
> (where corruption and outside influence have greatly harmed the
> Union) and the pendency of the Consent Decree since 1994 have
> made these special provisions necessary.
>
> Since the Bylaws were implemented in August 2011, I have
> strictly construed the requirement that delegates be elected "by the
> rank and file members of the United Brotherhood of each affiliated
> Local Union,' as superseding Section 32.B of the Constitution,
> which authorizes local union presidents to appoint delegates pro
> tem when a vacancy occurs "until such time as an election is held
> to fill the vacancy."   Based on the imperative of the Consent
> Decree's direction that the District Council and its local unions be
> run "democratically," I have found my interpretation of Paragraph
> 4.B (barring appointments) to be a highly effective means to
> prevent unlawful manipulation and degradation of the delegate
> body (through pressure being applied on lawfully-elected delegates
> to resign, and being replaced by appointed cronies of local union

officials and sometimes by persons loyal to racketeers).  Further, without a clear teaching from the UBC Constitution regarding when an election must be held, the excessive passage of time after an appointment of a delegate without a special election further contravenes the Consent Decree's requirement that the affairs of the Union be conducted democratically.   To date, the District Council and its eight affiliated local unions have abided by my interpretation of Paragraph 4.B.

However, I also recognize that vacancies may sometimes occur for legitimate reasons and without warning and that as a result, an affected local union is under such circumstances deprived of full representation in the delegate body even when it exigently notices and holds a special election to fill the vacancy.  Thus, I formally recommend that in order for the strict terms of the Consent Decree to be met – while maintaining the representation to which local unions are entitled – the District Council accept the credentials of a delegate pro tem for the first two meetings of the delegate body after the seat in question becomes vacant.  Such a method will serve to more closely harmonize Paragraph 4.B and Section 32.B and ensure that local unions are fully and effectively represented (provided that able delegates pro tem are appointed) and will allow sufficient time for the necessary special election to be noticed and held.

Note that I have considered the argument made by some members that a longer time in which to hold a special election is necessary because elections are "expensive" and other vacancies might occur in the same time.  Such thinking is insupportable. Elections do cost money, but that is part of the inescapable price of the democracy required by the Consent Decree. Even if this were not the case, there is no way to know when or indeed whether any subsequent vacancy in the delegate body relating to the particular local union might occur.

Section I.D.12 of the Review Officer's Final Report (quoting Letter of the Review Officer to the

District Council, October 13, 2014).  On December 10, 2014, the delegate body adopted this

recommendation, implementing a new system whereby the local union presidents could appoint

a *pro tem* appointment for the two meetings following a vacancy, in order to provide time for

elections to be held and for uninterrupted representation to continue.  This policy was intended to

33

promote democracy by limiting appointments and thus encouraging elections soon after vacancies arose.

Earlier this year, I was asked by Local Union 157 to review the *pro tem* policy adopted by the District Council with respect to two vacancies among its delegates. After considering the issues, I concurred with my predecessor's recommendation of permitting *pro tem* appointments, but significantly limiting their duration in favor of elections. Local Union 157's delegate seats at issue were filled by *pro tem* delegates for the allowed period of the two meetings following the occurrence of the vacancy and then vacated pending election.

In addition to these vacancies, more vacancies arose when Local Union 157's ineligible delegates and President were removed from office in late March for failing to timely pay their working dues (discussed *supra* Section II.A.10). Also, Local Union 157's Executive Committee Delegate was removed from office in on April 6, 2015, for unrelated reasons (discussed *infra* Section IV.C). Despite these vacancies, and the limited duration of the *pro tem* appointments, Local Union 157's leadership did not initiate the process of seeking approval for the funding of the election until the June 2015 meeting. As a result, Local Union 157 will forego full representation for at least three months, due to the UBC Constitutional notice requirements for nominations and elections. These vacancies are concerning.

There have been complaints that holding an election within the two-month limitation set forth in the *pro tem* policy is not feasible. I have yet to be convinced of this view because I have not observed a local union that has truly tried to meet this deadline but failed. Furthermore, some of the current policies that potentially make this deadline a challenge can be changed. First, nothing requires pre-approval of election expenses for each specific election, and

34

thus the approval process for this inevitable and legitimate expense could be streamlined.

