UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                  Plaintiff,

-against-

DISTRICT COUNCIL OF NEW YORK
CITY AND VICINITY OF THE UNITED
BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA, et al.,

                  Defendants.

90 Civ. 5722 (RMB)

# FOURTH INTERIM REPORT OF THE INDEPENDENT MONITOR

GLEN G. McGORTY
DANIEL E. VINISH
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
dvinish@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United
Brotherhood of Carpenters and
Joiners of America

April 7, 2017

## TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ........................................................................................................ 1

II.  THE DISTRICT COUNCIL ...................................................................................... 2

    A.   Efforts in the High-Rise Concrete Sector ........................................................ 2

    B.   Information Technology Upgrade...................................................................... 3

    C.   Leadership Training ........................................................................................... 4

    D.   Contract Negotiation ......................................................................................... 5

    E.   OWL Rules ........................................................................................................ 5

    F.   Goals .................................................................................................................. 7

        1.   IT Upgrades ............................................................................................ 8

        2.   Accounting Department........................................................................... 8

        3.   Oversight Policies and Tools for the Council Representative Center......... 8

        4.   Revisions to the Bylaws and Policies .................................................... 10

        5.   Grievances Department.......................................................................... 10

        6.   Trial Committee and Office of the Inspector General ............................ 10

    G.   Litigation......................................................................................................... 11

        1.   Ongoing Matters ................................................................................... 11

        2.   New Matters .......................................................................................... 12

III. THE BENEFIT FUNDS .......................................................................................... 13

    A.   Condition of the Funds..................................................................................... 13

    B.   Executive Leadership....................................................................................... 15

    C.   Litigation......................................................................................................... 17

    D.   Collections' Counsel Report............................................................................ 17

IV.  THE OFFICE OF THE INDEPENDENT MONITOR........................................... 18

    A.   Goals Project.................................................................................................... 18

    B.   Local Union Membership Relief Fund ............................................................ 19

    C.   Miscellaneous Investigations and Referrals.................................................... 21

    D.   Review of the IG's Office ............................................................................... 21

V.   CONCLUSION ........................................................................................................ 21

## I.      INTRODUCTION

Pursuant to Paragraph 5.l.iii of the Stipulation and Order filed in this matter on April 18, 2016 (the "2016 Stipulation and Order"), I respectfully submit this Fourth Interim Report as the Independent Monitor ("IM") of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" or "Union"), and its affiliated Taft-Hartley fringe benefit funds (the "Benefit Funds" or the "Funds").  Herein, I provide my assessment of the progress towards achieving the objectives of the 2016 Stipulation and Order and the Consent Decree approved by the Court on May 4, 1994; my view on the sustainability of reforms previously implemented; and my recommendations going forward.  In this Fourth Interim Report, I endeavor to continue the more focused report that I introduced by way of the Third Interim Report in an effort to streamline the process and conserve Union resources.  As before, I have omitted the general overview of departments where there has been no material development related to the objectives of the 2016 Stipulation and Order and the Consent Decree.  Should the Court desire additional information, it will be provided in a supplemental filing.

I will begin by summarizing the extension of the monitorship.[1]  Over the course of the past year, the focus of my conversations with the District Council leadership and the Benefit Funds has been to establish concrete goals for the organizations so that they may transition to self-monitoring or, at a minimum, a limited form of outside supervision.  The progress made toward reaching these goals is discussed in more detail below.  With respect to the continuation of the monitorship in the short term, counsel for the Government, the District Council, and the

---

[1] As the Court is aware, my first term began on January 1, 2015, pursuant to the prior Stipulation and Order filed in this matter on November 14, 2014 (the "2014 Stipulation and Order"), and expired on March 31, 2016.  I continued my monitorship for a second term that began on April 1, 2016, pursuant to the Stipulation and Order filed in this matter on April 18, 2016 (the "2016 Stipulation and Order"), which expired on March 31, 2017, but was provisionally extended through April 30, 2017, while the parties negotiated a new proposed Stipulation and Order.

Benefit Funds have submitted to the Court a draft Stipulation and Order for the Court's consideration.  I have offered my comments during the negotiations among the parties, and I concur with the proposed revisions which would modify my role with the Benefit Funds immediately and with the District Council over the course of the next year.

As I reported in the past, while I recognize that the Consent Decree and its anti-corruption principles will always be in place, my top priority remains preparing the District Council and the Benefit Funds to prosper in a compliant environment without the daily scrutiny of a Court-appointed monitor.

## II.    THE DISTRICT COUNCIL

### A.    Efforts in the High-Rise Concrete Sector

As discussed in my Second and Third Interim Reports, the United Brotherhood of Carpenters ("UBC") created Local 212 to organize high-rise concrete workers.  Since its inception, Local 212 has grown to include 1,004 members, some of whom transitioned from the non-union sector to the District council's unionized high-rise concrete superstructure sector as Provisional Journeymen Carpenters as part of the overall strategic plan for Local 212. Throughout the past year, the members have logged approximately 1.7 million hours in the high-rise concrete industry, including 374,000 hours logged by Provisional Journeymen Carpenters.

