RECEIVED
SDNY PRO SE OFFICE

2017 SEP 12 AM 9: 09

S.D. OF N.Y.

September 11, 2017

Honorable Victor Marrero
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl St
New York. NY l0007-1312

Re:    United States v. District Council of the United Brotherhood of Carpenters
90 civ. 5722 (VM)

Dear Judge· Marrero:

My name is Patrick Nee, I am a delegate from Local 157 to the New York City District Council of Carpenters. As this Court is aware, the Executive Secretary Treasurer of the District Council is currently attempting to amend the District Council's Bylaws which were created pursuant to a Stipulation and Order entered into on June 2, 2010. That stipulation also required the approval of a Court Appointed Review Officer prior to their enactment.

Prior to seeking this Court's intervention I asked for and received the Memorandum regarding amending the Bylaws from the District Council's General Counsel to Executive Secretary Treasurer Geiger,(attachment 1) I wrote to the District Council regarding this Memo (att. 2) but have not received a response. I have written to the Independent Monitor and the AUSA (att. 3) who have not responded and the Chief Compliance Officer who responded to my first letter but has declined anything further.(att. 4 & 5) I have also attached the current Bylaws (att. 6) and the proposed amendments as presented to us (att. 7)

Section 35 of our Bylaws require any proposed amendments to be initiated by the locals by submitting proposed amendments to the Executive Committee. ("(B) A proposed change must be submitted in writing by at least one third of the Local Unions" and '(C) All changes or proposed changes to the Bylaws or Trade Rules of this Council or any of the Local Unions shall be first referred to the Executive Committee for consideration and recommendation".)

The exact opposite of this is occurring, where the Executive Secretary Treasurer of the District Council (who is the Council's top officer and a member of the Executive Committee), appointed two other members of the Executive Committee, (Cavanaugh and Wallace), the Chief Compliance Officer and General Counsel Murphy to a "Bylaws Working Group." There is no basis in the Bylaws for the contention that a member of the Executive Committee may appoint other members of the Executive Committee (or appoint anyone for that matter) to a committee whose purpose is to submit proposed Bylaw amendments to the locals for approval, where the

1

locals then "submit" those same amendments back to the Executive Committee for review. This would require a new sense to be given to the word "submit" as it is nonsensical to consider that the locals are somehow sending an amendment back to its author for consideration and recommendation. The plain language of the Bylaws require that proposed amendments be submitted from the locals to the Executive Committee, not the other way around.

The EST has no authority to appoint committees, that authority is held solely by the delegate body under section 5(B)9:

> The Council Delegate Body shall have the following enumerated powers and duties:
>
> 9. Approve or reject the appointment and removal of Trustees to the Trust Funds and appoint and remove representatives to the Council's Rules and Resolutions Committee, District Council Grievance Committee, District Council Election Committee, and such other committee(s) it deems necessary.

Nor is there any basis for the contention that the "Executive Secretary Treasurer ("EST") of the District Council received approval from all elected delegates of the local members establishing the Bylaws Working Group" or that the process has been undertaken with full knowledge of the delegate body. The Bylaws Working Group were appointed some time prior to March 13, 2015, the delegate body was never consulted prior to October 12th, 2016, and were not given any information as to what the "Bylaws Working Group" were proposing until July 14, 2017. The delegate body has been kept in the dark during this entire process.The "Bylaws Working Group" has acted without any authority in this attempt to hijack the Bylaws amendment process.

That only the local unions can initiate the process was also the view of the Review Officer who participated in the drafting of the Council's Bylaws:

> "The District Council may amend its Bylaws upon the initiative of local unions after a special convention of the delegates is held in which the proposed changes are ratified." *RO 5th Inter. Rep* ' pg. 5 ¶2
>
> "[T]he people who govern the District Council will be able to make their own motions about how business is conducted, more in the nature of regulations than legislation. So people should remember there is that opportunity for democracy to implement changes at the pleasure of the rank and file members come January." *Hr. Tr. 90 civ. 522* June 28, 2011 pg. 30, 9-15

While it has been allowed by some that Bylaws section 10(B) grant's the EST the authority to propose amendments to the Bylaws, the only mention of the Bylaws in that section is

the requirement that the EST is "subject to the limitations and necessary approvals contained within these Bylaws," and in any event this circuit has held that:

> "The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir.2008). Also, "specific language in a contract will prevail over general language where there is an inconsistency between two provisions." *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010) "In interpreting a contract under New York law, words phrases should be given their plain meaning, and the contract should be construed so as to and give full meaning and effect to all of its provisions. A court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect." (citations omitted)." *TRAVELERS CAS. v. Dormitory Authority-State of NY*, 735 F. Supp. 2d 42, 56-7 (S.D.N.Y. 2010).

And this is before one even reaches the fact that one of the stated intentions of our current Bylaws was to curtail the authority held by the EST and to empower the delegate body, (see hearing transcripts 90 civ. 5722; February 8, 2011 pages 12 -13, and April 6, 2011 pages 3-8). Which makes the concept that the EST would have the authority to amend the Bylaws absurd, what would be the point of curtailing the EST's authority in the Bylaws if the Bylaws also permitted the EST to amend those Bylaws to restore omnipotent authority?

The current Bylaws were not written in a vacuum, the parties gave reasoned explanations for why they imposed certain strictures in the NYCDCC's Bylaws, which when viewed out of context might seem unimportant or even over reaching, but are there for a reason. Which is probably why the Review Officer in his final Report cautioned that "Material changes to the Bylaws and policies and procedures required by the Bylaws ......must be considered, constructed and adopted with great care and precision."*RO 9th Inter. Rep. Pg. 6 ¶ 3*

<u>Conclusion</u>

I am asking the Court to bar this unlawful attempt by the EST to amend the Bylaws of the District Council.

Sincerely,

_____  9/12/17

Patrick Nee                      Date
6818 52nd Dr.
Maspeth NY 11378
Ph. (718) 593 6414
Email patjnee@yahoo.com

## Attachments

1. March 13, 2015 Memorandum from Counsel Murphy to the EST re: Bylaw amendment process.
2. Letter from Nee to the District Council re March 13, Memorandum
3. August 13 letter to the IM and AUSA from Nee.
4. July 2 response from CCO to Nee. (CCO responses in blue)
5. July 2 letter from Nee to CCO.
6. The current Bylaws
7. Proposed amendments to the Bylaws.

ATTACHMENT 1



1700 Broadway
New York, NY 10019
T 212.765.2100
F 212.765.8954
spivaklipton.com

## MEMORANDUM

**TO:**      Joseph A. Geiger
Executive Secretary-Treasurer
New York City & Vicinity District Council of Carpenters

**FROM:**    James M. Murphy

**COPY:**    Michael Cavanaugh, Vice-President and Assistant to the EST
Josh Leicht, Chief Compliance Officer
Steve McInnis, President and Assistant to the EST
Matt Walker, Director of Operations
Scott Danielson, Director of Operations
Glen G. McGorty, Independent Monitor
Theresa J. Lee, Esq.

**DATE:**    March 13, 2015

**SUBJECT:**    Amending the Bylaws

---

You have asked for an opinion on the process and procedures to be followed to amend the District Council's Bylaws. Set out below are the steps to be followed, with citations to the applicable sections and subsections of the Bylaws. While not addressed here, any final memorandum or directive from you should contain a timetable for completing each step so that the process can be competed well within this calendar year.

The current Bylaws dated August 5, 2011 may be amended under Section 35. While some of the steps under Section 35 are less than clear, what follows is a guide that sets out the steps to be taken in the order provided under the Bylaws.

**Step 1.** You have designated Vice-President and Assistant to the EST Mike Cavanaugh to head up a Bylaws Working Group under his major delegated responsibilities effective February 12, 2014 ("To serve in a lead role on special projects as assigned by the Executive Secretary-Treasurer, which shall be reported to the Executive Committee and the Delegate Body"). VP/Asst. to the EST Cavanaugh contemplates that the Bylaws Working Group would be comprised of himself, Chief Compliance Officer Josh Leicht (under Bylaws, Section 28(F)), myself as General Counsel, one administrative employee (e.g., Meghan Klinkenborg), and, possibly, one or more District Council employees as VP/Asst. to the EST Cavanaugh deems necessary. The Bylaws Working Group would be responsible for meeting with various officers and executive staff to solicit suggestions for amendments. Those officers and staff (i.e., President, Director of Operations, Rep Center

Business Managers, Political Action Director, Grievance Department Director, Organizing/Area Standards Director, Jurisdiction Director, Human Resources Director, OWL Supervisor, the Inspector General, etc.) would also be the expert resource people available to the Bylaws Working Group. In addition, the Bylaws Working Group would also solicit and review proposals from members and the local unions as part of the process of developing, drafting, and circulating for discussion possible amendments.

**Step 2.** As soon as practical, you would recommend to the Delegate Body for appointment the proposed members of the Rules and Resolutions Committee consisting of at least three or more members, Bylaws Section 35(B) refers to "the Resolutions Committee" while Bylaws Section 5(B)(9) refers to "the Rules and Resolutions Committee." The only reasonable interpretation is that both Bylaws Sections are referring to the same committee. Based upon our discussions, I understand that you plan to appoint the presidents of the eight local unions and the President of the District Council to be the members of the Resolutions Committee and will refer those appointments to the Delegate Body to ratify those appointments under Bylaws Section 5(B)(9).

**Step 3.** The Bylaws Working Group will complete drafts of proposed amendments. Each draft amendment should be in the form of the current language, a redlined text showing what language is being added and deleted, the proposed new amendment, and then an explanation of the rationale for the proposed changes.

**Step 4.** The Bylaws Working Group will forward its draft amendments to the Resolutions Committee (see Step 2 above) to review and approve each amendment as to its legality under the UBC Constitution and "the applicable Collective Bargaining Agreement [sic] and State and Federal Laws." Bylaws Section 35(B).

**Step 5.** Each approved amendment would then be forwarded to each of the eight local unions for review. One-third of the local unions (i.e., at least three local unions) would then have to submit to the District Council the draft amendments with the local union's seal affixed. Bylaws Section 35(B).

**Step 6.** The proposed amendments would then be "referred to the Executive Committee for consideration and recommendation . . . ." Bylaws Section 35(B) (first sentence)

**Step 7.** Each proposed amendment recommended by the Executive Committee would then have to be "referred to a Bylaws committee and, if warranted, recommendation to the Delegate Body that a proposed change or changes be adopted." Bylaws Section 35(C) (first sentence). There is no other mention in the Bylaws of "a Bylaws committee." Given that "Bylaws committee" is preceded by the indefinite article "a" rather than the definite article "the" that precedes the listing of committees under Bylaws Section 5(B)(9), the reasonable construction of the Bylaws' language is that "a Bylaws committee" is not subject to Bylaws Section 5(B)(9). Moreover, a Bylaws committee is not a committee "deem[ed] necessary" by the Delegate Body under Bylaws Section 5(B)(9). That is because a Bylaws committee is contemplated by name in Bylaws Section 35(C) (first sentence). Consequently, the recommendation here is that "a Bylaws committee" be composed of a subcommittee of the Executive Committee designated by the members of the Executive Committee.

**Step 8.** If Step 7 results in a recommendation to the Delegate Body, then each proposed amendment would be considered for adoption by the Delegate Body at a Special Convention of the Council. Bylaws Section 35(A) and (C) (first sentence). The Executive Committee has the authority to call such a Special Convention. Bylaws Section 37(D) ("Written notice describing the purpose of a Special Convention must be given to all Delegates and the principal office of each Local Union at least thirty (30) days prior to such Convention.").

**Step 9.** If approved by the Delegate Body, any amendments must then be submitted for review and approval to the General Vice President of the UBC under Bylaws Section 35(C) (second sentence) and the UBC Constitution Section 11B. Eastern District Vice President Frank Spencer has informally suggested that draft amendments could be submitted to the General Vice President earlier in the process (e.g., at the end of Step 3) for "pre-clearance" to avoid objections late in the process at this step. My firm has local union clients that routinely do this "pre-clearance" process with their international unions for amendments to the local union's constitution and bylaws. Nevertheless, the Bylaws and the UBC Constitution would still require formal submission to, and approval by, the General Vice President at this step.

**Step 10.** The final required approval would be by the Office of the United States Attorney. Bylaws Section 35(C) (third sentence). As with Step 9, the recommendation is that the proposed amendments be submitted for "pre-clearance" to the United States Attorney following Step 3, with formal submission and approval by that office following the completion of Steps 4 through 9.

Since there is no longer a Review Officer, proposed amendments do not have to be approved by the Review Officer. Bylaws Section 35(C) (third sentence). Nevertheless, even though there is nothing in the 2014 Stipulation and Order Regarding Appointment of an Independent Monitor requiring approval by the Independent Monitor, his assistance and support in this effort to amend the Bylaws would be helpful throughout the process, especially with respect to acquiring the "pre-clearance" and the necessary formal approval of the United States Attorney.

ATTACHMENT 2

Hi Mat,

Since the communication was sent to me thru your office, I am thinking that that is how I am supposed to respond to Counsel Murphy's Memorandum.

Section 35 of the Bylaws is not very long, consisting of only three paragraphs, and it does not even remotely allow for the process described by Counsel. The Bylaws makes it very plain that the District Council has no authority to initiate any changes to the Bylaws where Section 35 (B) grants this authority exclusively to the Locals.

> "A proposed change must be submitted in writing by at least one third of the Local Unions affiliated with the District Council, with the seal affixed provided that the Resolutions Committee consisting of three (3) or more members has reviewed and approved the resolution as to its legality in accordance with the Constitution and Laws of the United Brotherhood and the applicable Collective Bargaining Agreement, and State and Federal laws."

Section 35(C) holds the the Councils involvement begins when the Locals submit a proposal to the Executive Committee,

> "All changes or proposed changes to the Bylaws or Trade Rules of this Council or any of the Local Unions shall be first referred to the Executive Committee for consideration"

Which clearly means that the Resolutions Committee referred to in Section 35(B) would clearly be a committee created by the Locals since the proposed amendment is **"first** referred to the Executive Committee for consideration" and **not** to a resolutions committee.

Section 5.where the Delegate Body is granted "the exclusive authority to consider, vote upon and finally make decisions on all matters affecting the Council", it restricts this authority to that which is "provided for in the Bylaws."

