UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 90 Civ. 5722 (RMB) |
| Plaintiff, | |
| -against- | |
| DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., | |
| Defendants. | |

**FIFTH INTERIM REPORT OF THE INDEPENDENT MONITOR**

GLEN G. McGORTY
DANIEL E. VINISH
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
dvinish@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United
Brotherhood of Carpenters and
Joiners of America

March 6, 2018

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ...................................................................................- 1 -

II. THE DISTRICT COUNCIL ...................................................................- 3 -

    A.  2017 District Council Leadership Election.......................................- 3 -

        1.  Establishment of the 2017 Election Rules ..............................- 3 -

        2.  Nominations Process................................................................- 4 -

        3.  The Campaign ..........................................................................- 6 -

        4.  Complaints and Related IM Investigations.............................- 6 -

        5.  Formal Election Rule Protests ................................................- 6 -

        6.  Election Results .......................................................................- 7 -

        7.  Letter to the UBC ....................................................................- 7 -

    B.  Revisions to the Bylaws and Policies ...............................................- 8 -

    C.  Resignation of District Council President........................................- 9 -

    D.  Efforts in the High-Rise Concrete Sector ........................................- 9 -

    E.  Information Technology Upgrade....................................................- 10 -

    F.  Leadership Training .......................................................................- 10 -

    G.  Contract Negotiation .....................................................................- 11 -

    H.  OWL Rules ....................................................................................- 12 -

    I.  Goals .............................................................................................- 14 -

        1.  Inspector General's Office.....................................................- 14 -

        2.  IT Upgrades ...........................................................................- 14 -

        3.  Accounting Department..........................................................- 15 -

        4.  Oversight Policies and Tools for the Council Representative Center...- 16 -

        5.  Grievances Department...........................................................- 16 -

        6.  Trial Committee and Shop Steward Review Committee .......- 17 -

J.      Litigation................................................................................................- 21 -

III.    THE OFFICE OF THE INDEPENDENT MONITOR...............................................- 23 -

A.      Goals Project...........................................................................................- 23 -

B.      Membership Relief Fund ........................................................................- 23 -

C.      Miscellaneous Investigations and Referrals..........................................- 25 -

D.      Review of the Inspector General's (IG) Office......................................- 25 -

E.      Review of the Council Representative Center ........................................- 26 -

F.      A Plan Forward .......................................................................................- 27 -

IV.     CONCLUSION........................................................................................................- 28 -

## I.     INTRODUCTION

Pursuant to Paragraph 5.l.iii of the Stipulation and Order filed in this matter on April 18, 2016 (the "2016 Stipulation and Order"), as extended by the Stipulation and Order filed in this matter on April 24, 2017 (the "2017 Stipulation and Order"), I respectfully submit this Fifth Interim Report as the Independent Monitor ("IM") of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" or "Union").

This report outlines my assessment of the District Council's progress towards achieving the objectives of the 2017 Stipulation and Order and the Consent Decree approved by the Court on May 4, 1994; my view on the sustainability of reforms previously implemented; and my recommendations going forward.   In this Fifth Interim Report, I continue to provide a streamlined style, as first introduced in my Third Interim Report, omitting discussion of matters for which there have been no material developments related to the objectives of the 2017 Stipulation and Order and the Consent Decree.   Additional information subsequently requested by the Court will be provided in a supplemental filing.

I will begin by summarizing the extension of my monitorship, the latest term of which is scheduled to conclude on March 31, 2018.[1]   There are two important aspects of the 2017 Stipulation and Order that I would like to emphasize at the outset of this report.   The first involves changes to the scope of my authority in respect of the Benefits Funds.   While I continued during this term to serve in the same capacity as I did before with respect to the District Council, the Government agreed to limit my oversight of the Benefits Funds to matters

---

[1] My first term began on January 1, 2015, pursuant to the prior Stipulation and Order filed in this matter on November 14, 2014 (the "2014 Stipulation and Order"), and expired on March 31, 2016.   I continued my monitorship for a second term that began on April 1, 2016, pursuant to the Stipulation and Order filed in this matter on April 18, 2016 (the "2016 Stipulation and Order"), which expired on March 31, 2017, but was provisionally extended through April 30, 2017, while the parties negotiated the 2017 Stipulation and Order.

referred to me pursuant to Paragraph 5(e)(ii) of the April 2016 Stipulation and Order, which allows the Benefit Funds (and the District Council) to refer any matter to me for further review and oversight.  I approved this change because the Benefits Funds confirmed its ability to self-govern; however, going forward, I expect the Benefits Funds to self-report and promptly alert me to any potential violations of the anti-corruption principles of the Consent Decree.  I expect that understanding to continue should this monitorship continue into another term.

The second involves my continued focus on working with the District Council leadership in transitioning to self-monitoring or, at a minimum, a more limited form of outside supervision. I emphasize that the fact that the Benefits Funds, but not the District Council, was released from the initial terms of the monitorship should not be construed in a negative manner with regard to the latter.   In other words, I continue to believe the District Council is capable of eventually transitioning to self-governance and self-policing.   Over the past year, I have continued a positive dialogue with the District Council leadership, focused on establishing concrete goals for self-governance.   The progress the District Council has made toward reaching these goals is discussed in more detail below.

Despite progress, in many respects the past year has been my most active as the IM.  My oversight has included changes to the Bylaws, as well the monitorship of an extremely contentious election.  In addition, my team also completed its review of the Inspector General's office, as well as assisted in finding a new Inspector General.   My team also conducted a seemingly constant flow of wide-ranging investigations.  Details regarding the most significant of these investigations are summarized and submitted to the Court *ex parte* and under seal in a separate letter.

While I recognize that the Consent Decree and its anti-corruption principles will *always* be in place, I remain hopeful that the District Council will be capable of transitioning to

increased self-governance, relying on a strong Inspector General's Office and Chief Compliance Officer function.

## II.    THE DISTRICT COUNCIL

### A.    2017 District Council Leadership Election

By far, the most significant event since my last Interim Report has been the recent District Council leadership elections.  The election required a substantial amount of my focus and appropriately so, as the democratic election of District Council leadership remains a cornerstone of a compliant and corrupt-free Union.

