UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-against-

DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al.,

Defendants.

90 Civ. 5722 (VM)

**SIXTH INTERIM REPORT OF THE INDEPENDENT MONITOR**

GLEN G. McGORTY
JOANNE R. OLEKSYK
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
joleksyk@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United
Brotherhood of Carpenters and
Joiners of America

December 31, 2018

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ..... - 1 -

II. THE DISTRICT COUNCIL ..... - 2 -

A. Updates ..... - 2 -

1. Elections ..... - 2 -

2. Litigation ..... - 3 -

B. Progress on Goals ..... - 6 -

1. Office of the Inspector General ..... - 6 -

2. Compliance Initiatives ..... - 7 -

3. Operation of New OWL Rules ..... - 7 -

4. Grievances Department ..... - 10 -

5. Trial Committee and Shop Steward Review Committee ..... - 10 -

III. THE OFFICE OF THE INDEPENDENT MONITOR ..... - 10 -

A. Investigations ..... - 10 -

B. A Plan Forward ..... - 13 -

IV. CONCLUSION ..... - 15 -

# I. INTRODUCTION

Pursuant to Paragraph 5.l.iii of the Stipulation and Order filed in this matter on June 1, 2018 (the "2018 Stipulation and Order"), I respectfully submit this Sixth Interim Report as the Independent Monitor ("IM") of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" or "Union").

This report outlines my assessment of the District Council's progress towards achieving the objectives of the 2018 Stipulation and Order and the Consent Decree approved by the Court on May 4, 1994; my view on the sustainability of reforms previously implemented; and my recommendations going forward. In the interest of keeping it brief and to the point, this report will focus primarily upon the goals identified in my Fifth Interim Report. Any additional information requested by the Court will be provided in a supplemental filing.

As reported in the Fifth Interim Report, 2017 was our most active year since I began as the IM, handling issues such as the District Council election, changes in the Bylaws, a review of the Office of the Inspector General ("OIG") and finding a new Inspector General ("IG"), and handling numerous investigations (exacerbated by the temporary absence of an IG). Since our last report, we have worked extensively with the United States Department of Labor ("DOL") following up on complaints filed related to the District Council election, we have worked with the OIG (which has taken back the lion's share of the rudimentary investigations we had been handling), and we have handled a number of matters arising from complaints raised by current and former District Council employees. I cannot say this year has been less busy than the last, but it is clear that the OIG is beginning to manage some of the more routine issues that came to my office last year. That is a good development, and ultimately, the key to the District Council moving towards self-governance. I have said many times that the Consent Decree and its anti-corruption principles will always be in place, but as my current term draws to a close in March

2019, I am hopeful that the District Council will be capable of transitioning further towards self-governance and becoming less in need of constant review and intervention from an external monitor.

## II. THE DISTRICT COUNCIL

### A. Updates

#### 1. Elections

As discussed in the Fifth Interim Report, District Council elections were held in December 2017. During the campaign, complaints were made about violations of the election rules. In each instance, the IM team reviewed the complaints, attempted to interview relevant parties where appropriate, conducted additional independent investigation if needed, reached a conclusion as to the alleged violation, and, to the extent there was any colorable violation or concern, appropriate action was taken.

Complaints regarding campaign tactics were also made to the DOL. In particular, the DOL investigated the allegation that incumbents were using phone lists of union members that were created using District Council resources – an issue which had previously been investigated by my office during the course of the election and ultimately reviewed by the Court. On October 25, 2018, we were advised by letter that the DOL had made the following investigative findings:

> NYCDCC candidates campaigned using union member phone lists that were created, in part, by union officials in their official union capacities. Those lists were not shared with all candidates, in violation of Section 401(c) of the LMRDA. Furthermore, those lists constituted union resources used to campaign, in violation of Section 401(g) of the LMRDA.

The DOL additionally advised the District Council that it would be closing its investigation because, even assuming its investigative findings were correct, they did not affect the outcome of the election. The DOL's headquarters in Washington, D.C. formally closed the investigation by letter dated November 15, 2018.

