UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                              Plaintiff,

-against-

DISTRICT COUNCIL OF NEW YORK CITY
AND VICINITY OF THE UNITED
BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, et al.,

                              Defendants.

90 Civ. 5722 (VM)

---

**SEVENTH INTERIM REPORT OF THE INDEPENDENT MONITOR**

GLEN G. McGORTY
LISA N. UMANS
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
lumans@crowell.com

Office of the Independent Monitor,
District Council of New York City and
Vicinity of the United Brotherhood of
Carpenters and Joiners of America

June 8, 2020

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................- 1 -

II.     THE DISTRICT COUNCIL .................................................................- 2 -

    A.      Special Election for President .................................................- 2 -

    B.      Local Union 2790 Executive Committee Delegate Election ..............- 4 -

    C.      June 2019 Delegate Elections .................................................- 5 -

    D.      Wall-Ceiling Association Collective Bargaining Agreement............- 6 -

    E.      July 2019 Attempted Wildcat Strike .......................................- 9 -

    F.      COVID-19 Response ............................................................- 9 -

    G.      Spring 2020 Trustee Special Election.......................................- 11 -

    H.      Civil Litigation ................................................................- 13 -

        1.      Federal Court Actions .................................................- 14 -

        2.      State Court Actions ....................................................- 15 -

        3.      Administrative Agency Proceedings.................................- 17 -

    I.      Progress on Goals .............................................................- 18 -

        1.      Office of the Inspector General......................................- 18 -

        2.      Business Representative Center Compliance Review ...........- 21 -

        3.      Grievances Department................................................- 22 -

III.    THE OFFICE OF THE INDEPENDENT MONITOR................................- 22 -

    A.      Investigations .................................................................- 22 -

        1.      Business Representative Job Referral Investigation ............- 22 -

        2.      Shop Steward Job Referrals ..........................................- 26 -

        3.      Local Union 926 Investigation.......................................- 27 -

    B.      A Plan Forward ................................................................- 29 -

IV.     CONCLUSION..................................................................................- 31 -

## I.     INTRODUCTION

Pursuant to Paragraph 5.l.iii of the Stipulation and Order filed in this matter on October 17, 2019 (the "2019 Stipulation and Order"), I respectfully submit this Seventh Interim Report as the Independent Monitor ("IM") of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" or "Union").

The 2019 Stipulation and Order extended my term as the IM through December 31, 2020. Since assuming the role of IM on January 1, 2015, my team and I have endeavored to assist the District Council towards achieving the objectives of the original Consent Decree approved by the Court on May 4, 1994.  This Report is intended to provide a brief update to the Court on the status of the District Council's compliance efforts.

The Sixth Interim Report was filed on December 31, 2018, and it was our intention to file this report in December 2019.  However, there have been significant on-going issues at the Union which justified delaying the filing until now, in order to provide a more fulsome report. These include a special election to fill the District Council President position, vacated by the prior President after his resignation last June, which concluded in February; the recent filing of lawsuits against the District Council; and, finally, the District Council's response to the COVID-19 pandemic, which understandably has been challenging for the Union's members.

In the interest of keeping my report brief and to the point, this submission will focus primarily upon a general update and analysis of the state of the Union following the events of the past year, as well as address any lingering issues from the Sixth Interim Report.  Any additional details requested by the Court will be provided in a supplemental filing.  As always, any confidential investigative information will be offered in a separate letter filed under seal.

II.     **THE DISTRICT COUNCIL**

A.     **Special Election for President**

In June 2019, after allegations from multiple sources that District Council President

Graham McHugh  accepted cash payments as a young carpenter many years prior to assuming

office (a significant violation of Union rules), Mr. McHugh resigned from office, leaving the

position of President vacant.  Upon Mr. McHugh's resignation, Vice President Michael

Cavanagh began running the Delegate meetings—the primary responsibility of the President as

per the United Brotherhood of Carpenters ("UBC") Constitution and the District Council's

Bylaws—and in my opinion did an excellent job doing so.  Because of the urgency to provide

Union members with another elected representative, however, I sought the consent of the Court

to conduct and oversee a special election on an expedited basis and, in the interest of time and

economy, to utilize the procedures followed in the 2018 special election to fill the President

vacancy ("2018 Special Election Rules").  The Court had previously approved the 2018 Special

Election Rules as a modified version of the rules from the 2017 General District Council election

("2017 General Election Rules").  The Court again approved the modified special election

schedule and rules on November 1, 2019 (the "Election Rules").

The election process began on October 21, 2019, when the Court was advised of and

subsequently approved the rules of this Special Election, which included the use of mail-in

ballots organized and administered by an independent third party (the American Arbitration

Association ("AAA")).  On November 12, 2019, in accordance with the Election Rules, the

District Council distributed a letter from my office providing notice of the upcoming election.

The letter advised the membership that the nomination phase would begin on November 26,

2019, at which point prospective candidates started gathering signatures of support from

members in good standing.  The Election Rules required 150 verified signatures to nominate any

individual candidate, although nominees remained subject to other eligibility requirements in the

Election Rules and my review of their qualifications to serve.  To that end, my office conducted

interviews of ten individuals for whom we received nominating petitions with the required

number of signatures.  After investigating and considering each of their qualifications, I

ultimately approved all ten prospective nominees to run for office, though Jeffrey Felline,

Jeremy Milin, and John Sheehy declined to seek a nomination.  At the Delegates meeting on

January 8, 2020, the other seven individuals accepted their nominations to run:  Patrick Crean,

James Noonan, Robert Villalta, Tammy Rivera, Paul Capurso, Gerry Matthews, and Michael

Rodin.  Both Mr. Matthews and Mr. Rodin subsequently withdrew from the race.  The remaining

five candidates were placed on the mail-in ballots, which were distributed to members on

January 30, 2020, the same date as a candidate debate which was open to all members.  The

debate was not heavily attended, but a video recording was placed on the Council website to give

all members an opportunity to hear from the candidates.

