UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-against-

DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al.,

Defendants.

90 Civ. 5722 (VM)

**EIGHTH INTERIM REPORT OF THE INDEPENDENT MONITOR**

GLEN G. McGORTY
LISA N. UMANS
Crowell & Moring LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
lumans@crowell.com

Office of the Independent Monitor,
District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America

December 31, 2021

# TABLE OF CONTENTS


I. **INTRODUCTION** ... - 1 -

II. **THE DISTRICT COUNCIL** ... - 1 -

A. 2021 Officer Election ... - 1 -

1. Establishment of the 2021 Election Rules ... - 2 -

2. Nominations Process ... - 2 -

3. The Campaign ... - 3 -

4. Complaints and Related IM Investigations ... - 4 -

5. Formal Election Rule Protests ... - 4 -

6. Election Results ... - 7 -

B. Criminal Prosecution in SDNY ... - 8 -

C. Appointment of the Independent Hearing Officer and Related Anti-Corruption Procedures ... - 10 -

D. Civil Litigation ... - 11 -

1. Federal Court Actions ... - 11 -

2. State Court Actions ... - 16 -

3. Administrative Agency Proceedings ... - 17 -

E. Progress on Goals ... - 18 -

1. Office of the Inspector General ... - 18 -

2. Business Representative Center Compliance Review ... - 22 -

3. Grievances Department ... - 23 -

III. **THE OFFICE OF THE INDEPENDENT MONITOR** ... - 23 -

A. Progress Since My Appointment ... - 24 -

B. A Plan Forward ... - 30 -

IV. **CONCLUSION** ... - 31 -

# I. INTRODUCTION

Pursuant to Paragraph 5.l.iii of the Stipulation and Order filed in this matter on October 17, 2019 (the "2019 Stipulation and Order"), I respectfully submit this Eighth Interim Report as the Independent Monitor ("IM") of the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America (the "District Council" or "Union").

The 2020 Stipulation and Order extended my term as the IM through December 31, 2021. Since assuming the role of IM on January 1, 2015, my team and I have endeavored to assist the District Council towards achieving the objectives of the original Consent Decree approved by the Court on May 4, 1994. This Report is intended to provide a brief update to the Court on the status of the District Council's compliance efforts.

This submission primarily will focus on a general update and analysis of the state of the Union following the events of the past year and a half, as well as address the future role of the Independent Monitor. Any additional details requested by the Court will be provided in a supplemental filing.

# II. THE DISTRICT COUNCIL

## A. 2021 Officer Election

The most significant event since my last Interim Report has been the recent election of the District Council leadership. As the democratic election of leadership remains a cornerstone of a compliant and uncorrupt Union, I am happy to report that the District Council election was conducted efficiently and effectively. While, as in any election, my team received some complaints and protests regarding the administration of the election, overall, the process ran smoothly and the result was determinative, with the current incumbent slate of officers re-elected for the 2022-2025 term.

### 1. Establishment of the 2021 Election Rules

Under the District Council's Bylaws, each member of the District Council leadership – which includes the Executive-Secretary Treasurer, President, Vice President, Warden, Conductor, and three Trustees – is elected for a 4-year term. The last full leadership election was held in 2017, so a new election for the District Council leadership was required this past fall.

This election was held – as described in greater detail below – resulting in the re-election of the incumbent leadership of the District Council. The new term of office will commence when the leadership is sworn in to office on January 12, 2022.

In anticipation of the 2021 election, as the election monitor, my staff and I undertook the process of reviewing the 2017 Election Rules and found appropriate changes and modifications in response to issues that arose during the 2017 election. By letter dated July 7, 2021, I advised the Court of the proposed changes to the rules and requested the Court's approval. On July 8, 2021, the Court approved the revised 2021 Election Rules, a copy of which is attached as Exhibit A to this Report.

### 2. Nominations Process

Under the 2021 Election Rules, the Executive-Secretary Treasurer, President, and Vice President were to be elected by the entire membership by mail-in ballots organized and administered by an independent third party (the American Arbitration Association ("AAA")); ballots were to be distributed in late October 2021, with the instruction that they must be returned to AAA no later than November 18, 2021, after which date the votes would be counted by AAA. The 2021 Election Rules also provided for the election of the Warden, Conductor and three Trustees at a special meeting of the District Council delegate body (which is made up of elected representatives of the nine local unions comprising the District Council) to be held on November 18, 2021.

In accordance with the 2021 Election Rules, the District Council distributed a letter from my office on July 13, 2021, notifying the membership of the nomination process. The Election Rules required 250 signatures to nominate any individual candidate and 500 signatures to nominate any "slate" of two or more candidates, although all nominees remained subject to other eligibility requirements in the Election Rules and my review of their qualifications to serve. As of the August 20, 2021 deadline, we received nomination packages for two candidate "slates," each comprised of two or more officer nominees, and one independent nominee for Executive-Secretary Treasurer, each of which submitted the required number of signatures. My office then conducted interviews of each nominee to investigate his (or her, though unfortunately, there were no female candidates seeking election this year) eligibility and qualifications for office. I ultimately approved the following nominees to run for election:

- Solidarity Slate – Joseph Geiger (EST); Paul Capurso (President); David Caraballoso (Vice President); Shawn Campbell (Warden); Denis Pupovic (Conductor); John Sheehy, Jeremy Milin, Phil Fiorentino (Trustees).
- New Accountability Slate – Patrick Crean (EST); Mike Power (Vice President); Andrew Hallas (Warden); Herman Warren (Conductor); Janusz Majewski, Doug O'Grady (Trustees).

While my office disallowed two nominees from running in the election, none of these candidates was disallowed because of perceived corruption or any belief that the nominee may be subject to corrupt influences in the future. Rather, they were not permitted to run because of other disqualifying factors under the By-Laws, the Election Rules, or the UBC Constitution.

**3. The Campaign**

Following the establishment of the approved candidates and slates, the respective candidates began to campaign. Part of the campaign included the submission of financial reports from each candidate/slate which included an accounting of expenses and donations. Multiple financial disclosures were submitted to my team on other dates as set and required by the 2021

Election Rules. Generally, these financial disclosures included expenses from the slates regarding the money they were spending on printing and similar costs incurred to create campaign materials or otherwise advertise the candidates' messages to Union members.

**4. Complaints and Related IM Investigations**

Not long after the campaign began, the IM team began to receive complaints from various sources that Election Rules were being violated. The nature of these complaints most often related to access to worksites, District Council employees campaigning during business hours, conduct of candidates or their supporters at Local Union meetings, and the propriety of different campaign methods. In each instance, the IM team reviewed the complaints, interviewed relevant parties where appropriate, conducted additional independent investigations if needed, and reached a conclusion as to the alleged violation and, to the extent there was any colorable violation or concern, appropriate action was taken.