Indeed, potentially an entire month is lost waiting until the next meeting of the Local Union

membership simply for them to approve the expenses for an election which must be held.

Second, the Executive Committee of the local does not need to wait until the next scheduled

Executive Committee meeting to approve the nomination card listing the positions up for

election – they could hold a special meeting just prior to the monthly meeting, which they all

should be attending.  If both of these actions were taken and a Local Union still could not meet

the two-month deadline, at that point I would revisit my position on the two-month limitation for

*pro tem* appointments of delegates and possibly support a modification of the policy to extend

the *pro tem* term to the time a diligent local requires to hold an election (which I do not imagine

would ever require more than three months).

Also, I have received well-articulated complaints that there is an "election

fatigue" plaguing the members, generated by having to hold elections so frequently.  I agree that

any measure that discourages participation by the members is to be avoided, and to this end, it is

unfortunate that vacancies have arisen so often this year to justify multiple elections.  But

clearly, the solution is not to rule by appointment – such a system breeds cronyism and

corruption.  Democracy requires its leadership to be elected.  The only way to do that is to hold

elections and, regardless of how often they occur, for members to participate fully.  The

members complaining of election fatigue will always be, by definition, the supporters of those in

power; those opposed to the current leadership will always likely welcome the next election.

Such is the reality of any political system, and a labor organization is no different.  My only

advice is for every member to participate in every election, regardless of how often they may

arise, and when one casts one's vote, it will hopefully be for candidates who will well-serve their constituency for their entire term of office.

With respect to the specific case of Local Union 157, there was also uncertainty over the positions up for election.  Since the President of Local Union 157 was removed, the Vice President has assumed the role pursuant to the UBC Constitutional provision which allows the Vice President to assume the position of President "until such times as a President is elected" (Section 34).  I believed it was unclear whether the succession rules permitted him to remain in that office for the duration of the original President's term, and reached out to the UBC for clarity on this point.  My letter to the General President of the UBC is attached as Exhibit H.  On June 29, 2015, the UBC General President responded and indicated that, per the UBC interpretation of Section 34, Local Union 157 should include the office of President in its upcoming election, but need not include the office of Vice President, as the Acting President would resume that role following the election.  The letter from the General President is attached as Exhibit I.  Counsel for Local Union 157 has indicated that, in light of the UBC's position on the matter, the upcoming election will include the position of President, along with the vacant delegate positions and the Executive Committee Delegate position, and it will be held in September 2015.  Nomination cards will be mailed out on a schedule pursuant to the UBC Constitution, and nominations will be held at the August 2015 meeting.

### 2.    Local 1556 Elections

This spring, Local 1556 sent out a notice of nominations and elections which prompted a few calls to the Independent Monitor Hotline.  The nomination card stated that all the positions for delegates to the District Council were open for nomination and election.  The

callers claimed that only two years of the three-year term for delegates had passed.  This matter

was referred to the IG Office for investigation, and I also discussed the situation with the

President of the local union, Chris Parzych.  Mr. Parzych explained his belief that the last

election of delegates was three years ago, and provided reasonable explanations for why

members may be confused as to the dates.  The nominations were allowed to go forward, but the

Inspector General requested copies of minutes from the meetings when the current delegates

were supposedly elected.  The day after the nominations meeting, Mr. Parzych contacted my

office and the Inspector General and explained that he was mistaken about the date of election of

the current delegates, and their terms had not yet expired.  The election of delegates to these

positions did not go forward.  While unfortunate, I do believe this entire incident stemmed from

a mistake and not intentional wrongdoing.

       **E.**     <u>**Ongoing Litigation**</u>

       As the Court is aware, the District Council has interest in a number of litigation

matters of note, several of which have already been brought to Your Honor's attention.  General

Counsel to the District Council, James M. Murphy, Esq. of Spivak Lipton LLP, is ably

representing the District Council in all of these matters.  In addition, as discussed at our June 16,

2015 status conference, special appellate counsel has been consulted and is in the process of

being retained to defend the appeal of the Court's April 27, 2015 Decision & Order in the Wall-

Ceiling matter, referenced first below.