One of the remaining goals for the District Council in 2017 is to completely transition experienced Provisional Journeymen Carpenters to the OWL to ensure that all members are being dispatched randomly to jobsites in accordance with the Consent Decree.  I indicated in my Third Interim Report that the District Council intended to make this transition by the end of 2016.  Third Interim Report, ECF No. 1704 at 3.  While this transition has yet to take place – in part because many of these Provisional Journeymen Carpenters have remained on steady jobs or been transitioned by the employers to new jobs – I have been advised by the District Council leadership that it expects the transition to occur within the next six months.  In the interim, the

members will continue to be dispatched as needed by the Area Standards Department based on the ratio specified in the collective bargaining agreement with The Cement League.

At the inception of Local 212, the General President of the UBC appointed the Local 212 Executive Board pursuant to Section 10(M) of the UBC Constitution.  My office reviewed each of these appointments in advance and I did not object to the UBC's selections.  Third Interim Report, ECF No. 1704 at 2.  My recommendation at that time, however, was that Local 212's Executive Board should be scheduled for reelection in June 2017 when all Locals are set to elect their executive boards, and the membership will likewise vote on Delegates, Executive Committee members, and Trial Committee members.  In line with my prior recommendation, the Local 212 Executive Board will be elected by the Local 212 membership in June 2017.

**B.      Information Technology Upgrade**

As I reported in my Third Interim Report, the District Council has employed the services of Data Research Group ("DRG"), an outside IT vendor, to overhaul the District Council's IT infrastructure for the express purpose of integrating new compliance controls throughout the organization.  I previously reported that the District Council expected to be fully converted to its new IT infrastructure by the end of 2016.  Third Interim Report, ECF No. 1704, at 4.  While this has largely held true, the District Council continues to work with DRG to complete the integration of the OWL module and two components of the Jobs module, including electronic reporting and picket duty features.  The picket duty feature is slated to become operational on April 10, 2017.  DRG recently advised the District Council that the overall complexity of the OWL module has delayed DRG's completion of the IT upgrade.  The District Council is working with DRG to understand DRG's anticipated timetable to finalize the OWL module, but DRG has been unable to provide a firm completion date.  Regardless, the District Council plans to complete this project in 2017.

As part of the overall IT upgrade, the District Council also redesigned its website in an effort to provide members greater access to information through a user-friendly interface.  Since rolling out the new website, members have reported gaining easier access to information about the OWL, including daily statistics on members dispatched to particular jobsites and contractors. It appears that this information has helped members to shape work from specific employers. Members also are able to access their hours and assessment history via the new website, and the District Council has been using the new website's landing pages and associated social media accounts to provide timely news to users.

C.     **Leadership Training**

In order to transition away from a fulltime, external monitorship to a state of self-governance and reporting, the District Council must continue its efforts to maintain strong leadership throughout the organization.  One means by which the District Council has been promoting promising leadership is by investing resources into programs designed to educate the broader membership about the District Council and train existing members in leadership best practices.  This has included the "UBC Journeyman: Building Leadership for a Strong Future" program, otherwise known as the "300 Hitters" program, offered to the membership, as well as the Collaborative Leadership program.  Both of these programs received new members in 2017 and since their inception, they have collectively provided education to over 1,150 members.

Over the course of 2016, the District Council trained twelve additional members to serve as Delegates.  This training included educating the members on the role and value of the Delegate to the District Council, increasing the members' understanding of the District Council's broader initiatives, developing the members' skills for effective communication with fellow members, and strengthening the members' relationships with other Delegates.

**D.     Contract Negotiation**

Over the last several months, the Executive Secretary-Treasurer has hosted a series of meetings attended by Delegates, foremen, company owners, and members to discuss the state of the construction industry and contracts coming up for renegotiation.  These meetings have served as an opportunity for attendees to voice their opinions on challenges facing the industry and the District Council and introduce ideas for continued future success.  These meetings also have allowed members to discuss the collective bargaining agreements set to expire on June 30, 2017 before the commencement of formal negotiations.  Renewing these agreements is a top priority of the District Council leadership and is vital to the wellbeing of the District Council.

**E.     OWL Rules**

As documented in my First Interim Report, the OWL rules would benefit from an "overhaul in the interest of creating a streamlined document (or documents) which sets forth the rules in a clear manner to the intended audience, and reflects the present environment of modern technology and full mobility."  First Interim Report, ECF No. 1628 at 14.  In response to my request, counsel for the District Council drafted a clearer and more comprehensive  version of the OWL rules which were submitted to my office for review.  I have provided my initial comments to the District Council and understand that the District Council is currently using them as a guide for further revision.

The primary issue addressed in my Third Interim Report concerned possible changes to the OWL rules to achieve a more equitable and effective operation.  My office has been working with the OWL Rules Working Group to identify possible inequalities ensuing from the existing three-referral rule.  Thus far, we have noted that under the existing three-referral rule, the OWL does not take into account total hours worked by each worker dispatched.  Under the referral rules, certain workers may fortuitously receive steady, long-term employment from one or more referrals while others may, for example, receive three short-term jobs.