And again in Section 37.(A)

> "The Council Delegate Body, by majority vote of the Delegates present, either in regular or special session, shall have the authority to adopt policies and procedures consistent with these Bylaws to govern the Council and all Local Unions"

And given the fact that these Bylaws were created in part to protect this union from the consequences of what the Review Officer described as a delegate body which served only as a

rubber stamp for a corrupt EST, it makes little sense that those drafting these Bylaws would allow a future EST so much authority to amend them.

What has occurred to date clearly does not conform with the Councils Bylaws, and I do not think that anyone honestly could say that they believed it was otherwise. Steps one thru five find no support in the Bylaws and can only be considered as an attempt to give the appearance that the District Council holds authority where it has none.

The citation in step six is missing the word "first", which is rather an important word as it shows where the District Councils involvement in the process is supposed to commence and so in reality would be step one.

And I have to say that I find Counsel Murphys suggestion that the primary role in drafting changes to the Bylaws be restricted to Council employees to be very disconcerting. I was unaware that it was as a result of his advice that 99.9% of the members of this District Council were excluded from the process.

As the memo is dated March 13, 2015 am I to understand that this process was actually put into motion three years ago unbeknownst to anyone?


Sincerely

Patrick Nee

ATTACHMENT 3

Dear AUSA Torrance and IM McGorty,

I am addressing you both because you have both independently endorsed both the process used and the amendments sought by EST Geiger, I would like to know why.

The District Council Bylaws establishes the authority, and limits of authority, of the various positions at the District Council. There is a procedure given in the Bylaws for amending the Bylaws. This was not followed in creating the proposed amendments which were given to your office. Instead a convoluted process contained in a MEMORANDUM dated March 13, 2015 was used. The memo created additional steps not envisioned in the Bylaws which allowed for the EST to create a committee to propose amendments where the Bylaws only allowed for such action to be initiated by the Local Unions.

.During a Court Conference on June 28, 2011, Review Officer Walsh held;

> "that the people who govern the District Council will be able to make their own motions about how business is conducted, more in the nature of regulations than legislation. So people should remember there is that opportunity for democracy to implement changes at the pleasure of the rank and file members come January."
> *Hr. Tr. June 28, 2011* pg. 30, 9-15

And again in his Decision Regarding the District Council Trial Committee dated October 31, 2012 RO Walsh, while exploring the various options for altering the Trial Committee Rules, described one of those options which was to amend the Bylaws,as the Trial Committee Rules are incorporated into the Bylaws and allowed that;

> "The District Council may amend its Bylaws upon the initiative of local unions after a special convention of the delegates is held in which the proposed changes are ratified; consent to implement the changes must then be obtained from the Review Officer, the government and the General Vice President of the UBC." *RO 5th Inter. Rep'* att. 8, pg. 5 ¶2

The discretion and authority to amend the Bylaws is held by the rank and file at a local level, any additional steps which impinge on this authority held by the rank and file cannot be viewed as lawful and cannot be considered as consistent with a Consent Decree which is intended to promote democracy. Any assertion that the process described in the Murphy Memorandum meets these strictures is belied by the exclusion of the rank and file from a meaningful role in the process:

> The Bylaws Working Group would be responsible for meeting with various officers and executive staff to solicit suggestions for amendments. Those officers and staff (i.e., President, Director of Operations, Rep Center Business Managers, Political Action Director, Grievance Department Director, Organizing/Area Standards Director, Jurisdiction Director, Human Resources Director, OWL

Supervisor, the Inspector General, etc.) would also be the expert resource people available to the Bylaws Working Group.

The rank and file are reduced to an add in to this process, standing behind District Council employees in a process where the Bylaws allows they are to have the driving seat. The net input of the rank and file which this process achieved is one email from one member. Compare this to the 60 detailed written comments from members received by RO Walsh in creating these Bylaws. This does not, and cannot be presented as a reflecting a democracy in action, it is more reflective of the results achieved by someone attempting to avoid having members involved. This was also achieved by the lack of any real timetable being created and by giving the shortest possible notice that anything was occurring prior to any step in the process.

After taking 21 months to create his own proposed amendments behind closed doors, suddenly everything had to be done in a rush.

The EST has no authority to amend the Bylaws, appoint or create committees; or expend union money and resources without going through the delegate body, yet that is what happened. According to the Murphy MEMORANDUM,( received April 24, 2017) EST Geiger had appointed a committee consisting of Assistant to the EST Mike Cavanaugh, Chief Compliance Officer Josh Leicht, Counsel Murphy, one administrative employee and one or more District Council employees. CCO Leight confirmed that he had been billing the District Council for his time spent on the committee.

The committee continued to work in secret for some 21 months later until November 2016 when the delegate body was informed that there had been proposed amendments created, and it was asked to have the Presidents of the Locals serve as a rules and resolutions committee.

For at least 21 months, EST Geiger had expended the Union's money and resources without authority, to create a set of proposed amendments intended to greatly expand the authority of the position of EST; reduce oversight and accountability; marginalize the delegate body; increase the potential number of employees directly answerable to the EST who could serve as delegates while simultaneously decreasing the protections afforded to them against retaliation; extend the term of the EST; remove the term limits for the position of EST; and increase the salary received by that position. This cannot be viewed or in the union's interest, but as the EST's personal quest to improve his own position.

The UBC and Review Officer Walsh drafted the Bylaws, below are excerpts as to what they said they were attempting to achieve. They qualify what they are trying to achieve, they do not simply say that they are trying to conform with something, they give a reason as to why they are doing something, for instance the stricture on council employees as delegates:

19 One of the phenomena that we have seen over the years is that
20 if one questions the acts of senior managers at the council, if
21 you are employed at the district council, you run the risk of
22 getting fired. And there are also ways of freezing people out

2

23 in the work force in the construction industry if they question
24 authority. We've seen that.

Or empowering the delegate body:

February 8, 2011:

Page 12

Review Officer Walsh

10 With respect to the administration of the district
11 council, I should mention that I have made recommendations
12 which were also published in the report as to how I believe the
13 district council and the UBC, while it supervises the district
14 council, should attempt to reconfigure the way the district
15 council is administered.
16 I specifically suggested that delegates be empowered
17 and that a way be found for them to be able to question
18 authority without fear of, for instance, economic reprisal.
19 One of the phenomena that we have seen over the years is that
20 if one questions the acts of senior managers at the council, if
21 you are employed at the district council, you run the risk of
22 getting fired. And there are also ways of freezing people out
23 in the work force in the construction industry if they question
24 authority. We've seen that.
25 And I have also expressed concern about the singular

Page 13

Review Officer Walsh:

1 power allotted to the executive secretary treasurer which I
2 have seen, based on my investigations, was abused by Mr. Forde
3 and his top lieutenants at the district council. I suggested
4 to the UBC, to counsel from the DeCarlo firm, that in revising
5 the bylaws for the district council, which was a requirement of
6 the stipulation and order, that the UBC go beyond the changes
7 brought by the stipulation and order and actually address the
8 issue of empowering the delegates, making sure they have the
9 ability to question the decisions of the EST and his top
10 lieutenants and trimming the power of the executive secretary
11 treasurer.

3

JUDGE CONBOY:

5 We have focused our attention on
6 the broader question of empowerment of the delegate body to
7 create an adequate checks and balances structure as against the
8 elected officers.
9 In light of the distressing history of excessive and
10 ultimately illegal control by the elected officers, we have
11 focused in the interim since February 8th on developing a
12 series of revised bylaws that will, we hope, in accordance with
13 the express wish of the United States Attorney, we hope that
14 these bylaws will create an effective check and balance system
15 to what has been an autocratic rule at Hudson Street which, of
16 course, has led to twice now necessary intervention of federal
17 grand juries and the United States Prosecutor with respect to
18 extraordinarily serious crimes that have undermined the
19 integrity and the credibility of the union as a whole and have
20 damaged individually every single member of the rank and file
21 of this union.
22 I am pleased to say that after a great deal of
23 discussion with the government and with the re[view] officer,
24 that we were yesterday able to hand to the United States
25 Attorney and to the review officer a formal draft of the
election -- indeed, beyond the election -- the broad
2 organizational structure of the District Council in accordance
3 with this proposed reconfiguration.
4 I also would like to say, Judge, that we have
5 committed to Dennis Walsh, the review officer, to provide to
6 him well in advance the beginning of the election cycle which
7 we are agreed with Mr. Walsh should begin on August 15th, with
8 an eye to having elections on December 15th. We have committed
9 to Mr. Walsh that any structural reconfiguration of locals or
10 other components in the District Council will be communicated
11 to Mr. Walsh and to the U.S. Attorney well in advance of that
12 August 15th step-off point with respect to development and
13 promulgation of rules for the election.
14 So on the point of union democracy, we are satisfied

4

15 that the direct-indirect discussion about who should elect the
16 District Council officers is, in our view, secondary. We had,
17 prior to the indictment of and conviction of Mr. Divine, we had
18 indirect elections and we had direct elections prior to the
19 indictment and conviction of Mr. Ford.
20 It is very apparent to us that the much more critical
21 question is how do we empower this delegate body to have an
22 effective and executive role at Hudson Street as opposed to a
23 passive and ultimately marginal role.
24 THE COURT: I know this could be a naive question, but
25 just trying to understand how this works, you have elections in

1 the past, and in each instance or in several instances it
2 resulted in the election of people who were ultimately
3 convicted of crimes, right?
4 So you're saying now that in the new bylaws and
5 probably in election procedures, but there is a new structure
6 that hopefully surrounds a new election on or about December 15
7 of this year which will lead to a different outcome?
8 JUDGE CONBOY: Hopefully.
9 THE COURT: How, just so the laymen can understand,
10 what changes are you making or proposing that would give rise
11 to a better outcome of union governance and union democracy?
12 JUDGE CONBOY: Let me just suggest, Judge, because the
13 United States Attorney and the reserve and review officer have
14 not had an opportunity to comment --
15 THE COURT: Right.
16 JUDGE CONBOY: -- let me just --
17 THE COURT: You say it is in draft form?
18 JUDGE CONBOY: General concept.
19 THE COURT: That is what I would like to hear.
20 JUDGE CONBOY: Let me just insert the word "perhaps"
21 in front of each of these because we are obviously totally
22 committed to accommodating any suggestions that the government
23 and the review officer make and ultimately, of course, any
24 reactions that you will have because ultimately these will be
25 submitted to you.

6

1 Perhaps delegates should have final authority, final
2 authority on budget, expenditures, the overall organizing plan,
3 collective bargaining and contracts.
4 Perhaps the delegates should have the authority to
5 review, approve, reject, hire, discipline and fire business
6 agents, shop stewards, organizers and counsel representatives.
7 Perhaps delegates should have the sole authority to
8 hire, evaluate and terminate the inspector general and the
9 chief compliance officer.
10 Perhaps the delegates should have the authority to
11 approve or reject the appointment of trustees and removal of
12 trustees from the benefit funds.
13 Perhaps delegates should review job referral
14 activities and records to ensure that referrals are being
15 conducted fairly and properly.
16 Perhaps the delegates, a CPA and inspector general
17 should constitute a new District Council audit committee and
18 officers should not be members of that audit committee.
19 Perhaps --
20 THE COURT: Excuse me for interrupting.
21 These all sound like significant suggestions, but the
22 audit committee, is that perhaps, perhaps a stronger, is that a
23 real enforcement mechanism in corporations? Audit committees
24 play very vital and important role. Is there an audit
25 committee now? I guess I should know that and I don't. And if
7
1 so, how would this one be different?
2 JUDGE CONBOY: Let me just say, Judge, that these
3 reforms are being considered in light of two very important
4 imperatives:
5 One is to create a check and balance upon the
6 executive power at Hudson Street and, therefore, reduce and
7 hopefully eliminate corruption;
8 Secondly -- and this is, indeed, of immense importance
9 to every member of the union and certainly every retired
10 member -- relates to the integrity of the funds. I am going to
11 ask Mr. McGuire when I am finished, Judge, and hopefully I
12 won't take too long, to give you a status report on his work

13 thus far.

14 THE COURT: Okay.

15 JUDGE CONBOY: The audit committee powers are being
16 considered as against adding the possible power of requiring
17 outside audits in tandem with the ongoing daily, weekly and
18 monthly work of the audit committee.

19 Finally and perhaps most importantly, and I won't put
20 a "perhaps" before this, delegates cannot be subject to adverse
21 employment action, intimidation, harassment or threats in the
22 good and faithful execution of their duties. There is a
23 provision in this draft -- and again it is a draft and we are
24 completely open to modifying or deleting anything in this draft
25 based upon a constructive dialogue with the United States

8

1 Attorney and the review officer -- there is a power that allows
2 the inspector general to go directly to the review officer and
3 the U.S. Attorney in the event of any threat, actual or
4 implied, to the proper execution of his duties.

5 I might add, Judge, and I don't want to dwell on this
6 now, but the bylaws contain a very significant enhancement of
7 the inspector general power and the chief compliance officer
8 power. So overall we think in terms of the concerns of all the
9 parties in the courtroom that the proposed elections are on
10 track.

11 We concur completely with Mr. Walsh's recommendation
12 that the indirect election of the officers of Hudson Street is
13 off the table, that the empowerment of the delegates is the
14 critical, immediate focus and that the ultimate resolution of
15 the scope and kind of that empowerment will emerge from the
16 negotiations we expect to have with the United States Attorney
17 and the review officer.

In regards to what democracy in amending the bylaws looks like
6-28-11

MR. WALSH: Judge, as we contemplated at the last
8 conference, there was a comment period of 30 days, and I
9 received approximately 60 detailed written comments from
10 members as well as correspondence from counsel.

7

diminishing returns.

6 I also held a town-hall type meeting last week, which
7 I called an hour forum. And in the notice I put out, I
8 specifically invited members to come and comment on the bylaws
9 as well as the restructuring proposed by the UBC. And that was
10 attended by about 200 members, and we also put in the notice
11 that the meeting would be recorded. And that should it please
12 the Court, I would make that recording available to the Court
13 and to the parties, if it was requested, and I have audio
14 recordings of that event.

Frankly this has all the hallmarks of a power grab and unravels anything which has been accomplished. It reduces the last seven years to an exercise in futility, putting us right back to where we were in 2010, so I would like to know why you both think this is a good idea and have endorsed these changes?
Sincerely
Patrick Nee

# ATTACHMENT 4

Chief Compliance Officer's answers in blue

Hi,

First I believe this would be the correct standard for considering what has occurred,

President Stephen C. McInnis discussed the memo from Chief Compliance Officer Josh Leicht regarding the hiring practices of the Inspector General's Office. The memo stated that the Delegate Body has no authority over the hiring process as the Bylaws and District Council Personnel Policy state that only authority the Delegate Body possesses in regards to the hiring of District Council employees is whether the Personnel Policy hiring provisions were fully and fairly followed. Therefore a motion from the Delegate Body to change the hiring requirement would be improper and should not be entertained.