#### 1.    Establishment of the 2017 Election Rules

Under the revised Bylaws that went into effect on October 31, 2017, each member of the District Council leadership – the Executive-Secretary Treasurer, President, Vice President, Warden, Conductor, and three Trustees – is elected for a 4-year term.  Prior to the recent Bylaws changes, each officer served for a 3-year term.  The last election was held in 2014, resulting in the need for an election for the District Council leadership this past fall.  This election was held – as described in greater detail below – resulting in the re-election of the incumbent leadership of the District Council.  The new terms for the leadership commenced on January 10, 2018.

In anticipation of the 2017 election, as the election monitor, my staff and I undertook the process of reviewing the 2014 Election Rules and implementing appropriate changes and modifications necessary to reflect the District Council progress over the past three years.  By letter dated July 19, 2017, I advised the Court of the District Council's proposed changes and in accordance with the District Council's Bylaws, requested the Court's approval.  On July 21, 2017, the Court approved the revised 2017 Election Rules.

### 2.    Nominations Process

Under the revised 2017 Election Rules, the Executive-Secretary Treasurer, President and Vice President were to be elected by the entire membership by mail-in ballots organized and administered by an independent third party, the American Arbitration Association ("AAA"). The ballots were to be distributed by mail to each member's home address in late November 2017 with the instruction that they must be returned to AAA no later than December 21, 2017, after which date the votes would be counted by AAA.  The 2017 Election Rules also provided for election of the Warden, Conductor and three Trustees at a special meeting of the District Council delegate body (which is made up of elected representatives of the nine local unions comprising the District Council) to be held on December 21, 2017.

In accordance with the revised Election Rules, the District Council distributed a letter from my office on August 1, 2017, notifying the membership that the nomination phase would begin on August 8, 2017.  The Election Rules required readily available nominating petitions, 250 signatures to nominate any individual candidate and 500 signatures to nominate any "slate" of two or more candidates, although all nominees remained subject to other eligibility requirements in the Election Rules and my review of their qualifications to serve.  As of September 1, 2017, we received nomination packages for four candidate "slates," each comprised of two or more officer nominees, and one independent nominee for Executive-Secretary Treasurer, all of whom submitted the required number of signatures.  My office then conducted interviews of each nominee to investigate his eligibility and qualifications for office. I ultimately approved the following nominees to run for election:

- *Solidarity Slate* – Joseph Geiger (EST); Stephen McInnis (President); Michael Cavanaugh (Vice President); Phillip Fiorentino (Warden); Joseph DiNapoli (Conductor); James Noonan, John Sheehy, James Ellis (Trustee)[2];

- *Members Voice Slate* – William McKenna (EST); Kevin Corrigan (President); John DeFalco (Vice President); Michael Hughes (Warden); Andrew Monje (Conductor); Christopher Brown, Oliver Christopher, Michael Donnelly (Trustee);

- *Independent* – Michael Connor (EST)[3];

- *Last Stand Slate* – Pat Nee (President); Gerard Gausman (Vice President); Danny Dore (Warden); and

- *Working Family Slate* – Patrick Crean (EST); Sean Murphy (President); Herman Warren (Vice President); Otis Reese, Januz Majewski, Junior Deterville (Trustee).

While my office disallowed four nominees from running in the election, none of these candidates was disallowed because of perceived corruption or any belief that the nominee may be subject to corrupt influences in the future. Rather, they were not permitted to run because of other disqualifying factors under the Bylaws, the Election Rules, and/or the United Brotherhood of Carpenters ("UBC") Constitution.[4]

---

[2] The Solidarity Slate was comprised exclusively of incumbent officers; two trustees were also incumbents.

[3] Mr. Connor subsequently withdrew from the election for personal reasons.

[4] One of the candidates was disqualified from running because, pursuant to Section 31-D of the UBC Constitution, I determined that the candidate did not meet the "working for a livelihood" and "depending on the trade" requirements. The candidate protested his disqualification to the UBC, which responded via December 1, 2017 letter, indicating that the ruling was within my authority under the 2017 Election Rules. The UBC General President referenced prior UBC guidance and information on the issue provided earlier last year in an unrelated matter (which was consistent with the my decision). Notably, the application of Section 31-D has come up several times this past year regarding the eligibility of candidates and my office is currently reviewing objections from three individuals recently removed from office for allegedly failing to meet this criterion.

### 3.    The Campaign

Following the establishment of the approved candidates and slates, the respective candidates commenced their campaigns.  Each slate and/or candidate was required to submit an accounting of election-related expenses and donations.  Multiple such financial disclosures were submitted to my team as required by the 2017 Election Rules.  Generally, these financial disclosures included spending on printing and related expenses to create and distribute campaign materials.  In addition, the District Council had previously conducted training of employees on permissible and prohibited campaign activities.  During this election cycle, the District Council provided refresher training to staff and distributed to them written guidelines in a question and answer format of permissible and prohibited campaign activities.

### 4.    Complaints and Related IM Investigations

Not long after the campaign began, the IM team began to receive complaints from various sources of election rule violations.  These complaints most often related to access to worksites, District Council employees campaigning during business hours, and the propriety of particular campaign methods.   The IM team reviewed the complaints, interviewed relevant parties where appropriate, conducted additional independent investigations if warranted, and reached conclusions as to the alleged violations.  To the extent there was any actual violation or concern, appropriate action was taken.

### 5.    Formal Election Rule Protests

On November 30, 2017, the IM team received a formal protest from counsel to the Members Voice Slate (the "Nov. 30th Protest") challenging campaign-related conduct by the Solidarity Slate.  Subsequently, on December 11, 2017, we also received a formal protest from counsel to the Solidarity Slate (the "Dec. 11th Protest") challenging campaign-related conduct of the Member's Voice Slate.  On January 10, 2018, after conducting a reasonable and thorough

investigation pursuant to my authority under Section Six of the Election Rules, I issued a written ruling in which I determined that neither the Nov. 30th Protest nor the December 11th Protest presented actionable violations of the 2017 Election Rules (the "Jan. 10th Decision").