It should be noted that my office did not find the use of phone numbers problematic because we determined that the numbers were not coming from formal lists or databases of union members which were available to the incumbent candidates and unavailable to the other candidates. Rather, we determined these numbers were culled from the individual and personal contact lists of those supporting the incumbent slate and not from District Council resources. The fact that the incumbent slate had many District Council employees supporting it who had amassed personal contact lists through work did not mean, in my opinion, that the incumbent slate inappropriately used resources unavailable to other members by virtue of its leadership role at the District Council. Accordingly, I demur on the notion that this is an impermissible use of resources. Where we agree with the DOL, however, is that this complaint – whether founded or not – had no discernible impact on the overwhelming victory margin for the incumbent slate.

We respect the DOL's finding even though we disagreed with the conclusion that the conduct was equivalent to actually using District Council lists and databases to advantage the incumbent slate over the challengers. DOL has agreed to meet with my office and counsel for the District Council to discuss how to better establish rules for the next election to avoid running afoul of the DOL's interpretation of election rules.

**2. Litigation**

Previously, we have summarized ongoing litigation involving the District Council in federal and state court, as well as before the Public Employment Relations Board, the EEOC, the National Labor Relations Board, and the New York City Department of Consumer Affairs. Currently, the following cases are pending:

- *New York City District Council of Carpenters v. Harsco Corporation*, 1:18-cv-5935 (AKH) (S.D.N.Y.). On August 18, 2018, in response to the District Council's June 29, 2018 petition to confirm arbitration awards, Respondent Harsco Corporation filed a cross-petition to vacate the awards. The cross-petition seeks Harsco's attorneys' fees and costs associated with the action.

- *State of New York and City of New York ex re. Brian Aryai v. Skansa, et al.*, Case No. 18 Civ. 9367 (LGS) (S.D.N.Y.). On September 5, 2018, Relator Brian Aryai filed this amended *qui tam* complaint in New York State court (Index No. 108471/2009 (N.Y. Sup. Ct., N.Y. Cty.), against numerous major construction industry contractors and unions, including "New York City District Council of Carpenters Local 1536" (Local 1536 was dissolved as a local union of the District Council in or around 2011). The Amended Complaint seeks damages on behalf of the State of New York and City of New York pursuant to the qui tam provisions of the New York State Finance Law (the False Claims Act) and the New York City Administrative Code. The Amended Complaint alleges a longtime scheme to defraud by the defendant construction companies and unions by which "union foremen" allegedly submitted two hours per day of overtime to the defendant contractors, even though they did not work the overtime hours, and the contractors then passed the fraudulent time records on to the federal, state, and municipal governmental agencies funding various construction projects. The Amended Complaint alleges that in addition to the two hours of "gratis pay" by which the "union foremen" received pay for "ghost hours," the "defendant unions" (which are described as Local 14, Operating Engineers; Local 79, Mason Tenders; and Local 1536, District Council of Carpenters) received fringe benefits of 40-50% of the amount paid to the foremen, and the defendant contractors recouped these monies from federal, state, and local government funds. The Amended Complaint alleges that the gratis pay constituted payroll fraud against the government entities on public projects. The Amended Complaint seeks unspecified treble damages, plus penalties of $12,000 for each false claim, fees and costs, and attorneys' fees. On October 12, 2018, before the Defendants had answered or responded to the Amended Complaint in state court, Defendant Local 79 (Mason Tenders) removed the case to federal court. Defendant Bovis-Lendlease also filed a notice of removal. All Defendants informed the federal court of their intentions to file motions to dismiss the Amended Complaint while the Realtor informed the federal court that he intended to file a motion to remand the case to State court. On December 12, 2018, the Court issued a Scheduling Order that set a briefing schedule for certain defendant-contractors to file their motion to dismiss and for the Relator to file his opposition to those motion and a cross-motion for partial summary judgment and remand to State court. The final reply papers on those motions are due on March 15, 2019. The Court further ordered that proposed motions to dismiss by any other defendant (including "New York City District Council of Carpenters Local 1536") will be discussed after resolution of the dispositive motions in a related case in which the Relator brought significantly identical claims under the federal False Claims Act against many of the same defendant-contractors in this case. In addition, by Order dated December 13, 2018, the Court directed that discovery in this case is stayed pending resolution of defendant-contractors motions to dismiss and the Relator's motion for partial summary judgment and remand to State court. The District Council will contest that it is a proper defendant and will seek to have the Amended Complaint dismissed as against the Union.