      AAA received 3,697 ballots (of the 16,709 which were mailed to the eligible Union

members) prior to the ballot reception deadline, which was set for February 19, 2020, at 5:00

p.m.  The counting of ballots took place at the AAA administrator's office on February 20, 2020,

in the presence of the candidates and approved observers.  I was personally present with my

colleague Lisa Umans, a member of the IM team.  In connection with my oversight of the

process, I personally reviewed eight envelopes which had been identified by the administrator as

having various defects, and I approved setting them aside and they were not counted.  Secrecy of

the ballot was maintained at all times.  The results were as follows:

|  | Patrick Crean | James Noonan | Robert Villalta | Tammy Rivera | Paul Capurso |
|---|---|---|---|---|---|
|  | *12.4%* | *20.2%* | *13.7%* | *9.5%* | *44.3%* |
| **Totals** | **455** | **740** | **501** | **348** | **1624** |

In consultation with the official certification provided by AAA, I formally certified the results and filed the information with the Court on February 25, 2020. Paul Capurso was sworn in as President of the District Council at the District Council Executive Committee Meeting that took place on March 9, 2020.

**B.**     **Local Union 2790 Executive Committee Delegate Election**

On February 20, 2020, the same day he lost the election for District Council President, Robert Villalta was nominated to run for Local Union 2790 Executive Delegate to the District Council Executive Committee. Mr. Villalta's eligibility to run for this office was subsequently challenged based on the belief that he was still technically a candidate in the Presidential election at the time of the Local nominations. My team had yet to file the certified results of the Presidential election with the Court (which we did 5 days later) and Mr. Villalta technically retained his right to appeal or protest the result, even though he had formally withdrawn and waived those rights by e-mail in order to accept the new nomination. The President of Local 2790 ruled that Section 31 of the UBC Constitution prohibited Mr. Villalta from running as a candidate for "more than one office in a regular election, in the same subordinate body" and on February 28, 2020, pursuant to Section 53(G) of the UBC Constitution, Mr. Villalta appealed the decision to UBC General President Douglas McCarron.

While local union matters are not my primary jurisdiction, I felt that it was incumbent upon me to offer the UBC my thoughts in connection with Mr. Villalta's eligibility to run for Executive Delegate from his Local Union vis-à-vis his status as a Presidential candidate in the election that I oversaw. In a letter dated March 4, 2020, I offered my view that Mr. Villalta was no longer a candidate in the Presidential election at the time the nominations for Executive Committee Delegate were made. I also noted that the Local 2790 President had thoughtfully sought my opinion on the topic, but we did not connect prior to his decision. On May 6, 2020,

- 4 -

the UBC issued its response to Mr. Villalta's appeal, finding that he was eligible to be nominated to the position of Executive Committee Delegate.

Despite this result, Mr. Villalta ultimately withdrew his candidacy on May 15, 2020. I have included this summary nonetheless as it demonstrates a member's ability to successfully seek redress on appeal from a local adverse ruling—a crucial element of a democratic union.

### C.     June 2019 Delegate Elections

On April 2, 2019, pursuant to Section 4(B) of the District Council's Bylaws, notice was sent to each Local Union regarding its allotment of the Delegates to be elected to serve as members of the District Council Delegate Body for the new three-year term. Elections were scheduled for each of the nine Local Unions, though in some instances, where there was no opposition, those Delegates were appropriately deemed "elected" with a single vote at the same time as nominations in May 2019. Ultimately, representatives from the nine Local Unions were elected to the Delegate Body.[1] There were no meritorious protests and these elections were uneventful.

As is typical of Union elections, many members ran on slates, and the slate associated with the current District Council leadership won overwhelmingly. This has had a dramatic impact on the tenor of Delegate meetings, which are now far less antagonistic and, accordingly, quite efficient. I note that some members have complained to my team that the District Council leadership is less "checked" than when different factions had more representation. While I agree that democracy is always best served when various viewpoints are presented, the current political composition of the Delegate Body is the direct result of democratic elections and this dynamic has had no impact on the compliance protocols established pursuant to the Consent Decree.

---

[1] As described below, Local Union 926 subsequently underwent supervision by the UBC and lost its eleven Delegate seats.

Nonetheless, I have encouraged the District Council leadership to continue to invite discussion and debate, particularly because it seems that an increasing—though still relatively small—number of Union members feel marginalized by not having representatives inside these meetings.

###### D.   Wall-Ceiling Association Collective Bargaining Agreement

On July 19, 2019, the District Council entered into a five-year collective bargaining agreement with the Association of Wall-Ceiling & Carpentry Industries of New York, Inc., ("WC&C Association") (the "Wall-Ceiling CBA" or the "Agreement"). The WC&C Association is the principal organization in New York that advocates on behalf of union carpentry contractors, suppliers, and manufacturers in the interior wall and ceiling industries.

Of particular import to the District Council, the Wall-Ceiling CBA addresses a growing concern for unions: the expansion of non-signatory contractors employing non-union labor, and the increasing encroachment of non-signatory contractors on the commercial construction sector. The Wall-Ceiling CBA's Market Recovery Addendum (the "Addendum"), which aims to increase union carpenter density and market share in residential, hospitality (*e.g.*, hotels), and commercial (*e.g.*, offices building) construction, particularly outside of Manhattan, is viewed by the District Council as crucial to the long-term stability of the Union. The Wall-Ceiling CBA further supports the twin goals of hiring local workers and promoting diversity among the New York State construction workforce.

Despite the District Council's belief that the Wall-Ceiling CBA is in the union's interest, some members have taken issue with the procedure by which it was approved, as well as with various substantive provisions of the Agreement. They have also voiced concern that monies from the members' pension fund were improperly diverted to a UBC Labor Management Trust Fund.

As to the procedure for approval, members have complained that the vote of the Delegates should have been done by a roll call vote rather than a vote by acclamation (*i.e.*, "yay" or "nay").  Based upon the District Council Bylaws and applicable parliamentary procedures, the complaining members are incorrect and the voting procedure was appropriate.  I would also note that the Agreement was ratified by acclamation without any dissenting "nay" votes voiced.  Further, no one to my knowledge has officially challenged the Agreement's approval.[2]

In addition, complaints have been made that rank-and-file members were not given the opportunity to understand the details or the potential impact of the Agreement before it was approved by the Delegate Body, in part because they were not provided with copies of the document.  The District Council does not provide copies of draft contracts to members as a matter of policy.  Rather, only the members of the Executive Committee and the Delegate Body, who are tasked with reviewing and approving the contract, were given access to the document before it was approved.