**5. Formal Election Rule Protests**

My office received formal protests related to the 2021 Officer Election. The first concern raised was by a District Council member who took issue with the election schedule. Specifically, the member alleged that the scheduled date of the election of the Warden, Conductor, and three Trustees—one day before the tabulation of the mail-in ballots for the Officer election—was unfair because the New Accountability Slate would be disadvantaged if the membership voted before knowing who prevailed in the Officer election. While this concern was not a protest of the election itself, but rather of the election schedule, I still considered the member's objection to the schedule and issued a decision accordingly. Specifically, I found that it was not unfair – but rather, intended – for the delegate body to decide whom to vote for without piecemeal knowledge of who won certain offices. I also found that there was no basis to presume that the schedule favored one slate over the other, or would have had an impact on which way the membership would vote. Finally,

I noted in my ruling that the rules themselves had been subject to public scrutiny, with ample time for the membership to offer comment prior to them being submitted and approved by the Court.

The second protest related to allegations of unruly behavior by certain participants at a Local Union's regular monthly meetings on September 16, 2021, and October 21, 2021, and the failure of the Local Union President to properly control those meetings. My office also received reports that certain nominated candidates for District Council officer positions were not allowed to attend the entire September 16, 2021 meeting in person, allegedly due to certain COVID safety protocols that limited the number of individuals permitted in the room. After speaking to members who attended these meetings in person and by Zoom, as well as reviewing audio recordings of the meetings, I determined that there were instances in which members of the audience interrupted the nominated candidates by yelling out questions or making loud, disruptive comments during the time that nominated candidates were addressing members – prohibited behavior under the Election Rules. After coming to these conclusions, I issued a warning letter to the President of the Local Union advising him that under the 2021 Final Election Rules (Section 3(4)(A)), he was required to maintain order during the regular monthly meetings in which nominated candidates addressed members. Further, I advised that a nominated candidate and up to four (4) designated supporters must be permitted prompt entry into the meeting and may attend the entire meeting and listen to the address of any other candidates who speak (Section 3(4)(A)). Finally, I advised that if these requirements were not followed, there could be disciplinary action taken. I also issued warnings to the President of the District Council and a Council Representative of the District Council, who were both present at the September 16, 2021 meeting and involved in the prohibited conduct.

The third protest my office received related to the mailing of the special election edition of *The Carpenter* magazine (the "Magazine"), which, pursuant to the Section Three (6)(A) of the Election Rules, was required to be posted and mailed to all members of local unions within the

jurisdiction of the District Council no later than Wednesday, October 27, 2021. Specifically, on November 5, 2021, a member claimed that he had not yet received the Magazine in the mail and that he had spoken to one or more members who likewise had not received the Magazine by mail. The member further stated that he was aware of Union members who had a received their ballots for the election, some of whom had already sent the ballots back to the election vendor for counting, and that some members may have voted and mailed back ballots before receiving the Magazine. The member alleged that, as a result, the process for mailing the special election edition of the Magazine had failed and that the Solidarity Slate should be held accountable because it was the member's belief that the Slate had control over the publishing of the Magazine.

After reviewing the United States Postal Service Postage Statement for the Magazine mailing, my team confirmed that the Magazine was mailed to members on October 27, 2021, as required. The Magazine was also posted to the District Council website on October 27, 2021. Therefore, it was my determination that there was no violation of the Election Rules. While it was not clear why some members did not receive the Magazine prior to receiving an election ballot, based on my investigation, the apparent delay was caused by the United States Postal Service and not as a result of misconduct by any nominated candidate or by the District Council. It is also important to note that there were two mailings required under the Rules – the first set of campaign literature was mailed to all members and published on the District Council website on October 8, 2021. Therefore, even if some members did not receive the Magazine prior to receiving an election ballot, they should have received the first set of campaign literature in advance of voting, which provided the same material information. Further, the Magazine contained campaign literature for all nominated candidates and both slates and, therefore, any delay caused by the United States Postal Service would not have unfairly disadvantaged one side or the other. Finally, even though I determined that there was no violation of the Election Rules in this instance, the

issues raised regarding timing of the Magazine mailing will be considered when finalizing election rules in the future.

The Solidarity Slate also raised a number of concerns about the conduct of the New Accountability Slate candidates and supporters during the election. As the Solidarity Slate won the election—and by a significant margin—we do not consider these protests, but when they were raised, we promptly investigated them to the best of our ability. One issue raised by the Solidarity Slate was that the New Accountability Slate candidates and supporters campaigned at worksites, where outside access was limited or not permitted. The Election Rules make clear that, in such situations, notice to my office is required in advance of such campaign activity, and we never received any such notice from the New Accountability Slate about any of their campaign locations. The Solidarity Slate also complained that a New Accountability Slate supporter used members' email addresses for campaign purposes without authorization and that the New Accountability Slate's financial disclosure forms were not in order. My team investigated all these complaints and took corrective action to the extent warranted, but because the Solidarity Slate won (and by such a significant margin), I do not believe we need to formally consider these as "protests."

All of the election complaints and protests as described above were resolved under the Election Rules and I believe no further actions are warranted.

**6. Election Results**

On November 19, 2021, representatives from the slates and many of the candidates themselves, along with representatives from the IM team, attended the official counting of the ballots at AAA headquarters. Members of the IM team were present for the entire process, and I personally was present for the final tally of the votes. Secrecy of the ballots was maintained at all times and any contested ballots were reviewed and adjudicated by my team. Representatives from both slates remained respectful and professional throughout the process. After several hours of

counting the ballots, the results were tabulated and the Solidarity Slate was declared victorious. The specific results – which were certified by the AAA and subsequently by the IM – are attached hereto as Exhibit B.

**B. Criminal Prosecution in SDNY**

As described in our Seventh Interim Report, the Office of Inspector General ("OIG") investigated allegations of a scheme involving the sale of union memberships by officials of affiliated Local Union 926. In January 2019, my office referred a matter to the OIG specifically regarding alleged inappropriate conduct on the part of Salvatore Tagliaferro, President of affiliated Local Union 926, Delegate to the District Council, and District Council Business Representative, and John DeFalco, Vice President of affiliated Local Union 157. That specific referral and the OIG investigation led to a criminal investigation conducted by law enforcement and, on June 27, 2019, a federal criminal indictment (the "Indictment") was unsealed in the Southern District of New York alleging that, from in or about 2017 through June 2019, Mr. Tagliaferro and Mr. DeFalco conspired to sell admission into Local Union 926 in exchange for cash bribes. Mr. DeFalco was also charged with obstruction of justice and witness tampering.