       Based upon the interest expressed at our last conference, below are summaries of

these matters:

- *New York City & Vicinity District Council* v. *Association of Wall-Ceiling & Carpentry Industries of New York*, 15-1574-cv (2d Cir.), on appeal from 14-CV-

6091 (RMB)/90-CV-5722 (RMB) (SDNY, decided April 27, 2015).  In this action the District Council moved to vacate an arbitrator's award that permitted the Wall-Ceiling Association ("WCC") to use a separate CBA signed with the UBC to circumvent the two-person job provision of the District Council-WCC Agreement with a term of July 1, 2011 to June 30, 2017.  The agreement with the UBC purportedly allowed the WCC contractors to employ two-person crews without the 1:1 matching provision by which any carpenter not a member of the District Council must be matched by a referral from the District Council's OWL. The Court vacated the arbitrator's award because it was a clear violation of the express terms of the District Council-WCC Agreement, it did not draw its essence from that Agreement but instead drew its essence from another agreement (the UBC-WCC agreement) to which the District Council was not a party, and it violated public policy because it was contrary to the Court's May 8, 2013 Decision & Order approving the District Council-WCC Agreement, along with the Court's subsequent Orders approving other multiemployer agreements that provided for so-called full mobility, the two-person jobs provision, and the 1:1 matching provision.  The WCC has appealed this ruling, and, as indicated above, an appellate specialist will likely be engaged to defend the appeal.

- *The Cement League and Northeast Regional Council of Carpenters*, NLRB Case No. 3-CA-126938.  The District Council is the Party in Interest in this case which challenges the 1:1 matching provision in its CBA with the multiemployer association, The Cement League.   The National Labor Relations Board's ("NLRB") December 31, 2014 complaint issued by its Office of General Counsel alleged that the 1:1 matching provision, which requires any hires who are not members of the District Council to be matched 1:1 by referrals from the District Council's OWL, on its face violates the NLRA.  1:1 matching provisions are in all of the District Council's agreements with multiemployer associations by which the employers were granted so-called full mobility to hire anyone they wanted (except for the District Council Certified Shop Steward who must lawfully be referred by the District Council's OWL).   The Court approved all of those agreements during 2013.   The District Council's and The Cement League's position is that the 1:1 matching provisions have an anti-corruption benefit because they ensure that there will be employees, other than the Shop Steward, who are District Council members with stakes in protecting the CBAs and the employers' required contributions to the District Council's Benefit Funds.  A trial before an Administrative Law Judge ("ALJ") was held on March 25, 2015.  The Cement League and the District Council presented evidence and argument that the anti-corruption benefits of the matching provisions in the Court-approved multi-employer agreements favored deferring to the Consent Decree and the Court's May 8, 2013 Decision & Order and subsequent Orders.  In his May 21, 2015 Decision, the ALJ agreed with the charging party that the 1:1 matching provision is on its face unlawful under the NLRA because it favors hiring District Council members   as   opposed   to   members   of   the   Northeast   Regional   Council   of

Carpenters.  The District Council will be filing exceptions and supporting briefs with the NLRB in Washington, D.C. by the July 2, 2015 due date.

- *United Brotherhood of Carpenters v. Tappan Zee Constructors, LLC*, 15-1002-cv (2d Cir.), on appeal from 14-CV-03688 (ALC) (SDNY, decided March 25, 2015). Although the District Council is not a party, this case is of importance because the jurisdictional claims of the District Council constituent Local 1556 Dockbuilders ("Dockbuilders") are at issue with respect to approximately 400,000 hours of work on the new Tappan Zee Bridge construction project.  The UBC directed that the work should be assigned to the Dockbuilders as opposed to carpenters represented by the Northeast Regional Council of Carpenters ("NERC Carpenters").  The employer, Tappan Zee Constructors, LLC ("TZC"), disagreed and the dispute was referred to arbitration pursuant to the Project Labor Agreement (the "PLA") that incorporates the National Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (the "Plan").  The arbitrator issued an award directing that the work be assigned to the Dockbuilders.  Eight days later, the same arbitrator issued a contradictory award directing that the work be assigned to the Northeast Regional Carpenters.  The UBC filed a petition to confirm the first award and vacate the second.  TZC filed a counter-petition to confirm the second award.  The District Court agreed with TZC and enforced the second award, finding that the first award was preliminary.  The UBC and District Council have appealed based upon the arbitrator not having the authority under the PLA and Plan to reverse himself with the second award because the first award determined the jurisdictional issue presented and he was essentially functus officio.  The UBC's motion for an expedited appeal was granted, the briefing is complete, and oral argument is scheduled for August 19, 2015.