In my Third Interim Report, I highlighted the fact that the District Council undertook an investigation to better understand the OWL in practice.  Third Interim Report of the Independent Monitor, ECF No. 1704 at 4.  As I explained in my Third Interim Report, the investigation produced the following statistics on the number work days assigned to members from three referrals during the one-year period commencing January 2015:

| Number of Days Worked from 3 Referrals | Number of Carpenters |
|---|---|
| <5 | 198 |
| 5-9 | 452 |
| 10-14 | 386 |
| 15-24 | 633 |
| 25-49 | 891 |
| 50-74 | 474 |
| 75-99 | 354 |
| >100 | 1596 |

The primary conclusion that the District Council was able to reach from these data, as noted in my Third Interim Report, was that approximately one-third of all carpenters registered with the OWL received fewer than 25 days of work from their three referrals, and thus risked being unable to qualify quarterly for Welfare Fund benefits.

With these statistics in mind, the District Council recently proposed a pilot program to monitor the effects of certain modifications to the three-dispatch rule to address the identified concerns.  The pilot program is expected to implement a 45-day threshold for the total number of work days a carpenter may receive from the OWL before being dropped from the list.  The purpose of this new threshold is to prevent individuals who were referred to jobs that fortuitously turned out to be of a lengthy duration and who have not yet used up their three dispatches from remaining active on and moving up the OWL while steadily employed.  Under the new protocol, a dispatched carpenter will be considered gainfully employed once dispatched until such time as the carpenter reports his or her unemployment within the 45-day threshold.  This modification

should increase the rate at which the OWL cycles by automatically eliminating those individuals that remain employed or choose not to reinstate themselves on the OWL.

As stated in my Third Interim Report, efforts to create a work day-based OWL rule in the past were terminated because they were believed to increase skill-puffing and job-quitting. Final Report of the Review Officer, ECF No. 1602 at 7. The countervailing consideration I have concluded to be necessary, however, is that members must work at least 250 hours per quarter to qualify for Welfare Fund benefits in the following quarter. Accordingly, the consensus has been to modify the OWL rules to focus the list on actual unemployment and increase OWL cycling. I have learned from discussions with the OWL Rules Working Group and District Council leadership that alleged skill-puffing and job-quitting by a few workers in the past before the implementation of the three dispatch rule may be monitored in the future on a rolling basis by implementing additional controls. As of the drafting of this report, I have approved the pilot program and am coordinating with the OWL Rules Working Group and counsel for the District Council to finalize new language for the OWL rules. My office will monitor the pilot program closely to see if it resolves issues of inequity without re-creating the problems which prompted the initial change. We will revisit the pilot program should it prove ineffective in achieving both goals.

**F.      Goals**

Over the course of the last year, I met with the Executive Secretary-Treasurer ("EST") and other District Council leadership to discuss objectives which must be met before I recommend terminating the monitorship. My Third Interim Report listed areas for improvement in meeting the requirements of the Consent Decree and ensuring the appropriate oversight and internal controls to guard against corruption. These goals and ensuing developments include:

### 1.   IT Upgrades

As I have emphasized in my prior reports, upgrading the District Council's IT infrastructure to enhance its oversight and compliance mechanisms is a critical consideration in my decision to recommend that the District Council self-govern.  As discussed above, the District Council's IT upgrade is substantially completed.  I anticipate that the District Council will continue to work with DRG to develop a firm timetable for completion of the OWL module and electronic reporting within this calendar year, barring unforeseen circumstances.

### 2.   Accounting Department

In 2015, the Audit Committee engaged Calibre CPA Group PLLC (the "Auditor") to review the District Council's redesigned membership assessment system.  A copy of the Auditor's report and my instructions to implement the Auditor's recommendations were attached to my Third Interim Report, ECF No. 1704 at 7.  The Audit Committee has since met monthly and provided me with its intended response to the Auditor's recommendations.  Included in the response are actions taken by the District Council to further modify the IT infrastructure, generate monthly reports to the Director of Operations outlining any changes in the responsible payors, and allow management to track the individuals responsible for reviewing financial information and depositing bank notes.  The Audit Committee also is reviewing and modifying the user- and group-level security privileges controlling user access within the accounting department and modifying them as necessary.  In addition to these measures, the Audit Committee has acknowledged certain compliance mechanisms that it believes are already in place to address some of the Auditor's recommendations.  I will continue to monitor the Audit Committee to ensure that the Auditor's recommendations are fully addressed.

### 3.   Oversight Policies and Tools for the Council Representative Center

In my Third Interim Report, I described an investigation by the IG's Office that identified a deficiency in jobsite attendance by a Council Representative.  I also explained how oversight of

the District Council's daily operations should be alleviated by the District Council's IT upgrade. Third Interim Report, ECF No. 1704 at 8.  As is discussed above, the IT upgrade is substantially completed and expected to be fully operational in 2017.