That is from the March 11, 2015 Delegate Meeting, if one has no authority over something, then one should not be meddling in it. If you disagree please give reasons.

- Pat, I'm not sure what you are getting at with the above statement. Nonetheless, I will say that the UBC Constitution and the District Council Bylaws do establish the authority, and limits of authority, of both District Council Officers and the Delegate Body.

1. Could you please give me the date that you were appointed to the "The committee to review and consider amendments to the District Council Bylaws"?
2. The EST advised both the Executive Committee and the Delegate Body of the creation of the Bylaws Working Group. You have been provided with Executive Committee and Delegate Body meeting minutes.
3. Who appointed you?
   - A "Bylaws Working Group" consisting of Michael Cavanaugh, Chris Wallace, Jim Murphy and me was established by EST Geiger. EST Geiger's creation of the working group and its purpose was reported to both the Executive Committee and the Delegate Body.
4. What was the source of their authority to appoint you?
   - The EST has responsibility for running the operations of the District Council in the best interests of the membership and the organization. [See Bylaw Section 10 (B)]. Recognizing that the current Bylaws contains provisions that are outdated and, in some cases, negatively affect the District Council's normal and legitimate operations to the detriment of the membership, the EST charged the Bylaws Working Group with undertaking a thorough review of the Bylaws and making recommendations for proposed amendments.

5. Were you billing the District Council for your hours in this?
   - Yes

6. Can you please list the other members and answer questions 1 thru 4 regarding them.
   - Identified above. Jim Murphy's work on the Bylaws Working Group was covered under the monthly retainer fee paid by the District Council for his services.

7. Can you please cite the authority in the Bylaws which allows the EST to initiate changes to the Bylaws.
   - Every member has the authority to propose amendments to the Bylaws.

8. Can you please show me where the Delegates were shown expenditures related to "The committee to review and consider amendments to the District Council Bylaws" and when they approved those expenditures.
   - Expenditures for Spivak Lipton's and my services are presented to the Executive Committee and Delegate Body for approval and are reviewed by the Trustees every month along with all other expenditures of the District Council. The work performed by Jim Murphy and myself on the Bylaws Working Group was directly related to our roles as General Counsel and Chief Compliance Officer, respectively. No additional approval was required.

9. Specifically in regards to "District Council Special Counsel Judge Barbara S. Jones", can you please tell me when the delegate body approved having District Council Special Counsel Judge Barbara S. Jones oversee anything in regards to amending the Bylaws?
   - Barbara Jones was not a member of and did not participate in the activities of the Bylaws Working Group. Ms. Jones likely had conversations with the Independent Monitor concerning the Bylaw amendment process and concerning any questions the IM may have had regarding proposed amendments. Any interaction in this regard would have been within her role that was approved by the Executive Committee and Delegate Body.

10. When did the delegate body approve the expenditure to have "District Council Special Counsel Judge Barbara S. Jones" oversee the effort of seeking to get approval for EST Geiger's Bylaws?
    - Answered above.

11. Who are the Bylaws Working Group?
    - Answered above.

12. Who appointed them?
    - Answered above.

13. When were they appointed?]
    - Answered above.

14. What is the source of authority for these appointments?
    - Answered above.

15. Where are the expenditures related to the Bylaws Working Group?
    - Answered above.

16. What is their Function?
    - Answered above.

17. What is the source of EST Geigers authority to amend the Bylaws?

- Answered above.

18. Can you please tell me where in the Bylaws it grants the EST any authority in regards to the bylaws.

- Answered above.

18. Why should this not have been the correct response from your office two years ago? The EST has no authority to amend the Bylaws. Amendments to the Bylaws can only be initiated by the local unions. Therefore any further action would be improper and should not be entertained.

- The current Bylaws requirements concerning amendments have been, and are being, followed scrupulously. The process was long ago vetted and approved by General Counsel and the Independent Monitor. There is no basis for your claim to the contrary. Indeed, you appear to be arguing that any amendments to the Bylaws must arise organically, as it were, solely from the Local Unions. That is not what the Bylaws provide. Rather, the Bylaws provide in Section 35(B) in relevant part that "A proposed change must be submitted in writing by at least one third of the Local Unions affiliated with the District Council, with the seal affixed . . . ." The amending process is moving forward in conformity with Bylaws Section 35.

"The District Council may amend its Bylaws upon the initiative of local unions after a special convention of the delegates is held in which the proposed changes are ratified; consent to implement the changes must then be obtained from the Review Officer, the government and the General Vice President of the UBC." *RO 5th Inter. Rep'* att. 8, pg. 5 ¶2

"[T]he people who govern the District Council will be able to make their own motions about how business is conducted, more in the nature of regulations than legislation. So people should remember there is that opportunity for democracy to implement changes at the pleasure of the rank and file members come January." *Hr. Tr. June 28, 2011* pg. 30, 9-15

I am looking for answers to all the above questions, please include all hours either billed or the dollar value for any hours spent by salaried council employees in the expenditures.

Thanks

Pat Nee

ATTACHMENT 5

Me again,

I am sorry, I had assumed that the correlation between your December 8, 2014 memo that I cited and what I was seeking was obvious. The memo refers to the specific authority held by the parties, and not unsupported justifications as to why they should have certain authority. I am aware that the UBC Constitution and the District Council Bylaws establish the authority, and limits of authority, of both District Council Officers and the Delegate Body. What I would like you to show me is where the Bylaws grant the specific authority which you allow that is held by the parties in this matter.

I would ask that you assume that I have attempted to find the answers to the questions which I pose, prior to asking them. So when I ask for the date that you were appointed to the "The committee to review and consider amendments to the District Council Bylaws" I have already gone through the minutes back to January of 2015 without result. I have attached every reference made to the Bylaws from those minutes back to that date. I have found nothing which shows the delegates appointing a "committee to review and consider amendments to the District Council Bylaws" which according to the memo from Counsel Murphy to the EST existed on March 13, 2015.

The delegate body did agree to have the Presidents of the locals serve on the "resolutions committee" on October 12th, 2016, but this is not the committee you were on and this is the only committee that I can find that was appointed by the delegate body in regards to the bylaws since 2014. So;

1. Could please give me the date that you were appointed to the "The committee to review and consider amendments to the District Council Bylaws"?

3. What was the source of the EST's authority to appoint you? What I am looking for is specific authority, ie the delegate body's authority in this regard;
Bylaws Section 5(B)

> 9. Approve or reject the appointment and removal of Trustees to the Trust Funds and appoint and remove representatives to the Council's Rules and Resolutions Committee, District Council Grievance Committee, District Council Election Committee, and such other committee(s) it deems necessary. Such appointments shall be based on the following qualifications, including but not limited to, training, ability, experience, reputation and integrity, and absence of disqualifying conflicts of interests. The District Council shall establish in writing the duties and responsibilities of each Committee.

And not irrelevant sections which have absolutely nothing to do with this, ie;
Bylaws Section 10(B)

1

(B) The Executive Secretary-Treasurer shall, subject to the limitations and necessary approvals contained within these Bylaws, be responsible for the management and supervision of the field activities, business office(s), and for conducting the daily business of the Council. The Executive Secretary-Treasurer shall assume all of the duties of the Recording Secretary and Treasurer. The Executive Secretary-Treasurer shall be paid a salary of Two Hundred and TwentyFive Thousand Dollars ($225,000) per annum which may be increased or decreased by five percent each year if such adjustment be approved by the Delegate Body and may not receive any other compensation from the District Council, other than fringe benefits equivalent to those paid to rank and file members as set forth in the collective bargaining agreement covering the greatest number of members.

(I honestly have no idea in Gods's earthly world how you think the above has anything to do with the authority to appoint committees.)


4. The original question was "Were you billing the District Council for your hours in this?"

Obviously the question now becomes "Since you were appointed to a committee by someone who held no authority to appoint you to that committee, and as you are the Chief Compliance Officer, which means that under your job description you should have been aware they held no such authority, how can you claim that it was lawful for you to bill and receive monies for serving on a committee which did not comport with the strictures of the Bylaws, especially considering that your role was to ensure compliance with the Bylaws?


5. You only refer to Murphy in regards to expending union assets, were Cavanaugh and Wallace doing this on their own personal time?


6. • Every member has the authority to propose amendments to the Bylaws
So, in other words there is no authority inherent in the office of EST in relation to initiating changes to the Bylaws?


7. Can you please show me where the Delegates were shown expenditures related to "The committee to review and consider amendments to the District Council Bylaws" and when they approved those expenditures.

Since you have not shown where the authority was granted to take any of the actions that were taken, you cannot hide behind a blanket approval of your expenses. The Delegate body has not to this day appointed a "Bylaws Working Group" and there is not a single mention anywhere in the

2

minutes about any "Bylaws Working Group" prior to November 2016, which is 21 months after Counsel Murphy's Memo regarding this.

What you are actually describing is what some might call corruption, you were billing for hours spent on a secret committee to which you were secretly appointed by someone who held no authority to appoint anyone. You accepted monies for doing something which appears contrary to the strictures of the Bylaws when your job was to ensure that the council is operating within those strictures. This is further supported by your your answers to my questions, where you attempt to give more weight to your own predilections than the provisions contained in the Bylaws which contradict your position.

8. Specifically in regards to "District Council Special Counsel Judge Barbara S. Jones", can you please tell me when the delegate body approved having District Council Special Counsel Judge Barbara S. Jones oversee anything in regards to amending the Bylaws?

In your quarterly report dated April 6th 2016 you wrote "The draft of proposed Bylaws amendments has now been submitted to the Office of the United States Attorney for the Southern District of New York for pre-clearance. That effort is being overseen by District Council Special Counsel Judge Barbara S. Jones and the members of the Bylaws Working Group."

Which doesn't comport with the limited role your answer describes, so can we try that one again?

And I am at a loss to understand how the Chief Compliance Officer has a role in seeking preclearance from the Office of the United States Attorney for the Southern District of New York, are we actually paying you to help get these approved?

9. When did the delegate body approve the expenditure to have "District Council Special Counsel Judge Barbara S. Jones" oversee the effort of seeking to get approval for EST Geiger's Bylaws?

Based on your quarterly report, it appears that you did not answer this question, can we try that one again?

And you did not answer any of the following;

14. Where are the expenditures related to the Bylaws Working Group?

15. What is their function?

17. Can you please tell me where in the Bylaws it grants the EST any authority in regards to the bylaws.

18. Why should this not have been the correct response from your office two years ago?
The EST has no authority to amend the Bylaws. Amendments to the Bylaws can only be initiated by the local unions. Therefore any further action would be improper and should not be entertained.

The current Bylaws requirements concerning amendments have not been, and are not being, followed scrupulously. You fail to cite a single section of the Bylaws which supports your position or even offers even a tangible connection between the office of EST and initiating changes to the Bylaws.

According to the supposition you put forward, the EST first drafts the Bylaws, then sends them out to the locals to get three locals to endorse his amendments, and then is part of the committee where they are shall be first referred to for consideration and recommendation. How can they be referred to the EST for the first time on the Executive Committee for consideration when he wrote the proposed amendments?

You think there is a possibility he is going to disagree with his own proposal which was being presented to him to consider? I think that the following provides some insight in what would have to be best practices in this matter;

"As an initial matter, there is the general practice of the District Council. While there are many examples of members of the Union holding two different positions, notably none of them are the positions at issue: Executive Committee Member and Delegate. This made sense because the Executive Committee was designed to review and approve the decisions of the District Council Executive Leadership (EST, President and Vice-President) and make recommendations to the Delegate body for their vote. In principle, it seemed to make no sense to me that the same individual should be reviewing the decisions of leadership in the Executive Committee meetings, reaching conclusions and consensus, making recommendations to the Delegate body, and then leaving the Executive Committee meeting to vote as a Delegate on the recommendation he or she previously made as an Executive Committee member. Accordingly, it did not surprise me that there is no history (at least in recent years) of individuals holding both offices.

Further, I concluded that the principles set forth in the UBC Constitution, the Consent Decree, and the Bylaws were all consistent with democratic diversification of power and decision-making. Fundamentally, the idea of one individual holding two jobs which, practically, serve as a check on the

4

other (the Delegate body must approve recommendations of the Executive Committee) seemed inconsistent with the idea that as many members as possible should play a role in the governance of the union. These ideas were set forth in connection with various anti-corruption provisions of the Bylaws which do identify positions which cannot be held by the same person (i.e., Section 4(A) of the Bylaws states that "no Council Officer or Executive Committee Delegate shall receive salary or other compensation or hold an elected or appointed position as an Officer of an affiliated local union."). While I did not believe that provision, or any provision of the Bylaws, addressed the idea of a single person serving as an Executive Committee member and as a Delegate, the principle behind it suggested that one person should not play those two important roles in running the Union."
IM 3rd interim report, pgs. 15-16.

Using the logic from above, how could it be considered proper that the same officer would be at both ends of creating new Bylaws, that the EST would first draft the Bylaws and then somehow be on the committee they are first referred to for consideration and recommendation?

And then there is the position taken by the Review Officer;

"The District Council may amend its Bylaws upon the initiative of local unions after a special convention of the delegates is held in which the proposed changes are ratified; consent to implement the changes must then be obtained from the Review Officer, the government and the General Vice President of the UBC." *RO 5th Inter. Rep'* att. 8, pg. 5 ¶2
"[T]he people who govern the District Council will be able to make their own motions about how business is conducted, more in the nature of regulations than legislation. So people should remember there is that opportunity for democracy to implement changes at the pleasure of the rank and file members come January." *Hr. Tr.* June 28, 2011 pg. 30, 9-15

Which does not allow that the District Council may initiate changes to the Bylaws, and the reason that I keep bringing the RO up is because he wrote the current Bylaws in conjunction with the UBC, I think, which gives considerable weight to his position In this.
But I think that for me at least, the most compelling reason of all for why this is incongruous, is the fact that the one of the stated purposes of the current Bylaws was to protect the members of this District Council from an omnipotent EST. It entirely defeats that purpose if the EST was

5

also given the authority to amend the Bylaws, and could exert a heavy hand in restoring that authority to his office, which coincedently is exactly what tis happening.

Want to try again?