By letter to the Court dated January 22, 2018, the Members Voice Slate appealed my Jan. 10th Decision (the "Jan. 22nd Notice of Appeal") pursuant to Paragraph 5 of Section 6 of the 2017 Election Rules.  Therein, the Members Voice Slate suggested that, *inter alia*, the IM should be required to issue a more robust statement of reasons to allow the Court to determine whether, in applying the Election Rules, I acted arbitrarily and capriciously.  Pursuant to the Court's Order of February 22, 2018, I filed a written response addressing the issues on February 28, 2018, which is pending before the Court.

### 6.      Election Results

On December 21, 2018, representatives from the slates and many of the candidates themselves, along with representatives from the IM team, attended the official counting of the ballots at AAA headquarters.  After several hours of counting the ballots, the results were tabulated and the Solidarity Slate was declared victorious.  The specific results – which were certified by the AAA and subsequently by the IM – are attached hereto as Exhibit 1.

### 7.      Letter to the UBC

In addition to appealing the Jan. 10th Decision to the Court, the Members Voice Slate sent a letter dated January 26, 2018, to the UBC General President appealing the certification of the election rules generally, and identifying violations of the Labor-Management Reporting and Disclosure Act of 1959 (the "LMRDA") (the "Jan. 26th UBC Letter").  The letter summarizes some of the complaints made to the IM team during the election process, as well as new allegations which only came to light after the close of the election process.  In a February 20, 2018 letter from the UBC to the candidates of the Members Voice Slate, the UBC General

President dismissed the election protest, determining that the authority to oversee the election lies exclusively with the IM, and ultimately the Court.  The UBC also acknowledged that the allegations in the January 26, 2018 letter, despite being untimely, are properly before my office for review and consideration.  Many of the complaints raised therein have already been investigated and addressed by my team, but to the extent there are new allegations which require additional investigation, we are currently looking into them.

**B.    Revisions to the Bylaws and Policies**

As the Court is well aware, the past two years have seen significant activity related to amending the District Council's Bylaws in an effort to better position the District Council for self-governance.  Recently, on October 10, 2017, the District Council held a special convention by which delegates representing all nine of the local unions voted in favor of approving the final set of proposed Bylaws amendments following a lengthy review period during which the Bylaws Working Group sought comments and suggestions first from the Presidents of the local unions and then from the local unions through their executive committees and membership.  Eight of the nine local unions endorsed the proposed amendments.  In accordance with the former (then-effective) Bylaws, the District Council then sought and received approval from the UBC and the Government to implement the amendments.[5]  The revised Bylaws became effective on October 31, 2017.

During the course of this approval process, the Court received substantive and procedural challenges to the proposed amendments separately from the Association for Union Democracy ("AUD") and a District Council delegate.  These challenges, as the Court will recall, took issue with the District Council's formation of the Bylaws Working Group, its efforts to work with the

---

[5] I understand from speaking with counsel for the District Council that the UBC and Government approved the proposed amendments on October 30, 2017, and October 31, 2017, respectively.

IM team and the Government to assemble preliminarily acceptable amendments before submitting final proposed amendments to the greater membership and the full Delegate Body for approval.  The Court denied these challenges by Order entered on September 29, 2017, finding that the District Council Working Group and its procedures were not inconsistent with the Bylaws [9/29/2017 Order, ECF no. 1780].  On October 17, 2017, a District Council delegate appealed the Court's September 29, 2017  Order to the Second Circuit, which has yet to rule.

### C.    Resignation of District Council President

In late December 2018, allegations were brought to the attention of the District Council regarding the District Council President Steven McInnis.  As a matter of protocol, the allegations were brought to my attention and my investigative team conducted a full review.   Upon conclusion of the investigation, I recommended that McInnis resign due to an infraction of the personnel policy.  Joseph Geiger, EST of the District Council, concurred with the findings of my team's review and requested Mr. McInnis's resignation.   Mr. McInnis complied with Mr. Geiger's request and resigned on February 21, 2018.  Mr. Geiger announced the appointment of Graham McHugh as President Pro Tem of the District Council effective February 27, 2018, following the process set forth in the UBC Constitution and the District Council Bylaws.

I will be working with the District Council in the same manner as with the 2017 officers' election to promptly initiate an election process to permanently fill the President position pursuant to the directives of the Constitution and Bylaws.

### D.    Efforts in the High-Rise Concrete Sector

In my last three Interim Reports, I have included explanations of the UBC's efforts to establish a new local union focused on organizing workers in the high-rise concrete sector and the UBC's related successes.  [Second Interim Report, ECF No. 1653 at 9; Third Interim Report, ECF No. 1704 at 3; Fourth Interim Report, ECF No. 1755 at 2.]  My Fourth Interim Report

highlighted two remaining recommendations for the District Council in 2017 related to this initiative:  (1) the transitioning of experienced Provisional Journeymen Carpenters to the OWL to ensure that all members are dispatched randomly to jobsites in accordance with the Consent Decree; and (2) an election for the new local union's executive board, Delegates, Executive Committee members, and Trial Committee members.  [Fourth Interim Report, ECF No. 1755 at 2.]  The District Council's leadership has confirmed that both of these recommendations have been satisfied and the new local union is operating presently as an effective tool to bring high-rise concrete jobs under District Council collective bargaining agreements.

E.      **Information Technology Upgrade**

As I reported most recently in my Fourth Interim Report, the District Council has employed the services of Data Research Group ("DRG"), an outside IT vendor, to overhaul the District Council's IT infrastructure for the purpose of integrating new compliance controls throughout the organization.  I previously reported that the complexity of certain features of the District Council's new IT infrastructure had caused minor delays in the implementation schedule and that the District Council hoped to resolve these delays in 2017.  [Fourth Interim Report, ECF No. 1755, at 3.]  These delays, as the Court may recall, involved the OWL module and two components of the Jobs module, including electronic reporting and union activity duty features.  Recently, the District Council leadership confirmed that all components of the IT upgrade, including the OWL and Jobs modules, are now complete.