- *Edward Saunders v. New York City District Council of Carpenters*, Public Employment Relations Board ("PERB") Charge No. U-34829. Javits Center employee Edward Saunders alleged that the District Council breached its duty of fair representation in violation of the Taylor Law. Of the multiple specific allegations, the PERB Administrative Law Judge dismissed all but two of them prior to trial. That trial was held on March 28, 2017 and July 27, 2017 on the remaining two allegations (failure to represent Charging Party during a meeting with Javits management and failure to file a grievance on Charging Party's behalf). The parties filed post-hearing briefs on October 31, 2017 and are awaiting a decision by the ALJ.

- *Edward Saunders v. New York City District Council of Carpenters*, Public Employment Relations Board ("PERB") Charge No. U-36519. Former Javits Center employee Edward Saunders filed his second improper practice charge against the District Council on August 11, 2018 alleging that the Union breached its duty of fair representation in violation of the Taylor Law by not processing a grievance contesting his discipline and not communicating with him regarding the Union's decision. The Union filed an answer to the charge and the PERB ALJ will set a trial date.

- *Ernest Bonneau v. Local 157 New York City District Council of Carpenters*, EEOC Charge No. 520-2015-02139. Carpenter Ernest Bonneau filed a charge against District Council affiliate Local Union 157 alleging that the Local Union and the Carpenters Training Fund (f/k/a Labor Technical College) violated Title VII of the Civil Rights Act by discriminating against him in job referrals on the basis of his race. No remedies were specified by the Charging Party. The District Council filed a position statement with respect to Local 157 with the EEOC on July 20, 2015. The EEOC's decision is pending.

- *Peter Marsalisi v. New York City District Council of Carpenters*, NLRB Charge No. 02-CA-215065, was filed on February 14, 2018 by former IGO employee Peter Marsalisi alleging unlawful termination based on "protected activity" and also alleging improper dues requirements. The charge was dismissed by NLRB Region 2 on May 31, 2018. Marsalisi has appealed the dismissal to the NLRB's General Counsel and the District Council responded to the appeal. The appeal is pending.

- *Brian D. Cunningham v. Thomas P. Gaulrapp*, United Brotherhood of Carpenters and Joiners of America New York City District Council, Joseph A. Geiger, Michael Cavanaugh and Graham McHugh, Index No. 702834/2018 (N.Y. Sup. Ct., Queens Cty.). Plaintiff in this personal injury suit seeks unspecified damages related to an automobile accident involving a District Council employee. Defense of the lawsuit is being handled by a law firm appointed by the District Council's automobile insurance carrier.

For additional detail on these and previous cases, please refer to my First, Second, Third, Fourth and Fifth Interim Reports at ECF Nos. 1628 at 37-39, 1653 at 24-26, 1704 at 9, 1755 at 11, and 1786 at 21-23.

**B. Progress on Goals**

**1. Office of the Inspector General**

My office has been working closely with Mr. David Pié, Inspector General, since he started at the District Council in January 2018 and we will continue to work with him to ensure a smooth transition and implementation of our recommendations. Mr. Pié has already implemented numerous recommendations and continues the process of incorporating those that remain. Individual investigators are now empowered with greater autonomy over their cases and are the ones to bring them before the Trial Committee or Shop Steward Review Committee. Training in the OIG is also continuing apace. Earlier this year, the investigators attended a summit hosted by the Interstate Labor Standards Association on issues of prevailing wage.

In the regular course, members' complaints of violations of UBC Constitution and District Council Bylaws made to my office are first referred to the OIG for investigation. The OIG combines the subject matter expertise of the carpenter investigators and its progressing investigative skills to handle most of the complaints. The OIG has also shown its capabilities on more complex cases when it successfully handled the investigation of a personnel violation earlier this year. Additionally, the OIG refers issues to local or state law enforcement as appropriate. For example, earlier this year the OIG brought the issue of fraudulent union letters purporting to be from a Local to the attention of the New York City Department of Investigation. In turn, many of the more common PLA and CBA violations observed by OIG investigators on the jobsite are now referred to the Council Representative Center to address, rather than the OIG

automatically initiating the grievance process against employers. This more efficient distribution of work is a crucial step towards the District Council's eventual self-governance.