The primary substantive concern among complaining members is the general view that changes in the Agreement will significantly and negatively impact their wages.  More specifically, they criticize the "Market Recovery" provisions of the Agreement which provide, among other things, for higher rates for work done in Manhattan than in the outer-boroughs.  They also voice concerns about provisions relating to worker ratios and how these ratios will be enforced, specifically with respect to Journeyperson classifications.[3]

---

[2] It is our understanding that Union member Frank Schiavone may have provided a copy to the Court of his January 28, 2020 letter to the IM regarding the Wall-Ceiling CBA, and that therefore the Court may already be aware of some of these issues.  Regardless, I felt the Court should be aware of an issue that caused such dissention among vocal members.  In addition, an apprentice named Jeffrey Souza Nunes has filed a lawsuit in this Court making claims against the Union in connection with the Wall-Ceiling CBA.  A brief description of that lawsuit is included in the Civil Litigation section below.

[3] Paragraph 4 of the Addendum provides for the permissible ratio of workers on any jobsite.  Specifically, "[n]o crew shall be comprised of more than 40% Journeypersons. There shall be at least 20% Apprentices on all crews. For a 10-person crew, the ratio shall be 4 Certified Journeypersons, 3 (Continued...)

As none of these provisions on their face violate the corruption provisions of the Consent Decree or of the current Monitorship, the Union's leadership and the Delegate Body were free to negotiate and ratify these provisions.

Finally, we have received complaints about the reallocation of what some members believed were Pension Fund contributions under the Agreement which were set to be, in their view, improperly diverted to a newly formed UBC Labor Management Trust Fund. After this issue was brought to the attention of Executive Secretary-Treasurer (EST) Joseph Geiger, however, it became clear that this UBC Trust Fund was never established and the monies contributed by the contractors under the Wall-Ceiling CBA were ultimately allocated to the Pension Fund. Although the actual contributions to the UBC Labor-Management Trust Fund (which was never actually established) were never allocated to that nonexistent fund, some members felt that the plan to allocate such contributions to that fund and not the Pension Fund was problematic in and of itself and they remain concerned about the issue

Inquiries made by my office determined that the concept of the UBC Trust Fund was created and requested to be incorporated as part of the Wall-Ceiling Agreement by the UBC. Accordingly, the District Council included the UBC Labor Management Trust Fund as part of the Agreement, which allocated $.05 per hour per member worked from contractor contributions that some members believed should have been destined for the Pension Fund. In any event, the contributions were ultimately allocated to the Pension Fund.

Despite the negative concerns voiced by some members, the District Council leadership maintains that the Wall-Ceiling CBA will ultimately prove beneficial and necessary to the health and advancement of the Union and its members. To the extent that we continue to receive any

---

Journeypersons, and 3 Apprentices." Some members have expressed a lack of confidence in the Union's ability to enforce these ratios.

complaints related to the Agreement, we will bring them to the attention of the District Council

leadership and assist in any way we can to address the underlying concerns.

### E.    July 2019 Attempted Wildcat Strike

On July 10, 2019, members protesting the Wall-Ceiling CBA organized a rally around

the corner from the District Council's offices at 395 Hudson Street in New York City.  During

the rally, Jeffrey Nunes, a young Union member, attempted to organize an unauthorized strike

(commonly referred to as a "wildcat" strike, which is a strike undertaken by a union member

without authorization from the union leadership).  The Office of Inspector General ("OIG")

brought disciplinary charges against Mr. Nunes on July 25, 2019, alleging that this conduct

violated various provisions of the UBC Constitution.  A trial was held before the District Council

Trial Committee on February 27, 2020, and Mr. Nunes was found guilty of both charges and

expelled from the Union.  Mr. Nunes has since filed a lawsuit against the District Council for

allegedly "retaliating" against him, as discussed more fully in the Litigation section below.

### F.    COVID-19 Response

It is not surprising that the construction industry has taken a significant hit from the

COVID-19 global pandemic, culminating with the Governor's Executive Order calling for all

non-essential construction projects to shut down during the crisis.  However, the District Council

is successfully leading the way through the crisis, both with respect to its communication efforts

with the members, and with respect to making difficult cost-cutting decisions that enable the

Union to continue to run effectively during these challenging times.  An April 1, 2020

communication from EST Joseph Geiger to the membership regarding the impact of COVID-19

on the carpenter community is attached hereto as Exhibit A.

With respect to its cost-cutting efforts, the District Council leadership made the difficult

decision to furlough/temporarily lay off approximately half of the District Council staff,

including members of the administrative staff and half of the District Council's business representatives.  With respect to the representatives' duties in the field, as there are still active construction jobsites consistent with the Governor's Executive Order, the District Council has devised a system whereby smaller groups of needed business representatives work on alternating weeks – one week with team A, and the next week with team B.  This permits the District Council to cut significant expenses, but also spread the sacrifice across the entire representative group.  Further, the Council has suspended the service of several non-essential vendors until such time as their expertise is needed.

Additionally, the District Council's Out-of-Work-List ("OWL") operations noted that some carpenters who had been dispatched to work on emergency/essential jobsites failed to show up.  Understandably, many members have been concerned about contracting the COVID-19 virus or passing it on to their loved ones, and have decided not to work, which is of course their prerogative.  For this reason, and in order to ensure that the Union is successfully providing skilled carpenters wherever needed, the District Council sought approval to add a new temporary "skill" entitled "Emergency/Essential Work" to the OWL.  This addition would permit the members to self-select their willingness to work under the current conditions.  By requiring members to formally indicate their desire to be called for work from the OWL, this temporary change will ensure that the OWL continues to serve its function during this period.

The District Council has also made some temporary procedural changes in the face of the unique challenges presented by the pandemic, and will continue to do so as necessary.  As an example, Union leadership will temporarily waive the requirement that Section 504 Affidavits—affidavits individuals must sign in order to be eligible to hold office or be employed by the Union—be notarized.  The Section 504 Affidavit was created by the Union to ensure that the affiant has not been convicted of any crime that would make him or her ineligible for Union

- 10 -

employment, consistent with Section 504 of the Labor-Management Reporting and Disclosure Act (LMRDA). Although the Union is not required by law to obtain such Section 504 Affidavits from individuals seeking Union employment or office, District Council leadership has sought to maintain anti-corruption measures wherever possible. However, given the current health risks associated with performing functions that require an individual's physical presence, the Union has decided to temporarily waive the requirement that the Section 504 Affidavits be notarized. Instead, District Council leadership has recommended that the Section 504 Affidavits still be signed and retained for record-keeping and follow-up purposes.