Specifically, the Indictment charged Mr. Tagliaferro and Mr. DeFalco with three counts: Count One: conspiracy to commit offenses against the United States, including embezzlement of union assets and honest services wire fraud, in violation of 18 U.S.C. § 371; Count 2: conversion of union assets, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2; and Count 3: honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 2.

On June 28, 2019, the day after the Indictment was unsealed, I issued notices to both Mr. Tagliaferro and Mr. DeFalco informing them that, pursuant to Paragraph 5.b.ii of the Stipulation and Order, the matter would be submitted to the District Council Executive Committee, and that I would be recommending their immediate removal from office and, for Mr. Tagliaferro, removal

from employment. Through their respective counsel, I subsequently received notices of resignation from both Mr. Tagliaferro and Mr. DeFalco.

After the commencement of the prosecution against Mr. Tagliaferro and Mr. DeFalco, Mr. DeFalco entered into a cooperation agreement with the Government and entered a guilty plea to his criminal conduct. Mr. Tagliaferro proceeded to a jury trial which commenced on April 20, 2021. At that trial, the Government called as its initial witness the District Council's Director of Operations, who testified about the interrelated structure of the District Council, its affiliated Local Unions, and its parent international Union. The Director of Operations also authenticated and explained to the jury various District Council membership documents and summaries received into evidence. Mr. DeFalco also testified for the Government against Mr. Tagliaferro. In addition, the Government called me in my capacity as the IM, and I testified about a meeting my office had with Mr. Tagliaferro at his request during the investigation.

On April 26, 2021, the parties provided their closing arguments and the jury was charged and, on April 28, 2021, the jury returned a guilty verdict against Mr. Tagliaferro on all three counts in the Indictment. On September 8, 2021, Mr. Tagliaferro was sentenced to 60 months in prison on all counts to run concurrently, two years supervised release, restitution totaling $145,065.33 to the Union, including the District Council and Local Union 926, criminal forfeiture of $296,400, and a $300 special assessment. His appeal to the U.S. Court of Appeals for the Second Circuit currently is pending and he is scheduled to surrender to the U.S. Marshals Service in January 2022. I note here that the District Council's leadership cooperated fully with the federal grand jury and the SDNY prosecutors from the initial investigation through Mr. Tagliaferro's sentencing.

While it is clear that corruption can still infect the Union, even among its elected and trusted officials, it is more significant that the Union itself, through its OIG, uncovered, investigated, and with the guidance and assistance of my office, ultimately referred this criminal conduct to the

Government for prosecution. It remains ever important that the Union be vigilant against corruption in all its forms and, as discussed below, the OIG has and will take on a continued role in enforcing that prime directive. This is a good example how the OIG, working in connection with the IM, was able to identify and halt corrupt actors successfully, as well as partner with law enforcement.

### C. Appointment of the Independent Hearing Officer and Related Anti-Corruption Procedures

A key part of the anti-corruption efforts of the District Council relate to the creation of the new position – the Independent Hearing Officer. On February 1, 2021, in the Supplemental Stipulation and Order in this matter, the Court established a process by which the IM or the OIG could bring charges against any member of the District Council for being a member of or knowingly associating with any member or associate of organized crime groups. The position of Independent Hearing Officer was established to preside over these charges and independently adjudicate any claims brought against members. As part of the February 1, 2021 Supplemental Stipulation and Order, the Court appointed former federal prosecutor Sharon L. McCarthy, Esq., of the firm of Kostelanetz & Fink to serve in this role. While the IM and OIG have not yet brought charges against members before Hearing Officer McCarthy, I expect this process to begin in the early part of 2022.

In addition, the Supplemental Stipulation and Order provides for new features to address issues that arose with the Tagliaferro and DeFalco criminal scheme. As discussed below, the EST, in conjunction with the District Council's Chief Compliance Officer, attorney and former prosecutor Josh Leicht will review all applications for new membership in and transfers to and from the District Council's affiliated Local Unions as well as qualifications, eligibility, and anti-corruption declarations for members who want to run for Local Union office.

**D. Civil Litigation**

Previously, we have summarized ongoing litigation involving the District Council in federal and state court, as well as before the Public Employment Relations Board, the Equal Employment Opportunity Commission ("EEOC"), the National Labor Relations Board, and the New York City Department of Consumer Affairs. Because these matters mostly are pending, to the extent I have developed any views, I will not offer comment on the merits unless as necessary and appropriate or requested by the Court. With that said, where litigations involve conduct which was investigated by the IM team or the OIG, such as jobsite referrals by business representatives, and these investigations have already been reported to the Court or involved in public filings, I am obligated to update Your Honor, either below, or under seal where appropriate. I present the procedural facts below and, unless indicated explicitly, these reports are not intended to reflect my personal view of the merits of any of these cases.

The following cases were recently and successfully resolved or are pending:

**1. Federal Court Actions**

***Jeffrey Souza Nunes v. United Brotherhood of Carpenters and Joiners of America, et al*****., 20-cv-1092 (ALC) (S.D.N.Y.).** Plaintiff Jeffrey Souza Nunes, who had been an apprentice carpenter, filed suit on February 7, 2020, against the District Council, the UBC, and Local 157 (collectively, the "Union Defendants"), and numerous construction industry contractor employers (collectively, the "Defendant Employers"). Mr. Nunes alleged that disciplinary charges were issued against him after he attempted to organize a wildcat strike in opposition to a collective bargaining agreement that had been negotiated between the District Council and the Wall & Ceiling Association (the "CBA"). He also alleged that he was blacklisted from jobs. Mr. Nunes alleged violations of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), and he brought a hybrid duty of fair representation ("DFR")-Section 301 Labor Management

Relations Act claim. On May 5, 2020, Mr. Nunes filed an Amended Complaint. Among other things, the Amended Complaint added claims relating to Mr. Nunes's union disciplinary trial; dropped Local 157 as a party; added Joseph Geiger in his official capacity as EST of the District Council as a party defendant; and added a request for a preliminary injunction enjoining the CBA. The Defendants filed motions to dismiss the Amended Complaint in its entirety. By Memorandum and Order dated March 29, 2021, the Court adopted Magistrate Judge Stewart D. Aaron's Report and Recommendation granting all Defendants' motions to dismiss and denied Mr. Nunes leave to further amend his pleading. Mr. Nunes did not appeal the dismissal, and the case is now concluded.