- *Lipnic* v. *United Brotherhood of Carpenters and Joiners, District Council of New York City*, EEOC Charge # 520-2013-01872.  The Commissioner of the Equal Employment Opportunity Commission ("EEOC") filed this charge against the District Council on behalf of anonymous employees alleging gender discrimination at the Javits Center.  The District Council cooperated with the EEOC's investigation, and the EEOC has decided to take no further action.

- *Herzog* v. *NYC District Council of Carpenters Pension Fund et al.*, Index No. 154427 (New York Supreme Court, New York County).  Arbitrator Robert Herzog brought this action seeking $283,479.83 in fees allegedly owed to him for serving as the arbitrator in numerous proceedings concerning employers' obligation under the District Council CBAs to contribute to the Benefit Funds.  In addition to the unpaid fees, plaintiff seeks interest on the fees, costs, and attorneys' fees.  The Funds are also defendants in the action (*see infra* Section III.F).  A motion to dismiss the complaint as against the District Council has been filed, mainly on the ground that plaintiff has failed sufficiently to allege that the District Council is obligated by contract or otherwise to pay the amounts sought.

In addition to these noteworthy litigations, there are several pending claims against the District Council by individuals for alleged employment discrimination and/or alleged breach of duty of fair representation.

## III.    THE BENEFIT FUNDS

Pursuant to the 2014 Stipulation and Order, I have the responsibilities of review and oversight of the Benefit Funds, the District Council's affiliated Taft-Harley fringe benefit funds.  During his tenure as Review Officer, Mr. Walsh oversaw dramatic improvements at the Benefit Funds, such as the development of a more centralized organization structure; the streamlining of its operations; the establishment of improved human resources policies and training; and the imposition of compliance programs.  To effectuate these improvements, the Benefit Funds, like the District Council, saw significant hiring under his monitorship including, *inter alia*, the hiring of a new Executive Director, the first Human Resources Director, and a new Chief Compliance Officer.  Significant strides have been made to improve the Benefit Funds' functioning.

Unfortunately, with the press of seemingly more urgent concerns elsewhere, as of the time of this writing I have not personally focused attention on the day-to-day operations of the Benefit Funds, though I felt welcome from the start by then-Executive Director Ryk Tierney; Chief Compliance Officer Julie Block; the Benefit Funds' outside counsel, Ray McGuire, Esq. and Elizabeth O'Leary, Esq. of Kauff McGuire & Margolis LLP; and the Board of Trustees, led by co-chairs David Meberg and Joseph Geiger.  Personnel developments, among other things (*see infra* Section III.B), have afforded me the opportunity to work more closely with the Benefit Funds in recent weeks, and I look forward to continuing that close working relationship in the

upcoming months.  Despite the strides forward, I believe that, like the District Council, there is

an important role for monitorship at the Benefit Funds, as it too works towards independent self-

governance.

A.    **Overall Condition of the Funds**

The total available assets of all of the District Council's affiliated Benefit Funds

are approximately $5.4 billion as of March 31, 2015.  Total available assets in the Pension Fund

have grown from $2.76 billion as reported in the Review Officer's Final Report to $2.89 billion

as of March 31, 2015.  The Pension Fund is predicted to be 93.9% funded as of July 1, 2015, up

from 89.1% as of July 2014.  Similarly, total available assets in the Welfare Fund have grown

from the $371 million reported in the Review Officer's Final Report to $419 million as of March

31, 2015.  The Annuity Fund has approximately $2 billion in assets as of March 31, 2015.

The Board of Trustees and a special Welfare Fund Subcommittee continue to

devote time and attention to ensuring that the Welfare Fund remains viable while prudently

considering whether any benefit changes are possible.  As previously reported to the Court, the

Trustees have reduced retiree premiums by 50% and reinstated both dental and vision benefits

within the last year.

B.    **Search for a New Executive Director**

As the Court has been previously made aware, Ryk Tierney resigned his position

as the Executive Director of the Benefit Funds to take a position at a large national pension fund.

Based on experience with prior job searches, the Trustees' expectation is that it will take a

number of months to fill the position.  The Trustees commenced searches for both an interim and

permanent Executive Director upon receipt of Mr. Tierney's notice of termination.