My office currently is reviewing a new operating manual for the Council Representative Center tasked with resolving member issues that arise on jobsites and pursuing appropriate disciplinary action.  The new manual describes the ongoing responsibilities of Council Representatives, Regional Managers, and the Lead Manager of the Council Representative Center as they carry out these tasks.  I expect to provide recommendations to this manual during the upcoming quarter.

I recently approved a related policy to decommission outdated, largely unused, and costly "Motorola ET" devices that the District Council previously had issued to shop stewards to track and report the workers on the job and their time.  Currently, more than half of District Council shop stewards log time on their personal devices.  Each "Motorola ET" device costs approximately $1,000, and 500 of the 700 deployed devices are no longer under warranty.  The costs for management and AT&T mobile data for the devices exceed $100,000 annually.

As part of the larger IT upgrade project undertaken by the District Council, the new time reporting portal will allow shop stewards to continue to report their time remotely and electronically.  Shop stewards will be able to access the new time reporting portal via an internet browser on any laptop or desktop, as well as via iOS and Android smartphone applications. Telephonic reporting also will remain available, and all telephonic reports will be entered immediately into the same electronic portal by intake staff at the District Council.  Regardless of which technology shop stewards use to log time, District Council members will be able to view all reported time through the Watch Dog system.

### 4.    Revisions to the Bylaws and Policies

In my Third Interim Report, I noted that the District Council needed to revise its Bylaws and policies in order to position the District Council for post-monitor governance.  In 2015, the leadership of the District Council convened the Bylaws Working Group to undertake the task of reviewing the Bylaws to identify amendments necessary to meet this goal.  After what I understand to be considerable, thoughtful discussion, the Bylaws Working Group has proposed revisions to the Bylaws.  I have preliminary approved the revised Bylaws and the proposed procedure for their passage and understand that they have been submitted to the Government for its review and evaluation.

### 5.    Grievances Department

As I have reported in the past, a backlog of grievances exists within the District Council. First Interim Report, ECF No. 1628 at 27, Second Interim Report, ECF No. 1653 at 20-21, and Third Interim Report, ECF No. 1704 at 8.  Over the past six months, the District Council has focused on developing procedures aimed at alleviating it of this backlog.  These procedures have resulted in decreasing the backlog from 7,239 grievances in 2016 to 2,171 as of March 1, 2017 and in combined collections by the District Council, the Funds, and the greater membership in the amount of $462,231.70.  In many cases, the District Council has also been able to categorically resolve grievances that did not target any particular member or resulted from a misunderstanding as to the hours reported by union contractors.  I view these developments positively and expect the District Council to continue to address the grievance backlog and adjudicate claims where appropriate.

### 6.    Trial Committee and Office of the Inspector General

In my Third Interim Report, I explained that my office had made a series of recommendations regarding the Trial Committee process and procedures, and that the District Council must address these and any forthcoming recommendations either by implementing them

or suggesting appropriate alternatives.  Third Interim Report, ECF No. 1704 at 9.  I have since

met with the District Council leadership several times to discuss the Trial Committee process.

The District Council has also provided responses to my office's recommendations concerning the

content of various forms utilized during the trial process.  My office will continue to work with

the District Council's leadership to ensure that the trial process is comprehensive, effective, and

an efficient use of the District Council's resources.  Inasmuch as the IG's Office works closely

with the Trial Committee, any final changes to be implemented to the trial process will await the

completion of my review of, and report on, the IG's Office.  See Section III.D. below.

### G.     Litigation

#### 1.     Ongoing Matters

Below we have summarized on-going litigations involving the District Council in federal

and state court:

- *United States v. District Council of N.Y.C. and Vicinity*, No. 15-3300-cv (2d Cir. Filed Oct. 16, 2015), on appeal from No. 90-CV-5722 (RMB) (S.D.N.Y. Sept. 16, 2015). Former Executive Delegate and Shop Steward to the District Council, John Daly, appealed to the Second Circuit this Court's affirmation of his removal.  On September 27, 2016, the Second Circuit affirmed this Court's Order.  On or about March 20, 2017, Daly filed with the Supreme Court of the United States a petition for a writ of certiorari.

- *New York City & Vicinity Dist. Council v. Association of Wall-Ceiling & Carpentry Indus. of NY*, No. 14-CV-6091 (RMB) (S.D.N.Y. filed Aug. 5, 2014). On June 20, 2016, the Second Circuit vacated Your Honor's decision in this matter and remanded for Your Honor to reconsider approval of the CBA in light of the arbitrator's interpretation of the agreement.  As Your Honor directed, on February 15, 2017, the parties and interested party multiemployer associations submitted position statements to Your Honor on the issues of the anti-corruption compliance features under the two-person jobs and full mobility provisions under the CBA with the Wall-Ceiling Association and related CBAs.