Sincerely

Pat Nee

ATTACHMENT 6

# BYLAWS

## District Council for New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America

**August 5, 2011**

**District Council for New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America**

## PREAMBLE

**WHEREAS,** our aim will be to promote and protect the interest of our membership, to elevate the moral, intellectual and social conditions of all working men and women, to assist each other in sickness and distress;

**WHEREAS,** we intend to encourage apprenticeship and a higher standard of skill, to cultivate a feeling of friendship, and to assist each other to secure employment;

**WHEREAS,** we shall aid and assist all organizations to uphold the dignity of labor and resist oppression by honorable means;

**WHEREAS,** we hold it as a sacred principle, that union members, above all others, should set a good example as good and faithful workers, performing their duties to their employer with honor to themselves and to their organization;

**WHEREAS,** we resent the principle of open shop association, and will continually strive for the enactment of legislation which will enable us to achieve our objectives;

**WHEREAS,** realizing that a blow at one organization is a blow to all, we recognize that it is our duty as union members to purchase union-made goods and patronize union shops and business establishments whenever possible to do so;

**THEREFORE,** with the above-stated aims and principles in mind, the Local Unions in the vicinity of New York, New York are affiliated into an organization known as the District Council for New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America in conformity with the provisions of the Constitution of the United Brotherhood.

## BYLAWS

## NAME AND TITLE

<u>Section 1</u>. This body is chartered and known as the District Council for New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (herein "Council" or "District Council"). This Council is organized in conformity with the Constitution of the United Brotherhood and shall exercise the powers and privileges of a Council under the Constitution and Laws of the United Brotherhood.

## CONSISTENCY WITH JUDICIAL ORDERS

Section 2. These Bylaws are intended to conform with any and all relevant provisions of the Consent Decree, the Stipulation and Order entered on June 3, 2010, and any other Order entered in the matter of *United States v. District Council et al.*, 90 Civ. 5722 (SDNY) (RMB). Any provision of these Bylaws that is inconsistent therewith shall be null and void, and of no force or effect.

## OBJECTS

Section 3. The objects of this Council shall be to promote and protect the interest of our membership through broadly democratic institutions free of corrupt influence, to encourage the apprenticeship system and higher standard of skill, to secure adequate pay for our work, to elevate the standard of our craft, to cultivate a feeling of friendship among the members of this Brotherhood, to assist our members in procuring employment and to protect our members by legal and proper means against any injustice that may be done to them, and improve the moral, social and intellectual conditions of our members and all working people.

## DISTRICT COUNCIL POWERS GENERALLY

Section 4.

(A)    This Council shall be the central governing body over and shall have legislative and executive powers on all matters relating to the general interest and welfare of affiliated Local Unions and their members. The Council shall establish working dues or monthly dues (that are sufficient to operate the Council, as determined by an assessment of the prior year's operating expenses and the projected budget for the period under consideration) payable to the Council and initiation fees. It shall have the power to collect and retain all fines levied by the Council for violation of the laws, trade and other rules of the Council. The Council shall have the power to issue the quarterly work card. It shall have the power to make agreements with kindred bodies or central organizations and send Delegates to same whenever deemed necessary. The Council shall have the power to hire, discipline, promote, and fire all employees of the Council, including Organizers and Representatives, in accordance with the established District Council Personnel Policy, effective January 31, 2011, as updated and amended (the "District Council Personnel Policy"). No Council Officer or Executive Committee Delegate shall receive salary or other compensation or hold an elected or appointed position as an Officer of an affiliated local union. Except for clerical employees of Local Unions, all persons employed on matters within the jurisdiction of the Council, including Business Representatives and Organizers, shall be employees of the Council. No person shall be an employee of an affiliated Local Union except for persons employed in clerical positions, subject to the District Council Personnel Policy. Upon approval of these Bylaws, all Local Union employment positions, except for clerical positions, shall cease to exist. Furthermore, the Council shall have all other powers provided for in the Bylaws. The governance, finance and administration of the District Council and its affiliated local unions shall at all times be in compliance with applicable law.

(B)    The full plenary power and authority of the District Council is hereby vested, without limitation, in the Delegates to the Council that shall collectively form the Council Delegate Body. In accordance with Section 7 of these Bylaws, the Council Delegate Body shall be elected by the rank and

file members of the United Brotherhood of each affiliated Local Union. There shall be a total of One Hundred (100) Delegates to the District Council from the Local Unions, such Delegates to comprise the Council Delegate Body. Each Local Union shall have at least one Delegate to the District Council, with the remaining Delegates allocated proportionally amongst the Local Unions based upon the total membership of each Local Union as a percentage of the aggregate membership of all Local Unions of the District Council. The Council Delegate Body shall exercise the authority granted to it in Section 5 of these Bylaws by majority vote and each Delegate shall be elected for a term of three (3) years. In the event of a tie vote, the President shall cast the tie-breaking vote.

(C)     These Bylaws and any other rules, resolutions and directives adopted by the Council shall govern and be binding on each Local Union affiliated with the Council.

## POWERS AND DUTIES OF THE COUNCIL DELEGATE BODY

Section 5.  The Council Delegate Body shall have the following enumerated powers and duties:

(A)     The Council Delegate Body shall have the exclusive authority to consider, vote upon and finally make decisions on all matters affecting the Council, as provided for in the Bylaws.

The Council Delegate Body shall also have authority to raise and finally resolve any matter within the jurisdiction of the Council on its own initiative.

(B)     Without limiting the Council Delegate Body's responsibilities or authority, the Council Delegate Body must:

1.     Meet at least monthly and more often as prudence or exigent circumstances may require to receive and review the Organizing Report, Membership Retention Report, and Political and Legislative Report as identified in Section 22 below, and request additional information as necessary;

2.     Review and approve or reject by June 30 of each year the budget for the Council for the following year;

3.     Review and approve or reject, in advance, all expenditures of the Council, including expenditures of the Council Officers, above Two Hundred Dollars ($200); provided further that the Delegate Body may establish in writing standing appropriations for designated amounts, not to exceed Five Hundred Dollars ($500.00), for specific, recurring bills of the District Council;

4.     Review and approve or reject, within one month after they have been incurred, all expenditures of the Council, including expenditures of the Council Officers, below Two Hundred Dollars ($200); provided further, that the Delegate Body may pre-approve, in writing, expenditures for specific items within Two Hundred Dollars ($200);

5.     Review and approve, reject or revise annually the overall organizing plan of the Council, which shall include, but not be limited to, information

regarding industry targets, developments in ongoing programs, obstacles faced and the involvement of volunteer organizing committees with organizers in jobsite actions, and housecalls; notwithstanding any other provision in the Bylaws, the overall organizing plan of the Council may be approved by a simple majority vote of the Delegates, but only repealed by two thirds vote of the Delegates;

6. Provide instruction to the Executive Committee and review, approve or reject all decisions of the Executive Committee;

7. Review and revise all draft contracts of the Council and approve or reject all such contracts prior to their execution, including, but not limited to, those contracts relating to the employment of service providers, outside legal counsel or other professional advisors. No contract shall be approved unless the District Council shall have issued a Request for Proposal ("RFP") to at least five (5) potential counterparties and received at least three (3) proposals in response. In deciding among the responses to an RFP and approving any contract, the Council Delegate Body must consider the following factors, among others: The cost of the contract as compared to the other proposals received, the qualifications of the counterparty (including prior experience providing similar services, the reputation and integrity of the counterparty, and any relationship(s) between the counterparty and District Council employees, Officers or Delegates (which may be a factor warranting disqualification);

8. Review and approve or reject, in advance, all Collective Bargaining Agreements following a recommendation from the Executive Committee. If a Collective Bargaining Agreement is rejected, the Delegate Body shall promptly inform the Executive Committee in writing of any provision(s) that caused, or will cause as indicated by a non-binding vote, in whole or in part, the rejection.

9. Approve or reject the appointment and removal of Trustees to the Trust Funds and appoint and remove representatives to the Council's Rules and Resolutions Committee, District Council Grievance Committee, District Council Election Committee, and such other committee(s) it deems necessary. Such appointments shall be based on the following qualifications, including but not limited to, training, ability, experience, reputation and integrity, and absence of disqualifying conflicts of interests. The District Council shall establish in writing the duties and responsibilities of each Committee.

10. Review and approve or reject, in advance, the hiring (including the compensation and other terms of employment), firing or discipline of Council representatives and organizers, in accordance with the established District Council Personnel Policy;

4

11. Appoint individuals to fill vacancies in the positions of Chief Accountant, Inspector General, Deputy Inspector General, Chief Compliance Officer, Deputy Chief Compliance Officer, Director of Human Resources, Director of Operations, and Director of Organizing, subject to the provisions of Sections 10, 12, 13, 27, 28, and 29;

12. As provided for herein, receive and review written presentations from the Inspector General on the integrity of the District Council, including the identification and status of all pending complaints and investigations completed, subject to necessary precautions to protect the integrity of ongoing investigations, as determined by the Inspector General;

13. Quarterly, receive and review written presentations from the Chief Compliance Officer on the implementation and administration of the District Council's compliance and ethics program;

14. Quarterly, receive and review written presentations from the Chief Accountant on the status of the District Council's finances and the implementation and administration of the accounting and financial controls program, as required by the policies and procedures established pursuant to Section 13(B) hereto;

15. Quarterly, receive and review written presentations from the Director of Human Resources on the implementation and administration of the District Council's Personnel Policy;

16. Review on a quarterly basis, through a subcommittee of the Delegate Body, or more often as the Council Delegate Body deems appropriate, the District Council's job referral activities and records to determine that job referrals are being conducted fairly and properly, in accordance with the job referral rules;

17. Establish an Audit Committee of the District Council that shall consist of the UBC District Vice-President or his designee; Legal Counsel; a Certified Public Accountant; the Inspector General; and two (2) Delegates from the Council Delegate Body (elected by the Council Delegate Body). The Audit Committee shall be responsible for monitoring compliance with the financial requirements of the District Council Bylaws, reviewing the District Council's financial systems and procedures, making recommendations regarding best practices on a periodic basis, monitoring the District Council so that no financial fraud or corruption occurs, and shall meet no less than once every month. The Audit Committee shall report quarterly to the Delegate Body or more frequently if requested to do so by the Delegate Body. The Audit Committee may require any employee, Officer, or Delegate to the District Council to appear before the Audit Committee and provide information as requested. The Audit Committee shall develop policies and procedures for the Audit Committee, which shall be subject to

the approval of the United States Attorney's Office for the Southern District of New York (the "United States Attorney") and the Review Officer appointed pursuant to the June 3, 2010 Stipulation and Order in *United States v. District Council, et al.*, 90 Civ. 5722, SDNY (RMB) (the "Review Officer" and the "Stipulation and Order," respectively), and set forth in a separate document. If the Audit Committee does not submit such policies and procedures to the Review Officer for approval by March 15, 2012, the Review Officer may draft such policies and procedures for approval by the United States Attorney. The Audit Committee must conduct its activities in accordance with those policies and procedures, and may not modify them without the prior approval of the United States Attorney and, during the Review Officer's tenure, the Review Officer.

18.    The District Council's Trustees shall sign and submit to the Audit Committee a written report on a monthly basis, or more frequently if requested to do so by the Audit Committee, regarding all expenditures of the District Council, including but not limited to, representing that the expenditures approved and/or incurred by the District Council are in accordance with the District Council's Expense Policy, Bylaws, and applicable law.

The District Council's Chief Accountant shall report in writing to the Audit Committee on a quarterly basis.

The Council Delegate Body may by a vote of two thirds of its members order an audit of the expenditures or financial condition of the District Council by an independent outside auditor, retained in accordance with the requirements of Section 4(B)(7) of the Bylaws.

No Officer of the District Council may be appointed to the Audit Committee. The term "Officer" shall not be interpreted to include employees of the District Council, the Inspector General, the Chief Compliance Officer or Delegates.

(C)    All approvals, rejections or revisions by the Council Delegate Body must be supported by a majority of the Council Delegates after due consideration and discussion of all relevant points of view, in accordance with the UBC Constitution and Laws and/or recognized parliamentary procedure, at a meeting of the Council Delegate Body. To the extent that the Council Delegate Body withholds any approval required by Sections 4(A) or 4(B) in advance of any action, the District Council may not proceed with the proposed course of conduct.

(D)    No approval by the Council Delegate Body of any change in compensation for a District Council employee, or class of District Council employees, shall be effective until after the next election of District Council Delegates if the affected employee or any member of the effected class of employees, is also a member of the Council Delegate Body.

(E)     All Delegates of the Council Delegate Body shall be compensated at the rate of Seventy-five Dollars ($75) per meeting, but such compensation shall not exceed Two Hundred Dollars ($200) in any month, regardless of the number of meetings held.

(F)     No Delegate of the Council Delegate Body shall be subject to any adverse employment action, harassment, intimidation, threats, or coercion by the District Council, the Council Delegate Body or any Officer thereof for exercising, in good faith, the authority of, or fulfilling the duties of, a Council Delegate as provided for in these Bylaws. Any Delegate that believes that he or she has been subject to a violation of this section may file a complaint with the Chief Compliance Officer and the Inspector General, who shall conduct a joint investigation of the merits of such complaint. Upon completion of that investigation, no later than ninety (90) days following receipt of the complaint, either the Chief Compliance Officer or the Inspector General may refer the matter to the Trial Committee, the Review Officer (to the extent such a Review Officer is in place), or the United States Attorney, as appropriate. The foregoing shall not limit any Delegate's right to also file a complaint with the General President of the United Brotherhood, as provided for under Section 53(G) of the UBC Constitution. In addition to the foregoing, any District Council Delegate may file a complaint with the Trial Committee Chairman and thereby initiate an arbitration to be conducted before a three-member panel consisting of the Trial Committee Chairman, Trial Committee Vice Chairman, and a third arbitrator to be chosen by the Trial Committee Chairman and Trial Committee Vice Chairman. All decisions of said panel must be supported by substantial evidence and any party to the proceeding may seek review of a decision with the District Court.

(G)     Any Delegate, or the Council Delegate Body, may file a complaint or raise any concerns regarding the District Council, its Officers, or the Council Delegate Body with the United States Attorney, the Review Officer (to the extent such a Review Officer is in place), or the General President of the United Brotherhood, as provided for under Section 53(G) of the UBC Constitution.

## OFFICERS OF THE COUNCIL

Section 6. The Officers of this Council shall consist of President, Vice President, Executive Secretary-Treasurer, Warden, Conductor, and three (3) Trustees (collectively, the "Officers"). The term of these offices shall be three (3) years.