F.      **Leadership Training**

In my Fourth Interim Report, I also discussed the District Council's efforts to promote promising leadership by investing resources into programs designed to educate the broader membership about the District Council and train existing members in leadership best practices.  I recognized the importance of this type of investment to the District Council's overall goal of

transitioning away from a full-time, external monitor.  The District Council has continued to train its members through the "UBC Journeyman: Building Leadership for a Strong Future" program (otherwise known as the "300 Hitters" program) and  the Collaborative Leadership program, educating over 385 additional members in 2017.  Some members have also received training to serve as Delegates to the District Council, which is required under the UBC Constitution.  The training is conducted at the UBC's International Training Center in Las Vegas, Nevada and all travel and accommodations are at no expense to the Delegates attending.

In November 2017, the District Council also began participating in a new program developed by the UBC to strengthen the education members receive through the "300 Hitters" program.  Only members who have completed the "300 Hitters" program will be eligible for this additional training.  The UBC successfully completed its first "pilot" session of this program in November 2017 and will officially open it to the membership in November 2018.  The District Council currently expects to send 100 additional members in November 2018.

### G.    Contract Negotiation

In my Fourth Interim Report, I referenced a series of meetings that the Executive Secretary-Treasurer had hosted over the course of 2016 for the purpose of involving Delegates, foremen, company owners, and members in the District Council's discussion of the state of the construction industry and contracts under negotiation.  [Fourth Interim Report, ECF No. 1755 at 5.]  These meetings provided an opportunity to all attendees to voice their opinions on challenges facing the District Council and how such challenges might have an impact upon the District Council's upcoming contract negotiations, including those impacting the collective bargaining agreements set to expire on June 30, 2017.   I understand that the District Council has since stopped hosting these meetings because actual contract negotiations are now underway, although

the District Council continues to use its revamped website to convey important information about all matters impacting the greater membership.

### H.     OWL Rules

As I have previously reported, I have been working with the District Council over the past year to overhaul the OWL rules in an effort to reflect the District Council's updated IT infrastructure and the present environment of full mobility.  [Fourth Interim Report, ECF. No. 1755 at 5.]  With recommendations from my office, the District Council has now finalized and implemented a revised set of OWL rules.

One of my primary areas of focus in this respect has been trying to resolve potential inequities that appear to have been caused by operation of the OWL's previous "three referral" rule.  Until recently, this "three referral" rule allowed a member registered with the OWL to remain on and move up on the OWL until such time as he or she received three job referrals, irrespective of how long the member remained gainfully employed between referrals.  As a result, members who received three short-term referrals and became unemployed were cycled to the end of the OWL to wait in line behind members who, conversely, received long-term referrals and retained their referral position on the OWL during lengthy periods of gainful employment.  As I explained in my Fourth Interim Report, the District Council presented observations suggesting that approximately one-third of all carpenters registered with the OWL received fewer than 25 days of work from their three referrals, thus risking disqualification from receiving Welfare Fund benefits, as a result of the OWL's slow cycling. [Fourth Interim Report, ECF No. 1755 at 6].

In my Fourth Interim Report, I advised the Court that I had recently approved a pilot program aimed at fixing the OWL's cycling problems.  Under the pilot program, which the District Council integrated into the revised OWL rules, members who receive a combined total

of 45 days of gainful employment from OWL referrals automatically will be dropped from the list.  On October 15, 2017, the pilot program commenced with an initial 45-day grace period, during which time all members currently registered with the OWL had the opportunity to report their unemployment.  As hoped, this initial grace period had the effect of cleansing the OWL of what appears to have been a significant number of registered individuals either gainfully employed or no longer seeking employment through the District Council.  As of December 1, 2017 when the initial grace period closed, 1,378 members remained registered with the OWL, representing a more than a 70% reduction from the OWL's prior registration roll that exceeded 4,000 individuals.  Going forward, members will remain automatically registered, and will be considered gainfully employed once referred to a job, unless and until such time as the carpenter reports his or her unemployment to the OWL.

I share the District Council's optimism that this modification to the OWL rules will increase the rate at which the OWL cycles by initially filtering the list to focus on unemployed members seeking work and thereafter to eliminate automatically members who receive long-term gainful employment or choose not to reinstate themselves on the OWL.  My Fourth Interim Report discussed historical concerns that a work-day-based OWL rule had the potential to be manipulated by members who would be incentivized to skill-puff and quit jobs early (*e.g.*, theoretically, a member could secure an additional referral by quitting on day 44).  As part of the pilot program, members who report unemployment between 40 and 45 days automatically will be flagged for further review by the responsible Council Representatives (*i.e.* business agents) and where misconduct is identified, the individual will be reprimanded according to the District Council's Bylaws.  I have been advised that none of the investigations conducted to date have identified improper conduct on the part of anyone using the OWL for job referrals.

I will continue to closely monitor the pilot program and should it prove to be ineffective at meeting its goals, I will revisit its structure with the District Council.

## I.      Goals

Since filing my last Interim Report, I have continued to maintain a dialogue with the Executive-Secretary Treasurer and District Council leadership regarding objectives that must be met before I can recommend a different form of monitorship for the District Council.  I discuss below the District Council's recent efforts toward meeting the areas for improvement that I have identified as necessary for the District Council to ensure the appropriate level of oversight and internal controls to guard against corruption as required by the Consent Decree.  These goals and ensuing developments include:

### 1.      Inspector General's Office

As discussed in more detail below, following our review of the Inspector General's Office, we conducted a search for a new IG.  The new IG began at the District Council in early January and, as discussed below, we are optimistic that, under his leadership, the IG's Office will eventually be able to assume the investigative responsibilities currently undertaken by my office. An independent and effective IG's Office is perhaps the most important goal along the road to self-governance for the District Council.

### 2.      IT Upgrades

Each of my prior reports has emphasized the importance of the District Council upgrading its IT infrastructure to enhance oversight and compliance mechanisms.  As discussed above, the District Council's IT upgrade is now completed.  Nevertheless, I understand from speaking with the Executive-Secretary Treasurer and other District Council leadership that the District Council will continue to monitor and refine the upgraded IT system to ensure that it

serves the intended purposes.  Likewise, I will continue to discuss this topic with the District Council leadership and evaluate the need for additional modifications.