**2. Compliance Initiatives**

As previously reported, my team began a comprehensive review of the Council Representative Center to best evaluate the effectiveness of its compliance controls. At the time of my Fifth Interim Report, I advised the Court that we had suspended our review as we focused on the District Council election and all the matters that flowed from it. Since then, we have been busy with other matters, including our independent review of a terminated Council Representative, discussed herein, but we hope to resume this important project by conducting additional interviews to fully understand the Council Representative Center's operations in order to ensure it functions in a corruption-free manner. Once complete, I expect we will provide a series of recommendations to the Council Representative Center and the District Council leadership regarding its infrastructure, compliance controls, and the Council Representative Center manual which has been a project in the works for the past two years.

The Chief Compliance Officer has been active with a number of new projects this year, including updating the Shop Steward Code of Ethics, revising the Trial Committee procedures, designing election training, and advising the District Council of best practices on a number of issues.

**3. Operation of New OWL Rules**

As I have previously reported, the District Council has implemented revised Out-of-Work List ("OWL") rules, which allow carpenters who have received fewer than 45 days of work to maintain their position on the OWL by reporting their unemployment within that period. Realizing that this could create the perverse incentive for a carpenter to quit a job before that time period runs in hopes of being quickly assigned to a longer-term job, Council

Representatives automatically review members who report unemployment close to the end of the 45-day period. Thus far, no instances of system-gaming job-quitting have been detected. This issue will continue to be monitored by the Council Representative Center as it is possible for such activity to increase in a slower market.

Another procedural change that the District Council has implemented involves Acting Shop Stewards. When a certified shop steward who possesses the skills needed for a job is not available on the OWL, a member with the required skills[1] is dispatched from the OWL as an Acting Shop Steward.[2] Historically, as soon as a qualified Certified Shop Steward became available on the OWL, he or she would be sent to replace the Acting Shop Steward. Employers disliked this process because of the disruption to their team and expense associated with onboarding new hires. Non-Certified Shop Steward members also had reason to dislike this process because they were at risk of losing their job if the employer didn't want to increase the crew when a qualified Certified Shop Steward became available. And despite the job security that this process afforded Certified Shop Stewards, the District Council still suffered from a shortage because most members apparently did not find that incentive great enough to spend the time to undergo the certification training.

Because this process provided little benefit to offset its detrimental effects, the District Council created a new process that strikes a different balance. After receiving feedback from the membership at a Delegate Body meeting, this process was revised further. Now when an Acting Shop Steward is used because of the unavailability of any qualified Certified Shop Steward, he or she will not necessarily be replaced as soon as a qualified Certified Shop Steward becomes

[1] OWL requests are monitored to ensure that the skills requested are actually needed for the job and the employer is not simply trying to avoid the hiring of a certified Shop Steward.

[2] Acting Shop Stewards are required to be eligible pursuant to Section 504 of the Labor Management Reporting and Disclosure Act.

available on the OWL. Rather, for jobs not anticipated to last more than forty-five (45) days, the Acting Shop Steward will be allowed to continue to serve in that capacity for the duration of the job, providing the continuity desired by the employers. For jobs anticipated to last more than forty-five (45) days, the Council Representative can direct the OWL to continue efforts to dispatch a Certified Shop Steward to the job to replace the Acting Shop Steward. The Council Representative's decision will be documented and subject to review by District Council leadership. Any Acting Shop Steward who is replaced by a Certified Shop Steward and loses his or her job after less than forty-five days will have his or her OWL referral restored. Regardless of the anticipated length of the job, if at any point the employer decides to increase the size of the crew where there is an Acting Shop Steward, the next hire must be a qualified Certified Shop Steward, if one is available (and the previous Acting Shop Steward is to stay on as a regular journeyman). Through my discussions with the District Council leadership about this policy change, it was evident that potential compliance implications were at the forefront of their considerations. I applaud the District Council for their innovation to better their relationship with employers in this competitive environment while incorporating the desires of the membership and balancing the needs of compliance.

As discussed in more detail in the sealed letter to the Court accompanying this report, there was a recent change in the leadership of the OWL office. Following an investigation conducted by the OIG into a personnel issue, the District Council and the former head of the office reached an agreement and he departed the District Council. That position has been filled internally and we will continue to work with the new OWL head and the OIG to ensure continued compliance within this important component of the District Council

**4. Grievances Department**

The current count of unresolved grievances is around 1,000, less than half the number as of March 2017 reported in the Fourth Interim Report. In 2018, approximately 400 grievances were closed, while fewer than 200 new grievances were opened. I continue to view these developments positively and expect the District Council will remain focused on resolving the grievance backlog going forward.