In addition, pursuant to the Consent Decree, individuals will continue to sign declarations regarding their involvement or association with organized crime. The Inspector General's office will also continue to run criminal background checks with the District Counsel's regular outside counsel doing follow-up research on individuals' criminal case dispositions, as another layer of oversight following any member's execution of a Section 504 Affidavit. It is my understanding that the Inspector General has already run background checks on a number of Local Union 926 members who are currently being considered by the UBC Trustee for various Union appointments, and that they were all returned without any issues implicating Section 504 of the LMRDA.

G.      **Spring 2020 Trustee Special Election**

In February 2020, the District Council notified the membership that nominations to fill a vacant position of Trustee of the District Council (one of three Trustee positions, with the Trustees' duties being to regularly review all of the Union's income and expenditures, including without limitation all bank records, credit card reports, invoices from vendors and service providers, and backup) would take place on March 11, 2020 at the District Council Delegate Body meeting, and that, pursuant to the UBC Constitution, all members in good standing would

be eligible to be nominated.  The notice also informed members that the election by the Delegate

Body would be held on April 8, 2020 at the District Council Delegate Body meeting.  While the

March 11 meeting was held and two members, Jeremy Milin and Hercules Reid, were

successfully nominated for the position, the District Council was unable to hold the April 8

Delegate meeting, during which the election was scheduled to be held, due to the COVID-19

pandemic.

   In light of these extenuating circumstances, including the uncertainty around when the

Union would be able to hold in-person meetings again, my Office made the decision to conduct

the Trustee election via email to the Delegates.  To that end, my team created a separate email

account to which the District Council did not have access for the purpose of distributing and

collecting ballots electronically and confidentially.  On April 17, 2020, the District Council

advised the Delegates of this procedural change, including that the election would still be

conducted anonymously through my office.  On April 20, 2020, my office distributed "ballots"

via email, instructing delegates to cast their vote by typing the name of their selection for Trustee

in the space provided within the email, and submitting their vote by 3:00 p.m. on April 23, 2020.

This email also included a brief statement by each candidate.

   After initiating this election process, we received a message from a Delegate, who is also

employed as a Council Representative, challenging the confidentiality of the election, and citing

that District Council employees using their work email to "cast" their vote could have their votes

identified by the District Council leadership upon review of the records by the District Council

IT department.  We were in the process of establishing protocols to address this concern when

we realized there were broader issues with the election.  Specifically, we learned that the email

election, as we had devised, was not compliant with the LMRDA, which established certain

standards for governing elections utilizing "remote electronic voting systems," including

- 12 -

requiring ballot secrecy, preserving observer rights, preserving records, and preserving the right to vote.  Upon consultation with counsel for the District Council, it did not appear that our *ad hoc* election—no matter how well intended—adequately considered the concerns addressed by the LMRDA, and specifically the guarantee of confidentiality requiring a "double blind" system. Accordingly, we discontinued our election and delayed filling the vacancy in the Trustee position until such time as Delegate meetings can resume and a traditional paper-ballot election can be held.  Further, in order to avoid any potential breach of confidentiality stemming from our initial effort, we destroyed all "ballots" and/or electronic correspondence received in connection with the discontinued election.

     **H.**    **Civil Litigation**

     Previously, we have summarized ongoing litigation involving the District Council in federal and state court, as well as before the Public Employment Relations Board, the EEOC, the National Labor Relations Board, and the New York City Department of Consumer Affairs. Because these matters are mostly pending, to the extent I have developed any views, I will not offer comment on the merits unless as necessary and appropriate or requested by the Court.  Four of the lawsuits involve three former employees of the District Council.  Two are in New York State court, with one on appeal following the District Council's successful motion to dismiss the amended complaint.  The other two are before Your Honor as cases filed by the plaintiffs as related to this action.  A fifth lawsuit was filed by an apprentice-member of the District Council and is pending in this District before Judge Carter.  With that said, where litigations involve conduct which was investigated by the IM team or the OIG, such as jobsite referrals by business representatives, and these investigations have already been reported to the Court or involved in public filings, I am obligated to update Your Honor, either below, or under seal where

appropriate.  I present the procedural facts and, unless indicated explicitly, these reports are not intended to reflect my personal view of the merits of any of these cases.

The following cases are pending:

### 1.    Federal Court Actions

***Jeffrey Souza Nunes v. United Brotherhood of Carpenters and Joiners of America, et al.***, **20-cv-1092 (ALC) (S.D.N.Y.).**  Plaintiff Jeffrey Nunes filed suit on February 7, 2020, against the District Council, the UBC, and Local Union 157 (collectively, the "Union Defendants"), and numerous construction industry contractor employers (collectively, the "Defendant Employers").  A third-year apprentice carpenter, Mr. Nunes alleges that disciplinary charges were issued against him after he attempted to organize a wildcat strike in opposition to a collective bargaining agreement that had been negotiated between the District Council and the Wall & Ceiling Association (the "CBA").  He also alleges that he was blacklisted from jobs.  Mr. Nunes alleges violations of the LMRDA, and he brings a hybrid duty of fair representation ("DFR")-Section 301 Labor Management Relations Act claim.  On May 5, 2020, Mr. Nunes filed an Amended Complaint.  Among other things, the Amended Complaint added claims relating to Mr. Nunes's union disciplinary trial; dropped Local 157 as a party; added Joseph Geiger in his official capacity as EST of the District Council as a party defendant; and added a request for a preliminary injunction enjoining the CBA.  As of this writing, the District Council has requested a pre-motion conference regarding the filing of a motion to dismiss the Amend Complaint in its entirety.

***Peter V. Corrigan v. United Brotherhood of Carpenters and Joiners of America, et al.***, **20-cv-1336 (VM) (S.D.N.Y.).**  Plaintiff Peter Corrigan, a former business agent employed by the District Council, filed suit on February 14, 2020 against the District Council, the United Brotherhood of Carpenters, and District Council Local 212.  Corrigan alleges that his termination

in May 2018 for referring apprentices to jobsites in violation of the District Council Bylaws and the Consent Decree violated the LMRDA and the common-law state torts of tortious interference and prima facie tort. The case was filed as a related case to *United States* v. *District Council*, 90-cv-5722 (VM) (S.D.N.Y.), and was assigned to Your Honor. Pursuant to Your Honor's rules, by letter dated March 18, 2020, the District Council's attorneys sent a letter to Mr. Corrigan's attorneys, copying the Court, advising of the District Council's intention to move to dismiss the Complaint, and setting forth the bases for the anticipated motion. On March 27, 2020, Mr. Corrigan's attorney sent a letter to the Court in which he indicated that he would be amending the Complaint, and that he would likely drop the state law claims.