***Peter V. Corrigan v. United Brotherhood of Carpenters and Joiners of America, et al.*, 20-cv-1336 (VM) (S.D.N.Y.).** Plaintiff Peter Corrigan, a former Council Representative (i.e., business agent) employed by the District Council, filed suit on February 14, 2020, against the District Council, the United Brotherhood of Carpenters, and District Council Local 212. Mr. Corrigan challenges his termination in May 2018 for referring apprentices to job sites in violation of the District Council Bylaws and the Consent Decree. The case was filed as a related case to *United States v. District Council*, 90-cv-5722 (VM) (S.D.N.Y.), and was assigned to Your Honor. Pursuant to Your Honor's rules, by letter dated March 18, 2020, the District Council's attorneys sent a letter to Mr. Corrigan's attorneys, copying the Court, advising of the District Council's intention to move to dismiss the Complaint, and setting forth the bases for the anticipated motion. On March 27, 2020, Corrigan's attorney sent a letter to the Court in which he indicated that he would be amending the Complaint, and that he would likely drop the state law claims. On August 12, 2021, Mr. Corrigan filed an Amended Complaint against the District Council only. Mr. Corrigan alleges that he was terminated in retaliation for exercising his freedom of speech rights in violation of the LMRDA. Pursuant to Your Honor's rules, the District Council's attorneys sent a letter to Mr. Corrigan's attorney, copying the Court, setting forth the bases for an anticipated

motion to dismiss the Amended Complaint. Mr. Corrigan's attorney sent a letter in response. Following the exchange of letters between the parties, on September 2, 2021, the District Council's attorneys wrote to Your Honor to request a pre-motion conference. That request is currently pending before Your Honor.

***Peter Marsalisi v. United Brotherhood of Carpenters and Joiners of America, et al.*, 20-cv-1806 (VM) (S.D.N.Y.).** On February 28, 2020, former OIG investigator Peter Marsalisi filed suit in federal court alleging that his termination from the OIG violated the LMRDA.[1]

Marsalisi filed his federal case as a related case to *United States v. District Council*, 90-cv-5722. Pursuant to Your Honor's rules, on March 26, 2020, the District Council's attorneys sent a letter to Mr. Marsalisi's attorney, copying the Court, advising of the District Council's intention to move to dismiss the Complaint, and setting forth the bases for the anticipated motion. On April 1, 2020, Mr. Marsalisi's attorney sent a letter to the District Council's attorneys, copying the Court, in which he indicated that he would be amending the Complaint. By Order dated October 5, 2021, Your Honor ordered Mr. Marsalisi to inform the Court within thirty days of the status of the matter and his contemplation of any further proceedings. On November 4, 2021, Mr. Marsalisi filed an Amended Complaint in which he alleged that he was terminated in violation of the LMRDA and New York Labor Law Section 215. Pursuant to Your Honor's rules, the District Council's attorneys sent a letter to Mr. Marsalisi's attorney, copying the Court, advising of the District Council's intention to move to dismiss the Amended Complaint, and setting forth the bases for the anticipated motion. Mr. Marsalisi's attorney did not respond to that letter within the timeframe provided under Your Honor's rules. On November 29, 2021, the District Council's attorneys sent

[1] Earlier Mr. Marsalisi also challenged his termination in New York State Supreme Court, New York County, under state law, Index No. 159707/2019 (N.Y. Sup. Ct., N.Y. Cty.). On November 3, 2021, the parties filed a stipulation of discontinuance without prejudice in the state court action.

a letter to the Court requesting a pre-motion conference. On December 1, 2021, Mr. Marsalisi's attorney filed a responsive letter.

***Edward Saunders v. New York Convention Center Operating Corporation, d/b/a Jacob K. Javits Convention Center, and the New York City District Council of Carpenters*, 20-cv-5805 (GWT) (S.D.N.Y.).** On July 27, 2020, Plaintiff Edward Saunders filed suit in federal court alleging that he was discriminated against by the District Council in violation of 42 U.S.C. § 1981, and that he was discriminated against by his former employer, the Jacob K. Javits Convention Center ("Javits") in violation of 42 U.S.C. § 1983. On April 11, 2018, following an altercation with another employee, Mr. Saunders—who at the time was a District Council member—was terminated by Javits. Mr. Saunders alleges that he was "terminated on the basis of his race or color, and in retaliation for his prior complaints about discriminatory disparate treatment and harassment." He further alleges that the District Council violated Section 1981 "by allowing or encouraging the Javits Center to terminate Plaintiff's employment." On October 27, 2020, the District Council and Javits filed Motions to Dismiss the Complaint. On November 17, 2020, in response to the District Council's and Javits's motions to dismiss, Mr. Saunders filed an Amended Complaint. On January 25, 2021, the District Council and Javits filed Motions to Dismiss the Amended Complaint. By Memorandum Opinion and Order dated September 23, 2021, the Court granted the District Council's Motion to Dismiss in its entirety, and granted Mr. Saunders leave to replead the dismissed claims against both Defendants. On October 21, 2021, Mr. Saunders filed a Second Amended Complaint. Pursuant to the Court's rules, on November 4, 2021, the District Council requested a pre-motion conference in anticipation of filing a motion to dismiss the Second Amended Complaint. The Court granted the request and, following a pre-motion conference, issued a scheduling Order for the District Council's Motion to Dismiss the Second Amended Complaint. Under the Court's scheduling Order, the District Council filed its Motions to Dismiss

on December 17, 2021. Mr. Saunders filed his opposition on December 23, 2021, and the District Council's reply is due on January 6, 2022. The Court also stayed discovery pending resolution of the Motions to Dismiss.

***Patrick Brendan Spillane, et al. v. New York City District Council of Carpenters and Joiners of America, et al.*, 21-cv-8016 (AT) (S.D.N.Y.).** On September 27, 2021, Patrick Spillane ("Spillane"), a retired member of the District Council, and his wife, Debra Spillane, filed suit in federal court against the District Council and its Director of Area Standards, Eddie McWilliams ("McWilliams") (collectively, the "Union Defendants") and the New York City District Council of Carpenters Annuity, Pension, and Welfare Funds (the "Funds"), as well as Joseph A. Geiger, as a Trustee of the Pension and Welfare Funds (collectively, the "Funds Defendants"). Mr. Spillane and Ms. Spillane alleged a prima facie tort claim against the Union Defendants relating to Mr. Spillane's expulsion from the Union. In accordance with the Court's rules, on November 11, 2021, the Union Defendants and the Funds Defendants sent letters to Mr. Spillane's and Ms. Spillane's attorney regarding filing motions to dismiss the Complaint. In response, on December 10, 2021, Mr. Spillane and Ms. Spillane filed an Amended Complaint. The Amended Complaint continues to allege a State law prima facie tort claim, and, as against the Union Defendants, it adds a claim under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 411(a), 412, and 529. The prima facie tort claim alleges that McWilliams instigated an OIG investigation of Patrick Spillane as part of an alleged "desire to destroy" the business of a non-Union contractor called Anfield. The LMRDA claim alleges that Patrick Spillane "was unfairly disciplined [by the Union] for violations that he did not commit, i.e., being falsely accused and falsely found guilty of being a carpenter foreman on Anfield jobs." In accordance with the Court's rules, on December 21, 2021, the Union Defendants sent a letter to Mr. Spillane's and Ms. Spillane's attorney regarding filing a motion to dismiss the Amended Complaint. On December 28, 2021, the Court

entered a Civil Case Management Plan and Scheduling Order. On December 30, 2021, the Union Defendants filed a pre-motion letter regarding a motion to dismiss, as required under the Court's rules.