With respect to the Interim Executive Director position, after interviewing three candidates the Trustees selected Regina Reardon who assumed the position effective May 26, 2015.  Ms. Reardon has broad experience in employee benefits.  She is an employee benefits attorney and has served as counsel to multiemployer funds.  She is also the president of Healthcare Strategies, Inc. ("HSI"), an employee benefits administration and consulting company which she founded in 1997.  Ms. Reardon is currently the President-elect of the International Foundation of Employee Benefit Plans ("IFEBP"), and she will become the President and Chair of the Board of the IFEBP in 2016.  Ms. Reardon will be supported in her role as Interim Executive Director by two of her colleagues from HSI.  I have had the privilege of meeting Ms. Reardon soon after she assumed office, and I have learned through multiple sources that she is bringing a much-needed fresh perspective on the management and operations of the Benefit Funds.  I look forward to seeing what Ms. Reardon is able to accomplish while Interim Executive Director and, as I have advised her, I remain willing and able to support her in her efforts.

With respect to the search for a permanent Executive Director, the Trustees advertised the position on April 2, 2015 on IFEBP, BenefitsLink, Monster.com, and Pension & Investments, and have received approximately 36 applications to date.  The Trustees have appointed a Search Committee which has begun preliminary interviews of the present candidates and is also considering retaining an executive search firm to expand the search.  I believe the Trustees are thoughtfully and diligently pursuing the search for this important position and I am hopeful that a replacement will be found well before the next interim report.

C.    **Information Technology**

The Benefit Funds' Information Technology ("IT") Department proposed a 5-year "Strategic Plan and Infrastructure Upgrade" for the Trustees to consider at the end of 2014. The Trustees retained a national IT consulting firm to review the IT Department's plan. The assessment of the IT Department's plan was favorable and its few recommendations have been incorporated into a revised 5-year plan. The Trustees recently approved moving forward with this plan, which is intended to ensure that the technology used by the Benefit Funds best serves its mission.

D.    **Employee Training and Compliance**

The Trustees continue to provide training to the Benefits Funds' employees so that they can best serve the Funds' participants and maintain a high level of professionalism. Since Mr. Tierney's departure, the Trustees have approved retaining a Certified Employee Benefit Specialist ("CEBS") instructor from Baruch College so that employees may continue to pursue, through evening courses, the CEBS certification offered through a partnership of IFEBP and the Wharton School of the University of Pennsylvania. Other training programs include annual handbook training, respectful workplace training and leadership training. The Human Resources Director has also overseen and has assisted managers with the implementation of performance reviews. Training that has been budgeted for the upcoming fiscal year includes "Phone-Pro Plus" for the call center employees, which will train them on how to best provide service over the phone.

43

### E.   Benefit Funds Collections

Virginia & Ambinder, LLP ("V&A") continues to handle the collections for the Benefit Funds.  V&A recovered nearly $2.5 million in the period from February 3, 2015, to April 7, 2015, consisting of settlement recoveries of approximately $760,000, judgment enforcement recoveries of approximately $130,000, and other recoveries of approximately $1.59 million. This brings the total amount recovered by V&A since it began as collections counsel in June 2011 to approximately $18.7 million.  Some of V&A's recent collections efforts are highlighted below.

The Benefit Funds referred twelve members of the Manufacturing Woodworkers Association of Greater New York ("MWA") with outstanding audits to V&A.  Based on V&A's recommendations, the Collections Committee subsequently approved settlements with ten of these employers in the total amount of $569,744.  Nine of those settlements have been paid in full; the tenth is in progress, and the employer is current in its installment payments.  On April 29, 2015, and May 4, 2015, V&A conducted successful arbitration hearings against the two remaining MWA employers, Nordic Interior and Rimi Woodcraft.

At the conclusion of the Nordic hearing, Arbitrator Martin Scheinman stated that he would issue an award against Nordic in the amount of $1,072,418.  The award will call for Nordic to pay $150,000 within fifteen days of the issuance of the award and the balance in eighteen equal monthly installments.  The award will include interest on the declining balance, and Nordic's principal will be required to provide a personal guarantee.  Nordic subsequently advised that it cannot comply with the prospective award and may file for bankruptcy.  On May

22, 2015, Nordic's principal asked to meet with Charles Virginia of V&A and counsel to the Benefit Funds granted permission for such a meeting.