- *Creative Constr. Servs. Corp. et al. v. District Council of N.Y.C. and Vicinity*, No. 14-CV-07629 (AKH) (S.D.N.Y. filed Sept. 19, 2014). This is an action filed by a signatory contractor and its principal under 42 U.S.C. Section 1981 and New York City's Human Rights Law. Plaintiffs allege, among other things, that the District Council purposely referred "unproductive and unskilled employees," including Shop Stewards, to the contractor because of its and its principal's minority status.  The District Council filed a motion for summary judgment to dismiss the Plaintiffs' second amended complaint in its entirety.  On March 29, 2017, the District Council's insurance carrier directed that the

Union agree to settle the action by which the insurance carrier would pay the entire settlement amount.  The parties are drafting a settlement agreement.

- *The Cement League and District Council of N.Y.C. and Vicinity, Joint Petitioners v. National Nat'l Labor Relations Bd., Respondent, and Northeast Regional Council of Carpenters, Charging Party Intervenor*, No. 16-495 (2d Cir. filed Feb. 19, 2016). This is an appeal by The Cement League and the District Council of a decision and order of the National Labor Relations Board finding that the one-to-one matching provisions under the anti-corruption features of full mobility in The Cement League-District Council CBA violate the National Labor Relations Act.  Oral argument was held on April 3, 2017 and the appeal is now fully submitted for decision.

- *Herzog v. NYC Dist. Council of Carpenters Pension Fund, et al.*, No. 154427/2015 (N.Y. Sup. Ct. N.Y. Cnty. filed May 4, 2015).  Arbitrator Robert Herzog brought this action seeking fees allegedly owed to him for serving as the arbitrator in numerous proceedings involving delinquent Benefit Funds' contributions.  The District Council's and the Funds' motions to dismiss the complaint were granted, but that ruling was reversed on appeal. All defendants have filed answers at this time and the Funds filed with the appellate court a motion for reconsideration supported by the District Council.  The Funds' motion was denied and the parties are now engaged in discovery.

- *Stampone v. Walker (Director of Operations) and New York City Dist. Council of Carpenters, et al.,* No. 15-cv-6956 (JLL) (JAD) (D.N.J. filed Sept. 18, 2015). This action is by a *pro se* plaintiff who is a member and Shop Steward against the District Council, the Funds, and the Northeast Regional Council of Carpenters Pension Fund.  On February 8, 2017, the Court dismissed the Second Amended Complaint in its entirety.  On February 27, 2017, Plaintiff filed a motion for reconsideration, for a stay, and for an extension of time to file a Third Amended Complaint.  On April 5, 2017, the Court denied Plaintiff's motion for reconsideration and gave Plaintiff until May 5, 2017 to file a Third Amended Complaint that comports with the Court's instructions on pleading.

For additional detail, please refer to my First, Second and Third Interim Reports, ECF Nos. 1628 at 37-39, 1653 at 24-26, and 1704 at 9.

## 2.    New Matters

Below we have summarized notable new litigations involving the District Council:

- *New York City District Council of Carpenters v. Best Made Floors Inc.*, 16-4281 (2d Cir. filed Dec. 22, 2016).  In this action, Best Made Floors appealed to the Second Circuit a judgment from the EDNY in favor of the District Council confirming an arbitration award in favor of the Union.  Appellant seeks to overturn the judgment and has not specified any monetary damages sought.  On February 28, 2017, the parties participated in Court ordered mediation but the litigation was not resolved.  Appellant Best Made Floors filed its brief on April 3, 2017, and Appellee Union's brief will be due thereafter within 91 days.

- *Ariel Servin v. New York City District Council of Carpenters et al.*, Index No. 711959/2016 (New York Supreme Court, Queens County). Carpenter Ariel Servin brought this personal injury action seeking an unspecified amount of damages for an injury allegedly sustained while operating a saw during a training class run by the Labor Technical College (now Carpenters Training Center). Both verbally and in writing, the District Council's counsel has explained to Plaintiff's counsel that the Union is not a proper defendant in this matter. Plaintiff's attorney refuses to dismiss the lawsuit as to the Union. This action is being defended on behalf of the District Council and the separate Benefit Funds and Training Fund by personal injury counsel, Gallo Vittucci Klar LLP, assigned by the liability insurance carrier.

## III. THE BENEFIT FUNDS

### A. Condition of the Funds

The Pension Fund held in excess of $3.1 billion in assets as of February 28, 2017. The Pension Fund's rate of return from July 1, 2016 (the beginning of its fiscal year) through February 28, 2017 was 7.81% compared to the policy index return of 6.52%[2] for that same period. Its one-year return as of February 28, 2017 was 14.16% compared to the policy index return of 12.62% for that same period. Its three-year return as of February 28, 2017 was 5.68% compared to the policy index return of 5.86% for that same period. Its five-year return as of February 28, 2017 was 8.35% compared to the policy index return of 8.22% for that same period. Its ten-year return as of February 28, 2017 was 5.75% compared to the policy index return of 4.81% for that same period. Its return since January 1, 1992 was 8.26% compared to the policy index return of 7.77% for that same period.