The member serving as Executive Secretary-Treasurer shall be limited to two (2) terms in office. The only Officer position of the District Council that shall be compensated by salary shall be the Executive Secretary-Treasurer position.

## NOMINATIONS AND ELECTIONS

Section 7.

(A)     The nomination, election and installation of Officers of the Council shall be governed by Paragraph 5(k)(i)-(iv) of the Stipulation and Order and the rules promulgated

thereunder, any applicable order of the District Court, the Constitution and Laws of the United Brotherhood, and in accordance with the following provisions:

(B)     Candidates for President, Vice President, and Executive Secretary-Treasurer shall be elected by secret ballot vote of the membership directly.  Candidates for Warden, Conductor and the three (3) trustees shall be elected by the Delegate Body.  Candidates for all such offices must be working within the bargaining unit represented by their Local Union, or employed full time within the framework of the United Brotherhood of Carpenters to be eligible.

(C)     Council Delegates shall be elected in accordance with the Constitution of the United Brotherhood.  Council Delegates shall be elected for a term of three (3) years.

(D)     Each Local Union president shall notify the Executive Secretary-Treasurer, by certified mail, of the names of the elected Delegates before July 1st of each year. The Executive Secretary-Treasurer of the Council shall notify these Delegates by mail that nominations and elections of the Council Officers will be held at the regular Council meeting in August, unless some other time is established by the Review Officer, Court, or by agreement of the parties to the Stipulation and Order entered June 3, 2010.

(E)     Absent the requirements of an order of the District Court, the nomination, election, and installation of Officers of the Council shall be governed by the Constitution and Laws of the United Brotherhood, and these Bylaws.

## DUTIES OF THE PRESIDENT

Section 8.  It shall be the duty of the President to preside at all meetings of the Council, enforce a due observance of the Constitution and Laws of the United Brotherhood, conduct the same according to parliamentary rules and perform such other duties as designated by the body. The President shall receive a stipend of Three Hundred Dollars ($300) each month for the performance of said duties.

## DUTIES OF THE VICE PRESIDENT

Section 9.  The Vice President shall assist the President in the performance of his or her duties and conduct meetings in his or her absence. The same rules are to govern as are applied to the President.  The Vice President shall receive a stipend of Two-Hundred Dollars ($200) each month for the performance of said duties.

## DUTIES OF THE EXECUTIVE SECRETARY-TREASURER

Section 10.

(A)     The Executive Secretary-Treasurer shall cause to be kept a detailed record of each Council Delegate Body meeting and a record of all roll-call votes cast by Delegates in such meetings, keep all documents and correspondence, issue all calls for a special meeting, keep a record of all charges, trials, in accordance with the District Council Charge and Trial

Procedures, and fines, take charge of the seal of the Council and affix same to all official documents, sign all legal orders, keep a correct account between the Council and the Local Unions, receive all monies paid to the Council and shall hold in his or her possession a sum of money not to exceed Seven Thousand Five Hundred Dollars ($7,500) for exigent expenses lawfully incurred by the District Council. The payment of such expenses must be reported in writing to the Chief Accountant and Trustees within Forty-Eight (48) hours of payment being rendered. He or she shall issue quarterly work cards to the affiliated Local Unions.

(B)     The Executive Secretary-Treasurer shall, subject to the limitations and necessary approvals contained within these Bylaws, be responsible for the management and supervision of the field activities, business office(s), and for conducting the daily business of the Council. The Executive Secretary-Treasurer shall assume all of the duties of the Recording Secretary and Treasurer. The Executive Secretary-Treasurer shall be paid a salary of Two Hundred and Twenty-Five Thousand Dollars ($225,000) per annum which may be increased or decreased by five percent each year if such adjustment be approved by the Delegate Body and may not receive any other compensation from the District Council, other than fringe benefits equivalent to those paid to rank and file members as set forth in the collective bargaining agreement covering the greatest number of members.

(C)     All monies paid into the Council shall be deposited by the Executive Secretary-Treasurer in the name of the Council in such bank or banks as properly designated by the Executive Committee.

(D)     The Executive Secretary-Treasurer shall furnish each Local Union with a copy of the quarterly financial report of the Council certified by the Audit Committee. This report shall be signed by the trustees of the Council.

(E)     The Executive Secretary-Treasurer shall furnish to each Local Union a correct record of each meeting of the Council.

(F)     The Executive Secretary-Treasurer shall formally log and refer all bills to the trustees for investigation, after which they shall be presented to the Council for approval. In referring bills to the trustees, the Executive Secretary-Treasurer shall provide a log including any receipts, invoices, bills of lading, or other proof that the work in question was performed or the item purchased was received. The Executive Secretary-Treasurer shall also provide the trustees with a summary report of all bills being referred and an explanation of their necessity. The trustees shall provide a summary of such information to the Council Delegate Body along with a recommendation as to whether such bills should be approved. The District Council shall establish procedures for the implementation of this provision.

(G)     The Executive Secretary-Treasurer is specifically authorized to expend, in accordance with the procedures of these Bylaws and in compliance with 29 U.S.C § 501, funds for any or all of the purposes and objects of the Council, subject to the necessary disclosures and approval by the Delegate Body.

(H)     After documented consultation with the Director of Human Resources, the Executive Secretary-Treasurer shall have the authority to hire, fire or discipline all clerical or

custodial employees and shall determine their duties, assignments, compensation, hours of employment and conditions. Provided, however, that the Executive Secretary-Treasurer may not hire more clerical or custodial employees than those allowed for by the table of organization developed by the Director of Human Resources. The Executive Secretary-Treasurer shall have the authority to hire, fire or discipline Council representatives and organizers, after receiving the approval of or such recommendation from the Executive Committee and the approval of the Council Delegate Body for such action. The foregoing hiring authority, both with respect to clerical and custodial employees and Council representatives and organizers, shall be exercised in accordance with the District Council Personnel Policy.

(I)     In accordance with the Bylaws, and subject to the District Council Personnel Policy and the necessary approval of both the Executive Committee and the Council Delegate Body, the Executive Secretary-Treasurer shall have the power and authority to nominate for appointment or propose the removal of representatives for and on behalf of its Local Unions to act as Trustees for all negotiated Employer/Union Trust Funds, including, but not limited to, annuity, health and welfare, pension, apprenticeship, labor-management cooperation committee, vacation savings and holiday plans. No such appointment shall be effective without the consent of both the Executive Committee and the Council Delegate Body. In the event that either the Executive Committee or the Council Delegate Body withholds its consent to an appointment, the Executive Secretary-Treasurer must submit a new candidate to fill the vacant position. In addition, the Executive Secretary-Treasurer has the power and authority to appoint and remove representatives on Joint Apprenticeship and Training Committees. Accordingly, all trust agreements and/or plan documents shall be amended by the authorized representatives of the Local Unions to reflect the forgoing appointment and removal process.

(J)     The Executive Secretary-Treasurer, by virtue of election to his or her office, shall automatically be deemed  an elected Delegate from the Council to the conventions or meetings of the United Brotherhood, State Building and Construction Trades Councils Labor Federations, and any other organizations, conferences or meetings with which the Council may participate or become affiliated with. All necessary notice with respect to this provision shall be provided.

(K)     The Executive Secretary-Treasurer shall serve as a trustee on any and all trust funds including, but not limited to, health and welfare, pension, labor-management and joint apprenticeship and training funds.

(L)     The Executive Secretary-Treasurer shall review with the Executive Committee of the Council all minutes of any trust funds meetings with a copy of same to remain at the office of the Council.

(M)     The Executive Secretary-Treasurer shall be assisted in carrying out his responsibilities and duties by a Director of Operations and a Director of Organizing. The Director of Operations shall assist the Executive Secretary-Treasurer in supervision of the day-to-day operations of the District Council. The responsibilities of the Director of Organizing shall include, but not be limited to, managing field organizers, communicating with parties regarding labor disputes, planning demonstrations, and communicating with Business Centers regarding potential organizing campaigns. The Executive Secretary-

Treasurer shall recommend to the Executive Committee candidates to fill vacancies in the positions of Director of Operations and Director of Organizing. If approved by the Executive Committee, such recommendations shall be submitted to the Council Delegate Body for final approval. To the extent that the Executive Committee or Council Delegate Body withhold approval of any recommendation made by the Executive Secretary-Treasurer, the Executive Secretary-Treasurer shall recommend additional candidates for consideration. During the period that the Consent Decree is in effect, no proposed appointment of an individual to the position of Director of Operations or Director of Organizing may be finalized without the consent of the United States Attorney. Additionally, during the tenure of the Review Officer, no proposed appointment of an individual to the position of Director of Operations or Director of Organizing may be finalized without the consent of the Review Officer.

(N)    The Executive Secretary-Treasurer may also, when he deems it necessary and subject to the approval of the Executive Committee, delegate in writing (such writing to contain a detailed description of the delegation and to have been submitted to the Executive Committee prior to approval) any of his authority to a District Council employee or Officer with the requisite skill, experience and training to efficiently and competently perform the assignment. Compensation for services rendered in this regard shall be reasonable and appropriate and consistent with the compensation for equivalent work performed by District Council employees and subject to approval of the Council Delegate Body.

## DUTIES OF WARDEN AND CONDUCTOR

Section 11. The Warden shall take charge of the door at all meetings of the Council and allow no one to enter except those who are entitled to do so. The Conductor takes up the password at all meetings.

## EXECUTIVE COMMITTEE

Section 12.

(A)    The Executive Committee shall be a subcommittee of the Delegate Body and shall consist of one member of each Local Union nominated and elected by secret ballot of the membership directly, and the President, Vice-President and Executive Secretary-Treasurer.

(B)    The Executive Committee, in consultation with the Council's Chief Accountant, Audit Committee, and Trustees, shall prepare an annual budget for the Council to be considered, voted upon and finally approved by the Delegate Body.

(C)    The Executive Committee shall review and make recommendations to the Delegates on all major purchases in excess of One Thousand Dollars ($1,000), after soliciting and considering at least three (3) proposals from vendors. In reviewing and recommending any proposed purchase, the Executive Committee must consider the following factors, among others: the cost and quality of the item as compared to other proposals received, any warranties offered by the seller, the reputation and integrity of the seller, and any relationship(s) between the seller and District Council employees, Officers or Delegates (which may be a factor warranting disqualification). In the event that the Council Delegate Body withholds its approval of a

purchase, such purchase must not go forward and the Executive Committee may recommend alternative purchases.

(D)     The Executive Committee shall implement written procedures incorporated in the District Council Personnel Policy describing the methods which must be employed by the District Council to hire, discipline, assess, compensate and terminate its employees.  Such procedures shall require that all persons hired as representatives, organizers and agents of the District Council shall have attended a UBC-run "three-day" assessment program and been rated in the top quarter of persons attending such programs, been subject to criminal background checks and drug testing, been interviewed by a hiring committee comprising no less than three District Council employees or Officers assisted by the HR Director, the Inspector General or his designee and the Chief Compliance Officer or his designee.  Said procedures shall further require that standardized questions crafted by the HR Director and others appropriate to the proceedings shall be posed by the hiring committee and that the results of the appraisal of each candidate by the hiring committee be forwarded in writing to the Executive Committee.  In reviewing and recommending any proposed personnel decision, the Executive Committee must be governed by the District Council Personnel Policy.  In the event that the Council Delegate Body withholds its approval of a personnel decision, such personnel decision must not go forward and the Executive Committee may recommend alternative personnel decisions.

(E)     The Executive Committee shall make recommendations to the Delegates on the appointment of individuals to fill vacancies in the positions of Inspector General, Deputy Inspector General, Chief Compliance Officer, Deputy Chief Compliance Officer, Director of Human Resources, and Chief Accountant.  The Executive Committee shall also approve or reject recommendations by the Executive Secretary-Treasurer of individuals to fill vacancies in the positions of Director of Operations and Director of Organizing.  In considering candidates for any of these positions, the Executive Committee must be governed by the District Council Personnel Policy and should consider the proposed candidate's training, ability, experience, reputation and integrity, and any relationship(s) between the proposed candidate and District Council employees, Officers or Delegates (which may be a factor warranting disqualification).  Preferred qualifications to be considered for candidates for the positions of Inspector General, Deputy Inspector General, Chief Compliance Officer, and Deputy Chief Compliance Officer include, but are not limited to, licensed private investigator credentials, law enforcement experience, legal experience, internal labor union governance experience, experience with a compliance program and the requirements of Chapter 8 of the Federal Sentencing Guidelines, and certified public auditing experience, as well as appropriate construction industry experience.  Preferred qualifications to be considered for candidates for the position of Chief Accountant include, but are not limited to, experience as an independent auditor, certified public accountant, or chief accounting officer or chief financial officer of a labor union or major corporation.  Preferred qualifications to be considered for candidates to the positions of Director of Operations and Director of Organizing include, but are not limited to, experience in the operations and management of a labor union or management of a government office with a work force of similar or greater size than the District Council.

(F)     The Executive Committee shall make recommendations upon specific findings to the Council Delegate Body regarding the hiring, firing or discipline of Council managers, representatives, agents and organizers.

(G)     The Executive Committee shall have the authority and responsibility to provide information about the District Council to the public and the membership including by publishing *The Carpenter* and effectively maintaining the District Council website. When presenting information to the public and the membership, the Executive Committee shall provide information fairly reflecting the range of positions and points of view on subjects relevant to the District Council and members.

(H)     The Executive Committee shall have the primary responsibility for drafting, and recommending to the Council Delegate Body for approval, the overall organizing plan of the Council, which shall include, but not be limited to, information regarding industry targets, developments in ongoing programs, obstacles faced and the involvement of volunteer organizing committees with organizers in jobsite actions. In the event that the Council Delegate Body withholds its approval of the overall organizing plan proposed by the Executive Committee, the Executive Committee must present a revised plan for the Council Delegate Body's further consideration. No such plan will be effective until approved by the Council Delegate Body.

(I)     The Executive Committee shall have the primary responsibility for negotiating, and recommending to the Council Delegate Body for approval, all Collective Bargaining Agreements.