### 3. Accounting Department

In my Fourth Interim Report, I discussed various steps taken by the District Council's Audit Committee aimed at satisfying the recommendations it received in 2015 from Calibre CPA Group PLLC (the "Auditor") following a review it conducted of the District Council's redesigned membership assessment system.  A copy of the Auditor's report and my instructions to implement the Auditor's recommendations were attached to my Third Interim Report.  [ECF No. 1704 at 7]

The Audit Committee has met on a monthly basis over the course of the past year to discuss issues impacting the District Council's collection of member working dues and efforts to finalize changes to its infrastructure in response to the Auditor's recommendations.  I previously reported on the District Council modified compliance mechanisms, including its revamped IT infrastructure, generation of monthly reports to the Director of Operations outlining changes in the responsible payors, and allowing tracking of the individuals responsible for reviewing financial information and depositing bank notes.  [Fourth Interim Report, ECF No. 1755 at 8.] Recently, the District Council leadership confirmed it has also established group security privileges to control user access within the accounting department and procedures for modifying these privileges in the future as necessary (*e.g.*, when employees leave the District Council or their responsibilities change).  At this point, I believe the Audit Committee has satisfied the Auditor's recommendations and therefore, I will not continue to directly monitor the Audit Committee's progress unless an issue involving working dues or the District Council's collection of them is brought to my attention.

### 4.      Oversight Policies and Tools for the Council Representative Center

My Third and Fourth Interim Reports have discussed the review I initiated in 2016 of the Council Representative Center's compliance controls following an investigation by the IG's office that identified a deficiency in jobsite attendance by one council representative.  [Third Interim Report, ECF No. 1704, at 8; Fourth Interim Report, ECF No. 1755, at 8-9.]  As I discuss in greater detail below in Section III(E), we will be conducting a more comprehensive review of the Council Representative Center's compliance controls for purposes of recommending any additional changes that may be necessary as the District Council transitions toward the next phase of its monitorship.  My recommendations to the Council Representative Center's operating manual, as discussed in my Fourth Interim Report, will also follow this review.  [Fourth Interim Report, ECF No. 1755, at 9.]

In the interim, the District Council's IT upgrade has streamlined the District Council's oversight of council representatives in the field through the introduction of, among other things, iOS and Android smartphone applications and an internet portal Shop Stewards can use to report the names and hours of crew members on jobsites and the District Council can likewise use to monitor its representatives (the Court will recall from my Fourth Interim Report that these reporting mechanisms replaced antiquated and costly "Motorola ET" devices that the District Council had previously made available to Shop Stewards [Fourth Interim Report, ECF No. 1755, at 9]).  All District Council members are also now able to login to the Watchdog system to review reported jobsite time.

### 5.      Grievances Department

My Fourth Interim Report focused on the District Council's efforts over the course of 2016 to address a grievance backlog pending within the IG's office.  These efforts culminated in the District Council resolving 5,068 grievances, with combined collections of $462,231.70 by the

District Council, Benefit Funds, and the greater membership.  [Fourth Interim Report, ECF No. 1755 at 10.]  Over the second half of 2017, the District Council has resolved 98 additional grievances, which contributed to collections of $903,482.09 last year.  The District Council expects to resolve between 500 and 1,000 additional grievances over the next six months.  I continue to view these developments positively and expect the District Council will remain focused on resolving the grievance backlog going forward.

### 6.    Trial Committee and Shop Steward Review Committee

In my Third Interim Report, I detailed my recommendations in connection with the work of the Trial Committee.  I also explained my insistence that the District Council implement these recommendations or suggest appropriate alternatives.  Third Interim Report, ECF No. 1704 at 9. I have since met with the District Council leadership on multiple occasions to discuss these recommendations and workings of the Trial Committee.  My office will continue to work with the District Council's leadership to ensure that the trial process is comprehensive, effective, and an efficient use of the District Council's resources.

Despite this progress, I am compelled to report on events which represent, in my view, a significant setback in this area.  As previously reported to the Court, on December 23, 2014, my predecessor Review Officer brought a Notice of Possible Action (the "Notice") against John Daly, Executive Committee Delegate from Local Union 157 and District Council Shop Steward. The Notice alleged that Mr. Daly's employer made contributions on his behalf to the District Council Employee Benefit Funds (and presumably paid him wages) for work he did not perform, in violation of both federal law, including the Taft-Hartley Act (29 U.S.C. § 186(a) and (b)), and the District Council's Code of Ethics for Shop Stewards.

Following receipt of the Notice, Mr. Daly provided a response that included a specific accounting of the hours he worked on the dates in question.  Based on Mr. Daly's response, I

conducted an additional investigation, which not only supported the original allegations but also demonstrated that Mr. Daly falsely reported his hours to a greater extent than originally alleged in the Notice.  I explained these facts to Mr. Daly in a letter dated March 10, 2015.

The Executive Committee then deliberated on April 6, 2015, determining that there was substantial evidence to support my recommendation to remove Mr. Daly from his positions. Accordingly, Mr. Daly was removed from the positions of Executive Committee Delegate and Shop Steward.

Mr. Daly then filed a succession of appeals to the Hon. Richard M. Berman, United States District Judge, the Court of Appeals for the Second Circuit, and the United States Supreme Court.  These appeals and requests for review were all denied.

While filing his ultimately meritless appeals, Mr. Daly also formally requested that I designate a time limitation for his bar from the positions from which he was removed.  I advised Mr. Daly that there was no limitation on his ineligibility for these positions, as I deemed him unfit to hold an office within the District Council, including his position as Executive Committee Delegate.  I did, however, grant him leave to seek reconsideration as a Shop Steward.  More specifically, I allowed that he could seek a review by the Shop Steward Review Committee, which is effectively the District Council Executive Committee.