**5. Trial Committee and Shop Steward Review Committee**

As the Court is aware, last year I permitted John Daly, who had previously been removed as a shop steward, to undergo Shop Steward Review so that the Shop Steward Review Committee could specify some limit – or no limit – to the time period during which Mr. Daly is not permitted to hold a shop steward position, after which he could re-apply.[3] The disappointing proceedings of Mr. Daly's Shop Steward Review are detailed in the Fifth Interim Report. The "re-do" I requested was scheduled for November 28, 2018. This time, the proceeding was respectful and the Shop Steward Review Committee clearly understood their task and asked relevant questions. Ultimately, the Shop Steward Review Committee determined that Mr. Daly would be ineligible to reapply to become a shop steward again for eight (8) years from the date of the hearing.

## III. THE OFFICE OF THE INDEPENDENT MONITOR

### A. Investigations

In my last three Interim Reports, I discussed my office's investigation into suspected delinquencies in certain employers' contributions to a Local Union's Membership Relief Fund ("MRF") and the efforts to collect the amounts owed. To date, outside legal counsel for the

[3] The underlying facts and proceedings that lead to John Daly's removal as Shop Steward and Executive Committee Delegate were detailed in the Fifth Interim Report and will not be repeated here.

MRF has been managing the collection process. "Dunning" letters were sent to delinquent employers for the years 2011-2013, advising amounts owed and requesting immediate payments. The accounting of moneys owed to the MRF through 2018 is in the process of being finalized, and the same process will be repeated for the years 2014-2018.

The MRF's counsel is coordinating with the Local Union that absorbed the MRF's associated Local to better structure the assessment process and permit more regular, less cost-prohibitive auditing of the fund going forward. Starting in 2019, a new fund account will be created for current members of the Local Union who were not members of the absorbed Local (and therefore are not eligible for benefits from the MRF). Contributions will be made by the members, rather than employers, which will make accounting of contributions easier to track and removes the risk of corrupt bargains with employers over their contributions. After contributions into the new fund have reached a certain amount relative to balance of the MRF, the remaining assets of the MRF will be transferred to the new fund and all Local Union members can contribute to and receive benefits from the new fund.

One new investigation of significance this year involves the circumstances surrounding the termination of Peter Corrigan as a Council Representative, which was presented to me as grounds for his removal from his elected position as a District Council Delegate pursuant to the procedure set forth in Paragraph 5.b.ii of the Stipulation and Order.

Last winter, OIG investigators identified and interviewed several Local Union 212 apprentices who were referred to jobsites for employment by Mr. Corrigan between the period of January 2017 and June 2017. OIG investigators independently interviewed four apprentices and each apprentice indicated that Mr. Corrigan had directed them to a single, specific jobsite where there would be an opportunity for them to be hired and, in each instance, the apprentice went to the jobsite provided by Mr. Corrigan and was hired. With respect to one of the apprentices, Mr.

Corrigan referred him/her to a specific jobsite on two separate occasions. In several instances, the contact between Mr. Corrigan and the apprentice was corroborated by a review of Mr. Corrigan's telephone records.

On December 19, 2017, Mr. Corrigan was interviewed by OIG investigators regarding referring Local Union 212 apprentices to jobs during the period of January 2017 to June 2017. The OIG investigators asked Mr. Corrigan how specific apprentices came to obtain this work. Mr. Corrigan first acknowledged that he was not allowed to send a member to a jobsite, but then stated that he gives members four to five jobsite locations where they can go and "shape a job." OIG investigators asked Mr. Corrigan if he ever told members whom to see when arriving on a jobsite and he responded that he did not. The statements made by Mr. Corrigan conflicted with the statements made by those previously interviewed who all stated they were told of only one specific jobsite where they could obtain (or "shape") a job.

Based on its investigation, the OIG concluded that Mr. Corrigan violated the Bylaws and, therefore, the Consent Decree. The OIG prepared a report on its investigation containing this determination, which it provided to District Council leadership and to me. Based on the results of the OIG investigation, I concurred that the conduct described therein would be a violation of the Bylaws, and therefore also a violation of the Consent Decree, and advised the District Council leadership as such. The District Council leadership also concurred with the findings of the OIG Report and terminated Mr. Corrigan from his employment as a Council Representative in the spring of 2018.