**Peter Marsalisi v. United Brotherhood of Carpenters and Joiners of America, et al.,** **20-cv-1806 (VM) (S.D.N.Y.).** On February 28, 2020, former Office of Inspector General ("OIG") investigator Peter Marsalisi filed suit in federal court alleging that his termination from the OIG violated the LMDRA. Mr. Marsalisi has also challenged his termination in New York State Supreme Court, New York County under state law, Index No. 159707/2019 (N.Y. Sup. Ct., N.Y. Cty.). As described below, Mr. Marsalisi's state court action is pending. Pursuant to Your Honor's rules, by letter dated March 26, 2020, the District Council's attorneys sent a letter to Mr. Marsalisi's attorney, copying the Court, advising of the District Council's intention to move to dismiss the Complaint, and setting forth the bases for the anticipated motion. On April 1, 2020, Mr. Marsalisi's attorney sent a letter to the District Council's attorneys, copying the Court, in which he indicated that he would be amending the Complaint. On April 13, 2020, this case was reassigned to Your Honor as a related case to the instant matter.

### 2.    State Court Actions

**State of New York and City of New York ex re. Brian Aryai v. Skanska, et al.,** **Index** **No. 108471/2009 (N.Y. Sup. Ct., N.Y. Cty.).** On September 5, 2018, Relator Brian Aryai filed

an amended qui tam complaint in New York State court against numerous major construction industry contractors and unions, including "New York City District Council of Carpenters Local 1536" (Local Union 1536 was dissolved as a local union of the District Council in or around 2011 when its members were merged into another newly chartered local union affiliated with the District Council.).  The Amended Complaint seeks damages on behalf of the State of New York and City of New York pursuant to the qui tam provisions of the New York State Finance Law (the False Claims Act) and the New York City Administrative Code.  The Amended Complaint alleges a longtime scheme to defraud by the defendant construction companies and unions by which "union foremen" allegedly submitted two hours per day of overtime to the defendant contractors, even though they did not work the overtime hours, and the contractors then passed the allegedly fraudulent time records on to the federal, state, and municipal governmental agencies funding various construction projects.  The Amended Complaint alleges that, in addition to the two hours of "gratis pay" by which the "union foremen" received pay for "ghost hours," the "defendant unions" (which are described as Local 14, Operating Engineers; Local 79, Mason Tenders; and Local 1536, District Council of Carpenters) received fringe benefits of 40-50% of the amount paid to the foremen, and the defendant contractors recouped these monies from federal, state, and local government funds.  The Amended Complaint alleges that the alleged gratis pay constituted payroll fraud against the government entities on public projects. The Amended Complaint seeks unspecified treble damages, plus penalties of $12,000 for each false claim, fees and costs, and attorneys' fees.  On October 11, 2019, all Defendants filed motions to dismiss the action in State court.  The motions to dismiss, which were fully submitted as of December 9, 2019, are pending.

*Michael Donnelly v. The New York City and Vicinity District Council of the United Brotherhood of Carpenters and Joiners of America, et al.,* **Index No. 152197/2019 (N.Y. Sup.**

Ct., N.Y. Cty.).  Michael Donnelly, a former employee of the District Council, brought several causes of action against the District Council, EST Joseph Geiger, and former President Stephen McInnis, (collectively, the "District Council Defendants") and various contractors and their principals relating to his termination as a Council Representative for the District Council.  Mr. Donnelly's Amended Complaint asserted violations of N.Y. Labor §§ 215, 201-d, and alleged misrepresentation/deceit/fraud and tortious interference with economic and/or contractual right to economic advantage (The tortious interference cause of action was not asserted against the District Council.).  On January 16, 2020, the Court granted the District Council Defendants' motion to dismiss the Amended Complaint in its entirety as against them.  On February 11, 2020, Mr. Donnelly filed a notice of appeal.

*Peter Marsalisi v. New York City District Council of Carpenters, et al.*, **Index No. 159707/2019 (N.Y. Sup. Ct., N.Y. Cty.).**  On October 4, 2019, Peter Marsalisi filed a lawsuit alleging several causes of action against the District Council, Patrick Kennedy, Dana Brownstein, Matthew Walker, and Paul Capurso (collectively, the "Defendants") relating to his termination as an investigator for the District Council's OIG.  On January 9, 2020, Mr. Marsalisi filed an Amended Complaint, which he styles as a "collective action under CPLR 901."  The Amended Complaint alleges violations of N.Y.L.L. §§ 215(1)(a) and 201-d against all Defendants.  He also brings a cause of action for misrepresentation/fraud (which is not brought against Paul Capurso).  On February 12, 2020, the Defendants filed a motion to dismiss the Amended Complaint.  The Court has adjourned the return date of the pending motion to dismiss to June 30, 2020.

### 3.    Administrative Agency Proceedings

*Edward Saunders v. New York City District Council of Carpenters*, **Public Employment Relations Board ("PERB") Charge No. U-34829.**  Charging Party Edward

Saunders, a then Javits Center employee, filed an improper practice charge against the District Council alleging that the District Council breached its duty of fair representation in violation of the Taylor Law. Of the multiple specific allegations, the PERB Administrative Law Judge ("ALJ") dismissed all but two of them prior to trial. After two days of trial in 2017, on November 4, 2019, the ALJ concluded that the District Council did not violate the law and dismissed the charge. The Charging Party has not appealed the dismissal and the time to do so has elapsed.

*Edward Saunders v. New York City District Council of Carpenters*, **PERB Charge No. U-36519.** Former Javits Center employee Edward Saunders filed his second improper practice charge against the District Council (and the Javits Center) on August 11, 2018 alleging that the Union breached its duty of fair representation in connection with his termination. Subsequent to the first day of hearing in February 2020, Mr. Saunders sought leave to withdraw his PERB charge so he could pursue his claims in court.

*Stevenson Nurse v. New York City District Council of Carpenters*, **NLRB Charge No. 02-CB-243883.** District Council member Steven Nurse filed an unfair labor practice charge against the District Council on July 10, 2019, alleging that the District Council (1) failed or refused to refer him to jobs through its hiring hall for reasons that were unlawful, (2) unlawfully assessed him because he engaged in unspecified protected activity, and (3) unlawfully brought internal charges against him because he engaged in unspecified protected activity. After the NLRB's investigation and the NLRB's review of Mr. Nurse's partial appeal, the NLRB dismissed the charge finding no merit to the allegations and no violation by the District Council.