**2. State Court Actions**

***State of New York and City of New York ex re. Brian Aryai v. Skanska, et al.*, Index No. 108471/2009 (N.Y. Sup. Ct., N.Y. City).** On September 5, 2018, Relator Brian Aryai filed an amended qui tam complaint in New York State court against numerous major construction industry contractors and unions, including "New York City District Council of Carpenters Local 1536." (Local 1536 was dissolved as a local union of the District Council in or around 2011 when its members were merged into another newly chartered local union affiliated with the District Council.) The Amended Complaint sought damages on behalf of the State of New York and City of New York pursuant to the qui tam provisions of the New York State Finance Law (the False Claims Act) and the New York City Administrative Code. On October 11, 2019, all Defendants filed motions to dismiss the action in State court, which were fully submitted by December 9, 2019. By Decision and Order dated June 30, 2021, the Court dismissed the Amended Complaint in its entirety as against all Defendants. The District Council served a Notice of Entry of the Order on July 1, 2021. Relator did not file a notice of appeal, and the case has ended.

***Michael Donnelly v. The New York City and Vicinity District Council of the United Brotherhood of Carpenters and Joiners of America, et al.*, Index No. 152197/2019 (N.Y. Sup. Ct., N.Y. Cty.).** Michael Donnelly, a former employee of the District Council, brought several causes of action against the District Council, EST Joseph Geiger, and former President Stephen McInnis, (collectively, the "District Council Defendants") and various contractors and their principals relating to his termination as a Council Representative for the District Council. Mr. Donnelly's Amended Complaint asserted violations of N.Y. Labor §§ 215, 201-d, and alleged

misrepresentation/deceit/fraud and tortious interference with economic and/or contractual right to economic advantage. (The tortious interference cause of action was not asserted against the District Council). On January 16, 2020, the Court granted the District Council Defendants' motion to dismiss the Amended Complaint in its entirety as against them. On February 11, 2020, Mr. Donnelly filed a notice of appeal. He did not perfect his appeal. On November 12, 2020, Mr. Donnelly filed a motion for leave to a file a Second Amended Complaint before the trial Court to bring a retaliation claim under the New York City Human Rights Law. The Court granted that motion by Decision and Order dated April 20, 2021. On May 12, 2021, the District Council Defendants filed a motion to dismiss the Second Amended Complaint. By Decision and Order dated October 1, 2021, the Court denied the motion to dismiss as to the District Council and Stephen McInnis and granted the motion as to EST Geiger. On November 10, 2021, the Court so-ordered a preliminary conference order in the matter that provides for all disclosures and discovery to be completed by May 26, 2022, and dispositive motions to be made by July 2022.

### 3. Administrative Agency Proceedings

***Jennifer Casey v. The New York City District Council of Carpenters, New York State Division of Human Rights Case* No. 10213319, EEOC Case No. 16GC102684.** On September 15, 2021, Jennifer Casey, a former employee of the NYCDCC Benefit Funds, filed a charge with the New York State Division of Human Rights ("NYSDHR") and the U.S. Equal Employment Opportunity Commission alleging that the District Council discriminated against her on the basis of disability and retaliated against her for engaging in protected activity. On September 20, 2021, the District Council filed a response explaining why the District Council is not a proper respondent because it never employed the complainant, and requesting dismissal of the case with prejudice as to the District Council. Ms. Casey amended the Complaint to remove the District Council.

***Stevenson Nurse v. New York City District Council of Carpenters, National Labor Relations Board Charge* No. 02-CB272373.** On April 6, 2021, the District Council was served with a charge filed by District Council member Stevenson Nurse alleging violations of Sections 8(b)(1)A and 8(b)(2) of the National Labor Relations Act. Specifically, Mr. Nurse alleged that the District Council refused to refer him for work for failing to pay internal union fines. On May 5, 2021, the NLRB dismissed the charge after receiving the District Council's position statement and supplemental information.

## E. Progress on Goals

### 1. Office of the Inspector General

As reported in our Seventh Interim Report, Inspector General David Pié left the Union in June 2020 to take a position closer to his home. Over the following five months, the District Council conducted a thorough search for a new Inspector General. After conducting intensive interviews of several candidates and a second round of interviews of three candidates, the District Council selected Richard Green, former Police Executive and Inspector with thirty years of service with the New York City Police Department, to take over the position. Mr. Green took over the role of Inspector General of the District Council in November 2020.

Over the last year, Mr. Green has worked tirelessly to establish new practices and protocols and to improve the investigative function of the OIG. While my office has continued to work closely with the OIG—and as we have continued to channel all complaints with any base level of support directly to the OIG— it has become clear that the OIG, under Mr. Green's leadership, is capable of receiving and investigating all member complaints currently made to the IM's team. Accordingly, it is my view that the OIG is operating competently and effectively and no longer requires the same extensive oversight that it has in the past. This is a critical ingredient for reducing the role of the Monitor in policing the Consent Decree.

With respect to the improvements made during Mr. Green's tenure—which, I will note, has taken place entirely during a global pandemic— the OIG has instituted several new programs aimed at strengthening and streamlining its investigative function. Just by way of a sample of these efforts, the OIG now conducts regular periodic case reviews during which Mr. Green and his staff evaluate and assess all ongoing investigations to ensure that they are being conducted thoroughly and efficiently. Mr. Green also introduced "Self-Initiated" or "SI" complaints, which allow OIG investigators to initiate and develop investigations based on information gleaned from unaffiliated sources. Further, Mr. Green recently instituted the Holiday Integrity Program, which allows investigators to periodically visit and search the vehicles of District Council employees and Council Representatives to ensure compliance with the Code of Ethics and the Personnel Policy Manual, which bans the solicitation or acceptance of gifts, entertainment, or other things of value. Mr. Green also created and filled a new position—the Supervisory Investigator—to serve as the lead investigator in his office. Further, Mr. Green is planning on hiring an additional former NYPD investigator, which would dramatically increase the OIG's ability not only to investigate complex complaints, but handle highly sensitive and confidential internal matters.