At conclusion of the Rimi hearing, Arbitrator Martin Scheinman stated that he would issue an award against Rimi in the amount of $851,300.  The award will require Rimi to make an initial payment on or before June 4, 2015 in the amount of $350,000, with the balance to be paid in eighteen equal monthly installments.  The award will include interest on the declining balance, and Rimi's principal will be required to provide a personal guarantee.

The Benefit Funds' collection department has continued to further refine the weekly Shop Steward Variance Reporting module, which compares contributions remitted with hours worked three weeks after the work takes place.  At the time of the Review Officer's Final Report, the module only covered employers in the WCC or the BCA.  Since the end of January, the module runs on all employers, and this program is serving its objective of promptly identifying delinquent contributions so that appropriate collection action can be taken.

### F.   <u>Ongoing Litigation</u>

The Funds are currently facing two lawsuits of note filed in the past six months. Former Executive Director Joseph Epstein filed suit on April 14, 2015, over his termination for cause in 2012, claiming that his termination should be deemed a termination "without cause." Details surrounding Mr. Epstein's termination were provided in the Review Officer's Fifth Interim Report (at Part 2).  The second lawsuit of note involves an arbitrator that the Benefit Funds used in connection with collection matters in the past, and is described *supra* Section II.E. He filed suit against the Benefit Funds on May 1, 2015, to recover fees he claims are due to him for the work he performed.  The work performed by this arbitrator was referenced in the Review

Officer's Third Interim Report, at Part Two F.1.c.i.  The Funds declined to pay the arbitrator's

invoices in large part due to the delay (in some cases years-long) in issuing awards.  The Benefit

Funds recently responded to the complaint.

G.      **Trustees' Relationship**

As is inevitable in any system where the organizational leadership is intentionally

divided between labor and employer representatives to ensure dual perspectives in the decision-

making process, I have found that more often than not, many decisions related to the Funds are

stalled because of divisive block voting along party lines.  Currently, unresolved disagreements

are decided by arbitrators.  The use of arbitrators is costly, and results in an outsider, rather than

the Trustees, ultimately making important decisions affecting the Benefit Funds.  Consistent with

my predecessor's approach, I have implored the Trustees to find a way to work together.  To this

end, I recommend Trustees seek the services of a mediator before apparently irresolvable issues

are escalated to arbitration.  This would provide the Trustees an opportunity to discuss and

negotiate in the presence of an independent, less costly third party in the hope of facilitating an

agreement without resorting to an external decision-maker.  Eventually, the mediation process

may provide the Trustees with the tools to negotiate and reach agreement without the

intervention of third parties, which will be particularly needed when there is no longer a Court-

appointed monitor.  While this is an important issue, I do not believe my intervention, aside from

providing this recommendation, is necessary or appropriate.  At the same time, I remain willing

and able to assist in the mediation of disputes, if requested.  I have witnessed the two "sides" of

the Benefit Funds working well together, and I hope for more of this collaboration.

### H.  **Hollow Metal Fund**

The Hollow Metal Pension Fund was 93.53% funded as of January 1, 2014 (the annual report for 2015 is not yet available).  The Hollow Metal Pension Fund had $107 million total investment as of March 31, 2015, and experienced nearly 3% earnings in the first quarter of 2015.

In June 2015, I met with several of the employer trustees of the Hollow Metal Fund, and opened a dialogue which I expect will continue in the coming months.  As described in my predecessor's Final Report, I, too, hope that the Hollow Metal Fund continues on a compliant path, and I will closely monitor its progress and assist in whatever manner appropriate.

### I.  **Labor Technical College**

In March, the Labor Technical College commenced a search for a new Director of Training following the former Director's removal for violating personnel policy.  Walter Warzecha was recently appointed to the position.  A graduate of the Labor Technical College himself, Mr. Warzecha has been involved in training apprentices since September 1999 when he first joined the Labor Technical College as a part-time instructor.  He worked his way up to become Assistant Director of Training in November 2011.  Mr. Warzecha was Interim Director during the search for a permanent Director, and he was selected for the permanent position from among three finalists.