The Welfare Fund, which is more conservatively positioned than the Pension Fund, held over $514 million in assets as of February 28, 2017. The Welfare Fund's rate of return from July 1, 2016 (the beginning of its fiscal year) through February 28, 2017 was 3.02% compared to the policy index return of 2.71% for that same period. Its one-year return as of February 28, 2017

---

[2] The Pension Fund's policy index is calculated on a monthly basis by weighting specific asset class indices with the targets set forth for each asset class in the Fund's investment policy statement. As of February 28, 2017, the Fund's policy index consisted of: Russell 3000 Index (23%); MSCI ACWI ex us Index (Net) (19%); Bloomberg Barclays U.S. Aggregate Index (25%); NFI ODCE Index (Net) (20%); LIBOR + 3% (10%); and Russell 3000 Index + 3% (3%).

was 6.14% compared to the policy index return of 6.76% for that same period.  Its three-year

return as of February 28, 2017 was 2.04% compared to the policy index return of 2.98% for that

same period.  Its five-year return as of February 28, 2017 was 3.17% compared to the policy

index return of 3.47% for that same period.  Its ten-year return as of February 28, 2017 was

3.99% compared to the policy index return of 4.48% for that same period.  Its return since

January 1, 1992 was 5.19% compared to the policy index return of 5.53% for that same period.

The Welfare Fund's continuation value (months) was 21.1 months of June 30, 2016 and

projected to be 20.2 months as of June 30, 2017.

The Annuity Fund, which is participant-directed, exceeded $2.3 billion in assets as of

February 28, 2017.

Over the past year, the Court has suggested the engagement of outside auditors to

evaluate the performance of the Funds' investment advisors.  In November 2016, the Funds

issued a Request for Proposal for Investment Review Services to five investment firms identified

by the Funds' counsel after consultation with various investment professionals.   None of these

firms had provided services to the Benefit Funds in the past.  The Funds engaged Aon Hewitt

("Aon") on February 2, 2017 to conduct the review.

Aon recently completed its audit of the Funds and issued a draft 79-page report of its

findings, which indicates that the returns of the Pension, Welfare and Apprenticeship Funds are

in line with their benchmark and that investment management fees fall within industry standards.

With respect to the Annuity Fund, which is participant-directed, Aon concluded that the 16

investment alternatives offer participants ample opportunity to diversify the assets. Aon made a

number of recommendations for the Trustees to consider with respect to each of the Funds,

ranging from, *inter alia*, modest additions to the Funds' Investment Policy Statements to more

substantive suggestions regarding possible changes to the Annuity Fund's Qualified Default

Investment Alternative, changing the Annuity Fund program to offer fewer, broader investment alternatives, and including additional index funds to the investment line up.  On March 28, 2016, the Trustees met separately with Arthur J. Gallagher & Co. ("Gallagher") (the investment consultant for the Funds), Prudential (the Annuity Fund's recordkeeping service provider), and Aon to discuss the draft report.  The Trustees have directed Gallagher and Prudential to respond to the report, including noting any areas of disagreement or views on Aon's recommendations.  The Trustees will be meeting with all three firms again (both separately and jointly) in the weeks to come to further review and evaluate Aon's recommendations.  After fully vetting each of the recommendations, the Trustees expect to adopt some or all of Aon's recommendations.  However, further review is required before determining the exact changes that will be adopted.

B.     **Executive Leadership**

Since I submitted my Third Interim Report, I have had the opportunity to meet with the newly-appointed Executive Director, Chief Financial Officer, and Chief Compliance Officer to continue the dialogue I began with the Co-Chairs of the Board of Trustees and their counsel concerning goals to facilitate the conclusion of my monitorship in its current form.  I am pleased by the progress that the Executive Director, Chief Financial Officer and Chief Compliance Officer have made in integrating themselves into the Funds' daily operations.  The appear to be engaged in a concerted effort to implement appropriate management protocols and foster a healthier working environment.  I intend to continue to work with the Executive Director, Chief Financial Officer, and Chief Compliance Officer, as well as the Co-Chairs and their counsel, to monitor the implementation of new compliance protocols.

The Executive Director of the Funds has been working toward a series of goals since his appointment last year.  These goals include increasing members' satisfaction with the scope of benefits provided and interaction in general with the Funds.  A key component of these efforts has been a focus on employee morale at the Funds.  The Executive Director has undertaken the

drafting of a five-year strategic plan for the Funds, which will include developing and implementing a variety of programs including the creation of a Members Education & Network for Dependency program, a Welfare Eligibility Department, a Paid Time Off Policy, a Continuing Education Compensation Program, and a revamped administrative budget.  The Executive Director is also considering operational changes to streamline the Funds and increase ease of access for members.

The Office of the Chief Compliance Officer ("OCCO") conducted two significant investigations between September 2016 and the present.  The first was an investigation into an allegation of undue influence exercised by a trustee in the hiring process of a professional.  This investigation concluded when the OCCO determined the allegations to be unfounded.  The second investigation involved an allegation of vendor misconduct during an RFP process.  This allegation was substantiated.  Recommendations from the OCCO for related sanctions and corrective action have been adopted by the Board.   Two calls received on the Hotline were also routed to the Welfare and Pension offices for further action.  There have been approximately five referrals from the IG's Office, all of which have related to pension or welfare questions and were forwarded to the relevant Funds offices.