(J)     All changes or proposed changes to the Bylaws or Trade Rules of this Council or any of the Local Unions affiliated therewith shall be first referred to the Executive Committee for consideration and recommendation pending final approval by the Delegate Body. If approved by the Council and in accordance with Section 11B of the Constitution and Laws of the United Brotherhood (the "UBC Constitution"), the proposed change or changes must be submitted to the General Vice President for approval after review of, among other things, whether such change or changes are in conformity with the UBC Constitution, are in the best interests of the District Council, and will further the objectives of the Consent Decree or Stipulation and Order. Notwithstanding the foregoing, nothing herein shall change or limit the authority of the General Vice President pursuant to the UBC Constitution to approve or disapprove changes to these Bylaws. Provided further, all changes or proposed changes to the Bylaws or Trade Rules of the District Council must be made in accordance with the Consent Decree and any other order entered in *United States v. District Council*, et al., 90 Civ. 5722.

(K)     The Executive Committee shall develop and preside over a uniform system of Shop Steward review including guidelines for disciplinary measures when necessary, as set forth in a separate document, which shall be adopted by the Delegate Body. Procedures required for the implementation of said system shall be developed by March 15, 2012 or thereafter be developed and implemented by the Review Officer. The Executive Committee shall establish such necessary criteria to be able to function properly and is authorized to suspend a Shop Steward's skill indefinitely, subject to appeals to the Executive Secretary-Treasurer. The Executive Committee shall regularly review the District Council's referral records in order to satisfactorily determine that job referrals and the appointment of Stewards are being conducted fairly and properly in accordance with the job referral rules and shall report in writing their findings to the Delegates.

(L)     The Executive Committee shall submit a written report on Council operations, financial condition, and other relevant matters to the Delegate Body at each meeting of the Council Delegate Body.

## TRUSTEES, FINANCIAL CONTROLS AND REPORTING, AND AUDITING

<u>Section 13</u>.

(A) The Trustees shall supervise all funds and property of the Council subject to such oversight and instructions from the Executive Committee, the Council Delegate Body, and the Audit Committee, as they may receive from time to time. The title to all property of the Council shall be held in the name of the Trustees of the Council and/or their successors in office. The Trustees shall audit all books and accounts of the Executive Secretary-Treasurer (including as enumerated herein in Sections 10(B) – 10(G) and as may be otherwise maintained) at least monthly and report their findings to the Council Delegate Body and perform such other duties as the Council may require. The Trustees shall, with the assistance of the Chief Accountant, audit all receipts and accounts of any other person authorized to collect funds. The Council shall engage a certified or registered public accountant for periodic audits, but not less than once a year, and such audits shall be examined by the Trustees for comparison with the Trustees' audit who shall report their conclusions in writing to the Council Delegate Body. The Trustees of the District Council and their representatives shall have access to all records of the District Council necessary to perform their duties in a complete and satisfactory manner.

All trustees shall be required to satisfactorily complete a training program provided for by the United Brotherhood. The District Council shall develop and implement policies and procedures for the Trustees which shall state the scope and methods of performing all required duties and be subject to the approval of the United States Attorney and the Review Officer and set forth in a separate document incorporated herein by reference. If the District Council does not submit such policies and procedures to the Review Officer for approval by March 15, 2012, the Review Officer may draft such policies and procedures for approval by the United States Attorney. The Trustees must conduct their duties in accordance with those policies and procedures, and may not modify them without the prior approval of the United States Attorney's Office for the Southern District of New York and, during the Review Officer's tenure, the Review Officer.

(B)     The District Council has established and shall effectively maintain an Accounting Department, headed by a Chief Accountant. The Accounting Department shall assist the Trustees, Officers and Delegates in implementing financial controls and reporting procedures, and managing the financial operations of the District Council. The District Council shall develop policies and procedures for the Chief Accountant, which shall be subject to the approval of the United States Attorney and the Review Officer, and set forth in a separate document incorporated herein by reference. If the District Council does not submit such policies and procedures to the Review Officer for approval by March 15, 2012, the Review Officer may draft such policies and procedures for approval by the United States Attorney The Chief Accountant must conduct his duties in accordance with those policies and procedures, and may not modify them without the prior approval of the United States Attorney and, during the Review Officer's tenure, the Review Officer.

14

(C)     The Council Delegate Body shall appoint an individual to fill any vacancies in the positions of Chief Accountant. During the period that the Consent Decree is in effect, no proposed appointment of an individual to the position of Chief Accountant may be finalized without the consent of the United States Attorney. Additionally, during the tenure of the Review Officer, no proposed appointment of an individual to the position of Chief Accountant may be finalized without the consent of the Review Officer.

## WORKING DUES (DUES CHECK-OFF);
## SPECIAL ASSESSMENTS AND PER CAPITA TAX

Section 14.

(A)     The Council shall receive working dues in the amount of 1% of the members total package rate as reflected in the current collective bargaining agreement covering members for each hour worked. The Council shall also receive working dues from each member of $.60 per hour for each hour worked, subject to review and modification by the Council Delegate Body after review and report by the Audit Committee. This $.60 will be allocated to Organizing in the amount of $.50 an hour, $.05 for Communications and $.05 for Civic Action. The apportionment of working dues amongst Organizing, Communications, and Civic Action shall be maintained in the same proportions as outlined in the prior sentence, subject to review and modification by the Council Delegate Body after review and report by the Audit Committee. The working dues due to this Council shall be due on the first day of the month and must be paid not later than the 15th day of the following month. The Council shall also receive working dues of $500 per year from every carpenter who has performed carpentry work for a signatory contractor in our jurisdiction during the calendar year. This $500 working dues to this Council shall be due on the first day of the month following the first day of work performed in our jurisdiction each year and must be paid not later than April 15th of the following year, provided however, that any member who shall have satisfied his or her Union Participation requirement for the applicable year, pursuant to Section 14(F) of the Bylaws, will receive credit for this $500 working dues requirement. The sums stated in this paragraph shall be reviewed periodically to determine if prudence requires that they be reduced or increased.

(B)     In case of a deficit in the funds of the Council, as determined by the Executive Committee in consultation with the District Council Accounting Department, the Council may levy a special assessment on each Local Union based on the number of members in the Local. The Council Delegate Body must give 30 days written notice to the Delegates and the principal office of each Local Union prior to such special assessment and shall require a majority vote by secret ballot of the Council Delegate Body at a Special Convention to adopt this special assessment which must be approved by the General Vice-President of the United Brotherhood. No such assessment may be implemented without the Council Delegate Body's approval, and the Executive Secretary-Treasurer shall notify all Local Unions that said assessment must be paid within 30 days from the time of final approval.

The Council Delegate Body may establish monthly dues or increase working dues payable to the Council by a majority vote of the Delegates voting at a Special Convention of the Council

held upon not less than 30 days' written notice to the principal office of each Local Union.

(C)    If a member who owes working dues fails to pay them as provided by these Bylaws, such working dues shall be charged to the member by notice in writing that same must be paid within 30 days to entitle the member to any privilege, rights or donations. If the member does not make payment of arrears within the time prescribed, the member shall not be in good standing and he or she shall be notified in writing that unless the amount owing is paid within 30 days thereafter his or her name shall be stricken from membership. Notices shall be sent to the last known address of the member reported by the member to the Local Union.

(D)    For any quarter in which less than 90% of a Local Union's membership have not signed authorization cards providing that working dues will be paid to the Council, a per capita tax shall be payable by such Local Union to the Council based on the number of non-participating members.

(E)    The Council may impose a per capita tax on each Local in the amount of $11 per member. The Council may increase the amount of the per capita tax by majority vote of the Delegates voting at a special convention held by the Council upon not less than thirty days' written notice to the principal office of each Local Union.

(F)    Pursuant to a Stipulation and Order entered into between the District Council and the United States Attorney entered on September 7, 2001, it shall be mandatory that each active member perform at least 1 day or 7 hours of union activity (picketing, etc.) per calendar year when called upon by the New York City District Council of Carpenters. The District Council shall call upon members to perform such activity on a fair and equitable basis.

## MONTHLY DUES

Section 15.

(A)    The monthly dues payable to the Local Unions in this Council shall be established by the Local Unions and must be adequate to enable each Local Union to operate efficiently in the best interests of its membership. The Audit Committee shall annually review the amount of dues levied by each local to ensure both their adequacy and reasonableness, and shall report on those subjects to the Delegate Body.

(B)    Monthly dues payable by the members to the Local Unions shall not be increased except upon the approval by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting after reasonable notice or by majority vote of the members in good standing in a membership referendum conducted by secret ballot. In addition, monthly dues payable to Local Unions must be approved by the Council.

(C)    Each Local Union shall furnish the Council with a correct monthly report of all members as indicated by the International per capita sheet.

# COUNCIL REPRESENTATION

<u>Section 16</u>.

(A)     Each Local Union shall elect a Delegate or Delegates to the Council Delegate Body in accordance with the Constitution and Laws of the United Brotherhood governing nomination and elections in subordinate bodies.  The ratio of representation from each Local Union to the Council Delegate Body shall be as follows. There shall be a total of One Hundred (100) Delegates to the District Council from the Local Unions, such Delegates to comprise the Council Delegate Body. Each Local Union shall have at least one Delegate to the District Council, with the remaining Delegates allocated proportionally amongst the Local Unions based upon the total membership of each Local Union as a percentage of the aggregate membership of all Local Unions of the District Council. No more than Fifty Percent (50%) of the Delegates representing any Local Union may be employees of the District Council.  No individual employed by the District Council on the day these Bylaws go into effect shall be included in the calculation of the Fifty Percent (50%) limit referred to in the prior sentence, unless the individual's employment by District Council is terminated.

(B)     Each Local Union shall submit to the Executive Secretary-Treasurer the correct number of members on its  rolls from month to month on and after the first meeting of each month.

The Executive Secretary-Treasurer shall notify each Local Union by mail, no later than April 15th of the year of each general election of Local Union Delegates to this Council, the correct number of Delegates each Local Union is entitled to have elected.

# DELINQUENT LOCAL UNIONS

<u>Section 17</u>.  A Local Union owing per capita tax for two months and the same not being paid by the end of the third month, such Local Union Delegates shall not have a vote or voice in the Council. When a Local Union owes a sum equal to three (3) months per capita tax to the Council, its Delegates will not be entitled to a seat in that body nor shall the members of the delinquent Local Union be entitled to the work card of the Council.

# DELEGATE CREDENTIALS

<u>Section 18</u>.  Recording Secretaries of Local Unions must forward credentials of Delegate or Delegates from their Local Union to the Council properly signed by the President and Recording Secretary with the seal of the Local Union affixed. They shall be referred to the Executive Committee who shall investigate the same and report their findings to the Council with recommendation thereof.

# DELEGATES ATTENDING MEETINGS

<u>Section 19</u>.  Any Delegate to this Council failing to attend its meetings shall upon the third (3rd) offense, provided they are successive and no reasonable excuse is presented and accepted by a majority vote of the Council Delegate Body, stand suspended and his Local Union shall be so notified.

## COLLECTIVE BARGAINING

<u>Section 20</u>. Following recommendation by the Executive Committee, the Council Delegate Body shall have the exclusive power and authority to ratify and execute Collective Bargaining Agreements for and on behalf of its affiliated Local Unions, except to the extent the International Union exercises its jurisdiction or authority.

The District Council Delegate Body shall adopt rules and procedures governing the method of collective bargaining ratification.

The District Council has established, and shall maintain, procedures for processing grievances filed pursuant to District Council collective bargaining agreements, as set forth in a separate document dated April 18, 2011, which is incorporated herein by reference.

## TRUST FUNDS

<u>Section 21</u>. All allocations from negotiated total wage amounts to annuity, health and welfare, pension, funds sponsored by the International, apprenticeship, labor-management cooperation committees, vacation savings, and holiday plans, shall be determined by the Council Delegate Body.

## MEETING NIGHTS

<u>Section 22</u>.

(A) The regular meetings of the Council Delegate Body shall be held at least monthly and more often as prudence may require. Upon a majority vote, the Delegate Body may invite members to attend and observe said meetings as space allows and upon such conditions as may be deemed necessary to insure the integrity of the proceedings. Special meetings may be called by the President and Executive Secretary-Treasurer upon written request of the Local Unions stating the nature of the business sought to be transacted. No other business shall be transacted except that for which the meeting is called. The Executive Secretary-Treasurer shall notify each Council Delegate of such special meeting a reasonable amount of time in advance, not less than ten (10) days of its appointed time.

(B) Prior to a regular or special called meeting of the Council Delegate Body, subject to reasonable precautions with respect to confidential and/or privileged information, the Council shall provide to each Delegate reasonably in advance of each meeting, a copy of each of the following:

1. prior meeting minutes for approval;

2. bills and expenditures for approval;

3. results of disciplinary proceedings;

4. the Organizing Report, Membership Retention Report, Political and Legislative Report, and Financial Report, as provided for in the Bylaws; and

5.      supporting materials, if practical, for other items on the meeting agenda.

(C)    The Council must provide certain oral and written reports to the Delegates at every regular meeting:

1.      Organizing Report: The Director of Organizing for the Council shall report to the Delegates on organizing activities within the Council including, but not limiting his report to, industry targets, developments in ongoing programs, obstacles faced and the involvement of volunteer organizing committees with organizers in jobsite actions and housecalling. The report shall include specific targets, the specific number of job site actions and the specific number of housecalls made to nonunion carpenters since the last report, the names of any contractors signed and the number of members brought in with that contractor.

2.      Membership Retention Report: The senior business agent, or a service representative appointed by the Executive Secretary-Treasurer, shall report to the Delegates on membership retention efforts. The report, based on the Ultra Growth and Retention Report, will include, but is not limited to, the current number of members, the number of members initiated, on withdrawal, or transferred since the last report, and specifically the number of members brought in through organizing activities. For members leaving the Brotherhood, the report should include an overview of the reasons as well as all efforts at membership contact, including contacts to encourage membership participation, and contact to members in arrears or on withdrawal to encourage their continued membership.

3.      Political and Legislative Report: The Council political director shall report to the Delegates on political organizing and legislative activities within the Council including, but not limiting his report to, political organizing activities, current legislation on the Federal, State and Local levels, and the involvement of volunteer organizing committees in the overall Council political program. When appropriate the presentation will include, political campaign activities, membership voter registration, membership voter education programs, and reports of contacts with government officials.

4.      Financial Report: The Chief Accountant shall report to the Delegates on the District Council's expenses and revenue.

(D)    If the Council Delegate Body determines by a majority vote of its members that the reports listed above are not sufficient to inform the Council Delegate Body about activities, membership, or finances of the Council and its local unions, the Council Delegate Body may make a request for additional information to the Executive Committee and/or the Officers specifying the additional information that is necessary for the Council Delegate Body to obtain. Such requests shall be complied with within fourteen (14) days. The reports described herein shall be made available to the Delegates for review at the District Council no later than five (5) days before the Delegate Body meeting.