In allowing a review by the Shop Steward Review Committee, I had several goals.  First, I wished to observe whether the Executive Committee members, acting in their collective capacity as the Shop Steward Review Committee, would adhere to procedures in adjudicating Mr. Daly, taking into account his significant misconduct and applying applicable precedent. Second, as part of my broader effort to allow the District Council to govern and police itself, I wanted to use Mr. Daly's adjudication as a test case to evaluate the District Council's ability to properly judge the misconduct of a high-ranking member and impose an appropriate penalty.

Unfortunately, the Committee failed in both respects. In the course of reviewing Mr. Daly's case, the Committee appeared not to understand the scope of its responsibilities or chose to ignore them.

On September 25, 2017, I appeared before the Executive Committee, in its capacity as the Shop Steward Review Committee, for the sole purpose of presenting the chronology of events leading to Mr. Daly's removal from office, including his unsuccessful efforts to appeal the decision. Mr. Daly also attended the meeting and was permitted an opportunity to make a statement. When he spoke, Mr. Daly expressed no remorse or contrition, but rather proceeded to attack the Chief Compliance Officer for his recommendations.[6]

Members of the Committee, rather than recognizing the inappropriateness of and gross inadequacies in Mr. Daly's presentation, proceeded to attack the Chief Compliance Officer and General Counsel merely for offering their advice. The Chief Compliance Officer in particular was singled out for outright disrespect which bordered on a personal affront. The Committee refused to allow me the opportunity to explain the chronology of events leading to Mr. Daly's removal from office, even though I made clear this understanding was necessary for the proper imposition of a penalty. Moreover, an Executive Committee member plainly stated that he did not need to hear about Mr. Daly's conduct because the Committee's task at hand was only "to determine the penalty." In addition to refusing to hear relevant facts and events pertaining to the case, at least one member of the Executive Committee injected his personal view of Mr. Daly as particularly relevant: the acting Chair declared to the Committee that Mr. Daly had "saved my life on more than one occasion." The Chair went on to participate actively in the deliberations and vote, contrary to the established procedures. Despite these irregularities and the overall tone,

---

[6] The District Council's General Counsel and Chief Compliance Officer had also drafted a memo summarizing the seriousness of Mr. Daly's conduct, recommending a significant amount of time prior to permitting Mr. Daly to reapply for a Shop Steward position.

I allowed the matter to proceed although the Committee either did not understand the scope of its responsibilities or chose to ignore them.

Soon thereafter, the Shop Steward Review Committee issued an opinion retroactively permitting Mr. Daly to be *reinstated* as a Shop Steward position three years from the date of his removal, thereby allowing for his reinstatement in April 2018.  That would result his being reinstated to a Shop Steward position while the five-year statute of limitation for felony convictions under 29 U.S.C. § 186(d) is still running.  The Committee committed serious procedural error on multiple fronts in reaching this determination.  First, the Committee was not permitted to impose a retroactive penalty.  Second, the Committee could not simply reinstate Mr. Daly, but rather could only allow him to reapply for a Shop Steward position.  In addition to these procedural errors, I was particularly alarmed by such light treatment of conduct which arguably amounted to a federal crime.  Moreover, the dismissiveness and even hostility displayed by members of the Committee to the advice of its Chief Compliance Officer was alarming.  Overall, the Committee failed to display a minimal appreciation of the mandated procedures in imposing a penalty, and demonstrated an attitude of laxity in the face of serious misconduct.

On February 1, 2018, I attended a meeting of the Committee and advised them that I expected them to repeat the proceeding and comply with all procedures while demonstrating respect for all parties appearing at the proceeding.  I told the Committee that if it reached the same conclusion, and permitted Mr. Daly to reapply, rather than be reinstated, I would not object.

To conclude, I provide these details to the Court for the purpose of making clear that I am closely monitoring compliance mechanisms within the District Council.   When these mechanisms function properly, the District Council is able to demonstrate its ability to self-

govern.  When these mechanisms fail, as was the case here, the need for outside monitoring is clear.

### J.      Litigation

Below we have summarized ongoing litigation involving the District Council in federal and state court, as well as before the Public Employment Relations Board the EEOC, the National Labor Relations Board, and the New York City Department of Consumer Affairs:

- *Frederick Stampone v. Matthew Walker (Director of Operations) and New York City District Council of Carpenters*, 17-2660 (3d Cir.), notice of appeal filed July 31, 2017. This is an appeal by a pro se plaintiff of an Order/Judgment of the United States District Court for the District of New Jersey dated July 20, 2017 dismissing with prejudice Civil Action No.: 15-6956 (JLL) (JAD) (U.S. Dist. Ct., New Jersey (Newark)). The plaintiff-appellant is a member and Shop Steward who filed suit seeking pension credits from the separate District Council of Carpenters Pension Fund and the Northeast Regional Council of Carpenters Pension Fund and claiming $100 million in damages against the District Council and other defendants. The plaintiff brought a variety of statutory, constitutional, and common law claims, including claims for alleged violation of the LMRA, the LMRDA, the First and Fourteenth Amendments, and various other claims alleging "Slander, Deformation of Character, Harassment and 360 Other Personal Injury," along with the denial of the right to a skill, age discrimination, whistleblowing, and loss of wages. After giving the plaintiff three earlier opportunities to cure the deficiencies in his pleadings, the District Court dismissed plaintiff's third amended complaint in its entirety with prejudice.  Plaintiff appealed to the Third Circuit Court of Appeals.   On or about January 8, 2018, the Court of Appeals affirmed the dismissal of all claims with prejudice, except for plaintiff's ERISA claim concerning the calculation of pension benefits , and remanded for further proceedings on plaintiff's ERISA claim.  On February 22, 2018, the District Council and its Director of Operations submitted a request to the District Court for entry of a final judgment terminating them as parties to the lawsuit because the dismissal with prejudice of all claims against them was affirmed by the Court of Appeals.