As the Independent Monitor, it is my responsibility to assess if Mr. Corrigan's conduct warrants his removal as a Delegate to the District Council from Local Union 212 and as Recording Secretary of Local Union 212. Since such a violation of the Consent Decree and the Bylaws as described in the OIG Report would certainly justify removal from elected positions, I

made a preliminary determination that I would recommend to the District Council Executive Committee that Mr. Corrigan be removed from these positions pursuant to Paragraph 5.b.ii of the Stipulation and Order. But before I did, in June I notified Mr. Corrigan's counsel of my intent in order to provide him with an opportunity to present evidence to the contrary before the removal procedures under Paragraph 5.b.ii were initiated.

Prior to receiving any evidence from Mr. Corrigan, a report that had been prepared by a third party on the subject was sent to me and others in approximately September. The report was prepared by Debbie Morgan, Legal Research and Investigations, LLC. Although Ms. Morgan had previously worked with my investigators, her professional relationship with them had been terminated and her report was not prepared at my office's direction. The Morgan Report documented statements that in many instances contradicted statements made by the same witnesses that were included in and relied upon by the OIG Report.

Faced with apparently contradictory accounts by the witnesses, I determined that my office would conduct its own investigation to determine whether Mr. Corrigan indeed engaged in conduct that violated the Bylaws and Consent Decree. The investigation has been mostly complete for some time but we have been waiting for our collective availability to schedule a time to interview Mr. Corrigan as the last piece of our review. I expect that interview to occur within the next week and our final report and findings will be issued soon thereafter.

Confidential information about other investigations that are still ongoing is provided under seal.

**B. A Plan Forward**

This monitorship presently extends through March 31, 2019. In the last Interim Report, I indicated that would be a time to consider a less active role for the Monitor, who would engage with the IG and District Council leadership when called upon. Considering the District

Council's progress, especially the transformation underway in the Office of the Inspector General, I believe the District Council is very much on-track for that moment. However, this plan is contingent upon continued compliance with the terms of the Consent Decree and the maintenance of robust internal controls to ensure such compliance in the future, as we expect the Consent Decree will remain in place indefinitely and irrespective of any changes to the monitorship. As referenced above, over the course of my fourth year as IM, the District Council leadership has continued to illustrate a genuine desire to put into place a structure enabling the District Council to self-govern within the bounds of the Consent Decree. Many of the goals set forth in my Fifth Interim Report to prepare for this, such as with respect to the IT Upgrade and the Accounting Department, have been attained. Others, such as the operation of the Office of the Inspector General, Council Representative Center, Grievance Department, and the Trial Committee require continued monitorship as new procedures and safeguards are rolled out and tested. My office has continued to receive complaints about the District Council regarding multiple issues, though at the same time, they seem to come from the same, small contingent of disaffected members. I am optimistic that the District Council's steady progress towards compliant systems with robust internal controls will warrant a different form of monitorship in the future.

In the last Interim Report, we discussed commencing a "phased" approach, involving increasingly sharing our investigative work with the OIG as the new IG gains familiarity with the District Council, with the goal of fully transitioning our investigative work by the end this current term (ending on March 31, 2019). We have transitioned to the OIG the membership hotline and concerns raised by members that relate to benefits, wages, and jobsite-related issues. We are continuing to work closely with the OIG and District Council leadership on all matters that relate to the enforcement of the Consent Decree and ongoing investigations as appropriate.

Some of these investigations are described in an ex parte submission accompanying this Interim Report, which we would request remains under seal.

## IV. CONCLUSION

Should the Court require any additional information, please contact the undersigned at Your Honor's convenience. We look forward to appearing before Your Honor in the near future to address concerns and questions of the Court.

Date: December 31, 2018
New York, New York

Respectfully submitted,

By: /s/ Glen G. McGorty

GLEN G. McGORTY
JOANNE R. OLEKSYK
Crowell & Moring, LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
joleksyk@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United
Brotherhood of Carpenters and
Joiners of America

CC:

**Counsel for the Government**

AUSA Benjamin Torrance
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

**Counsel for the District Council**

James M. Murphy, Esq.
Spivak Lipton, LLP
1700 Broadway, 21st Floor
New York, NY 10019

Barbara S. Jones, Esq.
Bracewell LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020