I.      **Progress on Goals**

        1.      **Office of the Inspector General**

- 18 -

My office has continued to work closely with the OIG.  Since the time of our Sixth Interim Report, Inspector General David Pié has worked hard to establish new protocols and to improve the investigative function of the OIG.  On June 2, 2020, I was disappointed to learn that Mr. Pié had accepted a new position closer to his home and would be leaving the Union.  We will work to conduct a thorough search for a new Inspector General who will continue the improvements made to the OIG over the past two years.  We wish Mr. Pié all the best on his new endeavors and thank him for his service to the Union.

With respect to the improvements made during Mr. Pié's tenure, the OIG has streamlined some of its reporting systems, reducing the number of forms generated and making the entire system more user-friendly, both for the investigators and for those who rely upon the reports. Further, the OIG has worked to create more efficiency in its administrative processes and personnel structure in order to generate cost savings for the Council while not sacrificing any of its compliance function.

Over the past year, among the areas of focus of the OIG has been the issue of retirees who have started to work full-time for non-union contractors in violation of the UBC Constitution, the District Council's Bylaws, and the rules and regulations of the Pension and Welfare Funds.  Consequently, several retirees who engaged in this conduct have been tried and convicted by the District Council Trial Committee based on charges brought by the OIG.  These retirees have been fined or expelled from the Union, and are also facing potential impact to their monthly pension payments and eligibility for lifetime health benefits through the Welfare Fund. These results will hopefully create a strong deterrent to any other retirees who may be considering the same course of conduct—conduct that directly undermines the Union's mission.

The OIG has also continued to work closely with the Business Representative Center regarding potential grievances.  Where appropriate, the OIG enlists the assistance of the Business

Representatives to triage complaints and return them to the OIG for future investigation if needed.  This collaboration has proved valuable by keeping business agents engaged in the process and aware of the conduct most concerning to the Union and OIG.  In the past, the volume of filed grievances was used as a barometer of OIG effectiveness, but Mr. Pié's efforts have minimized the filing of grievances best handled by the Business Agents.  There are better metrics for evaluating the OIG's investigative performance.

The OIG's coordination with Business Agents has also resulted in some other noteworthy successes.  Recently, two Business Agents referred a matter concerning alleged illegal employment practices on the part of various contractors to the OIG for investigation.  The matter was subsequently investigated by the OIG team (including by conducting video surveillance and obtaining FOIL records), and turned over to the Nassau County District Attorney.  The District Attorney's Office ultimately brought charges against eight individuals and nine corporations on March 9, 2020, for paying sub-minimum wages, the theft of more than $250,000 in employees' wages and benefits, nonpayment of more than $58,000 to the state labor department for unemployment insurance fund contributions, and nonpayment of more than $133,000 to the New York State Insurance Fund for workers' compensation insurance premiums.  The defendants allegedly underpaid employees by misclassifying dockbuilders as lower waged laborers, and failed to pay for overtime hours worked as a result of submitting false payroll records.  That these individuals and contractors are being held to account as a result of the OIG's diligence and hard work, including its collaboration with Business Agents and others at the District Council, is an important achievement and certainly worthy of the Court's consideration.

Similarly, the OIG has continued to work closely with the IM investigative team, which forwards complaints received with any base level support to the OIG for investigation. Ultimately, when an independent monitor is no longer needed, the OIG will be solely responsible

- 20 -

for receiving and investigating all member complaints currently made to the IM's team.  In light

of that consideration, we continue to make efforts to channel all members' complaints directly to

the OIG.  Although there still remains a lingering distrust of that office which predates Mr. Pié's

arrival at the Union, the IM team will continue to work with the OIG to overcome those

concerns, especially with the selection and installation of a new Inspector General in light of Mr.

Pié's departure.

   The best example of the OIG/IM partnership this year relates to the investigation and

presentation of the Local 926 investigation to the United States Attorney's Office for the

Southern District of New York, Criminal Division, which resulted in the prosecution of two

Local Union officials.  That matter is discussed more fully in the investigations section below.

### 2.    Business Representative Center Compliance Review

   As previously reported, my team began—and subsequently suspended— a

comprehensive review of the Business Representative Center in order to evaluate the

effectiveness of its compliance controls, and to recommend any necessary changes.  While our

efforts were paused in order to deal with more time-sensitive and pressing matters, including

oversight of the special election for District Council President this year, we are now resuming

our initiative to review and improve the Council Representative Center.

   As a refresher for the Court, our initial efforts included a presentation by leadership

personnel on the Council Representative Center's operations, procedures and personnel;

subsequent interviews with Council Representative Center leadership personnel regarding their

operations and available resources; review of operations documentation provided by the

Business Representative Center leadership personnel; and interviews of several council

representatives.  With timing somewhat dependent on the impact of the COVID-19 crisis, I

anticipate that my team will ramp up this effort and conduct additional interviews in order to

fully understand the Business Representative Center's operations, including any structural or substantive changes that have been made since we began this initiative in 2016. We also anticipate a more in-depth review of the Center's documentation, and finalization of its policy manual, of which we began review several years ago. Once this review is complete, I expect to provide a series of recommendations to the District Council and the Council Representative Center regarding its infrastructure, compliance controls, training, and the Business Representative manual.

### 3.   Grievances Department

The current count of unresolved grievances is 506, about half the number as of December 2018, as reported in the Sixth Interim Report. In 2019, approximately 802 grievances were closed, while only 264 new grievances were opened. I continue to view these developments positively and expect that the District Council will remain focused on continuing to resolve the grievance backlog.

## III.   THE OFFICE OF THE INDEPENDENT MONITOR

Since the last interim report filed with the Court, we have made every effort to assist the District Council in reaching its compliance goals under the Consent Decree. We highlight some of our efforts and investigations during this time period.