Also over the past year, in conjunction with my office, the OIG has conducted a number of notable and successful investigations. First, as reported to the Court in my letter of November 4, 2021, the OIG conducted a lengthy investigation into allegations that multiple Union members and employees had fraternized with and potentially sponsored known barred persons at an annual charity golf event in September 2020 on Long Island. As reported in my letter to the Court, this investigation resulted in a Local Union officer/District Council employee (the "Senior Individual") retiring from the Union after Mr. Green drafted charges against him for associating with a barred person in contravention of the Consent Decree. As I also reported in my letter, while the investigation revealed that other Union officers (some currently serving and some retired) and

employees were also present at the golf outing in question, in the end the OIG and my office determined that only the Senior Individual's conduct rose to the level of a Consent Decree violation. Nonetheless, the others were given warnings to avoid any contact with barred persons going forward. In addition, and in response to this investigation, the District Council's Chief Compliance Officer imposed supplementary "barred persons" training protocols for the Council Representatives and District Council officers.

This investigation was not the only time over the past year that the OIG's efforts led to the enforcement of the Consent Decree's prohibition on associating with barred persons. Indeed, after performing a background check on an individual member running for Delegate to the District Council, the OIG found that the individual—who already held two other positions within the Union—had maintained a relationship with a barred person. Along with disqualifying this individual from running for the position of Delegate, upon the OIG's recommendation, I made the decision to remove the individual from his position as Warden of his Local Union as well as Member of the District Council's Trial Committee. In light of this investigation, it is important to note that, pursuant to the Supplemental Stipulation and Order entered on November 24, 2020, all individuals running for a Local Union office—as well as those applying for membership in or transfer to a Local Union—are now required to sign a declaration stating that they are not a member of, or affiliated with, any organized crime family or any other criminal group or barred person. They are also required to sign a "LMRDA Section 504 certification" stating that they have not been convicted of a crime that would disqualify them from holding office.

Over the past year, the OIG also conducted an internal investigation into one of its own investigators. After being made aware of allegations that an investigator (the "Investigator") employed by the OIG—who regularly brought internal Union disciplinary charges against members working in the District Council geographical jurisdiction for non-union contractors—

was himself operating a non-union construction company during his District Council work hours. Mr. Green evaluated the claim and ultimately determined that his office could and would perform an internal investigation into the matter. The investigation was conducted by the OIG's newly-hired Supervisory Investigator, who had no prior knowledge of the circumstances or connection to the Investigator.

As a result of the investigation, and in consultation with the District Council's Chief Compliance Officer, the OIG found that the Investigator did not violate the District Council's Personnel Policy or Code of Ethics. My understanding of the facts is that the Investigator had hired non-Union carpenters to perform work on a residential property owned by the Investigator in his town of residence far upstate from New York City, outside the District Council's carpentry geographical jurisdiction. Further, my understanding is that the Investigator's project—unlike those run by non-Union contractors performing work in New York City and employing members against whom the Investigator had brought disciplinary charges—was not a project that was bid and developed for others. Rather, the Investigator's intention was to maintain and manage the property himself. Accordingly, the OIG found that this project did not pose a conflict with his role as Investigator for the District Council, and further, that the Investigator did not use District Council resources or time to perform any of the work on his personal upstate project. Based on the information before us, we have determined even as sensitive a matter as this—involving a member of the OIG itself—was handled objectively and properly. Notwithstanding this fact, I am concerned that there is a slippery slope created here and there must be vigilance going forward to avoid crossing a line, particularly for members of the OIG.

I have chosen to highlight these investigations in this report because they are excellent examples of the OIG working to investigate and successfully resolve serious allegations relating to violations of the Consent Decree and other issues, including those relating to District Council

officers, while maintaining the ability to operate independently and effectively. In light of the progress the OIG has made, in particular under the supervision of Mr. Green, my office has continued to share all of our investigative work with the OIG, and the OIG has continued to demonstrate the ability to efficiently and effectively police the District Council. It is therefore my recommendation that the OIG continue to serve as the primary recipient of member concerns and complaints, which will permit my team to play a less active role, engaging on such investigations only when called-upon.

**2. Business Representative Center Compliance Review**

As reported in my Seventh Interim Report, my team has resumed its comprehensive review of the Business Representative Center in order to evaluate the effectiveness of its compliance controls, and to recommend any necessary changes. *See* Seventh Interim Report of the Independent Monitor at 21-22.

As described in the prior report, our initial efforts included a presentation by leadership personnel on the Council Representative Center's operations, procedures, and personnel; subsequent interviews with Council Representative Center leadership personnel regarding their operations and available resources; review of operational documentation provided by the Business Representative Center leadership personnel; and interviews of Council Representatives. After ramping up our efforts over the past year, my team conducted a more in-depth review of the Center's documentation and of its Council Representative Manual (the "Manual"), a document designed to provide guidance to Council Representatives and Managers of the Council Representative Center, who are charged with (1) representing the District Council and its members; (2) enforcing CBAs; (3) resolving issues that arise on jobsites and with members; (4) identifying employment opportunities for the membership; and (5) filing grievances against signatory contractors and pursuing disciplinary action against members when necessary. Among

other revisions, the draft Manual now more comprehensively discusses the District Council's prohibition on direct job referrals, and specifically defines what it means to make such a referral. As the Court is aware, in my last Interim Report, I detailed multiple investigations conducted by my office and the OIG into allegations that various Council Representatives (i.e., business representatives) had directly referred members to jobsites for employment, contrary to Section 38 of the District Counsel Bylaws and to the Job Referral Rule system (the "OWL") established in Section 5 of the Consent Decree. *See* Seventh Interim Report of the Independent Monitor at 22-26. I am heartened to see that the District Council has taken this issue seriously and has updated its guidance accordingly.

The District Council leadership, Council Representative Center, and the Chief Compliance Officer have demonstrated an ongoing commitment to find better ways to balance the mandate of the Consent Decree with the practical need to get work opportunities for all brothers and sisters of the District Council.

### 3. Grievances Department

The current count of unresolved grievances is 430, including grievances that have been settled and are awaiting payment. Since the time of the Seventh Interim Report in June 2020—a year and a half ago—only 264 new grievances were opened. I continue to view these developments positively and expect that the District Council will remain focused on continuing to resolve the grievance backlog, which has been significantly improved from where it was when I was appointed in 2015, when there were 5,500 pending grievances.