One issue of note that Mr. Warzecha is addressing involves the facilities for divers.  The District Council does not have a dive tank in which to train divers, and historically divers have traveled to unions in Boston and Philadelphia to receive the appropriate training.  Mr. Warzecha has determined that the Labor Technical College will take on greater

responsibility in coordinating that off-site training for members, and he is exploring the possibility of accessing dive tank facilities locally in New York City.

## IV.   OFFICE OF THE INDEPENDENT MONITOR

### A.   Investigations

My predecessor's tenure was marked with numerous successful investigations which, among other things, targeted elements of organized crime within the Union. I feared that with Mr. Walsh's departure, those elements and other corrupting influences would immediately seek to regain a foothold within the Union. Accordingly, we remain ever steadfast in preventing such events, and our investigative capabilities, including our important relationships with law enforcement agencies and prosecutors, are stronger than ever. We have recently re-established communication within the Federal Bureau of Investigation, as well as the U.S. Department of Labor's Office of Inspector General, to augment our regular communication with the United States Attorney's Office.

With respect to sensitive on-going investigations, the details cannot be reported here. I will, however, supplement this Report with a letter under seal to Your Honor outlining any non-public investigative matters which should be brought to the Court's attention.

### B.   Hotline and Email Reporting

Calls to the Independent Monitor Hotline are infrequent. The Independent Monitor Hotline is forwarded to the desk phone of a member of my staff, who answers calls if she is available, and promptly returns messages that are left when she is out of the office. After obtaining basic information about the issue and the caller (if forthcoming), she informs me of the call. There have been approximately 25 calls to the Hotline over the past six months, excluding

48

solicitations, hang-ups, and individuals trying to reach the District Council or Benefits Funds.

Many are reports of worksite CBA violations, which have been referred to the IG Office as the

more appropriate recipient of the complaint or issue.  Other calls have reported individual issues

with the District Council administration, which my staff has reviewed on behalf of the caller.

We have also received a similar number of emails to our designated complaint email address:

monitor-mcgorty@crowell.com.

### C.    Removal of Local Union 157's Executive Committee Delegate

Along with my appointment as Independent Monitor, the 2014 Stipulation and

Order modified the "veto power" historically held by the monitor.  Paragraph 5.b.iii of the

Stipulation and Order still gives the Independent Monitor the ability to remove individuals from

positions of power, or to stop any wrongful action at the District Council, but the new version

imposes a significant procedural change.  Rather than a unilateral "veto," the new Stipulation and

Order requires the Independent Monitor to present the evidence to the District Council's

Executive Committee and recommend a proper action.  The Executive Committee then

determines whether there is "substantial evidence" to support the conclusion of the Independent

Monitor and "to make the final determination on whether the action should or should not be

taken or whether the individual should or should not be removed from office or employment or

face other action."  2014 Stipulation and Order ¶ 5.b.iii(1).

On December 23, 2014, a week prior to the conclusion of his term, Mr. Walsh

issued a Notice of Possible Action to John Daly, Executive Committee Delegate from Local

Union 157 and District Council Shop Steward.  The Notice alleged that Mr. Daly was paid by his

employer for work he did not perform, in violation of both federal law, including the Taft-

49

Hartley Act (29 U.S.C. § 186(a) and (b)), and the District Council's Code of Ethics for Shop Stewards.

As per the process, following the Notice, Mr. Daly provided a response to these allegations which included specific accountings of when, on the days in question, Mr. Daly had worked the number of hours he had reported.  Based upon Mr. Daly's response, I conducted additional investigation, and on March 10, 2105, I provided him with a detailed letter and spreadsheet outlining the newly-obtained evidence against him and my conclusion that the allegations were well-founded.  On April 1, 2015, after several weeks of discussion with the undersigned, Mr. Daly's counsel submitted his second response and soon thereafter, I passed my recommendation along to the Executive Committee for its independent evaluation of the evidence and Mr. Daly's responses.  Pursuant to the procedures set forth in the Stipulation and Order, on April 6, 2015, the Executive Committee deliberated on the question before determining that there was substantial evidence to support the Independent Monitor's recommendation, and Mr. Daly was removed from the positions of Executive Committee Delegate and Shop Steward.

Following the appellate procedures set forth in the Stipulation and Order, Mr. Daly filed a timely appeal to the Court and the matter has been fully briefed.  I am hopeful this matter will be ruled upon prior to the Local Union 157's pending election, which I believe will be held in September 2015, such that it can be resolved on the merits rather than potentially rendered moot if the Executive Committee Delegate seat is filled.