Various other internal governance and compliance initiatives are ongoing within the OCCO.  Within the past six months, the OCCO conducted annual training with all Funds staff on the Compliance and Ethics Program ("CEP").  The OCCO is also reviewing the CEP with the assistance of counsel to ensure the program is relevant and up-to-date.  The OCCO also is conducting audits for ERISA §411 and §408 (b) (2) compliance.   The OCCO has interviewed approximately eighty percent of the Funds' staff to acquaint them with the Chief Compliance Officer ("CCO") and survey their satisfaction with the Funds' working environment.   The

OCCO has specifically targeted office morale over the past year and a positive impact is being made to improve morale for the vast majority of staff under the present leadership.

### C.  Litigation

The Funds continue to defend a state court litigation commenced by Arbitrator Robert Herzog and a federal court litigation commenced by former Executive Director Joseph Epstein. The Funds' (and other defendants') motion to dismiss a *pro se* suit brought by a participant for pension benefits has been granted; however, the plaintiff has filed a motion for reconsideration which is pending before the court.

### D.  Collections' Counsel Report

At each meeting of the Delinquency Committee, Virginia & Ambinder, LLP ("V&A") provides a "scorecard" report, tracking monies recovered and legal fees incurred in each case. As reflected in these reports, during the six-month period ending March 20, 2017, recoveries net of attorneys' fees and costs totaled $5,356,202. Net recoveries during 2016 totaled $8,577,057.

The Funds continue to avail themselves of all means of recovering delinquent contributions, including arbitration and litigation against employers, actions against alleged alter egos and successors, actions against sureties that issued general payment bonds on publicly-financed projects, and legal action against general contractors and individuals.

During the six-month period ending March 20, 2017, the Funds recovered $495,050 as a result of litigation against sureties.  In February 2017, Judge Crotty ruled that the owner of a woodworking company is personally liable under ERISA for unpaid contributions and related fees owed to the Funds.

As part of V&A's efforts to maximize efficiency, the Funds commenced two joint actions with the Northeast Carpenters Funds against delinquent employers in the six-month period ending March 20, 2017, and settled another joint action for $250,000. The Funds also compelled 31 employers to submit to payroll audits by taking legal action based on estimated audit findings.

V&A achieved a global settlement of a multi-faceted dispute against an employer and its principal whereby: (1) the employer will pay the Funds $250,000 in 36 equal monthly installments with interest on the declining balance at the prime rate; (2) the employer will agree in its bankruptcy proceeding to an allowed claim by the Funds of $355,000, yielding a payout to the Funds of $142,000 over five years; (3) the employer will withdraw its action to claw back and the Funds will keep $72,000 previously recovered by V&A on the eve of the employer's bankruptcy filing via garnishment of a bank account; and (4) the principal will personally guarantee the settlement. The value of the settlement is approximately $476,000.

In February 2017, Rimi Woodcraft finished paying its settlement in the amount of $851,300. All eleven members of the Manufacturing Woodworkers Association of Greater New York ("MWA") with whom the Funds settled audits have now paid their settlements in full totaling $1,911,226.  The lone remaining MWA employer, Nordic Interior, filed for bankruptcy.

## IV.    THE OFFICE OF THE INDEPENDENT MONITOR

### A.    Goals Project

Over the course of my two terms as Independent Monitor, I have witnessed considerable positive change within the District Council and the Benefits Funds affecting the organization's structure.  Likewise, I have received from leadership of both entities support indicative of a genuine desire to achieve a prosperous and compliant future in which self-governance is realizable.   Transitioning away from a full-time monitorship would conserve the District Council's and Benefit Funds' resources.  At the same time, my support for such a transition is contingent upon the support by both entities for robust internal controls.

As the proposed Stipulation and Order suggests, the Government, the District Council, and I agree that the District Council should begin to transition further toward self-governance, but that the continued oversight of the Independent Monitor is necessary in order for the District Council to continue the implementation of identified reforms, including but not limited to

implementing the IT upgrade, which will serve as an additional safeguard against corrupt influences.  I am hopeful that the transition will be completed over the course of the next year and that the District Council will be able to function under the Consent Decree, and with modified external monitoring.  With respect to the Funds, the proposed Stipulation and Order accurately reflects my concurrence with the Government and the Funds' Trustees that, during the past year, the Benefit Funds have reached particular benchmarks, including the hiring of a new Executive Director, Chief Financial Officer, and Chief Compliance Officer, and have confirmed their abilities to self-govern.  Accordingly, the proposed Stipulation and Order has modified the powers of the Independent Monitor with respect to the Funds, though I would remain an available resource to the Trustees and Executive leadership while continuing into my next term.