(E)     An audio recording of each meeting of the Council Delegate Body shall be made. The audio recording for each Council Delegate Body meeting shall remain in the exclusive custody of the Chief Compliance Officer.  However, the Chief Compliance Officer shall make the audio recording of any meeting of the Council Delegate Body available to the District Council's Office of the Inspector General, the Review Officer, and to law enforcement authorities upon written request.

## ANNUAL AUDIT

Section 23.  The Fiscal year for this Council shall be July 1st to June 30th. All accounts shall be audited in conformance with these Bylaws and applicable law and a complete financial report for the fiscal year shall be submitted by the Audit Committee to the Executive Committee and Delegate Body for review and comment, no later than ninety days following the close of the fiscal year.

## OFFICERS BOND

Section 24.  Every Officer, agent or employee of the Council who handles funds and property thereof shall be appropriately bonded through the General Office for the faithful discharge of their duties.

## CHARGES AND TRIALS

Section 25.  The exclusive disciplinary procedures for members of the District Council are provided for in the District Council's Charge and Trial Procedures, effective September 7, 2010, and supplemented by the Review Officer on September 22, 2010 and July 8, 2011.  Said Charge and Trial Procedures shall remain in full force and effect.  The District Council shall ensure that sufficient funding is provided each year so that the District Council's Charge and Trial Procedures are continued and maintained in full force and effect.  During the tenure of the Review Officer, the term of the members of the Trial Committee shall be eighteen (18) months.  After the expiration of the term of the Review Officer, the term of the Trial Committee members shall be twelve (12) months.  The members of the Trial Committee shall be elected by secret ballot vote by each Local Union.  There shall be an equal number of Trial Committee members from each Local Union of the District Council and no fewer than eighteen or greater than twenty-two (22) members comprising the committee.

The District Council has established, and shall continue to maintain in full force and effect, the position of Advocate.  The District Council shall ensure that sufficient funding is provided so that the Advocate may effectively carry out the full scope of his duties.  The Advocate can only be replaced by action of the Delegate Body  with the consent of the District Council's Inspector General and Chief Compliance Officer.

The Advocate's duties shall be as provided for in the policies and procedures developed pursuant to Section 27(E)(12) of the Bylaws.  The Advocate may also be approved by the Delegate Body to serve as the Chief Compliance Officer or Deputy Compliance Officer. Those duties shall include, but not be limited to, preparing and presenting disciplinary charges brought for or on behalf of the District Council, including the Inspector General, to the Trial Committee. Any charge filed by the Review Officer may be presented by the Advocate provided that the Review Officer confirms such delegation in a written notice to the presiding officer of the matter.

Upon the expiration of the term of the Review Officer, all charges relating to violations of the Consent Decree, federal law, or state law shall be brought by the Advocate. The Advocate shall be a member of the Bar of the State of New York and admitted to practice in the Southern District of New York. Should a vacancy in the position occur, suitable candidates must be sought by appropriate public notice and selected only after an interview process conducted by the Inspector General and Chief Compliance Officer who shall each render his written recommendation for a replacement to the Delegate Body.

## RECORDS RETENTION

Section 26. The District Council has established, and shall continue to maintain in full force and effect, the District Council's Records Retention Schedule, as set forth in a separate document dated November 19, 2010, which is incorporated herein by reference. The District Council shall ensure that sufficient funding is provided each year so that the District Council's Records Retention Schedule and required oversight and enforcement is continued and maintained in full force and effect.

## INSPECTOR GENERAL

Section 27.

(A)     The District Council has established, and shall continue to maintain in full force and effect, the Office of Inspector General. The District Council shall ensure that sufficient funding is provided so that the District Council's Office of Inspector General is continued and maintained in full force and effect. The District Council shall employ an Inspector General and a Deputy Inspector General, who shall not hold another employment position with, or be an Officer, Delegate or Steward of, the District Council, except as otherwise provided herein. Neither the Inspector General nor Deputy Inspector General may serve as the Chief Compliance Officer.

(B)     The Council Delegate Body shall appoint individuals to fill vacancies in the positions of Inspector General and Deputy Inspector General. During the period that the Consent Decree is in effect, no proposed appointment of individuals to the positions of Inspector General and Deputy Inspector General may be finalized without the consent of the United States Attorney. Additionally, during the tenure of the Review Officer, no proposed appointment of individuals to the positions of Inspector General and Deputy Inspector General may be finalized without the consent of the Review Officer.

(C)     The Inspector General and/or Deputy Inspector General may be terminated by the District Council only for good cause. "Good cause" means significant and reliable evidence that the Inspector General or Deputy Inspector General has substantially failed to fulfill the requirements of the position, as set forth herein and in the policies and procedures promulgated pursuant to Section 27(E)(12) below, in which he or she serves. Prior to termination of the Inspector General or Deputy Inspector General, during the period that the Consent Decree is in effect, the District Council must give reasonable, written notice of, and the reasons for, the proposed termination to the United States Attorney. Additionally, during the tenure of the Review Officer, the District Council must give reasonable written notice of, and the reasons for, the proposed termination to the Review Officer. No such proposed termination may be finalized if, upon receiving notice as required by this section, either the Review Officer or the United States Attorney objects. Upon the expiration of the term of the Review Officer and the termination of the

Consent Decree, the District Council must give reasonable written notice of, and the reasons for, the proposed termination of the Inspector General or Deputy Inspector General to the UBC District Vice President. No such proposed termination may be finalized if, upon receiving notice as required by this section, the UBC District Vice President objects.

(D)     The Inspector General shall oversee a staff of investigators and clerical personnel in the Office of the Inspector General. The Inspector General shall be the senior executive official of the Office of Inspector General, and shall have overall responsibility for the daily operations of the Office of the Inspector General. An investigator employed in the Office of the Inspector General may only be terminated with the consent of the Inspector General and Chief Compliance Officer. The Inspector General may also serve as the Deputy Chief Compliance Officer. The Inspector General's jurisdiction shall extend to the District Council, and its affiliated local unions, and its and their departments, internal operations, field operations, employees, and membership. The District Council's Chief Accountant shall report to the Inspector General as requested. The Inspector General or his or her designee(s) under the Inspector General's authority shall have the same authority as a Council Representative or Organizer of the District Council. The Inspector General shall have access to all District Council records and Benefit Funds records in the custody and control of the District Council.

(E)     The Office of the Inspector General shall have the duty, responsibility and authority to:

1.     Investigate, except as otherwise provided for under the Stipulation and Order, (i) allegations of corruption or misconduct (as defined by the Stipulation and Order, the Constitution of the United Brotherhood and these Bylaws), (ii) violations of the collective bargaining agreements and (iii) other matters as may be assigned by the Delegate Body to protect the lawful interests of the District Council and which pertain to conduct engaged in by, or pertaining to, the District Council, and its affiliated local unions, and members, and when and if evidence of corruption or misconduct has been obtained, take or recommend that, as appropriate, all necessary and lawful remedial action be taken including, but not limited to, filing disciplinary charges with the Trial Committee, filing a criminal complaint, reporting such conduct to the appropriate authorities for further action, assisting counsel in preparing legal action, recommending to the Delegate Body appropriate curative or preventive measures and, when necessary, notifying the General President of the United Brotherhood of circumstances which may require his intervention;

2.     assist the District Council in complying with the requirements of the Consent Decree the Stipulation and Order and other orders entered in *United States v. District Council, et al.,* 90 Civ. 5722, SDNY (RMB);

3.     serve as liaison with the Review Officer, appointed pursuant to the Stipulation and Order, including responding to requests for information from the Review Officer; communicating with the membership regarding the Review Officer; conducting investigations referred to the District

Council by the Review Officer; and, reporting to the Review Officer as requested;

4. develop investigative procedures and guidelines, which may address, but not be limited to, (i) conducting investigative interviews of members, including Delegates and Officers, and employees of the District Council, and affiliated local unions, (ii) document and data review, (iii) legal and fact research, (iv) surveillance, (v) monitoring of employee communications occurring on District Council phones, computers and other equipment, (vi) obtaining and securing evidence, (vii) conducting lawful searches and (viii) lawfully entering jobsites where work is performed pursuant to District Council collective bargaining agreement(s);

5. serve as a liaison with the Labor Management Committee and Chief Compliance Officer, working with them to implement measures to prevent jobsite corruption and to investigate allegations of such corruption.

6. identify risks and vulnerabilities to corruption, misconduct, and unethical conduct, in the District Council's and Local Unions' operations, and identify effective solutions;

7. assist in ensuring that the District Council has in place and administers program(s) and/or policies to ensure compliance with the Stipulation and Order and Consent Decree;

8. assist in the development, implementation, and enforcement of an effective compliance and ethics program;

9. establish a procedure so that anyone having information regarding allegations of illegal, noncompliant or unethical conduct or corruption pertaining to the District Council, including affiliated Local Unions, engaged in by Officers, members or employees of the District Council or by persons conducting business with or seeking to influence the District Council or persons affiliated with the District Council, may report such conduct to the Inspector General in confidence, without fear of retaliation or adverse action, and without revealing who they are, if they so choose;

10. with the assistance of the District Council Advocate, bring disciplinary charges pursuant to the District Council's Charge and Trial Procedures;

11. report on a regular basis to the District Council Executive Committee with respect to the efforts of the Office of the Inspector General in fulfilling its mission. The Inspector General may also report to the District Council Delegate Body, upon request of either the District Council Delegate Body or at the Inspector General's own discretion. Provided further, that when circumstances warrant, and in the discretion of the Inspector General, reports may be made directly to the District Vice President, Eastern District,

or General President, of the United Brotherhood of Carpenters and Joiners of America;

12.    develop policies and procedures for the Office of the Inspector General, including a description of the scope of the Office of Inspector General and the District Council Advocate, their duties, including liaison responsibilities with respect to the Labor Management Committee, and the means and methods by which they will carry out those duties. Such practices and procedures shall be subject to the approval of the United States Attorney and the Review Officer, as set forth in a separate document which shall be incorporated herein by reference. If the Inspector General does not submit such policies and procedures to the Review Officer for approval by March 15, 2012, the Review Officer may draft such policies and procedures for approval by the United States Attorney. The Inspector General, the Deputy Inspector General, and their subordinates must conduct their duties in accordance with said policies and procedures, and may not modify them without the prior approval of the United States Attorney and, during the Review Officer's tenure, the Review Officer.

## CHIEF COMPLIANCE OFFICER

Section 28.

The District Council has established, and shall continue to maintain in full force and effect, the position of Chief Compliance Officer. The District Council shall ensure that sufficient funding is provided each year so that the District Council's Chief Compliance Officer position and function is continued and maintained in full force and effect.

(A)    The District Council shall employ a Chief Compliance Officer and Deputy Chief Compliance Officer, who shall not hold another employment position with, or be an Officer, Delegate or Steward of, the District Council, unless otherwise stated herein.

(B)    The Council Delegate Body shall appoint individuals to the positions of Chief Compliance Officer and Deputy Chief Compliance Officer. During the period that the Consent Decree is in effect, no proposed appointment of individuals to the positions of Chief Compliance Officer and Deputy Chief Compliance Officer may be finalized without the consent of the United States Attorney. Additionally, during the tenure of the Review Officer, no proposed appointment of individuals to the positions of Chief Compliance Officer and Deputy Chief Compliance Officer may be finalized without the consent of the Review Officer.

(C)    The Chief Compliance Officer shall develop policies and procedures for the Office of the Chief Compliance Officer, including a description of the scope of the positions of Chief Compliance Officer and Deputy Chief Compliance Officer, their duties, including liaison responsibilities with respect to the Labor Management Committee, and the means and methods by which they will carry out those duties. Such practices and procedures shall be subject to the approval of the United States Attorney and set forth in a separate document, incorporated herein by reference. If the Chief Compliance Officer does not submit such policies and procedures to the Review Officer for approval by March 15, 2012, the Review Officer may draft such policies and procedures for approval by the United States Attorney. The Chief Compliance Officer and Deputy

24

Chief Compliance Officer must conduct their duties in accordance with those policies and procedures, and may not modify them without the prior approval of the United States Attorney and, during the Review Officer's tenure, the Review Officer.

(D)     The Chief Compliance Officer, assisted as necessary by the Deputy Chief Compliance Officer who may be the Inspector General, is responsible for ensuring that the District Council develops, implements, and operates an effective compliance and ethics program consistent with Section 8 of the Federal Sentencing Guidelines, such that the District Council shall:

1.     exercise due diligence to prevent and detect noncompliant conduct; and

2.     otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law.

(E)     The Chief Compliance Officer shall ensure that the District Council's efforts at due diligence and the promotion of an organizational culture that encourages ethical conduct and a commitment to compliance with the law, within the meaning of Section 8 of the Federal Sentencing Guidelines, include that:

1.     the District Council shall establish standards and procedures to prevent and detect noncompliant conduct;

2.     the District Council's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program;

3.     high-level personnel of the District Council shall ensure that the District Council has an effective compliance and ethics program;

4.     specific individual(s) within the District Council shall be delegated day-to-day operational responsibility for implementing the compliance and ethics program;

5.     the District Council shall use reasonable efforts not to include within the personnel of the District Council any individual whom the District Council knew, or should have known through the exercise of due diligence, has engaged in illegal activities or other conduct inconsistent with an effective compliance and ethics program;

6.     the District Council shall take reasonable steps to communicate periodically and in a practical manner its standards and procedures, and other aspects of the compliance and ethics program, by conducting effective training programs and otherwise disseminating information appropriate to the respective roles and responsibilities of necessary personnel;

7.     the District Council shall take reasonable steps—

(A) to ensure that the District Council's compliance and ethics program is followed, including monitoring and auditing to detect noncompliant conduct;

(B) to evaluate periodically the effectiveness of the District Council's compliance and ethics program, and the level of compliance with the compliance and ethics program by District Council employees and Officers; and

(C) to ensure that the District Council has and publicizes a system, which may include mechanisms that allow for anonymity or confidentiality, whereby the District Council's employees, members, and others may report or seek guidance regarding potential or actual noncompliant conduct without fear of retaliation;

8. the District Council's compliance and ethics program shall be promoted and enforced consistently throughout the District Council through:

(A) appropriate incentives to perform in accordance with the compliance and ethics program; and

(B) appropriate disciplinary measures for engaging in noncompliant conduct and for failing to take reasonable steps to prevent or detect noncompliant conduct;

9. after noncompliant conduct has been detected, the District Council shall take reasonable steps to respond appropriately to the noncompliant conduct and to prevent further similar noncompliant conduct, including making any necessary modifications to the organization's compliance and ethics program;

10. the District Council shall periodically, but at least annually, assess the risk of noncompliant conduct and shall take appropriate steps to design, implement, or modify the compliance and ethics program to reduce the risk of noncompliant conduct identified through this process.