- *Tutor Perini Building Corp. v. The District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America*, No. 17-cv-3765 (KBF) (S.D.N.Y., filed May 18, 2017). This is an action filed by a signatory employer under Section 301 of the Labor Management Relations Act. The plaintiff alleges that the District Council violated the terms of a Project Labor Agreement ("PLA") by allegedly "calling, causing, inducing, encouraging, authorizing, conducting, continuing in or engaged in unlawful work stoppage activities on behalf of its members" from July 1-3, 2015.   Plaintiff seeks damages ranging between approximately $675,000 and approximately $795,000 arising from the alleged breach of the PLA.  The case is in the discovery phase.

- *Ariel Servin v. New York City District Council of Carpenters et al.*, Index No. 711959/2016 (New York Supreme Court, Queens County).  Carpenter Ariel Servin brought this personal injury action against the District Council, the UBC, the District Council Funds, and the Carpenters Training Center ("CTC") seeking an unspecified amount of damages for an injury allegedly sustained while operating a saw during a training class run by CTC.  Throughout the action, the District Council maintained that the Union is not a proper defendant in this matter.   The action was defended on behalf of the District Council and the separate Benefit Funds and CTC by counsel assigned by the liability insurance carrier.  The carrier agreed that the District Council was not a proper defendant.  In any event, in the interest of economic efficiency, the carrier reached a global settlement with the plaintiff to dismiss the lawsuit as to all named defendants.

- *Rocco Costabile v. New York District Council of Carpenters, William Lacey*, No. 17-cv-8488 (RWS) (S.D.N.Y., filed November 2, 2017).  On January 29, 2018, the District Council and its employee William Lacey were served with a complaint filed *pro se* by a former NYC Health and Hospitals Corporation employee alleging discrimination based on race, national origin, and retaliation in violation of federal, state, and local anti-discrimination statutes.  The Plaintiff seeks unspecified damages.  On February 20, 2018, the District Council filed a motion to dismiss the complaint in its entirety with prejudice.

- *Edward Saunders v. New York City District Council of Carpenters*, Public Employment Relations Board ("PERB") Charge No. U-34829.   Javits Center employee Edward Saunders alleged that the District Council breached its duty of fair representation in violation of the Taylor Law.   Of the multiple specific allegations, the PERB Administrative Law Judge dismissed all but two of them prior to trial.   That trial was held on March 28, 2017 and July 27, 2017 on the remaining two allegations (failure to represent Charging Party during a meeting with Javits management and failure to file a grievance on Charging Party's behalf). The parties filed post-hearing briefs on October 31, 2017 and are awaiting a decision by the ALJ.

- *Ernest Bonneau v. Local 157 New York City District Council of Carpenters*, EEOC Charge No. 520-2015-02139. Carpenter Ernest Bonneau filed a charge against District Council affiliate Local Union 157 alleging that the Local Union and the Carpenters Training Fund (f/k/a Labor Technical College) violated Title VII of the Civil Rights Act by discriminating against him in job referrals on the basis of his race. No remedies were specified by the Charging Party.  Since the charge relates to the operation of the OWL, the District Council filed a position statement with the EEOC on July 20, 2015. The EEOC's decision is pending.

- *NYC Department of Consumer Affairs v. AS Information Resource Inc*.  On October 2, 2017, the NYC Department of Consumer Affairs  dismissed the complaint that was filed against AS Information Resources Inc. and the District Council  alleging violations of the NYC Paid Sick Leave Law and Rules.

- *Milton Marcano v. United Brotherhood of Carpenters*, National Labor Relations Board Case No. 02-CB-211887.  The District Council was served with an unfair labor practice charge naming the UBC but alleging facts against the District Council.   The Charge

alleges breach of the duty of fair representation.  To date, the NLRB has not asked the District Council to take any action.

For additional detail, please refer to my First, Second, Third and Fourth Interim Reports at ECF Nos. 1628 at 37-39, 1653 at 24-26, 1704 at 9, and 1755 at 11.

## III.   THE OFFICE OF THE INDEPENDENT MONITOR

### A.   Goals Project

As referenced above, over the course of my third year as IM, the District Council leadership has continued to illustrate a genuine desire to put into place a structure enabling the District Council to self-govern within the bounds of the Consent Decree.  While the current form of monitorship under the Consent Decree is very important, I have witnessed considerable positive change within the District Council.  In my current view, and as discussed further below, this change should warrant a different form of monitorship in the future.  Likewise, I am optimistic that the District Council will reinvest the resulting cost savings into further securing a prosperous and compliant future for members.  Nevertheless, my continued support for the District Council's transition to self-governance is contingent upon the organization maintaining robust internal controls.

As I discussed in my last Interim Report, while the Government, the District Council, and I agree that the District Council should continue its transition toward self-governance, continued oversight is necessary while the District Council works toward implementing anti-corruption reforms.  As described below, I make recommendations for the coming year to allow the District Council to rely increasingly upon its internal compliance and self-governance capabilities.

### B.   Membership Relief Fund

In my last two Interim Reports, I discussed my investigation into suspected delinquencies in particular employers' contributions to a Local Union's Membership Relief Fund ("MRF") and

the District Council's recent efforts to collect the amounts owed.  In my Fourth Interim Report, I advised the Court that the local union responsible for administering the MRF had been able to develop software to allow a comparison between the MRF's participant contribution data and similar data within the Benefits Fund.  At that time, the local union responsible for administering the MRF utilized this software to begin the collection process for calendar years 2011 through 2013, but continued to evaluate contribution data for calendar years 2014 through 2016.

To date, outside legal counsel for the MRF has been managing the collection process. "Dunning" letters have been sent to delinquent employers, advising amounts owed and requesting immediate payments.  My Fourth Interim Report discussed the Local Union's success with this process for calendar years 2011 through 2013.  [Fourth Interim Report, ECF No. 1755 at 19.]  Recently, the Local Union administering the MRF retained new counsel to assist in the collection process.  I understand that the MRF's new counsel has continued to pursue collection through the use of "Dunning" letters and intends to commence collection lawsuits where necessary to resolve a small number of remaining delinquencies dating back to 2011.  The MRF's new counsel has also advised that it is coordinating with the Local Union administering the MRF in an effort to better structure the assessment process and permit more regular, less cost-prohibitive auditing of the fund going forward.