### A.   Investigations

### 1.   Business Representative Job Referral Investigation

In my Sixth Interim Report, I discussed my office's investigation into the circumstances surrounding the termination of Business Representative Peter Corrigan, who has now filed a federal lawsuit described above and pending before Your Honor. In May 2018, based upon an investigation conducted by the OIG, Mr. Corrigan was terminated from the District Council's Business Representative Center for improperly referring Union members to jobs, contrary to

Section 38 of the District Counsel Bylaws and to the Job Referral Rule system (the OWL) established in Section 5 of the Consent Decree.  Following his termination, I made a preliminary recommendation that, pursuant to Paragraph 5.b.ii of the Stipulation and Order, Mr. Corrigan be removed from his position as Delegate to the District Council for Local Union 212 and as Recording Secretary of Local Union 212.  Before initiating any removal procedures, I invited Mr. Corrigan, through counsel, to offer his own evidence on the matter.  Instead of a communication from Mr. Corrigan, I received a report prepared by Debbie Morgan of Legal Research and Investigations, LLC (the "Morgan Report").  The Morgan Report, which was not requested or solicited by my office, challenged the legitimacy of the originating complaint against Mr. Corrigan and the findings of the OIG investigation as a whole.  It also suggested that witnesses had provided new statements contradictory to statements which they previously made to the OIG.  In light of these apparent discrepancies, my office initiated our own, independent investigation into Mr. Corrigan's conduct.  In addition to reviewing relevant documents and phone records, my office interviewed Mr. Corrigan, along with a number of other relevant individuals.

On April 4, 2019, my investigative team issued a report concluding that Mr. Corrigan improperly referred four apprentices to jobsites for employment.  On May 14, 2019, I provided Your Honor with a copy of that report under seal.  My team also found that, to the extent any witnesses changed their versions of events after their initial OIG interviews, they likely did so in an attempt to protect Mr. Corrigan and/or themselves from what they subsequently learned would be serious consequences for Mr. Corrigan as a result of his conduct.  In light of these findings, I determined that the initial referral of the matter was legitimate and that neither the OIG investigation nor the ultimate decision to terminate Mr. Corrigan was the product of corruption.

- 23 -

Despite the findings of our investigation, and after careful consideration, I decided *not* to remove Mr. Corrigan from his role as District Council Delegate and as Recording Secretary for his Local Union.  While recommending his removal pursuant to Section 5.b.ii of the Stipulation and Order would have been within my authority and supported by precedent, I made the determination that Mr. Corrigan's termination as a Business Representative was more than a sufficient penalty for violating a rule that applied to Business Representatives (and other employees of the District Council).  Notwithstanding this leniency, I informed Mr. Corrigan's counsel that I would object to Mr. Corrigan seeking any additional, or more senior, offices within the District Council or his Local Union.  I also informed Mr. Corrigan's counsel that, should Mr. Corrigan decide to seek any other elected positions in the future, he would be required to seek leave from my office in order to do so.  Seemingly unsatisfied with this resolution, Mr. Corrigan has since filed a lawsuit against the District Council, which is described in the Civil Litigation section above.

Further, in May 2018, around the time Mr. Corrigan was terminated, the OIG issued another report following an investigation in connection with similar conduct on the part of another Business Representative ("Business Representative #1").  In its report, the OIG concluded that Business Representative #1 had directly referred a member to a jobsite for employment, bypassing the OWL, which was an explicit violation of Section 38 of the Bylaws as well as Section 5 of the Consent Decree.  During the pendency of the Corrigan investigation by my office, an adjudication of what to do with respect to Business Representative #1 was tabled.  Subsequent to the issuance of my office's report on the Corrigan matter, however, the District Council leadership made a preliminary decision to impose a two-week suspension on Business Representative #1 in connection with his violation.  After hearing about this decision, and in light of the significant discrepancy between the penalties imposed upon Mr. Corrigan and

Business Representative #1 for what, at first, appeared to be substantially similar conduct, I

discussed the matter with the District Council's leadership.  The leadership indicated because

both Mr. Corrigan's underlying conduct and his handling of his investigation into his conduct

was markedly worse than Business Representative #1's, who immediately admitted the far more

sympathetic facts underlying his conduct, a less severe penalty was contemplated for Business

Representative #1.  Ultimately, however, in September 2019, the District Council Executive

Committee reconsidered its initial decision and, upon the recommendation of the District

Council's Human Resources Director, determined that job site referrals, even under Business

Representative #1's circumstances, warrant termination.  In receipt of this news, Business

Representative #1 submitted his letter of resignation.

  An additional investigation was initiated by the OIG in April of 2018, regarding

allegations that another Business Representative ("Business Representative #2") violated OWL

rules by directly referring a member to a jobsite.  On July 5, 2018, the OIG issued a report which

concluded that the Business Representative #2 had directly referred a member to a jobsite in

violation of Section 38 of the Bylaws as well as Section 5 of the Consent Decree.  Again, the

OIG recommended that the District Council take whatever disciplinary action was deemed

appropriate.  During the pendency of the Corrigan investigation by my office, an adjudication of

what to do with respect to Business Representative #2 was tabled.

  After extensive review, the District Council leadership determined that Business

Representative #2's actions did not constitute a violation of the OWL rules or the Bylaws.  On

December 3, 2018, EST Joseph Geiger issued a Letter of Reprimand stating in part: "…I have

concluded you did *not* violate the OWL rules in that you did not directly refer a member to a job.

Rather, both members referred to the job at issue in this matter were done so by the Out of Work

List following its normal protocols.  In summary, I found that you had no role in the initial

referral process." The letter went on to note that Business Representative #2 "…exercised poor judgement in this matter. At the point when you knew, or should have known, that the member who was referred by the Out of Work List and instructed to report to the job may have refused the referral, and, consequently, was not entitled to the job, you should have contacted your manager and sought guidance on appropriate corrective actions. Your failure to seek guidance and your decision to act on your own under these circumstances led to unnecessary confusion and is unacceptable." The letter was placed in Business Representative #2's personnel file and was to be reflected in his annual performance evaluation.

The investigations into these job referral allegations highlight the need for specific training to be provided to Business Representatives detailing what is prohibited and what is permissible regarding assisting members seeking work. We note that the District Council has provided training in this regard to Council Representatives, and recommend that this topic be included among the training given to newly hired Council Representatives and as part of annual refresher training.

### 2. Shop Steward Job Referrals

During the investigation into the circumstances surrounding Mr. Corrigan's termination, my office learned that at least two shop stewards had been engaged in referrals to jobsites, but in contrast to Mr. Corrigan and Business Representative #1, had not lost their positions as shop stewards as a result. Specifically, upon learning about manpower needs at various jobsites, the two shop stewards referred other members to those employers. The discovery of this conduct concerned me particularly because of the firm position the District Council had taken with respect to the absolute prohibition on Business Representatives sending individual members to jobsites. The discovery that shop stewards were engaged in such conduct thus prompted the question of whether shop stewards, like Business Representatives, are considered agents of the

District Council such that they are prohibited from making referrals to jobsites, or informing employers about other members' availability.