## III. THE OFFICE OF THE INDEPENDENT MONITOR

In my First Interim Report filed with the Court on July 1, 2015, I stated that my top priority was to make sure that the District Council and the Benefit Funds were ready and able to prosper within a compliance-first environment without the daily scrutiny of a Court-appointed monitor.

Since that time, my primary goals have been to maintain the compliance structures implemented by my predecessor throughout the District Council and Benefit Funds; to assess what changes or new methodologies should be implemented to foster continued improvement within a culture of compliance; and to ensure that the Union remains free and clear of the influences of organized crime and corruption. To that end—while limited oversight may still be necessary—I believe the implementation over the past decade of reforms identified by my team and my predecessor, including the development of robust internal controls and permanent compliance mechanisms, have allowed the District Council to grow into the Union it is today: an organization far more capable of self-governance, with the proper structures in place to guard against corruption as required by the Consent Decree. Accordingly, as of the filing of this Eighth Interim Report on December 31, 2021, it is my position that as the term of the monitorship is renewed, the parties should discuss and agree upon whether a different form of monitorship is sufficient. While I believe it would be useful for my team to maintain some level of oversight and authority over the District Council, my vision for this next phase of the Independent Monitor's role is that the office will function more as a resource when called upon rather than a watchdog engaged in the daily workings of the Union.

### A. Progress Since My Appointment

Since the time of my appointment as Independent Monitor in January 2015, I have overseen the continued transformation of the District Council in the following important and concrete ways, including, among others:

- **Audit Committee Improvements**: In 2015, the District Council's Audit Committee received recommendations from its independent accounting firm, Calibre CPA Group PLLC, following a review it conducted of the District Council's redesigned membership assessment system. The District Council took various steps to satisfy these recommendations, including the generation of monthly reports to the Director of Operations outlining changes in the responsible payors, allowing tracking of the individuals

responsible for reviewing financial information and depositing bank payments, and establishing group security privileges to control user access within the accounting department and procedures for modifying these privileges in the future as necessary (e.g., when employees leave the District Council or their responsibilities change).

- **Benefit Funds:** By 2017, the Benefit Funds demonstrated their abilities to self-govern, including through the hiring of a new Executive Director, Chief Financial Officer, and Chief Compliance Officer. Accordingly, the powers of the Independent Monitor with respect to the Funds was modified. Though I have remained an available resource to the Trustees and Executive leadership over the years, the Funds have operated successfully without my direct oversight.

- **Revised Bylaws:** In 2017, after the leadership of the District Council two years earlier convened a Bylaws Working Group to undertake the task of reviewing the Bylaws to identify necessary amendments, the District Council revised its Bylaws in order to position itself for post-monitor governance. Among other things, the Bylaws establish positions and functions that are essential to the organization's operations and overall compliance environment (i.e., a Chief Accountant, an Audit Committee, an HR Director, a Director of Operations, an Inspector General, and a Chief Compliance Officer). Each position/group has developed written policies and procedures outlining their respective responsibilities, which had contributed to the development and maintenance of the District Council's healthy compliance environment.

- **IT Upgrade:** In 2018, the District Council completed a comprehensive upgrade of its information technology ("IT") infrastructure in order to enhance its oversight and compliance mechanisms. The development of a new IT system, including the integration of new compliance controls throughout the organization, has allowed the District Council to serve its membership in a more efficient, compliant, and transparent way. And the transition of all of the District Council's activities to a single platform has served as an additional safeguard against corrupt influences.

- **Implemented Revised OWL Rules:** In 2018, with recommendations from my office, the District Council finalized and implemented a revised set of Out-of-Work List ("OWL") Rules. Through this effort, the District Council created a streamlined document setting forth the rules in a clear manner to the intended audience that reflects the District Council's updated IT infrastructure and the present environment of full mobility. The District Council, with the review of my office and the Government, has continued to update the skills, certifications, and referral procedures of the OWL to meet the evolving needs of the of the Union's signatory building and construction contractors.

- **Revised Policies and Procedures:** Through 2021, the District Council's Chief Compliance Officer led the effort to revise many of the District Council's policies and manuals—a crucial aspect of the establishment of permanent compliance protocols. For example, the District Council's Code of Ethics, which establishes the essential behavioral expectations required of all District Council officers, employees, and agents, has been updated several times since its adoption in 2012, most recently in April 2021, to ensure it remains relevant. Other mainstay policies and procedures developed and regularly updated include, but are not limited to:
  - The Accounting and Financial Procedures Manual;
  - The Personnel Policy Manual;
  - Investigative Guidelines for the Inspector General's Office;
  - Trial Committee Procedures;
  - Policy & Procedure for Monthly Trustee Audits;
  - Policy and Procedure to become a New York City & Vicinity District Council Certified Shop Steward;
  - Shop Steward Code of Ethics;
  - Shop Steward Disciplinary Review Procedure; and
  - Grievance Committee Procedure.

- **Improvement of the OIG:** Through 2021, and as discussed above, the OIG has made significant and important improvements, including increasing efficiency by streamlining reporting systems, delegating grievances to the Business Representative Center, overseeing the memberships hotline, and independently handling investigative matters.

- **Establishment of the Independent Hearing Officer:** While neither the IM or OIG has yet initiated proceeding to remove a member because of association with organized crime organization under the rubric of this new system, an experienced Independent Hearing Officer is in place to adjudicate those matters going forward.

In addition to the above improvements, the District Council has developed and maintained a robust and effective compliance program, helmed by its Chief Compliance Officer Josh Leicht. As an initial matter, Mr. Leicht has regular and open access to the District Council's Executive Leadership as well as to all District Council managers and staff, Local Union representatives on the District Council Executive Committee, and Local Union Officers. He attends regular meetings (both formal and informal) with the District Council Leadership and staff to discuss compliance needs and the impact of new initiatives and other issues affecting operations. Mr. Leicht also provides the Executive Committee and Delegate Body with quarterly reports on compliance

activities and attends their monthly meetings. District Council representatives and employees are encouraged to and frequently do contact Mr. Leicht (as well as the Inspector General) with concerns or questions involving compliance.

The District Council's Compliance Committee, guided by a Compliance Committee Charter, also ensures that Officers, Directors, and Senior Managers of the District Council are actively engaged in and remain aware of the operation and function of the District Council compliance program. The Compliance Committee meets twice a year and is comprised of District Council employees and referenced professionals holding the following positions:

- Executive Secretary-Treasurer
- Inspector General
- Director of Operations
- Director of Area Standards
- Supervisor of the Out of Work List
- Council Representative Center Lead Managers
- Chief Accountant
- Director of Human Resources
- Chief Compliance Officer
- General Counsel

Compliance Committee meetings include discussions regarding potential, new, and changing compliance risks facing the District Council. Those discussions also focus on determining whether adequate steps have been taken to mitigate the likelihood of particular risks or to detect violations when they occur, and whether existing policies and procedures need to be expanded or revised.