50

## V.    <u>CONCLUSION</u>

In sum, my first six months at the Union have gone by incredibly quickly.   In many respects, I feel that these months have served as my "transition" period above and beyond the two prior months as set forth in the 2014 Stipulation and Order.   I look forward to continuing to work with the leadership, employees, and members on both the District Council and Benefit Funds sides.

I close with several thoughts and observations:

First, it is clear that the financial condition of the Benefit Funds is strong and, relatedly, the man hours are the highest achieved in a substantial period of time, likely in connection with the improving economy.   Despite this good news, it is important to remember that when there is another economic downturn or when market share is eroded through non-union labor, the Funds will feel the impact.   Careful and cautious financial decisions should be made now, when the economy is strong.   At the same time, however, I have heard from many members who, while grateful for reductions to certain health insurance premiums and the reinstatement of dental and vision coverage, would prefer to experience the prosperity of the Benefit Funds reflected by a reduction in benefit costs and expansion of benefits coverage.   I urge the Trustees on both the employer and union sides to work closely together to make decisions which balance fiscal responsibility with the needs of the working men and women of the Union.

Second, I encourage all in the Union, from the leadership of the District Council to the members themselves, to embrace the roles of the IG Office and Chief Compliance Officer. While there have been tremendous strides in the interest of compliance, as have been properly

lauded, there have been expenses associated with those programs, and those expenses are not often well-received by all stakeholders. On multiple occasions I have been presented with comparisons of costs with other unions locally and across the U.S. I have reminded all those who have expressed concerns regarding these costs that those labor organizations, unlike this one, simply do not have the history which resulted in the Consent Decree. Though the Consent Decree shall remain intact, the current monitorship may not be in place forever, and for those who wish self-governance for the Union, I encourage everyone to accept that these compliance systems are here to stay, as are their related (and necessary) costs.

Finally, but relatedly, I was surprised to learn that the delegate body of the District Council has been extremely outspoken regarding the investigators sought to be hired by the IG Office. One particular issue of contention was their experience as carpenters. The proposed candidates had both carpentry work experience and law enforcement or related experience, yet it seemed that the delegates' concern was that they were not carpenters for a sufficiently long tenure. I stress the importance of this issue because it raises deep philosophical issues that threaten the culture of compliance the Union has fought so hard to establish. Experience with labor organizations, or even as a carpenter, is certainly of value. But when it comes to staffing an entity such as the IG Office, with its critical investigatory function, a requirement that the staff be comprised of carpenters, especially a requirement of decades of carpentry experience, is not appropriate. A paramount qualification for investigator staff should be prior law enforcement or other investigatory experience, not the years worked as a carpenter. All should want the best, most qualified candidate for any job, and be willing to pay him or her based on market demands. Only then will the Union be capable of effective and efficient

decision-marking, and be able to demonstrate suitable self-governance, rendering my role unnecessary.

Should the Court require any additional information, please contact the undersigned at Your Honor's convenience.  As indicated at the last status conference, we look forward to appearing before the Court on September 16, 2015, to discuss this interim report, as well as additional developments I anticipate in the coming months.


Date:   July 1, 2015
New York, New York

Respectfully submitted,



By:   _____
       GLEN G. McGORTY
       JOANNE R. OLEKSYK
       Crowell & Moring, LLP
       590 Madison Avenue, 20th Floor
       New York, NY 10022
       (212) 223-4000
       gmcgorty@crowell.com
       joleksyk@crowell.com

       Office of the Independent Monitor,
       District Council of New York City
       and Vicinity of the United
       Brotherhood of Carpenters and
       Joiners of America

CC:

AUSA Benjamin Torrance
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

Raymond McGuire, Esq.
Elizabeth O'Leary, Esq.
Kauff McGuire & Margolis LLP
950 Third Avenue, 14th Floor
New York, NY 10022

James M. Murphy, Esq.
Spivak Lipton, LLP
1700 Broadway, 21st Floor
New York, NY 10019

Barbara S. Jones, Esq.
Theresa J. Lee, Esq.
Zuckerman Spaeder LLP
399 Park Avenue, 14th Floor
New York, NY 10017