**B.      Local Union Membership Relief Fund**

In my last interim report, I discussed the investigation my team previously undertook to evaluate suspected delinquencies in some employers' contributions to the Membership Relief Fund ("MRF") as administered by a Local Union affiliated with the District Council.  I provided a comprehensive analysis of the MRF structure, the prior Review Officer's investigation, the basis for years of delay in analyzing and collecting upon any delinquencies, and current efforts by the MRF aimed at resolving this issue.  Third Interim Report, ECF No. 1704 at 17.   My Third Interim Report also focused on the Local's efforts to finally resolve this issue by developing software that would allow the Local to compare Benefit Funds' data to the MRF's participant and contribution data.  While this software is now operational and the Local has been able to calculate the monies owed from delinquent employers for calendar years 2011 through 2013, my team's investigation remains ongoing in respect of calendar years 2014 through 2016.

As a general matter, on an employer-by-employer and member-by-member basis, the records my investigative team has reviewed show the number of assessment hours reported and the number of benefit hours paid.  Where the number of benefits hours paid to the individuals

working for a particular employer exceeds the number of assessment hours recorded by that employer, I have referred to this as a "shortage."  Each employer responsible for a "shortage" is considered "delinquent" for the monetary equivalent of the "shortage."

For 2012, the records show that employers paid benefits on approximately 1,100,000 assessment hours and that there is a total shortage of approximately 41,215 assessment hours. This translates to employers having paid approximately 96.45% of the total amount due.  The value of the 41,215-hour shortage is currently believed to be approximately $38,527.

For 2013, the records show that employers paid benefits on approximately 1,532,050 assessment hours and that there is a total shortage of approximately 46,346 assessment hours. This translates to employers having paid approximately 97% of the total amount due.  The value of the 46,346-hour shortage is currently believed to be approximately $43,361.

In November 2016, the Local began sending "dunning" letters to each delinquent employer advising it of the amounts owed for calendar years 2011 through 2013, and requesting that the employer pay these amounts immediately.  A dialogue between the Local and specific employers related to the letters and shortages is underway.  The Local has also developed a protocol whereby it will evaluate on a regular basis all assessment hours reported and benefits paid, as well as any resulting delinquencies and the status of the MRF's collection efforts.  The Local is currently evaluating whether to retain the services of Novak Francella at a cost of approximately $55,000 per year to conduct 33 regular audits of the MRF over the course of a 3-year period.

To date, my team's investigation has been limited to calendar years 2011 through 2013. While I understand that certain members of the District Council have alleged that one or more of the employers responsible for the "shortages" identified above were improperly given a "pass" for the amounts owed, there is no indication that any of the identified shortages is the result of a

"pass" being given to any employer or other impropriety on the part of the Local.  We did not identify any employer that failed to pay benefits altogether or otherwise appeared to have been relieved from its obligation to pay benefits.  My office has requested that the Local assemble records for calendar years 2014 through 2016 and I intend to continue to pursue our investigation into such data.

### C.      Miscellaneous Investigations and Referrals

My investigative team continues to monitor the membership hotline and assist members in resolving a variety of concerns that relate to benefits, wages, and jobsite-related issues.  My team also attends Delegates meetings and generally make themselves available to field any other concerns raised among the District Council membership.  We have been able to resolve most issues brought to our attention simply by facilitating contact between the reporting member and the appropriate District Council or Funds department.  At the same time, however, several issues have been raised requiring my team's investigative resources.  I will report on these issues under seal.

### D.      Review of the IG's Office

As indicated in my last interim report, my team and I have undertaken a comprehensive review of the IG Office aimed at evaluating the current structural, policy, and procedural framework.  Third Interim Report, ECF no. 1704 at 21.  My team has finalized a draft report on its review, and we are working together to assemble recommendations based on my team's findings.  Our goal is to ensure a continued focus on the objectives of the Consent Decree, including self-governance and reporting.

## V.      CONCLUSION

Should the Court require any additional information, please contact the undersigned at Your Honor's convenience.  As indicated at the last status conference, we look forward to appearing before Your Honor in the near future to address concerns and questions of the Court.

Date:   April 7, 2017
        New York, New York

                                        Respectfully submitted,

                                        By:  /s/ Glen G. McGorty____
                                             GLEN G. McGORTY
                                             DANIEL E. VINISH
                                             Crowell & Moring, LLP
                                             590 Madison Avenue, 20th Floor
                                             New York, NY 10022
                                             (212) 223-4000
                                             gmcgorty@crowell.com
                                             dvinish@crowell.com

                                             Office of the Independent
                                             Monitor, District Council of
                                             New York City and Vicinity of
                                             the United Brotherhood of
                                             Carpenters and Joiners of
                                             America

CC:

AUSA Benjamin Torrance            James M. Murphy, Esq.
United States Attorney's Office   Spivak Lipton, LLP
Southern District of New York     1700 Broadway, 21st Floor
86 Chambers Street, 3rd Floor     New York, NY 10019
New York, NY 10007

Raymond McGuire, Esq.             Barbara S. Jones, Esq.
Elizabeth O'Leary, Esq.           Rita K. Maxwell, Esq.
Kauff McGuire & Margolis LLP      Bracewell LLP
950 Third Avenue, 14th Floor      1251 Avenue of the Americas, 49th
New York, NY 10022                Floor
                                  New York, NY 10020

Boyd M. Johnson III, Esq.
Sarah Mortazavi, Esq.
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, NY 10007