(F) The Chief Compliance Officer, or his designee, shall sit on any District Council, or affiliated Local Union, Committee with voice but no vote. The Chief Compliance Officer shall attend all meetings of the Delegate Body to observe the proceedings and make a confidential audio recording of the proceedings to be kept in his or her custody for use as authorized herein or by a written resolution passed by the Delegate Body and endorsed by the signature of the Executive Secretary-Treasurer. Said recordings are subject to the District Council Records Retention Policy.

The Chief Compliance Officer and Deputy Chief Compliance Officer may also receive complaints regarding misconduct involving the District Council.

(G)     The Chief Compliance Officer shall report on a regular basis to the District Council Executive Committee with respect to the efforts of the Chief Compliance Officer in fulfilling the mission of the position. Also, the Chief Compliance Officer shall report quarterly to the District Council Delegate Body, and may report more frequently upon request of either the District Council Delegate Body or at the Chief Compliance Officer's own discretion. The Chief Compliance Officer shall report on the effectiveness of the compliance and ethics program in general, and the fulfillment of the Chief Compliance Officer's responsibilities, in particular. Provided further, that when circumstances warrant, and in the discretion of the Chief Compliance Officer, reports may be made directly to the District Vice President, Eastern District, or General President, of the United Brotherhood of Carpenters and Joiners of America.

(H)     The Chief Compliance Officer or Deputy Chief Compliance Officer may be terminated by the District Council only for good cause. "Good cause" means significant and reliable evidence that the Chief Compliance Officer or Deputy Chief Compliance Officer has substantially failed to fulfill the requirements of the position in which he or she serves, as set forth herein and in the procedures promulgated pursuant to Section 28(C) above. Prior to termination of the Chief Compliance Officer or Deputy Chief Compliance Officer, during the period that the Consent Decree is in effect, the District Council must give reasonable, written notice of, and the reasons for, the proposed termination to the United States Attorney. Additionally, during the tenure of the Review Officer, the District Council must give reasonable written notice of, and the reasons for, the proposed termination to the Review Officer. No such proposed termination may be finalized if, upon receiving notice as required by this section, either the Review Officer or the United States Attorney, objects. Upon the expiration of the term of the Review Officer and the termination of the Consent Decree, the District Council must give reasonable written notice of, and the reasons for, the proposed termination of the Chief Compliance Officer or Deputy Chief Compliance Officer to the UBC District Vice President. No such proposed termination may be finalized if, upon receiving notice as required by this section, the UBC District Vice President objects. The Chief Compliance Officer shall take charge of all the ballots cast in any election of the Council and shall preserve said ballots and other records relating to the election for a period of one year after the election date.

## DIRECTOR OF HUMAN RESOURCES

Section 29.

(A)     The District Council has established, and shall continue to maintain in full force and effect, the position of Director of Human Resources. The District Council shall ensure that sufficient funding is provided each year so that the District Council's Director of Human Resources position and function is continued and maintained in full force and effect.

(B)     The Council Delegate Body shall appoint an individual to fill any vacancies in the positions of Director of Human Resources. During the period that the Consent Decree, issued in United States v. District Council, et al., 90 Civ. 5722, SDNY (RMB) is in effect, no proposed appointment of an individual to the positions of Director of Human Resources may be finalized without the consent of the United States Attorney's Office for the Southern District of New York. Additionally, during the tenure of the Review Officer appointed under the June 3, 2010 Stipulation and Order in the above captioned case, no proposed appointment of an individual to the position of Director of Human Resources may be finalized without the consent of the Review Officer.

(C)     The Director of Human Resources shall have responsibility for implementing, maintaining, and ensuring compliance with the District Council Personnel Policy, and a document retention program, and also assisting in providing training for, and dissemination of, an effective compliance and ethics program.  The Director of Human Resources may not change the provisions of the District Council Personnel Policy without the approval of the United States Attorney's Office for the Southern District of New York and, during the tenure of the Review Officer appointed under the June 3, 2010 Stipulation and Order in *United States v. District Council, et al.*, 90 Civ. 5722, SDNY (RMB), the Review Officer.  At his or her discretion, the Director of Human Resources may bring issues related to the position to the attention of the District Vice President.

(D)     The responsibilities and duties of the Director of Human Resources shall also include, but not be limited to, the following:

1.      develop and present for annual approval by the Council Delegate Body a table of organization identifying the relevant employee positions within the District Council (including job titles and descriptions of responsibilities and associated salary ranges) and the number of individuals needed to be employed at any given time for each position to efficiently conduct the necessary business of the District Council within budgeted costs.  Said table of organization may only be otherwise amended upon a majority vote of the Delegate Body after receiving from a majority of the members of the Executive Committee a written statement of necessity to amend the table of organization which states why such amendment is necessary for the conduct of said District Council business;

2.      ensure that all job opportunities and openings are appropriately advertised and that candidates for employment are well qualified and are hired through uniform, best practices (including development and use of application forms, standardized interviews and rating on objective criteria by duly-authorized hiring committee);

3.      ensure that all required and appropriate Human Resources-related records are maintained properly and securely;

4.      process, investigate, and report to the District Council complaints of alleged discrimination and harassment through uniform procedures;

5.      ensure that objective performance and productivity evaluations of all District Council employees are completed at least annually;

6.      interact with other functions and departments of the District Council;

7.      develop and implement other human resources functions in a uniform, documented manner that adheres to best practices.

## INITIATION FEES

<u>Section 30</u>.  The initiation fee(s) in this Council shall be Three Hundred Dollars ($300).

Arrangements may be made for the payment of initiation fees by installments. The Initiation Fee for apprentices shall be in accordance with the Constitution and Laws of the United Brotherhood. Where an ex-member has violated any of the Rules and Laws of this Council and has been tried and found guilty of same and where a fine has been imposed, such fine must be paid before initiation.

## WORKING CARDS

Section 31. The Council shall have the power to issue quarterly working cards to the Local Unions for each member of the United Brotherhood on the Local Unions' books. No member shall be entitled to receive a working card from a Local Union unless all arrearages for dues, fines and assessments are paid in full.

## REPRESENTATIVES AND ORGANIZERS

Section 32.

(A)    All Representatives and Organizers working in the jurisdiction of the Council must be hired pursuant to, and their employment governed by, the procedures outlined herein and in the District Council Personnel Policy.  Such employees shall be subject to regular oversight by the Executive Committee and shall be placed under the supervision and direction of the Executive Secretary-Treasurer of the Council.  No Representative, Organizer, or Special Representative shall have authority to act as such until he or she receives the proper credentials from the Council.

(B)    The Local Unions shall not be allowed to employ anyone other than clerical employees.

(C)    Any member who represents himself or herself as a Representative or any member acting as such and not having received credentials from the Council, or a Business Representative whose credentials have been canceled and who represents himself or herself as a Representative of this Council or any Local Union, shall for the first offense, after having been tried and found guilty, be fined a sum of Five Hundred Dollars ($500.00) and for the second offense, if found guilty shall be expelled from the United Brotherhood.

## FURTHER OBJECTIVES

Section 33.  The Council shall have the authority to organize and operate a special Political Education Committee for the purpose of political objectives including, but not limited to, public relations, political activities and contributions and furtherance of legislation.  Such Committee shall operate pursuant to its bylaws and act in accordance with all applicable laws.

## LAWSUITS AGAINST THE COUNCIL

Section 34.  No member fined, suspended or expelled by action of the Council shall file any lawsuit against the Council, its Officers or Representatives, or its affiliated Local Unions without first exhausting all appeal remedies provided for in these Bylaws and the Constitution of the United Brotherhood.

# AMENDMENTS

<u>Section 35</u>.

(A)     Any amendments and changes to these Bylaws may be put into effect by the action of the Delegates at a Special Convention of the Council.

(B)     A proposed change must be submitted in writing by at least one third of the Local Unions affiliated with the District Council, with the seal affixed provided that the Resolutions Committee consisting of three (3) or more members has reviewed and approved the resolution as to its legality in accordance with the Constitution and Laws of the United Brotherhood and the applicable Collective Bargaining Agreement, and State and Federal laws.

(C)     All changes or proposed changes to the Bylaws or Trade Rules of this Council or any of the Local Unions shall be first referred to the Executive Committee for consideration and recommendation, and then referred to a Bylaws committee for consideration and, if warranted, recommendation to the Delegate Body that a proposed change or changes be adopted.  If approved by the Council and in accordance with Section 11B of the Constitution and Laws of the United Brotherhood (the "UBC Constitution"), the proposed change or changes must be submitted to the General Vice President for approval after review of, among other things, whether such change or changes are in conformity with the UBC Constitution, are in the best interests of the District Council, and will further the objectives of the Consent Decree or Stipulation and Order.  Notwithstanding the foregoing, nothing herein shall change or limit the authority of the General Vice President pursuant to the UBC Constitution to approve or disapprove changes to these Bylaws.  All proposed changes to the Bylaws shall be subject to the approval of the United States Attorney and, during the term of the Review Officer, the Review Officer.

# SEVERABILITY

<u>Section 36</u>.  If any Section or part of these Bylaws shall be held invalid by operation of law or by any tribunal of competent jurisdiction, the remaining Sections of these Bylaws shall not be affected thereby and shall remain in full force and effect.

# MISCELLANEOUS

<u>Section 37</u>.

(A)The Council Delegate Body, by majority vote of the Delegates present, either in regular or special session, shall have the authority to adopt policies and procedures consistent with these Bylaws to govern the Council and all Local Unions, and to enact all measures, resolutions, trade rules, instruction to members and Local Unions and all other actions that may be necessary to further the objectives and purposes of the Council.  Provided further that the foregoing shall be in conformity with the Consent Decree, Stipulation and Order of June 3, 2010, and any other Order entered, in *United States v. District Council*, 90 Civ. 5722 (CSH), and subject to the approval of the United States Attorney and, during the term of the Review Officer, the Review Officer.

(B)These Bylaws, Trade Rules and any other rules, resolutions and directives adopted by the Council shall govern and be binding on each Local Union.

(C)Any subject not covered by these Bylaws and Trade Rules shall be governed by the Constitution of the United Brotherhood and nothing in these Bylaws shall in any way be construed to conflict with the Constitution of the United Brotherhood.

(D)     The Executive Committee of the Council shall have the authority to call a Special Convention. Written notice describing the purpose of a Special Convention must be given to all Delegates and the principal office of each Local Union at least thirty (30) days prior to such Convention. The delegates of any Special Convention of this Council shall consist exclusively of the Delegates to this Council.

(E)     All current Bylaws of Local Unions must be submitted to the Council for approval. All Bylaws of Local Unions that are inconsistent with these Bylaws are superseded.

## HIRING HALL OR JOB REFERRAL SYSTEM

Section 38.  The Executive Committee of the Council shall maintain, and all workers shall be governed by, uniform rules and/or procedures consistent with the Consent Decree, and any other Order entered in *United States v. District Council, et al.*, 90 Civ. 5722, for the registration and/or referral to employment of unemployed workers. Workers shall have the right to seek work and be employed throughout the territorial jurisdiction of the Council.  The referral of all workers to jobs shall be performed by the Executive Secretary-Treasurer. Representatives, organizers and agents of the District Council may not otherwise refer members to jobs or in any way inform an employer that a member is available for employment. The Executive Secretary-Treasurer shall maintain records of all worker registration and referrals, which shall be reviewed regularly by the Executive Committee and which may be reviewed by any member upon reasonable request.

## SHOP STEWARDS

Section 39.

(A)     All Stewards shall  be appointed by the Council Delegate Body or its duly-authorized designee in a fair and equitable manner consistent with job referral rules and the Consent Decree entered in *United States v. District Council, et al.*, 90 Civ. 5722, and any other applicable order issued pursuant to that case.

(B)     Stewards shall be members of the District Council in good standing and be appointed according to their skills and position on the out of work list.

(C)     The Council may require workers who desire to serve as a Steward to complete the UBC's Comprehensive Steward Training Program; have five (5) years journey level experience in the construction industry; and to provide the Council a declaration of eligibility to serve as a Shop Steward, attesting that they have not been convicted of any crime which would make them ineligible to serve as a Shop Steward under Section 504 of the Labor Management Reporting and Disclosure Act of 1959.

(D)     All Shop Stewards must have on file at the office of the Inspector General, a copy of the "Shop Steward Code of Ethics." Any Shop Steward not having this Code of Ethics on file will not be dispatched as Shop Steward and their Shop Steward credentials will be suspended until the Code of Ethics is on file.

(E)     All Shop Stewards must have on file at the Office of the Inspector General, a copy of the "Notice of Acknowledgement Regarding Background Investigation" authorizing a background check. Any Shop Steward not having such notice will not be dispatched as Shop Steward and their Shop Steward credentials will be suspended until the Notice of Acknowledgement is on file.

(F)     No worker shall be referred from the out-of-work list out of turn to fill a Steward position.

(G)     All Stewards must take the District Council eight (8) hour certification class and complete the 2001 Skill Set Training. In addition to the UBC's Comprehensive Steward Training Program and the required working experience provided under this section, the following skill sets shall be required of any worker who desires to serve as a Steward.

| Carpenters Local Union 20, 45, 157, 926 and Dockbuilders | Floorcoverers, Timbermen and Shop | Millwright |
|---|---|---|
| UBC Comprehensive Steward Training Program | UBC Comprehensive Steward Training Program | UBC Comprehensive Steward Training Program |
| 10 Hour Construction Safety Course (OSHA) | 10 Hour Construction Safety Course (OSHA) | 10 Hour Construction Safety Course (OSHA) |
| First Aid Certified | First Aid Certified | First Aid Certified |
| CPR Certified | CPR Certified | CPR Certified |
| Sexual Harassment Prevention Course | Hazardous Communications (MSDS) | Sexual Harassment Prevention Course |
| Hilti/Ram-Set Power Tool Activated Certified | District Council I.D. Process | |
| Certified of Fitness Bureau of Fire Prevention, NYC | *   30 Hour OSHA training for Floorcoverers | |