As I discussed previously in my Fourth Interim report, particular District Council members have alleged that the MRF delinquencies were, at least in part, the direct result of one or more employers receiving a "pass" for the amount owed.  [Fourth Interim Report, ECF No. 1755 at 20.].  My team was unable to substantiate any of these allegations for calendar years 2011 through 2013, although we intend to continue the investigation into calendar years 2014 through 2016 once the data is available.  I expect to report on this matter in the future.

C.      **Miscellaneous Investigations and Referrals**

My investigative team continues to monitor the membership hotline, attend Delegate Body meetings, and generally be available to the District Council leadership and broader membership to assess concerns as they develop.  We also continue to assist members in resolving a variety of concerns that relate to benefits, wages, and jobsite-related issues.  While we have been able to resolve most of the issues brought to our attention simply by facilitating contact between the reporting member and the appropriate District Council or Funds department, several have required my team's investigative resources.  We will continue to report these matters to the Court as appropriate, including a summary of investigative matters accompanying this Interim Report in an *ex parte* submission which we would request remains under seal.

D.      **Review of the Inspector General's (IG) Office**

I have previously reported on my team's efforts to undertake a comprehensive review of the IG's Office's operational and policy frameworks.  [Fourth Interim Report, ECF No. 1755 at 21.]  In May 2017, we finalized a report that outlined various changes necessary for the IG's Office to properly serve the District Council.  Given the confidential nature of my team's review, however, the details of that review are included in a sealed *ex parte* submission referenced above.

At the conclusion of our review, I met with the incumbent IG to explain my team's findings, as well as convey my expectations moving forward for the IG's office.  Soon thereafter, the IG announced his intentions to retire and we began a search to find his successor.  My team then worked closely with the District Council to find potential candidates and we reviewed the credentials of numerous applicants and participated in interviews.  I am pleased to report that we were able to locate a highly-qualified successor IG and he commenced service on January 2, 2018.

The new IG, David Pié, possesses the requisite experience and qualifications, as well as the personality and temperament, needed for this extremely important position.  Mr. Pié is a former New Jersey State Trooper—who was involved in all aspects of law enforcement and training, was an integrity officer, and retired as a Lieutenant after nearly thirty years of service— with substantial experience in the security field.  Most recently, Mr. Pié served as the Corporate Securities Manager for Bristol-Myers Squibb Pharmaceuticals.  My office has been working closely with Mr. Pié since he started at the District Council and we will continue to work with him to ensure a smooth transition and implementation of our recommendations.  We believe this is a crucial – perhaps the most significant – factor in ensuring the monitorship can transition into a less active model in the future.

**E.      Review of the Council Representative Center**

As I mentioned briefly above, my team has undertaken a comprehensive review of the Council Representative Center to evaluate the effectiveness of its compliance controls.  To date, our review has included: a presentation by leadership personnel on the Council Representative Center's operations, procedures. and personnel; subsequent interviews with Council Representative Center leadership regarding operations and resources; review of operations documentation provided by the Council Representative Center leadership personnel; and interviews of several council representatives.  The review was temporarily suspended as we focused our resources on multiple urgent elections-related issues.  In the upcoming months, I anticipate that my team will conduct additional interviews in order to fully understand the Council Representative Center's operations, as well as ensure that the Center operates in a corrupt-free manner.  Once this review is complete, I expect to provide a series of

recommendations to the Council Representative Center regarding its infrastructure, compliance controls, and manual (as discussed above in Section II.I.4).

### F.      A Plan Forward

In light of the foregoing, it is my recommendation to the parties and to the Court that we undertake the following plan with respect to the Monitorship of the District Council.  Assuming that the parties can agree to appropriate language for a new Stipulation and Order, and that the Court will find that proposal acceptable, we recommend that the Monitorship continue for another term commencing April 1, 2018.  We believe the terms and authority of the IM should remain unchanged from those of the 2017 Stipulation and Order.  At the same time, we remain hopeful that as the new IG gains familiarity with the District Council, we are able to commence a "phased" approach, increasingly sharing our investigative work with the IG's Office, with the goal of transitioning our investigative work before the end of this next term.  Through this period of time, we will continue to work closely with the IG's Office and the District Council leadership on all matters which relate to the enforcement of the Consent Decree and ongoing investigations as appropriate.

Second, assuming the IG is able to fully assume the role of policing the District Council, and no issues or concerns arise during the remainder of the next term, the IM would revert to a less active role and engage with the IG and District Council leadership when called-upon.  At that time, the IG's Office would commence serving as the primary recipient of member concerns and complaints.  I would continue as the IM with the same authorities and powers through March 31, 2019 at which time I would reconsider the status of the monitorship going forward.  This plan is contingent upon full compliance with the terms of the Consent Decree, which we expect will remain in place indefinitely and irrespective of any changes to the monitorship.

## IV.    CONCLUSION

Should the Court require any additional information, please contact the undersigned at Your Honor's convenience.  We look forward to appearing before Your Honor in the near future to address concerns and questions of the Court.

Date:    March 6, 2018
         New York, New York

                                                Respectfully submitted,


                                      By:    /s/ Glen G. McGorty
                                             GLEN G. McGORTY
                                             DANIEL E. VINISH
                                             Crowell & Moring, LLP
                                             590 Madison Avenue, 20th Floor
                                             New York, NY 10022
                                             (212) 223-4000
                                             gmcgorty@crowell.com
                                             dvinish@crowell.com

                                             Office of the Independent Monitor,
                                             District Council of New York City
                                             and Vicinity of the United
                                             Brotherhood of Carpenters and
                                             Joiners of America

CC:
**<u>Counsel for the Government</u>**              **<u>Counsel for the District Council</u>**
AUSA Benjamin Torrance                   James M. Murphy, Esq.
United States Attorney's Office          Spivak Lipton, LLP
Southern District of New York            1700 Broadway, 21st Floor
86 Chambers Street, 3rd Floor            New York, NY 10019
New York, NY 10007


                                         Barbara S. Jones, Esq.
                                         Rita K. Maxwell, Esq.
                                         Bracewell LLP
                                         1251 Avenue of the Americas, 49th Floor
                                         New York, NY 10020