After considering this question, the District Council clarified that, in contrast to Business Representatives, who are full time employees of the District Council, shop stewards are considered agents of the District Council *only when* they are acting in their capacity as a shop steward, and *only* with respect to the specific job to which they have been assigned. When they are not on the clock and are therefore in the status of rank-and-file members, they are not subject to rules governing shop stewards or the restrictions that limit the conduct of agents of the District Council.

To illustrate this concept, a shop steward who learns of manpower needs on the job to which he or she is assigned may not alert other members of those manpower needs and may not advise the company that certain members are available to work. In this situation, the shop steward should advise the employer to contact the OWL. If this same shop steward learns of work opportunities on another job (for instance, a foreman he or she has worked for in the past calls and asks if he or she is available to work), the shop steward may contact other members and advise them of those manpower needs.

While shop steward training has not historically addressed this concern, it is my intention to ensure that the District Council includes proper training with respect to this issue in the future.

### 3.   Local Union 926 Investigation

The OIG had been investigating allegations of a scheme involving the sale of union membership cards by officials of affiliated Local Union 926. In January 2019, my office referred a matter to the OIG specifically regarding alleged inappropriate conduct on the part of Salvatore Tagliaferro, President of affiliated Local Union 926, Delegate to the District Council, and District Council Business Representative, and John DeFalco, Vice President of affiliated

Local Union 157.  That specific referral and the OIG investigation led to a criminal investigation conducted by law enforcement and, on June 27, 2019, a federal criminal indictment was unsealed in the Southern District of New York alleging that, from in or about 2017 through June 2019, Mr. Tagliaferro and Mr. DeFalco conspired to sell admission into Local Union 926 in exchange for cash bribes.  Mr. DeFalco was also charged with obstruction of justice and witness tampering.

The following day, on June 28, 2019, I issued notices to both Mr. Tagliaferro and Mr. DeFalco informing them that, pursuant to Paragraph 5.b.ii of the Stipulation and Order, the matter would be submitted to the District Council Executive Committee, and that I would be recommending their immediate removal from office and, for Mr. Tagliaferro, removal from employment.  Through their respective counsel, I subsequently received notices of resignation from both Mr. Tagliaferro and Mr. DeFalco.

In connection with this matter, and out of concern that the affairs of Local Union 926 were being conducted in a manner detrimental to the welfare and best interests of its members, the District Council, and the UBC, General President Douglas McCarron of the UBC, under the authority of the UBC Constitution, immediately placed Local Union 926 under an emergency trusteeship.  Mr. McCarron appointed William Waterkotte, Vice President for the UBC's Eastern District, to assume supervision and authority over the Local Union's affairs.  As part of that effort, and in coordination with my office, the UBC seized and performed forensic analysis on Local Union 926's computers.  On September 17, 2019, the UBC held a hearing for members of Local Union 926 in which members were offered the chance to share their views regarding the future of the Local Union, including whether continued supervision by the UBC would be necessary.  After the hearing, on October 16, 2019, the UBC Hearing Committee recommended to the UBC General Executive Board that the trusteeship over the Local Union be continued until

- 28 -

the Local Union could function effectively without UBC supervision.  The Hearing Committee further recommended that, in the interim, Mr. Waterkotte maintain his supervisory authority over the Local Union.

On October 16, 2019, after considering the Hearing Committee's report, the UBC General Executive Board adopted the Hearing Committee's recommendation to keep the Local Union under trusteeship and a letter regarding that determination was circulated to the membership on November 25, 2019.

In the months since, the IM team has met with representatives of the UBC and District Council leadership to discuss some compliance-related changes that the District Council, my office, and the government could impose flowing from the Local Union 926 investigation.  The parties are continuing their discussions and the District Council and the government, with my full support, will likely soon be submitting to the Court for consideration a supplementary stipulation and order addressing issues raised by the federal criminal proceedings and the trusteeship of Local 926.

## B.     A Plan Forward

I have spent five years working with the Union, and I am heartened by its progress.  I am pleased that many of the goals set forth in prior interim reports have been met.  The District Council has worked very hard to navigate significant challenges, from negotiating successor collective bargaining agreements with most of the multi-employer associations in a difficult economy to dealing with the impact of COVID-19.  At the same time, it is clear that there is unrest within the Union and, no matter how small this vocal minority of disaffected members may be, it is always incumbent upon any union leadership to reach out to those who feel they are underrepresented, listen to them, and, if appropriate, address the concerns they raise.  A democratic and corruption-free union requires no less.

A critical element of the District Council's path to success under the Consent Decree is the development and maintenance of a strong OIG.  The enhancements made to that office in recent years, including having a greater role in day-to-day compliance work and engaging in significant proactive investigations, have made the OIG the most crucial component in the Union's detection of corruption.  Its maturity and effectiveness are also the necessary precursors to minimizing and ultimately ending the need for an Independent Monitor.  While the OIG—like the District Council—has made tremendous strides, the departure of the current Inspector General is definitely a setback and will require the IM team to be more active in investigations in the near term.  Our first order of business will be to help identify a suitable replacement.  Once a new Inspector General is in place, I believe that the District Council will continue to benefit from the support of and collaboration with my office.

I have previously discussed with the District Council leadership and the United States Attorney's Office whether, as the need for a monitor continues, a fresh set of eyes should be brought on board to continue in my place.  After this consultation, I have agreed to the continuation of my monitorship term through the end of this calendar year, and will consider an extension beyond that, unless the needs of the Union would be better served by a new monitor.

## IV.    CONCLUSION

Should the Court require any additional information, please contact the undersigned at

Your Honor's convenience.  We look forward to appearing before Your Honor in the near future

to address concerns and questions of the Court.

Date:    June 8, 2020
         New York, New York

Respectfully submitted,

By:    _____
       GLEN G. McGORTY
       LISA N. UMANS
       Crowell & Moring, LLP
       590 Madison Avenue, 20th Floor
       New York, NY 10022
       (212) 223-4000
       gmcgorty@crowell.com
       lumans@crowell.com

       Office of the Independent Monitor,
       District Council of New York City
       and Vicinity of the United
       Brotherhood of Carpenters and Joiners of
       America

CC:

**Counsel for the Government**
AUSA Benjamin Torrance, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

**Counsel for the District Council**
James M. Murphy, Esq.
Spivak Lipton, LLP
1700 Broadway, 21st Floor
New York, NY 10019

Barbara S. Jones, Esq.
Bracewell LLP
1251 Avenue of the Americas, 49th Floor
New York, NY 10020