The Compliance Committee and the Audit Committee also assist with evaluating and monitoring the effectiveness of the overall compliance program and with determining areas within the District Council that should be subject to auditing. Indeed, the Chief Compliance Officer and the OIG periodically audit various District Council functions (e.g., the OWL operations) to verify that policies and procedures are being followed properly. The Union's policies and procedures are also reviewed regularly to ensure that they remain relevant and effective.

Further, the District Council recently engaged an independent auditing firm to perform a review of the Accounting Department's policies, procedures, and workflows. The auditing firm submitted a draft report in November 2021, and a final report with any recommended improvements will be presented to the District Council leadership for consideration.

Additionally, the District Council maintains various avenues through which members may report concerns or seek guidance on any number of issues, including the 24/7 hotline operated by the OIG through which District Council members and personnel can anonymously report actual or suspected incidents of fraud, waste, or abuse. The District Council's Code of Ethics and Personnel Policy Manual (i.e., the employee handbook) clearly state that the District Council will not tolerate retaliatory action against those who report concerns in good faith. This "no tolerance for retaliatory actions" policy is reinforced and emphasized in all trainings given to District Council employees and Shop Stewards.

Finally, the District Council regularly communicates its policies and procedures, as well as other aspects of the compliance and ethics program, through training and other broad communications:

- **New Employee Training**: All new employees receive compliance training from the Director of Human Resources as part of their orientation. Among other materials, all new employees (permanent and temporary) receive a copy of the District Council's Code of Ethics and are required to sign

acknowledgments that they have read, understood, and agree to abide by its terms.

- **Shop Steward Training**: The CCO provides compliance and ethics training as part of the Shop Steward training program. This training covers, among other areas, the Shop Steward Code of Ethics, the District Council compliance program, and every Shop Steward's duty to report misconduct and to seek guidance regarding concerns about conduct. The training focuses on the importance of Shop Stewards as the "first line of defense," responsible for ensuring compliance with the wage and work rules under collective bargaining agreements and for identifying and reporting unethical or corrupt behavior.

- **Compliance Moment Emails**: Periodic "Compliance Moment" emails have been sent to all District Council officers and employees. The emails highlight various aspects of the District Council's Code of Ethics and are intended as a reminder regarding the compliance expectations that have been established by the District Council.

- **The District Council Website:** The District Council website (http://www.nycdistrictcouncil.com) includes a "Library" that contains copies of the District Council Bylaws, the District Council Code of Ethics, and other governing documents detailing the District Council's policies and procedures. All District Council members have access to the website "Library."

- **The Carpenters Magazine**: The Carpenters Magazine is distributed to all members and contains sections reserved for messages and/or articles from the CCO and the Inspector General. Similar to the "Compliance Moment" emails circulated to District Council staff, these opportunities are used to inform the membership of various aspects of the District Council's compliance program, and to reinforce avenues available for members to seek guidance or to report concerns.

- **Code of Ethics Refresher Training:** District Council Officers and employees receive periodic training to refresh and reinforce the expectations set forth in the District Council's Code of Ethics. The most recent training was given to Council Representatives in October 2021. The training focused on various requirements of the District Council's Code of Ethics. In light of the recent investigation into the Senior Individual's association with barred persons, described in section II(D)(1) above, the October 2021 training emphasized rules and reasoning around the Consent Decree's prohibition on associating with barred persons, and provided guidance on how Council Representatives should respond when confronted with such situations. The October 2021 refresher training also focused on the rules around direct job referrals. Council Representatives were provided with a definition of what constitutes a direct referral as well as examples of

prohibited and allowed behavior. A refresher training for the handful of Council Representatives who were unable to attend the training in October, and for remaining District Council staff, will be given in January 2022.

- **Supplemental Training*:*** Additional training is given to District Council employees as needed on an *ad hoc* basis. For example, in light of the District Council Officer election that occurred this fall, a supplementary training was given to Council Representatives in July 2021 to ensure they were aware of the rules governing allowable and prohibited campaign activities, as well the new election rules concerning campaigning at jobsites with restricted access.

**B. A Plan Forward**

I have spent seven years working with the Union and I believe the District Council has made significant progress. There have been some setbacks over the years including, but not limited to, the criminal prosecution of Union officers and the removal and/or departure of District Council officers, but I am pleased that many of the goals set forth in prior interim reports have been met. The District Council has navigated significant challenges over the years, including responding to the COVID-19 global pandemic, which for a short time all but halted the construction industry in the New York City metropolitan area. Despite these accomplishments, the Union is a political organization and there will always be unrest and dissatisfaction espoused by a vocal minority. It is always incumbent upon any union leadership to reach out to those who feel they are underrepresented, listen to them, and, if appropriate, address the concerns they raise. This is a critical aspect for the future success of any democratic Union free of corruption.

As I have noted before, the most critical element of the District Council's path to success under the Consent Decree is the development and maintenance of a strong OIG. I think we have made significant strides in this regard and I believe the current OIG is competent, independent, and effective, and this will be crucial in the months and years to come. It is because of the strength of that office that I feel comfortable engaging in a dialogue to further minimize the role of the IM in the day-to-day functions of the District Council. I am aware that the parties are requesting an

extension of my term (which technically ends today, December 31, 2021) through mid-March 2022, in order for the parties to engage in a conversation regarding the contours of a new Stipulation and Order. I have agreed to continue to serve in this capacity if the Court wishes me to do so.

## IV. CONCLUSION

Should the Court require any additional information, please contact the undersigned at Your Honor's convenience. We look forward to appearing before Your Honor in the near future to address concerns and questions of the Court.

Date: December 31, 2021
New York, New York

Respectfully submitted,

By: ______________________

GLEN G. McGORTY
LISA N. UMANS
Crowell & Moring, LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
gmcgorty@crowell.com
lumans@crowell.com

Office of the Independent Monitor,
District Council of New York City
and Vicinity of the United Brotherhood
of Carpenters and Joiners of America

CC:

| **Counsel for the Government** | **Counsel for the District Council** | |
|---|---|---|
| AUSA Benjamin Torrance<br>United States Attorney's Office<br>Southern District of New York<br>86 Chambers Street, 3rd Floor<br>New York, NY 10007 | James M. Murphy, Esq.<br>Spivak Lipton, LLP<br>1700 Broadway<br>21st Floor<br>New York, NY 10019 | Barbara Jones, Esq.<br>Bracewell LLP<br>1251 Ave. of the Americas<br>49th Floor<br>New York, NY 10020 |